**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| JANELL MCDOWELL and STEPHANIE SANDERS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **CIVIL ACTION NO. 1:06-CV-314-CSC** |
| SOUTHERN NUCLEAR OPERATING COMPANY, INC., | ) ) ) ) | |
| Defendant. | ) | |

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant Southern Nuclear Operating Company ("Southern Nuclear") respectfully files the following Brief in support of its contemporaneously filed Motion for Summary Judgment. Southern Nuclear seeks summary judgment as to all of Plaintiffs' claims related to their discipline and the termination of their employment from Southern Nuclear's Joseph M. Farley Nuclear Plant ("Plant Farley").

**INTRODUCTION**

The Eleventh Circuit has long held that "not everything that makes an employee unhappy is an actionable adverse employment action" under the federal anti-discrimination statutes. See, e.g., Doe v. DeKalb County School Dist., 145 F.3d 1441, 1450 (11th Cir. 1998). "Otherwise, every personnel action that an irritable, chip-on-the-shoulder employee did not like would be the basis of a discrimination suit." Id. at 1450 (citation omitted). No doubt the Eleventh Circuit had cases such as this in mind when it adopted such a rule. Plaintiffs Janell McDowell ("McDowell") and Stephanie Sanders ("Sanders") were disciplined and ultimately terminated from Southern Nuclear for legitimate, non-discriminatory reasons. Now, in a desperate attempt

to challenge these decisions, Plaintiffs argue that they were the victims of a grand scheme to single them out because of their race.  Their only support for this theory is the kind of "chip-on-the-shoulder" allegations not recognized under Eleventh Circuit precedent.  As such, Southern Nuclear is entitled to judgment as a matter of law on all of Plaintiffs' claims.

## NARRATIVE STATEMENT OF FACTS

### I.    PLAINTIFFS' EMPLOYMENT WITH SOUTHERN NUCLEAR

McDowell was hired by Southern Nuclear in 1998 as a Nuclear Security Officer at Plant Farley in Dothan, Alabama.  (Collins Decl. at ¶ 2; McDowell Depo. at 299:9-10, 300:5-7).[1]  By 2000, McDowell was working as a Helper.  (McDowell Depo. at 303:6-14).  Sanders was hired by Southern Nuclear in October 1999 as a Helper at Plant Farley.  (Sanders Depo. at 129:7-11, 146:2-4).  "Helpers" are entry level, labor-intensive positions at Southern Nuclear and are subject to the Collective Bargaining Agreement ("CBA") between Southern Nuclear and Local 796 of the International Brotherhood of Electrical Workers.  (Bestwick Decl. at ¶ 6).  Both Plaintiffs were Facilities Helpers during the events at issue in this lawsuit.  (Id.).

Plaintiffs both received positive performance evaluations while employed at Southern Nuclear.  (McDowell Depo. at Exs. 8-15; Sanders Depo. at Exs. 13-19).  Plaintiffs' various Foremen and supervisors, the majority of whom were white and, as will be discussed below, are the very people that Plaintiffs now complain about, had input into the evaluations.  (McDowell Depo. at 299:11-313:22 & Exs. 8-15; Sanders Depo. at 131:3-132:7, 133:16-141:12, 142:8-143:16 & Exs. 13-19).[2]  Both Plaintiffs also received annual bonuses under Southern Nuclear's "Pay for Performance Plan" ("PPP") while employed with Southern Nuclear based on their

---

[1] Deposition line numbers are designated as follows: page 299, line 9 is 299:9.

[2] For example, Plaintiffs' 2004 reviews were signed by Freeman and Crutchfield, two of the people that Plaintiffs now claim discriminated against them, while their 2005 mid-year reviews were signed by Freeman.  (McDowell Depo. at Ex. 14, p. 4, Ex. 15, p.1; Sanders Depo. at Ex. 18, pp. 4, Ex. 19, p.1).

supervisors' assessment of their performance.[3]    (Sanders Depo. at 132:11-14, 141:13-142:3; Bestwick Decl. at ¶ 50).  McDowell and Sanders both received PPP in March 2004 for the 2003 work year.  (Bestwick Decl. at ¶ 51).  The gross amount that McDowell and Sanders received was $6,048.  (Id.).  They both received PPP in March 2005 as well in the gross amount of $6,641 for the 2004[4] work year.  (Id.).[5]

Prior to the events that ultimately led to Plaintiffs' terminations, Plaintiffs had not received any discipline at Southern Nuclear.  (McDowell Depo. at 52:14-17).  To the contrary, Plaintiffs often received compliments and praise from their Foremen, many of whom, again, were white and are the same people who are now being accused of discrimination during the same time period and of harboring ill will towards Plaintiffs for several years before then.  (McDowell Depo. at 90:7-98:23 & Ex. 4, pp. 6-15, Ex. 5).  Indeed, in some instances emails were written by other employees to Plaintiffs' Foremen, who then forwarded them to Plaintiffs to show them that their work was appreciated.  (Id.).  Moreover, Plaintiffs were given additional learning opportunities.   For example, Mark Freeman ("Freeman"), African American, and Dennis Teat, white, both Facilities Foremen and two of the people that allegedly discriminated against Plaintiffs, selected McDowell to attend a Diesel Generation Equipment Outage Readiness Review meeting.  (Freeman Decl. at ¶ 5).  This invitation was part of an initiative by the

---

[3] PPP is paid out each year in March for the previous work year.  The management at each Southern Nuclear site ranks every site employee either a 1, 2A, 2B or 3.  Top Performers are "1," and the lowest performing employees are rated "3".  A Top Performer rating means an employee is ranked within the top 10% of employees at the Plant for the work year in question.  Top Performers receive a larger annual bonus than other employees.  Employees who are rated a "3" receive no PPP.  Employees must be employed on December 31 of any given year to be entitled to PPP for that year.  Employees who either are terminated or resign during a work year are not eligible for PPP for that year.  (Bestwick Dec. at ¶ 50).

[4] Plaintiffs' receipt of PPP for the 2004 work year based on their Supervisors' evaluations of them is significant because this is the year in which Plaintiffs contend their supervision began singling them out.

[5] Additional PPP awards belie Plaintiffs' claim of disparate treatment based on race.  For example, African American former Helper Eddie Harris was rated as a "Top Performer" in 2000, 2001, 2002, 2003 and 2004.  (Bestwick Decl. at ¶ 50).

Foremen to establish a culture of team work and participation by everyone in the Facilities group. (Id.). This was the first time that a Plant Farley Helper had been asked to attend such a meeting. (Id.).

Plant Manager Don Grissette's perception of Plaintiffs was vastly different from that of Plaintiffs' direct supervision. Grissette noticed that when he saw them around the Plant, McDowell and Sanders always seemed to be together. (Grissette Decl. at ¶¶ 2, 7).[6] Grissette questioned Richard Bryant, the Facilities Supervisor, about this after observing Plaintiffs working together in the Service Building, where Grissette's office is located, on several occasions. Grissette told Bryant that assigning any two people to the Service Building was a waste of resources. (Id. at ¶¶ 7-8; Crutchfield Decl. at ¶¶ 6-7). Management's concerns about McDowell and Sanders pairing up to work together were solely based on issues of efficiency and productivity. (Johnson Decl. at ¶ 19; Grissette Decl. at ¶ 10; Crutchfield Decl. at ¶ 7).[7] Management's focus on efficiency and productivity dictated that Foremen constantly scrutinize job assignments to ensure that one-person jobs were assigned to one person. (Wilson Decl. at ¶

---

[6] Plant Farley Helpers routinely pair up and work together early on in a Helper's career when he or she is still learning the job. (Johnson Decl. at ¶ 17). After a period of time, however, management expects Helpers to have gained the confidence and competence to do most job assignments on their own. (Johnson Decl. at ¶ 17). McDowell and Sanders continued to pair up well after they had navigated the initial learning curve. (Johnson Decl. at ¶ 18). Sanders and McDowell were observed performing jobs together that were one (1) person jobs. (Johnson Decl. at ¶ 18; Grissette Decl. at ¶ 6).

[7] To give an example, one day as Grissette was leaving the Service Building, he walked down to the first floor of the building, which includes a lobby where pictures of Company executives are displayed. Grissette saw McDowell and Sanders sitting on the floor of the lobby. They appeared to be doing something related to a school fundraiser: they were counting money and one of them seemed to be sorting through merchandise. The material was spread out on the lobby floor. When Grissette asked what they were doing, Plaintiffs said that they were "on break." Grissette thought that this was a very unacceptable way to be using break time and was very frustrated with their lack of judgment in using the Service Building lobby for this purpose because this building is where visitors to the Plant, including the President of Southern Nuclear or officers of affiliated companies, come when they arrive at the Plant. Anyone entering the building through its front doors would have seen the school merchandise strewn all over the lobby floor and two employees engaged in a non-work related activity on Company time. (Grissette Decl. at ¶ 8; Crutchfield Decl. at ¶ 6). At this point, Grissette went back to Richard Bryant and told him what he had seen and that what he had seen was a waste of Company resources. He also said that if it took doing performance management to convey management's expectations to McDowell and Sanders, then that needed to be done. Grissette also said that he did not want to see McDowell and Sanders assigned together to empty garbage again. (Id. at ¶ 9).

8). Other employees who previously had paired up to work together were separated, and job assignments constantly were being assessed to ensure they were not over-staffed. (Id.). Foremen continued to assign McDowell and Sanders to work together, however, when a job assignment required two people. (Crutchfield Decl. at ¶ 8; Sanders Depo. at 123:20-124:10).

## II.     PROBLEMS IN THE FACILITIES GROUP

In 2004 Don Grissette, Plant Farley General Manager, and Mike Stinson, Vice President Farley Project, tasked Clif Buck, the Health Physics & Chemistry Manager, who for a time had supervisory responsibilities over the Facilities Foremen at Plant Farley, with creating a plan of action to address several problems within the Facilities Department. (Grissette Decl. at ¶ 14; Buck Decl. at ¶¶ 3-4). These included complaints that the male Facilities Helpers were receiving the harder and dirtier job assignments, complaints of inappropriate touching, inappropriate discussions and materials having been brought on site, complaints of ineffective leadership and unfair job assignments by the Facilities Foremen, Helpers tattling on each other, and excessive use of profanity. (Grissette Decl. at ¶ 14; Buck Decl. at ¶ 4).

Buck proposed an action plan that included a coaching session with a female Helper identified to have brought an inappropriate birthday cake on site (depicting a woman in a bikini) and a group meeting with all of the Facilities Foremen to discuss management's expectations of them and to answer questions about their role as supervisors. (Grissette Decl. at ¶ 14; Buck Decl. at ¶ 5). Buck also proposed splitting the Helper group up into three smaller groups that he could meet with and explain management's expectations of them for work performance and conduct and to answer any questions that they had regarding these expectations. (Grissette Decl. at ¶ 14; Buck Decl. at ¶ 5).

Grissette and Stinson approved Buck's action plan.  (Grissette Decl. at ¶ 14; Buck Decl. at ¶ 6).  Additionally, three Facilities Foremen, two white males, and one African American female, were issued discipline.  (Buck Decl. at ¶ 6).[8]  Also, Joe Walden, the Health Physics & Chemistry Training Supervisor, was assigned to the Facilities group temporarily as an acting Facilities Supervisor to help gain control over the group.  (Id.).

On or around June 2, 2004, Buck had a morning meeting with all of the Facilities Foremen except Bill Barber, who was on vacation.  (Buck Decl. at ¶ 7; Wilson Decl. at ¶ 10).[9] When Buck met with the Foremen, he briefed them on the problems that had been brought to management's attention, listened to their experiences and explanations, and answered their questions.  (Id.).  Buck also laid out management's expectations, including the following:

- Any disciplinary or performance issue was to be discussed with Joe Walden or Buck before action was taken, if possible.  If it was not possible to speak with them beforehand, Foremen were to discuss the issue with Walden or Buck as soon as possible afterwards.

- No tolerance of joking or horseplay directed to the Foremen or between Helpers.

- No tolerance for inappropriate items brought on site.

- Employees were to be coached on inappropriate clothing or personal possessions worn or brought on Plant property.

- Use of profanity was to be actively discouraged, excessive use was to be coached first, and then escalated to discipline.

- Emphasis on the Foremen as the Helpers' bosses first.

---

[8] Patricia Glasco, an African-American Foreman, and Howard Maddox, a white Foreman, both received Oral Reminders because of their failure to address the cake incident.  (Bestwick Decl. at ¶ 41 & Exs. T, U).  White Foreman Bill Barber was disciplined for engaging in inappropriate behavior with female subordinates.  (Bestwick Decl. at ¶ 45 & Ex. Y).

[9] Buck met with Barber later.  (Buck Decl. at ¶ 7).

(Id.; Wilson Decl. at ¶ 10).  Buck also planned to meet with the Helpers in three groups.  (Buck Decl. at ¶ 8).  The first meeting occurred on or around June 7, 2004.  (Id.).  The second meeting was on or around June 14, 2004, and the third meeting was scheduled for June 28, 2004.  (Id.).[10]

In the two meetings that Buck had with the Facilities Helpers, he asked them about problems within the work group, discussed the concept of harassment, and went over the Company's policy on harassment again.  (Buck Decl. at ¶ 9).  The feedback that Buck received suggested that most of the issues within the group were dated, and not current problems.  (Id. at ¶ 10).  The Helpers expressed uncertainty about what "harassment" was, and there were comments about people making charges of harassment to get back at each other.  (Id.).  Buck and the Helpers also discussed the perception that only lower level or certain groups of employees were disciplined and that some groups were disciplined differently than others.  (Buck Decl. at ¶ 11).  Buck's impression from this discussion was that Helpers who had these concerns were only hearing one side of what took place either because of the Company's policy to keep discipline private or because the disciplined employee only told his/her side of what transpired.  (Id.).

In July 2004, all Facilities Foremen with the exception of Dennis Teat and Deborah Crutchfield were replaced based on management's belief that they were ineffective leaders given the ongoing problems within the Facilities group and feedback from Helpers.  (Grissette Decl. at ¶ 15; Freeman Decl. at ¶ 3).  Deborah Crutchfield, a former Facilities Foremen, who appeared to have the respect of the Helper group, was made the Facilities Supervisor over all the Facilities Foremen.  (Id.).

---

[10] Because Buck transferred to Plant Vogtle, however, he was not able to conduct the third Helper meeting scheduled for June 28th.  (Id.).

7

### III.    THE HARASSMENT ALLEGATIONS, JOB SWAPPING, AND THE INITIAL DISCIPLINE

Southern Nuclear has a corporate policy designed to prevent harassment in the workplace.  (McDowell Depo. at 54:5-12 & Ex. 3).[11]    In July 2005, Facilities Helpers Tammy Caldwell ("Caldwell") and Jennifer White ("White") reported that this policy had been breached. Caldwell came to Facilities Supervision and told them that she and White were being harassed and subjected to a hostile work environment by other Helpers in the Facilities group. (Crutchfield Decl. at ¶ 11; Johnson Decl. at ¶ 3).[12]  Maintenance Superintendent Jim Parrish and Crutchfield initially interviewed Caldwell and White about their claims.  (Johnson Decl. at ¶ 3; Crutchfield Decl. at ¶ 11).  Caldwell and White stated that they were working in a hostile environment and gave examples of things that they were experiencing.  (Crutchfield Decl. at ¶ 11).  Parrish and Crutchfield kept notes of these interviews.  (Id. & Ex. C).

Sharon Bestwick, an Employee Relations Coordinator[13] assigned to support Plant Farley, was asked to investigate the allegations of harassment and a hostile work environment raised by Caldwell and White.  (Bestwick Decl. at ¶¶ 2, 5; Johnson Decl. at ¶ 4; Crutchfield Decl. at ¶ 12). On or about August 4, 2005, Bestwick interviewed Caldwell and White separately about their

---

[11] McDowell testified that she was familiar with the policy, and Sanders had been made aware of the policy during orientation.  (McDowell Depo. at 54:10-16; Sanders Depo. at Ex. 22).

[12] Earlier that morning, African American Foreman Freeman observed Caldwell and White come out of a meeting with Helper and union steward Doris Ashford ("Ashford").  (Freeman Decl. at ¶ 8).  Freeman observed Caldwell and White to be very upset and heard Caldwell say "this is harassment" as she walked away.  (Id.).  Foremen John Wright, Phillip Avery, and Facilities Supervisor Deborah Crutchfield made similar observations.  (Bestwick Decl. at ¶ 5 & Ex. C; Crutchfield Decl. at ¶ 10).  Later, the Foremen saw a list that Ashford had used in her meeting with Caldwell and White.  (Crutchfield Decl. at ¶ 10 & Ex. B).  The Facilities Foremen who saw the list felt that it was threatening or intimidating.  (Id.; Bestwick Decl. at Ex. C).

[13] The Employee Relations Coordinator is responsible for conducting employee investigations at the request of Company management.  Another job duty is to advise management on administering discipline to employees under the Company's Positive Discipline Guideline at the Company.  Bestwick's involvement in Management's discipline decisions is intended to ensure that discipline is consistently administered.  (Bestwick Decl. at ¶ 4).  A copy of the Company's Positive Discipline Guideline is located at Exhibit A to Bestwick's Declaration.

harassment allegations.  (Bestwick Decl. at ¶ 8).  Bestwick also reviewed Parrish's notes of the July 20, 2005 interviews of White and Caldwell.  (Id. at ¶¶ 8, 25 & Ex. G).

Among other things, Caldwell and White both told Bestwick about a picture of a brown recluse spider that had been put up in a break room used by the Helpers.  (Bestwick Decl. at ¶ 8 & Ex. D).  Caldwell and White said the picture had derogatory, handwritten notes on it and that it represented a hostile environment because they felt it was directed at them.  (Id. at ¶ 8 & Ex. D).

Caldwell and White also told Bestwick about a meeting with Doris Ashford that prompted their complaint to management.  (Bestwick Decl. at ¶ 13).  During the meeting, Caldwell and White said Ashford read through a written list of complaints/issues with Caldwell.  (Id. & Ex. E).  Caldwell and White told Bestwick that they felt harassed, intimidated and threatened by Ashford during the meeting.  (Id.).  Caldwell, in particular, felt threatened by a reference to "skeletons"[14] in her closet related to her alleged sexual misconduct while at an outage[15] at Plant Hatch in Georgia in 2004.  (Id. & Ex. E).

Bestwick next interviewed Sanders and then interviewed McDowell.  (Bestwick Decl. at ¶ 16).  When Bestwick questioned McDowell about whether she asked Ashford to talk with Caldwell on her behalf, her response was, "I spoke with Doris and said as a job steward that she needed to talk with Tammy about being in the Foreman's office.  That's her job as a job

---

[14] Ashford's notes on this issue are as follows: "U need 2 remember these R the ones who know all about the "skeletons" U put in your closet in Georgia, including Phyllis.  They do know who, what, where, when = How cuz your "boy toy" was telling it all.  If they hated U – they'd of told it to your family."  (Bestwick Decl. at ¶ 22; Crutchfield Decl. at ¶ 10 & Ex. B).

[15] An outage is a work period when an operating unit is shut down for scheduled refueling and maintenance activities.  (Crutchfield Decl. at ¶ 18).  In addition to Plant Farley, Southern Nuclear operates two other nuclear power plants, Plant Hatch in Baxley, Georgia, and Plant Vogtle near Waynesboro, Georgia.  (Id.).  Facilities employees from all three Nuclear Plants are required to support outages at each of the other plants as needed.  (Id.).  Plant Hatch has one scheduled outage a year in the spring only because they have 24 month fuel cycle.  (Id.).  Plant Farley and Plant Vogtle have 18-month fuel cycles and, therefore, the units at these Plants are shutdown every 18 months to refuel.  (Id.).  As such, Plants Farley and Vogtle sometimes have an outage twice a year (spring and fall) depending on fuel cycles.  (Id.).

steward." (Id.).  McDowell admits that she did not answer certain questions posed to her by Bestwick during the investigation.  (McDowell Depo. at 58:22-59:23, 202:15-203:1 204:2-8).[16] Unlike McDowell, Sanders indicated to Bestwick that she was not aware of Doris Ashford having spoken with Caldwell allegedly on behalf of the Helper group.  (Bestwick Decl. at Ex. F, p.11).

When Bestwick interviewed Doris Ashford, she told Bestwick that the consensus among the Helpers was that Caldwell could not be trusted.  (Bestwick Decl. at ¶ 21).  A.G. James, the Union President, accompanied Ashford into the interview.  (Id.).  When Bestwick asked Ashford whether she was speaking on behalf of the union when she met with Caldwell, she said, "More on behalf of the group," and James shook his head, indicating to Bestwick that Ashford had not acted in her role as a union steward.  (Id.).

Helper Phyllis Hughes admitted during the investigation that she had written one set of the comments on the spider picture and that she did it because she "felt spidery" that day. (Bestwick Decl. at ¶ 24).  Hughes denied asking Ashford to speak with Caldwell about being in the Foremen's office, but was aware Ashford planned to talk with Caldwell.  (Id.).

In total, nine (9) Facilities group employees were interviewed during the hostile environment investigation, including Caldwell, White, Sanders, McDowell, Hughes, Ashford, John Wright, Leonard Russ, and Chris Stovall.  (Bestwick Decl. at ¶ 25 & Ex. F).[17]  At the end of the investigation, Bestwick reported that four female Helpers were believed to have contributed to a hostile working environment for Caldwell and White.  Those Helpers were

---

[16] According to McDowell, she answered the questions "the way [she] wanted to answer it that day."  (McDowell Depo. at 205:16-20).

[17] For a more detailed account of the various interviews, see Bestwick Decl. at ¶¶ 8-25 & Exs. D-G.

Hughes, McDowell, Sanders, and Ashford. (Johnson Decl. at ¶ 5; Crutchfield Decl. at ¶ 14; Bestwick Decl. at ¶ 26).

Contemporaneous with the hostile environment complaint, management also learned that several Facilities Helpers had swapped job assignments without their supervision's approval. (Bestwick Decl. at ¶ 7; Johnson Decl. at ¶ 6; Crutchfield Decl. at ¶ 13; Collins Decl. at ¶ 4). Specifically, Eddie Harris, one of the African American male Helpers, came to Crutchfield and said that Helpers were not doing their assigned jobs but were swapping job assignments without Supervision approval. (Crutchfield Decl. at ¶ 13). Crutchfield directed Wright to look into this report of unauthorized job swapping. (Id.). Swapping job assignments created, among other things, an accountability problem because it made it difficult to track who was responsible for a certain job task. (Murrell Decl. at ¶ 4). The Helper group previously had been instructed that they were not to swap job assignments unless a member of Facilities Supervision approved the assignment change. (Johnson Decl. at ¶ 6; Murrell Decl. at ¶ 4; Bestwick Decl. at ¶ 7). The employees identified as having swapped jobs without appropriate supervisory approval were Hughes, Leonard Russ, McDowell, Sanders, Ashford, and Bobby White. (Johnson Decl. at ¶ 6; Crutchfield Decl. at ¶ 13; Bestwick Decl. at ¶ 7).

Discipline was issued to several Facilities Helpers as a result of both the harassment investigation and the discovery of the unauthorized job swapping. (Johnson Decl. at ¶ 7; Crutchfield Decl. at ¶ 14). On August 16, 2005, Southern Nuclear issued discipline to McDowell based on her having contributed to a hostile work environment, her swapping jobs without Facility Supervision's approval, and her conduct and comments indicating that she was attempting to create a division between employees and supervision. (McDowell Depo. at 51:14-52:8, 53:3-19 & Ex. 2; Bestwick Decl. at ¶¶ 28, 31 & Ex. J; Johnson Decl. at ¶ 9 & Exs. A-C;

Crutchfield Decl. at ¶ 16 & Ex. D).[18]    McDowell was placed on a Decision-Making Leave ("DML"), which is Southern Nuclear's highest form of discipline.    (Id. at 52:9-13; Freeman Decl. at ¶ 9; Johnson Decl. at ¶¶ 8, 9 & Exs. A-C; Crutchfield Decl. at ¶ 15).[19]    Upon returning from her DML leave, McDowell committed to, among other things, perform her duties in such a way as to not create a hostile environment.  (McDowell Depo. at Ex. 2, p.3).    Management agreed to have monthly follow-up meetings with McDowell to give her feedback on her progress under the terms of the DML.  (McDowell Depo. at 78:18-23; Freeman Decl. at ¶ 9; Johnson Decl. at ¶ 10; Crutchfield Decl. at ¶ 18).    The DML issued to McDowell stated that the consequences for failing to improve to an acceptable level would be termination of employment. (Bestwick Decl. at ¶ 29).

On August 17, 2005, Southern Nuclear also disciplined Sanders, based in part on her having engaged in harassing conduct towards co-workers, her failure to participate in meetings with supervision, and her having swapped job assignments without the approval of Facility Supervision.  (Sanders Depo. at 22:4-23:4 & Ex. 3; Freeman Decl. at ¶ 15; Bestwick Decl. at ¶¶ 33, 35 & Ex. L; Johnson Decl. at ¶ 13 & Ex. D; Crutchfield Decl. at ¶ 17 & Ex. E).    Unlike McDowell, however, Sanders was given a written reminder rather than a DML.  (Sanders Depo.

---

[18] McDowell admits that she had in fact swapped job.  (McDowell Depo. at 55:15-56:12).  Moreover, although she claims that she had permission to switch job assignments, McDowell admits that she did not get permission from the Foreman, who was the person that she was instructed to seek permission from.  (Id. at 280:2-8).  The Foremen had instructed Helpers not to swap job assignments without supervisor approval.  (Freeman Decl. ¶ 10).

[19] When a DML is issued, the supervisor describes the performance deficiencies to the employee, the severity of the problem, and the need for the employee to make a decision concerning continued employment.  (Bestwick Decl. at ¶ 29).  The employee is told that this is the third and final level of discipline and is given the following work day off with pay to consider the circumstances.  (Id.).  The first work day following the DML, the employee is to report to the supervisor with a decision to make a total performance commitment or to resign.  (Id.).  If the employee makes a total performance commitment, specific notice is given that any performance problems requiring discipline during the 18 months the DML remains active will result in discharge.  (Id.).  When the employee's decision is to continue employment, the DML is documented by writing a letter to the employee outlining the discussion, decision and commitment to improve.  (Id.).

at Ex. 3; Freeman Decl. at ¶ 15; Bestwick Decl. at ¶¶ 33, 35 & Ex. L; Crutchfield Decl. at ¶ 15).[20]

Other employees were also disciplined as a result of the investigation. Phyllis Hughes, who is white, was terminated. (McDowell Depo. at 86:8-12; Crutchfield Decl. at ¶ 15). Hughes was terminated for creating a hostile work environment and for swapping job assignments. (McDowell Depo. at 285:10-18; Bestwick Decl. at ¶ 26). Several factors contributed to management's decision to terminate Hughes' employment, including the following: her past unacceptable performance, the fact that she was already under discipline,[21] her contribution to a hostile work environment and harassment of co-workers, and her unauthorized swapping of job assignments. (Bestwick Decl. at ¶ 27 & Ex. H).[22]

## IV.    SUBSEQUENT EVENTS LEAD TO PLAINTIFFS' TERMINATION

Despite being advised of the specific areas in which she needed to improve, McDowell either refused to or was unable to make the adjustments necessary to keep her job. For example, in a Facilities group morning meeting on August 24, 2005, McDowell continued to display

---

[20] Under Southern Nuclear's Positive Discipline Guideline, a Written Reminder is the second level of formal discipline. (Bestwick Decl. at ¶ 34). When an employee is issued a Written Reminder, the supervisor must describe performance deficiencies to the employee, explain job expectations and the good business reasons for their existence, and the consequences if the problem is not corrected. (Id.). The employee is told that this is the second level of formal discipline and is asked to make a commitment to correct the problem. (Id.). Following the conversation, the supervisor sends a letter to the employee to document the discussion and a copy is placed in the employee's personnel file. (Id.). If the employee corrects the problem, the letter will be removed from the personnel file and given to the employee 12 months later with verbal recognition for improving. (Id.). If the employee does not correct the problem or a similar infraction occurs within 12 months, discipline should be escalated to the next level unless discharge is warranted. (Id.). The supervisor's role in the written reminder is to emphasize the employee's responsibility for performance and create a partnership for problem solving. (Id.).

[21] Hughes twice had previously been disciplined. One discipline was for wearing inappropriate attire to work, and one was for unauthorized absences. (Bestwick Decl. at ¶ 27 & Ex. H).

[22] In addition, Doris Ashford was also placed on a DML and on a Performance Improvement Plan. (Bestwick Decl. at ¶¶ 28-30 & Ex. I; Johnson Decl. at ¶ 8; Crutchfield Decl. at ¶ 15). Helper Leonard Russ was issued a DML for interfering in interactions between supervision and another employee, refusing to meet with supervision without union representation when he was told it was not needed, and swapping job assignments after being instructed not to by Facilities Supervision. (Bestwick Decl. at ¶ 32 & Ex. K). Helper Bobby White was issued a Written Reminder for failure to follow work instructions. (Bestwick Decl. at ¶ 36 & Ex. M).

behaviors that contributed to a "chilled" work environment and that were not consistent with management's expectations set out in the DML that she had received earlier in the month. (Murrell Decl. at ¶ 6). For example, McDowell kept her hardhat and her reflective safety glasses on, and she held her personal bag on her lap as if she did not intend to stay. (Id.; McDowell Depo. at 159:4-9, 160:7-13). She kept her head down and never looked up during the whole meeting to acknowledge anything that was said, nor did she show any interest in what was being said. (Murrell Decl. at ¶ 6). When the Foreman handed out job assignments, she just put out her hand to take it and did not even look up. (Id.).

Management held the first monthly feedback meeting with McDowell on September 9, 2005. (McDowell Depo. at 78:14-20; Murrell Decl. at ¶ 7; Crutchfield Decl. at ¶ 18; Freeman Decl. at ¶ 11). The meeting was attended by Facilities Foremen Mark Freeman and Shelley Murrell and Facilities Supervisor Deborah Crutchfield. (Murrell Decl. at ¶ 7; Crutchfield Decl. at ¶ 18).[23] Management advised McDowell that their impression was that her attitude toward supervision still needed improvement. (Freeman Decl. at ¶ 13). For example, Murrell told McDowell that she needed to be more attentive in the morning meetings and that keeping her head down during morning meetings gave them the impression that she was not paying attention. (McDowell Depo. at 195:12-16; Freeman Decl. at ¶ 13; Murrell Decl. at ¶ 9; Crutchfield Decl. at ¶ 20).

---

[23] McDowell claims that the meeting was a "set up" because, among other things, the meeting was held less than thirty days after the DML and because Freeman was in the meeting so that McDowell "wouldn't know that they were trying to discriminate against [her]." (McDowell Depo. at 78:14-79:5). Management decided to meet with McDowell prior to thirty (30) days passing because Freeman was leaving to work an outage at Plant Vogtle in Georgia and would not be at Plant Farley on the 30th day. (Freeman Decl. at ¶ 11; McDowell Depo. at 79:6-12). Shelley Murrell attended the September 9, 2005 meeting because she would be supervising McDowell in Freeman's absence and it was felt that she needed to be present at the meeting to hear both the feedback given to McDowell and McDowell's feedback to supervision. (Id. at ¶ 12; Murrell Decl. at ¶ 7; Crutchfield Decl. at ¶ 18).

In the feedback meeting McDowell displayed the same attitude that Murrell had noticed in the August 24 morning meeting. (Murrell Decl. at ¶ 7).[24]  During the meeting, McDowell stood in front of the desk the entire time even though she was invited to sit down. (Murrell Decl. at ¶ 8; Crutchfield Decl. at ¶ 19). While management talked, McDowell kept her arms folded across her chest, and she never made eye contact. (Id.). When McDowell responded, she did not seem to take ownership of what management was saying, and she did not appear to take responsibility for any of the feedback. (Id.; Freeman Decl. at ¶ 14). When Freeman tried to get McDowell to communicate any concerns she had about her supervision of their expectations of her, she simply replied "no comment." (Freeman Decl at ¶ 14). Freeman's impression was that McDowell was simply going through the motions and was not committed to improving either her attitude or management's perception that she was contributing to a chilled work environment. (Id.).

After the meeting, Freeman, Murrell, and Crutchfield discussed what had taken place and concluded that McDowell was neither receptive to, nor interested in, the feedback given to her. (Freeman Decl. at ¶ 14 & Ex. A; Murrell Decl. at ¶ 9; Crutchfield Decl. at ¶ 21). Based on McDowell's behavior and her Supervision's conclusions, Crutchfield recommended to management that McDowell's employment be terminated. (Crutchfield Decl. at ¶ 21 & Ex. F). McDowell was terminated on or about September 16, 2005, for not meeting management's expectations under the terms of her DML. (Bestwick Decl. at ¶ 37 & Ex. N; Johnson Decl. at ¶ 11; Murrell Decl. at ¶ 9; Crutchfield Decl. at ¶ 22 & Ex. G).[25]

---

[24] Murrell also told McDowell that she did not have to speak in the morning meetings, but that she did need to show that she was paying attention. Murrell advised McDowell that holding her head down, keeping her reflective glasses on her lap while facing away from the Foreman during the meeting displayed not only a total lack of interest, but also was disrespectful to the person speaking. (Murrell Decl. at ¶ 9; Crutchfield Decl. at ¶ 20).

[25] To Murrell, McDowell's demeanor also was inconsistent with a commitment stated in the preamble of the CBA. Among other things in the preamble, there is a joint statement by the Company and the Union that, "We desire to

Unlike McDowell, Sanders' poor attendance led to her termination. Initially, Sanders was absent from work from October 11-13, 2005. (Crutchfield Decl. at ¶ 23; Sanders Depo. at 42:1-11 & Ex. 5).[26]  Sanders called in to management to report these absences. (Crutchfield Decl. at ¶ 23; Sanders Depo. at Ex. 5).  Beginning October 15, 2005, however, Sanders continued to miss work without calling management to report the absences. (Id.).  On October 21, 2005, Deborah Crutchfield wrote Sanders, noting that Sanders had been absent without calling in since October 15. (Sanders Depo. at Ex. 5; Crutchfield Decl. at ¶ 23; Johnson Decl. at ¶ 14).  Crutchfield included the necessary paperwork for Sanders to apply for leave under the Family and Medical Leave Act. (Sanders Depo. at 43:3-44:2 & Exs. 5-6; Crutchfield Decl. at ¶ 23; Johnson Decl. at ¶ 14).  Crutchfield also advised Sanders that failure to communicate with management regarding her absences could result in discipline, up to and including termination. (Sanders Depo. at Exs. 5-6).  Sanders was given five days to complete and return the FMLA paperwork. (Sanders Depo. at 32:9-22 & Exs. 5-6; Crutchfield Decl. at ¶ 23; Johnson Decl. at ¶ 14).  Sanders signed for the letter on October 26, 2006, and called Crutchfield that same day, leaving a voice mail indicating that she would be in the next week with the paperwork. (Sanders Depo. at 46:23-47:5 & Ex. 5; Crutchfield Decl. at ¶ 23).  Sanders failed to return to work or submit the FMLA paperwork. (Sanders Depo. at 46:14-22 & Ex. 5; Crutchfield Decl. at ¶ 23 & Ex. H; Johnson Decl. at ¶ 14 & Ex. E).  As such, Southern Nuclear terminated Sanders' employment on November 1, 2005, for job abandonment. (Sanders Depo. at Ex. 5; Freeman Decl. at ¶ 16; Bestwick Decl. at ¶ 39; Johnson Decl. at ¶ 14; Crutchfield Decl. at ¶ 23 & Ex. H).

develop mutual respect between employees and management, and between all people with whom we work." (Murrell Decl. at ¶ 9 & Ex. A).

[26] Sanders testified on deposition that she did not disagree with any of the statements made in the November 1, 2005 letter from Southern Nuclear terminating her employment.  This letter detailed Sanders' absences and failure to keep supervision informed of her status. (Sanders Depo. at 47:18-48:4 & Ex. 5).

Ironically, also on November 1, 2005, Sanders faxed a letter of "resignation" to Southern Nuclear. (Sanders Depo. at 30:8-14, 33:4-13 & Ex. 4; Crutchfield Decl. at ¶ 24; Johnson Decl. at ¶ 16). The resignation letter makes no mention of race being the reason for any alleged unfair treatment. (Sanders Depo. at 33:14-34:3 & Ex. 4). Sanders faxed the Plant her resignation before she received the termination letter. (Sanders Depo. at 32:4-8). Sanders testified that, in her mind, she had resigned her employment from Southern Nuclear. (Sanders Depo. at 42:23-43:2, 65:12-16, 151:11-16). The letter that Sanders faxed to the Plant on the evening of November 1, 2005, was not accepted as a resignation because Sanders did not specifically state that she resigned her employment nor did she sign the letter. (Sanders Depo. at 30:8-10; Bestwick Decl. at ¶ 39 & Ex. R; Johnson Decl. at ¶ 16; Crutchfield Decl. at ¶ 24 & Ex. I). Sanders now contends that was discriminated against based on race when management refused to accept her resignation letter and instead terminated her employment.

## V.    PLAINTIFFS' CHIP-ON-THE-SHOULDER ALLEGATIONS

Plaintiffs' Complaint alleges that "[b]eginning in the Summer of 2005, both Plaintiffs began to experience disparate treatment by their supervisor." (Doc. 1 at ¶ 6). On deposition, however, Plaintiffs changed their story and claimed that the alleged disparate treatment towards them actually began on April Fool's Day (April 1) of 2004. As will be seen, Plaintiffs' allegations are nothing more than the "chip-on-the shoulder" allegations repeatedly rejected by the Eleventh Circuit. More importantly, none of these allegations identify proper comparators for purposes of the McDonnell Douglas analysis.[27]

---

[27] Southern Nuclear will address here the allegations that it feels most clearly demonstrate how misinformed the Plaintiffs are regarding the decisions and actions of management.

A.      **The Cafeteria Incident**

According to Plaintiffs, their mistreatment began on April Fool's Day of 2004 with an incident in the Cafeteria involving Facilities Foreman Tim Wilson. (McDowell Depo. at 42:17-43:20, Sanders Depo. at 36:9-16, 76:4-11; Wilson Decl. at ¶ 3). The Facilities group previously had gone from an 8.5-hour schedule with a 30 minute meal break to an 8-hour schedule with no designated meal break. (Wilson Decl. at ¶ 5). As such, the Foremen told all the Helpers that they were to grab something to eat whenever they could and eat in their break room so that they could be accessible for a work assignment at all times. (Id.). Plaintiffs' designated break room was in the Building and Grounds building, sometimes referred to as B & G. (Id.). Plaintiffs contend that on April 1, 2004, Wilson came in the cafeteria and saw them eating. Wilson spoke to them, even asking how they were doing. Wilson then saw Ray Dyck, an African American Helper, and told him that he was not allowed to eat in the cafeteria. Dyck then pointed out that Plaintiffs were eating in the cafeteria. According to Plaintiffs, Wilson then came over to them "ranting and raving, yelling and screaming, telling [them] to get up" and that they were not allowed to eat in the cafeteria. Plaintiffs then went and complained to Plant Manager Don Grissette about the way that Wilson had treated them. (McDowell Depo. at 42:17-43:14, 50:5-8; Sanders Depo. at 36:17-37:14; Wilson Decl. at ¶ 6; Grissette Decl. at ¶ 11). Grissette told Plaintiffs he "would handle the situation" with Wilson. (Sanders Depo. at 117:2-6).

Based on his meeting with Plaintiffs, Grissette questioned Wilson about his treatment of Plaintiffs. (Grissette Decl. at ¶ 11; Wilson Decl. at ¶ 7). Wilson explained to Grissette that the Facilities Helpers had been informed at a meeting that because they no longer had a designated meal period, they should grab something to eat and drink when they could and take it to the Facilities break room. (Grissette Decl. at ¶ 11). Wilson said the Helpers were not supposed to

eat in the Cafeteria because they were to always be accessible for work assignments and eating in the break room would ensure their availability. (Id.). Wilson denied saying or doing anything to embarrass McDowell and Sanders. (Id.). Nevertheless, Grissette counseled Wilson that there might be a better way to communicate this message. (Id.; Wilson Decl. at ¶ 7). Grissette suggested to Wilson that he should have spoken with McDowell and Sanders outside the presence of the other employees in the Cafeteria. (Grissette Decl. at ¶ 11). Wilson then went back and spoke with other people who had been in the Cafeteria to determine how they perceived his behavior. (Wilson Decl. at ¶ 7).

Sanders and McDowell claim that everything that was "done" to them subsequently was in retaliation for their complaint about Tim Wilson. (Sanders Depo. at 72:12-15). Plaintiffs allege that after they complained to Grissette about Wilson, Wilson then went and complained to Grissette that Plaintiffs stayed together too much and needed to be split up. (McDowell Depo. at 43:15-17; Sanders Depo. at 116:5-11). According to Plaintiffs, Grissette then put all of the Foremen on notice that they should split them up. (McDowell Depo. at 43:18-20). Sanders admits, however, that she and McDowell were still assigned to work together even after Grissette directed the Foremen to "single" them out and split them up. (Sanders Depo. at 123:20-124:10).

Plaintiffs went back to Grissette a second time to discuss being singled out by their supervision. (Grissette Decl. at ¶ 12). McDowell claims that Grissette admitted to them that he had told the supervisors to single them out. (McDowell Depo. at 41:18-43:20). Sanders' recollection is that Grissette merely told them that he had told the foremen to keep Plaintiffs from working together. (Sanders Depo. at 34:18-35:6). Grissette told Plaintiffs that his impression of them was that they worked together on one person jobs, and that he had told their Supervision to stop wasting Company resources by assigning or allowing this. (Grissette Decl.

at ¶ 12).  Grissette told McDowell and Sanders that he had no problem with two people working together if they were assigned to a job that requires two people.  (Id.  See also Crutchfield Decl. at ¶ 7).  Sanders claims that she told Grissette that Plaintiffs were being "picked on" because of their race and gender.  (Sanders Depo. at 121:3-9).  Grissette told Plaintiffs that he apologized if they were taking his comments and actions personally, but that "this is just business."  (Grissette Decl. at ¶ 12).  Grissette tried to convey to them that his concern was efficiency and productivity. (Id.).  Grissette neither said[28] nor in any way indicated that this directive was based on Plaintiffs' race.  (Sanders Depo. at 35:7-9; Grissette Decl. at ¶ 13).

        **B.**    **Subsequent Alleged Discrimination By Facilities Supervision**

        1.    Mark Freeman

Next, Plaintiffs claim that in the summer of 2005 Mark Freeman, an African American Foreman, accused Plaintiffs and Phyllis Hughes, a white Helper, of changing a schedule. (McDowell Depo. at 9:13-20; Sanders Depo. at 23:9-17, 24:2-12; Freeman Decl. at ¶ 6). Freeman eventually apologized for the allegation, but, according to Plaintiffs, later accused them again of changing the schedule.  (McDowell Depo. at 10:6-11:16, Sanders Depo. at 28:6-7; Freeman Decl. at ¶ 6).  Plaintiffs admit, however, that they were never disciplined because of this incident.  (McDowell Depo. at 11:20-12:1).  Rather, in their minds the mere fact of being accused of such conduct is discriminatory.  (McDowell Depo. at 11:17-19).  Freeman also asked other Helpers whether they had revised the schedule because he did not know who had made the revisions.  (Freeman Decl. at ¶ 6).  Freeman went to Deborah Crutchfield, his immediate supervisor, and told her of his discussions with Plaintiffs and Hughes, including the fact that he had apologized to them.  (Id. at ¶ 7).  Freeman and Crutchfield then met with Plaintiffs and

---

[28] Sanders also claims that another employee told her that Grissette told the Foremen that he was sick of seeing Plaintiffs together, although Sanders does not know why Grissette made this statement.  (Sanders Depo. at 114:22-115:13).

Hughes in an attempt to clear the air.  (Id.).  Freeman again apologized and expressed regret over the way that he handled the situation.  (Id.).  Plaintiffs and Hughes accepted the apology.  (Id.).

        2.      John Wright

Plaintiffs also claim that John Wright, another foreman, failed to offer them overtime and that this failure was discriminatory because the overtime was offered to two white females instead.  (McDowell Depo. at 15:1-12, 27:7-13).  The offering of overtime is controlled by a predetermined process agreed to with the Union leadership.  (Wright Decl. at ¶ 6 & Ex. A).  A computerized overtime database is used for tracking the overtime offered.  (Id. at ¶ 7). Management maintains a running total of hours of overtime offered and of hours of overtime worked.  (Id.).  Notably, Plaintiffs had been offered overtime hours consistent with that offered to other Helpers.  (Wright Decl. at ¶¶ 10-14 & Exs. B-E).  Plaintiffs refused a significant portion of the overtime hours offered to them.  (Id.).

According to Plaintiffs, Wright also allegedly admitted that he was not assigning jobs fairly[29] and that he would change.  (McDowell Depo. at 21:1-24:12).  However, Plaintiffs' only evidence of this "admission" is an email from Cheri Collins, Assistant General Manager at Plant Farley, to Sanders after Collins spoke with Wright about Plaintiffs' allegations of unfair job assignment.  (Id., 29:23-30:3; Collins Decl at ¶¶ 2, 8 & Ex. A).  Plaintiffs never told Collins that assignments were being made based on race, nor did Collins interpret Sanders' complaint as one of race discrimination.  (Sanders Depo. at 8:23-9:4; Collins Decl. at ¶ 6).  Collins did not tell Sanders that the assignments were being made based on race.  (Sanders Depo. at 9:5-8). Rather, Wright was struggling with both some difficult people in the Facilities group and with a

---

[29] For example, Plaintiffs claim that they were assigned to work in the turbine building for six or weeks in either 2003 or 2004.  (McDowell Depo. at 186:3-187:7).  However, when the new Foremen come on board, all Helpers remained under the job rotation created by the former Foremen, and agreed to by the Union.  (Wright Decl. at ¶ 20). Because of the shortage of Helpers at the time, everyone in the group was being assigned the same jobs for extended periods of time.  (Id.).

job rotation system that was in place when he came to the position. (Id.; Wright Decl. at ¶ 20). Because of the shortage of Helpers at the time, everyone in the group was being assigned the same jobs for extended periods of time. (Id.).

>3.     Shelley Murrell

Plaintiffs also accuse Shelley Murrell, a white female Foreman, of discrimination. (McDowell Depo. at 30:11-20). Specifically, McDowell alleges that in 2004 Murrell allowed White, a white Helper, to see certain "confidential" information that McDowell had provided to Murrell. (McDowell Depo. at 30:17-31:6). McDowell admits, however, the "confidential" information was merely a time off request whereby she voluntarily relinquished planned overtime. No other information was included. (McDowell Depo. at 31:11-16, 32:19-22, 34:21-35:5, 192:14-193:23). According to McDowell, allowing White to see the time off request form was discriminatory because no one had ever given McDowell someone else's information. (Id. at 37:16-38:21).

McDowell's request, however, was not a "Confidential" matter for Supervision because it was a common request from Helpers at that time, and management frequently discussed with the Union its position on swapping time. (Crutchfield Decl. at ¶ 9). McDowell's request was wrtten on a standard form and was treated in the routine manner by supervision. (Id.).

>4.     Deborah Crutchfield

McDowell also contends that Facilities Supervisor Crutchfield discriminated against her by not offering to pay her health insurance after she was terminated but offering to help Phyllis Hughes, a white Helper and McDowell's friend, pay for insurance. (McDowell Depo. at 247:21-248:20). Over the years, Crutchfield has personally offered to provide and has provided financial assistance to various Plant employees and former employees, both white and African

American, when they have faced financial hardship. (Crutchfield Decl. at ¶ 5). Crutchfield also
has organized the collection of money to assist Plant employees during financial hardships. (Id.).
Some of the employees whom Crutchfield has helped includes Tracy Morris, former White
female Helper, Bobbie White, former African American male Helper, Derroll Johnson, former
African American Helper, and former Helper Jimmy Johnson, White male. (Id.). Crutchfield
wrote a personal check to help White on one occasion and on another occasion gave him money
to assist at Christmas. (Id.). Regarding Johnson, Crutchfield sent money to him when he had
surgery while he reported to her as a Helper. (Id.). Crutchfield also provided financial
assistance to Derroll Johnson when he had surgery. (Id.). Further, Crutchfield gave money to
Sandra Little, an African American former Chemistry employee. (Id.). Most notably,
Crutchfield contributed to the collection of money for McDowell when she was off work for an
extended period of time for medical reasons a few years prior to her termination. (Id.).
Likewise, Crutchfield offered to assist Hughes with her health insurance payments so that she, a
single parent, could have health coverage for her child. (Id.). Crutchfield contributed to the
Facilities group's collection for Doris Ashford, African American Helper, as well. (Id.).

Next, McDowell claims that Crutchfield made her and Sanders come in to work even
though they had been given "rest provision." (McDowell Depo. at 261:1-13). Southern Nuclear
concedes that Plaintiffs were denied "rest provision" and instead were required to come to work
at Plant Farley for their regular schedule after they finished the Plant Hatch outage in spring
2005. (Crutchfield Decl. at ¶ 26; Wright Decl. at ¶ 15). None of the Facilities Helpers, however,
were allowed rest provision after this outage because of a shortage of manpower resulting from
back to back outages (first Plant Hatch and then Plant Vogtle). (Id.). Rest provision is time off
with pay due to a schedule change at management's request. (Id.). Payment of rest provision is

a discretionary decision for management. (Id.). Plaintiffs got off work at Plant Hatch at 7:00 a.m. on Friday, March 4, and were paid 8 hours of travel time for Saturday March 5 (40 hours off), although it only takes 5 hours to travel from Plant Hatch to Plant Farley. (Crutchfield Decl. at ¶ 26). McDowell and Sanders were off work from 7:00 a.m. on Friday, March 4, until 11:00 p.m. Saturday, March 5, when they reported back to work on their regular shift at Plant Farley. (Id.). The only Helpers who were allowed to be "OFF" on Saturday, March 5, were those whose regularly scheduled off day was Saturday or those who took vacation. (Crutchfield Decl. at ¶ 26 & Ex. J; Wright Decl. at ¶ 15 & Ex. F).[30]

Finally, Plaintiffs claim that Deborah Crutchfield refused to accept the resignation of Jackie Cureton Boutwell ("Boutwell") so that Boutwell could receive her PPP for the 2004 year. (McDowell Depo. at 210:8-23, Sanders Depo. at 80:4-11). McDowell claims that this is unfair because she was not treated similarly, even though she was terminated while Boutwell resigned. (McDowell Depo. at 211:2-12; Crutchfield Decl. at ¶ 3). Sanders claims that since Southern Nuclear refused to accept her unsigned resignation letter and later reflected her status as terminated, this is evidence that she was maliciously terminated. (Sanders Depo. at 80:16-81:4). Plaintiffs simply are incorrect.[31] Boutwell submitted her letter of resignation on January 3, 2005, three (3) days after she needed to be employed to receive PPP. Further, her resignation was not effective until January 29, 2005. (Crutchfield Decl. at ¶ 3 & Ex. A; Bestwick Decl. at ¶ 53 & Ex. Z). Because Boutwell was employed with Southern Nuclear on December 31, 2004, she was eligible for the Company's incentive bonus or PPP for the 2004 work year. (Id.). Crutchfield did not refuse to accept Boutwell's resignation in order for her to receive PPP. (Crutchfield

---

[30] At other times, Plaintiffs have been granted rest provision. (Wright Decl. at ¶ 16 & Ex. G). Moreover, white Helpers, including White, have been denied rest provision. (Id. at ¶¶ 17-18 & Exs. H-I).

[31] Plaintiffs' allegations regarding Boutwell's resignation further illuminate their chip-on-the-shoulder allegations of discrimination.

Decl. at ¶ 4). Boutwell did call Crutchfield at home and told her that she was having problems with her blood pressure and was considering resigning. Crutchfield suggested that Boutwell see a doctor about her blood pressure. (Id.).

### C.   Other Acts of Alleged Discrimination

Plaintiffs allege that white employees engaged in more egregious conduct yet were not disciplined. (Complaint at ¶ 10). One example involved an inappropriate cake brought in to work by Caldwell in 2004. (McDowell Depo. at 60:18-62:14; Sanders Depo. at 77:9-12). McDowell claims that Caldwell told her that her "slate was wiped clean," which McDowell interpreted to mean that Caldwell was not disciplined for bringing in the cake. (McDowell Depo. at 62:15-19). McDowell asserts that the only employee disciplined as a result of this incident was Patricia Glasco, an African-American Foreman, although McDowell admits that she has no personal knowledge regarding other employees receiving discipline. (Id. at 61:11-17, 63:10-17). Contrary to McDowell's unsupported belief, however, two Foremen were issued discipline because they took no action regarding the cake. (Bestwick Decl. at ¶ 41). Specifically, Glasco and Howard Maddox, a white male Plant Hatch Foreman working the outage at Plant Farley at the time, both received Oral Reminders because of their failure to address the situation. (Bestwick Decl. at ¶ 41 & Exs. T, U).

McDowell also complains that she was allegedly asked by Don Grissette to take tables to his house during normal business hours for a party. (McDowell Depo. at 231:22-232:9). McDowell did not know what kind of party it was. (Id. at 232:10-16). The party was a retirement party for Martin Mitchell, the Health Physics Superintendent and a 30-year employee. (Grissette Decl. at ¶ 16). Grissette hosted the retirement party at his home. (Id.). The party was a company function and was paid for by Southern Nuclear. (Id.).

## VI.    PROCEDURAL HISTORY

Plaintiff McDowell filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or around December 12, 2005. (McDowell Depo. at 100:12-22 & Ex. 6, p.4; Bestwick Decl. at ¶ 38 & Exs. O, P).[32]  The EEOC dismissed the charge on January 19, 2006, without requiring a response from Southern Nuclear. (Bestwick Decl. at ¶ 38 & Ex. Q).   More specifically, the EEOC advised McDowell that, *even assuming her allegations to be true*, the allegations "establish that you were discharged for a reason which, in the Commission's view, would not constitute discrimination . . . or retaliation.  Discharge for your part in the creation of a hostile work environment would raise no inference of discrimination sufficient to warrant further Commission investigation or involvement." (McDowell Depo. at 101:2-5 & Ex. 6).

Sanders alleges that she filed a charge with the EEOC as well. (Sanders Depo. at 66:11-69:5).  However, the EEOC has no record of having received a charge from Sanders. (Tulloss Decl. at ¶ 6 & Ex. B).  In any event, Southern Nuclear never received notice that Sanders had filed a charge of discrimination with the EEOC, nor did it ever receive any charge of discrimination filed by Sanders. (Bestwick Decl. at ¶ 40).   After being deposed, Sanders produced the "charge" that she allegedly filed with the EEOC, which in fact was a letter that she wrote to the EEOC dated January 22, 2006. (Tulloss Decl. at ¶ 7 & Ex. C).  The letter offered by Sanders was not verified or made under oath. (Id.).  Sanders claims that the EEOC advised her that "they couldn't find any findings" relating to her allegations. (Sanders Depo. at 69:6-12).

Plaintiffs filed their Complaint on April 7, 2006. (Doc. 1). Plaintiffs' Complaint alleges race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et

---

[32] McDowell's EEOC charge mentions only being discharged because of the hostile work environment allegations. It does not mention being disciplined for swapping job assignments, even though McDowell knew that swapping job assignments was part of the reason she was disciplined. (McDowell Depo. at 315:10-316:4 & Ex. 6).

seq., and 42 U.S.C. § 1981. (Id.). The Complaint also alleges that Southern Nuclear created a racially hostile work environment. (Id. at ¶ 11). However, the allegation of "hostile environment" is supported by the allegation that "whites are not punished for serious offenses but blacks are punished for minor or imagined offenses." (Id.). In other words, the allegation labeled "hostile environment" is a mislabeled disparate treatment claim.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 mandates summary judgment when, under the standards applied by the substantive law, no substantial evidence establishes a material issue of fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). In order to defeat summary judgment, the plaintiff may not rest merely on her pleadings, but must present admissible evidence that raises a genuine issue of material fact. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient. . . ." Id. at 252 (internal citations omitted); see Matsushita Electronics Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 581 (1986).

Summary judgment is appropriate for disposing of cases in which, under the evidentiary standards applied by the substantive law, there is no outcome-determinative issue of fact, supported by substantial evidence. "Material" means "outcome determinative." Anderson, 477 U.S. at 252. "The determination of whether a genuine factual dispute requires submission to a [fact finder] must be guided by the 'substantive evidentiary standards' that apply to the case . . . ." When the "substantive evidentiary standards" place the burden of proof on the merits of the nonmovant, the movant may prevail by offering evidence or by pointing out deficiencies in the nonmovant's evidence. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437-38 (11th Cir. 1991)) (en banc).

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  That party must demonstrate that there is a "genuine issue for trial."  Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 587.  This showing requires the non-movant to raise "significant probative evidence" that would be sufficient to support a jury verdict in favor of the non-moving party.  Moses v. American Nonwovens, Inc., 97 F.3d 446, 447 (11th Cir. 1996), cert. denied, 519 U.S. 1118 (1997).

The Eleventh Circuit in Chapman v. AI Transport, 229 F.3d 1012 (11th Cir. 2000), stated that "summary judgment is hardly unknown, or for that matter rare, in employment discrimination cases, more than 90 percent of which are resolved before trial . . . many of them on the basis of summary judgment for the defendant."  Chapman, 229 F.3d at 1025, quoting Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1396 (7th Cir. 1997).  See also, Earley v. Champion Intern. Corp., 907 F.2d 1077, 1081 (11th Cir. 1990) ("Summary judgments for defendants are not rare in employment discrimination cases.").  Title VII and related cases are appropriate for summary judgment even though they involve questions of intent.  Coleman v. St. Regis Corp., 39 Fair Empl. Prac. Cas. (BNA) 479, 481 (N.D. Ala. 1985); accord, Hamm v. Dresser Indus., Inc., 41 Empl. Prac. Dec. (CCH) Par. 36,652 at 44,964 65 n.1 (N.D. Ala. 1986).  There is "no justifiable reason for treating Title VII and related cases any differently than other cases" for summary judgment purposes because the "proclivity for  abuse in filing actions in that area is just as great, if not greater, than in other areas of the law." Hamm, 41 Empl. Prac. Dec.

(CCH) 36,652 at 44,964 65 n.2.  Given the "substantive evidentiary standards" applicable to an employment discrimination case, a non-movant plaintiff who cannot at the summary judgment stage offer substantial evidence of employment discrimination will not survive a summary judgment motion.  See Palmer v. District Bd. of Trustees, 748 F.2d 595, 599 (11th Cir. 1984), quoting Pace v. Southern Ry. System, 701 F.2d 1383, 1391 (11th Cir.), cert. denied, 464 U.S. 1018 (1983); Chapman, 229 F.3d at 1027 (holding that "we have frequently railed about the evils of shotgun pleadings and urged district courts to take a firm hand and whittle cases down to the few triable claims, casting aside the many non triable ones through . . . summary judgment where there is no genuine issue of material fact.").

## ARGUMENT AND CITATION TO AUTHORITY

I.    **PLAINTIFFS' RACE DISCRIMINATION CLAIMS ARE DUE TO BE DISMISSED.[33]**

Faced with the clear, non-discriminatory reasons for their terminations, Plaintiffs now allege that their terminations were the final step in some grand plan to single them out because of their race.  Because there is no direct evidence of discrimination, this case is governed by the familiar analytical framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and its progeny.[34]  Each step in that framework will be addressed in turn.

---

[33] In addition to the reasons discussed below, Sanders' Title VII claim is due to be dismissed because she failed to file an adequate charge of discrimination with the EEOC.  "It is settled law that in order to obtain judicial consideration of [a Title VII] claim, a plaintiff must first file an administrative charge with the EEOC within 180 days after the alleged unlawful employment practice occurred."  Pijnenburg v. West Georgia Health Sys., Inc., 255 F.3d 1304, 1305 (11th Cir. 2001), citing 42 U.S.C. § 2000e-5(e)(1).  However, Sanders' alleged "charge," the letter that she wrote to the EEOC, is not sworn or otherwise verified.  As such, it is not an adequate charge.  See 42 U.S.C. § 2000e-5(b) (EEOC charges must be made under "oath or affirmation"); 29 C.F.R. § 1601.9 (EEOC charges must be verified); Pijnenburg, 255 F.3d at 1307 ("The law is clear that to meet the requirements of Title VII, a charge has to be verified.").  Sanders' Title VII claim is due to be dismissed.

[34] The Eleventh Circuit has stated that the "elements of a claim of race discrimination under 42 U.S.C. § 1981 are also the same as a Title VII disparate treatment claim in the employment context."  Rice-Lamar v. City of Fort Lauderdale, 232 F.3d 836, 843 n.11 (11th Cir. 2000).

A.  **Plaintiffs Cannot Establish a *Prima Facie* case because they cannot show that they were similarly situated to white employees who were treated more favorably.**

In order to make out a *prima facie* case of discrimination, Plaintiffs must show that (1) they belong to a protected class, (2) they were subjected to an adverse employment action, (3) a similarly situated person outside of their protected class was treated more favorably, and (4) they were qualified to hold their positions.  See Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003); Rice-Lamar, 232 F.3d at 842-43.  For purposes of summary judgment only, Southern Nuclear concedes that Plaintiffs belong to a protected class, that they were qualified to hold their positions, and that they suffered an adverse employment action – discipline and later termination.[35]

Plaintiffs' claims are due to be dismissed, however, because they have failed to produce sufficient evidence to demonstrate that they were treated less favorably than a similarly situated person outside of their protected class.  The Eleventh Circuit has provided guidance on what it means to be similarly situated:

> "In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."  Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1311 (11th Cir.), opinion modified by 151 F.3d 1321 (1998) (quoting Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997)).  "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed."  Id. (internal quotations and citations omitted).  We require that the quantity and quality of the comparator's misconduct be nearly identical to

---

[35] None of the other alleged mistreatment offered by Plaintiffs constitutes an adverse employment action.  "To be considered an adverse employment action . . . the action must either be an ultimate employment decision or else must 'meet some threshold of substantiality.'"  Stavopoulos v. Firestone, 361 F.3d 610, 616-17 (11th Cir. 2004) (citation omitted).  To meet this threshold of substantiality, the employment action must be "'objectively serious and tangible enough' to alter [the employee's] 'compensation, terms, conditions, or privileges of employment . . . .'"  Gupta v. Florida Bd. of Regents, 212 F.3d 571, 588 (11th Cir. 2000) (citations omitted).  See also Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001) (holding that changes in "the terms, conditions, or privileges of employment" must be "serious and material").  Plaintiffs' allegations of unfair job assignments, allowing employees to look at "confidential" overtime slips, and the like simply do not rise to this level.  Moreover, allegations of unfair treatment against other Plant employees do not translate into an adverse employment action against Plaintiffs.

> prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges. See Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.").

Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999) (emphasis added). See also Knight, 330 F.3d at 1316.

To avoid this obvious hurdle to their claims, Plaintiffs have recounted the numerous "incidents" outlined above. The purported "comparators" contained in Plaintiffs' laundry-list of allegations, however, did not engage in conduct of the kind, quantity, or severity of that engaged in by Plaintiffs. In other words, none of the incidents recounted by Plaintiffs involved the creation or promotion of a hostile work environment. Nor does any of the alleged comparator conduct involve: (1) repeated performance problems once being placed on DML (McDowell), or (2) job abandonment (Sanders). As such, to accept any of Plaintiffs' alleged incidents as "comparators" for a discrimination analysis would be to engage in the very comparison of apples and oranges proscribed by the Eleventh Circuit. See Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001) ("The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishment imposed.").

Rather, because Plaintiffs have pointed to no other similar misconduct, the only possible proper comparators would be the other employees disciplined as a result of Bestwick's harassment investigation. However, consideration of these comparators does not advance Plaintiffs' position because Southern Nuclear conducted an investigation in which it concluded that different employees had engaged in different levels of misconduct. Southern Nuclear disciplined these varying levels of culpability accordingly. Because the employees were found to have engaged in different levels of misconduct, they cannot, by definition, be similarly situated to the Plaintiffs. Moreover, even assuming *arguendo* that all employees disciplined at

the same time as Plaintiffs were similarly situated, the fact remains that the only proper comparator outside of Plaintiffs' protected class was treated <u>less favorably</u> than Plaintiffs. Phyllis Hughes, who is white, was terminated as a result of the investigation while McDowell was given only a DML and Sanders only a written warning. Moreover, other African American employees found to have engaged in misconduct at the time of the investigation were treated <u>more favorably</u> than Plaintiffs based on lower levels of culpability. <u>See</u> <u>supra</u>, n.22. Consideration of these comparators, thus, actually supports Southern Nuclear's position.

Regarding their terminations, Plaintiffs again can point to no other employees who were similarly situated and treated more favorably. Although Plaintiffs have tried to cloud the issue by raising every "chip-on-the-shoulder" allegation they could think of, the fact remains that they have pointed to no proper comparators. Specifically, McDowell identified no one who was on a DML for creating a hostile work environment and swapping job assignments who later was not terminated even though they continued to engage in improper behavior. Nor has Sanders, despite her laundry list of complaints, pointed to anyone who failed to report to work under the same circumstances as she did, for as long as she did but was allowed to remain employed. Likewise, Sanders can identify no one whose unsigned letter of resignation was accepted by Plant management. Plaintiffs simply cannot meet their burden to point to a similarly situated comparator and thus have failed to establish a *prima facie* case of discrimination. Their claims are due to be dismissed. <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997) ("If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present.").

**B.     Southern Nuclear Has Presented Legitimate, Non-Discriminatory Reasons For Its Actions.**

Assuming *arguendo* that Plaintiffs have made out a *prima facie* case of discrimination, Southern Nuclear has presented legitimate, non-discriminatory reasons for its actions.  The burden on the employer to produce a legitimate, non-discriminatory reason is relatively light:

> [T]he employer's burden is merely one of production; it "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."
>
> If the defendant articulates one or more such reasons, the presumption of discrimination is eliminated . . . .

Chapman, 229 F.3d at 1024 (emphasis added) (citations omitted).[36]  See also Rice-Lamar, 232 F.3d at 843.  The reason offered by the employer "does not have to be a reason that the judge or jurors would act on or approve."  Schoenfeld v. Babbitt, 168 F.3d 1257, 1269 (11th Cir. 1999) citations omitted).  Rather, "all that matters is that the employer advances an explanation for its action that is not discriminatory in nature."  Id. at 1269.

Here, Southern Nuclear has met its burden of production.  Both Plaintiffs were initially disciplined for, among other things, creating a hostile work environment and for switching job assignments without Supervision approval.  Both of these infractions were violations of specific policy and/or instructions, and the discipline was issued only after Southern Nuclear received a specific complaint and conducted a thorough investigation.  Notably, Plaintiffs did not receive the same level of discipline, but rather were disciplined consistent with Southern Nuclear's conclusions regarding their respective roles in the underlying conduct.  McDowell was subsequently terminated for continued behavioral problems.  Sanders, by contrast, was

---

[36] Chapman involved a suit brought under the Age Discrimination in Employment Act.  However, the court in Chapman noted that the Title VII framework is generally applicable.  229 F.3d at 1024.

terminated for job abandonment.  Southern Nuclear clearly has articulated a legitimate, non-discriminatory reason for its actions.

### C.    Plaintiffs Cannot Show That Southern Nuclear's Articulated Reasons Are Pretextual.

Once an employer articulates a legitimate, non-discriminatory reason for the adverse employment action, the burden is on the plaintiff to show that the proffered reason is a pretext for discrimination.  See Rice-Lamar, 232 F.3d at 843.  In order to demonstrate pretext on the part of the employer,

> "[T]he plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim.

Chapman, 229 F.3d at 1024-25 (emphasis added) (citations and footnote omitted).  However, in arguing that the employer's proffered reason is pretextual:

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.  See Alexander v. Fulton County, Ga., 207 F.3d 1303, 1341 (11th Cir. 2000) (Title VII case) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated."); Combs, 106 F.3d at 1541-43. We have recognized previously and we reiterate today that:
>
> > [f]ederal courts "do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [Section 1981] does not interfere.  Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior."

Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1988) (citations

omitted)); see also Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984) (An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."); Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1361 (11th Cir. 1999) ("We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. We are not in the business of adjudging whether employment decisions are prudent or fair." (internal citation omitted)).

Chapman, 229 F.3d at 1030 (emphasis added) (footnotes omitted) (some citations omitted). Simply stated, neither Title VII nor § 1981 "take[s] away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." Maniccia, 171 F.3d 1369 (citation and quotation marks omitted).

Plaintiffs disagree with the conclusions reached as a result of the hostile environment investigation. They also disagree with the discipline issued and the subsequent terminations. However, whether Plaintiffs, or this Court, believe that Southern Nuclear's conclusions were correct is irrelevant. Rather, Plaintiffs must show that Southern Nuclear did not in fact reach the conclusions. See, e.g., Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002) (Noting that courts "are not interested in whether the [employer's] conclusion is a correct one, but whether it is an honest one."); Silvera, 244 F.3d at 1261 ("Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action.") (citation omitted); Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253 (11th Cir. 2000) ("A plaintiff must show not merely that the defendant's employment decisions were mistaken, but that they were in fact motivated by [race].").  Despite Plaintiffs' attempts to confuse the issue, the evidence negating pretext is overwhelming:

- When Southern Nuclear learned of problems in the Facilities Group involving the Helpers, it took comprehensive steps to remedy the issues and prevent future problems from occurring. These steps included replacing the majority of the Foremen in the Facilities Group.

35

- Until it received the specific complaint from Caldwell and White, Southern Nuclear viewed Plaintiffs as good employees and treated them accordingly. Both Plaintiffs consistently received very good performance evaluations, many of which were completed by the very people that are now accused of mistreatment.[37] These good evaluations continued even after the alleged scheme to single Plaintiffs out began.

- The same allegedly biased supervisors and Foremen also often sent Plaintiffs emails of praise and encouragement and even forwarded emails to Plaintiffs sent from other employees to show Plaintiffs that they were appreciated.

- Plaintiffs continued to be assigned to work together even after allegedly being singled out.

- Plaintiffs also received PPP bonuses, i.e., performance bonuses, throughout their tenure with Southern Nuclear based on the allegedly biased supervisors' feedback.

- In July 2005, Southern Nuclear received a specific complaint from two employees that alleged a violation of Southern Nuclear's specific anti-harassment policy.

- Southern Nuclear conducted an investigation of the allegations, interviewing a total of nine (9) employees.  The investigation concluded that both African American and white employees had contributed to a hostile work environment.

- As a result of the investigation, Southern Nuclear issued discipline consistent with what it believed were the various parties' roles in the alleged misconduct.

- Contemporaneous with the hostile environment investigation, Southern Nuclear learned that various Helpers, both African American and white, were swapping jobs without permission.

- McDowell was placed on DML, while Sanders was given only a written warning, underscoring that discipline was based on conduct, not race.

- Phyllis Hughes, a white employee, was terminated for her part in the alleged conduct, further underscoring that conduct, not race, was the driving force behind the discipline.

- Other employees were disciplined, including African American employees who were given lesser discipline.

- McDowell was ultimately terminated for not complying with the terms of her DML.

---

[37] Cf. Williams v. Vitro Services Corp., 144 F.3d 1438, 1442-43 (11th Cir. 1998) (creating a "permissible inference that no discriminatory animus motivated" the employer when same actor both hires and terminates an employee).

- Sanders, by contrast, was not terminated for continued behavioral problems. Rather, Sanders was terminated for job abandonment for failing to report to work and report her status even after being given an opportunity to complete FMLA paperwork.

Simply put, "[n]on-discriminatory differences just as readily explain the difference in treatment." Nix, 738 F.2d at 1186 (citation omitted). Plaintiffs were never disciplined, and in fact were praised and rewarded, until Southern Nuclear received a specific complaint that they, and others, had engaged in misconduct. Plaintiffs may disagree with the conclusions reached by Southern Nuclear, but they have no evidence that Southern Nuclear did not honestly reach these conclusions. See, e.g., Rojas, 285 F.3d at 1342 (Noting that courts "are not interested in whether the [employer's] conclusion is a correct one, but whether it is an honest one."). To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Rather, that party must show that there is a "genuine issue for trial." Matsushita, 475 U.S. at 586, 587. Plaintiffs have not met this burden, and therefore Southern Nuclear is entitled to judgment as a matter of law.

## II.    PLAINTIFFS' HOSTILE ENVIRONMENT CLAIMS ARE DUE TO BE DISMISSED.

As noted above, although Plaintiffs' allege a "hostile environment," in their complaint, it is clear that this term of art was simply misapplied to the disparate treatment claim already discussed above. Out of an abundance of caution, however, Southern Nuclear will address a separate hostile environment claim. In reviewing the elements, Southern Nuclear would note that "motions for summary judgment are appropriate as a matter of law 'to police the baseline for hostile environment claims.'" Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc), cert. denied, 529 U.S. 1068 (2000) (quoting Indest v. Freeman Decorating, Inc., 164 F.3d 258, 264 n.8 (5th Cir. 1999)). Plaintiffs' harassment claims necessarily fail because they cannot establish that the alleged harassment was sufficiently severe or pervasive to alter the

terms and conditions of employment and create a discriminatorily abusive working environment.[38]

The Supreme Court has made it clear that not all harassment is actionable under Title VII. Meritor Sav. Bank FSB v. Vinson, 477 U.S. 57, 67 (1986); see also Oncale v. Sundowner Offshore Svcs., Inc., 523 U.S. 75, 81 (1998); Gupta, 212 F.3d at 583 (observing that fourth element is one that "tests the mettle of most sexual harassment claims"). Title VII is neither "a general civility code" nor "designed to purge the workplace of vulgarity." Oncale, 523 U.S. 75, 81 (1998); see Blevins v. Heilig-Meyers Corp., 52 F.Supp.2d 1337, 1350-51 (M.D. Ala. 1998) (stating that Title VII does not guarantee refinement and sophistication in the workplace); cf. Meritor Savings Bank, 477 U.S. at 67 (emphasizing that not all workplace conduct that has sexual overtones can be characterized as harassment forbidden by Title VII). In order to establish this "crucial" element, a plaintiff must "subjectively perceive" the offending conduct as severe or pervasive and such belief must be "judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Mendoza, 195 F.3d at 1246 (internal quotations omitted). Even assuming that Plaintiffs can meet the subjective prong, there is no question that they cannot meet the objective prong.

In determining whether the alleged conduct is sufficiently severe or pervasive from an objective standpoint, the Court should consider four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating,

---

[38] "Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment." AMTRAK v. Morgan, 536 U.S. 101, 116 n.10 (2002). Therefore, to prove racial harassment under Title VII or § 1981, a plaintiff must show (1) that she belongs to a protected group; (2) that she has been subjected to unwelcome racial harassment; (3) that the harassment was based on his race; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists. Hulsey v. Pride Restaurants, LLC, 367 F.3d 1238, 1244 (11th Cir. 2004); Johnson v. Booker T. Washington Broad. Serv., 234 F.3d 501, 508 n. 7 (11th Cir. 2000); Mendoza v. Borden, Inc. 195 F.3d 1238 (11th Cir. 1999).

or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Gupta, 212 F.3d at 584 (citation omitted); Clark County School District v. Breeden, 532 U.S. 268, 270-71 (2001); Mendoza, 195 F.3d at 1246-47 (holding that the absence of three of the four factors - physically threatening or humiliating conduct, interference with job performance, severity and frequency-prevented the establishment of a hostile environment). As one court has noted in the context of sexual harassment, "[a]ll of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment." Indest v. Freeman Decorating, Inc., 164 F.3d 258, 263 (5th Cir. 1999).

A hostile work environment is created only "when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (emphasis added); Edwards v. Wallace Community College, 49 F.3d 1517, 1521 (11th Cir. 1995) ("For example, the racial slurs allegedly spoken by co-workers had to be so 'commonplace, overt and denigrating that they created an atmosphere charged with racial hostility.'") (citation omitted). Isolated and sporadic instances are insufficient. Rather, there must be a steady barrage of comments or touching in order to constitute a hostile environment. Harris, 510 U.S. at 23 ("mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment") (quotation omitted); Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) ("simple teasing . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of

employment.'"); <u>Bolden v. PRC Inc</u>., 43 F.3d 545, 551 (10th Cir. 1994), <u>cert denied</u>, 516 U.S. 826 (1995) ("Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments.") <u>cert. denied</u>, 516 U.S. 826 (1995); <u>Drinkwater v. Union Carbide Corp</u>., 904 F.2d 853, 863 (3rd Cir. 1990) ("Hostile environment harassment claims must demonstrate a continuous period of harassment, and two comments do not create an atmosphere."); <u>Merriweather v. Alabama Dept. of Public Safety</u>, 17 F. Supp. 2d 1260, 1272 (M.D. Ala. 1998) ("The complained of conduct must be persistent and routine rather than isolated or sporadic in nature in order to be sufficiently severe and pervasive to alter the conditions of employment."); <u>Givhan v. Electronic Engineers, Inc</u>., 4 F. Supp. 2d 1331, 1342 (M.D. Ala. 1998) (racially derogatory remarks by supervisors, although patently offensive and derogatory, do not meet the threshold for stating a hostile environment claim); <u>Ellis v. Wal-Mart Stores, Inc</u>., 952 F. Supp. 1522, 1527 (M.D. Ala. 1996) ("It is well established that isolated and sporadic incidents of harassment are insufficient to create a hostile working environment."); <u>Bivens v. Jeffers Vet Supply</u>, 873 F. Supp. 1500, 1508 (M.D. Ala. 1994) ("Unfortunately for plaintiff, a 'mere utterance of an . . . epithet which engenders offensive feelings' does not adversely affect a term or condition of employment."), <u>aff'd</u> 58 F.3d 640 (11th Cir. 1995).[39]

---

[39] In <u>Mendoza v. Borden, Inc.</u>, 195 F.3d 1238 (11th Cir. 1999), the Eleventh Circuit cited a host of cases in which the alleged conduct was not severe or pervasive enough to warrant a finding of harassment. <u>Id.</u> at 1246-1248. An examination of the cases cited in <u>Mendoza</u> demonstrates that courts routinely reject harassment claims premised on conduct which is worse than the conduct alleged by Plaintiffs. <u>See, e.g.</u>, <u>Shepherd v. Comptroller of Public Accounts of Texas</u>, 168 F.3d 871, 872-75 (5th Cir. 1999) (holding that several incidents over a two-year period, including comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, touching plaintiff's arm, and attempts to look down the plaintiff's dress, were insufficient to support hostile-environment claim); <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 768 (2d Cir. 1998) (holding that statement that plaintiff had the "sleekest ass" in office plus single incident of "deliberately" touching plaintiff's "breasts with some papers that he was holding in his hand" were insufficient to alter the terms or conditions of the plaintiff's employment); <u>Adusumilli v. City of Chicago</u>, 164 F.3d 353, 357 (7th Cir. 1998) (holding actions insufficient to support hostile environment claim where co-employees teased plaintiff, made sexual jokes aimed at her, asked her what "putting one rubber band on top and another on the bottom means," commented about her low neck tops, repeated staring at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers or buttocks); <u>Sprague v. Thorn Americas, Inc.</u>, 129 F.3d 1355, 1365-66 (10th Cir. 1997) (holding five "sexually-oriented, offensive" statements over sixteen months insufficient to show hostile environment, even though one of the

When viewed in light of the foregoing standards, Plaintiffs' allegations simply do not rise to the level of actionable harassment.  Plaintiffs, at best, recite a series of isolated incidents that occurred over the period of approximately sixteen months.[40]  These allegations relate to unfair job assignments, unwarranted discipline or similar unfair treatment.  None of these alleged events involved racial epithets, racially hostile symbols or pictures (i.e., nooses), physically threatening or humiliating conduct, offensive touching, or like conduct that has led to successful harassment claims.  Nor can it be said to have interfered with Plaintiffs' job performance, given that Plaintiffs received praise from management, positive job evaluations, and annual performance bonuses up until they were found to have themselves contributed to a hostile work environment.  Stated differently, from an objective standpoint, Plaintiffs' hostile environment claims necessarily fail and Southern Nuclear is entitled to summary judgment on those claims.

## CONCLUSION

For the foregoing reasons, Southern Nuclear respectfully requests that the Court grant summary judgment to it on all of Plaintiffs' claims.

/s/ Lisa J. Sharp
Lisa J. Sharp (SHA035)
Brent Cobb (COB020)
Attorneys for Southern Nuclear Operating Comp.
BALCH & BINGHAM LLP
Post Office Box 306
Birmingham, AL 35201-0306
Telephone: (205) 251-8100
Facsimile: (205) 488-5708
E-mail: lsharp@balch.com
              bcobb@balch.com

---

harasser's statements occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it when you can"); Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753-54 (4th Cir. 1996) (holding evidence that the harasser "bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding, and stared at him in the bathroom" insufficient to establish violation of Title VII).

[40] The alleged harassment began on April 1, 2004.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and service will be perfected upon the following this the 21st day of December, 2006:

Attorney for Plaintiff
Malcolm Newman
Post Office Box 6137
Dothan, Alabama 36302
(334) 792-2132 Telephone
Email: mnewman470@aol.com

Respectfully submitted,

/s/ Lisa J. Sharp
Lisa J. Sharp (SHA035)
Brent Cobb (COB020)
Attorney for Defendant, Southern Nuclear
Operating Company
BALCH & BINGHAM LLP
Post Office Box 306
Birmingham, AL 35201-0306
Telephone: (205) 251-8100
Facsimile: (205) 488-5708
E-mail: lsharp@balch.com
          bcobb@balch.com