**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

## Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3      SOUTHERN DIVISION
4
5  CASE NUMBER:  1:06-cv-314-CSC
6
7  JANELL MCDOWELL and
8  STEPHANIE SANDERS,
9    Plaintiffs,
10 vs.
11 SOUTHERN NUCLEAR OPERATING
12 COMPANY, INC.,
13    Defendant.
14
15
16 BEFORE:
17   Cynthia M. Noakes, Court Reporter
18   and Notary Public
19
20
21 DEPOSITION TESTIMONY OF JANELL MCDOWELL
22
23 ****************************

## Page 2

1        S T I P U L A T I O N
2
3      IT IS STIPULATED AND AGREED by and
4  between the parties through their respective
5  counsel, that the deposition of JANELL MCDOWELL
6  may be taken before Cynthia M. Noakes, Court
7  Reporter, at the Law Offices of MALCOLM R.
8  NEWMAN, 219 West Crawford Street, Dothan, Alabama
9  36301, on the 6th day of October, 2006.
10     IT IS FURTHER STIPULATED AND AGREED
11 that the signature to and the reading of the
12 deposition by the witness is waived, the
13 deposition to have the same force and effect as
14 if full compliance had been had with all laws and
15 rules of Court relating to the taking of
16 depositions.
17     IT IS FURTHER STIPULATED AND AGREED
18 that it shall not be necessary for any objections
19 to be made by counsel to any questions except as
20 to the form or leading questions, and that
21 counsel for the parties may make objections and
22 assign grounds at the time of the trial, or at
23 the time said deposition is offered in evidence,

## Page 3

1  or prior thereto.
2      IT IS FURTHER STIPULATED AND AGREED
3  that the notice of filing of the deposition by
4  the Court Reporter is waived.
5
6
7
8
9
10
11
12
13
14
15
16 ****************************************
17
18
19
20
21
22
23

## Page 4

1            INDEX
2  EXAMINATION BY:              PAGE NUMBER:
3  MS. SHARP                    6-110
4
5  EXHIBITS:
6  Defendant's Exhibit No. 1          8
7  Defendant's Exhibit No. 2          53
8  Defendant's Exhibit No. 3          54
9  Defendant's Exhibit No. 4          83
10 Defendant's Exhibit No. 5          99
11 Defendant's Exhibit No. 6          100
12 Reporter's Certificate             111
13
14
15
16
17
18 ****************************************
19
20
21
22
23

1 (Pages 1 to 4)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 5

```
1              APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFFS:
4        MR. MALCOLM R. NEWMAN
5        ATTORNEY AT LAW
6        219 West Crawford Street
7        Dothan, Alabama  36301
8
9    ON BEHALF OF THE DEFENDANT:
10       MS. LISA J. SHARP
11       ATTORNEY AT LAW
12       BALCH & BINGHAM, LLP
13       1710 Sixth Avenue North
14       Birmingham, Alabama  35203
15
16   ALSO PRESENT:
17       MS. SHARON F. BESTWICK,
18       Employee Relations Coordinator
19       Southern Nuclear Operating Company,
20       Inc.
21
22
23   *************************************
```

Page 6

```
1
2         I, CYNTHIA M. NOAKES, a Court Reporter
3    of Eufaula, Alabama, acting as Commissioner,
4    certify that on this date, as provided by the
5    Alabama Rules of Civil Procedure, there came
6    foregoing stipulation of counsel, there came
7    before me at the Law Offices of MALCOLM R.
8    NEWMAN, 219 West Crawford Street, Dothan, Alabama
9    36301, beginning at 9:30 a.m., JANELL MCDOWELL,
10   witness in the above cause, for oral examination,
11   whereupon the following proceedings were had:
12
13        JANELL MCDOWELL,
14   being first duly sworn, was examined and
15       testified as follows:
16
17       THE COURT REPORTER:  Usual
18   stipulations?
19       MR. NEWMAN:  Yes.
20       MS. SHARP:  That will be fine.
21
22          EXAMINATION
23   BY MS. SHARP:
```

Page 7

```
1    Q.   Ms. McDowell, we met before we got started
2    with the deposition. I'm Lisa Sharp and I'm
3    representing Southern Nuclear Operating Company in
4    this lawsuit that you filed against the company.
5        I just wanted to run through a couple of the
6    ground rules that we're going to be operating
7    under today.
8        Would you let me know if you need a break
9    during the deposition?
10   A.   Sure.
11   Q.   Okay. If I ask you a question and you don't
12   understand my question, would you commit to
13   letting me know that you're not sure what I'm
14   asking you?
15   A.   Sure.
16   Q.   Because if I ask you something and you
17   answer, I'm going to hold you to that, even though
18   you may not have understood what I asked of you.
19       Do you know of any reason why you cannot
20   give me a truthful answer today as I ask you
21   questions during the deposition?
22   A.   I can give a truthful answer to the best of
23   my ability. But as far as, like, trying to hold
```

Page 8

```
1    me to dates and times on particular things, no, I
2    can't do that.
3    Q.   Okay. Well, if there are dates and times
4    that you are not sure of, would you just let me
5    know?
6    A.   Sure.
7    Q.   Are you on any type of medication today?
8    A.   No, I'm not.
9    Q.   Okay.
10       (Defendant's Exhibit No. 1 was
11        marked for identification and a
12        copy of the same is attached
13        hereto.)
14   Q.   I'll go ahead and hand you a copy of what
15   I've marked as Defendant's Exhibit 1. That's a
16   copy of the Complaint that's been filed on your
17   behalf in this lawsuit.
18       Have you seen a copy or read through a copy
19   of Defendant's Exhibit 1 prior to today?
20   A.   Of this Complaint?
21   Q.   Yes, ma'am.
22   A.   Uh-huh.
23   Q.   What was your answer?
```

2 (Pages 5 to 8)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 9

1  A.   Yes.
2  Q.   Okay. Is the -- are the allegations
3  contained in Defendant's Exhibit 1 truthful and
4  accurate?
5  A.   Yes.
6  Q.   I want you to look at paragraph 6, which is
7  on page 2 of the Complaint. Do you see that?
8  A.   Uh-huh.
9  Q.   Okay. That reads that, "Beginning in the
10  summer of 2005, both Plaintiffs began to
11  experience disparate treatment by their
12  supervisor."
13      What happened in the summer of 2005 that you
14  contend was discrimination by your supervisor?
15  A.   I had a supervisor, Mark Freeman, that came
16  into work, and a schedule was changed. He
17  approached myself, Stephanie Sanders, and Phyllis
18  Hughes at the end of the shift and asked who
19  changed the schedule. We told him that we did not
20  do it.
21      He asked us who got the computer code to go
22  in and change -- who got the foreman's computer
23  code to go in and change the schedule. We told

Page 10

1  him it was not us.
2      Stephanie stated to him that she believed it
3  was Shelley, another foreman's handwriting. He
4  then turned around and said he didn't believe us.
5  So, again, we stated that we didn't do it.
6      And he knew, when he approached us in the
7  manner that he did, he was wrong. He came back
8  and apologized and said, I knew the way that I
9  spoke to y'all and asked y'all the incident was
10  wrong, and would you accept my apology. We told
11  him it was no problem.
12      The next group that came in, Doris Ashford,
13  who was relieving him -- who was relieving us --
14  instead of him asking them if they changed the
15  schedule, he then turned around and asked her
16  which one of us changed the schedule.
17      So therefore he didn't believe us and then
18  he was still accusing us of falsifying documents.
19  Q.   I just want to make sure I'm getting this
20  right. He apologized at the way -- the manner in
21  which he asked you about the schedule change?
22  A.   He apologized for stating that we falsified
23  the documents. He apologized for that.

Page 11

1  Q.   Okay. For accusing you of doing that?
2  A.   For falsifying the documents.
3  Q.   And is all of this taking place in the same
4  day?
5  A.   Same day.
6  Q.   Okay. So then, after he apologized to you,
7  he then went to Doris Ashford?
8  A.   That's right. Who was relieving us.
9  Because they were evening shift; I believe we were
10  day shift. And asked her which one of us on day
11  shift changed the schedule. When, in fact,
12  Shelley, like Stephanie stated to him, changed the
13  schedule without informing him.
14  Q.   And he didn't ask Ms. Ashford if she or
15  someone else had changed the schedule?
16  A.   No.
17  Q.   And, in your mind, or your position is that
18  that was discriminatory treatment by Mr. Freeman?
19  A.   That is correct.
20  Q.   Okay. Is there anything that happened in
21  relation to discipline that took place against
22  you, Ms. Sanders, or Phyllis Hughes, because of
23  the schedule change?

Page 12

1  A.   No, there was no discipline. But just the
2  fact that he accused us of falsifying records,
3  that's a serious allegation.
4  Q.   Did anything else happen other than his
5  accusation of you three and his questioning Ms.
6  Ashford about the changing of the schedule?
7  A.   As far as?
8  Q.   Were you called into a meeting with him
9  or --
10  A.   We went to Deborah Crutchfield and we
11  explained to Deborah what had happened. Deborah
12  Crutchfield indicated that she was very upset,
13  because Jim Parrish wanted her to write Mark up on
14  a prior incident, which she didn't get into.
15  Started crying, saying that her job was being very
16  difficult because they were wanting her to do
17  things that she didn't want to do. And supposedly
18  spoke with Mark; but the outcome of it, we do not
19  know.
20  Q.   Was that the same day that Mr. Freeman
21  accused you of --
22  A.   This was the next day.
23  Q.   One rule I want to state that I should have

3 (Pages 9 to 12)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 13

1  said earlier: If you can let me finish my
2  question before you answer, Cindy here can't take
3  us both down at the same time, so let me get my
4  question out. I'm sorry for interrupting you.
5  But I just want to be sure the record's clear.
6  A.  That's okay.
7  Q.  What, if anything -- strike that.
8      Did your conversation with Deborah
9  Crutchfield that you just described, did that take
10  place the same day that you say Mark Freeman
11  accused you of falsifying documents?
12  A.  No, it did not.
13  Q.  Okay. When did your conversation with Ms.
14  Crutchfield take place?
15  A.  It was either the day after or two days
16  after. He accused us on a weekend, and she was
17  not there; and we spoke with her when she was at
18  work.
19  Q.  So when she returned to work, y'all went to
20  her?
21  A.  Uh-huh.
22  Q.  And who all went to her and talked to her
23  about this situation?

Page 14

1  A.  Stephanie and myself.
2  Q.  Did anything else happen related to Mr.
3  Freeman's accusation that y'all had falsified
4  documents, other than you going and talking with
5  Ms. Crutchfield?
6  A.  No.
7  Q.  Is there anything else, Ms. McDowell, that
8  goes into the allegation in paragraph 6 that,
9  beginning in the summer of 2005, you began to
10  experience disparate treatment by your supervisor?
11  A.  Well, actually, no, not 2005. But prior to
12  2005, when you came to give a deposition for
13  Derrick Henderson, it was mentioned to you, in a
14  meeting, about us being singled out and
15  discriminated against.
16  Q.  Okay. Let me just make sure I close off
17  paragraph 6.
18  A.  Okay.
19  Q.  The supervisor that you are complaining
20  about in paragraph 6 is Mark Freeman?
21  A.  He's not the only supervisor.
22  Q.  Okay.
23  A.  There are other supervisors.

Page 15

1  Q.  Okay. So with regard to paragraph 6 --
2  that's what I want to focus on; I want to make
3  sure I close this completely out -- what
4  supervisor are you complaining about there?
5  A.  Complaining about John Wright. An incident
6  occurred where he was offering overtime. Overtime
7  was based on a seniority list. Me myself,
8  Stephanie Sanders, and Eddie Harris were denied
9  overtime. He said he had no more overtime.
10      Then he turns around and gives the overtime
11  to two white females, when they weren't even
12  eligible for it.
13      He was addressed on the issue and sent out
14  an e-mail pertaining to he knew not to be fair
15  with us. And I believe Mr. Newman has a copy of
16  that e-mail.
17  Q.  Okay. When did this take place?
18  A.  I don't have the date or time. It's all
19  around the same time the e-mail was addressed.
20  Q.  Okay. And you said the folks who asked for
21  overtime were Eddie Harris, Stephanie Sanders, and
22  you?
23  A.  It was quite a few of us. But Eddie,

Page 16

1  Stephanie, and myself were turned down. Said
2  there was no more overtime for the day. He turns
3  around and gives the overtime that he sent us home
4  to Tammy Caldwell and Jennifer White.
5  Q.  Besides Ms. Caldwell and Ms. White, who else
6  got to work overtime?
7  A.  I don't know who worked on day shift. They
8  received overtime on evening shift, when that is
9  not the union procedure. You give your overtime
10  on day shift, based on seniority.
11  Q.  So what shift were you on?
12  A.  Day shift.
13  Q.  And you're saying Ms. Caldwell and Ms. White
14  were on evening shift?
15  A.  That is correct.
16  Q.  Okay. And your contention is that that
17  overtime should have been staffed by people on day
18  shift?
19  A.  That is correct, according to union
20  guidelines.
21  Q.  How do you know that Mr. Wright allowed Ms.
22  Caldwell and Ms. White to work overtime, after he
23  had told you and Mr. Harris and Ms. Sanders that

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 17

1  there wasn't any more overtime?
2  A.  The job steward at the time was Ashley Key.
3  Ashley Key and a few other helpers addressed it in
4  the morning briefing.
5      They wanted Phillip Avery to call Tammy and
6  Jennifer at home to take the overtime away from
7  them.
8      After the briefing, Stephanie and I went in
9  the office and told Phillip Avery that he didn't
10  have to call her; he didn't have to do that. If
11  it was already assigned and that's the way John
12  wanted to do it, that he didn't have to call her.
13  Q.  Who is Phillip Avery?
14  A.  He is also a foreman. Facilities foreman.
15  Q.  What happened?
16  A.  Phillip said he wasn't going to call her
17  anyway, and she received the overtime.
18  Q.  Okay. And you said that there is an e-mail
19  reflecting the time frame that this incident
20  happened; is that correct?
21  A.  I believe so. If it's not that incident,
22  it's another incident based on the same issue.
23  Q.  Who was the e-mail from and who was it to?

Page 18

1  A.  E-mailed from John Wright to Doris Ashford,
2  I believe.
3  Q.  And what does the e-mail say?
4  A.  Something on the grounds as he knew not to
5  be fair.
6  Q.  He knew not to be fair?
7  A.  Uh-huh. With this group.
8  Q.  Was anybody else on the e-mail? Was it
9  addressed to anyone other than Ms. Ashford?
10  A.  You would have to look at the e-mail.
11  Q.  How did you get the e-mail?
12  A.  Through, I believe, Phyllis Hughes.
13  Q.  Do you know how Ms. Hughes got the e-mail?
14  A.  No, I do not.
15  Q.  When did you receive a copy of the e-mail?
16  A.  I can't answer that; I do not know.
17  Q.  But you said that there was more than one
18  incident of John Wright being discriminatory in
19  awarding overtime?
20  A.  That is correct.
21  Q.  Tell me about the other incident or
22  incidents.
23  A.  An incident occurred where they needed

Page 19

1  overtime at the last minute. Tammy Caldwell was
2  in the office. She then turned around and asked
3  John to give it to her. Phillip Avery turned
4  around and said, Just go ahead and give it to her
5  and don't worry about it. And so no one in the
6  group was asked for the overtime.
7  Q.  So before anyone else in the group knew that
8  there was an opportunity for overtime, Ms.
9  Caldwell asked for it and received it?
10  A.  That is correct.
11  Q.  How did you find out about Ms. Caldwell
12  being awarded the overtime?
13  A.  Through Doris Ashford, who was the job
14  steward.
15  Q.  And how did Ms. Ashford know about it?
16  A.  I can't tell you that.
17      MR. NEWMAN:  Well, you can't tell her
18  or you don't know?
19      THE WITNESS:  I don't know.
20  Q.  When did this second incident or other
21  incident take place?
22  A.  I don't know that exact date either.
23  Q.  Is there a document that will reflect the

Page 20

1  date --
2  A.  I believe she took notes.
3  Q.  -- when this happened?
4      MR. NEWMAN:  Let her finish her
5  question.
6  Q.  Is there a document that reflects when this
7  second incident happened?
8  A.  I believe she might have taken notes. I
9  don't know; I can't answer that.
10  Q.  Who might have taken notes?
11  A.  Doris Ashford.
12  Q.  Do you know if Ms. Ashford was present when
13  Ms. Caldwell was awarded this overtime?
14  A.  No, I do not.
15  Q.  So you just don't have any way of knowing
16  how Ms. Ashford even knows that this took place?
17  A.  No, I do not.
18  Q.  And Ms. Ashford is the only way that you
19  know that this took place?
20  A.  I believe so, yes.
21  Q.  Is there another similar incident involving
22  John Wright that you are complaining about in this
23  lawsuit?

5 (Pages 17 to 20)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

Page 21

1   A.   John Wright? Let me see. Cheri Johnson
2   (sic), a former assistant manager, came down
3   through Farley, after she received a promotion in
4   Birmingham --
5   Q.   Are you talking about Cheri Collins?
6   A.   Collins. I'm sorry. Yes, that is correct.
7   Q.   Okay.
8   A.   We asked Deborah Crutchfield if we can go
9   speak with her. Deborah said it was not a
10  problem, that she will inform the foremen to let
11  us go over and speak with her.
12       During one briefing, John Wright came in and
13  handed us the e-mail from Deborah that we were
14  allowed to go and speak with her.
15       He, later on that night, decides that he's
16  going to call her at home and ask her why we came
17  over to see her.
18       And so she explains to him that they just
19  came over on a friendly visit. But I asked them
20  how were things going, and we started explaining
21  to her that we weren't being treated fairly.
22       And he told her that he knew that he was not
23  doing the rotation, assigning jobs fairly, but, in

---

Page 22

1   fact, that he would change.
2        She turned around and sent the e-mail to
3   Stephanie Sanders indicating that. But yet the
4   job rotation was still not being handed out
5   fairly.
6   Q.   How do you know that Mr. Wright called Ms.
7   Collins at home?
8   A.   Because she mentioned it in the e-mail.
9   Q.   And that's the only way you know?
10  A.   Yes.
11  Q.   And you say you've turned the e-mail over to
12  your attorney?
13  A.   That is correct.
14  Q.   And I'm just trying to clarify. In the
15  e-mail -- strike that.
16       How do you know that John Wright told Cheri
17  Collins he knew he was not assigning the jobs
18  fairly?
19  A.   From the e-mail.
20  Q.   Was the e-mail from John Wright to Cheri
21  Collins?
22  A.   No. The e-mail was from Cheri Collins to
23  Stephanie Sanders.

---

Page 23

1   Q.   So you're saying that Cheri Collins said, in
2   the e-mail, that John Wright told her that he was
3   not assigning the jobs fairly?
4   A.   That is correct.
5   Q.   And it's your testimony that Ms. Collins
6   sent the e-mail to Ms. Sanders?
7   A.   That is correct.
8   Q.   And how did you get a copy of it?
9   A.   Because Stephanie showed me her copy.
10  Q.   When did she show you a copy of it?
11  A.   The very day she received it.
12  Q.   Which will be reflected on the e-mail?
13  A.   That is correct.
14  Q.   Did you do anything with the e-mail once you
15  saw a copy of it?
16  A.   No. We saved it.
17  Q.   Why?
18  A.   Because he admits that he wasn't doing the
19  rotation correctly and that he was showing
20  favoritism.
21  Q.   Why did you save it?
22  A.   Because that just adds to everything else
23  that they were doing as far as singling and

---

Page 24

1   labeling us and retaliating against us and
2   discriminating against us.
3   Q.   But what was the purpose of saving it?
4   A.   The purpose of saving it? Because it was
5   evidence that they were not treating us fairly.
6   Q.   Is that what you and Ms. Sanders talked
7   about at the time?
8   A.   Yes.
9   Q.   What were y'all planning to do with the
10  evidence?
11  A.   At that particular time, nothing. We just
12  were saving it.
13  Q.   Was there another incident involving John
14  Wright and the overtime issue?
15  A.   Not that I can recall.
16  Q.   Is there any other evidence that you or Ms.
17  Sanders saved regarding John Wright and the
18  overtime issue?
19  A.   The only evidence that I know of is with
20  Doris Ashford keeping a record of how overtime was
21  allotted.
22  Q.   Did you see Ms. Ashford's records for
23  yourself?

---

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

| Page 25 |
| --- |

1   A.   Yes, I did.
2   Q.   When was that?
3   A.   I don't have an exact date.
4   Q.   Describe the record that she was keeping to
5   me.
6   A.   It was the overtime list that she said was
7   not accurate. She said time was not being given
8   properly to certain individuals that were working
9   overtime. Not only Doris Ashford but Ashley Key
10  as well.
11  Q.   So Ms. Key was keeping a record as well?
12  A.   That is correct.
13  Q.   Now, are both of these individuals union
14  representatives?
15  A.   They both were at one time. Ashley -- I
16  don't know who was union rep first, but they both
17  were at one time.
18  Q.   Were they union representatives when they
19  were keeping these records of overtime?
20  A.   Yes.
21  Q.   Do you know if, as union representatives,
22  they approached management or supervision about
23  the inequities that they saw in the award of

| Page 26 |
| --- |

1   overtime?
2   A.   I know that both of them have approached the
3   foremen.
4   Q.   About the award of overtime being unfair?
5   A.   That is correct.
6   Q.   Which foreman did they talk to?
7   A.   John Wright.
8   Q.   Is he the only one?
9   A.   He basically kept up with the overtime.
10  Q.   So he was the only one?
11  A.   That I know of, yes.
12  Q.   Were you present when they talked with Mr.
13  Wright about the award of overtime?
14  A.   I was present in the break room when Doris
15  and Ashley went in to speak to the foremen about
16  the overtime -- or John about the overtime.
17  Q.   Did you hear what was said?
18  A.   No, I did not.
19  Q.   Do you know when this was?
20  A.   No, I do not.
21  Q.   Okay. Was there anyone else present besides
22  Ms. Ashford, Ms. Key, and Mr. Wright?
23  A.   In the meeting?

| Page 27 |
| --- |

1   Q.   Yes.
2   A.   I do not know that.
3   Q.   Okay. Was there any other evidence that you
4   are aware of that relates to this overtime award
5   issue?
6   A.   Not at this particular time.
7   Q.   Is there any other way that you feel that
8   John Wright discriminated against you?
9   A.   I can't recall at this time.
10  Q.   Was he your foreman?
11  A.   Yes.
12  Q.   Your immediate supervisor?
13  A.   Yes.
14  Q.   Was Mark Freeman your immediate supervisor
15  when --
16  A.   Yes.
17  Q.   -- when you say he accused you of falsifying
18  documents?
19  A.   Yes.
20  Q.   Did Ms. Collins tell you and Ms. Sanders
21  anything else about her conversation with John
22  Wright, other than what you may have already told
23  me?

| Page 28 |
| --- |

1   A.   You will have to ask Ms. Sanders that.
2   Q.   You were not present for a meeting with Ms.
3   Collins on this issue?
4   A.   I was in the meeting, yes. What exactly are
5   you asking me?
6   Q.   I'm asking: Have you told me everything
7   that Ms. Collins said about her discussion with
8   John Wright on the overtime issue in that meeting?
9   A.   Okay. In the meeting, it wasn't discussed
10  as far as what John Wright said. It was discussed
11  afterwards.
12       After we got out of the meeting, she said
13  John Wright called her at home. So as far as the
14  issue, it was told afterwards, not during.
15  Q.   I'm sorry. I need you to clarify. You said
16  as far as the issue was told afterwards, what are
17  you referring to?
18  A.   Okay. John Wright called Cheri Collins at
19  home and asked Cheri why did Stephanie and I come
20  to see her. She told him that we just came as
21  friends to see how she was doing and getting along
22  on her new job.
23       She then turned around and told him that an

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 29

1  issue was brought up pertaining to overtime, being
2  treated fairly. And he said he knew that he was
3  not doing the rotation correctly and that he will
4  correct it.
5      She then turned around and said to
6  Stephanie, Give him time. He said he was going to
7  correct it; give him time to correct the issue.
8  But yet he did not.
9  Q.    Did Ms. Collins talk to Stephanie and say,
10  Give him time, or are we talking about the e-mail?
11  A.    The e-mail.
12  Q.    So she didn't talk to Ms. Sanders?
13  A.    She did not talk to her.
14  Q.    And the only way you know about Ms. Collins
15  having talked with Mr. Wright about the assignment
16  of overtime is based on the e-mail; is that
17  correct?
18  A.    It was overtime and job rotation. It wasn't
19  just based on overtime. It was job rotation,
20  being treated fairly, being given the same job
21  assignments over and over again while other people
22  were getting easier job assignments.
23  Q.    But my question was: Is the e-mail the only

Page 30

1  evidence that Cheri Collins had this conversation
2  with John Wright?
3  A.    Yes.
4  Q.    Okay. So the e-mail contains everything
5  that you say is evidence of such a conversation
6  between Ms. Collins and Mr. Wright?
7  A.    That is correct.
8  Q.    Okay. Now, you have identified Mark Freeman
9  and John Wright as supervisors whom you are
10  referring to in paragraph 6.
11      Are there other supervisors that you are
12  referencing in paragraph 6 of the Complaint?
13  A.    Shelley Murrell.
14      THE COURT REPORTER: Who? I'm sorry.
15      THE WITNESS: Shelley Murrell.
16  M-U-R-R-E-L-L, I believe.
17  Q.    Tell me what Shelley Murrell did that you
18  believe was discrimination toward you?
19  A.    Shelley Murrell also played favoritism, as
20  far as job assignments. She also allowed Jennifer
21  White to see some confidential stuff that I gave
22  her. Jennifer White then is relieving me from Air
23  Locks that night, and she goes in with Shelley and

Page 31

1  Deborah and discuss what I had on my paperwork
2  with them, and turns around and calls A.G., the
3  union president, to discuss the matter.
4  Q.    When was this?
5  A.    This was during an outage, I believe, of
6  2004.
7  Q.    Okay. So you say Ms. White, Deborah
8  Crutchfield, and Ms. Murrell discussed a
9  confidential matter of yours?
10  A.    That is correct.
11  Q.    It is something that you confided to Ms.
12  Murrell?
13  A.    It is something that I had on a piece of
14  paper. Actually, it was a piece of paper for me
15  getting some time off. And I wanted to give up,
16  at that particular time, my overtime.
17      Jennifer reads the piece of paper, and then
18  she goes and tells Deborah what she could do and
19  what she can't do.
20      Deborah then turns around and calls A.G.,
21  the union president, and then the union president
22  comes back to discuss the issue with me.
23      If I put in a piece of paper for vacation,

Page 32

1  absence, that's none of Jennifer's concern.
2  Q.    But you're saying you gave this piece of
3  paper to Ms. Murrell?
4  A.    I sure did.
5  Q.    And you're saying she then shared it with
6  Ms. White?
7  A.    That is correct.
8  Q.    How do you know she shared it with Ms.
9  White?
10  A.    Because Deborah Crutchfield, when I was
11  relieved from Air Locks, told me that Jennifer
12  said that I could not do that and that she was
13  verifying it through A.G.
14  Q.    What was it that you were not supposed to
15  do? What was it that Jennifer said you were not
16  supposed to do?
17  A.    That I could not give up my overtime for
18  straight time.
19  Q.    Is the piece of paper that you gave to Ms.
20  Murrell, did it ask to give up overtime for
21  straight time?
22  A.    That is correct.
23  Q.    Did Ms. Crutchfield tell you that Ms.

8 (Pages 29 to 32)

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 33

1  Murrell gave Ms. White or showed Ms. White the
2  confidential document?
3  A.   No.
4  Q.   Did Ms. White tell you that she had seen the
5  confidential document?
6  A.   The union president told me that Jennifer
7  said something about I was trying to give up my
8  overtime for straight time.
9  Q.   So the union president -- that's A.G. James
10  -- said that Jennifer told him?
11  A.   Yes.
12  Q.   Is that against company rules or against the
13  Collective Bargaining Agreement, the contract, for
14  you to swap overtime and straight time?
15  A.   I don't know whether it's against the rule
16  or not. Nevertheless, the issue is that she was
17  in my business.
18  Q.   Let me ask you this: Was Jennifer White a
19  job steward at the time this was happening?
20  A.   No, she was not.
21  Q.   You said this all took place around the
22  outage of 2004?
23  A.   That's correct.

Page 34

1  Q.   Which plant outage was it?
2  A.   Farley.
3  Q.   Did you make a complaint about this
4  disclosure of confidential information?
5  A.   I told Deborah Crutchfield, as well as A.G.
6  James, to tell Jennifer to stay out of my
7  business.
8  Q.   Let me ask you this, Ms. McDowell: What
9  information on the piece of paper that you gave
10  Ms. Murrell, what was the confidential information
11  that we're talking about?
12  A.   If I hand in a piece of paper pertaining to
13  me, it's no one else's business.
14     I cannot go in the office and pick up
15  somebody else's paperwork to see when they're off.
16  I can't do that.
17     That has already been addressed by Deborah
18  Crutchfield telling other people to mind their
19  business when it pertains to other people trying
20  to take off, have vacation or do whatever.
21  Q.   Did the piece of paper that you gave to Ms.
22  Murrell that you say she shared with Jennifer
23  White, did it have anything on it besides your

Page 35

1  request to switch overtime for straight time?
2  A.   No.
3  Q.   That was the only topic discussed on that
4  piece of paper?
5  A.   That is correct.
6  Q.   Is there anything else that Shelley Murrell
7  did that you say was disparate treatment and which
8  you are referencing in paragraph 6 of the
9  Complaint?
10  A.   I can't recall at this time.
11  Q.   Are there any other foremen whom you are
12  referencing in paragraph 6 of the Complaint?
13  A.   Deborah Crutchfield, who was a supervisor at
14  the time -- no, she was a foreman at the time;
15  excuse me -- went to her, told her I was having
16  major surgery, asked her not to disclose that
17  information to anybody, the reasoning for my
18  surgery.
19     The last day that I was going to leave the
20  plant before having surgery, I had three people
21  approach me telling me about my surgery.
22  Q.   Who were the three people that approached
23  you?

Page 36

1  A.   Vanessa Locke, Tammi Shaddix, and Luann
2  Stevens.
3  Q.   Did these individuals tell you that Deborah
4  Crutchfield had told them that you were having
5  surgery?
6  A.   One of them did.
7  Q.   Who did?
8  A.   Luann Stevens.
9  Q.   Do you know how Vanessa Locke or Tammi
10  Shaddix found out you were having surgery?
11  A.   I asked; however, they wouldn't tell me.
12  Q.   Did anyone else at the plant besides Deborah
13  Crutchfield know that you were having surgery,
14  from you?
15  A.   No.
16  Q.   Did Ms. Sanders know that you were having
17  surgery?
18  A.   Well, yeah, Stephanie.
19  Q.   Did you ask Ms. Sanders if she told anyone
20  that you were having surgery?
21  A.   Yes, I did.
22  Q.   And what did she say?
23  A.   No.

9 (Pages 33 to 36)

Page 37

1  Q.   Is there anything else that Ms. Crutchfield
2  did that you feel was discrimination and which you
3  are referencing in paragraph 6 of the Complaint?
4  A.   I can't recall at this time.
5  Q.   Why do you think that Ms. Crutchfield's
6  disclosure of your having surgery is
7  discriminatory?
8  A.   Again, if I come to you in confidence and
9  ask you not to say something, why would you
10 disclose my medical history to someone else?
11 Q.   Is there any other reason that you feel that
12 Ms. Crutchfield's disclosure of your medical
13 information is discriminatory?
14 A.   I can't recall it, not at this particular
15 time.
16 Q.   Why do you feel that Shelley Murrell's
17 sharing of your note to her is discriminatory?
18 A.   To her who?
19 Q.   Ms. Murrell. You said you gave Ms. Murrell
20 a piece of paper making a request to swap overtime
21 to straight time.
22     Why do you think her sharing of that to
23 another employee is discriminatory?

Page 38

1  A.   Okay. Like I said before, Deborah has
2  indicated that your business is your business and
3  no one else should be in your business.
4      Shelley shared my information with Jennifer
5  because they were friends. They have a
6  relationship beyond just coworker-supervisor.
7      If that's the case, then I should be allowed
8  to go in the office and look through everybody's
9  records that I ask for.
10 Q.   And that's why you think it was
11 discriminatory?
12 A.   Yes. Because she wouldn't do it for them.
13 She wouldn't give out their information.
14 Q.   Do you know that she's not given out
15 information on anyone else?
16 A.   She hasn't given it to me. I can't talk for
17 somebody else; I'm talking for me. She didn't
18 give it to me.
19 Q.   So you only know that she never gave anyone
20 else's information to you?
21 A.   That is correct.
22 Q.   Why do you think John Wright's actions in
23 assigning either overtime or work assignments was

Page 39

1  discriminatory?
2  A.   Because he had the tendency of playing
3  favoritism to people that he cared for, that he
4  was buddies with, that he would sit down and talk
5  about a ball game with.
6  Q.   Who was he buddies with?
7  A.   Jonathon Nall, Brad Knighton , Tammy
8  Caldwell, Jennifer White.
9  Q.   Anyone else?
10 A.   No.
11 Q.   These were the people that you say he showed
12 favoritism to and gave the more favorable job
13 assignments, in your opinion?
14 A.   That is correct. Another one is Chuck
15 Schaule.
16     THE COURT REPORTER:  I'm sorry. Chuck
17 who?
18     THE WITNESS:  Chuck Schaule. I believe
19 it's S-C-H-A-U-L-E.
20 Q.   What were the favorable job assignments that
21 you say John Wright made to his buddies?
22 A.   Constantly putting them on truck crew,
23 outside jobs, so that they would have a truck to

Page 40

1  ride around on.
2      When it was time to go in the turbine
3  building for rotation, he'll find a reason to pull
4  them out or they didn't go at all.
5      When it was time for them to do the
6  restrooms in the service building, before we had
7  the service building contract -- not the service
8  building. I'm sorry. The maintenance shop. When
9  it was time for them to do the maintenance shop,
10 they were pulled out or didn't do it and was given
11 a vehicle.
12 Q.   Now, is it your contention that you always
13 had the maintenance shop job assignment?
14 A.   Maintenance shop, service building, annex.
15 Q.   Anything else?
16 A.   Turbine building. That's it.
17 Q.   Okay. And you never got placed on a truck
18 crew?
19 A.   I received truck crew, but not as frequently
20 as they did. As a matter of fact, I believe I had
21 truck crew two times last year.
22 Q.   So that was 2005?
23 A.   That is correct.

10 (Pages 37 to 40)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 41

1  Q.  How often is the truck crew assigned?  Is it
2  every shift?
3  A.  No.  It's assigned just day shift for a
4  week.
5  Q.  For an entire week at a time?
6  A.  That is correct.
7  Q.  Okay.  Why do you think Mark Freeman's
8  accusation of you and Phyllis Hughes and Stephanie
9  Sanders of falsifying documents, why do you think
10  that was discrimination?
11  A.  Because he accused us of doing something
12  that we did not do.  We had already been labeled
13  and singled out and retaliated against.
14  Q.  I'm going to have to get some clarification
15  here.  You said you were accused, labeled, singled
16  out, and retaliated against already.
17    What are you talking about there?
18  A.  The incident that occurred with Don
19  Grissette that I spoke to you prior pertaining to
20  when you came to talk about Derrick Henderson.
21  Q.  That was in 2004?
22  A.  2003, 2004.  I don't recall the exact date.
23  And during that incident, Don Grissette informed

Page 42

1  Stephanie and myself, in a meeting, that he did,
2  in fact, tell the foremen to single us out.  And
3  he indicated to us in that meeting that if the
4  foremen would have challenged him, he would have
5  dropped the issue then.
6  Q.  When did you have this meeting with Mr.
7  Grissette?
8  A.  My attorney has, I believe, some notes on
9  around the time frame everything had occurred.
10  Q.  Okay.  Who else was present in this meeting,
11  besides yourself and Ms. Sanders?
12  A.  Don Grissette.
13  Q.  Just the three of you?
14  A.  That is correct.
15  Q.  Where did the meeting take place?
16  A.  In his office.
17  Q.  Why did he say that he had told his foremen
18  to single you and Ms. Sanders out?
19  A.  Because an incident had occurred in the
20  cafeteria where Tim Wilson saw Stephanie and I
21  sitting in the cafeteria eating.  He walked by us,
22  spoke to us, asked us how we were doing; we told
23  him fine.

Page 43

1    He went in the cafeteria, he got his
2  breakfast, he came back out.  And he saw Ray Dick,
3  who -- he was the foreman over Ray Dick -- sitting
4  in the cafeteria eating.  And he said to Ray, I
5  told you that you were not allowed to eat in the
6  cafeteria.  Ray Dick turned around and said, Why
7  are you coming to me?  What about them?
8    So Tim comes over there, ranting and raving,
9  yelling and screaming, telling us to get up, that
10  we weren't supposed to eat in the cafeteria.
11    We explained to Tim we did not hear that; we
12  did not get that e-mail.  He continues to yell; he
13  embarrassed us.  So we went and we reported him
14  for talking to us in the manner that he did.
15    Tim then turns around and goes to Don
16  Grissette and informs him that Stephanie and I
17  stay together too much and we need to be split up.
18  So he puts out to all the foremen to do so.  He
19  then turns around and tells the foremen to write
20  us up.
21    And Deborah Crutchfield comes back to me and
22  Stephanie and tells us that her and Dennis Teague
23  refused to write us up because we were good

Page 44

1  workers.
2    Then Bill Barber gives us a job assignment
3  one day up at the service water.  It was a list to
4  pull some things out of the service water.  We go
5  inside and key in the inside door to get in and
6  pull one item that was on the list out.  We come
7  out of the door, but we're still in the intake
8  structure, and he decides he wants to pull a cart
9  reader.
10    We come out for break.  He tells Stephanie
11  that she needs to report to him because he's going
12  to write her up.  He then later tells me that he
13  is going to write me up for not being in our work
14  area.
15    So we go down to the building.  Richard
16  Bryant, who was the supervisor at the time, comes
17  down wanting us to sign discipline for being out
18  of our work area.
19    I informed them that we were in our work
20  area and that if they would get with security and
21  see what time we bioed our hand in and bioed it
22  out that we were, in fact, in the service water
23  all the time.

11 (Pages 41 to 44)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

## Page 45

1    Richard Bryant took a break. He got in
2  touch with security and, of course, as I stated,
3  we were in our work area. He then turns around
4  and tells us that he's not going to write us up
5  but he's going to give us a verbal warning. I
6  told him that we shouldn't get a verbal warning
7  because we were not out of place.
8    Bill Barber then informs Deborah Crutchfield
9  that Richard Bryant let him take the fall for him,
10  basically, trying to set us up.
11    Left them there, got out of that meeting,
12  went in my work area. The next day, I'm coming
13  out the female's bathroom getting some things
14  out of the storage locker. There's a group of
15  people around a corner at the water fountain by
16  the turbine building.
17    Cliff Buck comes out of the turbine
18  building, passes them, comes to me and asks me,
19  Why is everybody standing around the corner? I
20  say to him, How am I supposed to know? I'm coming
21  out of the female's bathroom. He then turns
22  around and tells me that I shouldn't be eating
23  while working. I had a piece of candy in my hand.

## Page 46

1  So I went and got a union representative, Don
2  Hunter at the time, went upstairs to speak with
3  Cliff Buck, because I felt I was being harassed.
4    Go upstairs, talk to Cliff Buck. He said
5  the reason why he did it, because he knew that we
6  were just disciplined for being out of our work
7  area.
8    Left from him, went up to Don Grissette's
9  office, spoke to Don about it, that we knew that
10  we were being singled out. He admitted to it.
11  And that's when he indicated that if the foremen
12  would have challenged him, that it wouldn't be the
13  way that it is.
14  Q.  So that meeting with Don Grissette -- I
15  mean, you said -- let me back up. Strike that.
16    You mentioned getting Don Hunter to go with
17  you to Cliff Buck's office?
18  A.  That is correct.
19  Q.  And then you talk about going up to Don
20  Grissette's office from there?
21  A.  Right.
22  Q.  Was Don Hunter with you when went into Don's
23  office?

## Page 47

1  A.  No.
2  Q.  So at some point you get Ms. Sanders and
3  y'all go up?
4  A.  I believe this was like the day after.
5  After discussing it together, we decided that we
6  needed to go and speak to the plant manager.
7  Q.  Let me just ask some questions because
8  you've talked for a good bit now describing. Let
9  me just back up and back up.
10    It sounds like, and you correct me if I'm
11  wrong, all of this singling out that you are
12  complaining about came up because of the cafeteria
13  incident with Tim Wilson. Am I right or wrong
14  about that?
15  A.  I disagree. I think that it has something
16  to do with it. But once you are labeled, you just
17  cannot get a label off of you.
18  Q.  At what point are you saying that you were
19  labeled?
20  A.  I believe that I was labeled during the time
21  frame of the incident with Tim Wilson.
22  Q.  Okay. And that's what I'm getting at. You
23  said Tim Wilson yelled at you and Ms. Sanders in

## Page 48

1  the cafeteria, correct?
2  A.  That is correct.
3  Q.  And you said that you and Ms. Sanders then
4  went and complained about Tim Wilson's behavior
5  toward you; is that correct?
6  A.  That is correct.
7  Q.  And then you say, because you and Ms.
8  Sanders complained about Mr. Wilson, he then went
9  to Don Grissette and said the two of you are
10  together too much and you need to be split up; is
11  that correct?
12  A.  That is correct.
13  Q.  And from there, Don Hunter directed the
14  foreman to split you up and to watch the two of
15  you?
16  A.  Don Hunter?
17  Q.  I'm sorry. Don Grissette.
18  A.  That is correct.
19  Q.  So once Tim Wilson complained to Don and
20  said split you guys up you're together too much,
21  Don Grissette then said to the foreman, split them
22  up; don't let them be together; watch them. Am I
23  right or wrong?

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

Page 49

1  A.  That is correct.
2  Q.  So all of the singling you out, watching
3  you, trying to keep you and Ms. Sanders from
4  working together, originated from the cafeteria
5  incident with Tim Wilson; is that correct?
6  A.  Well, I can't say that, because Don
7  Grissette, plant manager, had already left.  We
8  had a new set of foremen that came in.  So I can't
9  say that.
10  Q.  Don Grissette had left at the time of the
11  Tim Wilson cafeteria incident?
12  A.  No.  He left after that.  But I'm talking
13  about as far as Mark Freeman, Deborah being
14  supervisor, John Wright, he was already gone.
15  Q.  Okay.  I understand you're saying that after
16  that this continued, but I'm trying to identify
17  when it began.
18  A.  Okay.
19  Q.  And I think we're in agreement that it began
20  with the cafeteria incident with Tim Wilson.
21  A.  Okay.
22  Q.  Okay.  And you stated that initially Tim was
23  fine with you and Ms. Sanders eating in the

Page 50

1  cafeteria until he saw another employee eating,
2  and that employee pointed you two out?
3  A.  That is correct.
4  Q.  Who was that employee?
5  A.  Ray Dick.
6  Q.  And who is he?
7  A.  He is a coworker.  He was a helper at the
8  time, just like Stephanie and I.
9  Q.  And you said that Mr. Wilson first got onto
10  Mr. Dick about eating in the cafeteria; correct?
11  A.  That is correct.
12  Q.  And it was Mr. Dick that then directed Mr.
13  Wilson to you and Ms. Sanders who also were eating
14  in the cafeteria?
15  A.  That is correct.
16  Q.  And said, What about them?
17  A.  That is correct.
18  Q.  And you have alluded or made reference to
19  what you told me in the 2003-2004 time frame; is
20  that correct?
21  A.  That is correct.
22  Q.  And it was about feeling singled out by Don
23  Grissette?

Page 51

1  A.  That is correct.
2  Q.  The types of things that we have just been
3  talking about?
4  A.  That is correct.
5  Q.  I want to make sure, Ms. McDowell, that I
6  completely cover all of your allegations that you
7  are making in paragraph 6, as best we can this
8  morning.
9  Can you think of any other supervisor who
10  you are referencing in paragraph 6 as having
11  subjected you and Ms. Sanders to disparate
12  treatment?
13  A.  No, not at this time.
14  Q.  Okay.  Let's move to paragraph 7.  I want to
15  understand this allegation wherein it says,
16  "Plaintiff McDowell was accused of creating a
17  hostile work environment because she did not
18  'greet' a white female coworker."
19  Did I read that correctly?
20  A.  Yes.
21  Q.  Who accused you of creating a hostile work
22  environment?
23  A.  I will assume it's Randy Johnson.  That was

Page 52

1  stated to me when I went in for my DML, when I
2  received my DML.
3  Q.  You're saying you assume it was Randy
4  Johnson.  Do you know who accused you of creating
5  a hostile work environment?
6  A.  I don't know who accused me; however, Randy
7  Johnson stated to me that by not greeting this
8  coworker, it creates a hostile work environment.
9  Q.  And when was it that Mr. Johnson stated this
10  to you?
11  A.  The date that I received my DML.
12  Q.  Okay.  What is a DML?
13  A.  Decision-making leave.
14  Q.  Had you received any discipline while you
15  have been at Southern Nuclear, prior to the time
16  that you received the DML?
17  A.  No.
18  Q.  Who was the coworker whom you were accused
19  of not speaking to?
20  A.  Tammy Caldwell.
21  Q.  Was she the only one?
22  A.  Yes.
23  Q.  And what was her position?

13 (Pages 49 to 52)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 53

1   A.   Helper.
2   Q.   Okay.
3          (Defendant's Exhibit No. 2 was
4          marked for identification and a
5          copy of the same is attached
6          hereto.)
7   Q.   Okay. I'm handing you and your lawyer what
8   I've marked as Defendant's Exhibit 2 to your
9   deposition.
10         Is that the DML that was issued to you for
11  creating a hostile work environment?
12  A.   That is correct.
13  Q.   Okay. And you said it was issued to you by
14  Randy Johnson?
15  A.   That is correct.
16  Q.   Okay. And, actually, the DML involves more
17  than just creating a hostile work environment,
18  does it not?
19  A.   That is correct.
20  Q.   Okay. Did you have access to a computer
21  during your employment at Southern Nuclear-Plant
22  Farley?
23  A.   Yes.

Page 54

1          (Defendant's Exhibit No. 3 was
2          marked for identification and a
3          copy of the same is attached
4          hereto.)
5   Q.   I'm handing you and your lawyer what I've
6   marked as Defendant's Exhibit 3 to your
7   deposition, and it is a copy of Southern Nuclear's
8   Policies 703 -- "Corporate Policies 703 -
9   Workplace Free of Harassment Policy."
10        Are you familiar with that policy, Ms.
11  McDowell?
12  A.   Yes.
13  Q.   And you are aware that this policy was in
14  existence while you were employed with the
15  company?
16  A.   Yes.
17  Q.   When you were issued the DML for, among
18  other things, creating a hostile work environment,
19  did you feel that you dispute that you had
20  violated the company's policy?
21  A.   I know I didn't violate the company policy.
22  Q.   And you were familiar with the policy at the
23  time?

Page 55

1   A.   That is correct.
2   Q.   What did Randy Johnson tell you that you had
3   done to create a hostile work environment?
4   A.   He indicated to me that me not speaking to a
5   female coworker, not greeting her, created a
6   hostile work environment.
7        He also indicated that I had told the job
8   steward to speak to this coworker on my behalf,
9   which I did not do.
10       He indicated about the swapping of job
11  assignments, and I explained to him on that
12  occasion.
13  Q.   You explained what to Mr. Johnson?
14  A.   About the swapping of job assignments.
15  Q.   Did you deny that you had swapped job
16  assignments?
17  A.   No, I didn't deny swapping job assignments.
18  Q.   Had you, in the past, swapped job
19  assignments with Phyllis Hughes, so that you could
20  work with Ms. Sanders?
21  A.   No, I have not.
22  Q.   You had not?
23  A.   No, I wouldn't say that: to work with her.

Page 56

1   I don't understand.
2   Q.   Okay. Had you swapped what you had been
3   assigned to do with Ms. Hughes, when Ms. Hughes'
4   assignment was to be paired to do an assignment
5   with Ms. Sanders?
6   A.   I have swapped job assignments if Ms. Hughes
7   did not want to do that job assignment. I have
8   swapped job assignments with Phyllis if I have
9   asked permission to do so. But to just swap job
10  assignments without permission, no, I have not.
11  Q.   You have never done that?
12  A.   No. I have always asked for permission.
13  Q.   Okay. Looking at the policy, at the bottom,
14  there is a listing of prohibited behavior, which
15  includes, "Conduct or language that denigrates or
16  shows hostility or aversion toward an individual
17  or group..."
18       Do you feel that that did not apply to your
19  interactions with Ms. Caldwell?
20  A.   No. I spoke to Tammy if it had something to
21  do with work related. Never said anything out of
22  the way to her. But as far as conversing back and
23  forth with her on a friendly basis, no, I didn't

14 (Pages 53 to 56)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 57

1  do that.
2      But as far as job assignments, when I had to
3  go to her for a turnover, I did so. Never said
4  anything out of the way to her.
5  Q.   So you would speak to her only on business
6  related matters?
7  A.   That is correct.
8  Q.   There was no friendly conversation or
9  greetings with her?
10  A.   No friendly conversations, no. She didn't
11  want it that way.
12  Q.   What about friendly greetings?
13  A.   I spoke and she spoke, you know. She spoke
14  sometimes; sometimes she didn't speak. Sometimes
15  I didn't speak.
16  Q.   And when you said another piece of the
17  finding that you had created a hostile work
18  environment related to Doris Ashford. Tell me
19  about that situation.
20  A.   I don't understand what you are asking me.
21  Q.   What were you accused of doing with regard
22  to Doris Ashford that created a hostile work
23  environment?

Page 58

1  A.   I was accused of telling Doris to go and
2  speak to Tammy, on my behalf, about Tammy staying
3  in the office; when, in fact, that did not occur.
4  Q.   Y'all didn't have a conversation about Tammy
5  Caldwell being in the foreman's office?
6  A.   We did. Doris Ashford stopped Stephanie and
7  myself one day and said, I need to ask y'all a
8  question. She said, Do you think Tammy stays in
9  the foreman's office too much? We said, Yes. She
10  said, I just wanted to know. She said, Because I
11  asked everybody in the group except you and
12  Stephanie. And she said, And I didn't speak to
13  Sam and Pam because they are painting.
14      So when Doris came to us, we were the last
15  two people that she asked. But then I'm the one
16  who sent Doris to talk to Tammy.
17  Q.   What did you tell Ms. Ashford when you spoke
18  with her?
19  A.   I told her yes. I answered her question:
20  Do you think Tammy stays in the foreman's office
21  too much? I said, Yes.
22  Q.   So during the investigation, you said that
23  you did not tell Ms. Bestwick -- you did not

Page 59

1  either confirm or deny whether you had said to Ms.
2  Ashford that Ms. Caldwell stays in the foreman's
3  office too much; is that correct?
4  A.   That is not correct. Ms. Bestwick asked me,
5  in that meeting, Did you ask Doris to talk to
6  Tammy for you? And I didn't confirm or deny it.
7  All I said was, That was the job steward's job.
8      Because I knew that Doris was going to speak
9  to her. Did I know what Doris said to her in that
10  meeting? No, I did not. I did not know Doris
11  went to Tammy with what she did.
12  Q.   But you would neither confirm nor deny it
13  with Ms. Bestwick?
14  A.   Well, I said that I didn't confirm or deny
15  it because I didn't give her a yes or no answer.
16  All I indicated was I knew that Doris was going to
17  speak to Tammy. But that was the job of the job
18  steward.
19  Q.   Okay. But you didn't answer Ms. Bestwick's
20  question?
21  A.   No, not really, no.
22  Q.   And that was during the investigation?
23  A.   That is correct.

Page 60

1  Q.   Okay. Did you report to Deborah Crutchfield
2  that Kevin Jones missed fire watch and signed that
3  he had done fire watch?
4  A.   I didn't report it; Stephanie did. But I
5  was present when it happened. And I explained to
6  Deborah that people were coming up to us asking us
7  about the fire watch.
8      Stephanie reported it to Deborah because she
9  wanted to make sure that she was covered.
10  Q.   Did you report to Deborah Crutchfield when
11  Phyllis Hughes was late to work?
12  A.   I don't know. I can't recall that.
13  Q.   But is it possible?
14  A.   Anything is possible.
15  Q.   Okay. Paragraph 8 of the Complaint says,
16  "Plaintiff" -- well, let's skip that; we're
17  talking about Ms. Sanders there.
18      Paragraph 10 says that, "The Plaintiffs were
19  disciplined for this 'infraction' while whites
20  committed more egregious conduct and were not
21  disciplined at all."
22      What conduct are you referring to there?
23  A.   Okay. The incident that I spoke with Ms.

15 (Pages 57 to 60)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 61

1  Bestwick about the cake incident. I had to go in;
2  Shannon Brown was interviewing everybody about
3  that incident. I don't know who initially
4  reported the cake. But I know that Ms. Caldwell
5  called me in the break room to look at the cake.
6  When I saw the cake, I jumped, turned around,
7  walked out the door. I went to my mailbox, I came
8  back in, and -- I think his name was Al Deweese --
9  saw the cake. He came in the break room, told her
10  to close up the box, that that was inappropriate.
11     Tim Wilson, Deborah Crutchfield, and
12  Patricia Glasco were sitting at the table.
13  Deborah and Tim indicated they didn't see the
14  cake. They weren't there. Patricia Glasco was
15  written up for that.
16  Q.  Who is Patricia Glasco?
17  A.  She was a black female foreman at the time.
18  Q.  And you're saying that other white foremen
19  saw the same thing that Ms. Glasco saw and you're
20  saying that they were not disciplined?
21  A.  That is correct.
22  Q.  What was this cake? What was the problem
23  with the cake?

Page 62

1  A.  It was of a woman's lower anatomy.
2  Q.  Which white foreman did you say also saw
3  what Ms. Glasco saw?
4  A.  Tim Wilson and Deborah Crutchfield.
5  Q.  Did you give a statement during the
6  investigation about the cake?
7  A.  Yes, I did.
8  Q.  Did you identify Mr. Wilson and Ms.
9  Crutchfield as having seen the cake, in your
10  statement?
11  A.  I can't verify that; I don't know. It's
12  been a while.
13  Q.  Who brought the cake into the plant?
14  A.  Tammy Caldwell.
15  Q.  Was Ms. Caldwell disciplined?
16  A.  No.
17  Q.  How do you know that?
18  A.  She told me that her slate was wiped clean.
19  Those were her exact words.
20  Q.  Were y'all specifically talking about
21  whether she had been disciplined because of the
22  cake being brought into the plant?
23  A.  She stopped me one day and started talking

Page 63

1  about the incident, saying that she knew who
2  turned her in about the cake.
3  Q.  Who was that?
4  A.  I didn't ask. And she indicated that every
5  time we have a feed, she was going to bring in a
6  cake, in a joking manner.
7  Q.  Every time you have what?
8  A.  A feed. That's when everybody brings in
9  food.
10  Q.  And you said Patricia Glasco was disciplined
11  about the cake incident. Was anyone else
12  disciplined?
13  A.  No.
14  Q.  How do you know that?
15  A.  Well, I can't say for anyone else. I know
16  Tammy told me her slate was wiped clean. Patricia
17  told me that she was disciplined.
18  Q.  Okay. What else goes into your allegation
19  in paragraph 10 that whites committed more
20  egregious conduct and were not disciplined?
21  A.  Another incident. Went over to assist Plant
22  Hatch. Angela Smith -- at the time Angela Smith;
23  her name is Angela Peters -- Tammy Caldwell came

Page 64

1  in with inappropriate attire on, had thong
2  undergarments showing, just a lot of inappropriate
3  behavior.
4     When Stephanie and I went back to Hatch,
5  2005 March, we had people coming up to us asking
6  if we were part of the Dixie Chicks, because that
7  was their group name.
8     They were never disciplined for the
9  inappropriate attire or their behavior. The only
10  thing that was done, Deborah Crutchfield spoke
11  with the next group that was going over there for
12  an outage and told them what the proper attire
13  was, which there were already guidelines out on
14  what to wear and what not to wear.
15  Q.  And you said this was Angela, at that time
16  Smith but now Peters, and Tammy Caldwell?
17  A.  That is correct.
18  Q.  And you said one of the things was the
19  wearing of inappropriate undergarments and thongs
20  being displayed in the workplace?
21  A.  Thongs being displayed; one putting their
22  legs up and not having any undergarments on;
23  dancing on the tables.

16 (Pages 61 to 64)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 65

1  Q.  Anything else? You said there was a lot of
2  inappropriate conduct. Is there anything else?
3  A.  Not that I can recall at this time.
4  Q.  Who put their legs up without undergarments?
5  A.  Angela Peters.
6  Q.  And you saw that?
7  A.  No, I did not see that. That was brought
8  back to the plant by Albert Williams.
9  Q.  You didn't witness that?
10  A.  No, I didn't.
11  Q.  Did you witness the dancing on the tables?
12  A.  No, I did not.
13  Q.  How do you know about that?
14  A.  That was brought back to the plant. That
15  was also mentioned in the meeting from Deborah
16  Crutchfield.
17  Q.  And did you see the thongs being displayed?
18  A.  That I saw.
19  Q.  And that was both Ms. Peters and Ms.
20  Caldwell?
21  A.  That was Ms. Caldwell.
22  Q.  Okay. And did you make a report about Ms.
23  Caldwell wearing inappropriate attire?

Page 66

1  A.  No.
2  Q.  And you said this was at Plant Hatch?
3  A.  That is correct.
4  Q.  Which year?
5  A.  I don't have the year.
6  Q.  How do you know that neither of these ladies
7  was disciplined?
8  A.  Because Deborah Crutchfield came back, spoke
9  with everyone and indicated that discipline
10  actions will take place if it happened again.
11  Q.  Did she say that no discipline had been
12  administered?
13  A.  Yes.
14  Q.  She said that?
15  A.  Yes.
16  Q.  Was Deborah Crutchfield at the outage, at
17  the Hatch outage?
18  A.  No, she was not.
19  Q.  Okay. Do you know if any supervisors who
20  were at the outage knew about these -- about this
21  conduct while at Plant Hatch?
22  A.  I know Bill Barber was there. I'm pretty
23  sure he heard about it or knew what was going on.

Page 67

1  I mean, I can't speak for other foremen. Or what
2  was said behind closed doors, I don't know that.
3  Q.  So you're assuming that Bill Barber would
4  have known?
5  A.  I'm not going to even assume that.
6  Q.  Okay. What other egregious conduct have
7  whites engaged in for which they have not been
8  disciplined?
9  A.  I mean, some have been disciplined, but they
10  don't receive a severe discipline like how blacks
11  have.
12       You have a gentleman in security, last name
13  is Rinehardt, told another male, Jeff Mims, to
14  suck his lower anatomy; and he only received 12
15  months probation for that.
16  Q.  And what did you say he told Mr. Mims?
17  A.  To suck his lower anatomy.
18  Q.  And how do you know about this?
19  A.  From Luann Stevens.
20  Q.  How did Ms. Stevens know?
21  A.  I can't answer that.
22  Q.  How do you know about the level of
23  discipline that was given?

Page 68

1  A.  Through Luann Stevens.
2  Q.  What else?
3  A.  Leonard Russ tells another coworker that
4  he's entitled to union representation, and
5  receives a DML for that. Whereas you have
6  coworkers like Jonathon Nall, Brad Knighton, Luann
7  Stevens, Lee Laney that has actually cursed at a
8  foreman that I've heard, and have not been
9  disciplined at all.
10  Q.  Okay. Leonard Russ, you said, received a
11  DML?
12  A.  Uh-huh.
13  Q.  Yes?
14  A.  Yes.
15  Q.  I always need a verbal response so that
16  Cindy can take it down.
17       For, you said, telling a union member that
18  he was entitled to union representation?
19  A.  That is correct.
20  Q.  How do you know that?
21  A.  Mr. Leonard Russ.
22  Q.  Did you see the discipline that was given to
23  Mr. Russ?

17 (Pages 65 to 68)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 69

1  A.  I did not see the discipline that was given
2  to him; however, I was in the office waiting by
3  Brenda Singleton's desk when he was in the office
4  with Randy Johnson.
5  Q.  You didn't see any confidential paperwork
6  when you were in there, did you?
7  A.  No, I did not.
8  Q.  Okay.  So Leonard Russ told you that he
9  received discipline solely for telling a union
10 member that he was entitled to representation?
11 A.  That is correct.
12 Q.  When was that?
13 A.  When we received that DML.
14 Q.  Same time frame?
15 A.  Yes.
16 Q.  And then you said that other employees have
17 cursed at foremen and received no discipline at
18 all?
19 A.  That is correct.
20 Q.  And you named several people.
21 A.  That is correct.
22 Q.  What other instances of whites engaging in
23 egregious behavior and being either not

Page 70

1  disciplined or receiving less discipline than
2  blacks?
3  A.  Tim Wilson calls in the break room, he asks
4  for Calvin Jones and another shared employee. I
5  can't recall his name. I answered the telephone.
6  He tells me to put one of them on.
7      The guy comes out and tells Tim Wilson that
8  if he did him a favor, that he needed to suck his
9  lower anatomy. There was about 12 witnesses in
10 that break room.
11 Q.  So Calvin Jones told Mr. Wilson that?
12 A.  No. The other shared employee did.
13 Q.  Who was that?
14 A.  I don't remember his name.
15 Q.  How do you know what discipline the shared
16 employee received?
17 A.  The shared employee didn't receive any
18 discipline, because he indicated that he didn't
19 receive any discipline.
20 Q.  Did he tell you that?
21 A.  Yeah, he did. He sure enough did.
22 Q.  But you don't remember his name?
23 A.  I don't remember his name.

Page 71

1  Q.  But he's not a Farley employee?
2  A.  No. He's a Hatch employee.
3  Q.  What position did he have?
4  A.  He was a helper.
5  Q.  Did you tell me when this incident took
6  place?
7  A.  This was during an outage.
8  Q.  Which one?
9  A.  I can't recall right now.
10 Q.  You don't know if it was 2004 or 2003?
11 A.  It might have been 2004.
12 Q.  What else?
13 A.  That's it that I know of at this time.
14 Q.  Is paragraph 11, the allegations there, is
15 there more in paragraph 11 than what you have told
16 me about paragraph 10?
17 A.  I mean, there could be more, but I can't
18 recall all of it at this time.
19 Q.  Okay.  Do you have any notes or e-mails or
20 documents that will help you to recall? a calendar
21 where maybe you made notes of incidents?
22 A.  I believe my attorney has that information.
23 Q.  Okay.  Is it a calendar?

Page 72

1  A.  Notes.
2  Q.  Just notes.  Okay.  And you gave your
3  attorney all of your notes that you created?
4  A.  No. There's a list that I have, that I just
5  started to generate that I have.
6  Q.  Where is it?
7  A.  I don't have it at this time. It's a list
8  of stuff that I was talking about, as far as me
9  remembering what had occurred, that I just told
10 you about.
11 Q.  But where is the list?
12 A.  The list is on my computer. I don't have
13 it; I didn't bring it.
14 Q.  Why did you not bring it or send it to your
15 attorney, give it to your attorney?
16 A.  Because I just started making notes of it on
17 a piece of paper. I just started making notes of
18 it.
19 Q.  Okay.  Would you please provide a copy of
20 that to your attorney?
21 A.  Yes.
22 Q.  We have a document request asking for
23 anything related to your employment and your

18 (Pages 69 to 72)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

Page 73

1  allegations in this lawsuit.
2  　　　　MR. NEWMAN: Are you talking about a
3  list that you just started making?
4  　　　　THE WITNESS: Yes.
5  　　　　MR. NEWMAN: After the lawsuit was
6  filed?
7  　　　　THE WITNESS: Yes.
8  Q.　If it relates to this lawsuit and your
9  allegations --
10 A.　I mean, I started the list yesterday.
11 Q.　And these are things in addition to what you
12 have put in your notes?
13 A.　Those are the things that I just spoke to
14 you about, as far as blacks versus whites.
15 Q.　So you've told me everything that's on the
16 list?
17 A.　I can't verify that because I don't know if
18 I told you. That's what I'm saying. I have a
19 list that I just started generating, but I can't
20 verify whether I told you everything that's on the
21 list.
22 　　　　MS. SHARP: I think we're entitled to
23 her list.

---

Page 74

1  　　　　MR. NEWMAN: I disagree, but I'll look
2  at it.
3  　　　　MS. SHARP: Yeah. I mean, I'm asking
4  her if there's something else that she has; and
5  she's telling me right now, you know, I'm telling
6  you the best I can right now.
7  　　But if she's got something more on that list
8  that helps her answer my questions today --
9  　　　　MR. NEWMAN: I'll look at what she has.
10 But, obviously, anything that she has generated
11 since the lawsuit has filed could easily fall
12 under work product.
13 (BY MS. SHARP)
14 Q.　Did you create this list at your attorney's
15 request?
16 　　　　MR. NEWMAN: Well, it could very easily
17 fall into that and I can always fall back on that.
18 But in the spirit of cooperation, I will look at
19 that.
20 　　　　MS. SHARP: Okay.
21 Q.　But my question, Ms. McDowell was: Did you
22 create this list at your attorney's request?
23 A.　I created the list, I would say, by his

---

Page 75

1  request as well as mine. He said if there's
2  anything that I need to put down to call to memory
3  -- I asked him if I was able to make a list to
4  remember everything.
5  Q.　Okay.
6  　　　　MS. SHARP: I'm going to just note for
7  the record that if there is something on that
8  list, we're going to leave the deposition open so
9  that I can ask her, if it's something in addition
10 to what we've talked about and what she's told me
11 about or what she can remember during the course
12 of this deposition.
13 　　　　MR. NEWMAN: We have an obligation to
14 supplement her answers anyway.
15 　　　　MS. SHARP: Right. Absolutely. I
16 understand that. But I just want to make sure
17 that I can ask her, if there's something that I
18 have no knowledge of and have no opportunity today
19 to talk about, I want to be able to ask her a
20 question about that.
21 　　　　MR. NEWMAN: You're entitled to that.
22 　　　　MS. SHARP: Thank you.
23 (BY MS. SHARP)

---

Page 76

1  Q.　While we're on that subject, Ms. McDowell,
2  you have said several times that you have tapes of
3  conversations or meetings with employees at Plant
4  Farley.
5  　　Your attorney provided me two microcassette
6  tapes yesterday.
7  　　Did you tape -- are there tapes in addition
8  to these two microcassette tapes that you've made?
9  A.　Who are those tapes from?
10 Q.　From listening, I will tell you what I can
11 make out on these tapes. And obviously they are
12 your tapes.
13 　　One of them says, "Grievance Hearing." And
14 it's barely audible, and it sounds like it might
15 be part of a grievance hearing.
16 　　This one says, "Alabama State." And what it
17 sounds like is your recording of the unemployment
18 compensation telephone conference.
19 A.　That's right.
20 Q.　But your notes indicate that there are more
21 recordings made during your employment.
22 A.　I have the tape that Deborah Crutchfield,
23 Mark Freeman, and Shelley Murrell, when they

---

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

Page 77

1  called me in the office and asked me some
2  questions. And then the day that I was terminated
3  they turned around and said that I said several
4  things that I did not say. And the tape will
5  verify that.
6  Q.  Where is that tape?
7  A.  I thought I handed it in to my attorney; if
8  not, then I have to look for it. But I thought
9  that I had turned it in.
10 Q.  Like I said, those are -- I understand, from
11 your attorney, those are the two tapes that he was
12 provided, which were provided to me. I came by
13 and picked those up yesterday.
14     So I need the tape of the September 9, 2005,
15 meeting.
16 A.  Well, what I'm thinking that I did, the tape
17 that I thought I handed to him, I gave it to the
18 NAACP. So that's probably why he does not have
19 the tape.
20     I thought that I gave it to him, but, in
21 fact, I must have given it to Mr. Wade Morrison at
22 the NAACP.
23 Q.  Okay. I need to get that tape and any other

Page 78

1  tapes that you've made during your employment with
2  Southern Nuclear Operating Company, or any other
3  tapes that you plan on using in any way during
4  this litigation.
5  A.  Okay.
6  Q.  Aside from the September 9, 2005, meeting,
7  what other recordings did you make of plant
8  management or plant supervision?
9  A.  None.
10 Q.  That was the only other tape you've made
11 related to your employment at Southern Nuclear -
12 Plant Farley?
13 A.  Yes.
14 Q.  Why did you tape that September 9th meeting?
15 A.  Because I was brought in the office with
16 three foremen with no union representation, and I
17 knew it was a setup.
18 Q.  What do you mean you knew it was a setup?
19 A.  I'm going in with three foremen, supposedly
20 for a 30-day consultation for my DML. When, in
21 fact, number one, the plant and management is
22 acting as if that was their idea, when, in fact,
23 it was the union rep's idea.

Page 79

1      Number two, the 30 days was not up. But
2  they decide to have Mark Freeman, who was leaving
3  to go to another plant, be the spokesperson
4  because he was black, thinking that I wouldn't
5  know that they were discriminating against me.
6  Q.  Why do you say that they made Mark Freeman
7  the spokesperson because he was black?
8  A.  Because Mark was supposed to be leaving to
9  go to another plant for an outage. They called me
10 in there several days prior to him leaving and
11 asked him to speak to me about my progress for my
12 DML.
13     Number one, like I iterated before, it was
14 not management's idea for me to go -- for them to
15 come -- me to go to them to see how I was doing
16 every 30 days. That was something that was
17 recommended through my union rep.
18     Number two, the 30 days wasn't even up.
19     Number three, I had not seen management.
20 They swapped from not speaking to Tammy to not
21 speaking to management altogether.
22     So, I mean, it was a setup. If you tell me
23 that you're disciplining me for not speaking and

Page 80

1  greeting a coworker and harassing a coworker and a
2  hostile environment, and then the day that I go in
3  for termination you're telling me that you're
4  terminating me because I didn't abide to my
5  contract by not speaking to management...
6  Q.  Let me just ask the question, because I
7  don't know the answer to this and obviously that's
8  what I'm here for: What does it matter whose idea
9  it was for a 30-day evaluation?
10 A.  If it's my 30 days and you agree to it -- if
11 I go to you and I say, "Can I come back to you in
12 30 days to see if I'm doing well or not?" If you
13 agree to that, then I should be allotted 30 days
14 to come back to you and say, "Am I doing it
15 correctly or do I need to improve myself?"
16 Q.  So because it was less than 30 days, you've
17 got an issue with that?
18 A.  Yes, I have an issue with that, number one.
19 I have an issue because management takes it and
20 turns it around as if that's something that was
21 part of my discipline, like that's part of
22 Southern Company's guidelines. There's nothing in
23 the guidelines about that.

20 (Pages 77 to 80)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

### Page 81

1    I mean, just making up stuff as they go
2  along.
3  Q.   Did Mark Freeman -- strike that.
4    You did say that Mark Freeman was one of
5  your foremen? He was one of your supervisors,
6  correct?
7  A.   That is correct.
8  Q.   So he would have some input or feedback into
9  your performance and behavior after the DML was
10  issued, correct?
11  A.   Before and after, that is correct.
12  Q.   Okay. So just the fact that he was black
13  you find offensive or problematic?
14  A.   Yes. I find it offensive because of the
15  fact that they went to go get him thinking that it
16  wouldn't be so obvious that they were singling out
17  and discriminating against me.
18    If that's the case, then why was Shelley
19  Murrell in there? Why was she in the meeting?
20  Q.   Why was she in there or not in there?
21  A.   Why was she in there?
22  Q.   Was she not one of your supervisors?
23  A.   Yeah, she was a supervisor. But why didn't

---

### Page 82

1  she do it or why didn't somebody else do it? Why
2  did they have to get Mark to do it, prior to the
3  30 days.
4  Q.   So you're saying that there should have only
5  been one of your foremen in there, in the meeting?
6  A.   Yes.
7  Q.   Okay.
8  A.   Okay. If that's the case, then why wasn't
9  John Wright in there and why wasn't Phillip Avery
10  in there?
11  Q.   I don't have any answer to that question.
12    What in the DML says that management only
13  expected you to speak to Tammy Caldwell and to
14  greet Tammy Caldwell?
15  A.   It doesn't indicate that in the DML. But
16  Randy Johnson indicated that in the meeting.
17  That's how he started the meeting out, that he was
18  giving me this DML because I created the hostile
19  work environment by not speaking to Tammy
20  Caldwell.
21  Q.   Okay.
22  A.   When, in fact, when an incident had occurred
23  with the cake, Tammy indicated to the group that

---

### Page 83

1  she was isolating herself and that she didn't
2  trust anybody but her aunt, Jennifer White.
3    So if she isolates herself from the group
4  and doesn't want to have anything to do with them,
5  then why, all of a sudden, is it mandatory that I
6  have to speak to her?
7    And where in the guidelines does it say that
8  I have to meet and greet a fellow coworker.
9  Q.   So based on the fact that Mark Freeman was
10  included in the 9/9 meeting, and the fact that the
11  9/9 meeting took place less than 30 days after
12  your DML, and the fact that you did not go and ask
13  for feedback on your conduct or performance, you
14  believe the 9/9 -- September 9, 2005 -- meeting
15  was a setup?
16  A.   Yes.
17  Q.   Okay. In your Complaint you ask for damages
18  -- compensatory damages -- of $4 million, and
19  you're seeking punitive damages of $1 million.
20    Do you know where those numbers came from?
21  A.   My attorney.
22  Q.   Okay.
23    (Defendant's Exhibit No. 4 was

---

### Page 84

1    marked for identification and a
2    copy of the same is attached
3    hereto.)
4  Q.   I'm handing you and your attorney what I've
5  marked as Defendant's Exhibit 4 to your
6  deposition.
7    Have you seen a copy of Defendant's Exhibit
8  4 before today, Ms. McDowell?
9  A.   Yes.
10  Q.   Okay. What information do you believe
11  Phyllis Hughes has that would support your claims
12  in this lawsuit?
13  A.   As far as -- as far as blacks being -- or
14  receiving harsher discipline than whites. That
15  Phyllis Hughes had sexual harassment charges out
16  on Bill Barber. And another incident had
17  occurred, and I was told by Phyllis Hughes that
18  Deborah Crutchfield took her up to the visitor
19  center and asked her to sign a piece of paper not
20  filing charges against Bill Barber, because
21  Phyllis had been in trouble prior to, and that it
22  wouldn't look good on her.
23    I also know that Phyllis Hughes told me that

---

21 (Pages 81 to 84)

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

## Page 85

1  Ms. Bestwick tried to get her to state that I had
2  printed off a picture of a spider with a bite,
3  just so that Phyllis can write on it -- write
4  something on it pertaining to Tammy Caldwell.
5      And that is not the truth. Because the
6  pictures were printed off a whole month prior to
7  her or Jonathon writing on the picture.
8      As a matter of fact, Phyllis was disciplined
9  and terminated for that picture, but nothing
10  happened to Jonathon Nall. And his handwriting
11  was on that picture as well.
12  Q.   Did you tell Ms. Bestwick or any member of
13  management that Jonathon Nall had written on the
14  picture?
15  A.   I don't know if I did, but I believe
16  Stephanie told me that she did.
17      But nevertheless, it was never investigated,
18  and there was a second handwriting on that
19  picture.
20  Q.   Is there anything else that you believe that
21  Ms. Hughes knows that's going to be helpful to you
22  in supporting your claims in this lawsuit?
23  A.   Phyllis Hughes called me and informed me

## Page 86

1  that Deborah indicated to her that she didn't know
2  why she was taking the blame or the fall for this
3  whole incident.
4      And Phyllis replied to her telling her that
5  she was terminated and that she wasn't taking the
6  fall for anything because we did not harass Ms.
7  Caldwell.
8  Q.   So at the conclusion of the investigation,
9  Phyllis Hughes was terminated?
10  A.   That is correct.
11  Q.   And she is white?
12  A.   That is correct.
13  Q.   Okay. When did Ms. Hughes say it was that
14  Ms. Bestwick tried to get her to blame you for the
15  spider picture?
16  A.   She called me after I was terminated. The
17  exact date, I don't know. But she called me after
18  I was terminated.
19  Q.   And she had already been terminated?
20  A.   That is correct.
21  Q.   Okay. Are you and Ms. Hughes friends?
22  A.   We're associates. I wouldn't classify her
23  as being my friend.

## Page 87

1  Q.   But y'all have talked since you both left
2  Plant Farley?
3  A.   That is correct.
4  Q.   On how many occasions?
5  A.   Maybe six.
6  Q.   Where does Ms. Hughes work?
7  A.   I don't know the company she works for.
8  Q.   Okay. Have you seen Ms. Hughes since you
9  both left Plant Farley?
10  A.   No, I have not.
11  Q.   Okay. What information do you believe Cheri
12  Collins has to support your claims in this
13  lawsuit?
14  A.   The e-mail. She knew about the issue with
15  Don Grissette.
16  Q.   Is that it?
17  A.   Uh-huh.
18  Q.   Okay. What about Graven Townsend? What
19  information do you think he has that will support
20  your claims in this lawsuit?
21  A.   Graven Townsend was told to make a choice
22  between his wife and his job, when he decided that
23  he wanted to stay out and care for his wife that

## Page 88

1  was in a car wreck.
2  Q.   Is that it?
3  A.   Yes.
4  Q.   Who told Mr. Townsend to make a choice?
5  A.   Someone in management. I can't recall.
6  Q.   How do you know about that conversation?
7  A.   It was told to Stephanie Sanders.
8  Q.   Who told it to you?
9  A.   That is correct.
10  Q.   Who told it to Ms. Sanders?
11  A.   You will have to ask Ms. Sanders.
12  Q.   Okay. I'm looking on page 3 of the initial
13  disclosures. Have we already talked about the
14  several audio recordings that are reflected here?
15  Is it just three tape recordings that you made?
16  A.   That is correct.
17  Q.   In either of those three instances, did you
18  tell the individuals, who you were going to tape,
19  that you were going to tape them?
20  A.   Did I tell them?
21  Q.   Yes.
22  A.   No.
23  Q.   Where was your tape recorder when you taped

22 (Pages 85 to 88)

Page 89

1  the September 9, 2005, meeting?
2  A.  On my body. Taped on my body.
3  Q.  Where?
4  A.  In between my shirt.
5  Q.  Where in between your shirt?
6  A.  Stuck down in between my bra, taped across
7  my breasts.
8  Q.  Did you have a microphone?
9  A.  No. The tape recorder has a microphone.
10  Q.  What kind of tape recorder was it?
11  A.  Similar to that one.
12  Q.  Okay. And then the other tape recordings
13  you made were of the unemployment compensation
14  telephone conference. Were you at your home?
15  A.  That is correct.
16  Q.  And then the grievance hearing, where was
17  the tape recorder?
18  A.  Same place. On my body.
19  Q.  Okay. Did your union representation at the
20  grievance hearing know that you were going to tape
21  the hearing?
22  A.  No.
23  Q.  Okay. If you will flip over on this list of

Page 90

1  initial disclosures, there is an e-mail string
2  there.
3      The first one is from Cheri D. Collins to
4  Stephanie M. Sanders. Is that the e-mail that you
5  were referring to earlier?
6  A.  That is correct.
7  Q.  The next e-mail string appears to start with
8  an e-mail from Anthony W. Dumas dated Wednesday,
9  July 13, 2005, going to Deborah Crutchfield. And
10  it's related to you and Ms. Sanders. And then at
11  the top it shows that Ms. Crutchfield then
12  forwarded that e-mail to you and Ms. Sanders.
13      And it looks like Mr. Dumas is praising
14  y'all for the job that you did at the plant.
15  Is that e-mail familiar to you?
16  A.  Yes.
17  Q.  It is one that you printed off from your
18  computer?
19  A.  Yes.
20  Q.  Okay. Do you believe that you and Ms.
21  Sanders were deserving of the praise that Mr.
22  Dumas was giving you in this e-mail?
23  A.  I know for a fact I was deserving of the

Page 91

1  praise.
2  Q.  Why do you say that?
3  A.  Because I was an outstanding worker. I've
4  never had any complaints about doing my job.
5  Q.  Do you know Mr. Dumas?
6  A.  Yes. He works in the maintenance shop.
7  Q.  What race is Mr. Dumas?
8  A.  I assume white. He might be mixed with
9  something; I don't know.
10  Q.  He's not African American that you can tell?
11  A.  No.
12  Q.  And then Ms. Crutchfield is white. Or she
13  is not African American; is that correct?
14  A.  That is correct.
15  Q.  And the next, if you will flip over to the
16  next e-mail. It's that same e-mail string. But
17  at the top it looks like an e-mail from Phillip D.
18  Avery. Who is that?
19  A.  One of the foremen.
20  Q.  And it goes to you and Ms. Sanders. And it
21  also is praising you and Ms. Sanders for your work
22  performance; is that correct?
23  A.  That is correct.

Page 92

1  Q.  And, again, do you feel like y'all were
2  deserving of this recognition by Mr. Avery?
3  A.  Yes.
4  Q.  What race is Mr. Avery?
5  A.  White.
6  Q.  The next page is an e-mail string from, at
7  the bottom, James W. Goodson to Deborah
8  Crutchfield. And actually this is regarding only
9  Ms. Sanders, so I'll skip over that one.
10      The next e-mail is the next page, bottom, is
11  one from William G. Barber to Elbert D. Teat. Who
12  is Mr. Teat?
13  A.  He's a former foreman.
14  Q.  Okay. Who is Billy Joe Yance?
15  A.  He was a foreman. He's no longer employed.
16  Q.  And Deborah Crutchfield. And you've
17  identified Patricia Glasco as an African-American
18  foreman. And Tim Wilson, you said, is a foreman
19  or was a foreman?
20  A.  That is correct.
21  Q.  Richard Bryant. Was he a foreman as well?
22  A.  He was the supervisor.
23  Q.  Foreman supervisor?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 93

1   A.   At that time.
2   Q.   And Clifton Buck?
3   A.   Was over Richard Bryant. He was over the
4   whole department.
5   Q.   And this e-mail from Bill Barber, subject
6   U-1 Alpha SGFP Outage, was copied to yourself and
7   Ms. Sanders, among some other employees.
8       And Mr. Barber here is congratulating you
9   for the work that you did on that outage. That's
10   what I'm reading. Is that what you understand
11   that to be?
12   A.   That's correct.
13   Q.   And he said he wanted to give a big thumbs
14   up for a job well done. Do you think that y'all
15   were deserving of that recognition?
16   A.   Yes.
17   Q.   And then up top of that e-mail is one from
18   Richard Bryant to yourself and others, including
19   Ms. Sanders. And about the outage and him
20   thanking you and saying you did an excellent and
21   safe job in record time, and your dedication and
22   professionalism has made us look good.
23       Again, do you feel like you deserved that

Page 94

1   attention?
2   A.   Yes.
3   Q.   And Mr. Bryant is what race?
4   A.   White.
5   Q.   The next page. The lower e-mail is from
6   Helen Lawson to Richard Bryant. Subject:
7   Excellent work by Janell and Stephanie.
8       Who is Helen Lawson?
9   A.   I believe she was the, I think, assistant
10   plant manager at the time. Assistant plant
11   manager's secretary at the time.
12   Q.   Okay. What race is Ms. Lawson?
13   A.   She's white.
14   Q.   And her e-mail was going to Richard Bryant,
15   correct, up top of that?
16   A.   To --
17   Q.   That lower e-mail was to Richard Bryant,
18   correct?
19   A.   Correct.
20   Q.   And up top of that, he forwards that e-mail
21   to you and Stephanie, correct?
22   A.   That is correct.
23   Q.   And he's there thanking you and Stephanie

Page 95

1   again for taking extra effort.
2       And do you feel that y'all were deserving of
3   that recognition?
4   A.   Yes.
5   Q.   Okay. And then it appears that he forwarded
6   -- he copied several people on the e-mail that he
7   sent to you and Stephanie praising you.
8       Are all the folks that he copied that e-mail
9   to, are they all foremen?
10   A.   That's correct.
11   Q.   And then at the very top is Cliff Buck also
12   thanking you and Ms. Sanders, correct?
13   A.   That's correct.
14   Q.   This next e-mail chain, on the following
15   page, is an e-mail that originated from Brenda
16   Wise Singleton. Who is she?
17   A.   Plant manager's secretary.
18   Q.   What race is she?
19   A.   White.
20   Q.   And she is e-mailing, it appears to be
21   foremen, the plant manager Don Grissette at the
22   time, and the assistant manager Randy Johnson,
23   about you and Ms. Sanders being excellent

Page 96

1   supporters; is that correct?
2   A.   That's correct.
3   Q.   And then up top you have yet another e-mail
4   from Cliff Buck thanking you and Ms. Sanders for
5   your efforts?
6   A.   That's correct.
7   Q.   The next e-mail is an e-mail chain that
8   starts with Randy Johnson going to Richard Bryant.
9   Copy: Cliff Buck and Don Grissette. The subject
10   is good job. And it's solely about you and the
11   great job that you did; is that correct?
12   A.   That's correct.
13   Q.   He says an excellent job that you did?
14   A.   Uh-huh.
15   Q.   And up top of that you have Richard Bryant
16   forwarding the e-mail to several foremen about the
17   job that you did and telling them to let you know
18   how much your work is appreciated; is that
19   correct?
20   A.   That's correct.
21   Q.   And then you have an e-mail atop that from
22   Elbert Teat copying you and forwarding it on,
23   showing that it went to Richard Bryant and some

24 (Pages 93 to 96)

Page 97

1  foremen, but copying you on the e-mails about your
2  performance, correct?
3  A.   Correct.
4  Q.   This next e-mail is one from Jennifer Jewel
5  White to yourself and Ms. Sanders copying Tammy
6  Caldwell and Darran Williams.
7       Who is Darran Williams?
8  A.   He was a helper at the time.
9  Q.   Okay.  And thanking you for the job that you
10  did as well, correct?
11  A.   That is correct.
12  Q.   The next page is an e-mail that starts with
13  Nicole Faulk going to Billy Joe Yance copied to
14  several foremen about you and Ms. Sanders doing a
15  good job, correct?
16  A.   That's correct.
17  Q.   And who is Nicole Faulk?
18  A.   I believe she was a shift supervisor.
19  Q.   What race is she?
20  A.   White.
21  Q.   And atop of that you have Ms. Faulk's e-mail
22  being sent to more plant supervisors and foremen
23  by Dennis Teat, correct?

Page 98

1  A.   That is correct.
2  Q.   And he's adding some notes of appreciation
3  to you and Ms. Sanders, correct?
4  A.   Correct.
5  Q.   Okay.  And then somebody, Joe Walden,
6  forwards all of that to you expressing his
7  appreciation, correct?
8  A.   That is correct.
9  Q.   The final e-mail chain here begins with one
10  from Craig Hanks.
11       Do you know who Craig Hanks is?
12  A.   Yes.
13  Q.   Who is he?
14  A.   He's the plant manager on back shift.  He's
15  the top man on the back shift.
16  Q.   Okay.  What race is he?
17  A.   White.
18  Q.   And it appears that he is expressing
19  appreciation for work that had been done in the
20  hot calibration lab.  And it looks like the e-mail
21  atop here that you and Ms. Sanders are in part
22  responsible for that work; is that correct?
23  A.   Yes.

Page 99

1       (Defendant's Exhibit No. 5 was
2       marked for identification and a
3       copy of the same is attached
4       hereto.)
5  Q.   I'm showing you, Ms. McDowell, and your
6  attorney what I have marked as Exhibit 5 to your
7  deposition.  It is another e-mail related to your
8  work performance.  The e-mail is coming from Jason
9  Jordon, Facilities foreman at Plant Hatch.
10       Was this during an outage?
11  A.   That is correct.
12  Q.   Do you happen to know Jason Jordon?
13  A.   I know him as the foreman, but that's all I
14  know of him.
15  Q.   Would you recognize him if you saw him?
16  A.   Yes.
17  Q.   What race is he?
18  A.   White.
19  Q.   When you were employed with the Houston
20  County Sheriff's Department, you received
21  discipline in the form of a ten-day suspension
22  without pay.  What was that for?
23  A.   I had a cousin that was living with me at

Page 100

1  the time who was receiving telephone calls from an
2  inmate.  And I as well spoke with the inmate on
3  the telephone.
4  Q.   Is that against the department's rules?
5  A.   Well, I really didn't know it at the time,
6  being that the calls were not initiated from me
7  originally.
8  Q.   But when you received the discipline, did
9  you learn that it was against the department's
10  rules to do what you did?
11  A.   Yes.
12       (Defendant's Exhibit No. 6 was
13       marked for identification and a
14       copy of the same is attached
15       hereto.)
16  Q.   I have marked as Exhibit 6 to your
17  deposition, Ms. McDowell, several pages of
18  correspondence and information related to your
19  EEOC Charge filing.
20       Did you receive that top letter?  Do you
21  remember receiving that from the EEOC?
22  A.   That is correct.
23  Q.   Did you read the letter?

25 (Pages 97 to 100)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

Page 101

1  A.  Yes, I did.
2  Q.  And do you understand from reading the
3  letter that the finding with the EEOC was that
4  your termination was not discriminatory?
5  A.  I read that.
6  Q.  And looking at the next page, the Dismissal
7  and Notice of Rights, are you aware that the EEOC
8  did not require the company to respond to your
9  EEOC Charge?
10  A.  No, I was not aware of that.
11  Q.  Okay. And then we've got your Charge of
12  Discrimination. And actually you apparently typed
13  up separately your allegations against the
14  company, correct?
15  A.  That is correct.
16  Q.  Have you identified for me previously
17  everyone who you feel discriminated against you at
18  Plant Farley?
19      THE WITNESS: I thought we did that
20  already.
21      MR. NEWMAN: Just answer her question
22  as best you can.
23  A.  I believe Deborah Crutchfield discriminated

---

Page 102

1  against me; I believe Sharon Bestwick
2  discriminated against me; I believe Randy Johnson
3  discriminated against me.
4  Q.  Who else? Let me try to make this easier.
5  Anyone else, other than the people whom we've
6  already talked about?
7  A.  I cannot recall that at this time.
8  Q.  Can I get your commitment that if you do
9  recall anyone else, that you will let your lawyer
10  know, so that he can let me know that information?
11  A.  Yes.
12  Q.  Okay. Have you told me every way that you
13  believe Deborah Crutchfield discriminated against
14  you?
15  A.  I can't confirm or deny that because I don't
16  know. Because I can't verify what I decided to
17  put on that list. I don't know if I have
18  everything.
19  Q.  Okay. Good enough. Tell me how you believe
20  that Sharon Bestwick discriminated against you.
21  A.  Initially, Sharon Bestwick indicated, in the
22  meeting for the State of Alabama, that I told her
23  that I did send Doris to Tammy, to talk to Tammy

---

Page 103

1  for me. And that was not true. That's one of the
2  things.
3      Number two, Sharon Bestwick comes in and she
4  types stuff, and she doesn't type, and she
5  paraphrases things to the way she believes it's
6  supposed to be, when it's biased. And she doesn't
7  ask you, Well, do you agree with this or you don't
8  agree with this? And then they accept her word as
9  the golden rule. And I was terminated for that.
10  Q.  Is there anything else?
11  A.  As far as Sharon Bestwick is concerned?
12  Q.  Yes, ma'am.
13  A.  Yeah. For right now, yes.
14  Q.  The first instance that you referred to was
15  the hearing with the unemployment compensation
16  hearing officer; is that correct?
17  A.  I believe so.
18  Q.  Where you said she told the state
19  incorrectly that you had agreed that you had sent
20  Doris to Ms. Caldwell; is that correct?
21  A.  That's correct.
22  Q.  And that was after you were terminated,
23  correct?

---

Page 104

1  A.  That was after I was terminated yet did not
2  know the contents of the letter that was presented
3  to Tammy Caldwell until that unemployment
4  compensation meeting.
5  Q.  Okay. But that action that you are
6  complaining about by Ms. Bestwick was after you
7  had been terminated?
8  A.  That is correct.
9  Q.  And you actually did receive unemployment
10  compensation benefits?
11  A.  That is correct.
12  Q.  Okay. And then Randy Johnson. How did
13  Randy Johnson discriminate against you?
14  A.  He discriminated against me because he took
15  the word of Tammy Caldwell and Sharon Bestwick and
16  Deborah Crutchfield, not allowing Sharon to go get
17  the true facts, just taking their word for it as
18  it was golden, and then terminating me over
19  accusations that I had nothing to do with.
20      Also, he indicated in his meeting, when I
21  was receiving my DML, and smirked and said, And
22  I'm not going to single you out.
23  Q.  Repeat that. What did he say?

---

26 (Pages 101 to 104)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 105

1   A.   And I'm not going to single you out. I'm
2   not going to have a foreman -- excuse me -- single
3   you out.
4   Q.   And you felt that was discriminatory?
5   A.   Well, what would he know about them singling
6   me out prior to? Why would he make that statement
7   if he didn't know what happened to me prior?
8   Q.   What was his position at the time?
9   A.   At the time of?
10  Q.   Of the DML meeting, where you said he made
11  these comments?
12  A.   Plant manager.
13  Q.   Do you know whether or not anyone had told
14  him that you had that concern about the previous
15  plant manager singling you out?
16  A.   It was all over plant site about what had
17  happened, from union reps discussing it. People
18  coming up to us in the maintenance shop laughing,
19  asking us why are we were working together, that
20  they knew that we weren't supposed to be together.
21  It was a joke on plant site.
22  Q.   So, in other words, everyone knew that y'all
23  felt like you were being singled out?

Page 106

1   A.   No. Everybody knew that we were being
2   singled out.
3   Q.   And you had complained about that, correct?
4   A.   Yes, I complained about it. I complained
5   about it to the plant manager.
6   Q.   Randy Johnson?
7   A.   At the time it was Don Grissette.
8   Q.   Okay. And do you know if Don Grissette had
9   told Randy Johnson about that complaint?
10  A.   I don't know if he told him. But I can't
11  see how the assistant plant manager would not know
12  what was going on with the employees.
13  Q.   Okay. That's what I want to establish.
14      You said that Randy Johnson discriminated
15  against you by taking the word of Tammy Caldwell.
16      What is it that you know that Tammy Caldwell
17  told Randy Johnson?
18  A.   I don't know what she told Randy Johnson.
19  But according to Ms. Bestwick, I know that she
20  indicated that I was creating a hostile
21  environment towards her. And I'm pretty sure that
22  Ms. Bestwick has to go to the plant manager and
23  let him know of her findings.

Page 107

1   Q.   So you're saying, through the investigation,
2   Mr. Johnson learned of Ms. Caldwell's complaints
3   about you or accusations against you; and you're
4   saying that he credited what she said in that
5   investigation?
6   A.   I'm sure, yes. I mean, in order for those
7   charges to come down on me, obviously she had to
8   go to someone, which was Sharon Bestwick.
9   Q.   And during the investigation, you're saying
10  that Randy Johnson got information from the
11  investigation, and that's why he issued the DML?
12  A.   (No response.)
13  Q.   I'm trying to get an understanding here.
14  A.   I don't know who issued the DML. My
15  understanding that the DML came from him, at one
16  time. Another time, I heard it came from Sharon
17  Bestwick. So I don't know who issued the DML.
18  Q.   Do you know who made the decision to
19  terminate your employment?
20  A.   I was told by the assistant plant manager
21  that it was Randy Johnson.
22  Q.   Okay. Do you know what Deborah Crutchfield
23  told to Randy Johnson about the investigation?

Page 108

1   A.   I don't know what she told Randy Johnson.
2   But I know what she told or what she indicated to
3   the assistant plant manager in a meeting.
4   Q.   What was that?
5   A.   That I came in with my hard hat on one day
6   and was sitting in a chair and didn't say anything
7   in morning briefing.
8       And she also indicated that I told her in
9   that meeting that I recorded on, I believe you
10  said it was the 9th of September, that I told her
11  that I did not care whether I kept my job or not.
12  And that is not on that tape.
13  Q.   Do you know if she told these things to
14  Randy Johnson?
15  A.   I don't know if she told them to Randy
16  Johnson. I just know that this is what the
17  assistant plant manager spoke in the meeting the
18  day I was terminated.
19  Q.   Okay. And let me clarify this. Do you know
20  what, if anything, Tammy Caldwell told to Randy
21  Johnson?
22  A.   No, I don't know that.
23  Q.   Okay.

27 (Pages 105 to 108)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 109

1    MR. NEWMAN: Are you at a good point
2  for a break?
3    MS. SHARP: Yeah, we can do that now.
4  No problem.
5    (A lunch recess was taken.)
6    MS. SHARP: We are going back on the
7  record in the Janell McDowell deposition. And the
8  parties have agreed to recess Ms. McDowell's
9  deposition for the day in order for defense
10  counsel to file a motion with the Court for a
11  protective order excluding one plaintiff from the
12  deposition of the other plaintiff.
13    We were unable to speak with Judge Coody
14  this afternoon, but the Judge's secretary was able
15  to speak with one of the law clerks for Judge
16  Coody, and, I think, the law clerk assigned to the
17  case, if I'm not mistaken.
18    MR. NEWMAN: Yes.
19    MS. SHARP: And the law clerk felt that
20  both plaintiffs would be entitled to sit in each
21  other's depositions; however, defense counsel
22  feels strongly and wants to file a motion for a
23  protective order.

Page 110

1    MR. NEWMAN: That is my understanding.
2  That's our agreement.
3
4
5    FURTHER THE DEPONENT SAITH NOT
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 111

1    C E R T I F I C A T E
2
3  STATE OF ALABAMA
4  BARBOUR COUNTY
5
6    I hereby certify that the above and
7  foregoing deposition was taken down by me in
8  stenotype and the questions and answers thereto
9  were transcribed by means of computer-aided
10  transcription, and that the foregoing represents
11  a true and correct transcript of the testimony
12  given by said witness upon said hearing.
13    I further certify that I am neither of
14  counsel, nor kin to the parties to the action,
15  nor am I in anywise interested in the result of
16  said cause.
17
18
19
20
21    CYNTHIA M. NOAKES,
22    COURT REPORTER and
23    COMMISSIONER

28 (Pages 109 to 111)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page  112

**A**

abide 80:4
ability 7:23
able 75:3,19 109:14
absence 32:1
Absolutely 75:15
accept 10:10 103:8
access 53:20
accurate 9:4 25:7
accusation 12:5
 14:3 41:8
accusations 104:19
 107:3
accused 12:2,21
 13:11,16 27:17
 41:11,15 51:16,21
 52:4,6,18 57:21
 58:1
accusing 10:18 11:1
acting 6:3 78:22
action 104:5 111:14
actions 38:22 66:10
adding 98:2
addition 73:11 75:9
 76:7
addressed 15:13,19
 17:3 18:9 34:17
adds 23:22
administered 66:12
admits 23:18
admitted 46:10
African 91:10,13
African-American
 92:17
afternoon 109:14
agree 80:10,13
 103:7,8
agreed 2:3,10,17
 3:2 103:19 109:8
agreement 33:13
 49:19 110:2
ahead 8:14 19:4
Air 30:22 32:11
Al 61:8
Alabama 1:2 2:8
 5:7,14 6:3,5,8
 76:16 102:22
 111:3
Albert 65:8
allegation 12:3 14:8
 51:15 63:18
allegations 9:2 51:6
 71:14 73:1,9
 101:13

allotted 24:21 80:13
allowed 16:21
 21:14 30:20 38:7
 43:5
allowing 104:16
alluded 50:18
Alpha 93:6
altogether 79:21
American 91:10,13
anatomy 62:1 67:14
 67:17 70:9
Angela 63:22,22,23
 64:15 65:5
annex 40:14
answer 7:17,20,22
 8:23 13:2 18:16
 20:9 59:15,19
 67:21 74:8 80:7
 82:11 101:21
answered 58:19
 70:5
answers 75:14
 111:8
Anthony 90:8
anybody 18:8 35:17
 83:2
anyway 17:17
 75:14
anywise 111:15
apologized 10:8,20
 10:22,23 11:6
apology 10:10
apparently 101:12
APPEARANCES
 5:1
appears 90:7 95:5
 95:20 98:18
apply 56:18
appreciated 96:18
appreciation 98:2,7
 98:19
approach 35:21
approached 9:17
 10:6 25:22 26:2
 35:22
area 44:14,18,20
 45:3,12 46:7
Ashford 10:12 11:7
 11:14 12:6 18:1,9
 19:13,15 20:11,12
 20:16,18 24:20
 25:9 26:22 57:18
 57:22 58:6,17
 59:2

Ashford's 24:22
Ashley 17:2,3 25:9
 25:15 26:15
Aside 78:6
asked 7:18 9:18,21
 10:9,15,21 11:10
 15:20 19:2,6,9
 21:8,19 28:19
 35:16 36:11 42:22
 56:9,12 58:11,15
 59:4 75:3 77:1
 79:11 84:19
asking 7:14 10:14
 28:5,6 57:20 60:6
 64:5 72:22 74:3
 105:19
asks 45:18 70:3
assign 2:22
assigned 17:11 41:1
 41:3 56:3 109:16
assigning 21:23
 22:17 23:3 38:23
assignment 29:15
 40:13 44:2 56:4,4
 56:7
assignments 29:21
 29:22 30:20 38:23
 39:13,20 55:11,14
 55:16,17,19 56:6
 56:8,10 57:2
assist 63:21
assistant 21:2 94:9
 94:10 95:22
 106:11 107:20
 108:3,17
associates 86:22
assume 51:23 52:3
 67:5 91:8
assuming 67:3
atop 96:21 97:21
 98:21
attached 8:12 53:5
 54:3 84:2 99:3
 100:14
attention 94:1
attire 64:1,9,12
 65:23
attorney 5:5,11
 22:12 42:8 71:22
 72:3,15,15,20
 76:5 77:7,11
 83:21 84:4 99:6
attorney's 74:14,22
audible 76:14

audio 88:14
aunt 83:2
Avenue 5:13
aversion 56:16
Avery 17:5,9,13
 19:3 82:9 91:18
 92:2,4
award 25:23 26:4
 26:13 27:4
awarded 19:12
 20:13
awarding 18:19
aware 27:4 54:13
 101:7,10
A.G 31:2,20 32:13
 33:9 34:5
a.m 6:9

**B**

back 10:7 31:22
 43:2,21 46:15
 47:9,9 56:22 61:8
 64:4 65:8,14 66:8
 74:17 80:11,14
 98:14,15 109:6
BALCH 5:12
ball 39:5
Barber 44:2 45:8
 66:22 67:3 84:16
 84:20 92:11 93:5
 93:8
BARBOUR 111:4
barely 76:14
Bargaining 33:13
based 15:7 16:10
 17:22 29:16,19
 83:9
basically 26:9 45:10
basis 56:23
bathroom 45:13,21
began 9:10 14:9
 49:17,19
beginning 6:9 9:9
 14:9
begins 98:9
behalf 5:3,9 8:17
 55:8 58:2
behavior 48:4
 56:14 64:3,9
 69:23 81:9
believe 10:4,17 11:9
 15:15 17:21 18:2
 18:12 20:2,8,20
 30:16,18 31:5

39:18 40:20 42:8
 47:4,20 71:22
 83:14 84:10 85:15
 85:20 87:11 90:20
 94:9 97:18 101:23
 102:1,2,13,19
 103:17 108:9
believed 10:2
believes 103:5
benefits 104:10
best 7:22 51:7 74:6
 101:22
Bestwick 5:17
 58:23 59:4,13
 61:1 85:1,12
 86:14 102:1,20,21
 103:3,11 104:6,15
 106:19,22 107:8
 107:17
Bestwick's 59:19
beyond 38:6
biased 103:6
big 93:13
Bill 44:2 45:8 66:22
 67:3 84:16,20
 93:5
Billy 92:14 97:13
BINGHAM 5:12
bioed 44:21,21
Birmingham 5:14
 21:4
bit 47:8
bite 85:2
black 61:17 79:4,7
 81:12
blacks 67:10 70:2
 73:14 84:13
blame 86:2,14
body 89:2,2,18
bottom 56:13 92:7
 92:10
box 61:10
bra 89:6
Brad 39:7 68:6
break 7:8 26:14
 44:10 45:1 61:5,9
 70:3,10 109:2
breakfast 43:2
breasts 89:7
Brenda 69:3 95:15
briefing 17:4,8
 21:12 108:7
bring 63:5 72:13,14
brings 63:8

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 113

brought 29:1 62:13
  62:22 65:7,14
  78:15
Brown 61:2
Bryant 44:16 45:1
  45:9 92:21 93:3
  93:18 94:3,6,14
  94:17 96:8,15,23
Buck 45:17 46:3,4
  93:2 95:11 96:4,9
Buck's 46:17
buddies 39:4,6,21
building 40:3,6,7,8
  40:14,16 44:15
  45:16,18
business 33:17 34:7
  34:13,19 38:2,2,3
  57:5

**C**

C 111:1,1
cafeteria 42:20,21
  43:1,4,6,10 47:12
  48:1 49:4,11,20
  50:1,10,14
cake 61:1,4,5,6,9,14
  61:22,23 62:6,9
  62:13,22 63:2,6
  63:11 82:23
Caldwell 16:4,5,13
  16:22 19:1,9,11
  20:13 39:8 52:20
  56:19 58:5 59:2
  61:4 62:14,15
  63:23 64:16 65:20
  65:21,23 82:13,14
  82:20 85:4 86:7
  97:6 103:20 104:3
  104:15 106:15,16
  108:20
Caldwell's 107:2
calendar 71:20,23
calibration 98:20
call 17:5,10,12,16
  21:16 75:2
called 12:8 22:6
  28:13,18 61:5
  77:1 79:9 85:23
  86:16,17
calls 31:2,20 70:3
  100:1,6
Calvin 70:4,11
candy 45:23
car 88:1

care 87:23 108:11
cared 39:3
cart 44:8
case 1:5 38:7 81:18
  82:8 109:17
cause 6:10 111:16
center 84:19
certain 25:8
Certificate 4:12
certify 6:4 111:6,13
chain 95:14 96:7
  98:9
chair 108:6
challenged 42:4
  46:12
change 9:22,23
  10:21 11:23 22:1
changed 9:16,19
  10:14,16 11:11,12
  11:15
changing 12:6
Charge 100:19
  101:9,11
charges 84:15,20
  107:7
Cheri 21:1,5 22:16
  22:20,22 23:1
  28:18,19 30:1
  87:11 90:3
Chicks 64:6
choice 87:21 88:4
Chuck 39:14,16,18
Cindy 13:2 68:16
Civil 6:5
claims 84:11 85:22
  87:12,20
clarification 41:14
clarify 22:14 28:15
  108:19
classify 86:22
clean 62:18 63:16
clear 13:5
clerk 109:16,19
clerks 109:15
Cliff 45:17 46:3,4
  46:17 95:11 96:4
  96:9
Clifton 93:2
close 14:16 15:3
  61:10
closed 67:2
code 9:21,23
Collective 33:13
Collins 21:5,6 22:7

22:17,21,22 23:1
  23:5 27:20 28:3,7
  28:18 29:9,14
  30:1,6 87:12 90:3
come 28:19 37:8
  44:6,10 79:15
  80:11,14 107:7
comes 31:22 43:8
  43:21 44:16 45:17
  45:18 70:7 103:3
coming 43:7 45:12
  45:20 60:6 64:5
  99:8 105:18
comments 105:11
Commissioner 6:3
  111:23
commit 7:12
commitment 102:8
committed 60:20
  63:19
company 1:12 5:19
  7:3,4 33:12 54:15
  54:21 78:2 87:7
  101:8,14
company's 54:20
  80:22
compensation
  76:18 89:13
  103:15 104:4,10
compensatory
  83:18
complained 48:4,8
  48:19 106:3,4,4
complaining 14:19
  15:4,5 20:22
  47:12 104:6
complaint 8:16,20
  9:7 30:12 34:3
  35:9,12 37:3
  60:15 83:17 106:9
complaints 91:4
  107:2
completely 15:3
  51:6
compliance 2:14
computer 9:21,22
  53:20 72:12 90:18
computer-aided
  111:9
concern 32:1
  105:14
concerned 103:11
conclusion 86:8
conduct 56:15

60:20,22 63:20
  65:2 66:21 67:6
  83:13
conference 76:18
  89:14
confided 31:11
confidence 37:8
confidential 30:21
  31:9 33:2,5 34:4
  34:10 69:5
confirm 59:1,6,12
  59:14 102:15
congratulating 93:8
Constantly 39:22
consultation 78:20
contained 9:3
contains 30:4
contend 9:14
contention 16:16
  40:12
contents 104:2
continued 49:16
continues 43:12
contract 33:13 40:7
  80:5
conversation 13:8
  13:13 27:21 30:1
  30:5 57:8 58:4
  88:6
conversations
  57:10 76:3
conversing 56:22
Coody 109:13,16
cooperation 74:18
Coordinator 5:18
copied 93:6 95:6,8
  97:13
copy 8:12,14,16,18
  8:18 15:15 18:15
  23:8,9,10,15 53:5
  54:3,7 72:19 84:2
  84:7 96:9 99:3
  100:14
copying 96:22 97:1
  97:5
corner 45:15,19
Corporate 54:8
correct 11:19 16:15
  16:19 17:20 18:20
  19:10 21:6 22:13
  23:4,7,13 25:12
  26:5 29:4,7,7,17
  30:7 31:10 32:7
  32:22 33:23 35:5

38:21 39:14 40:23
  41:6 42:14 46:18
  47:10 48:1,2,5,6
  48:11,12,18 49:1
  49:5 50:3,10,11
  50:15,17,20,21
  51:1,4 53:12,15
  53:19 55:1 57:7
  59:3,4,23 61:21
  64:17 66:3 68:19
  69:11,19,21 81:6
  81:7,10,11 86:10
  86:12,20 87:3
  88:9,16 89:15
  90:6 91:13,14,22
  91:23 92:20 93:12
  94:15,18,19,21,22
  95:10,12,13 96:1
  96:2,6,11,12,19
  96:20 97:2,3,10
  97:11,15,16,23
  98:1,3,4,7,8,22
  99:11 100:22
  101:14,15 103:16
  103:20,21,23
  104:8,11 106:3
  111:11
correctly 23:19
  29:3 51:19 80:15
correspondence
  100:18
counsel 2:5,19,21
  6:6 109:10,21
  111:14
County 99:20 111:4
couple 7:5
course 45:2 75:11
Court 1:1,17 2:6,15
  3:4 6:2,17 30:14
  39:16 109:10
  111:22
cousin 99:23
cover 51:6
covered 60:9
coworker 50:7
  51:18 52:8,18
  55:5,8 68:3 80:1,1
  83:8
coworkers 68:6
coworker-superv...
  38:6
Craig 98:10,11
Crawford 2:8 5:6
  6:8

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 114

create 55:3 74:14
 74:22
created 55:5 57:17
 57:22 72:3 74:23
 82:18
creates 52:8
creating 51:16,21
 52:4 53:11,17
 54:18 106:20
credited 107:4
crew 39:22 40:18
 40:19,21 41:1
Crutchfield 12:10
 12:12 13:9,14
 14:5 21:8 31:8
 32:10,23 34:5,18
 35:13 36:4,13
 37:1 43:21 45:8
 60:1,10 61:11
 62:4,9 64:10
 65:16 66:8,16
 76:22 84:18 90:9
 90:11 91:12 92:8
 92:16 101:23
 102:13 104:16
 107:22
Crutchfield's 37:5
 37:12
crying 12:15
cursed 68:7 69:17
Cynthia 1:17 2:6
 6:2 111:21

**D**

D 90:3 91:17 92:11
damages 83:17,18
 83:19
dancing 64:23
 65:11
Darran 97:6,7
date 6:4 15:18
 19:22 20:1 25:3
 41:22 52:11 86:17
dated 90:8
dates 8:1,3
day 2:9 11:4,5,10
 11:10 12:20,22
 13:10,15 16:2,7
 16:10,12,17 23:11
 35:19 41:3 44:3
 45:12 47:4 58:7
 62:23 77:2 80:2
 108:5,18 109:9
days 13:15 79:1,10

79:16,18 80:10,12
 80:13,16 82:3
 83:11
Deborah 12:10,11
 12:11 13:8 21:8,9
 21:13 31:1,7,18
 31:20 32:10 34:5
 34:17 35:13 36:3
 36:12 38:1 43:21
 45:8 49:13 60:1,6
 60:8,10 61:11,13
 62:4 64:10 65:15
 66:8,16 76:22
 84:18 86:1 90:9
 92:7,16 101:23
 102:13 104:16
 107:22
decide 79:2
decided 47:5 87:22
 102:16
decides 21:15 44:8
decision 107:18
Decision-making
 52:13
dedication 93:21
Defendant 1:13 5:9
Defendant's 4:6,7,8
 4:9,10,11 8:10,15
 8:19 9:3 53:3,8
 54:1,6 83:23 84:5
 84:7 99:1 100:12
defense 109:9,21
denied 15:8
denigrates 56:15
Dennis 43:22 97:23
deny 55:15,17 59:1
 59:6,12,14 102:15
department 93:4
 99:20
department's 100:4
 100:9
DEPONENT 110:5
deposition 1:21 2:5
 2:12,13,23 3:3 7:2
 7:9,21 14:12 53:9
 54:7 75:8,12 84:6
 99:7 100:17 109:7
 109:9,12 111:7
depositions 2:16
 109:21
Derrick 14:13
 41:20
Describe 25:4
described 13:9

describing 47:8
deserved 93:23
deserving 90:21,23
 92:2 93:15 95:2
desk 69:3
Deweese 61:8
Dick 43:2,3,6 50:5
 50:10,12
difficult 12:16
directed 48:13
 50:12
disagree 47:15 74:1
discipline 11:21
 12:1 44:17 52:14
 66:9,11 67:10,23
 68:22 69:1,9,17
 70:1,15,18,19
 80:21 84:14 99:21
 100:8
disciplined 46:6
 60:19,21 61:20
 62:15,21 63:10,12
 63:17,20 64:8
 66:7 67:8,9 68:9
 70:1 85:8
disciplining 79:23
disclose 35:16
 37:10
disclosure 34:4
 37:6,12
disclosures 88:13
 90:1
discriminate
 104:13
discriminated
 14:15 27:8 101:17
 101:23 102:2,3,13
 102:20 104:14
 106:14
discriminating 24:2
 79:5 81:17
discrimination 9:14
 30:18 37:2 41:10
 101:12
discriminatory
 11:18 18:18 37:7
 37:13,17,23 38:11
 39:1 101:4 105:4
discuss 31:1,3,22
discussed 28:9,10
 31:8 35:3
discussing 47:5
 105:17
discussion 28:7

Dismissal 101:6
disparate 9:11
 14:10 35:7 51:11
displayed 64:20,21
 65:17
dispute 54:19
DISTRICT 1:1,2
DIVISION 1:3
Dixie 64:6
DML 52:1,2,11,12
 52:16 53:10,16
 54:17 68:5,11
 69:13 78:20 79:12
 81:9 82:12,15,18
 83:12 104:21
 105:10 107:11,14
 107:15,17
document 19:23
 20:6 33:2,5 72:22
documents 10:18
 10:23 11:23 13:11
 14:4 27:18 41:9
 71:20
doing 11:1 21:23
 23:18,23 28:21
 29:3 41:11 42:22
 57:21 79:15 80:12
 80:14 91:4 97:14
Don 41:18,23 42:12
 43:15 46:1,8,9,14
 46:16,19,22 48:9
 48:13,16,17,19,21
 49:6,10 50:22
 87:15 95:21 96:9
 106:7,8
Don's 46:22
door 44:5,7 61:7
doors 67:2
Doris 10:12 11:7
 18:1 19:13 20:11
 24:20 25:9 26:14
 57:18,22 58:1,6
 58:14,16 59:5,8,9
 59:10,16 102:23
 103:20
Dothan 2:8 5:7 6:8
dropped 42:5
duly 6:14
Dumas 90:8,13,22
 91:5,7

**E**

E 111:1,1
earlier 13:1 90:5

easier 29:22 102:4
easily 74:11,16
eat 43:5,10
eating 42:21 43:4
 45:22 49:23 50:1
 50:10,13
Eddie 15:8,21,23
EEOC 100:19,21
 101:3,7,9
effect 2:13
effort 95:1
efforts 96:5
egregious 60:20
 63:20 67:6 69:23
either 13:15 19:22
 38:23 59:1 69:23
 88:17
Elbert 92:11 96:22
eligible 15:12
else's 34:13,15
 38:20
embarrassed 43:13
employed 54:14
 92:15 99:19
employee 5:18
 37:23 50:1,2,4
 70:4,12,16,17
 71:1,2
employees 69:16
 76:3 93:7 106:12
employment 53:21
 72:23 76:21 78:1
 78:11 107:19
engaged 67:2
engaging 69:22
entire 41:5
entitled 68:4,18
 69:10 73:22 75:21
 109:20
environment 51:17
 51:22 52:5,8
 53:11,17 54:18
 55:3,6 57:18,23
 80:2 82:19 106:21
establish 106:13
Eufaula 6:3
evaluation 80:9
evening 11:9 16:8
 16:14
everybody 45:19
 58:11 61:2 63:8
 106:1
everybody's 38:8
evidence 2:23 24:5

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 115

24:10,16,19 27:3
30:1,5
exact 19:22 25:3
41:22 62:19 86:17
exactly 28:4
examination 4:2
6:10,22
examined 6:14
excellent 93:20 94:7
95:23 96:13
excluding 109:11
excuse 35:15 105:2
Exhibit 4:6,7,8,9,10
4:11 8:10,15,19
9:3 53:3,8 54:1,6
83:23 84:5,7 99:1
99:6 100:12,16
**EXHIBITS** 4:5
existence 54:14
expected 82:13
experience 9:11
14:10
explained 12:11
43:11 55:11,13
60:5
explaining 21:20
explains 21:18
expressing 98:6,18
extra 95:1
e-mail 15:14,16,19
17:18,23 18:3,8
18:10,11,13,15
21:13 22:2,8,11
22:15,19,20,22
23:2,6,12,14
29:10,11,16,23
30:4 43:12 87:14
90:1,4,7,8,12,15
90:22 91:16,16,17
92:6,10 93:5,17
94:5,14,17,20
95:6,8,14,15 96:3
96:7,7,16,21 97:4
97:12,21 98:9,20
99:7,8
**E-mailed** 18:1
e-mailing 95:20
e-mails 71:19 97:1

**F**

F 5:17 111:1
**Facilities** 17:14
99:9
fact 11:11 12:2 22:1

40:20 42:2 44:22
58:3 77:21 78:21
78:22 81:12,15
82:22 83:9,10,12
85:8 90:23
facts 104:17
fair 15:14 18:5,6
fairly 21:21,23 22:5
22:18 23:3 24:5
29:2,20
fall 45:9 74:11,17
74:17 86:2,6
falsified 10:22 14:3
falsifying 10:18
11:2 12:2 13:11
27:17 41:9
familiar 54:10,22
90:15
far 7:23 12:7 23:23
28:10,13,16 30:20
49:13 56:22 57:2
72:8 73:14 84:13
84:13 103:11
Farley 21:3 34:2
53:22 71:1 76:4
78:12 87:2,9
101:18
Faulk 97:13,17
**Faulk's** 97:21
favor 70:8
favorable 39:12,20
favoritism 23:20
30:19 39:3,12
feed 63:5,8
feedback 81:8
83:13
feel 27:7 37:2,11,16
54:19 56:18 92:1
93:23 95:2 101:17
feeling 50:22
feels 109:22
fellow 83:8
felt 46:3 105:4,23
109:19
female 51:18 55:5
61:17
females 15:11
**female's** 45:13,21
file 109:10,22
filed 7:4 8:16 73:6
74:11
filing 3:3 84:20
100:19
final 98:9

**find** 19:11 40:3
81:13,14
**finding** 57:17 101:3
**findings** 106:23
**fine** 6:20 42:23
49:23
**finish** 13:1 20:4
**fire** 60:2,3,7
**first** 6:14 25:16
50:9 90:3 103:14
**flip** 89:23 91:15
**focus** 15:2
**folks** 15:20 95:8
**following** 6:11
95:14
**follows** 6:15
**food** 63:9
**force** 2:13
**foregoing** 6:6 111:7
111:10
**foreman** 17:14,14
26:6 27:10 35:14
43:3 48:14,21
61:17 62:2 68:8
92:13,15,18,18,19
92:21,23 99:9,13
105:2
**foreman's** 9:22 10:3
58:5,9,20 59:2
**foremen** 21:10 26:3
26:15 35:11 42:2
42:4,17 43:18,19
46:11 49:8 61:18
67:1 69:17 78:16
78:19 81:5 82:5
91:19 95:9,21
96:16 97:1,14,22
**form** 2:20 99:21
**former** 21:2 92:13
**forth** 56:23
**forwarded** 90:12
95:5
**forwarding** 96:16
96:22
**forwards** 94:20
98:6
**found** 36:10
**fountain** 45:15
**frame** 17:19 42:9
47:21 50:19 69:14
**Free** 54:9
**Freeman** 9:15
11:18 12:20 13:10
14:20 27:14 30:8

49:13 76:23 79:2
79:6 81:3,4 83:9
**Freeman's** 14:3
41:7
frequently 40:19
friend 86:23
friendly 21:19
56:23 57:8,10,12
friends 28:21 38:5
86:21
full 2:14
further 2:10,17 3:2
110:5 111:13

**G**

G 92:11
game 39:5
generate 72:5
generated 74:10
generating 73:19
gentleman 67:12
getting 10:19 28:21
29:22 31:15 45:13
46:16 47:22
give 7:20,22 14:12
16:9 19:3,4 29:6,7
29:10 31:15 32:17
32:20 33:7 38:13
38:18 45:5 59:15
62:5 72:15 93:13
given 25:7 29:20
38:14,16 40:10
67:23 68:22 69:1
77:21 111:12
gives 15:10 16:3
44:2
giving 82:18 90:22
Glasco 61:12,14,16
61:19 62:3 63:10
92:17
go 8:14 9:21,23
19:4 21:8,11,14
34:14 38:8 40:2,4
44:4,15 46:4,16
47:3,6 57:3 58:1
61:1 79:3,9,14,15
80:2,11 81:1,15
83:12 104:16
106:22 107:8
goes 14:8 30:23
31:18 43:15 63:18
91:20
going 7:6,17 14:4
17:16 21:16,20

29:6 35:19 41:14
44:11,13 45:4,5
46:19 59:8,16
63:5 64:11 66:23
67:5 75:6,8 78:19
85:21 88:18,19
89:20 90:9 94:14
96:8 97:13 104:22
105:1,2 106:12
109:6
golden 103:9
104:18
good 43:23 47:8
84:22 93:22 96:10
97:15 102:19
109:1
Goodson 92:7
Graven 87:18,21
great 96:11
greet 51:18 82:14
83:8
greeting 52:7 55:5
80:1
greetings 57:9,12
grievance 76:13,15
89:16,20
Grissette 41:19,23
42:7,12 43:16
46:14 48:9,17,21
49:7,10 50:23
87:15 95:21 96:9
106:7,8
**Grissette's** 46:8,20
ground 7:6
grounds 2:22 18:4
group 10:12 18:7
19:6,7 45:14
56:17 58:11 64:7
64:11 82:23 83:3
guidelines 16:20
64:13 80:22,23
83:7
guy 70:7
guys 48:20

**H**

hand 8:14 34:12
44:21 45:23
handed 21:13 22:4
77:7,17
handing 53:7 54:5
84:4
handwriting 10:3
85:10,18

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Hanks 98:10,11
happen 12:4 14:2
 99:12
happened 9:13
 11:20 12:11 17:15
 17:20 20:3,7 60:5
 66:10 85:10 105:7
 105:17
happening 33:19
harass 86:6
harassed 46:3
harassing 80:1
harassment 54:9
 84:15
hard 108:5
Harris 15:8,21
 16:23
harsher 84:14
hat 108:5
Hatch 63:22 64:4
 66:2,17,21 71:2
 99:9
hear 26:17 43:11
heard 66:23 68:8
 107:16
hearing 76:13,15
 89:16,20,21
 103:15,16 111:12
Helen 94:6,8
help 71:20
helper 50:7 53:1
 71:4 97:8
helpers 17:3
helpful 85:21
helps 74:8
Henderson 14:13
 41:20
hereto 8:13 53:6
 54:4 84:3 99:4
 100:15
he'll 40:3
history 37:10
hold 7:17,23
home 16:3 17:6
 21:16 22:7 28:13
 28:19 89:14
hostile 51:17,21
 52:5,8 53:11,17
 54:18 55:3,6
 57:17,22 80:2
 82:18 106:20
hostility 56:16
hot 98:20
Houston 99:19

Hughes 9:18 11:22
 18:12,13 41:8
 55:19 56:3,3,6
 60:11 84:11,15,17
 84:23 85:21,23
 86:9,13,21 87:6,8
Hunter 46:2,16,22
 48:13,16

_____ I _____

idea 78:22,23 79:14
 80:8
identification 8:11
 53:4 54:2 84:1
 99:2 100:13
identified 30:8
 92:17 101:16
identify 49:16 62:8
immediate 27:12,14
improve 80:15
inappropriate
 61:10 64:1,2,9,19
 65:2,23
incident 10:9 12:14
 15:5 17:19,21,22
 18:18,21,23 19:20
 19:21 20:7,21
 24:13 41:18,23
 42:19 47:13,21
 49:5,11,20 60:23
 61:1,3 63:1,11,21
 71:5 82:22 84:16
 86:3
incidents 18:22
 71:21
included 83:10
includes 56:15
including 93:18
incorrectly 103:19
INDEX 4:1
indicate 76:20
 82:15
indicated 12:12
 38:2 42:3 46:11
 55:4,7,10 59:16
 61:13 63:4 66:9
 70:18 82:16,23
 86:1 102:21
 104:20 106:20
 108:2,8
indicating 22:3
individual 56:16
individuals 25:8,13
 36:3 88:18

inequities 25:23
inform 21:10
information 34:4,9
 34:10 35:17 37:13
 38:4,13,15,20
 71:22 84:10 87:11
 87:19 100:18
 102:10 107:10
informed 41:23
 44:19 85:23
informing 11:13
informs 43:16 45:8
infraction 60:19
initial 88:12 90:1
initially 49:22 61:3
 102:21
initiated 100:6
inmate 100:2,2
input 81:8
inside 44:5,5
instance 103:14
instances 69:22
 88:17
intake 44:7
interactions 56:19
interested 11:15
interrupting 13:4
interviewing 61:2
investigated 85:17
investigation 58:22
 59:22 62:6 86:8
 107:1,5,9,11,23
involves 53:16
involving 20:21
 24:13
isolates 83:3
isolating 83:1
issue 15:13 17:22
 24:14,18 27:5
 28:3,8,14,16 29:1
 29:7 31:22 33:16
 42:5 80:17,18,19
 87:14
issued 53:10,13
 54:17 81:10
 107:11,14,17
item 44:6
iterated 79:13

_____ J _____

J 5:10
James 33:9 34:6
 92:7
Janell 1:7,21 2:5

 6:9,13 94:7 109:7
Jason 99:8,12
Jeff 67:13
Jennifer 16:4 17:6
 30:20,22 31:17
 32:11,15 33:6,10
 33:18 34:6,22
 38:4 39:8 83:2
 97:4
Jennifer's 32:1
Jewel 97:4
Jim 12:13
job 12:15 17:2
 19:13 22:4 28:22
 29:18,19,20,22
 30:20 33:19 39:12
 39:20 40:13 44:2
 55:7,10,14,15,17
 55:18 56:6,7,8,9
 57:2 59:7,7,17,17
 87:22 90:14 91:4
 93:14,21 96:10,11
 96:13,17 97:9,15
 108:11
jobs 21:23 22:17
 23:3 39:23
Joe 92:14 97:13
 98:5
John 15:5 17:11
 18:1,18 19:3
 20:22 21:1,12
 22:16,20 23:2
 24:13,17 26:7,16
 27:8,21 28:8,10
 28:13,18 30:2,9
 38:22 39:21 49:14
 82:9
Johnson 21:1 51:23
 52:4,7,9 53:14
 55:2,13 69:4
 82:16 95:22 96:8
 102:2 104:12,13
 106:6,9,14,17,18
 107:2,10,21,23
 108:1,14,16,21
joke 105:21
joking 63:6
Jonathon 39:7 68:6
 85:7,10,13
Jones 60:2 70:4,11
Jordon 99:9,12
Judge 109:13,15
Judge's 109:14
July 90:9

jumped 61:6

_____ K _____

keep 49:3
keeping 24:20 25:4
 25:11,19
kept 26:9 108:11
Kevin 60:2
key 17:2,3 25:9,11
 26:22 44:5
kin 111:14
kind 89:10
knew 10:6,8 15:14
 18:4,6 19:7 21:22
 22:17 29:2 46:5,9
 59:8,16 63:1
 66:20,23 78:17,18
 87:14 105:20,22
 106:1
Knighton 39:7 68:6
know 7:8,13,19 8:5
 12:19 16:7,21
 18:13,16 19:15,18
 19:19,22 20:9,12
 20:19 22:6,9,16
 24:19 25:16,21
 26:2,11,19 27:2
 29:14 32:8 33:15
 36:9,13,16 38:14
 38:19 45:20 52:4
 52:6 54:21 57:13
 58:10 59:9,10
 60:12 61:3,4
 62:11,17 63:14,15
 65:13 66:6,19,22
 67:2,18,20,22
 68:20 70:15 71:10
 71:13 73:17 74:5
 79:5 80:7 83:20
 84:23 85:15 86:1
 86:17 87:7 88:6
 89:20 90:23 91:5
 91:9 96:17 98:11
 99:12,13,14 100:5
 102:10,10,16,17
 104:2 105:5,7,13
 106:8,10,11,16,18
 106:19,23 107:14
 107:17,18,22
 108:1,2,13,15,16
 108:19,22
knowing 20:15
knowledge 75:18
known 67:4

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

knows 20:16 85:21

**L**

L 2:1
lab 98:20
label 47:17
labeled 41:12,15
47:16,19,20
labeling 24:1
ladies 66:6
Laney 68:7
language 56:15
late 60:11
laughing 105:18
law 2:7 5:5,11 6:7
109:15,16,19
laws 2:14
Lawson 94:6,8,12
lawsuit 7:4 8:17
20:23 73:1,5,8
74:11 84:12 85:22
87:13,20
lawyer 53:7 54:5
102:9
leading 2:20
learn 100:9
learned 107:2
leave 35:19 52:13
75:8
leaving 79:2,8,10
Lee 68:7
left 45:11 46:8 49:7
49:10,12 87:1,9
legs 64:22 65:4
Leonard 68:3,10,21
69:8
letter 100:20,23
101:3 104:2
letting 7:13
let's 51:14 60:16
level 67:22
Lisa 5:10 7:2
list 15:7 25:6 44:3,6
72:4,7,11,12 73:3
73:10,16,19,21,23
74:7,14,22,23
75:3,8 89:23
102:17
listening 76:10
listing 56:14
litigation 78:4
living 99:23
LLP 5:12
Locke 36:1,9

locker 45:14
Locks 30:23 32:11
longer 92:15
look 9:6 18:10 38:8
61:5 74:1,9,18
77:8 84:22 93:22
looking 56:13 88:12
101:6
looks 90:13 91:17
98:20
lot 64:2 65:1
lower 62:1 67:14,17
70:9 94:5,17
Luann 36:1,8 67:19
68:1,6
lunch 109:5

**M**

M 1:17 2:6 6:2 90:4
111:21
mailbox 61:7
maintenance 40:8,9
40:13,14 91:6
105:18
major 35:16
making 37:20 51:7
72:16,17 73:3
81:1
MALCOLM 2:7
5:4 6:7
male 67:13
man 98:15
management 25:22
78:8,21 79:19,21
80:5,19 82:12
85:13 88:5
management's
79:14
manager 21:2 47:6
49:7 94:10 95:21
95:22 98:14
105:12,15 106:5
106:11,22 107:20
108:3,17
manager's 94:11
95:17
mandatory 83:5
manner 10:7,20
43:14 63:6
March 64:5
Mark 9:15 12:13,18
13:10 14:20 27:14
30:8 41:7 49:13
76:23 79:2,6,8

81:3,4 82:2 83:9
marked 8:11,15
53:4,8 54:2,6 84:1
84:5 99:2,6
100:13,16
matter 31:3,9 40:20
80:8 85:8
matters 57:6
ma'am 8:21 103:12
McDowell 1:7,21
2:5 6:9,13 7:1
14:7 34:8 51:5,16
54:11 74:21 76:1
84:8 99:5 100:17
109:7
McDowell's 109:8
mean 46:15 67:1,9
71:17 73:10 74:3
78:18 79:22 81:1
107:6
means 111:9
medical 37:10,12
medication 8:7
meet 83:8
meeting 12:8 14:14
26:23 28:2,4,8,9
28:12 42:1,3,6,10
42:15 45:11 46:14
59:5,10 65:15
77:15 78:6,14
81:19 82:5,16,17
83:10,11,14 89:1
102:22 104:4,20
105:10 108:3,9,17
meetings 76:3
member 68:17
69:10 85:12
memory 75:2
mentioned 14:13
22:8 46:16 65:15
met 7:1
microcassette 76:5
76:8
microphone 89:8,9
MIDDLE 1:2
million 83:18,19
Mims 67:13,16
mind 11:17 34:18
mine 75:1
minute 19:1
missed 60:2
mistaken 109:17
mixed 91:8
month 85:6

months 67:15
morning 17:4 51:8
108:7
Morrison 77:21
motion 109:10,22
move 51:14
Murrell 30:13,15
30:17,19 31:8,12
32:3,20 33:1
34:10,22 35:6
37:19,19 76:23
81:19
Murrell's 37:16
M-U-R-R-E-L-L
30:16

**N**

N 2:1
NAACP 77:18,22
Nall 39:7 68:6
85:10,13
name 61:8 63:23
64:7 67:12 70:5
70:14,22,23
named 69:20
necessary 2:18
need 7:8 28:15
43:17 48:10 58:7
68:15 75:2 77:14
77:23 80:15
needed 18:23 47:6
70:8
needs 44:11
neither 59:12 66:6
111:13
never 38:19 40:17
56:11,21 57:3
64:8 85:17 91:4
nevertheless 33:16
85:17
new 28:22 49:8
Newman 2:8 5:4
6:8,19 15:15
19:17 20:4 73:2,5
74:1,9,16 75:13
75:21 101:21
109:1,18 110:1
Nicole 97:13,17
night 21:15 30:23
Noakes 1:17 2:6 6:2
111:21
North 5:13
Notary 1:18
note 37:17 75:6

notes 20:2,8,10 42:8
71:19,21 72:1,2,3
72:16,17 73:12
76:20 98:2
notice 3:3 101:7
Nuclear 1:11 5:19
7:3 52:15 78:2,11
Nuclear's 54:7
Nuclear-Plant
53:21
number 1:5 4:2
78:21 79:1,13,18
79:19 80:18 103:3
numbers 83:20

**O**

O 2:1
objections 2:18,21
obligation 75:13
obvious 81:16
obviously 74:10
76:11 80:7 107:7
occasion 55:12
occasions 87:4
occur 58:3
occurred 15:6
18:23 41:18 42:9
42:19 72:9 82:22
84:17
October 2:9
offensive 81:13,14
offered 2:21
offering 15:6
office 17:9 19:2
34:14 38:8 42:16
46:9,17,20,23
58:3,5,9,20 59:3
69:2,3 77:1 78:15
officer 103:16
Offices 2:7 6:7
okay 7:11 8:3,9 9:2
9:9 11:1,6,20 13:6
13:13 14:16,18,22
15:1,17,20 16:16
17:18 21:7 26:21
27:3 28:9,18 30:4
30:8 31:7 38:1
40:17 41:7,10
47:22 49:15,18,21
49:22 51:14 52:12
53:2,7,13,16,20
56:2,13 59:19
60:1,15,23 63:18
65:22 66:19 67:6

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 118

68:10 69:8 71:19
71:23 72:2,19
74:20 75:5 77:23
78:5 81:12 82:7,8
82:21 83:17,22
84:10 86:13,21
87:8,11,18 88:12
89:12,19,23 90:20
92:14 94:12 95:5
97:9 98:5,16
101:11 102:12,19
104:5,12 106:8,13
107:22 108:19,23
**once** 23:14 47:16
48:19
**open** 75:8
**operating** 1:11 5:19
7:3,6 78:2
**opinion** 39:13
**opportunity** 18:8
75:18
**oral** 6:10
**order** 107:6 109:9
109:11,23
**originally** 100:7
**originated** 49:4
95:15
**other's** 109:21
**outage** 31:5 33:22
34:1 64:12 66:16
66:17,20 71:7
79:9 93:6,9,19
99:10
**outcome** 12:18
**outside** 39:23
**outstanding** 91:3
**overtime** 15:6,6,9,9
15:10,21 16:2,3,6
16:8,9,17,22 17:1
17:6,17 18:19
19:1,6,8,12 20:13
24:14,18,20 25:6
25:9,19 26:1,4,9
26:13,16,16 27:4
28:8 29:1,16,18
29:19 31:16 32:17
32:20 33:8,14
35:1 37:20 38:23

**P**

**P** 2:1
**page** 4:2 9:7 88:12
92:6,10 94:5
95:15 97:12 101:6

**pages** 100:17
**painting** 58:13
**paired** 56:4
**Pam** 58:13
**paper** 31:14,14,17
31:23 32:3,19
34:9,12,21 35:4
37:20 72:17 84:19
**paperwork** 31:1
34:15 69:5
**paragraph** 9:6 14:8
14:17,20 15:1
30:10,12 35:8,12
37:3 51:7,10,14
60:15,18 63:19
71:14,15,16
**paraphrases** 103:5
**Parrish** 12:13
**part** 64:6 76:15
80:21,21 98:21
**particular** 8:1
24:11 27:6 31:16
37:14
**parties** 2:4,21 109:8
111:14
**passes** 45:18
**Patricia** 61:12,14
61:16 63:10,16
92:17
**pay** 99:22
**people** 16:17 29:21
34:18,19 35:20,22
39:3,11 45:15
58:15 60:6 64:5
69:20 95:6 102:5
105:17
**performance** 81:9
83:13 91:22 97:2
99:8
**permission** 56:9,10
56:12
**pertaining** 15:14
29:1 34:12 41:19
85:4
**pertains** 34:19
**Peters** 63:23 64:16
65:5,19
**Phillip** 17:5,9,13,16
19:3 82:9 91:17
**Phyllis** 9:17 11:22
18:12 41:8 55:19
56:8 60:11 84:11
84:15,17,21,23
85:3,8,23 86:4,9

**pick** 34:14
**picked** 77:13
**picture** 85:2,7,9,11
85:14,19 86:15
**pictures** 85:6
**piece** 31:13,14,17
31:23 32:2,19
34:9,12,21 35:4
37:20 45:23 57:16
72:17 84:19
**place** 11:3,21 13:10
13:14 15:17 19:21
20:16,19 33:21
42:15 45:7 66:10
71:6 83:11 89:18
**placed** 40:17
**plaintiff** 51:16
60:16 109:11,12
**plaintiffs** 1:9 5:3
9:10 60:18 109:20
**plan** 78:3
**planning** 24:9
**plant** 34:1 35:20
36:12 47:6 49:7
62:13,22 63:21
65:8,14 66:2,21
76:3 78:7,8,12,21
79:3,9 87:2,9
90:14 94:10,10
95:17,21 97:22
98:14 99:9 101:18
105:12,15,16,21
106:5,11,22
107:20 108:3,17
**played** 30:19
**playing** 39:2
**please** 72:19
**point** 47:2,18 109:1
**pointed** 50:2
**Policies** 54:8,8
**policy** 54:9,10,13
54:20,21,22 56:13
**position** 11:17
52:23 71:3 105:8
**possible** 60:13,14
**praise** 90:21 91:1
**praising** 90:13
91:21 95:7
**present** 5:16 20:12
26:12,14,21 28:2
42:10 60:5
**presented** 104:2
**president** 31:3,21
31:21 33:6,9

**pretty** 66:22 106:21
**previous** 105:14
**previously** 101:16
**printed** 85:2,6
90:17
**prior** 3:1 8:19
12:14 14:11 41:19
52:15 79:10 82:2
84:21 85:6 105:6
105:7
**probably** 77:18
**probation** 67:15
**problem** 10:11
21:10 61:22 109:4
**problematic** 81:13
**procedure** 6:5 16:9
**proceedings** 6:11
**product** 74:12
**professionalism**
93:22
**progress** 79:11
**prohibited** 56:14
**promotion** 21:3
**proper** 64:12
**properly** 25:8
**protective** 109:11
109:23
**provide** 72:19
**provided** 6:4 76:5
77:12,12
**Public** 1:18
**pull** 40:3 44:4,6,8
**pulled** 40:10
**punitive** 83:19
**purpose** 24:3,4
**put** 31:23 65:4 70:6
73:12 75:2 102:17
**puts** 43:18
**putting** 39:22 64:21

**Q**

**question** 7:11,12
13:2,4 20:5 29:23
58:8,19 59:20
74:21 75:20 80:6
82:11 101:21
**questioning** 12:5
**questions** 2:19,20
7:21 47:7 74:8
77:2 111:8
**quite** 15:23

**R**

**R** 2:7 5:4 6:7 111:1

**race** 91:7 92:4 94:3
94:12 95:18 97:19
98:16 99:17
**Randy** 51:23 52:3,6
53:14 55:2 69:4
82:16 95:22 96:8
102:2 104:12,13
106:6,9,14,17,18
107:10,21,23
108:1,14,15,20
**ranting** 43:8
**raving** 43:8
**Ray** 43:2,3,4,6 50:5
**read** 8:18 51:19
100:23 101:5
**reader** 44:9
**reading** 2:11 93:10
101:2
**reads** 9:9 31:17
**really** 59:21 100:5
**reason** 7:19 37:11
40:3 46:5
**reasoning** 35:17
**recall** 24:15 27:9
35:10 37:4,14
41:22 60:12 65:3
70:5 71:9,18,20
88:5 102:7,9
**receive** 18:15 67:10
70:17,19 100:20
104:9
**received** 16:8 17:17
19:9 21:3 23:11
40:19 52:2,11,14
52:16 67:14 68:10
69:9,13,17 70:16
99:20 100:8
**receives** 68:5
**receiving** 70:1
84:14 100:1,21
104:21
**recess** 109:5,8
**recognition** 92:2
93:15 95:3
**recognize** 99:15
**recommended**
79:17
**record** 24:20 25:4
25:11 75:7 93:21
109:7
**recorded** 108:9
**recorder** 88:23 89:9
89:10,17
**recording** 76:17

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 119

recordings 76:21
78:7 88:14,15
89:12
records 12:2 24:22
25:19 38:9
record's 13:5
reference 50:18
referencing 30:12
35:8,12 37:3
51:10
referred 103:14
referring 28:17
30:10 60:22 90:5
reflect 19:23
reflected 23:12
88:14
reflecting 17:19
reflects 20:6
refused 43:23
regard 15:1 57:21
regarding 24:17
92:8
related 14:2 56:21
57:6,18 72:23
78:11 90:10 99:7
100:18
relates 27:4 73:8
relating 2:15
relation 11:21
Relations 5:18
relationship 38:6
relieved 32:11
relieving 10:13,13
11:8 30:22
remember 70:14,22
70:23 75:4,11
100:21
remembering 72:9
rep 25:16 79:17
Repeat 104:23
replied 86:4
report 44:11 60:1,4
60:10 65:22
reported 43:13 60:8
61:4
Reporter 1:17 2:7
3:4 6:2,17 30:14
39:16 111:22
Reporter's 4:12
representation 68:4
68:18 69:10 78:16
89:19
representative 46:1
representatives

25:14,18,21
representing 7:3
represents 111:10
reps 105:17
rep's 78:23
request 35:1 37:20
72:22 74:15,22
75:1
require 101:8
respective 2:4
respond 101:8
response 68:15
107:12
responsible 98:22
restrooms 40:6
result 111:15
retaliated 41:13,16
retaliating 24:1
returned 13:19
Richard 44:15 45:1
45:9 92:13 93:3
93:18 94:6,14,17
96:8,15,23
ride 40:1
right 10:20 11:8
46:21 47:13 48:23
71:9 74:5,6 75:15
76:19 103:13
Rights 101:7
Rinehardt 67:13
room 26:14 61:5,9
70:3,10
rotation 21:23 22:4
23:19 29:3,18,19
40:3
rule 12:23 33:15
103:9
rules 2:15 6:5 7:6
33:12 100:4,10
run 7:5
Russ 68:3,10,21,23
69:8

___ S ___

S 2:1
safe 93:21
SAITH 110:5
Sam 58:13
Sanders 1:8 9:17
11:22 15:8,21
16:23 22:3,23
23:6 24:6,17
27:20 28:1 29:12
36:16,19 41:9

42:11,18 47:2,23
48:3,8 49:3,23
50:13 51:11 55:20
56:5 60:17 88:7
88:10,11 90:4,10
90:12,21 91:20,21
92:9 93:7,19
95:12,23 96:4
97:5,14 98:3,21
save 23:21
saved 23:16 24:17
saving 24:3,4,12
saw 23:15 25:23
42:20 43:2 50:1
61:6,9,19,19 62:2
62:3 65:6,18
99:15
saying 12:15 16:13
23:1 32:2,5 47:18
49:15 52:3 61:18
61:20 63:1 73:18
82:4 93:20 107:1
107:4,9
says 51:15 60:15,18
76:13,16 82:12
96:13
Schaule 39:15,18
schedule 9:16,19,23
10:15,16,21 11:11
11:13,15,23 12:6
screaming 43:9
second 19:20 20:7
85:18
secretary 94:11
95:17 109:14
security 44:20 45:2
67:12
see 9:7 21:1,17
24:22 28:20,21
30:21 34:15 44:21
61:13 65:7,17
68:22 69:1,5
79:15 80:12
106:11
seeking 83:19
seen 8:18 33:4 62:9
79:19 84:7 87:8
send 72:14 102:23
seniority 15:7 16:10
sent 15:13 16:3
22:2 23:6 58:16
95:7 97:22 103:19
separately 101:13
September 77:14

78:6,14 83:14
89:1 108:10
serious 12:3
service 40:6,7,7,14
44:3,4,22
set 45:10 49:8
setup 78:17,18
79:22 83:15
severe 67:10
sexual 84:15
SGFP 93:6
Shaddix 36:1,10
Shannon 61:2
shared 32:5,8 34:22
38:4 70:4,12,15
70:17
sharing 37:17,22
Sharon 5:17 102:1
102:20,21 103:3
103:11 104:15,16
107:8,16
Sharp 4:3 5:10 6:20
6:23 7:2 73:22
74:3,13,20 75:6
75:15,22,23 109:3
109:6,19
Shelley 10:3 11:12
30:13,15,17,19,23
35:6 37:16 38:4
76:23 81:18
Sheriff's 99:20
shift 9:18 11:9,10
11:11 16:7,8,10
16:11,12,14,18
41:2,3 97:18
98:14,15
shirt 89:4,5
shop 40:8,9,13,14
91:6 105:18
show 23:10
showed 23:9 33:1
39:11
showing 23:19 64:2
96:23 99:5
shows 56:16 90:11
sic 21:2
sign 44:17 84:19
signature 2:11
signed 60:2
similar 20:21 89:11
single 42:2,18
104:22 105:1,2
singled 14:14 41:13
41:15 46:10 50:22

105:23 106:2
Singleton 95:16
Singleton's 69:3
singling 23:23
47:11 49:2 81:16
105:5,15
sit 39:4 109:20
site 105:16,21
sitting 42:21 43:3
61:12 108:6
situation 13:23
57:19
six 87:5
Sixth 5:13
skip 60:16 92:9
slate 62:18 63:16
smirked 104:21
Smith 63:22,22
64:16
solely 69:9 96:10
somebody 34:15
38:17 82:1 98:5
sorry 13:4 21:6
28:15 30:14 39:16
40:8 48:17
sounds 47:10 76:14
76:17
Southern 1:3,11
5:19 7:3 52:15
53:21 54:7 78:2
78:11 80:22
speak 21:9,11,14
26:15 46:2 47:6
55:8 57:5,14,15
58:2,12 59:8,17
67:1 79:11 82:13
83:6 109:13,15
speaking 52:19
55:4 79:20,21,23
80:5 82:19
specifically 62:20
spider 85:2 86:15
spirit 74:18
split 43:17 48:10,14
48:20,21
spoke 10:9 12:18
13:17 41:19 42:22
46:9 56:20 57:13
57:13,13 58:17
60:23 64:10 66:8
73:13 100:2
108:17
spokesperson 79:3
79:7

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 120

| | | | | |
|---|---|---|---|---|
| staffed 16:17 | structure 44:8 | T 2:1,1 111:1,1 | 58:17,23 70:20 | 43:15 47:13,21,23 |
| standing 45:19 | Stuck 89:6 | table 61:12 | 71:5 76:10 79:22 | 48:4,19 49:5,11 |
| start 90:7 | stuff 30:21 72:8 | tables 64:23 65:11 | 85:12 88:18,20 | 49:20,22 61:11,13 |
| started 7:1 12:15 | 81:1 103:4 | take 13:2,9,14 | 91:10 102:19 | 62:4 70:3,7 92:18 |
| 21:20 62:23 72:5 | subject 76:1 93:5 | 15:17 17:6 19:21 | telling 14:18 35:21 | time 2:22,23 13:3 |
| 72:16,17 73:3,10 | 94:6 96:9 | 34:20 42:15 45:9 | 43:9 58:1 68:17 | 15:18,19 17:2,19 |
| 73:19 82:17 | subjected 51:11 | 66:10 68:16 | 69:9 74:5,5 80:3 | 24:7,11 25:7,15 |
| starts 96:8 97:12 | suck 67:14,17 70:8 | taken 2:6 20:8,10 | 86:4 96:17 | 25:17 27:6,9 29:6 |
| state 12:23 76:16 | sudden 83:5 | 109:5 111:7 | tells 31:18 43:19,22 | 29:7,10 31:15,16 |
| 85:1 102:22 | summer 9:10,13 | takes 80:19 | 44:10,12 45:4,22 | 32:18,21 33:8,14 |
| 103:18 111:3 | 14:9 | talk 26:6 29:9,12,13 | 68:3 70:6,7 | 33:19 35:1,10,14 |
| stated 10:2,5 11:12 | supervision 25:22 | 38:16 39:4 41:20 | tendency 39:2 | 35:14 37:4,15,21 |
| 45:2 49:22 52:1,7 | 78:8 | 46:4,19 58:16 | ten-day 99:21 | 40:2,5,9 41:5 42:9 |
| 52:9 | supervisor 9:12,14 | 59:5 75:19 102:23 | terminate 107:19 | 44:16,21,23 46:2 |
| statement 62:5,10 | 9:15 14:10,19,21 | talked 13:22 24:6 | terminated 77:2 | 47:20 49:10 50:8 |
| 105:6 | 15:4 27:12,14 | 26:12 29:15 47:8 | 85:9 86:5,9,16,18 | 50:19 51:13 52:15 |
| STATES 1:1 | 35:13 44:16 49:14 | 75:10 87:1 88:13 | 86:19 103:9,22 | 54:23 61:17 63:5 |
| stating 10:22 | 51:9 81:23 92:22 | 102:6 | 104:1,7 108:18 | 63:7,22 64:15 |
| stay 34:6 43:17 | 92:23 97:18 | talking 14:4 21:5 | terminating 80:4 | 65:3 69:14 71:13 |
| 87:23 | supervisors 14:23 | 29:10 34:11 38:17 | 104:18 | 71:18 72:7 93:1 |
| staying 58:2 | 30:9,11 66:19 | 41:17 43:14 49:12 | termination 80:3 | 93:21 94:10,11 |
| stays 58:8,20 59:2 | 81:5,22 97:22 | 51:3 60:17 62:20 | 101:4 | 95:22 97:8 100:1 |
| stenotype 111:8 | supplement 75:14 | 62:23 72:8 73:2 | testified 6:15 | 100:5 102:7 105:8 |
| Stephanie 1:8 9:17 | 78:19 | Tammi 36:1,9 | testimony 1:21 23:5 | 105:9 106:7 |
| 10:2 11:12 14:1 | support 84:11 | Tammy 16:4 17:5 | 111:11 | 107:16,16 |
| 15:8,21 16:1 17:8 | 87:12,19 | 19:1 39:7 52:20 | Thank 75:22 | times 8:1,3 40:21 |
| 22:3,23 23:9 | supporters 96:1 | 56:20 58:2,2,4,8 | thanking 93:20 | 76:2 |
| 28:19 29:6,9 | supporting 85:22 | 58:16,20 59:6,11 | 94:23 95:12 96:4 | today 7:7,20 8:7,19 |
| 36:18 41:8 42:11 | supposed 32:14,16 | 59:17 62:14 63:16 | 97:9 | 74:8 75:18 84:8 |
| 42:20 43:16,22 | 43:10 45:20 79:8 | 63:23 64:16 79:20 | thereto 3:1 111:8 | told 9:19,23 10:10 |
| 44:10 50:8 58:6 | 103:6 105:20 | 82:13,14,19,23 | thing 61:19 64:10 | 16:23 17:9 21:22 |
| 58:12 60:4,8 64:4 | supposedly 12:17 | 85:4 97:5 102:23 | things 8:1 12:17 | 22:16 23:2 27:22 |
| 85:16 88:7 90:4 | 78:19 | 102:23 104:3,15 | 21:20 44:4 45:13 | 28:6,14,16,20,23 |
| 94:7,21,23 95:7 | sure 7:10,13,15 8:4 | 106:15,16 108:20 | 51:2 54:18 64:18 | 32:11 33:6,10 |
| Stevens 36:2,8 | 8:6 10:19 13:5 | tape 76:7,22 77:4,6 | 73:11,13 77:4 | 34:5 35:15 36:4 |
| 67:19,20 68:1,7 | 14:16 15:3 32:4 | 77:14,16,19,23 | 103:2,5 108:13 | 36:19 42:17,22 |
| steward 17:2 19:14 | 51:5 60:9 66:23 | 78:10,14 88:15,18 | think 37:5,22 38:10 | 43:5 45:6 50:19 |
| 33:19 55:8 59:18 | 70:21 75:16 | 88:19,23 89:9,10 | 38:22 41:7,9 | 55:7 58:19 61:9 |
| steward's 59:7 | 106:21 107:6 | 89:12,17,20 | 47:15 49:19 51:9 | 62:18 63:16,17 |
| STIPULATED 2:3 | surgery 35:16,18 | 108:12 | 58:8,20 61:8 | 64:12 67:13,16 |
| 2:10,17 3:2 | 35:20,21 36:5,10 | taped 88:23 89:2,6 | 73:22 87:19 93:14 | 69:8 70:11 71:15 |
| stipulation 6:6 | 36:13,17,20 37:6 | tapes 76:2,6,7,8,9 | 94:9 109:16 | 72:9 73:15,18,20 |
| stipulations 6:18 | suspension 99:21 | 76:11,12 77:11 | thinking 77:16 79:4 | 75:10 84:17,23 |
| stopped 58:6 62:23 | swap 33:14 37:20 | 78:1,3 | 81:15 | 85:16 87:21 88:4 |
| storage 45:14 | 56:9 | Teague 43:22 | thong 64:1 | 88:7,8,10 102:12 |
| straight 32:18,21 | swapped 55:15,18 | Teat 92:11,12 96:22 | thongs 64:19,21 | 102:22 103:18 |
| 33:8,14 35:1 | 56:2,6,8 79:20 | 97:23 | 65:17 | 105:13 106:9,10 |
| 37:21 | swapping 55:10,14 | telephone 70:5 | thought 77:7,8,17 | 106:17,18 107:20 |
| Street 2:8 5:6 6:8 | 55:17 | 76:18 89:14 100:1 | 77:20 101:19 | 107:23 108:1,2,8 |
| strike 13:7 22:15 | switch 35:1 | 100:3 | three 12:5 35:20,22 | 108:10,13,15,20 |
| 46:15 81:3 | sworn 6:14 | tell 18:21 19:16,17 | 42:13 78:16,19 | top 90:11 91:17 |
| string 90:1,7 91:16 | S-C-H-A-U-L-E | 27:20 30:17 32:23 | 79:19 88:15,17 | 93:17 94:15,20 |
| 92:6 | 39:19 | 33:4 34:6 36:3,11 | thumbs 93:13 | 95:11 96:3,15 |
| strongly 109:22 | | 42:2 55:2 57:18 | Tim 42:20 43:8,11 | 98:15 100:20 |
| | **T** | | | |

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 121

topic 35:3
touch 45:2
Townsend 87:18,21
  88:4
transcribed 111:9
transcript 111:11
transcription
  111:10
treated 21:21 29:2
  29:20
treating 24:5
treatment 9:11
  11:18 14:10 35:7
  51:12
trial 2:22
tried 85:1 86:14
trouble 84:21
truck 39:22,23
  40:17,19,21 41:1
true 103:1 104:17
  111:11
trust 83:2
truth 85:5
truthful 7:20,22 9:3
try 102:4
trying 7:23 22:14
  33:7 34:19 45:10
  49:3,16 107:13
turbine 40:2,16
  45:16,17
turned 10:4,15 16:1
  19:2,3 22:2,11
  28:23 29:5 43:6
  61:6 63:2 77:3,9
turnover 57:3
turns 15:10 16:2
  31:2,20 43:15,19
  45:3,21 80:20
two 13:15 15:11
  40:21 48:9,14
  50:2 58:15 76:5,8
  77:11 79:1,18
  103:3
type 8:7 103:4
typed 101:12
types 51:2 103:4

  U
U 2:1
Uh-huh 8:22 9:8
  13:21 18:7 68:12
  87:17 96:14
unable 109:13
undergarments

64:2,19,22 65:4
understand 7:12
  49:15 51:15 56:1
  57:20 75:16 77:10
  93:10 101:2
understanding
  107:13,15 110:1
understood 7:18
unemployment
  76:17 89:13
  103:15 104:3,9
unfair 26:4
union 16:9,19 25:13
  25:16,18,21 31:3
  31:21,21 33:6,9
  46:1 68:4,17,18
  69:9 78:16,23
  79:17 89:19
  105:17
UNITED 1:1
upset 12:12
upstairs 46:2,4
Usual 6:17
U-1 93:6

  V
vacation 31:23
  34:20
Vanessa 36:1,9
vehicle 40:11
verbal 45:5,6 68:15
verify 62:11 73:17
  73:20 77:5 102:16
verifying 32:13
versus 73:14
violate 54:21
violated 54:20
visit 21:19
visitor 84:18
vs 1:10

  W
W 90:8 92:7
Wade 77:21
waiting 69:2
waived 2:12 3:4
Walden 98:5
walked 42:21 61:7
want 9:6 10:19
  12:17,23 13:5
  15:2,2 51:5,14
  56:7 57:11 75:16
  75:19 83:4 106:13
wanted 7:5 12:13

17:5,12 31:15
58:10 60:9 87:23
93:13
wanting 12:16
  44:17
wants 44:8 109:22
warning 45:5,6
wasn't 17:1,16
  23:18 28:9 29:18
  79:18 82:8,9 86:5
watch 48:14,22
  60:2,3,7
watching 49:2
water 44:3,4,22
  45:15
way 10:8,20 17:11
  20:15,18 22:9
  27:7 29:14 46:13
  56:22 57:4,11
  78:3 102:12 103:5
wear 64:14,14
wearing 64:19
  65:23
Wednesday 90:8
week 41:4,5
weekend 13:16
went 11:7 12:10
  13:19,22 17:8
  26:15 35:15 43:1
  43:13 45:12 46:1
  46:2,8,22 48:4,8
  52:1 59:11 61:7
  63:21 64:4 81:15
  96:23
weren't 15:11 21:21
  43:10 61:14
  105:20
West 2:8 5:6 6:8
we're 7:6 34:11
  44:7 49:19 60:16
  73:22 75:8 76:1
  86:22
we've 75:10 101:11
  102:5
white 15:11 16:4,5
  16:13,22 30:21,22
  31:7 32:6,9 33:1,1
  33:4,18 34:23
  39:8 51:18 61:18
  62:2 83:2 86:11
  91:8,12 92:5 94:4
  94:13 95:19 97:5
  97:20 98:17 99:18
  whites 60:19 63:19

67:7 69:22 73:14
  84:14
wife 87:22,23
William 92:11
Williams 65:8 97:6
  97:7
Wilson 42:20 47:13
  47:21,23 48:8,19
  49:5,11,20 50:9
  50:13 61:11 62:4
  62:8 70:3,7,11
  92:18
Wilson's 48:4
wiped 62:18 63:16
Wise 95:16
witness 2:12 6:10
  19:19 30:15 39:18
  65:9,11 73:4,7
  101:19 111:12
witnesses 70:9
woman's 62:1
word 103:8 104:15
  104:17 106:15
words 62:19 105:22
work 9:16 13:18,19
  16:6,22 38:23
  44:13,18,19 45:3
  45:12 46:6 51:17
  51:21 52:5,8
  53:11,17 54:18
  55:3,6,20,23
  56:21 57:17,22
  60:11 74:12 82:19
  87:6 91:21 93:9
  94:7 96:18 98:19
  98:22 99:8
worked 16:7
worker 91:3
workers 44:1
working 25:8 45:23
  49:4 105:19
workplace 54:9
  64:20
works 87:7 91:6
worry 19:5
wouldn't 36:11
  38:12,13 46:12
  55:23 79:4 81:16
  84:22 86:22
wreck 88:1
Wright 15:5 16:21
  18:1,18 20:22
  21:1,12 22:6,16
  22:20 23:2 24:14

24:17 26:7,13,22
  27:8,22 28:8,10
  28:13,18 29:15
  30:2,6,9 39:21
  44:14 82:9
Wright's 38:22
write 12:13 43:19
  43:23 44:12,13
  45:4 85:3,3
writing 85:7
written 61:15 85:13
wrong 10:7,10
  47:11,13 48:23

  Y
Yance 92:14 97:13
yeah 36:18 70:21
  74:3 81:23 103:13
  109:3
year 40:21 66:4,5
yell 43:12
yelled 47:23
yelling 43:9
yesterday 73:10
  76:6 77:13
y'all 10:9,9 13:19
  14:3 24:9 47:3
  58:4,7 62:20 87:1
  90:14 92:1 93:14
  95:2 105:22

  $
$1 83:19
$4 83:18

  1
1 4:6 8:10,15,19 9:3
1:06-cv-314-CSC
  1:5
10 60:18 63:19
  71:16
100 4:11
11 71:14,15
111 4:12
12 67:14 70:9
13 90:9
1710 5:13

  2
2 4:7 9:7 53:3,8
2003 41:22 71:10
2003-2004 50:19
2004 31:6 33:22
  41:21,22 71:10,11

**2005** 9:10,13 14:9
    14:11,12 40:22
    64:5 77:14 78:6
    83:14 89:1 90:9
**2006** 2:9
**219** 2:8 5:6 6:8

---
**3**

**3** 4:8 54:1,6 88:12
**30** 79:1,16,18 80:10
    80:12,13,16 82:3
    83:11
**30-day** 78:20 80:9
**35203** 5:14
**36301** 2:9 5:7 6:9

---
**4**

**4** 4:9 83:23 84:5,8

---
**5**

**5** 4:10 99:1,6
**53** 4:7
**54** 4:8

---
**6**

**6** 4:11 9:6 14:8,17
    14:20 15:1 30:10
    30:12 35:8,12
    37:3 51:7,10
    100:12,16
**6th** 2:9
**6-110** 4:3

---
**7**

**7** 51:14
**703** 54:8,8

---
**8**

**8** 4:6 60:15
**83** 4:9

---
**9**

**9** 77:14 78:6 83:14
    89:1
**9th** 78:14 108:10
**9/9** 83:10,11,14
**9:30** 6:9
**99** 4:10

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

Page 112

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
3   SOUTHERN DIVISION
4
5   CASE NUMBER: 1:06-cv-314-CSC
6   JANELL MCDOWELL and STEPHANIE SANDERS,
7        Plaintiffs,
8        vs.
9   SOUTHERN NUCLEAR OPERATING COMPANY,
10       Defendant.
11
12       S T I P U L A T I O N
13       IT IS STIPULATED AND AGREED by
14   and between the parties through their
15   respective counsel, that the deposition of
16   Janell McDowell may be taken before Anita
17   Thebo, Commissioner, at the offices of
18   Malcolm Newman, at 219 West Crawford
19   Street, Dothan, Alabama 36301, on the 1st
20   day of November, 2006.
21       VOLUME II
22   DEPOSITION OF JANELL MCDOWELL
23       (50885)

---

Page 113

1        IT IS FURTHER STIPULATED AND
2   AGREED that the signature to and the
3   reading of the deposition by the witness
4   is waived, the deposition to have the same
5   force and effect as if full compliance had
6   been had with all laws and rules of Court
7   relating to the taking of depositions.
8        IT IS FURTHER STIPULATED AND
9   AGREED that it shall not be necessary for
10   any objections to be made by counsel to
11   any questions except as to form or leading
12   questions, and that counsel for the
13   parties may make objections and assign
14   grounds at the time of the trial, or at
15   the time said deposition is offered in
16   evidence, or prior thereto.
17        IT IS FURTHER STIPULATED AND
18   AGREED that in accordance with Rule 5(d)
19   of The Alabama Rules of Civil Procedure,
20   as Amended, effective May 15, 1988, I,
21   Anita Thebo, am hereby delivering to Lisa
22   Sharpe the original transcript of the oral
23   testimony taken on the 1st day of

---

Page 114

1   November, 2006, along with the exhibits.
2       Please be advised that this is
3   the same and not retained by the Court
4   Reporter, nor filed with the Court.
5       * * * * * * * * * *
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

---

Page 115

1            I N D E X
2       EXAMINATION CONTINUED
3                    Page
4   By Ms. Sharp ......................... 118
5       DEFENDANT'S EXHIBITS
6                    Page
7   Exhibit 7 ............................ 118
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

---

1 (Pages 112 to 115)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 116

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3          SOUTHERN DIVISION
4
5    CASE NUMBER: 1:06cv314-CSC
6    JANELL MCDOWELL and STEPHANIE SANDERS,
7          Plaintiffs,
8          vs.
9    SOUTHERN NUCLEAR OPERATING COMPANY,
10          Defendant.
11
12    BEFORE:
13          Anita Thebo, Commissioner.
14
15    APPEARANCES:
16          MALCOLM R. NEWMAN, ESQUIRE, of
17    Attorney at Law, 219 West Crawford Street,
18    Dothan, Alabama 36301, appearing on behalf
19    of the Plaintiffs.
20          LISA J. SHARP, ESQUIRE, of Balch
21    & Bingham, 1710 6th Avenue North,
22    Birmingham, Alabama 35203, appearing on
23    behalf of the Defendant.

Page 117

1          ALSO PRESENT: Sharon Bestwick
2    and Stephanie Sharp.
3                * * * * * *
4
5          I, Anita Thebo, a Court Reporter
6    of Prattville, Alabama, acting as
7    Commissioner, certify that on this date,
8    as provided by the Alabama Rules of Civil
9    Procedure and the foregoing stipulation of
10    counsel, there came before me at the
11    offices of Malcolm Newman, 219 West
12    Crawford, Dothan, Alabama 36301, beginning
13    at 1:35 p.m., Janell McDowell, witness in
14    the above cause, for oral examination,
15    whereupon the following proceedings were
16    had:
17          JANELL MCDOWELL,
18    being first duly sworn, was examined and
19    testified as follows:
20          COURT REPORTER: Usual
21    stipulations?
22          MS. SHARP: That's fine.
23          MR. NEWMAN: Yes.

Page 118

1          EXAMINATION CONTINUED
2    BY MS. SHARP:
3          Q.    Miss McDowell, we're back on
4    the Record for your deposition.
5          And Mr. Newman's assistant gave
6    me -- handed me some typewritten notes
7    here just before we reconvened your
8    deposition; and I tried to go through
9    them.
10          Is this a copy, and I'm just going
11    to hand them to you at this point --
12    You've got a copy. Let's go ahead and
13    mark your copy as Defendant's Exhibit 7 to
14    your deposition.
15          Are those the handwritten notes that
16    you referred to during the first part of
17    your deposition as something that you had
18    started to prepare to document for
19    yourself all of the instances that you
20    recall of discrimination while you had
21    been employed at Plant Farley?
22                (Whereupon, Defendant's
23                Exhibit No. 7 was

Page 119

1                marked for
2                identification.)
3          A.    No. These are the notes that
4    I had that I had typed up that day to
5    refresh my memory.
6          Q.    What day?
7          A.    The day of the deposition.
8          Q.    You're not saying you typed
9    these notes up the day of the deposition.
10          A.    I typed these -- this note
11    right here, these notes right here
12    (indicating) the day of the deposition
13    after the deposition.
14          Q.    Okay. During the first part
15    of your deposition you said that you had
16    been working on a document, you had been
17    typing up a document related to your
18    allegations. This is not that document?
19          A.    No. I deleted that document
20    because I didn't have it that day; so I
21    deleted it and I started it over, and this
22    is what I have now.
23          Q.    So you destroyed that document

2 (Pages 116 to 119)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

Page 120

1  after you mentioned it to me in the first
2  part of your deposition?
3      A.   I deleted it because it was
4  not completed and, yes, because I wanted
5  to start it over.  I had it on a disk, I
6  did not have that disk in my possession at
7  the time, so, therefore, I -- what I had I
8  deleted it on that disk because I had
9  started typing this.
10     Q.   But you did that after we
11 started your deposition and had adjourned
12 your deposition?
13     A.   Yes.
14     Q.   Okay.
15     I'm going to refer you back to
16 Exhibit 6, which we marked when we were
17 previously here for your deposition.  And
18 I had been actually asking you about the
19 allegations contained in your EEOC charge,
20 and I want to pick up with my questions
21 regarding your allegations; is that okay?
22     A.   That's fine.
23     Q.   To my recollection, where I

---

Page 121

1  left off, I had been asking you, based on
2  the allegations in your EEOC charge, and
3  you actually created a typewritten
4  document which should be the last two
5  pages of Exhibit 6; is that correct?
6      A.   That's correct.
7      Q.   I was asking you about the
8  folks at Plant Farley whom you say
9  discriminated and retaliated against you.
10 And if my recollection is correct, we had
11 talked about Deborah Crutchfield and Randy
12 Johnson, and you were listing for me those
13 individuals whom you felt had retaliated
14 against you or discriminated against you
15 during your employment at Plant Farley.
16 And I want to pick up with you from that
17 list.
18     The last person that you talked
19 about, my notes reflect, is Randy Johnson.
20 Who else besides Randy Johnson either --
21 let's first start with discriminated
22 against you and then tell me how that
23 individual discriminated against you.

---

Page 122

1      A.   Who do you want me to start
2  with?
3      Q.   Whoever you want to tell me
4  about.  You've already told me about
5  Deborah Crutchfield and you've told me
6  about Randy Johnson.
7      A.   John Wright.
8      Q.   And did he discriminate
9  against you?
10     A.   Yes, he did.
11     Q.   In what manner?
12     A.   He inhibited my ability to
13 learn when he kept placing me on the same
14 job and not rotating the schedule
15 accordingly.
16     Q.   And when did he do this?
17     A.   He did it when he kept giving
18 Brad and Jonathan, white males, and Chuck
19 Schaule, white males, jobs when it was
20 supposed to be rotated and continued to
21 give Stephanie and myself, black females,
22 fire watch; or he would take a job
23 position away that was already posted and

---

Page 123

1  assigned to an individual, Jackie Cureton,
2  and turn around and give it to Stephanie
3  and myself.
4      Q.   When was that?
5      A.   The incident with Jackie
6  Cureton happened during the outage of 2004
7  when everybody had posted and assigned
8  fire watches; the fire watches was on a
9  thirty-day rotation, everybody knew what
10 fire watches they were supposed to have.
11 We put in paperwork to come from night
12 shift to day shift, when we got on day
13 shift, he decides that he wants to cross
14 Jackie's name out and turn around and give
15 us her fire watch and it was another
16 individual's fire watch, I don't know who
17 was the other individual, but I know
18 Jackie was one.
19     Q.   And you said Jackie Cureton is
20 a white female?
21     A.   Yes, she is.
22     Q.   And that was during the outage
23 of 2004?

---

3 (Pages 120 to 123)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 124

1    A.    That's correct.
2    Q.    And did you ask Mr. Wright why
3  he made that change on the schedule or did
4  he tell you why he made that change in the
5  schedule?
6    A.    No, I didn't ask him. And I
7  didn't feel there was a need for me to ask
8  him why, if the rotation is set and if
9  she's there and she's supposed to be given
10  a fire watch, then she should do her job
11  according to the rotation.
12    Q.    But you didn't ask him why he
13  had made that change given that the
14  rotation was set?
15    A.    No.
16    Q.    Did you ask anyone why that
17  change was being made?
18    A.    No.
19    Q.    Did you file a grievance
20  regarding that change in the schedule?
21    A.    No. We don't file grievances.
22  We're not union members.
23    Q.    Did you go and speak with A.G.

Page 125

1  James?
2    A.    No, I didn't go to speak to
3  A.G. James. But this incident is
4  something that had been occurring over and
5  over again from, you know, a long period
6  of time, so I felt there was no need to
7  discuss it any more; it was a need just to
8  take notes and keep documenting it. That
9  was a routine with him.
10    Q.    So -- And to follow up on
11  something you just said, John Wright was a
12  union member as well?
13    A.    No. John Wright was the
14  foreman.
15    And that is something that he was
16  constantly doing, not assigning job
17  assignments according to the schedule.
18  And that is the reason why supposedly he
19  felt guilty when calling Cheri Collins
20  wanting to know why Stephanie and I went
21  to see her.
22    Q.    My question that I was getting
23  at though, is why did you not file a

Page 126

1  grievance relating to John Wright changing
2  that schedule if you thought he was in the
3  wrong in making that change?
4    A.    Because, number one, it has
5  already been talked to Deborah concerning
6  the rotation needing to be followed. You
7  know, we felt we went to supervision about
8  it; if supervision didn't want to do
9  anything about it, then I just left it
10  alone and took notes, because I felt that
11  that was the best thing for me to do at
12  that particular time.
13    Q.    But my -- That's contrary to
14  what I had asked you previously. I asked
15  you did you talk to anyone about this
16  schedule change, and now you're telling me
17  you actually talked to someone about it.
18    A.    Well, that is correct. I did
19  speak to Deborah about the rotation at one
20  time, I did.
21    Q.    When did you speak to Deborah
22  about that rotation being changed?
23    A.    I don't recall exactly when.

Page 127

1  But I spoke to Deborah about the foremen
2  needing to follow the rotation.
3    Q.    You said you did that on one
4  occasion?
5    A.    Yes. That I can remember,
6  yes.
7    Q.    Are we talking about Deborah
8  Crutchfield?
9    A.    Yes.
10    Q.    Did you make any effort to
11  file an employee concern regarding John
12  Wright not following the rotation
13  schedule?
14    A.    No, I did not.
15    Q.    When was it that you say
16  Mr. Wright inhibited your ability to learn
17  new job responsibilities? When did that
18  occur?
19    A.    When he was constantly giving
20  us fire watch. We weren't being rotated
21  on the schedule, we either had fire watch
22  or we had offices. If it's supposed to be
23  an equal employment opportunity for

4 (Pages 124 to 127)

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 128

1  everyone, then everybody should rotate
2  through the schedule. When the males are
3  supposed to clean, housecleaning, they
4  should be able to do housecleaning as well
5  as the females.
6      Q.   What time frame are you
7  referring to?
8      A.   Prior to the email that you
9  have from Cheri to Stephanie. But it's
10  been going on for quite some time. Not
11  only with the old foremen but the new
12  ones.
13      Q.   And I'm referring to
14  Defendant's Exhibit 4, Miss McDowell. And
15  you just referred to an email from Cheri
16  Collins to Stephanie Sanders regarding the
17  time frame that I'm asking you about. Is
18  this the email that you were referring to?
19      A.   That is correct.
20      Q.   So you are saying that John
21  Wright was inhibiting your ability to
22  learn as early as February 20, 2005, but
23  earlier than that?

Page 129

1      A.   Earlier than the email that
2  you have right there, yes.
3      Q.   And this email is dated -- the
4  bottom email is dated December 14, 2004,
5  correct?
6      A.   That is correct.
7      Q.   So prior to December 14, 2004,
8  you said Mr. Wright was engaging in this
9  behavior?
10      A.   And after.
11      Q.   Right. But I'm saying it was
12  even before December 2004.
13      Had he -- How long had Mr. Wright
14  been a foreman?
15      A.   At that time, I don't know.
16  Maybe less than a year or a year, I'm not
17  for sure. You'll have to get his dates
18  from personnel.
19      Q.   But is it your testimony that
20  he had been engaging in this behavior the
21  entire time he had been a foreman?
22      A.   That is correct.
23      Q.   And given that you say that

Page 130

1  Mr. Wright had been engaging in this
2  behavior since he had been moved into the
3  foreman position, does that help to orient
4  you as to when you made a complaint or
5  report to Deborah Crutchfield regarding
6  Mr. Wright's behaviors?
7      A.   I don't know of the exact date
8  or time frame, but I know I did go to
9  Deborah concerning that.
10      Q.   Okay. Aside from what you
11  told me, tell me of any other ways that
12  John Wright discriminated against you.
13      A.   Another incident occurred
14  during one of the outages, he was saying
15  that there was no job swapping, but yet he
16  allowed Tammy Caldwell, white female, to
17  swap her job. After the outage I went to
18  him and Daryl (phonetic) Johnson, both
19  black male and female, asked them could we
20  swap job assignments, his exact words was
21  we do not swap job assignments.
22      Q.   Which outage was this?
23      A.   Same outage, 2004.

Page 131

1      Q.   Did you ask him why he had
2  allowed Tammy Caldwell to swap
3  assignments?
4      A.   I didn't feel I had a need to,
5  if there's no swapping, there's no
6  swapping.
7      Q.   But you knew at that time that
8  he had allowed Tammy Caldwell to swap?
9      A.   Yes, I did.
10      Q.   Why didn't you ask him to
11  clarify why she was allowed to swap?
12      A.   Once again, if he said no
13  swapping, no swapping; it was justified to
14  me already. What he said -- If he said no
15  swapping and he allowed her to do it, then
16  I see that the rules apply to some and not
17  to all.
18      Q.   Did you go and make a
19  complaint about --
20      A.   No. I documented it.
21      Q.   You didn't file a grievance?
22      A.   No, I did not.
23      Q.   You didn't file an employee

5 (Pages 128 to 131)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

| Page 132 | Page 134 |
|---|---|
| 1 concern? | 1   Q.   Did you file a grievance about |
| 2   A.   No, I did not. | 2 him not following through? |
| 3   Q.   How else do you feel that John | 3   A.   No, I did not. |
| 4 Wright discriminated against you? | 4   Q.   Did you file an employee |
| 5   A.   I don't know. Let me look. | 5 concern about him not following through? |
| 6   Q.   You're referring to | 6   A.   No, I did not. |
| 7 Defendant's Exhibit 7 to refresh your | 7   Q.   What about an EEOC charge |
| 8 recollection? | 8 about him not following through? |
| 9   A.   That is correct. | 9   A.   No, I did not. |
| 10   That's all that I can recall at this | 10   Q.   Also in your charge you make |
| 11 time. | 11 the statement, I am filing this complaint |
| 12   Q.   Aside from your allegation of | 12 with your establishment for being |
| 13 discrimination against Mr. Wright, are you | 13 wrongfully discharged. |
| 14 making an allegation that he retaliated | 14   A.   That is correct. |
| 15 against you in any way? | 15   Q.   Singled out? |
| 16   A.   If he retaliated against me in | 16   A.   That is correct. |
| 17 any way? | 17   Q.   Discharged and singled out, as |
| 18   Q.   Yes, ma'am. | 18 you write this, are those two different |
| 19   A.   Yes, I believe he did | 19 things? |
| 20 retaliate. | 20   A.   I was wrongfully discharged, |
| 21   Q.   Tell me how. | 21 yes; and I had been singled out, yes. |
| 22   A.   Because of the fact he was | 22   Q.   Are you making an allegation |
| 23 singling us out, he was going along with | 23 that John Wright had something to do with |

| Page 133 | Page 135 |
|---|---|
| 1 the flow that everybody else was going | 1 you being wrongfully discharged? |
| 2 along with. Once again, not being treated | 2   A.   No, I'm not saying that he did |
| 3 fairly as far as job assignments; you | 3 -- Well, no. No, I'm not saying that. |
| 4 know, constantly giving me housecleaning | 4   Q.   Tell me how Mr. Wright singled |
| 5 duties; constantly giving me fire watch; | 5 you out separate, if it is separate, from |
| 6 you know, checking behind me to see if I'm | 6 where you say retaliated against and |
| 7 doing my job, but then when other people | 7 discriminated against. |
| 8 are not doing their job, if I go to him | 8   A.   Let go back. Let me retract. |
| 9 and say, John, can you please post a note, | 9   Yes, he did in a sense when he is |
| 10 people are not doing what they're supposed | 10 doing what he's doing going along with |
| 11 to be doing, he would post a note but | 11 what Deborah or whomever in management |
| 12 still don't check behind them. | 12 tells him to do; so then, yes, he is |
| 13   So, yeah, that's retaliation against | 13 singling me out. Because if management |
| 14 me when he don't follow through with what | 14 goes with him and say, look, this is what |
| 15 he's supposed to follow through, but he's | 15 I want done, that is what the foremen were |
| 16 constantly looking at me, not looking at | 16 doing, exactly what management had been |
| 17 the other people. If you're there to do | 17 telling them to do, so then, yes. I mean, |
| 18 the job, then everybody should do their | 18 he might not have came and said something |
| 19 job. | 19 to me directly, but his actions. |
| 20   Q.   Did you ask him why he was not | 20   Q.   But his actions what? |
| 21 following through and making sure that | 21   A.   But his actions show that he |
| 22 everybody was doing their job? | 22 was discriminating against me, retaliating |
| 23   A.   No, I did not. | 23 against me, or singling me out and |

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 136

1  retaliating against me.
2      Q.   So the singling out allegation
3  is separate from the retaliating against
4  you allegation and the discriminating
5  against you allegation, or are they part
6  and parcel?
7      A.   I don't know how you want to
8  classify it. All I'm saying is that I
9  have been discriminated against, I have
10  been retaliated against, and I have been
11  singled out. Now, how they go about doing
12  it or the way you want to classify it, I
13  don't know. All I know is what happened,
14  what occurred. And I can't classify it
15  for you the way that, you know, you're
16  trying to get me to classify it.
17      Q.   And let me just say, I'm not
18  trying to classify it, and I'm not trying
19  to get you to classify it if that's not
20  what you are saying here.
21      What I want you to do and the
22  purpose here is for me to understand what
23  your allegations are here. And it appears

Page 137

1  that you have several different
2  allegations here, and I want to make sure
3  that, as best I can, I hear from you as to
4  your explanation and what you have to
5  support each and every one of your
6  allegations.
7      So, that said, tell me specifically
8  what John Wright did to single you out,
9  separate from what you told me, if it is
10  separate from your allegations that he
11  discriminated against you, and separate,
12  if it is separate, from your allegation
13  that he retaliated against you.
14      A.   He has, like I indicated
15  before, discriminated against me; he has
16  singled me out because he was going along
17  with, number one, things that was shared
18  from one foreman to the next.
19      If you need an example, for example,
20  Bill Barber, former foreman, went to
21  Phillip Avery and told Phillip Avery from
22  the very beginning when the foremen first
23  got over there to be careful of Janell and

Page 138

1  Stephanie because we were trouble; went to
2  Deborah Crutchfield about it, Deborah's
3  response was that she was going to speak
4  to the foremen. But once you're labeled,
5  you're labeled, and behaviors from the old
6  foremen just spilled over to the new
7  foremen.
8      Q.   Now, I guess that would be an
9  example of Bill Barber singling you out to
10  Phillip Avery; is that correct?
11      A.   That is correct.
12      Q.   I want to know how John Wright
13  singled you out.
14      A.   John Wright singled me out
15  when he decided that he was not going to
16  put me on a rotating schedule and continue
17  to keep me in a housekeeping job and not
18  allow me to progress. If he specifically
19  keeps assigning me to the same job, he's
20  singling me out.
21      Q.   What else?
22      A.   What else about --
23      Q.   John Wright singling you out.

Page 139

1      A.   I thought we had already --
2      MR. NEWMAN: She means in
3  addition to anything you have already
4  said.
5      THE WITNESS: And I told her
6  that's all that I can recall at this time.
7      Q.   Did you make a complaint about
8  Mr. Wright singling you out in this
9  manner?
10      A.   No.
11      Q.   Not to anyone?
12      A.   I didn't make a complaint to
13  the EEOC or to the concerns program. But
14  I did, once again, inform Deborah
15  Crutchfield that John was not rotating the
16  schedule according to how he was supposed
17  to be rotating the schedule.
18      Q.   And you can't recall when you
19  made that complaint or report to Deborah
20  Crutchfield?
21      A.   No.
22      Q.   Are you complaining separately
23  that John Wright labeled you?

7 (Pages 136 to 139)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

| Page 140 |
|---|
| 1       A.   No.  I'm not reporting that he |
| 2   labeled me. |
| 3       Q.   Are you alleging that Randy |
| 4   Johnson singled you out? |
| 5       A.   Yes. |
| 6       Q.   Tell me how. |
| 7       A.   Because when I went in for my |
| 8   DML, Randy indicated that he wasn't going |
| 9   to single me out, but he chuckled, and |
| 10   then said that he would inform the rest of |
| 11   the foremen not to single me out as well. |
| 12   But yet everything that went down |
| 13   afterwards with the incident with Deborah |
| 14   and Mark and Shelly in the office, I was |
| 15   being singled out. |
| 16       Q.   Do you know if Randy Johnson |
| 17   had anything to do with what went down in |
| 18   the office with Mark and Shelly and |
| 19   Deborah? |
| 20       A.   Well, I'm pretty sure he would |
| 21   -- If they're supposed to be following up |
| 22   on a thirty-day evaluation, I'm pretty |
| 23   sure that that would come from management. |

| Page 141 |
|---|
| 1       Q.   You're pretty sure or you |
| 2   know? |
| 3       A.   I'm pretty sure that it would |
| 4   come from management. |
| 5       Q.   So you're saying it would come |
| 6   from management? |
| 7       A.   Yes. |
| 8       Q.   What evidence do you have that |
| 9   it came from management? |
| 10       A.   Number one, why would they do |
| 11   thirty-day evaluation when, number one, |
| 12   thirty days wasn't up; number two, Randy |
| 13   was the one who handed out the DML, so is |
| 14   he not accountable for his people and what |
| 15   they do and does his people not have to |
| 16   run stuff by him, or they just take it |
| 17   upon himself to just do it because they're |
| 18   just picking on Janell? |
| 19       Q.   What evidence do you have that |
| 20   Randy Johnson was involved in the decision |
| 21   to have that meeting? |
| 22       A.   I don't have any evidence. |
| 23   I just go by the evidence that was |

| Page 142 |
|---|
| 1   on the DML papers with his signature on |
| 2   it. |
| 3       Q.   Which was before that meeting |
| 4   with Shelly and Mark and Deborah |
| 5   Crutchfield, correct? |
| 6       A.   That is correct. |
| 7       Q.   How else are you alleging that |
| 8   Randy Johnson singled you out? |
| 9       A.   Well, I'll say this, that I |
| 10   know for a fact that he knew what was |
| 11   going on prior to with Don Grissette.  And |
| 12   once you're labeled, it's hard to get a |
| 13   label off of you, so, therefore, they just |
| 14   picked up where the last plant manager |
| 15   left off. |
| 16       So, like I said before, it was just |
| 17   a ploy because the charges and the |
| 18   allegations and the way the bias |
| 19   investigation went was all bogus. |
| 20       Q.   So tell me how Randy Johnson |
| 21   otherwise singled you out. |
| 22       A.   He singled me out when he |
| 23   decided that he wanted to terminate me |

| Page 143 |
|---|
| 1   without going back and investigating and |
| 2   finding the truth. |
| 3       Nobody even knew what Sharon |
| 4   Bestwick was there for.  Not once did she |
| 5   come out of that meeting to indicate the |
| 6   reason why she was there.  We were |
| 7   assuming she was there for another reason. |
| 8       Q.   What evidence do you have that |
| 9   Randy Johnson told Sharon Bestwick how to |
| 10   conduct that investigation that you're |
| 11   referring to? |
| 12       A.   I don't have any evidence of |
| 13   how he told her to conduct the meeting. |
| 14   But as, supposedly, she takes notes and |
| 15   she went in, and I'm -- I'm going against |
| 16   what she said, then at least, you know, go |
| 17   and investigate it, don't take her word |
| 18   for it because she's a human resource |
| 19   director or whatever position she plays. |
| 20       Q.   So is your answer that you |
| 21   have no evidence that Randy Johnson told |
| 22   Sharon Bestwick how to conduct that |
| 23   investigation? |

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

| Page 144 |
|---|

1    A.   No, I don't have any evidence
2  how he told to her to conduct that
3  investigation. How would I know that?
4    Q.   So if you would, let's go back
5  to my original question: How otherwise
6  are you saying that Randy Johnson singled
7  you out?
8    A.   Because he allowed his people
9  to single me out and he's accountable for
10  all his people, that's how he singled me
11  out.
12    Q.   Who are his people?
13    A.   Everybody in management from
14  Deborah Crutchfield to Brad Moore to Mark
15  Freeman, Shelly Murrell, John Wright,
16  Phillip Avery.
17    Q.   Have you told me every way
18  that you're alleging that Deborah
19  Crutchfield singled you out?
20    A.   I don't know if I've told you
21  every way how Deborah singled me out.
22    Q.   Then tell me how Deborah
23  Crutchfield singled you out.

| Page 145 |
|---|

1    A.   Number one, Deborah knew that
2  management was after Stephanie and myself.
3  I had spoken to Deborah; Stephanie and I
4  both went to Deborah and asked her
5  supposedly there's a list going around of
6  people that they wanted to get rid of. We
7  went to Deborah and asked her if we were
8  on that list. Deborah's response to us
9  was, just continue to do your job and
10  nothing will happen. So when she decided
11  -- or they decided that she was being too
12  -- I don't know the word to say, nice, I
13  don't know, then all of a sudden Deborah
14  decides that she's going to go with
15  management and single us out.
16    Q.   My question was how did
17  Deborah Crutchfield single you out.
18    A.   I'm trying to think of a
19  couple of incidents, because I know it has
20  occurred.
21    She singled us out for, number one,
22  the incident that had occurred with
23  Phyllis. After Phyllis was terminated,

| Page 146 |
|---|

1  Deborah goes to Phyllis and asked Phyllis
2  why she was taking the blame for the
3  letter. Phyllis turned around and told
4  her that she didn't know what she was
5  talking about because she didn't know
6  anything about a letter. Deborah then
7  turns around and says that she knows that
8  we, meaning Stephanie and I, had something
9  to do with the letter that Doris Ashford
10  presented to Tammy.
11    Once, again, as I have alleged all
12  along, I did not know about that letter or
13  the contents of that letter until my state
14  unemployment hearing. But Deborah was so
15  persistent that Stephanie and I had
16  something to do with that letter, so
17  that's how she singled me out when she
18  accused me of doing something that I had
19  absolutely nothing to do with.
20    Q.   And you say she did this with
21  a terminated employee; is that correct?
22    A.   Phyllis was not terminated at
23  the time.

| Page 147 |
|---|

1    Well, let me back up. Phyllis was
2  terminated, and she called Phyllis and
3  asked Phyllis why was she taking the fall
4  for the letter. And Phyllis told her that
5  we had nothing to do with that letter.
6  When I went in to see Sharon Bestwick, I
7  did not even know a letter existed.
8    Q.   So you're saying that Deborah
9  Crutchfield had this conversation with
10  Phyllis Hughes; is that correct?
11    A.   That is correct.
12    Q.   After Ms. Hughes had been
13  terminated?
14    A.   That is correct.
15    Q.   And this conversation took
16  place at the end of the investigation?
17    A.   That is correct.
18    Q.   Had you received your DML at
19  that time?
20    A.   That is correct.
21    Q.   Had Ms. Sanders, to your
22  knowledge, received her discipline at that
23  time?

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 148

1    A.    Yes, she did.
2    Q.    So Ms. Crutchfield's
3  conversation with Ms. Hughes was after all
4  of the discipline had been administered
5  related to that investigation?
6    A.    Yes.
7    Q.    Aside from her remarks to
8  Ms. Hughes, what effect did
9  Ms. Crutchfield's comment have on you?
10    A.    Can you repeat that?
11    Q.    When you say Ms. Crutchfield
12  singled you out on this occasion, you told
13  me about Ms. Crutchfield's comment to
14  Ms. Hughes, correct?
15    A.    That is correct.
16    Q.    Is there anything else that
17  goes into your allegation that
18  Ms. Crutchfield singled you out on this
19  occasion?
20    A.    No. On that occasion, that is
21  what I was told.
22    Q.    And Ms. Hughes told you this?
23    A.    That is correct.

Page 149

1    Q.    When did she tell you this?
2    A.    She called me at home shortly
3  after I was terminated and informed me
4  that Deborah Crutchfield had spoken with
5  her on at least two occasions.
6    Q.    Did she tell you the date that
7  Ms. Crutchfield had told her that she felt
8  you had had something to do with that
9  spider picture?
10    A.    Did she tell me --
11    Q.    The date of her conversation
12  with Deborah Crutchfield, wherein
13  Ms. Crutchfield made these comments about
14  you?
15    A.    She didn't tell me -- She
16  didn't tell me the date. But it was after
17  she was terminated and I was terminated
18  when she --
19    Q.    I understand.
20    A.    -- when I spoke with her.
21    Q.    Let me just make sure for the
22  Record that my question is clear.
23    Your testimony is that the

Page 150

1  conversation between Ms. Crutchfield and
2  Ms. Hughes happened after Ms. Hughes was
3  terminated?
4    A.    That is correct.
5    Q.    Ms. Hughes told you the about
6  the conversation after you were
7  terminated?
8    A.    That is correct.
9    Q.    Do you know the date of the
10  conversation between Ms. Hughes and
11  Ms. Crutchfield?
12    A.    No, I do not.
13    Q.    Okay. Ms. Hughes did not tell
14  you that day?
15    A.    All she told me was that
16  Deborah called her after she was
17  terminated and asked her why she took the
18  fall for the letter. So whatever date
19  that Phyllis was terminated, it was a day
20  after the date she was terminated.
21    Q.    How else do you say
22  Ms. Crutchfield singled you out?
23    A.    That's all I can recall at

Page 151

1  this time.
2    Q.    Is it your contention that
3  Ms. Crutchfield labeled you?
4    A.    Yes, she labeled me.
5    Q.    How is that?
6    A.    She labeled me when she
7  assumed that I was part of Doris's doing.
8  And I had nothing to do with that.
9    Q.    Again, you found out about
10  this after you were terminated?
11    A.    I found out about what?
12    Q.    Her -- Ms. Crutchfield having
13  labeled you in this manner.
14    A.    After who was terminated,
15  after I was terminated?
16    Q.    After you were terminated.
17    A.    Yes.
18    Q.    How else did Ms. Crutchfield
19  label you?
20    A.    Once again, like I just
21  indicated a few minutes ago, that's all I
22  can remember at this time.
23    Q.    How did Ms. Crutchfield

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 152

1  retaliate against you?
2      A.    Once again, she retaliated
3  against me when she decided to indicate
4  that I had something to do with the spider
5  picture with the letter and everything
6  else.
7      Q.    Any other ways that you say
8  Ms. Crutchfield retaliated against you?
9      A.    She retaliated against me when
10 she went that in that meeting the day I
11 was terminated and lied and said that I
12 said in that meeting that had occurred on
13 the 9th that I told her that I didn't want
14 my job or not.
15     Q.    In your termination meeting?
16     A.    That is correct.
17     Q.    What did she say in your
18 termination meeting?
19     A.    She didn't say it in my
20 termination meeting.
21     Q.    You said she went into that
22 meeting.
23     A.    Sonny Bargeron, the assistant

Page 153

1  plant manager, indicated that I said in
2  the meeting that I had with Deborah, I
3  believe it was on the 9th, that I did not
4  care whether or not I kept my job. And
5  that was not stated in that meeting.
6      Q.    Mr. Bargeron, did he tell you
7  that Deborah told him that you made that
8  statement?
9      A.    He didn't indicate that
10 Deborah made the statement. What he said
11 was that I indicated in that meeting that
12 I didn't care whether I kept my job or
13 not.
14     Q.    I want to make sure you're
15 answering the question I asked you.
16     Did Mr. Bargeron tell you that
17 Deborah said you made that statement in
18 the September 9 meeting?
19     A.    And I'm going to say it like
20 this again: I said that he indicated in
21 the meeting that I said; he did not
22 mention a name, he indicated in the
23 meeting that I stated in that meeting that

Page 154

1  I didn't care whether I kept my job or
2  not.
3      Q.    How did he indicate in your
4  termination meeting that you indicated in
5  the September 9 meeting that you did not
6  care whether you kept your job or not?
7      A.    Exactly what I said, in the
8  meeting he said, it's to my understanding
9  that you indicated in the meeting that you
10 didn't care whether you kept your job or
11 not, so, therefore, we're going to
12 terminate you as of today.
13     Q.    Did you tell him that his
14 understanding was incorrect?
15     A.    Yes, I did.
16     Q.    What did you say to him?
17     A.    I told him that that was not
18 the truth, that that did not even occur in
19 that meeting.
20     And I turned to Deborah and I said,
21 Deborah, is that what I said in the
22 meeting? And she didn't even respond.
23     Q.    So what evidence do you have

Page 155

1  that Deborah Crutchfield labeled you by
2  telling Sonny Bargeron or anyone in the
3  September 9 meeting that you stated or
4  indicated that you didn't care whether you
5  kept your job or not?
6      A.    She labeled me when she told a
7  lie on me because of the fact that that
8  supposedly backed up their allegations
9  that I had been harassing white female
10 Tammy Caldwell. That's labeling me when
11 she accuses me of something I didn't do.
12     Q.    No. My question, Miss
13 McDowell, is on the last instance you told
14 me of Ms. Crutchfield labeling you, you
15 specifically pointed to your termination
16 meeting and said that she somehow conveyed
17 to Sonny Bargeron, or someone, that in the
18 September 9, 2005, meeting you indicated
19 that you did not care whether you kept
20 your job or not.
21     My question is: What evidence do
22 you have that Deborah Crutchfield told
23 anyone that in the September 9, 2005,

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 156

1  meeting you said or indicated that you did
2  not care whether you kept your job or not?
3      A.  What evidence do I have that
4  Deborah stated that?
5      Q.  That she is responsible for
6  management's understanding that you either
7  said or otherwise indicated that you
8  didn't care whether you kept your job or
9  not.
10      A.  Well, number one, she's a
11  supervisor and she's over Mark Freeman and
12  Shelly Murrell; number two, she was in the
13  meeting the day that I was terminated, so
14  she's accountable.  She's accountable if
15  it came from Shelly or if it came from
16  Mark, obviously she agreed with it and she
17  was sitting up there in the termination
18  meeting having me fired.
19      Q.  So that's the evidence you
20  have?
21      A.  That's the evidence I have.
22      Q.  Is that the only evidence?
23      A.  That's the evidence I have.

Page 157

1      Q.  The only evidence --
2      A.  Yeah.
3      Q.  -- that you have?  Okay.
4      Is there anything else, Miss
5  McDowell, that goes into your allegation
6  that Ms. Crutchfield retaliated against
7  you?
8      You told me about the spider
9  picture, the Doris Ashford letter, and
10  then the termination decision.  How else
11  do you contend that Deborah Crutchfield
12  retaliated against you?
13      A.  She retaliated against me when
14  she felt it was mandatory that only I
15  speak, when in fact you had two white
16  males that wasn't speaking to her because
17  of the change of the job rotation, and she
18  goes up to them and tells them that I know
19  why you're not speaking to me, but I had
20  nothing to do with the rotation.  But it
21  was okay for them not to speak, but then
22  when she claims that I didn't speak, then
23  that's a ground for termination.

Page 158

1      She retaliated against me when she
2  also went in that meeting saying that I
3  came in with my hard hat on in a morning
4  briefing, like I was the only one who ever
5  walked in a morning briefing with a hard
6  hat on.  I had fire watch that day, I
7  wasn't staying long.
8      Q.  What meeting did she go into
9  and say that you had your hard hat on?
10      A.  She didn't go into the
11  meeting; she indicated that at the state
12  of Alabama, that that was one of the
13  reasons why -- for my termination, when
14  her and Sharon Bestwick was on the
15  telephone indicating that I kept my hard
16  hat on and I wouldn't look up.
17      And also -- Let me back up, the
18  meeting that had occurred September 9, she
19  also indicated in that meeting as well.
20      Q.  Let's stick with the first
21  meeting.  You said she went into a meeting
22  and said you had your hard hat on.  What
23  meeting did she go into and say?

Page 159

1      A.  The meeting that occurred with
2  me, her, Shelly and Mark, that meeting for
3  my thirty-day evaluation meeting.
4      Q.  So she went into that meeting
5  and said you've got your hard hat on?
6      A.  That I had my hard hat on in
7  morning briefing.  And which I was not the
8  first one who ever sat in a morning
9  briefing with a hard hat on.  I had fire
10  watch, I wasn't going to be in the meeting
11  long.  And you said something about the
12  September 9, 2005, meeting separately from
13  that.
14      Q.  What else did you say about
15  her referring to you having your hard hat
16  on?
17      A.  I'm not sure if that September
18  9 date is correct.  It could be the 9th or
19  the -- I'm not sure of the date.  But the
20  date I went in with Deborah Crutchfield,
21  Mark Freeman, that is the date that I'm
22  talking about.  Also, she indicated when I
23  had my unemployment hearing on the

12 (Pages 156 to 159)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 160

1 telephone.
2      Q.    She then talked about you
3 having worn your hard hat --
4      A.    Yes.
5      Q.    -- in the morning briefing?
6      A.    In the morning briefing.
7      Q.    Okay.  Did you wear your hard
8 hat into the morning briefing?
9      A.    Yes.
10      Q.    So that was a correct
11 description?
12      A.    Yes, that was a correct
13 description.  But if you speaking about it
14 like it was just a correct description,
15 like it was nothing wrong, then if it
16 wasn't a big problem, you know, why did
17 she indicate that that was one of the
18 reasons during my termination that she was
19 trying to justify to the state of Alabama?
20      When the lady asked her what other
21 evidence she had to back up me being
22 terminated, she mentioned about me coming
23 in morning briefing with a hard hat on.

Page 161

1      Q.    Okay.
2      Was she not explaining to the
3 hearing officer that your appearance in
4 the morning briefing signaled to her that
5 you were not paying attention and engaged
6 in what was going on in the morning
7 briefing?
8      A.    That's just what signaled to
9 her, that's under her perception.  She
10 doesn't know.  And like I indicated as
11 well, did she ever ask me a question to
12 see whether or not I was understanding or
13 hearing what was said in the morning
14 briefing?
15      Don't assume.  That's assuming.  She
16 doesn't know whether or not I was
17 listening or not.
18      Q.    And I understand that.  But is
19 that not why Ms. Crutchfield described
20 your demeanor and appearance in the
21 morning briefing meeting --
22      A.    No.
23      Q.    -- to explain that she felt

Page 162

1 you were not paying attention and engaged
2 in what was taking place?
3      A.    No.  She was just trying to
4 justify along with Sharon Bestwick their
5 mess-up.
6      Q.    My question is did
7 Ms. Crutchfield not tell the hearing
8 officer that this was her perception of
9 you, because you then said, why didn't you
10 ask me if I knew what was said?
11      A.    Exactly.
12      Q.    Correct?
13      A.    That's correct.
14      Q.    So Ms. Crutchfield said, what
15 I saw told me that Miss McDowell was not
16 listening, was not paying attention, and
17 was not engaged, correct?
18      A.    Is that what she saw or is
19 that what she knew?  Is that what she saw?
20      Q.    Is that what she conveyed to
21 the hearing officer or not?
22      A.    I don't know.  You'll have to
23 go back and play the tape.

Page 163

1      Q.    Then tell me why you felt the
2 need to say, well, why didn't you ask me
3 if I heard what was going on?
4      A.    Because she indicated that I
5 wasn't paying attention.
6      Q.    To the hearing officer.
7      A.    She didn't know that -- She
8 didn't know that for sure.
9      Q.    But my question is: Did she
10 not indicate to the hearing officer that
11 she didn't know whether you were paying
12 attention?
13      A.    Yeah, uh-huh (positive
14 response).
15      Q.    Okay.  That's the point I want
16 to clarify.
17      MR. NEWMAN:  Are we talking a
18 bout a hearing that was after she got
19 fired?
20      THE WITNESS:  Yes.
21      MS. SHARP:  That's what your
22 client is talking about being retaliation.
23      MR. NEWMAN:  Why are we talking

13 (Pages 160 to 163)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 164

1  about that?
2      MS. SHARP: That's what your
3  client is telling me is retaliation. And
4  I'm just asking the question.
5      Q.  What was the protected
6  activity, Miss McDowell, that you had
7  engaged in that you said prompted -- that
8  you say prompted Ms. Crutchfield to
9  retaliate against you by blaming you for
10  the spider picture?
11      A.  Because when I went into the
12  meeting with Sharon Bestwick I was asked
13  about the spider picture, who printed off
14  the spider picture, and why was the spider
15  picture being printed off.
16      I explained to Ms. Bestwick that
17  that spider picture had been sitting on
18  that table for quite some time and that it
19  was printed off by me for safety purpose.
20  It wasn't just a picture of a spider, it
21  was a picture of a man's hand being bit by
22  a spider and the progression of the bite
23  from a Brown Recluse.

Page 165

1      Q.  What was the protected
2  activity that you had engaged in that you
3  say prompted Ms. Crutchfield to blame you
4  for the Doris Ashford letter?
5      A.  Because obviously an
6  investigation was launched due to that
7  letter. And as I indicated before, when I
8  went into that meeting with Sharon
9  Bestwick, I did not know that I was there
10  for that letter. I thought that I was in
11  that meeting for Phyllis' dress attire.
12  It was never indicated in that meeting
13  that charges was being brought up on me
14  about writing or having somebody write a
15  letter.
16      Q.  You mentioned that
17  Ms. Crutchfield is responsible for conduct
18  of the foremen that report to her,
19  correct?
20      A.  That's correct.
21      Q.  And you mentioned someone by
22  the name of Moore. Is that someone who
23  you contend discriminated against you?

Page 166

1      A.  Brad Moore is not somebody
2  that works underneath her, but he is above
3  her.
4      Q.  Do you contend that he
5  discriminated against you?
6      A.  Yes, I do contend that.
7      Q.  Tell me how.
8      A.  Because in the day of my
9  termination, I know he made reference to
10  that not speaking to somebody one time is
11  more than enough. And him going on
12  hearsay from management or whatever proof
13  they seen that they supposedly had, like I
14  indicated before, it was a set up from the
15  beginning, it was a biased investigation.
16      Q.  So Mr. Moore, you said,
17  attended your termination meeting?
18      A.  Yes, he did.
19      Q.  And he said in that meeting
20  that not speaking to someone one time is
21  more than enough?
22      A.  That is correct.
23      Q.  For what?

Page 167

1      A.  To be terminated.
2      Q.  Now, how did Mr. Moore know
3  about your not speaking to someone?
4      A.  You have to get with
5  Mr. Moore.
6      Q.  I'm going to back up a minute.
7  You said that Deborah Crutchfield
8  complained about you not speaking to her,
9  but then let two white males slide who had
10  not spoken to her; is that correct?
11      A.  That is correct.
12      Q.  Were the two white males on a
13  DML?
14      A.  No.
15      Q.  Were the two white males on
16  discipline for the same reasons that you
17  were on discipline at that time?
18      A.  No.
19      Q.  Are there any other ways that
20  you feel that Brad Moore discriminated
21  against you, Miss McDowell?
22      A.  No.
23      Q.  Do you feel like he singled

14 (Pages 164 to 167)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

| Page 168 | Page 170 |
|---|---|
| 1  you out? | 1     A.   He retaliated against me when |
| 2     A.   He singled me out when he was | 2  he sat in that office the day of my |
| 3  going with the flow with the rest of the | 3  termination. |
| 4  foremen and management and supervisors, | 4     Q.   How did he do that? |
| 5  yeah. | 5     A.   Same as -- Same as singling |
| 6     Q.   How did he go with the flow? | 6  out and prior to, the same thing.  It's |
| 7     A.   Because he went with whatever | 7  all related to what occurred that led up |
| 8  Sharon Bestwick and Randy Johnson and | 8  to my termination. |
| 9  Deborah Crutchfield, all of what they | 9     Q.   Do you know if Mr. Moore |
| 10  said.  My explanation was not heard, it | 10  played a role in the investigation that |
| 11  was not investigated, so, yeah, he singled | 11  resulted in your discipline? |
| 12  me out when he went right along with them. | 12     A.   No, I don't know that. |
| 13     Q.   Anything else? | 13     But he must have if he was in the |
| 14     A.   No. | 14  meeting during termination. |
| 15     Q.   Do you contend that Mr. Moore | 15     Q.   Tell me how the fact he's in a |
| 16  labeled you? | 16  meeting related to your termination means |
| 17     A.   By their actions, yeah, I'm | 17  that he had a role in the investigation. |
| 18  labeled.  I'm labeled as being someone | 18     A.   Well, I'm pretty sure before |
| 19  that harasses somebody. | 19  the investigation or afterward, during the |
| 20     Q.   How did Mr. Moore label you? | 20  investigation that Deborah had to go to |
| 21     A.   Whatever -- I don't know | 21  him and explain to him what was going on. |
| 22  exactly whatever the whole -- When they | 22     Q.   Is this -- I'm sorry, go on. |
| 23  got together and decided to do what they | 23     A.   When she took that letter or |

| Page 169 | Page 171 |
|---|---|
| 1  were going to do and they all went | 1  picture to him, I'm pretty sure he had |
| 2  together with it.  I was singled out | 2  some input. |
| 3  because of the fact that they didn't go | 3     Q.   Do you know that for a fact or |
| 4  and listen to what I had to say.  So | 4  is this something that you're assuming? |
| 5  that's how I figured how he indirect or | 5     A.   I'm assuming that. |
| 6  direct collectively; they did it | 6     Q.   You mentioned Phillip Avery |
| 7  collectively. | 7  earlier as someone whose actions you felt |
| 8     Q.   So you don't have any evidence | 8  like Deborah Crutchfield was responsible. |
| 9  that Mr. Moore separately labeled you in | 9  Tell me what Phillip Avery did to, first, |
| 10  any way? | 10  discriminate against you. |
| 11     A.   The only evidence I have is | 11     A.   When he decides also that he's |
| 12  when he told me in that meeting that not | 12  going to give white female Tammy Caldwell |
| 13  speaking once was more than enough, and I | 13  and white female Jennifer White certain |
| 14  don't see anything in the policy that says | 14  jobs, and then continue to keep Janell and |
| 15  I have to meet and greet management or | 15  Stephanie on the same jobs. |
| 16  personnel; as long as I'm civil to them, | 16     Q.   Mr. Avery is a foreman? |
| 17  that's all that should count. | 17     A.   That is correct. |
| 18     Q.   So that's everything that you | 18     When he allows her to tell him that |
| 19  have regarding Mr. Moore separately? | 19  she needs overtime, and instead of him |
| 20     A.   Uh-huh (positive response). | 20  going to the group and saying who wants |
| 21     Q.   Okay. | 21  overtime; because she says, let me get it, |
| 22     How did Mr. Moore retaliate against | 22  and he turns around and gives it to her |
| 23  you? | 23  without going according to the union |

15 (Pages 168 to 171)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 172

1  contract.
2      Q.   He allows who to tell him she
3  needs overtime?
4      A.   Tammy.
5      Q.   Do you know whether Mr. Avery
6  checked to see how much overtime
7  Ms. Caldwell had already worked for the
8  year?
9      A.   It doesn't matter how much
10  overtime, he still -- If overtime is
11  offered, you have to go by the seniority
12  list.
13      Q.   That's pursuant to the union
14  contract?
15      A.   That's correct.
16      Q.   It specifically says that?
17      A.   No, it doesn't specifically
18  say that. But you have to go by the
19  seniority overtime list, put it that way.
20      Q.   According to whom?
21      A.   According to union contract
22  you have to go down the list and see who
23  was offered overtime and who has worked

Page 173

1  overtime and call -- ask for overtime
2  according to that list.
3      Q.   According to the list, who was
4  entitled to be offered that overtime that
5  you say Ms. Caldwell was given by
6  Mr. Avery?
7      A.   She wasn't. She wasn't
8  because she didn't even give them the
9  opportunity to go and ask to generate the
10  overtime list. The incident was caught by
11  Doris Ashford, the job steward, about them
12  not going down the list for overtime and
13  just giving it to her.
14      Q.   Do you know who was entitled
15  to be offered that overtime?
16      A.   No.
17      Q.   When did this occur?
18      A.   I don't know. I don't know
19  the date.
20      Q.   How else did Mr. Avery
21  discriminate against you, Miss McDowell?
22      A.   That's all I can remember at
23  this time.

Page 174

1      Q.   You said that she did not
2  allow him to generate the overtime list,
3  who are you talking about?
4      A.   Tammy did not -- I wouldn't
5  say she -- Well, he did not -- Put it that
6  way, he did not generate an overtime list
7  so that he can go to the group and ask who
8  wants overtime. She said she wanted it
9  and so she got it.
10      Q.   How do you know he did not
11  generate an OT list?
12      A.   According to Doris Ashford the
13  list was not generated. No one was asked.
14      Q.   So your knowledge is based on
15  what Ms. Ashford told you?
16      A.   I know I wasn't asked.
17      Q.   I understand. You know you
18  were not asked --
19      A.   I know Stephanie wasn't asked.
20      Q.   How do you know that?
21      A.   I talk with Stephanie.
22      Q.   And aside from yourself and
23  Ms. Sanders, your knowledge is based on

Page 175

1  what Ms. Ashford told you, correct?
2      A.   That is correct.
3      Q.   How do you know that
4  Mr. Avery's awarding the overtime to
5  Ms. Caldwell is based on her race?
6      A.   Because she stays in the
7  office all the time, they have a
8  relationship that was too friendly, and he
9  was allowing her, as well as other foremen
10  were allowing her to do things other
11  people could not do.
12      If she's allowed to do something,
13  and then you turn around and you ask to do
14  the same thing she's doing, and then you
15  turn around and you're told no, then, you
16  know, that's based on her race.
17      Q.   Is there anything else that
18  says to you that Mr. Avery's actions were
19  based on Ms. Caldwell's race?
20      A.   That's all I can recall at
21  this time.
22      Q.   Are you contending that
23  Mr. Avery singled you out?

16 (Pages 172 to 175)

Page 176

1     A.   Yes.
2     Q.   Tell me how.
3     A.   Because he allowed me to be
4  labeled by Bill Barber and other foremen
5  and then his actions as well.
6     Q.   Explain that to me.
7     A.   Job assignments.
8     Q.   What about job assignments?
9     A.   Supposedly Tammy Caldwell and
10  Jennifer White were doing a Jim's list,
11  had the list for three days and was
12  supposed to go down to the other side to
13  get the pressure washer or they were
14  waiting for the truck crew to bring the
15  pressure washer over.  Three days they sat
16  around in and out of the office, pressure
17  washer job never got done.
18     All of a sudden the temperature
19  drops, who gets the job?  Stephanie and
20  Janell.  But due to the cold weather, then
21  that job had to be cancelled.  But other
22  than that, we were assigned the job to do.
23     Q.   What's a Jim's list?

Page 177

1     A.   That's what they called it.  A
2  Jim's to-do list, things on a list that
3  Jim Parrish wanted done.
4     Q.   So you and Ms. Sanders never
5  actually did the things on this list?
6     A.   No.
7     Q.   And what was the reason that
8  Ms. White and Caldwell were taken off of
9  this assignment?
10     A.   You have to ask Ms. White and
11  Ms. Caldwell.
12     Q.   You don't know the reason?
13     A.   I don't know the reason.  I
14  just know that the job was not done after
15  three days.
16     Q.   Do you know why it wasn't done
17  after three days?
18     A.   Because they were waiting for
19  the pressure washer to be brought over by
20  a truck crew when they could have went and
21  got the pressure washer themselves.
22     Q.   Do you know if there was any
23  other reason that the job wasn't done over

Page 178

1  those three days?
2     A.   I know that from Tammy and
3  Jennifer themselves saying that they were
4  waiting for the truck crew to bring the
5  pressure washer over.
6     Q.   Do you know if the pressure
7  washer was being used in some other manner
8  during those three days?
9     A.   I don't know about that
10  particular pressure washer, but that's not
11  the only pressure washer on the plant
12  site.
13     Q.   Do you know of another
14  pressure washer that was available to them
15  for this assignment?
16     A.   No.
17     Q.   How else do you say that
18  Phillip Avery singled you out?
19     A.   That's all I can recall at
20  this time.
21     Q.   And you said that he allowed
22  you to be labeled by Bill Barber and other
23  foremen, what do you mean?

Page 179

1     A.   Because Bill Barber went to
2  Phillip Avery and told Phillip Avery that
3  Stephanie and Janell is trouble and that
4  he needed to watch out for us.  Luan
5  Stevens -- He turns around and tells Luan
6  Stevens who tells Stephanie, Stephanie and
7  I both went to Deborah and spoke to
8  Deborah about what Bill Barber did.  And
9  nothing happened to him.
10     Q.   What is it that you understand
11  Phillip Avery told Luan Stevens?
12     A.   That Bill Barber came to him
13  and told him that Stephanie and Janell was
14  nothing but trouble.
15     Q.   What action did Mr. Avery take
16  based on Mr. Barber's comment that you
17  were trouble?
18     A.   Action as far as just the
19  regular routine, not following job
20  assignments, not following rotation,
21  playing favoritism, the same routine.
22     Q.   Did you report that Mr. Avery
23  was doing these things?

17 (Pages 176 to 179)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 180

1    A.    Well, like I said before, it
2    was reported to Deborah about rotation not
3    being done fairly, you know, use your
4    chain of command.
5    Q.    Did you tell Deborah that
6    Mr. Avery was doing these things?
7    A.    I told her the foremen, yes,
8    were not rotating the schedule.
9    Q.    When was that?
10    A.    The same time I went to speak
11   to her about John.
12    Q.    So this was a separate
13   conversation?
14    A.    No. I said the same time I
15   spoke to her about John it was the foremen
16   not doing the rotation.
17    Q.    But did you specifically say
18   John Wright?
19    A.    I said John Wright, I said
20   Phillip Avery, I said Shelly Murrell; the
21   foremen.
22    Q.    You listed the foremen not
23   just said "the foremen"?

Page 181

1    A.    I'm pretty sure I did, yes.
2    Q.    What evidence do you have,
3    Miss McDowell, that the foremen were not
4    following the rotation or enforcing the
5    rotation because of race?
6    A.    What evidence I have?
7    Q.    Yes, ma'am.
8    A.    I have evidence when you take
9    black females and the black males and put
10   them in a heat-stress environment and have
11   them in the turbine building when you're
12   supposed to have the turbine building for
13   just two weeks and you're constantly
14   giving the white males an outside job or a
15   different job and you're rotating around,
16   and then when someone goes to one of the
17   foremen and mention to him that they've
18   been in that heat-stress environment for
19   quite some time and the foreman turns
20   around and tells them that they be all
21   right, that's discriminating.
22    Q.    When was that?
23    A.    I don't know the date, but it

Page 182

1    occurred.
2    Q.    Who went and complained about
3    that situation you just described?
4    A.    I believe Eddie Harris went to
5    John Wright pertaining to John Locke being
6    left in the turbine building.
7    Q.    Do you know that Mr. Harris
8    went to Mr. Wright and made that
9    complaint?
10    A.    Yes, I do.
11    Q.    When was that?
12    A.    I just told you, I didn't know
13   the date.
14    Q.    How do you know that
15   Mr. Harris made this complaint?
16    A.    Because he told me that he
17   made the complaint.
18    Q.    When did he tell you he made
19   the complaint?
20    A.    I don't know the date.
21    Q.    Do you know if it was the same
22   year that you were terminated?
23    A.    Yes.

Page 183

1    Q.    2005?
2    A.    Yes.
3    Q.    So did Mr. Harris make this
4    statement to Mr. Wright regarding one
5    occasion?
6    A.    Yeah. One of many.
7    Q.    And you said that Mr. Wright
8    told Mr. Harris that it would be okay?
9    A.    That he would be okay.
10    Q.    That Mr. Harris would be okay?
11    A.    No. That John Locke would be
12   okay.
13    Q.    And was Mr. Locke okay?
14    A.    Who's going to be okay working
15   in a heat-stress environment for weeks
16   after weeks when you're not doing the
17   rotation right?
18    Q.    Is the answer no?
19    A.    No, he wasn't okay with it.
20    Q.    Okay.
21    Let me clarify this: You said that
22   Mr. Wright told Mr. Harris that John Locke
23   would be okay. Does that mean okay

18 (Pages 180 to 183)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 184

1  physically or okay with the assignment?
2      A.    Okay being in the turbine
3  building for another week.
4      Q.    With the assignment?
5      A.    Uh-huh (positive response).
6      Q.    So tell me what Mr. Locke said
7  about the assignment.
8      A.    That he thought it was unfair
9  that he was in the turbine building that
10 long.
11     Q.    Did he go to Mr. Wright?
12     A.    I don't know if he went to
13 Mr. Wright.  I know John Locke spoke to me
14 about being in the turbine building.
15     Q.    Do you know if Mr. Locke
16 complained to anyone about the job
17 assignment?
18     A.    I'm pretty sure -- I can't say
19 that but -- No.  No.
20     Q.    And you said at this time
21 Mr. Wright had been assigned to work in
22 the turbine building for how long?
23     A.    I said Mr. Wright was

Page 185

1  assigned?
2      Q.    I'm sorry.  My question was or
3  should have been:  How long had Mr. Locke
4  been assigned to work in the turbine
5  building or this heat-intensive
6  environment?
7      A.    For several weeks.
8      Q.    What do you mean by several
9  weeks?
10     A.    Several, more than one, more
11 than two.
12     Q.    Three weeks or more?
13     A.    (Witness nods head
14 affirmatively.)  Yes.
15     Q.    And this was not a routine
16 assignment in that regard?
17     A.    What do you mean by routine
18 assignment?
19     Q.    It was not --
20     A.    If you go by rotation, then
21 no.
22     Q.    According to the rotation, how
23 long was the normal assignment to the

Page 186

1  turbine building?
2      A.    Two weeks.
3      Q.    Were there ever any occasions
4  where an employee was assigned, aside from
5  Mr. Locke, to work in the turbine building
6  or on any job assignment for more than two
7  weeks?
8      A.    Yes.
9      Q.    When?
10     A.    Stephanie and I were assigned
11 to the turbine building between six and
12 eight weeks.
13     Q.    When was that?
14     A.    I don't know the exact date.
15 But it was during the time of B.J. Yance
16 was the foreman.
17     Q.    Is that the year you were
18 terminated?
19     A.    No.
20     Q.    The year before you were
21 terminated?
22     A.    It would have to be before I
23 was terminated.

Page 187

1      Q.    The year before, 2004?
2      A.    Yes.
3      Q.    It would have been in 2004?
4      A.    It could have been 2003, 2004.
5  It was prior to whenever B.J. Yance was
6  the foreman, it was prior to me being
7  terminated in 2005.
8      Q.    Were any other employees
9  assigned to the turbine building for six
10 to eight weeks?
11     A.    Not to my knowledge.
12     Q.    What were you assigned to do
13 in the turbine building?
14     A.    Stripping and mop the floors,
15 dust.
16     Q.    And did Mr. Yance assign you
17 and Ms. Sanders to the turbine building
18 for that six to eight weeks?
19     A.    Not all at once.  Every week.
20 He would assign us for one week, we come
21 back the next Monday, we're back on the
22 same assignment the following week for the
23 whole week; we'll come back again, and it

19 (Pages 184 to 187)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 188

1  continued between six to eight weeks.
2      Q.   But it was Mr. Yance who made
3  the assignment?
4      A.   That is correct.
5      Q.   What other evidence do you
6  have that the job assignments and overtime
7  awards were based on race?
8      A.   As I had said in the last
9  deposition, the time occurred where
10  overtime was asked, Stephanie and myself
11  said we wanted the overtime, John Wright,
12  white foreman, indicated that we could not
13  get the overtime, there was no more
14  overtime to be given; turned around, gave
15  the overtime to white female Tammy
16  Caldwell and white female Jennifer White,
17  who was not entitled to overtime because
18  overtime was for day shift.  You don't get
19  overtime on evening shift.  But he allowed
20  them to pre-shift, not for a fire watch,
21  but he allowed them to pre-shift to allow
22  them to get the overtime that he turned us
23  down for.

Page 189

1      Q.   What else?
2      A.   That's all I can recall at
3  this time.
4      Q.   Do you contend that Phillip
5  Avery retaliated against you in any way?
6      A.   Phillip Avery retaliated
7  against me right along with the group, the
8  foremen, the supervisors; yes, the same as
9  I explained before, all foremen had a hand
10  in it.
11      Q.   Are there any specific acts of
12  retaliation that you contend Mr. Avery
13  engaged in?
14      A.   None at this time.  Not
15  pertaining to me, but not at this time.
16      Q.   Are you contending that Shelly
17  Murrell retaliated against you?
18      A.   Oh, yeah.
19      Q.   Tell me how.
20      A.   Number one, Shelly and
21  Jennifer were good friends.
22      Also the last time during the
23  deposition I had explained about my

Page 190

1  personal business being put out.  And
2  Sharon Bestwick writes a little note on a
3  pad to you and slides it asking if
4  Jennifer was the job steward.  Okay.  So
5  now you have -- which she was not the job
6  steward at the time.  But you have this
7  white female that is not the job steward
8  to go in an office and look on my
9  paperwork and then discuss it with Deborah
10  about my overtime and my pay, and there's
11  no problem because Sharon wants to know if
12  she's job steward.  But then you have a
13  black female who is the job steward that
14  goes to a white female, Tammy Caldwell,
15  about some issues in the group, and then
16  everybody receives a DML.
17      Q.   What are you talking about the
18  situation with the black female going to
19  Tammy Caldwell and everyone receiving a
20  DML?
21      A.   I am not finished, I'm getting
22  to the rest of it.
23      So Shelly now, who is friends with

Page 191

1  Jennifer and allows Jennifer to put out
2  all this information, receive all this
3  information and go to the union president
4  about Janell's pay, Shelly right then was
5  wrong for allowing Jennifer to see my
6  paperwork, number one; number two, she
7  discusses my paperwork with Jennifer, who
8  is not a job steward; number three, she
9  singled me out when she lied about saying
10  that swapping job assignments when she
11  indicated in a meeting that she did not
12  want to be called at home for any reason.
13      She indicated in a morning briefing
14  one day not to be called at home late at
15  night, and that she was speaking for her
16  and the rest of the foremen.  But then
17  when the issue came up about swapping job
18  assignments, she then turned around and
19  said that I never called her at home.  So
20  you either want me to call you or you
21  don't want me to call you.
22      Q.   Is there anything else?
23      A.   She singled me out when she

20 (Pages 188 to 191)

Page 192

1　was in that meeting with Deborah and Mark
2　Freeman sitting there talking about the
3　hard hat and not paying attention when
4　that's something that she was assuming.
5　　　So as earlier as you stated, if I
6　was sure whether or not Deborah was the
7　one who went to the plant manager, it had
8　to have been one of the three to go to him
9　to indicate to him that I indicated in
10　that meeting that I didn't care whether I
11　kept my job or not.
12　　Q.　Is there anything else?
13　　A.　No.
14　　Q.　The first part of your
15　deposition you testified that Ms. Murrell
16　showed Jennifer Caldwell your confidential
17　paperwork -- or Tammy Caldwell, I'm sorry,
18　Tammy Caldwell your paperwork?
19　　A.　No. I said Jennifer White.
20　　Q.　So it was Jennifer White.
21　Okay.
22　　　And you said it was a request to
23　swap overtime for straight time?

Page 193

1　　A.　That is correct.
2　　Q.　And I asked you was that the
3　only thing contained on that paperwork,
4　and you said yes. Do you recall that?
5　　A.　I believe I said yes, to my
6　knowledge. I know I said that through a
7　lot, but, okay, if that's what you're
8　saying.
9　　Q.　Well, was there anything else
10　on that paperwork that you said Shelly
11　Murrell showed to Ms. White?
12　　A.　It was a piece of paperwork
13　for overtime, right, for straight time.
14　　Q.　A request --
15　　A.　A request, that is correct.
16　　Q.　-- to swap --
17　　A.　That is correct.
18　　Q.　-- overtime for straight time?
19　　A.　That is correct.
20　　Q.　What else was on that piece of
21　paper?
22　　A.　On that particular piece of
23　paper, that was it. That was the slip.

Page 194

1　　Q.　You mentioned earlier a
2　problem with an African-American female
3　making a report and then everyone getting
4　a DML. What are you referring to there?
5　　A.　I believe when I said
6　African-American I was talking about Doris
7　Ashford with the letter that she presented
8　to Tammy. And supposedly we received a
9　DML from something that we had nothing to
10　do with.
11　　Q.　You received a DML?
12　　A.　I received a DML, Stephanie
13　received probation.
14　　Q.　Ms. Sanders actually received
15　a written warning, correct?
16　　A.　If that's what you say she
17　did.
18　　Q.　Do you know what she received?
19　　A.　No. No.
20　　Q.　But that's what you were
21　referring to?
22　　A.　That's correct.
23　　Q.　And you said that Ms. Murrell

Page 195

1　retaliated against you in the 9 -- the
2　September 9 -- what we're calling the
3　September 9, 2005, meeting, I understand
4　you say you're not sure of that date, by
5　saying you had been wearing a hard hat and
6　not paying attention, that she was making
7　an assumption --
8　　A.　Right.
9　　Q.　-- is that correct? Is that
10　correct?
11　　A.　That's correct.
12　　Q.　So Ms. Murrell in that meeting
13　said that you had been wearing a hard hat
14　in the morning meetings and appeared to
15　not be paying attention?
16　　A.　That is correct.
17　　Q.　Okay.
18　　　That is how you say Ms. Murrell
19　retaliated against you, correct?
20　　A.　That is one of the ways.
21　　Q.　One of the ways that you just
22　discussed. Okay.
23　　　What is the protected activity that

21 (Pages 192 to 195)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 196

1  you say prompted Ms. Murrell to retaliate
2  against you by doing these things?
3      A.    Deborah Crutchfield, Sharon
4  Bestwick, Tammy Caldwell, Jennifer White.
5      Q.    You're going to have to
6  explain that to me. My question is what
7  is the protected activity?
8          MR. NEWMAN: If you don't know
9  what she means by a question, ask her to
10  explain it to you.
11     A.    Okay. Explain it.
12     Q.    What had you done to prompt or
13  to cause Ms. Murrell to show your
14  paperwork to Ms. White?
15     A.    I have not done anything to
16  Ms. Murrell for her to show my paperwork
17  to Ms. White. She had no business showing
18  any paperwork to Ms. White. She was not
19  the job steward, she's not in payroll.
20     Q.    What had you done to prompt
21  Ms. Murrell to first say in the morning
22  briefings, do not call me at night, and
23  then for her to turn around and say that

Page 197

1  she didn't say that?
2      A.    I did not do anything. An
3  incident had occurred with Darren
4  Williams, and she came in the next day and
5  mentioned in morning briefing about being
6  called at home late at night, and she
7  believed she can speak for the rest of the
8  foremen.
9      Q.    What had you done to cause or
10  prompt Ms. Murrell to say in the -- what
11  we call the September 9, 2005, meeting
12  that you had been wearing your hard hat in
13  the morning meetings and had appeared to
14  not be paying attention?
15     A.    What prompted was the fact
16  that I was on a DML and so any little
17  thing that I did was -- or assumed that I
18  did was mentioned or stated. You know, I
19  was under DML, that's all that they
20  needed.
21     Q.    How did your race relate or
22  tie into all these things that you say
23  Ms. Murrell did?

Page 198

1      A.    My race ties into that
2  because, number one, the charges brought
3  against me are false; number two, I should
4  not have received a DML for an
5  investigation that was not done
6  thoroughly; number three, you have white
7  females that have done some terrible
8  things that are not appropriate for the
9  work environment, but yet they're not even
10  given a probation or anything. And if
11  their behavior is wrong, and the
12  supervisor calls a meeting and indicates
13  how wrong it was, and they're still not
14  being punished for it, but yet you turn
15  around and try to punish me for something
16  that you don't have any evidence on,
17  that's how she plays a part in it; because
18  they are her friends.
19         MS. SHARP: Let's take a short
20  break.
21         (Recess was taken.)
22     Q.    Miss McDowell, you, right
23  before our break, mentioned that the

Page 199

1  investigation was not done thoroughly.
2  What do you mean by that?
3      A.    I mean that when I went in to
4  speak with Sharon, I was never told what
5  that investigation was pertaining to. So
6  when the question was asked did I ask
7  Doris to speak to Tammy Caldwell, and I
8  did not give a yes or no answer, what I
9  was told from Doris, as far as her
10  speaking to Tammy, was about her being in
11  the office. I later found out that Doris
12  had went to Tammy with some other things
13  that I had no knowledge of.
14     Q.    Is that all, the only reason
15  you said the investigation wasn't
16  thorough?
17     A.    No.
18     Q.    It wasn't thorough because
19  when Sharon Bestwick was taking her notes,
20  she paused, typed down certain things, I
21  don't know what she typed down; she never
22  came back to verify is this what you're
23  saying. She never specified exactly what

22 (Pages 196 to 199)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 200

1  she was investigating.
2      Also, when I came back and said that
3  I had nothing to do with that and asked
4  them to look into it, to continue the
5  investigation, it was never done because
6  they were going on her word. I don't know
7  what she typed down.
8      Q.  You said you told someone that
9  you found out something different about
10  the investigation than what you believe.
11  Who were you talking to?
12     A.  I told -- No. I told Randy
13  Johnson in a meeting that I had absolutely
14  nothing to do with Doris presenting Tammy
15  with that letter and what was in that
16  letter.
17     When I -- I asked Doris several
18  occasions what was in the letter after the
19  DML.
20     Q.  When did you tell Randy
21  Johnson that you had nothing to do with
22  the letter that Doris Ashford gave to
23  Ms. Caldwell?

Page 201

1      A.  I told him that after I had my
2  day off I believe.
3      Q.  So that was after you had
4  received discipline at the end of the
5  investigation?
6      A.  I received discipline, that is
7  correct.
8      Q.  And Randy Johnson told you
9  that the discipline was being issued based
10  on the investigation, correct?
11     A.  That is correct.
12     Q.  Is there any other reason you
13  say the investigation was not thorough
14  that you haven't told me about today or
15  previously in your deposition?
16     A.  That's all that I know at this
17  time.
18     Q.  You mentioned before we took a
19  break that white females did inappropriate
20  things at work with no discipline given.
21  Are those the things that you've already
22  told me about or is there something else?
23     A.  There's other things that you

Page 202

1  already marked as an exhibit, 7.
2      Q.  Okay.
3      Are all those things reflected in
4  Exhibit 7?
5      A.  Not all. But there are some
6  things in the exhibit. There are extra
7  things in here that was not mentioned
8  prior, yes.
9      Q.  Let me clarify this for the
10  Record: Exhibit 7 plus what you have told
11  me equals the things that you said white
12  females did that were inappropriate for
13  which they were not disciplined?
14     A.  Yes.
15     Q.  In the first paragraph, when
16  you talk about the investigation, you say
17  so when a direct answer was not given, I
18  was under the assumption, blah, blah,
19  blah, what do you mean, so when a direct
20  answer was not given, what are you
21  referring to there?
22     A.  Because she asked if I sent
23  Doris to talk to Tammy, and I didn't

Page 203

1  answer her yes or no.
2      Q.  Why not?
3      A.  Because I already knew that
4  Doris Ashford was going to speak to Tammy.
5  I already knew that. But I did not send
6  Doris. Doris indicated to Stephanie and
7  myself that she was going to speak to
8  Tammy about being in the office. She
9  stopped Stephanie and I and said, I have a
10  question to ask you, do you think Tammy
11  and Jennifer stays in the office too much.
12  The answer was yes. It was a question
13  that was asked and that was the answer
14  that was given.
15     She said I had asked the whole
16  group -- she said, y'all are the last two
17  that I've asked, I have asked the whole
18  group except Pam and Sam because they are
19  painting right now and I can't get to
20  them. So if she asked everybody else
21  except Pam and Sam prior to Stephanie and
22  myself, then how is it that I sent her to
23  go speak to Tammy about staying in the

23 (Pages 200 to 203)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 204

1  office?
2      Q.   So the direct answer to
3  Ms. Bestwick's question was no?
4      A.   No.  I did not send her, no.
5      Q.   Did you tell Ms. Bestwick
6  that?
7      A.   I didn't answer Ms. Bestwick
8  with a yes or no.  What I said to her was
9  that that was Doris' job to go to the --
10  to go to Tommy as a job steward; because I
11  knew, I had knowledge of Doris going to
12  Tammy.  So there's a difference.  I didn't
13  send Doris, I had knowledge; Doris already
14  told me she was going to Tammy.
15      Q.   So why didn't you tell
16  Ms. Bestwick that?
17      A.   Because, like I said, when the
18  question was presented, we thought we were
19  going to Ms. Bestwick because of Phyllis'
20  dress attire.  So when Doris came in the
21  smoke area and said to me, Stephanie, and
22  Phyllis, I have an idea, I was thinking
23  about getting with A.G. and Bob Scamp and

Page 205

1  going and sitting down with Tammy and
2  talking to Tammy about being in the
3  office.
4      So when Doris went to Tammy, I
5  wasn't even on day shift, I was on evening
6  shift, number one; number two, I was under
7  the assumption that she went with A.G. and
8  Bob Scamp because that's what she stated
9  in the smoke area.  So if the union
10  president and the union vice president was
11  going with her as what she had told us
12  that was going to happen, then I'm under
13  the assumption it's okay.  I knew about
14  it, and that's why I told Sharon.  That's
15  her job.
16      Q.   But if you were under the
17  assumption it was okay, why didn't you
18  answer Ms. Bestwick's question?
19      A.   I answered it the way that I
20  wanted to answer it that day, the best to
21  my knowledge.  When she asked me that
22  question, I said that was Doris' job.
23      Q.   Under the second paragraph

Page 206

1  starting with Tammy Caldwell and talking
2  about her being allowed to swap job
3  assignments, we've already discussed that,
4  correct?
5      A.   Correct.
6      Q.   In paragraph three starting --
7  the sentence starts with Deborah
8  Crutchfield, you are saying -- These are
9  your typewritten notes, correct?
10      A.   That's correct.
11      Q.   And you said you typed these
12  up the day that I last deposed you?
13      A.   That is correct.
14      Q.   You are saying here that Jim
15  Parrish told Ms. Sanders that Tammy --
16  that's Tammy Caldwell, right?
17      A.   Uh-huh (positive response).
18      Q.   -- informed Sharon Bestwick
19  that when she walked in the break room
20  everyone stopped talking?
21      A.   That is correct.
22      Q.   And your question is:  So does
23  that apply to them when we walk in the

Page 207

1  break room.  And you're saying that when
2  you and Ms. Sanders walked in the break
3  room people stopped talking?
4      A.   When Ms. Sanders, myself, and
5  Phyllis walked in the break room during
6  this investigation, Deborah, Jennifer, and
7  Tammy were in the break room laughing and
8  having a good time.  When we walked in,
9  everybody just stopped talking, laughing,
10  and having a good time.
11      Q.   Okay.  Who did you report that
12  to?
13      A.   Let me see.  No one.
14      I took notes.
15      Q.   The fourth paragraph, John
16  Wright calls Cheri Collins, have we
17  already talked about this situation?
18      A.   That is correct.
19      Q.   The Shelly Murrell paragraph,
20  five, paragraph five, have we already
21  discussed this?
22      A.   Yes.
23      Q.   The last paragraph on the page

24 (Pages 204 to 207)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 208

1 beginning with Bill Barber, have we
2 already discussed that?
3     A.    Yes.
4     Q.    Over on page -- what I think
5 is page two, they're not -- the pages are
6 not numbered.  But what I have as page two
7 begins with Sanders period, correct?
8     A.    Correct.
9     Q.    First paragraph on that --
10 full paragraph on that page that begins
11 Bill Barber, white male, have we discussed
12 this situation?
13     A.    No.
14     Q.    Tell me -- Is this the
15 situation where Angela Smith-Peters says
16 she can get her job assignment changed by
17 Bill Barber, correct?
18     A.    That is correct.
19     Q.    And Ms. Smith-Peters was a
20 helper?
21     A.    That is correct.
22     Q.    Is she still employed at the
23 plant?

Page 209

1     A.    No.
2     Q.    Are you aware if
3 Ms. Smith-Peters received discipline while
4 she was employed?
5     A.    Yes.
6     Q.    Are you aware if Bill Barber
7 received discipline?
8     A.    Discipline for?
9     Q.    This situation or any related
10 situation that you're describing here.
11     A.    About the changing of job
12 assignments?
13     Q.    Yes.
14     A.    No, he wasn't disciplined for
15 that.
16     Q.    Do you know of any situation
17 in which Mr. Barber was disciplined?
18     A.    No.
19     Q.    Did you complain about Bill
20 Barber changing this job assignment for
21 Ms. Smith-Peters?
22     A.    No.
23     Q.    You just made the note?

Page 210

1     A.    Yes.
2     Q.    And this is the note you made?
3     A.    Yes.
4     Q.    And you only made this the day
5 that I began taking your deposition,
6 correct?
7     A.    Yes.
8     Q.    The next paragraph begins:
9 When Jackie Cureton.  How do you know
10 about this situation?
11     A.    Through Doris Ashford who then
12 in turn we spoke to Deborah briefly, and
13 Deborah indicated that she was going to
14 hold off with her resignation because she
15 at least wanted Jackie to get her PPP
16 check.
17     Q.    So Deborah Crutchfield told
18 you that?
19     A.    Told me and Stephanie Sanders
20 that.
21     Q.    Okay.  And this was fall of
22 2004?
23     A.    That's correct.

Page 211

1     Q.    Okay.
2 How is it, Miss McDowell, that you
3 say that this situation involving Jackie
4 Cureton and Deborah Crutchfield ties into
5 your lawsuit?
6     A.    Well, here she's willing to go
7 and help a white woman, she's not trying
8 to help me as a black woman.
9     Q.    You were terminated, correct?
10     A.    Correct.
11     Q.    Ms. Cureton resigned?
12     A.    That is correct.
13     Q.    And the next paragraph that
14 starts John Wright, and it talks about him
15 taking three days of assigned outage fire
16 watches from Jackie Cureton and giving
17 them to yourself and Ms. Sanders.  Do you
18 know why Mr. Wright made that
19 reassignment?
20     A.    I believe you asked that
21 question before, and the answer is no.
22     Q.    Did you complain about
23 Mr. Wright making that reassignment?

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

|  | Page 212 |
|---|---|

1    A.    I can't recall.
2    Q.    This next paragraph, Don
3  Grissette, have we already talked about
4  this situation?
5    A.    Yes, we have.
6    Q.    And you say Mr. Grissette has
7  a friendship with Tim Wilson?
8    A.    Yes, he does.
9    Q.    Why do you say that
10  Mr. Grissette has a friendship with
11  Mr. Wilson, what do you mean by that?
12    A.    Tim Wilson told me that him
13  and Don Grissette were very good friends.
14    Q.    When did he tell you that?
15    A.    Prior to the April 1 incident
16  with him and me and Stephanie in the
17  cafeteria.
18    Q.    This next paragraph that also
19  begins Don Grissette, have you already
20  told me about this situation that you're
21  describing?
22    A.    That is the situation -- I
23  told you about that during the last

|  | Page 213 |
|---|---|

1  deposition. I told you about that during
2  Derrick Henderson's deposition.
3    Q.    Did you file a grievance
4  related to this situation?
5    A.    No, a grievance wasn't filed.
6    Q.    Did you file an employee
7  concern related to this situation?
8    A.    No.
9    Q.    Did you file a charge, an EEOC
10  charge, related to this situation?
11    A.    No.
12    Q.    When was it that you say that
13  you and Ms. Sanders had signed on a work
14  schedule to work together?
15    A.    At the end of every year you
16  sign a work schedule, and we've been
17  paired up for the last, I believe, was
18  three years. So we were work partners for
19  the last three years.
20    Q.    Three years from the date --
21    A.    Prior to me being terminated.
22    Q.    Okay.
23    This next paragraph beginning B.J.

|  | Page 214 |
|---|---|

1  Yance, how does this situation relate to
2  your lawsuit?
3    A.    Because this ties in from the
4  very beginning with the Tim and Don
5  Grissette issue where we were retaliated
6  against and was told to separate us and
7  single us out. And he was just doing what
8  he was told.
9    Q.    Who was doing what he was
10  told?
11    A.    The person that you just
12  mentioned, Mr. B.J. Yance.
13    Q.    And you say -- Are you saying
14  that he retaliated against you by never
15  informing management that ice and Gatorade
16  were in the cooler?
17    A.    Repeat the question.
18    Q.    You say this shows how he,
19  Mr. Yance, retaliated against you. And my
20  question is the retaliation the fact that
21  he did not tell management that ice and
22  Gatorade was in the cooler you two were
23  carrying?

|  | Page 215 |
|---|---|

1    A.    He retaliated against us --
2  Yes.
3    Q.    Okay.
4    So you received discipline for this
5  situation?
6    A.    It led into a couple of
7  things. They tried to give me discipline,
8  but it didn't work. They tried to write
9  me up, but their tactics didn't work.
10    Q.    So you were not written up?
11    A.    I was written up, but it was
12  torn up.
13    Q.    The next situation we've
14  already talked about, is that correct, the
15  assignment to the turbine building?
16    A.    That is correct.
17    Q.    But you also in here talk
18  about white employees' time in the turbine
19  building being reduced; is that correct?
20    A.    That is correct.
21    Q.    Why do you -- Strike that.
22    Do you contend that those job
23  assignment adjustments were made based on

26 (Pages 212 to 215)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

| Page 216 | Page 218 |
|---|---|
| 1  race?<br>2     A.    Yes.<br>3     Q.    Why?<br>4     A.    Because that's what Mr. B.J.<br>5  Yance who was some distant cousin to<br>6  Jonathan Nall, Brad Knighton he played<br>7  favoritism to; Luan Stevens he played<br>8  favoritism to. When Stephanie and I were<br>9  in the turbine building we -- our time was<br>10  longer, when they were in the turbine<br>11  building they were either pulled out or<br>12  time being reduced.<br>13     If it wasn't because of race or<br>14  color, then why couldn't our time be<br>15  reduced and their time increased?<br>16     Q.    Is there any other reason that<br>17  you say that this was based on race?<br>18     A.    No.<br>19     Q.    Have we already talked about<br>20  this next paragraph that begins Deborah<br>21  Crutchfield?<br>22     A.    I don't recall.  I don't know.<br>23     Q.    When did this take place? | 1     Q.    Now, this next paragraph that<br>2  begins Randy Johnson, in parentheses<br>3  you've got white plant manager, all caps,<br>4  underlined, and in bold.  Why did you do<br>5  that?<br>6     A.    Because he is the plant<br>7  manager, and I wanted it to be known that<br>8  he is the plant manager.  What he<br>9  disciplined me for, he turned around and<br>10  did himself and was not disciplined for<br>11  it.<br>12     Q.    And that's why you put white<br>13  plant manager in all caps, underlined, in<br>14  bold?<br>15     A.    Uh-huh (positive response).<br>16     Q.    Now, your discipline was not<br>17  simply for not speaking to a white<br>18  coworker, was it?  Didn't we look at your<br>19  discipline last time?<br>20     A.    When I went in for my<br>21  discipline, that was what -- the first<br>22  thing that came out of his mouth, that it<br>23  created a hostile work environment. |

| Page 217 | Page 219 |
|---|---|
| 1     A.    During the whole Tim<br>2  Wilson/Don Grissette incident.<br>3     Q.    Was it before that incident?<br>4     A.    I don't recall.<br>5     Q.    The next paragraph that starts<br>6  with Mark Freeman, have we discussed that?<br>7     A.    About falsifying the<br>8  documents, yes.<br>9     Q.    Did you complain to anyone<br>10  about Mr. Freeman's allegation or<br>11  accusation?<br>12     A.    I complained to Deborah.<br>13     Q.    And what did she say to you?<br>14     A.    Exactly what it states there.<br>15  We went to Deborah and she became upset<br>16  because she said Jim Parrish wanted her to<br>17  write up Mark.<br>18     Q.    For that situation?<br>19     A.    Prior to the incident.<br>20     Q.    So what did she say about your<br>21  situation?<br>22     A.    That she was going to talk<br>23  with Mark and see what had happened. | 1     Q.    But that was not the only<br>2  thing that your discipline was based on.<br>3     A.    It was not the only thing, but<br>4  it was mentioned.<br>5     Q.    Did you complain that<br>6  Mr. Johnson did not -- shook everyone's --<br>7  is it supposed to be shook everyone's<br>8  hand?<br>9     A.    It could be.  It's a rough<br>10  draft.<br>11     Uh-huh (positive response).<br>12     Q.    It should be shook everyone's<br>13  hand?<br>14     A.    Uh-huh (positive response).<br>15     Q.    Did you complain that<br>16  Mr. Johnson did not shake Mr. Stovall's<br>17  hand at this Christmas party?<br>18     A.    No.<br>19     Q.    This next paragraph that<br>20  begins Phyllis Hughes says:  Phyllis<br>21  Hughes, white female, is discriminated<br>22  against because she associated with Janell<br>23  and Stephanie. |

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 220

1    What evidence do you have to support
2    this allegation?
3        A.    The evidence I indicated
4    before, number one, that Deborah asked her
5    why was she taking the fall for the letter
6    on the spider picture. I mean, which we
7    didn't have anything to do with that.
8        Q.    But you're saying Ms. Hughes
9    is being discriminated against --
10        A.    She is being discriminated
11    against because she's associated with us,
12    they're assuming that she is doing these
13    things.
14        Q.    She admit -- didn't --
15        A.    I don't know what she
16    admitted.
17        Q.    Did you not identify Phyllis
18    Hughes as having put the spider picture up
19    in the investigation?
20        A.    What Sharon asked me was who
21    put the picture up. I told her I didn't
22    know, that I thought -- I didn't tell her
23    definitely, I told her when I went to fire

Page 221

1    watch and came back, the picture was
2    posted on the board.
3        Q.    And you testified that
4    Ms. Hughes said she told Deborah
5    Crutchfield that she was responsible for
6    the picture, correct?
7        A.    I testified that when?
8        Q.    Earlier in your deposition.
9        A.    I don't recall that.
10        Q.    What did you testify to
11    earlier that Deborah Crutchfield called
12    Ms. Hughes and said why did you take the
13    fall?
14        A.    Oh, I thought you said -- I
15    thought you said something else.
16        I testified that Deborah called
17    Ms. Hughes and asked her why did she take
18    the fall for the picture by herself.
19        And Phyllis turned around and told
20    her that she didn't know anything about
21    the picture -- not the picture, the
22    letter. I'm sorry, it's the letter. And
23    Phyllis told her that she didn't know

Page 222

1    anything about the letter, that we did not
2    do that letter. That's what I testified
3    to.
4        Q.    Okay. Do you now know whether
5    Ms. Hughes had posted that spider picture?
6        A.    Do I know for sure? I'm just
7    going by what was said, yeah. I guess so,
8    yes.
9        Q.    Who said it?
10        A.    Phyllis said that she was
11    accused of posting the picture and her
12    handwriting being on the picture, but she
13    also had indicated that her handwriting
14    wasn't the only handwriting that was on
15    the picture, so.
16        Q.    So she had some responsibility
17    for the picture, correct?
18        A.    The writing on the picture?
19        The writing on the picture?
20        Q.    Yes, ma'am.
21        A.    Yes.
22        Q.    So explain to me why you say
23    Phyllis Hughes is discriminated against

Page 223

1    because she associated with Janell and
2    Stephanie.
3        A.    That's just not the only
4    thing. You're looking at the picture.
5    There has been other things that has
6    occurred because Phyllis has been
7    associating with Stephanie and Janell.
8        Q.    And that's --
9        A.    That she had been
10    discriminated about. But I don't think
11    that that's anything pertaining to why I'm
12    being discriminated against.
13        Q.    But, Miss McDowell, you put it
14    in your document related to your lawsuit
15    of discrimination, so that's why I'm
16    asking you.
17        So what is it that you say that
18    supports your allegation that Ms. Hughes
19    was discriminated against because she
20    associated herself with yourself and
21    Ms. Sanders?
22        A.    Because Phyllis started being
23    picked on in certain incidents. She

28 (Pages 220 to 223)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 224

1  started being singled out in certain
2  incidents. The issue with her attire, her
3  clothes attire, was made a big issue,
4  that's what I was talking about.
5      She was initially -- This whole
6  thing supposedly came about, her dress
7  attire and the way she came to work, it
8  wasn't just about the writing on the
9  picture. That's not how the issue had
10 started.
11     Q.  So was it the dress attire
12 that started her being picked on?
13     A.  Not from the beginning. But
14 for this incident about with the
15 discipline and the DML, it started out
16 with Phyllis and her attire, the way
17 she came to work one day.
18     Q.  So you think it was
19 inappropriate to have disciplined her for
20 her work attire?
21     A.  No. Because she didn't work
22 in her clothes. She came to work in those
23 clothes; she did not perform her duties in

Page 225

1  those clothes.
2      Q.  So you think the discipline
3  was wrong?
4      A.  Yes.
5      Q.  And you think the reason that
6  she was disciplined was because she was
7  associating with you and Ms. Sanders?
8      A.  Yes.
9      Q.  What evidence do you have to
10 support that?
11     A.  Just evidence that how I see
12 -- things that I see in how they were
13 treating her compared to other people;
14 mistreating her because of the fact that
15 she was associated not only with Stephanie
16 and myself but just other black people,
17 you know, that Phyllis constantly said she
18 didn't see color.
19     Q.  Is there any other reason?
20     A.  Seeing is enough.
21         MR. NEWMAN:  Just answer her
22 question yes or no.
23     A.  Yes.

Page 226

1      Q.  Your answer is yes there are
2  other reasons?
3      A.  No. No. There are no other
4  reasons, just seeing.
5      Q.  This next paragraph that
6  begins Jonathan Nall, and your statement
7  is: Jonathan Nall, white male,
8  handwriting is on a picture of a spider
9  that Sharon Bestwick, human resource
10 representative, white female, tries to
11 incriminate Janell McDowell, black female,
12 of printing off a picture of a spider that
13 supposedly Phyllis Hughes, white female,
14 used to write a hostile message on.
15     Did you tell Ms. Bestwick
16 Mr. Nall's handwriting was on the picture?
17     A.  I told her that I believe it
18 was his handwriting.
19     Q.  Did you tell Ms. Bestwick the
20 reason the picture was printed off in the
21 first place?
22     A.  Yes, I did.
23     Q.  Why do you say that

Page 227

1  Ms. Bestwick tries to incriminate you?
2      A.  Because when I went into that
3  meeting she tried to indicate that the
4  picture was just printed off solely so
5  that somebody can write on it and post it
6  up on the board for Tammy Nall (sic).
7  When I explained to her that the picture,
8  it was not just a picture of a spider, it
9  was a picture with several other pictures
10 with it and that that paperwork had been
11 sitting on that desk in the break room for
12 several weeks, that it was not
13 specifically printed off for the Tammy
14 Caldwell purpose.
15     Q.  Do you know if anyone had told
16 Ms. Bestwick prior to you explaining that
17 when the picture had been printed off and
18 for what purpose it had been printed off?
19     A.  No.
20     Q.  And you mentioned Tammy Nall
21 earlier, are you still talking about Tammy
22 Caldwell?
23     A.  Tammy Caldwell.

29 (Pages 224 to 227)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 228

1    Q.    The top of the next page you
2    have -- looks like a different section.
3    It says: What blacks done versus whites
4    and receive more egregious discipline.
5         Is that the next page you have in
6    your stack on Exhibit 7?
7    A.    Yes.
8    Q.    Your first paragraph speaks to
9    black females in security were not
10   accommodated with pregnancy while white
11   females were.
12        How does this relate to your claim
13   that you were discriminated against or
14   retaliated against?
15   A.    It relates to discrimination,
16   period. There is a discrimination problem
17   going on not only with me but other
18   people, but discrimination is going on.
19   Q.    So this didn't happen to you?
20   A.    No.
21   Q.    When did this situation that
22   you're describing take place?
23   A.    When a black female, Angelica,

Page 229

1    in security was pregnant, she wasn't
2    accommodated, but white females like
3    Tracey Morris and Luan Stevens and Ashley
4    Keith were accommodated with their jobs.
5    Q.    You said Angelica is the
6    African-American female?
7    A.    That's correct.
8    Q.    What is her last name?
9    A.    I don't recall.
10   Q.    How do you know she was not
11   accommodated?
12   A.    She told me.
13   Q.    When did she tell you this?
14   A.    During her pregnancy.
15   Q.    Was it at work?
16   A.    Yes.
17   Q.    Is she still employed?
18   A.    I don't know.
19   Q.    Was she still employed when
20   you were terminated?
21   A.    Yes.
22   Q.    Aside from Angelica what other
23   black females in security were not

Page 230

1    accommodated?
2    A.    I don't recall right now.
3    Q.    Were there any other black
4    females that you're aware of that were not
5    accommodated?
6    A.    There could be, I don't know
7    at this time. I don't know.
8    Q.    Next paragraph, Angela Smith
9    gets in air lock and goes on a rampage
10   about how stupid management is regarding a
11   schedule, and she was talking to you and
12   Chris Stovall, and Mark Freeman does not
13   say a word. When did this occur?
14   A.    During the 2004 outage. I was
15   operating the air lock.
16   Q.    So you heard Ms. Smith's
17   comments?
18   A.    Yes, I did.
19   Q.    And did you say Mark Freeman heard
20   her comments?
21   A.    Yes, he did.
22   Q.    And are you saying that
23   Ms. Smith was not disciplined for her

Page 231

1    comments?
2    A.    That is correct.
3    Q.    What black employee spoke in a
4    similar manner and was disciplined?
5    A.    Chris Stovall threw down his
6    hard hat. I'm not saying that he spoke in
7    a similar manner, because it wasn't equal,
8    and he received an eighteen-month DML for
9    throwing his hard hat down.
10   Q.    Okay, Chris Stovall. What
11   black employees spoke in a similar manner
12   and were not disciplined?
13   A.    I don't know of any black
14   employee that spoke in a similar manner
15   and was not disciplined.
16   Q.    The next paragraph, did you
17   report Bill Barber for sexual harassment?
18   A.    No.
19   Q.    Was Derrick Henderson reported
20   for sexual harassment?
21   A.    Yes.
22   Q.    Next paragraph, Don Grissette
23   sends Farley employees to drop some tables

30 (Pages 228 to 231)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 232

1 and chairs off during normal work hours
2 for his party; however, he is not
3 questioned about his actions.
4        What was egregious about
5 Mr. Grissette's actions?
6        A.    I thought Farley employees was
7 supposed to be for working for Farley?  I
8 didn't know that we could go to
9 management's house and set up for parties.
10        Q.    What kind of party was it?
11        A.    I don't know what kind of
12 party it was.
13        Q.    Do you know if it was a
14 community party?
15        A.    I don't know what kind of
16 party it is.
17        Q.    Do you know if --
18        A.    But it was Farley employees on
19 Farley time.
20        Q.    Do you know if Mr. Grissette's
21 responsibilities as plant manager for
22 Plant Farley require him to interact with
23 the community?

Page 233

1        A.    I understand you're supposed
2 to act with the community.
3        Q.    Do you know whether he's
4 required or expected to interact on a
5 social basis with the people in the
6 community?
7        A.    Yes.
8        Q.    Do you know if this party was
9 such an interaction?
10        A.    No, I do not.
11        Q.    Next paragraph, Jamie Johnson,
12 while male friend of Randy Johnson and
13 husband to human resource director Chere
14 Johnson, goes into a confined space alone.
15 He comes up out of the hole vomiting,
16 about to pass out, and is not reprimanded.
17        Is Mr. Johnson a helper?
18        A.    No.  He's an SO.
19        Q.    Do you know why he went into
20 the confined space alone?
21        A.    It doesn't matter.  The policy
22 says don't go in a confined space by
23 yourself.

Page 234

1        Q.    And do you know whether he
2 went in as part of his job
3 responsibilities?
4        A.    Not by himself.  There's no
5 job that you go in a confined space by
6 yourself, according to policy.
7        Q.    You know all the SO's job
8 responsibilities?
9        A.    I know a confined space, and
10 no one is supposed to go in a confined
11 space by himself.
12        Q.    Did you report Mr. Johnson's
13 conduct?
14        A.    No.
15        Q.    Jennifer White, white female,
16 places toilette paper on table to Janell
17 and Stephanie about going in the office
18 and brown nosing, yet she turns around and
19 reports them for harassing her by putting
20 out toilette paper and this information is
21 used by Sharon Bestwick, human resource
22 representative, white female, to justify
23 terminating Janell employment benefits.

Page 235

1        When did this action by Jennifer
2 White take place?
3        A.    It has taken place throughout
4 -- I mean -- It's just something that has
5 been done throughout Farley -- my
6 employment there, you know, in a helper
7 group when we transition to that side.  I
8 don't have an exact date, but she has done
9 it.
10        Q.    You're saying Ms. White did it
11 more than one time?
12        A.    Yes.
13        Q.    Did you report Ms. White each
14 time she did it?
15        A.    No.
16        Q.    Did you report Ms. White any
17 time she did it?
18        A.    No.
19        Q.    Jonathan Nall, white male,
20 gets caught playing a guitar, jumping off
21 a table like he is in concert and is not
22 reprimanded.
23        When did this occur?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 236

1    A.    One time on back shift.
2    Q.    Time frame?
3    A.    Don't know the time frame.
4    They had been paging him for a while and
5    couldn't get ahold of him. So they
6    decided to walk down to the building, it
7    was Antonio Bedford walked down to the
8    building, and saw him playing a guitar.
9    Q.    Who is Mr. Bedford?
10    A.    He was the shift supervisor at
11    that time.
12    Q.    So did you see Mr. Nall doing
13    this?
14    A.    No.
15    Q.    How do you know that he did
16    this?
17    A.    Tammy Caldwell told me.
18    Q.    And I'm assuming since you
19    didn't see it, you didn't report Mr. Nall?
20    A.    Since I didn't see it -- If I
21    did see it I wasn't going to report it.
22    Q.    Jonathan Nall called Sharon
23    Bestwick to inform her he missed his AA

Page 237

1    meeting due to him watching a race on TV.
2    He told Stephanie and Janell that Sharon
3    Bestwick told him not to worry about it.
4    The meetings are mandatory and could not
5    be missed.
6        When did this take place?
7    A.    One day Phyllis was discussing
8    in the break room that she called Sharon,
9    that, you know, she had to miss a meeting,
10    and Sharon told her that she couldn't miss
11    a meeting, it was mandatory. I don't know
12    the details pertaining to it.
13        Jonathan and Brad was in the break
14    room, and Jonathan indicated that he had
15    missed the meeting, he got caught up in
16    the game; he called Sharon, and Sharon
17    told him not to worry about it.
18    Q.    Sharon Bestwick?
19    A.    That is correct.
20    Q.    And let me ask you, you said
21    Ms. Hughes said that she needed to miss a
22    meeting?
23    A.    That is correct.

Page 238

1    Q.    An AA meeting?
2    A.    That is correct.
3    Q.    Why did Ms. Hughes need to
4    report to Ms. Bestwick or anyone that she
5    needed to miss an AA meeting?
6    A.    You have to speak to
7    Ms. Hughes about that.
8    Q.    So you don't know the
9    circumstances?
10    A.    Huh-uh (negative response).
11    Q.    Likewise, with Jonathan Nall,
12    do you know why he would need to report to
13    anyone in management or Ms. Bestwick that
14    he needed to miss an AA meeting?
15    A.    All I was told from them that
16    it was mandatory and that they had to
17    call. That's all I know.
18    Q.    Your next paragraph also
19    relates to Jonathan Nall, and it relates
20    to him putting a Bush Hog in the river
21    three times in one day and does not
22    receive a urinalysis. When does this take
23    place?

Page 239

1    A.    I don't know the exact date.
2    Q.    How do you know about this
3    situation?
4    A.    I was down at the river.
5    Q.    You saw it?
6    A.    Yes.
7    Q.    Did you report it?
8    A.    There was no need to report
9    it, because they had to get somebody to
10    come and get him out so it was reported to
11    foremen.
12    Q.    And how do you know that he
13    did not receive a urinalysis?
14    A.    He told me.
15    Q.    When did he tell you that?
16    A.    I don't know.
17    Q.    Do you know whether he was
18    required to go for a fitness for duty
19    examination?
20    A.    He who?
21    Q.    Mr. Nall.
22    A.    No, I don't know.
23    Q.    Prince Patton is your next

32 (Pages 236 to 239)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 240

1  paragraph -- is the person whom you
2  discuss in your next paragraph. You say:
3  Prince Patton, white male, had several
4  charges of sexual harassment against him
5  and is still gainfully employed.
6      When did Mr. Patton have several
7  charges of sexual harassment against him?
8      A.   I don't know the exact time
9  frame.
10     Q.   How do you know that
11 Mr. Patton had several charges of sexual
12 harassment against him?
13     A.   Because it came out through
14 Tammy and Jennifer.
15     Q.   What came out through them?
16     A.   That a female had charges on
17 him, several females in HP had charges of
18 sexual harassment out on him.
19     Q.   How did Tammy and Jennifer
20 know this?
21     A.   You have to ask Tammy and
22 Jennifer.
23     Q.   You don't know?

Page 241

1      A.   No.
2      Q.   Reinhardt, white male, tells
3  another male to suck his lower anatomy in
4  front of two black females and receives
5  twelve months probation.
6      When did this happen?
7      A.   After I received my DML I
8  believe or -- I believe, I'm not sure.
9      Q.   How do you know about this?
10     A.   Through Luan Stevens.
11     Q.   And Tammy Caldwell brings in
12 inappropriate cake to work, tells Janell
13 McDowell her slate was wiped clean.
14     Did we talk about this?
15     A.   Yes.
16     Q.   Did you report that
17 Ms. Caldwell brought in the inappropriate
18 cake?
19     A.   I didn't report it, but an
20 investigation was launched, and I did
21 indicate in there that she was the one who
22 brought in the cake.
23     Q.   So you -- In the investigation

Page 242

1  you reported that Ms. Caldwell brought in
2  the cake?
3      A.   That is correct.
4      Q.   Tammy Caldwell sends Jim
5  Parrish an email and refers to him by
6  "Hey."
7      How is that egregious conduct?
8      A.   Because she was allowed to
9  refer to him as "Hey," but then when a
10 black man says "he," he's told that to
11 address him by Mr. Parrish or Jim Parrish.
12     Q.   So are you saying the
13 egregious conduct is --
14     A.   Why is she allowed to say
15 "hey" in a friendly manner and he can't
16 refer to him as "he." And then he turns
17 around and receives an eighteen-month DML
18 during this whole process for telling
19 somebody that they entitled to union
20 representation.
21     Q.   Do you know if that is the
22 only reason Mr. Russ received a DML?
23     A.   According to Mr. Russ.

Page 243

1      Q.   You did not see the paperwork?
2      A.   No.
3      Q.   The next paragraph begins with
4  Tammy Caldwell, did we discuss that in
5  your earlier deposition?
6      A.   Yes.
7      Q.   Tim Wilson is the subject of
8  the next paragraph, tells Deborah
9  Caldwell -- calls Deborah -- tells
10 calls -- should be calls?
11     A.   Calls.
12     Q.   Calls Deborah Crutchfield a
13 stupid bitch and does not get reprimanded.
14 When did that happen?
15     A.   It was during one of the
16 outages, I believe it was 2003.
17     Q.   Did you report that?
18     A.   No.
19     Q.   Did you witness it?
20     A.   No. But Deborah told --
21 Deborah told me.
22     Q.   Tammy Caldwell, Jennifer
23 White, and Hayden corners Ashley Key to

33 (Pages 240 to 243)

Page 244

1    intimate her. When did that happen?
2        A.    I don't have a date.
3        Q.    Do you know if Ms. Key made a
4    complaint about this situation?
5        A.    No, I don't.
6        Q.    Do you know if anyone made a
7    complaint about that?
8        A.    No, I don't.
9        Q.    The next paragraph relates to
10   Tim Wilson. Did you report these things
11   that Tim Wilson you say did?
12       A.    The portion about the lower
13   anatomy was brought out in an
14   investigation when it was pertaining to
15   the cake.
16       Q.    Did you report that?
17       A.    Yes. It was -- I didn't
18   report it, it was already reported and I
19   was asked about it.
20       Q.    Okay. Do you know if
21   Mr. Wilson was disciplined?
22       A.    No.
23       Q.    Next paragraph starts off

Page 245

1    about Angela Smith-Peters and several
2    things that you say that she did. How
3    does that relate to your lawsuit?
4        A.    Because she has a record of
5    things that have occurred during things
6    that I have seen, that have occurred with
7    her coming to work intoxicated, with her
8    sleeping, her disappearing and doing her
9    job, her being absent. All these things
10   are in her file, but yet she is not
11   terminated, she decides to resign.
12       Q.    At the end of the paragraph
13   you talk about Graven Townsend was told to
14   make a decision between his job and his
15   wife when he stayed out to care for her
16   after an incident.
17       Are you relating to that Ms. Peters
18   situation?
19       A.    That was supposed to be --
20   Yes.
21       Q.    How are those things related?
22   How are you tying those two things
23   together?

Page 246

1        A.    Well, also in here as far as
2    them indicating that it was mandatory that
3    everybody needed to work during an outage
4    and have to be there; also there was one
5    day that came out and said everybody had
6    to come to work, it was mandatory
7    everybody comes to work, she decides she
8    wasn't going to come that day. She
9    already indicated that she wasn't coming,
10   but she still was allowed to keep her job;
11   and then you have a black man that stayed
12   out to tend for his wife during an
13   accident, and he was told to make a
14   choice.
15       Q.    Do you know why she didn't
16   come to work during the outage?
17       A.    Yeah. Because she just didn't
18   want to come.
19       Q.    How do you know that that's
20   the reason?
21       A.    Because she told us.
22       Q.    And how does that tie in to
23   what was told to Graven Townsend?

Page 247

1        A.    Because she's allowed to have
2    all this time off and take off all this
3    time, and she has all these things in her
4    file, she has a DML, she's on a
5    developmental plan, she has this thick
6    record, but yet here you have a man whose
7    wife was in an accident and he's trying to
8    tend to her, and you're telling him to
9    make a choice; and then he's terminated
10   and she is not.
11       Q.    Do you know how long
12   Mr. Townsend was out before -- or off
13   work?
14       A.    No. It doesn't matter.
15       Q.    Do you know if Mr. Townsend
16   took FMLA leave?
17       A.    I don't know.
18       Q.    And you said that
19   Ms. Smith-Peters had been disciplined?
20       A.    Yes.
21       Q.    Have we talked about the next
22   paragraph related to Deborah Crutchfield
23   and Phyllis Hughes?

34 (Pages 244 to 247)

Page 248

1    A.    I don't know.
2    Q.    Let's talk about it. Earlier
3  you said that Ms. Crutchfield called
4  Ms. Hughes after Ms. Hughes was
5  terminated. Is that this same situation?
6    A.    I don't know if this is the
7  same situation.
8    Q.    How do you know about this?
9    A.    From Phyllis Hughes.
10   Q.    When did she tell you this?
11   A.    I don't know when. But in a
12  conversation.
13   Q.    Had you been terminated?
14   A.    Yes.
15   Q.    How does this relate to your
16  lawsuit, the allegations you make in your
17  lawsuit?
18   A.    Did she offer me or Stephanie
19  or Graven or any other black person to pay
20  for their insurance.
21   Q.    Who is Raven?
22   A.    Townsend.
23   Q.    Graven. And I take it the

Page 249

1  answer to that is no?
2    A.    No.
3    Q.    The next paragraph relates to
4  Phyllis Hughes. And it says that your
5  photo was posted on window at front gate
6  as being a hostile person. How do you
7  know that?
8    A.    From Mary Hollis.
9    Q.    Who?
10   A.    Mary Hollis.
11   Q.    Who is that?
12   A.    She used to be an employee in
13  security at Farley.
14   Q.    She's no longer employed?
15   A.    No.
16   Q.    When did she tell you this?
17   A.    I don't know the exact date.
18  I ran into her one day.
19   Q.    And she told you that your
20  photo was pasted at the front gate as
21  being a hostile person?
22   A.    That is correct.
23   Q.    And she told you that Phyllis

Page 250

1  Hughes' photo was not posted?
2    A.    That is correct.
3    Q.    Were you aware of employees
4  who had been terminated having their
5  photographs posted at the gate at the
6  plant before Ms. Hollis told you this?
7    A.    Was I aware, yes.
8    Q.    Are you, in this last
9  paragraph on this page, just comparing
10  Phillip Avery allowing white males to use
11  strong profanity about a ball game to
12  Phillip using profanity to Doris Ashford?
13   A.    I'm not saying that he used
14  profanity towards Doris Ashford. I'm
15  comparing it that you have two white males
16  that's sitting in the office with a white
17  supervisor using profanity and cursing
18  about a ball game; and yet you have a
19  black female who says the word hell and
20  then Phillip turns around and starts
21  yelling at her saying that he doesn't want
22  to hear her talk like that.
23   Q.    Where were these white males

Page 251

1  watching the game?
2    A.    I don't know where they were
3  watching the game.
4    Q.    Was it at work?
5    A.    No. They were talking about a
6  game that they watched.
7    Q.    Okay. At work. They were
8  talking at work about a game they had
9  watched?
10   A.    That is correct.
11   Q.    Okay.
12        When did this happen, Miss McDowell?
13   A.    I don't know the date.
14   Q.    How do you know this happened?
15   A.    I heard them in the office
16  talking about the ball game.
17   Q.    How do you know that the
18  second situation -- how do you know about
19  the second situation?
20   A.    Because Doris informed me what
21  Phillip did to her.
22   Q.    Do you know if Ms. Ashford
23  made any complaint about that situation?

35 (Pages 248 to 251)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 252

1    A.    No.
2    Q.    Now, how do you know about
3 this next situation, Deborah Crutchfield
4 has covered up Jonathan Nall coming to
5 work intoxicated?
6    A.    Because Jonathan Nall comes in
7 intoxicated and go in the office and
8 starts talking and breathing, and then
9 other helpers turn around and tell him
10 that he need not go in the office because
11 there's no way that the foremen couldn't
12 smell the alcohol on him.
13    Q.    So how do you know this?
14    A.    Because I was at work that
15 day.
16    Q.    You were one of the people
17 that told him that the foreman would smell
18 alcohol on him?
19    A.    No, I wasn't one of the people
20 that had told him.  But I was around when
21 it was told.
22    Q.    Was Deborah Crutchfield one of
23 the people that told him that a foreman

Page 253

1 would know that he had -- that he was
2 intoxicated?
3    A.    Was Deborah Crutchfield --
4    Q.    You say Deborah Crutchfield
5 has covered up Jonathan Nall coming to
6 work intoxicated.
7    A.    Because he would go in the
8 office and talk with them, be around them.
9    Q.    Who is them?
10    A.    Deborah Crutchfield, B.J.
11 Yance, Dennis Teague.
12    Q.    And Ms. Crutchfield and the
13 rest would tell him that he needed to
14 leave work or leave the premises?
15    A.    I did not say that.
16    Q.    What would they say to him?
17    A.    Another helper had told him
18 that he needed to stay out of the office
19 because there was no way that the foremen
20 could not know -- or let me specify,
21 Deborah could not know that he was not
22 drinking, because it was coming off of his
23 breath and out of his pores.

Page 254

1    Q.    So how is it that Deborah
2 Crutchfield is covering up for him?
3    A.    If he goes in the office and
4 he talks to her, and if somebody is
5 standing next to somebody that's been
6 drinking and know about it, and then you
7 don't say anything, if I know that this
8 person has been drinking, it's obvious
9 that she has to know if he's over next to
10 her talking and breathing all over her.
11    Q.    How do you know in the next
12 paragraph that Chuck -- is it Schaule --
13 was not given a urinalysis?
14    A.    Because we asked him.  I
15 believe it was Bobby White asked him if he
16 was sent up on the hill to take a
17 urinalysis, and at that time he said no.
18    Q.    And Mr. White told you this?
19    A.    No.  I was standing there.
20    Q.    When did this occur?
21    A.    You have to get the notes when
22 he cut the tree down on the truck.
23    Q.    Where would I get those notes?

Page 255

1    A.    I'm pretty sure Farley has it.
2    Q.    So you don't have notes about
3 that other than this?
4    A.    No.  I have a memory.
5    Q.    Bobby White asked him, him
6 being Mr. Schaule, the same day that this
7 occurred, whether he was sent for a
8 urinalysis?
9    A.    That is correct.
10    Q.    When did this next incident
11 occur?
12    A.    What next incident?
13    Q.    Jonathan Nall and Brad
14 Knighton to tell B.J. Yance that they
15 would like to listen to a ball game.  B.J.
16 tells Stephanie and Janell off of truck
17 crew -- takes Stephanie and Janell off of
18 truck crew and sends them to clean the
19 restroom while the two white males go to
20 the barn to listen to the game.
21    A.    I have already discussed that
22 in the first deposition.  It's exactly
23 what it says, that he put us on the truck

36 (Pages 252 to 255)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 256

1  crew, told us to go and check the trash,
2  he called us back and told us to give the
3  truck to Jonathan and Brad, that they
4  wanted to go listen to a game and they
5  were going to go down to the barn and
6  clean the barn and listen to the game and
7  told Stephanie and I to go clean the
8  rest rooms.
9      Q.   When was this?
10      A.   It was during an outage.
11      Q.   Which outage?
12      A.   I don't know.  2003 maybe.
13      Q.   Did you report or make a
14  complaint about this?
15      A.   No.
16      Q.   The next paragraph speaks to
17  Janell and Stephanie are made to work in
18  the turbine building for six to eight
19  weeks.  Have we already covered that?
20      A.   Yes.
21      Q.   Jackie Cureton refuses job
22  assignment.  Tells B.J. Yance she refused
23  to do it.  Job assignment was given to

Page 257

1  someone else.  Safety was not an issue.
2      When did that occur?
3      A.   Don't know.
4      Q.   How do you know about it?
5      A.   I was there.  It happened in
6  morning briefing.
7      Q.   In a meeting with a lot of
8  people she said she wasn't going to do the
9  job assignment?
10      A.   That's correct.
11      Q.   And it was given to someone
12  else?
13      A.   That is correct.
14      Q.   And do you know if Ms. Cureton
15  was disciplined because of this?
16      A.   No, she wasn't disciplined.
17      Q.   How do you know?
18      A.   Because we asked her if she
19  got in trouble for it.
20      Q.   Do you know of an
21  African-American employee who similarly
22  refused a job assignment?
23      A.   Not at this time.

Page 258

1      Q.   When did Sam Hubbard swap job
2  assignments?
3      A.   During the same time frame
4  that we swapped job assignments and was
5  disciplined for it.
6      Q.   What job assignment did he
7  swap?
8      A.   Fire watch.
9      Q.   Did he get supervision
10  approval?
11      A.   No.
12      Q.   How do you know?
13      A.   Because he came in and saw the
14  schedule, he said that they didn't rotate
15  it like they were supposed to.  And
16  somebody mentioned to him to just call
17  over there and have it changed; and he
18  said, no, we're going to change it
19  ourselves, and he changed the fire watch
20  himself.
21      Q.   And this was in 2005 you say?
22      A.   That is correct.
23      Q.   Did you report Mr. Hubbard?

Page 259

1      A.   No.
2      Q.   When you were being
3  disciplined for swapping job assignments,
4  you did not ask why Mr. Hubbard was not
5  disciplined?
6      A.   No.
7      Q.   Have you already told me about
8  this next paragraph, where you say
9  Jonathan, Brad, and Chuck, white males,
10  are pulled out of turbine building when
11  assigned?
12      A.   That's correct.
13      Q.   Next paragraph, Deborah
14  Crutchfield approaches Jonathan and Brad
15  to tell them she knew why they were not
16  speaking to her, have we covered that?
17      A.   Yes.
18      Q.   Have we already covered --
19      A.   This shooting the condensers
20  goes with the truck crew.
21      Q.   Okay.  Shelly Murrell tells
22  Angela Peters that she can do her job
23  assignment in the smoke area.  What is

37 (Pages 256 to 259)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 260

1  that referring to?
2      A.    That she had a job assignment,
3  and she told her that she can just go and
4  smoke cigarettes that day.
5      Q.    When was this?
6      A.    Sometime in 2005.
7      Q.    What was the job assignment
8  that Ms. Peters had?
9      A.    I don't remember what it was,
10  but it wasn't in the smoke area.
11      Q.    How do you know --
12      A.    I believe --
13      Q.    I'm sorry.
14      A.    I believe, I'm not for sure,
15  that it was a catch bag, had something to
16  do with a catch bag.
17      Q.    Did you report or make a
18  complaint about this?
19      A.    No.
20      Q.    Have we already talked about
21  this next situation, Shelly tells group
22  not to call her at home?
23      A.    Yes.

Page 261

1      Q.    Deborah Crutchfield makes
2  Stephanie, Janell, and Phyllis come in
3  when maintenance manager approved us to
4  have rest prevision (sic). When is this?
5      A.    We went over to hatch. I
6  believe it was 2005.
7      Q.    Have we talked about this
8  previously?
9      A.    I believe so.
10      Q.    Who was the maintenance
11  manager that approved you having the rest
12  provision?
13      A.    Brad Moore.
14      Q.    When did this situation with
15  Chris Stovall take place?
16      A.    You have to get his paperwork.
17      Q.    What about Teresa Rambaucher?
18      A.    That happened 2005.
19      Q.    How do you know what level of
20  discipline each of these individuals
21  received?
22      A.    Chris told me that he received
23  an eighteen-month DML.

Page 262

1      Q.    And Ms. Rambaucher's
2  discipline?
3      A.    And she told me.
4      Q.    Have we talked about the next
5  situation, Deborah shares confidential
6  information?
7      A.    Yes.
8      Q.    Next paragraph, Deborah lied
9  and told Step and Janell that she did not
10  inform management about who told her about
11  fire watch with Kelvin, yet Cheri Collins
12  informed Step that our names were
13  mentioned to management.
14      When did this happen? When did
15  Cheri Collins say that your names were
16  mentioned to management?
17      A.    You'd have to ask Stephanie.
18      Q.    What was the situation with
19  the fire watch with Kelvin that y'all
20  didn't want Deborah to talk about in
21  relation to the two of you?
22      A.    We didn't want to get anyone
23  in trouble, but someone had approached me

Page 263

1  about the fire watch, and someone had
2  approached Stephanie about the fire watch,
3  and it was obvious that a fire watch was
4  missed. So when we went to Deborah,
5  Stephanie told Deborah that, you know, she
6  was coming to her to cover herself because
7  security was talking; and she didn't want
8  to get in trouble, she wanted to cover
9  herself as far as the fire watch being
10  performed.
11      Deborah asked Stephanie who was it,
12  and Stephanie told her she didn't want to
13  tell her. Deborah said you might as well
14  tell me because all I have to do is pull
15  the records.
16      So Stephanie then told Deborah what
17  had happened as far as the fire watch
18  being missed and that she was coming to
19  her because if it was reported to the NRC
20  that the fire watch was missed and she and
21  I knew that the fire watch was missed, we
22  didn't want -- we did not want to get in
23  trouble with the company for holding back

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 264

1 that information. And that's why it was
2 presented to Deborah.
3     But when we went to Deborah, it was
4 not to say Kelvin missed a fire watch
5 getting fired, it was just because we were
6 covering ourselves because people in
7 security was coming to us pertaining about
8 the fire watch being missed and that it
9 was going to be reported.
10     Q.   Did security interview you
11 about the fire watch?
12     A.   Did security do what?
13     Q.   Interview you about the fire
14 watch.
15     A.   Security didn't interview me
16 about the fire watch. It was a security
17 guard that had stopped me at the time and
18 asked me if the doors in the diesel
19 building were being opened or not being
20 opened. And they was supposed to be
21 opened, and that was the fire watch that
22 was missed; and it was four doors that was
23 not being opened. And so that's why we

Page 265

1 went to Deborah.
2     And then Deborah said that she was
3 telling management that somebody put the
4 paperwork on her desk, that she wasn't
5 going to tell any names because we didn't
6 want to get anybody in trouble.
7     Q.   But you wanted to cover
8 yourselves?
9     A.   Of course. If it's up to my
10 job or his job.
11     Q.   You knew that Mr. Jones had
12 missed his fire watch?
13     A.   I was told that he missed his
14 fire watch.
15     Q.   Who told you?
16     A.   I don't recall the person, the
17 gentleman. I can't remember his name.
18 But I was stopped and asked about the fire
19 watch, and they said the fire watch was
20 missed.
21     Q.   So you had no personal
22 knowledge of Mr. Jones missing a fire
23 watch, correct?

Page 266

1     A.   That's correct.
2     Q.   So did you just tell Deborah
3 that someone else told you that Mr. Jones
4 missed the fire watch?
5     A.   No. What I did -- Stephanie
6 went and told Deborah about the fire
7 watch, I went in with Stephanie. Deborah
8 was asking us a question pertaining to the
9 fire watch.
10     It's not like I went in and said to
11 Deborah, okay, Kelvin missed a fire watch.
12 I was with Stephanie when Stephanie went
13 and told Deborah that people were coming
14 up to her saying about the fire watch and
15 she didn't know whether it was missed or
16 not. Because one person asked her why is
17 the doors being opened when you come on,
18 and then prior to the doors weren't being
19 opened.
20     Q.   Was Ms. Sanders the only
21 person who could have known who missed the
22 fire watch?
23     A.   No. Security knew that the

Page 267

1 fire watch was being missed because
2 security had to open the doors. That's
3 how it was known that the fire watches
4 were missed.
5     Q.   So did Cheri Collins tell you
6 that Deborah Crutchfield mentioned your
7 names to management related to this missed
8 fire watch?
9     A.   Cheri Collins did not mention
10 it to me, she mentioned it to Stephanie.
11     Q.   Is it your understanding Cheri
12 Collins told Stephanie Sanders that
13 Deborah Crutchfield told management that
14 y'all knew about this missed fire watch?
15     A.   No. Cheri Collins told
16 Stephanie that Deborah told management
17 that it was us that had given the
18 information that the fire watch was
19 missed.
20     Q.   But that wasn't the case, you
21 said security knew the fire watch was
22 missed, correct?
23     A.   Say it again. That's not

39 (Pages 264 to 267)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 268

1  correct because what?
2      Q.    You said that security knew
3  the fire watch had been missed prior to
4  Ms. Sanders, correct?
5      A.    They didn't know for sure,
6  that's why they stopped her. They stopped
7  her to ask her why is she opening up the
8  doors on this shift, was the fire watch
9  just placed on the fire watch sheet the
10  hours that she started working or was --
11  were these doors on this sheet all day.
12      Q.    And Ms. Sanders only told them
13  about her shift, correct?
14      A.    She told security that as far
15  as her knowledge that the fire watches
16  have been on the sheet all day.
17      Q.    Okay. So security figured out
18  that Kelvin Jones had not done his fire
19  watch?
20      A.    That is correct.
21      Q.    Next paragraph you said
22  Deborah, Tim lied about not knowing about
23  cake was sitting at table with Patricia

Page 269

1  Glass. How do you know they lied about
2  not knowing about the cake?
3      A.    Because Deborah wasn't
4  disciplined, Tim wasn't disciplined.
5  Deborah said she wasn't sitting at the
6  table, but we saw her sitting at the
7  table.
8      Q.    How do you know Deborah said
9  she wasn't sitting at the table?
10      A.    She told us that she wasn't
11  sitting there.
12      Q.    Did you tell her that you knew
13  otherwise?
14      A.    No. No.
15      Q.    Did you report during the
16  investigation that Ms. Crutchfield and
17  Mr. Wilson had seen the cake or were
18  sitting at the table?
19      A.    I believe I did.
20          (Recess was taken.)
21  (The deposition of Janell McDowell was
22  suspended at 4:55 p.m. on November 1,
23  2006.)

Page 270

1          C E R T I F I C A T E
2
3  STATE OF ALABAMA        )
4  AUTAUGA COUNTY          )
5
6      I do hereby certify that the above
7  and foregoing transcript was taken down by
8  me in stenotype, and the questions and
9  answers thereto were transcribed by means
10  of computer-aided transcription, and that
11  the foregoing represents a true and
12  correct transcript of the testimony given
13  by said witness.
14      I further certify that I am neither
15  of counsel, nor of any relation to the
16  parties to the action, nor am I anywise
17  interested in the result of said cause.
18
19
20
21          Anita Thebo, Certified
            Shorthand Reporter and
22          Commissioner for the
            State of Alabama at
23          Large.

40 (Pages 268 to 270)

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 271

```
1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE MIDDLE DISTRICT OF ALABAMA
3            SOUTHERN DIVISION
4
5    CASE NUMBER: 1:06-cv-314-CSC
6
7    JANELL MCDOWELL and
8    STEPHANIE SANDERS,
9        Plaintiffs,
10   vs.
11   SOUTHERN NUCLEAR OPERATING
12   COMPANY, INC.,
13       Defendant.
14
15
16   BEFORE:
17     Cynthia M. Noakes, Court Reporter
18     and Notary Public
19
20   DEPOSITION TESTIMONY OF JANELL MCDOWELL
21       (continued)
22
23   ******************************
```

Page 273

```
1    the time said deposition is offered in evidence,
2    or prior thereto.
3          IT IS FURTHER STIPULATED AND AGREED
4    that the notice of filing of the deposition by
5    the Court Reporter is waived.
6
7
8
9
10
11
12
13
14
15
16
17   *****************************************
18
19
20
21
22
23
```

Page 272

```
1      S T I P U L A T I O N
2
3          IT IS STIPULATED AND AGREED by and
4    between the parties through their respective
5    counsel, that the deposition (continued) of
6    JANELL MCDOWELL may be taken before Cynthia M.
7    Noakes, Court Reporter, at the Law Offices of
8    MALCOLM R. NEWMAN, 219 West Crawford Street,
9    Dothan, Alabama 36301, on the 2nd day of
10   November, 2006.
11         IT IS FURTHER STIPULATED AND AGREED
12   that the signature to and the reading of the
13   deposition by the witness is waived, the
14   deposition to have the same force and effect as
15   if full compliance had been had with all laws and
16   rules of Court relating to the taking of
17   depositions.
18         IT IS FURTHER STIPULATED AND AGREED
19   that it shall not be necessary for any objections
20   to be made by counsel to any questions except as
21   to the form or leading questions, and that
22   counsel for the parties may make objections and
23   assign grounds at the time of the trial, or at
```

Page 274

```
1              INDEX
2    EXAMINATION BY:              PAGE NUMBER:
3    MS. SHARP                    6-110
4
5    EXHIBITS:
6    Defendant's Exhibit No. 8        299
7    Defendant's Exhibit No. 9        300
8    Defendant's Exhibit No. 10       302
9    Defendant's Exhibit No. 11       305
10   Defendant's Exhibit No. 12       306
11   Defendant's Exhibit No. 13       309
12   Defendant's Exhibit No. 14       311
13   Defendant's Exhibit No. 15       313
14   Defendant's Exhibit No. 16       317
15   Defendant's Exhibit No. 17       321
16   Defendant's Exhibit No. 18       322
17   Defendant's Exhibit No. 19       330
18   Defendant's Exhibit No. 20       330
19   Defendant's Exhibit No. 21       336
20   Defendant's Exhibit No. 22       365
21   Defendant's Exhibit No. 23       366
22   Reporter's Certificate           381
23   *****************************************
```

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 275

```
1            APPEARANCES
2
3   ON BEHALF OF THE PLAINTIFFS:
4       MR. MALCOLM R. NEWMAN
5       ATTORNEY AT LAW
6       219 West Crawford Street
7       Dothan, Alabama  36301
8
9   ON BEHALF OF THE DEFENDANT:
10      MS. LISA J. SHARP
11      ATTORNEY AT LAW
12      BALCH & BINGHAM, LLP
13      1710 Sixth Avenue North
14      Birmingham, Alabama  35203
15
16  ALSO PRESENT:
17      MS. SHARON F. BESTWICK,
18      Employee Relations Coordinator
19      Southern Nuclear Operating Company,
20      Inc.
21      STEPHANIE SANDERS, Co-Plaintiff
22
23  ***************************************
```

Page 276

```
1       I, CYNTHIA M. NOAKES, a Court Reporter
2   of Eufaula, Alabama, acting as Commissioner,
3   certify that on this date, as provided by the
4   Alabama Rules of Civil Procedure and the
5   foregoing stipulation of counsel, there came
6   before me at the Law Offices of MALCOLM R.
7   NEWMAN, 219 West Crawford Street, Dothan, Alabama
8   36301, beginning at 9:10 a.m., JANELL MCDOWELL,
9   witness in the above cause, for oral examination,
10  whereupon the following proceedings were had:
11
12      THE COURT REPORTER:  Usual
13  stipulations?
14      MR. NEWMAN:  Yes.
15      MS. SHARP:  That will be fine.
16      THE COURT REPORTER:  Do you want her to
17  be sworn in again?
18      MS. SHARP:  No.  She was sworn
19  yesterday.  That's fine.
20      THE COURT REPORTER:  Okay.  Thank you.
21
22          EXAMINATION
23  BY MS. SHARP:
```

Page 277

```
1   Q.   Ms. McDowell, we're going to kind of pick up
2   where we left off yesterday.  Looking at Exhibit
3   7, the next to the last page, the last paragraph
4   on the page.
5        And my question to you is:  What is the
6   significance of the things that you describe in
7   that last paragraph to your lawsuit here?
8   A.   That on my DML, that was one of the issues
9   that was put on the DML as far as me swapping job
10  assignments without permission.
11       And I indicated to them that I had received
12  permission to swap my job assignment, that that
13  seemed to be an issue.
14       Yet someone like Chuck Schaule, who was a
15  white male, received a firewatch.  When it was
16  stipulated if you have the service firewatch, that
17  you have to stay in it, inside.
18       So they are checking behind some people and
19  not all people.
20  Q.   And you explained, when you were given your
21  DML, that you had had permission for the job swap?
22  A.   Yes, I did.
23  Q.   What job swap were you referring to?
```

Page 278

```
1   A.   Service water firewatch.
2   Q.   Do you recall the date that you were
3   referencing?
4   A.   I don't recall a date, but I know it was
5   after I got back from Plant Hatch.
6   Q.   This is 2005?
7   A.   '-5.
8   Q.   Had you had more than one service water
9   firewatch at that time since you'd come back from
10  Plant Hatch?
11  A.   Yes.
12  Q.   So did you tell them whether it was the
13  first service water firewatch that you were
14  referring to or the second?
15  A.   I told them not only about that firewatch, I
16  just indicated if I had any firewatch and if it
17  was swapped, that I received permission from the
18  shift operator to do so.
19  Q.   Was the shift operator the person you had
20  been told to receive permission from to swap a job
21  assignment?
22  A.   Was he the one that I was told?
23  Q.   That your supervision told you to go to make
```

2 (Pages 275 to 278)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 279

1  a job assignment change?
2  A.  Well, that was during the time when they
3  said one thing at one time, and then Shelley
4  referred to not calling her at home, on and prior
5  to.
6  Q.  So did you try to contact Ms. Murrell,
7  rather than go to the shift person, before making
8  this job change?
9  A.  I contacted her on the first night, and I
10  told her I had the flu.  That was the night that
11  was in question when we received rest provision.
12  But then Deborah said at the last minute that we
13  had to come in.
14      And I called Shelley and I informed her that
15  I had the flu and that I would be up at the
16  service water, can I go to the service water to do
17  the service water firewatch.
18  Q.  And what did she say?
19  A.  She said that wasn't a problem.
20  Q.  Okay.  So that's one occasion.  And then you
21  said there were other times after that that you
22  had the service water firewatch and you swapped
23  the assignment?

Page 280

1  A.  That is correct.
2  Q.  And who did you get permission from on those
3  occasions?
4  A.  The shift supervisor.
5  Q.  Did you try to contact the foreman, as you
6  had been requested to do, before getting
7  permission from the shift supervisor?
8  A.  No.
9  Q.  When you were given your DML, did you tell
10  your supervision about this situation that you are
11  describing in this last paragraph relating to
12  Chuck Schaule?
13  A.  No.
14  Q.  So you did not report this incident?
15  A.  No.
16  Q.  At the end of this paragraph you say, "...
17  but John Wright (white male) tries to justify
18  Stephanie's (black female) termination he goes to
19  the operations office to pull her firewatch logs."
20      Are you referring to Ms. Sanders?
21  A.  That is correct.
22  Q.  How do you know that Mr. Wright went to pull
23  Ms. Sanders' firewatch logs to justify her

Page 281

1  termination?
2  A.  From Stephanie.
3  Q.  When did she tell you this?
4  A.  I don't know.  I don't have an exact date.
5  Q.  Do you know how she knows that John Wright
6  went to pull her firewatch logs to justify her
7  termination?
8  A.  She received a telephone call from another
9  helper.
10  Q.  Who was that helper?
11  A.  Bobby White.
12  Q.  And what did Mr. White tell Ms. Sanders, to
13  your knowledge?
14  A.  That John Wright was in the office pulling
15  her firewatch logs.
16  Q.  Did he tell Ms. Sanders what day Mr. Wright
17  was pulling the logs?
18  A.  You would have to ask Stephanie.
19  Q.  Okay.  Now, Ms. Sanders was not terminated
20  based on missing a firewatch, was she?
21  A.  No.
22  Q.  Do you know why Ms. Sanders is no longer
23  employed at Plant Farley?

Page 282

1  A.  I don't recall if I'm -- I don't recall
2  right now.
3  Q.  Let's go over to the last page of your
4  typewritten notes, Ms. McDowell.
5      How do you know that Deborah Crutchfield
6  made this statement to Teresa Rambaucher?
7  A.  From Stephanie.
8  Q.  How does Ms. Sanders know this statement was
9  made?
10  A.  Because Teresa Rambaucher told her.
11  Q.  When did Ms. Rambaucher tell Ms. Sanders
12  this?
13  A.  I don't know that.
14  Q.  Do you know when Deborah supposedly made
15  this statement to Teresa Rambaucher?
16  A.  No, I don't know that.
17  Q.  Do you know what year?
18  A.  It was 2005.
19  Q.  Okay.  Do you know if any white employees
20  were disciplined or terminated at Plant Farley in
21  2005?
22  A.  There were some white employees that were
23  terminated, but not like there were black

3 (Pages 279 to 282)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

| Page 283 |
| --- |

1  employees.
2  Q.  Explain that statement.
3  A.  Just in the Facilities group you've had
4  several black employees that have been terminated:
5  Gamaska Vickers, myself, Stephanie Sanders, Graven
6  Townsend, Bobby White. And that was just in 2005
7  alone.
8  Q.  Do you know why Mr. Vickers was terminated?
9  A.  I was told it had something to do with the
10  firewatch.
11  Q.  Aside from what you were told, do you know
12  why he was terminated?
13  A.  No. He was terminated after me, so no.
14  Q.  Do you know why Mr. Townsend was terminated?
15  A.  I don't recall right now.
16  Q.  Did someone tell you why Mr. Townsend was
17  terminated?
18  A.  I believe Stephanie told me, but I don't
19  remember at this time.
20  Q.  Do you know when she told you why he was
21  terminated or that he was terminated?
22  A.  Sometime in 2005.
23  Q.  Do you know why Bobby White was terminated?

| Page 284 |
| --- |

1  A.  I was told about the firewatch.
2  Q.  What specifically about a firewatch were you
3  told?
4  A.  That he was placed on firewatch and John
5  Wright caught him sleeping.
6  Q.  Are you aware of any other Plant Farley
7  employees who had ever been terminated for
8  sleeping on firewatch?
9  A.  Not that I can recall at this time.
10  Q.  You said that Mr. Vickers was also
11  terminated because of a firewatch. What
12  specifically about a firewatch caused his
13  termination?
14  A.  Okay. I was told that he missed a
15  firewatch. And then after that, he went to do
16  another firewatch; and the time that was allotted
17  to do the firewatch, it was indicated that it was
18  impossible.
19  Q.  Now, who told you that?
20  A.  Phyllis Hughes.
21  Q.  And you testified earlier that Calvin Jones
22  also was terminated related to a firewatch; is
23  that correct?

| Page 285 |
| --- |

1  A.  That is correct.
2  Q.  And it's your belief that Mr. Jones was
3  terminated, not that he resigned from employment?
4  A.  We were told he was terminated.
5  Q.  Who told you that?
6  A.  Deborah Crutchfield.
7  Q.  Okay. Have you spoken with Mr. Jones since
8  he left Plant Farley?
9  A.  No, I haven't.
10  Q.  Okay. Do you know, Ms. McDowell, of any
11  white employees who were terminated from Plant
12  Farley in 2005?
13  A.  Phyllis Hughes and I believe David Patton.
14  Q.  Why was Ms. Hughes terminated?
15  A.  For creating a hostile environment.
16  Q.  Was Ms. Hughes -- was her termination
17  related to swapping job assignments?
18  A.  She said that also was on the list.
19  Q.  Anything else?
20  A.  I don't know.
21  Q.  What about David Patton? Why was he
22  terminated?
23  A.  I believe he had a positive urinalysis.

| Page 286 |
| --- |

1  Q.  How do you know the reason for his
2  termination?
3  A.  Rumors going around the maintenance shop.
4  Q.  Okay. That brings us to the end of Exhibit
5  7, your documentation -- typewritten
6  documentation.
7     I have a question though related to the
8  entire exhibit. You testified several times that
9  you did not make complaints or reports to
10  supervision or management related to the incidents
11  that you've described in Exhibit 7; is that
12  correct?
13  A.  That is correct. But I thought about it
14  and, yes, some of those issues were discussed to
15  management.
16  Q.  So you're changing your testimony this
17  morning to say that you now did make some reports?
18  A.  That is correct. There's been a lot of
19  information that I have to recall. But issues
20  that was pertaining to Stephanie and myself has
21  been reported to Shannon Brown, when she did the
22  investigation about the cake; it has been reported
23  to Deborah Crutchfield; it has been reported to

4 (Pages 283 to 286)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 287

1 Don Grissette, which is already in the
2 documentation that we have went to see Don about
3 Stephanie and I being singled out; we had went to
4 Cliff Buck about us being singled out and asked
5 that it be stopped; we've been in meetings with
6 Bill Barber and Richard Bryant.
7 Q. Anyone else?
8 A. We've spoken to Dennis Teat about it; we
9 spoke to B.J. about the way we were being treated.
10 Q. Anyone else?
11 A. That's all that I can recall at this time.
12 Q. Okay. For several of the incidents that you
13 have described in Exhibit 7, you said that you did
14 not make a report but that you made a note of the
15 incident.
16 Where are your notes of these incidents that
17 you said yesterday you made related to these
18 things?
19 A. I believe I dropped a lot of paperwork off
20 to my attorney with notes pertaining to some of
21 the issues in this documentation. And then I also
22 indicated that the reason why this was drafted, so
23 that it could help me to recall some of the issues

Page 288

1 that I just had -- I had on my mind that I knew
2 about but I didn't make notes of but it did occur.
3 Q. I understand that. But you said yesterday
4 you made notes of incidents described here. Where
5 are each of those notes?
6 A. What I believe I said -- okay, let me back
7 up.
8 Each incident here I don't have notes on.
9 This was the reason why this was drafted of things
10 that I remembered that I was going to bring in
11 here so that I can go to recall my memory.
12 On some of the issues, like Don Grissette
13 issue, that was in the notes that was given to my
14 attorney. The Tammy and Jennifer and Deborah in
15 the break room smiling and not speaking, that was
16 in the paperwork that I gave my attorney.
17 Q. Any other incidents that you say are in the
18 notes that you gave to your attorney?
19 A. The issue concerning John Wright calling
20 Cheri Collins at home. You know, that's an e-mail
21 that you've already received.
22 And I know about -- you should have
23 something about the incident with notes on B.J.

Page 289

1 pulling us from the maintenance shop, Mark Freeman
2 accusing us. And I believe that's it.
3 Q. So the things you just recounted should be
4 in separate notes that you gave to Mr. Newman?
5 A. Yes.
6 Q. Okay. Tell me what you reported to Shannon
7 Brown.
8 A. The investigation that was going on
9 pertaining to the cake, that was reported at the
10 time I was asked about it.
11 I was asked about the incident with Tim
12 Wilson and a shared employee making a statement
13 about sucking his genitalia.
14 I spoke with her about the treatment that we
15 had been receiving from management, being labeled.
16 Q. What specifically did you tell her on that
17 subject?
18 MR. NEWMAN: Didn't we cover this on 6?
19 MS. SHARP: Shannon Brown?
20 MR. NEWMAN: Yeah, the incident about
21 the cake?
22 A. And about the shared employee.
23 Q. I've got the shared employee. My question

Page 290

1 is: What did you tell Shannon Brown regarding the
2 treatment that you received from management. And
3 you said being labeled. What specifically did you
4 say to her?
5 A. The issue came into the cooler, staying
6 longer in a heat-stress environment, how they were
7 singling us out, how management told us that they
8 were singling us out, how they came back and
9 retracted, the incident with Bill Barber writing
10 us up and then having to be torn up because after
11 they investigated they found out that that wasn't
12 the truth.
13 Q. What did you say to her about the cooler
14 incident?
15 A. Exactly what happened. I thought that I had
16 explained about the cooler incident prior to.
17 Q. What did you say to her, to Shannon Brown,
18 about the cooler incident?
19 A. I understand your question, but I thought
20 that I had explained that already.
21 That B.J. came in the back of the building;
22 he said he needed two volunteers. There was a
23 whole bunch of people out there. He said, I need

5 (Pages 287 to 290)

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

## Page 291

1  two volunteers. He walked past several people; he
2  said Stephanie and Janell, come with me. He said,
3  I need you to take a 55 gallon cooler with some
4  ice over to the RAD side for the people in
5  containment. We went to the maintenance shop,
6  filled up the cooler and was carrying the cooler.
7      I believe it was Richard Bryant saw that we
8  were taking the cooler to the other side and
9  questioned about why did it take two people to
10  carry an empty cooler to the RAD side. We
11  explained to him that the cooler had Gatorade and
12  ice in it. After that had occurred, we went to go
13  talk to them because we felt that they were
14  singling us out.
15     Cliff Buck then turned around and indicated
16  that he knew that we had already been spoken to on
17  a prior incident pertaining to service water and
18  us not doing our job and not being in the service
19  water.
20     So all of this was just on one day. We were
21  in meetings all day with management trying to
22  clear our names and address issues because they
23  had singled us out. This was something that they

## Page 292

1  were told to do by Don Grissette.
2  Q.   And these are the things that you told
3  Shannon Brown?
4  A.   That is correct.
5  Q.   Okay. What did you tell to Ms. Brown
6  regarding the heat-stress incident?
7  A.   I'm not sure I mentioned the heat-stress
8  incident to her.
9  Q.   Have you told me everything that you told to
10  Shannon Brown regarding the singling you out
11  allegation?
12  A.   I don't know.          .
13  Q.   Okay. Then tell me what you told Ms. Brown
14  regarding being singled out.
15  A.   I don't know everything at this time. I
16  can't recall it all. I know that I spoke to
17  Shannon. There were several issues that were
18  addressed; and if she took notes, then you'll have
19  to receive those notes from Shannon Brown.
20  Q.   But I want to know from you what you do
21  recall about your conversation with Shannon Brown
22  about being singled out.
23  A.   And I just told you everything that I recall

## Page 293

1  at this particular time what I told Shannon Brown.
2  Q.   What did you tell Ms. Brown about Bill
3  Barber?
4  A.   I explained to her about the incident where
5  he sent Stephanie and me to do a job at service
6  water. He went and pulled the service water card
7  reader and saw that we had been inside the service
8  water for a short period of time. He then turned
9  around and told Stephanie that he was going to
10  write her up and told her -- and then told me that
11  he was going to write me up because we were not at
12  service water.
13     So we went down to the building, Bill Barber
14  Richard Bryant was in the office, and he explained
15  that we were not at service water doing our job,
16  therefore he was going to write us up.
17     We told him that we were in service water.
18  We were not inside the service water, but we were
19  inside the service water grounds, and that if they
20  would pull the bioreader box, that bioreader box
21  would indicate that we were in the service water.
22     When they did that and saw that we were
23  telling the truth, then they turned around and

## Page 294

1  decided that they were going to rip it up.
2  Q.   Anything else?
3  A.   No.
4  Q.   Have you, either today, yesterday, or in the
5  first part of your deposition, told me of all of
6  the complaints or reports that you made to Deborah
7  Crutchfield of unfair treatment?
8  A.   I don't know that.
9  Q.   Okay. Tell me what complaints you made to
10  Deborah Crutchfield.
11     MR. NEWMAN: Haven't we already done
12  this?
13     MS. SHARP: Well, the problem is she
14  came in today and said she's changing her
15  testimony from yesterday. And I want to know what
16  she's gone back and recalled. If she doesn't
17  recall anything specifically, your client's free
18  to say that. But she specifically said she's
19  changing her testimony.
20     MR. NEWMAN: Well, you said, "changing"
21  her testimony.
22     MS. SHARP: And she said, Yes, I am.
23     MR. NEWMAN: And she said she was

6 (Pages 291 to 294)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 295

1  clarifying some things.
2       MS. SHARP: No, that's not what she
3  said. And we can go back and --
4       MR. NEWMAN: Go ahead and tell her
5  what's new and in addition to what you've already
6  told her, but don't go back over the same stories
7  again.
8       MS. SHARP: Yes.
9  A.   The only thing that I said different was as
10 far as reporting it. It was reported, and I named
11 the people. But as far as the incidents have
12 occurred, the incidents, they did occur. And
13 that's the only thing that is different, that I
14 did mention it to supervision.
15 Q.   What did you report to each of these people?
16 Because literally, for most of the things in
17 Exhibit 7, you said you made no report. So I now
18 need to know what you reported to each of these
19 people that you've listed out this morning,
20 please, ma'am.
21 A.   Deborah Crutchfield, she knew about the Don
22 Grissette incident.
23 Q.   You told her?

Page 296

1  A.   Yes.
2  Q.   Go ahead.
3  A.   She knew about John Wright not doing the
4  schedule fairly, the rotation fairly.
5  Q.   You told her?
6  A.   I told her that. She knew about Mark
7  Freeman accusing us of falsifying documents; she
8  knew about Bill Barber going to Phillip Avery and
9  labeling Stephanie and myself as being
10 troublemakers; she knew about Tammy Caldwell being
11 allowed to swap a job assignment.
12 Q.   You told her that?
13 A.   Yes.
14 Q.   Which job assignment?
15 A.   I don't recall the job assignment. All I
16 know is that her job assignment was swapped. She
17 was allowed to swap her job assignment.
18 Q.   What day or days?
19 A.   In the outage 2004. She knew about the
20 restriction being placed by Don Grissette on us to
21 separate us; she knew about B.J. constantly
22 putting us on the same job assignments.
23 Q.   You complained to her about that?

Page 297

1  A.   Yes, I did. And that's all I can recall at
2  this time.
3  Q.   Okay. Have you told me previously all of
4  the complaints that you recall making to Don
5  Grissette?
6  A.   Yes.
7  Q.   Have you told me previously all of the
8  complaints that you recall making to Cliff Buck?
9  A.   No.
10 Q.   Okay. Tell me what complaints you made to
11 Cliff Buck.
12 A.   About we knew that we were being singled
13 out; we knew that Don Grissette had put a
14 restriction on us; we knew that he was following
15 his rules, and that they were wrong.
16 Q.   Whose rules?
17 A.   Don Grissette's rules, and that he was
18 wrong. And that we were being harassed and we
19 wanted it to stop.
20 Q.   What did you tell him -- how did you tell
21 him you were being harassed?
22 A.   Being harassed as far as being singled out,
23 being retaliated against.

Page 298

1  Q.   How were you being retaliated against?
2  A.   It all ties into the issue with Don
3  Grissette and Tim Wilson.
4  Q.   What else did you tell Cliff Buck?
5  A.   Just basically that, pertaining to that
6  issue.
7  Q.   Have you told me all the complaints that you
8  made to Bill Barber, previously?
9  A.   Yes.
10 Q.   Have you told me all of the complaints that
11 you made to Richard Bryant?
12 A.   Yes.
13 Q.   Have you told me all the complaints that you
14 made to Dennis Teat?
15 A.   I don't know about that.
16 Q.   Okay. Tell me what complaints you made to
17 Dennis Teat.
18 A.   About being singled out; job assignments not
19 being rotated fairly.
20 Q.   Anything else?
21 A.   No.
22 Q.   Have you told me the complaints that you
23 made to B.J. Yance?

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 299

1   A.   Basically the same thing.
2   Q.   All right. Looking back at Exhibit 6, Ms.
3  McDowell, let's go to your typewritten charge.
4      In the first paragraph, you said that you
5  had nothing but good evaluations. What years did
6  you receive good evaluations?
7   A.   From the time I started until I was -- up
8  until August of 2005.
9   Q.   What year were you first employed?
10  A.   I believe in '98.
11  Q.   I'm handing you and your lawyer what I'm
12  going to mark as Defendant's Exhibit 8 to your
13  deposition.
14      (Defendant's Exhibit No. 8 was
15        marked for identification and a
16        copy of the same is attached
17        hereto.)
18  Q.   It looks like the top somehow got cut off in
19  copying. But is this a performance evaluation for
20  you for the 1998 work year? Take a minute and
21  just look at it.
22      (The witness examines the
23        document.)

Page 300

1   A.   Yes.
2   Q.   Okay. Who is Lisa Hogg?
3   A.   She was my captain -- my supervisor on the
4  shift.
5   Q.   And you were hired in as a nuclear security
6  officer?
7   A.   That is correct.
8   Q.   On the first page under, "Development/Career
9  Plan," there are some goals, some strengths and
10  skills, and areas for development.
11      Are these things that you put together or
12  are these things that you worked with your
13  supervisor on developing?
14  A.   Those are things that my supervisor put.
15  Q.   Okay. Why did you leave the nuclear
16  security officer position?
17  A.   Because it was taking too much time away
18  from my son.
19  Q.   So you chose to move to the helper position?
20  A.   That's correct.
21      (Defendant's Exhibit No. 9 was
22        marked for identification and a
23        copy of the same is attached

Page 301

1      hereto.)
2   Q.   I'm handing you and your lawyer what I've
3  marked as Defendant's Exhibit 9. I'll ask you to
4  take a moment to look at that and then tell me if
5  you recognize that as your performance evaluation
6  and plan for the 1999 work year.
7      (The witness examines the
8        document.)
9   Q.   Do you recognize this as your performance
10  evaluation and plan for the 1999 work year?
11  A.   Yes.
12  Q.   And you said Lisa Hogg was your supervisor
13  while you were in the nuclear security officer
14  position?
15  A.   That's correct.
16  Q.   What race is Lisa Hogg?
17  A.   White.
18  Q.   And who is it that signed as the reviewer of
19  this evaluation?
20  A.   Ken Dyar.
21  Q.   What race is Mr. Dyar?
22  A.   White.
23  Q.   Do you agree with this evaluation of your

Page 302

1  performance for the 1999 work year?
2   A.   Yes.
3   Q.   Under the Development/Career Plan, did you
4  review these goals, strengths and skills, and
5  areas for development when you signed off on this
6  evaluation?
7   A.   Yes.
8   Q.   And were these goals, strengths/skills, and
9  areas for development things that were put
10  together for the year to come? the next year?
11  A.   I don't know.
12  Q.   Okay. Did you have any input into these
13  areas?
14  A.   What do you mean "input"?
15  Q.   Did Ms. Hogg or Mr. Dyar talk with you and
16  get your agreement to work on these things, at the
17  time you signed off on the performance plan?
18  A.   When I signed off on the performance plan,
19  this is something that they would like me to get
20  myself familiarized with, yes.
21  Q.   Okay.
22      (Defendant's Exhibit No. 10 was
23        marked for identification and a

8 (Pages 299 to 302)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 303

```
1        copy of the same is attached
2        hereto.)
3   Q.   I'm handing you and your lawyer what I've
4   marked as Defendant's Exhibit 10 to your
5   deposition.
6        Take a minute and look at that document and
7   tell me if you recognize that as your performance
8   evaluation and plan for the 2000 work year.
9        (The witness examines the
10       document.)
11  A.   Yes.
12  Q.   And at this point, you had moved to the
13  helper classification; is that correct?
14  A.   That's correct.
15  Q.   And who was your supervisor at this point?
16  A.   Richard Bryant was the supervisor.
17  Q.   Okay.  And who was the reviewer for this
18  work year?
19  A.   I don't know.  It doesn't say.
20  Q.   Last page.
21  A.   Maybe I'm overlooking it.
22  Q.   Next to last page; I'm sorry.
23  A.   I must not have the same packet.
```

Page 304

```
1   Q.   Okay.  Starting from the first page, go back
2   to the third page.  Who is the reviewing
3   supervisor?
4   A.   I guess this says Tim Wilson is the
5   supervisor and Richard Bryant is -- no, I'm sorry.
6        Tim Wilson is the immediate supervisor and
7   Richard Bryant is the supervisor.
8   Q.   Was Mr. Wilson a foreman at this time?  Do
9   you recall?
10  A.   Yes.
11  Q.   And you actually wrote -- I'm sorry.  You
12  did not put comments on this.
13       On the first page of the evaluation, in the
14  bottom box it says Developmental Action Plan.  And
15  it's typed in here:  "Receive needed training and
16  on shift experience to improve my developmental
17  needs."
18       Is that input that you provided on this
19  plan?
20  A.   No.
21  Q.   Okay.  Do you disagree with that statement?
22  A.   No.
23  Q.   Okay.
```

Page 305

```
1        (Defendant's Exhibit No. 11 was
2        marked for identification and a
3        copy of the same is attached
4        hereto.)
5   Q.   I'm handing you and your lawyer what I've
6   marked as Defendant's Exhibit 11 to your
7   deposition.
8        Take a minute to look at that and tell me if
9   you recognize that as your performance evaluation
10  and plan for the 2001 work year.
11       (The witness examines the
12       document.)
13  A.   What was the question now?
14  Q.   Do you recognize this as your performance
15  evaluation and plan for the 2001 work year?
16  A.   Yes.
17  Q.   Okay.
18  A.   2001?  No.  2002.  Yeah, 2001.  Sorry.
19  Q.   Okay.  Do you agree with this assessment of
20  your performance for the work year 2001?
21  A.   Yes.
22  Q.   Who was your immediate supervisor during
23  this work year?
```

Page 306

```
1   A.   B.J. Yance.
2   Q.   And the reviewing supervisor was who?
3   A.   Richard Bryant.
4   Q.   On the third page of this exhibit is a sheet
5   that has a different rating system for you.  Do
6   you recall receiving or seeing a copy of this
7   during the 2001 year?
8   A.   Yes.
9   Q.   Do you agree with these assessments of your
10  performance for that work year?
11  A.   Yes.
12  Q.   Do you agree with the developmental action
13  plan on the first page of this exhibit?
14  A.   Yes.
15       (Defendant's Exhibit No. 12 was
16       marked for identification and a
17       copy of the same is attached
18       hereto.)
19  Q.   I'm handing you copies of what I've marked
20  as Defendant's Exhibit 12 to your deposition, Ms.
21  McDowell.
22       Do you have your own copies of each of your
23  evaluations and plans?
```

9 (Pages 303 to 306)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

| Page 307 | Page 309 |
|---|---|

**Page 307**

1   A.   I have some.
2   Q.   Okay.  Take a moment and look at Exhibit 12.
3        (The witness examines the
4        document.)
5   Q.   Do you recognize Exhibit 12 as your
6   performance evaluation and plan for the 2002 work
7   year?
8   A.   Yes.
9   Q.   Do you agree with the evaluation of your
10  performance for that work year?
11  A.   Yes.
12  Q.   Do you agree with the developmental action
13  plan on page 1 of this exhibit?
14  A.   Yes.
15  Q.   In the "Overall Performance" block on page 4
16  of Exhibit 12, there's a typewritten description
17  of your overall work performance.  It starts off
18  with the statement:  "Janell has consistently
19  performed at a level that meets and often exceeds
20  the expectations of her direct supervision."
21  A.   Yes.
22  Q.   Who was your foreman at this time -- your
23  immediate supervisor?  Excuse me.

**Page 309**

1   the sheet to?
2   A.   Yes.
3        (Defendant's Exhibit No. 13 was
4        marked for identification and a
5        copy of the same is attached
6        hereto.)
7   Q.   I'm handing you and Mr. Newman a copy of
8   what I've marked as Defendant's Exhibit 13 to your
9   deposition, Ms. McDowell.
10       Take a minute and look at this exhibit and
11  tell me if you recognize this as your performance
12  evaluation and plan for the 2003 work year.
13       (The witness examines the
14       document.)
15  Q.   Do you recognize this as your performance
16  evaluation and plan for the 2003 work year?
17  A.   Yes.
18  Q.   The next to the last page of the plan is
19  entitled, "Closeout Performance Summary."  The top
20  block is the overall performance.
21  A.   What page?
22  Q.   The next to last page.
23  A.   Okay.

**Page 308**

1   A.   Deborah Crutchfield.
2   Q.   Who was the reviewing supervisor at this
3   time?
4   A.   Richard Bryant.
5   Q.   Four lines down, in the third sentence of
6   this overall performance block, states:  "During
7   the course of the year she has continuously made
8   the effort to communicate turnover items with her
9   coworkers and/or her direct supervision."
10       Do you agree with that assessment of your
11  performance?
12  A.   Yes.
13  Q.   What turnover items did you communicate to
14  your supervision during that work year?
15  A.   Turnover as far as the job that I was
16  performing for that day.
17  Q.   How did you communicate these things to your
18  supervision?
19  A.   Through a job assignment sheet.
20  Q.   Did you just hand that sheet to your
21  supervisor?
22  A.   That is correct.
23  Q.   Was it your foreman that you typically gave

**Page 310**

1   Q.   The first block that's labeled, "Overall
2   performance."
3   A.   Yes.
4   Q.   Take a minute and review that assessment of
5   your overall performance for the work year, and
6   tell me if you agree with this assessment.
7        (The witness examines the
8        document.)
9   A.   Yes.
10  Q.   Who reviewed Exhibit 13 with you?
11  A.   You're talking about where it says
12  "Reviewing Supervisor," in that block?
13  Q.   Yes, ma'am.
14  A.   I guess that would be Joe Walden's initials,
15  I believe.
16  Q.   Did Deborah Crutchfield go over this
17  evaluation with you?
18  A.   Yes.
19  Q.   Was anyone else present when she went over
20  this evaluation with you?
21  A.   I don't recall.
22  Q.   Who was the reviewing supervisor?
23  A.   Joe Walden.

10 (Pages 307 to 310)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

### Page 311

1  Q.   Okay.  On the first page of the exhibit is
2  the Developmental Action Plan block.  Do you agree
3  with the action plan items reflected there for
4  this work year?
5  A.   Yes.
6  Q.   Okay.  Are those your initials at the top of
7  the page?
8  A.   Yes.
9  Q.   Now, why did you put your initials up there
10  and those dates?
11  A.   Because that is what we were supposed to do,
12  initial off.
13  Q.   Are these dates during the year that this
14  plan was gone over with you?
15  A.   I don't recall.
16  Q.   You don't recall?  Okay.
17       (Defendant's Exhibit No. 14 was
18       marked for identification and a
19       copy of the same is attached
20       hereto.)
21  Q.   Ms. McDowell, I'm handing you and your
22  attorney a copy of what I've marked as Exhibit 14
23  to your deposition.

### Page 312

1       Would you take a moment and review this
2  exhibit?
3       (The witness examines the
4       document.)
5  Q.   Have you had a chance to look at the Overall
6  Performance block on page 4 of this exhibit?
7  A.   Yes.
8  Q.   Do you agree with this assessment of your
9  performance for the 2004 work year?
10  A.   Yes.
11  Q.   Who was your immediate supervisor for this
12  work year?
13  A.   Mark Freeman.
14  Q.   And who was your reviewing supervisor?
15  A.   Deborah Crutchfield.
16  Q.   And you didn't make any comments on this
17  evaluation, did you?
18  A.   No.
19  Q.   On the first page of the evaluation, in the
20  developmental action plan, would you please review
21  those things and tell me if you agree with those?
22  A.   Yes.
23  Q.   Okay.

### Page 313

1       (Defendant's Exhibit No. 15 was
2       marked for identification and a
3       copy of the same is attached
4       hereto.)
5  Q.   I'm handing you and your lawyer what I've
6  marked as Exhibit 15 to your deposition.
7       If you would, take a look at that exhibit
8  and refresh yourself, and tell me if this is your
9  performance evaluation and plan for the 2005 work
10  year.
11       (The witness examines the
12       document.)
13  A.   Yes, it is.
14  Q.   And your employment with Southern
15  Nuclear-Plant Farley ended in September of 2005,
16  correct?
17  A.   That is correct.
18  Q.   But at least up until July 12th of 2005, you
19  agree with this assessment of your performance for
20  the 2005 work year?
21  A.   Up until my last evaluation, yes, in July of
22  2005.
23  Q.   Okay.  On page 4 of Exhibit 15, there's a

### Page 314

1  block designated "Performance Versus
2  Expectations."  Do you see that?
3  A.   Yes.
4  Q.   The last entry on that block states:
5  "Janell has brought to the attention of
6  supervision equipment conditions, plant material
7  condition, and communicates to her fellow
8  coworkers of her discovery."
9       What did you do to merit that comment?
10  A.   I don't recall.  It might be in the e-mails
11  that you received.  I don't recall.
12  Q.   Okay.  Who was your immediate supervisor
13  during 2005, up until your termination?
14  A.   Mark Freeman.
15  Q.   Have you seen a copy of this evaluation
16  before now?
17  A.   No, not completely, no.
18  Q.   And the exhibits that we just marked as your
19  performance evaluations for the years that you
20  worked at Plant Farley, those are the evaluations
21  that you referenced earlier as having been very
22  positive evaluations that you received; is that
23  correct?

11 (Pages 311 to 314)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

| Page 315 |
| --- |

1  A.    That is correct.
2  Q.    And those are the ones that you are
3  referring to in your EEOC Charge Statement marked
4  as Exhibit 6?
5  A.    That is correct.
6  Q.    Okay. You believe you deserved the positive
7  feedback that you got in these performance
8  evaluations?
9  A.    That is correct.
10  Q.    Okay. The second paragraph of your EEOC
11  Statement begins with a sentence that reads: "On
12  Tuesday, August 16, 2005, I received an 18-month
13  DML (decision making leave) for not speaking to a
14  coworker."
15       Do you know if I read that statement
16  correctly, or do you need me to re-read it?
17  A.    You can re-read it.
18  Q.    Okay. The second paragraph, first sentence
19  states: "On Tuesday, August 16, 2005, I received
20  an 18-month DML (decision making leave) for not
21  speaking to a coworker."
22       Did I read that statement correctly?
23  A.    That is correct.

| Page 316 |
| --- |

1  Q.    Your DML was given for more than just the
2  reason that you've recounted here; isn't that
3  correct?
4  A.    That is correct.
5  Q.    On the second page of this EEOC Statement,
6  the first paragraph on the second page, you
7  reference a September 9, 2005, date.
8       Does that refresh your recollection on the
9  date of the meeting that you had with your foreman
10  and the supervisor of Facilities foremen; those
11  people being Shelley Murrell, Deborah Crutchfield,
12  and Mark Freeman?
13  A.    That is correct.
14  Q.    And in the last paragraph on this page, you
15  reference a hearing via teleconference with the
16  State Department of Industrial Relations.
17       Is that the teleconference that you have
18  previously testified that you tape recorded?
19  A.    That is correct.
20  Q.    Have you listened to that tape recording of
21  that teleconference?
22  A.    Yes, I have.
23  Q.    Do you agree with the contents of your tape

| Page 317 |
| --- |

1  recording of that teleconference as being
2  accurate?
3  A.    Do I agree with the -- can you repeat that?
4  Q.    Is your tape recording of that
5  teleconference an accurate recordation of that
6  teleconference?
7  A.    Yes.
8  Q.    Have you tampered with that tape in any way?
9  A.    No.
10  Q.    So the contents of your tape recording
11  accurately reflects what was said during that
12  teleconference?
13  A.    That is correct.
14  Q.    Okay.
15       (Defendant's Exhibit No. 16 was
16       marked for identification and a
17       copy of the same is attached
18       hereto.)
19  Q.    I'm handing you, Ms. McDowell, what I've
20  marked as Defendant's Exhibit 16 to your
21  deposition.
22       MS. SHARP: Mr. Newman, your assistant
23  made me just one copy of this.

| Page 318 |
| --- |

1  Q.    And this, Ms. McDowell, is a document that I
2  was handed just before we started your deposition
3  this morning.
4       Would you please identify what Defendant's
5  Exhibit 16 is for me?
6       MR. NEWMAN: I'm sorry. You didn't get
7  that until today?
8       MS. SHARP: He handed me this one
9  today. He handed me Ms. Sanders' yesterday.
10       MR. NEWMAN: Oh. Are you sure? She
11  didn't have hers yesterday?
12       MS. SHARP: So whose did I get
13  yesterday?
14       THE WITNESS: Mine.
15       MS. SHARP: Okay. I'm sorry. Let the
16  record reflect that I received Defendant's Exhibit
17  16 yesterday, before we reconvened Ms. McDowell's
18  deposition at 1:30.
19       THE WITNESS: That's right.
20  (BY MS. SHARP)
21  Q.    Okay. Tell me what Defendant's Exhibit 16
22  is.
23  A.    A payroll stub.

12 (Pages 315 to 318)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

| Page 319 |
|---|

1   Q.   From what employer?
2   A.   Wal-Mart.
3   Q.   How long have you been working at Wal-Mart?
4   A.   I believe since the end of August.
5   Q.   2006?
6   A.   That is correct.
7   Q.   What job do you perform?
8   A.   Order filler.
9   Q.   Order filler?
10  A.   Yes.
11  Q.   Okay.  What are your responsibilities in
12  that position?
13  A.   Order filler.  Orders.
14  Q.   What kind of orders?
15  A.   Groceries.
16  Q.   What are your hours?
17  A.   I go in at five in the morning and I leave
18  when the work is done.  Fridays, Saturdays, and
19  Sundays -- Saturdays, Sundays, and Mondays.
20  Excuse me.
21  Q.   I need you to repeat what you just said.
22  A.   I go in at 5 a.m. in the morning and I leave
23  when the work is completed.  And it's Saturdays,

| Page 320 |
|---|

1   Sundays, and Mondays.
2   Q.   So Saturday, Sunday, and Monday are your
3   work days?
4   A.   That is correct.
5   Q.   Are you a full-time employee?
6   A.   Yes.
7   Q.   How many hours are you averaging per week?
8   A.   It varies.  Anywhere between 70 to over 80.
9   Q.   What is your hourly rate of pay?
10  A.   It's $12 and change.  Is it not on that?
11       MR. NEWMAN:  That's it right there on
12  the top.
13  A.   12.65.
14  Q.   $12.65 an hour?
15  A.   I believe so.  It's around that, yes.
16  Q.   Okay.  Do you have insurance with Wal-Mart?
17  A.   No.
18  Q.   No insurance at all?
19  A.   No.
20  Q.   Do you have vacation available to you?
21  A.   No.
22  Q.   Which Wal-Mart are you employed at?
23  A.   The Wal-Mart Distribution Center in

| Page 321 |
|---|

1   Brundidge.
2   Q.   Do you know that address?
3   A.   No, I do not.
4   Q.   Who is your supervisor?
5   A.   Chris Rudd.
6   Q.   R-U-D-D?
7   A.   That is correct.
8   Q.   Did you have the option to take health
9   insurance with Wal-Mart and you chose not to?
10  A.   No.  I'm not eligible for it yet because I
11  have not been there long enough.
12  Q.   Do you currently have health insurance?
13  A.   No, I do not.
14  Q.   When was the last day you were covered with
15  health insurance?
16  A.   The day that -- I guess the 30 days that it
17  ran out after I was terminated.
18  Q.   Did you receive a COBRA notification after
19  you were terminated?
20  A.   Yes, I did.
21  Q.   And you did not opt to take COBRA coverage?
22  A.   I could not afford to take COBRA coverage.
23       (Defendant's Exhibit No. 17 was

| Page 322 |
|---|

1        marked for identification and a
2        copy of the same is attached
3        hereto.)
4   Q.   I'm handing you what I've marked as
5   Defendant's Exhibit 17 to your deposition, Ms.
6   McDowell.
7        If you would, ma'am, please take a minute
8   and review that document.
9        (The witness examines the
10       document.)
11  Q.   Have you seen this document prior to today?
12  A.   Yes.
13  Q.   Have you had a chance to review it before
14  today?
15  A.   Yes.
16  Q.   Okay.  Did you review it carefully when you
17  reviewed it previously?
18  A.   Yes.
19  Q.   And did you respond fully to the requests in
20  this document?
21  A.   To the best of my ability, yes.
22  Q.   Okay.
23       (Defendant's Exhibit No. 18 was

13 (Pages 319 to 322)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 323

```
1        marked for identification and a
2        copy of the same is attached
3        hereto.)
4   Q.   Were you aware when you signed this
5   document, Ms. McDowell, that you were signing this
6   document under oath and swearing to tell the truth
7   in this document?
8   A.   Yes.
9        MR. NEWMAN: What document are you
10  referring to?
11       MS. SHARP: Strike that.
12  Q.   I'm handing you Defendant's Exhibit 18, Ms.
13  McDowell. Take a look at that document and tell
14  me if you have reviewed this document previous to
15  today.
16  A.   Yes.
17  Q.   Did you review it carefully?
18  A.   (No response.)
19  Q.   Did you review it carefully?
20  A.   Yes.
21  Q.   Do you understand, Ms. McDowell, that
22  Defendant's Exhibit 18 is your answer to the
23  questions that I posed to you in Defendant's
```

Page 324

```
1   Exhibit 17?
2   A.   That is correct.
3   Q.   Okay. Did you understand, when you signed
4   off on Defendant's Exhibit 18, Ms. McDowell, that
5   you were signing that your answers in this
6   document were being given under oath and that you
7   were swearing to the truthfulness of those
8   answers?
9   A.   To the best of my ability, yes.
10  Q.   On the first page of Defendant's Exhibit 18,
11  you identify employees whom you have worked for
12  within the past ten years. And you list
13  Kaye-Jen-Step Environmental Hygienic Service; is
14  that correct?
15  A.   That is correct.
16  Q.   What is this company?
17  A.   That's my business.
18  Q.   What kind of business is this?
19  A.   Cleaning service.
20  Q.   What kind of cleaning services do you
21  provide?
22  A.   Residential and commercial.
23  Q.   How long have you had this business?
```

Page 325

```
1   A.   The day after I was terminated. Since
2   September 16th.
3   Q.   Were you terminated on September 16th?
4   A.   Yes, September 16th.
5   Q.   Is this business a corporation?
6   A.   It's being incorporated, yes.
7   Q.   Who's handling the incorporation of the
8   business for you?
9   A.   Corbin Enterprises.
10  Q.   Corbin?
11  A.   Uh-huh.
12  Q.   C-O-R-B-I-N?
13  A.   That's correct.
14  Q.   Where are they located?
15  A.   Right here on Oates.
16  Q.   Who are you working with at Corbin
17  Enterprises to incorporate your business?
18  A.   Mr. Corbin.
19  Q.   What is Mr. Corbin's first name?
20  A.   I can't recall at this time.
21  Q.   So how have you been operating this
22  business, since you are now working on
23  incorporating it?
```

Page 326

```
1   A.   How have I been --
2   Q.   That's a bad question. What type of
3   business entity is Kaye-Jen-Step at this point in
4   time?
5   A.   A cleaning service.
6   Q.   Is it a partnership?
7   A.   That is correct.
8   Q.   Are you the only partner in this business?
9   A.   No, I am not.
10  Q.   Who are the other partners in this business?
11  A.   My sister and Stephanie Sanders.
12  Q.   What is your sister's name?
13  A.   Kenneather Kelly.
14  Q.   Would you spell the first name, please?
15  A.   K-E-N-N-E-A-T-H-E-R.
16  Q.   Kelly, K-E-L-L-Y?
17  A.   Yes.
18  Q.   And the three of you have been partners in
19  this business since September 16, 2005?
20  A.   That is correct.
21  Q.   And you testified that you started this
22  business the same day that you were terminated
23  from Plant Farley; is that correct?
```

14 (Pages 323 to 326)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

| Page 327 |
|---|

1  A.  That's correct.
2  Q.  Had you been working on starting this
3  business prior to that date?
4  A.  No.
5  Q.  What salary have you drawn from this
6  business?
7  A.  I can't give you a definite price. It's not
8  enough for me to maintain my household.
9  Q.  You can't give me a definite price regarding
10  the salary that you've paid yourself from your
11  business?
12  A.  Whatever statements that you received that I
13  gave you as far as the two bank statements, that's
14  normally split between Stephanie and myself.
15     My sister does not take any money because
16  she is working at this particular time and she
17  knows that we need the money.
18  Q.  Is Alabama Telco Credit Union the bank or
19  financial institution that you use for this
20  business?
21  A.  That is correct.
22  Q.  Is that the only place where you have an
23  account for this business?

| Page 328 |
|---|

1  A.  No. I have another bank. It's Army
2  Aviation Federal Credit Union.
3  Q.  Where is this credit union located?
4  A.  Montgomery Highway in Dothan. I don't have
5  an address.
6  Q.  What type of account do you maintain at that
7  credit union?
8  A.  For the business?
9  Q.  Yes, ma'am.
10  A.  It's an account that has the business name
11  on it, but it's set up in my name and Stephanie's
12  name. The account lists both our names on it.
13  Q.  Is it a checking account?
14  A.  It is a -- I believe it is a checking and
15  savings account. We don't write checks from that
16  business account; it's savings.
17  Q.  How long have you had that account with Army
18  Aviation Federal Credit Union?
19  A.  I don't know the exact date.
20  Q.  Did you open it in 2005, when you started
21  the business?
22  A.  Yes.
23  Q.  Where are the statements related to that

| Page 329 |
|---|

1  account?
2  A.  They're at the house.
3  Q.  Why did you not provide me the statements
4  for that account?
5  A.  Because I was told to bring in paperwork to
6  verify my income. So I pulled the last two months
7  that I had, plus a pay stub, and thought that that
8  would suffice. I was not told to bring every
9  month.
10  Q.  Do you not use the Army Aviation Federal
11  Credit Union account to pay your salary or Ms.
12  Sanders' salary?
13  A.  Yes, I do.
14  Q.  So why did you not bring statements from
15  that bank account versus the Alabama Telco Credit
16  Union account?
17  A.  Because the Alabama Telco account is the
18  account that we had used for the last two months.
19     Once again, I did not bring it. I thought
20  it was just verification of income, so I brought
21  the last two months' statements plus one paycheck
22  stub.
23  Q.  Aside from your account statements from the

| Page 330 |
|---|

1  Alabama Telco Credit Union account and the Army
2  Aviation Federal Credit Union account, do you have
3  any other documentation that reflects your
4  earnings from your business? And your business
5  being Kaye-Jen-Step Environmental Hygienic
6  Services.
7  A.  I have my receipt books.
8  Q.  Can we get an agreement that you will go
9  back and pull your account statements from both of
10  these credit unions, your receipt books, and any
11  other documentation that you might have that
12  reflects your earnings since your termination from
13  Plant Farley on September 16, 2005, and that you
14  will provide that information to Mr. Newman who
15  can then provide that information to me?
16  A.  Okay.
17     (Defendant's Exhibits Nos. 19
18     and 20 were marked for
19     identification and a copy of the
20     same is attached hereto.)
21  Q.  And I'm handing you what I've marked as
22  Defendant's Exhibits 19 and 20 to your deposition.
23     Are those the two account statements that

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

### Page 331

1  you previously referred to as your most recent
2  statements from your Alabama Telco Credit Union
3  account for your business?
4  A.   That is correct.
5  Q.   Have you filed a tax return for 2005, Ms.
6  McDowell?
7  A.   Not yet, no.
8  Q.   Have you gotten an extension?
9  A.   Yes, I did.
10  Q.   When do you plan to file your tax return for
11  2005?
12  A.   When I can get the money to do it. I know
13  I'm going to be penalized for it. But Mr. Corbin,
14  he's going to work on that for us.
15  Q.   And you understand I'm asking about last
16  year, not this year?
17  A.   Yes.
18  Q.   Okay. Is Mr. Corbin an accountant?
19  A.   No. He has someone that he knows is an
20  accountant.
21        MR. NEWMAN: Are you at a point where I
22  can take a real quick five-minute break?
23        MS. SHARP: Sure, sure, no problem.

---

### Page 332

1        (A brief recess was taken.)
2  (BY MS. SHARP)
3  Q.   Going back to Exhibit 18, Ms. McDowell, your
4  answers to the interrogatories, in No. 8, I ask
5  you to state whether you have ever applied for
6  worker's compensation benefits. And you responded
7  that I have --
8        MR. NEWMAN: Worker's compensation?
9        MS. SHARP: That was my question.
10  Q.   And you can look on Exhibit 18 -- sorry --
11  17 for that. My questions are Exhibit 17, No. 8.
12        And your response to No. 8, looking on
13  Exhibit 18, is that you have not applied for
14  unemployment compensation. So is that just a
15  mistake?
16  A.   It's a typographical error. Because when I
17  answered this question, worker's comp, I was
18  looking at the nature of the injury.
19        No, I have not applied for worker's comp for
20  an injury on the job.
21  Q.   And looking at your response to No. 11,
22  where I asked you to identify all complaints or
23  charges you have filed with any federal, state, or

---

### Page 333

1  local agency, including the EEOC, in 11(b), in
2  your response, you make reference to your
3  December 15, 2005, EEOC Charge. Do you see that?
4  A.   Right.
5  Q.   Have we discussed the allegations that you
6  were singled out, that you were labelled, of race
7  discrimination, of retaliation, of harassment, of
8  sexual harassment, and maliciously discharged, in
9  your deposition up to this point?
10  A.   Yes.
11  Q.   Okay. Is there anything else that you
12  recall at this time to add to support your
13  allegations?
14  A.   Not at this time.
15  Q.   Okay. In (c) you identify NAACP, Mr. Wade
16  Morrison.
17        What type of complaint or charge did you
18  make to the NAACP?
19  A.   I believe you have a copy of that letter.
20  Q.   Is that something that you produced in
21  response to the request for production?
22  A.   That is something that I produced to my
23  attorney.

---

### Page 334

1  Q.   Do you recall me showing it to you up until
2  today?
3  A.   I don't recall. I don't remember.
4  Q.   Who was the letter addressed to?
5  A.   To the NAACP, Mr. Wade Morrison.
6        MS. SHARP: I don't have a copy of that
7  letter.
8        MR. NEWMAN: Do you want a copy of it?
9        MS. SHARP: (Nods head.)
10        MR. NEWMAN: Okay.
11        MS. SHARP: Do you have a copy that I
12  can look at while I'm deposing her?
13        MR. NEWMAN: I'll get Jonah to look for
14  it.
15        MS. SHARP: Okay.
16        (A brief recess was taken.)
17        MR. NEWMAN: I found I think what maybe
18  she's referring to, but neither is signed. So I'm
19  going to have them to identify what's what for me,
20  because it looks like you have the same letter.
21        So step over here and tell me which pages go
22  with which.
23        THE WITNESS: All of it went together

---

16 (Pages 331 to 334)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

| Page 335 |
|---|

1  when the package was sent to him. It was her
2  information as well as mine.
3      MR. NEWMAN: Well, what I'm confused
4  about is this: There's one page that's got your
5  name and there's another page that's got both
6  names sincerely, so I don't know what's what. Is
7  it two different letters?
8      THE WITNESS: Right. But the packet
9  was sent together.
10     MR. NEWMAN: This is one?
11     MS. SANDERS: I think one was a
12  follow-up letter and the top page is missing.
13     MR. NEWMAN: Well, it appears that both
14  are dated March 6th.
15     MS. SANDERS: What are these?
16     THE WITNESS: March 6th.
17     MR. NEWMAN: And the first paragraph is
18  different on each one, so they are different
19  letters.
20     MS. SANDERS: There's one page missing
21  on there.
22     MR. NEWMAN: Can you identify which
23  letter is your letter, Ms. McDowell?

| Page 336 |
|---|

1      THE WITNESS: This is mine. And then I
2  think this is the beginning. Okay. This is what
3  we wrote together.
4      MR. NEWMAN: This goes with this?
5      THE WITNESS: No. This goes with this
6  one.
7      MR. NEWMAN: This goes with this?
8      THE WITNESS: I don't know. I think
9  something is missing. We'll have to come up with
10  it.
11     MS. SANDERS: Let me look at one real
12  quick.
13     MR. NEWMAN: I'll tell you what, we're
14  going to step out here for just a second.
15     MS. SHARP: Okay. Mr. Newman, if you
16  can get Ms. McDowell's completely in order, would
17  you bring me a copy for her and a copy for me to
18  use as I question her? Two copies of it.
19     MR. NEWMAN: Yeah.
20     (A brief recess was taken.)
21     (Defendant's Exhibit No. 21 was
22  marked for identification and a
23  copy of the same is attached

| Page 337 |
|---|

1      hereto.)
2  (BY MS. SHARP)
3  Q.  Ms. McDowell, I'm handing you what I've
4  marked as Defendant's Exhibit 21 to your
5  deposition.
6      Is this the complaint or charge that you
7  made to the NAACP that you referred to earlier?
8  A.  Yes.
9  Q.  Okay. And I heard you tell your lawyer that
10  you had sent a packet. Were you saying you sent a
11  packet to the NAACP or were you saying you gave a
12  packet to Mr. Newman?
13  A.  I sent this letter and cassette tape and her
14  letter.
15  Q.  And Ms. Sanders' letter?
16  A.  Yes.
17  Q.  And the cassette tapes are the three
18  cassette tapes that we previously have talked
19  about in your deposition?
20  A.  That is correct.
21  Q.  And Mr. Wade Morrison, is he a NAACP
22  representative here in Dothan?
23  A.  That is correct.

| Page 338 |
|---|

1  Q.  In your interrogatory response, you
2  identified Greater Beulah Baptist Church, Dothan,
3  Alabama, as part of your response to the
4  complaints and charges that you have made.
5      Why do you indicate this church here?
6  A.  Because that's where his office is located.
7  Q.  Okay.
8      MR. NEWMAN: Well, that's where they
9  have the meetings.
10     MS. SHARP: Okay.
11  Q.  Is there an NAACP office here in Dothan?
12  A.  I don't know.
13  Q.  Okay. But you have spoken with Mr. Morrison
14  at the Greater Beulah Baptist Church?
15  A.  I have spoken to him. Not at the Greater
16  Beulah, no.
17  Q.  How did you get your packet to Morrison?
18  A.  I dropped it off to him.
19  Q.  Where?
20  A.  At the Greater Beulah.
21  Q.  But you didn't speak with him at that time?
22  A.  No.
23  Q.  Okay. When did you drop off your packet to

17 (Pages 335 to 338)

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 339

1    Mr. Morrison?
2    A.   Around the 6th of March, 2006.
3    Q.   When did you prepare your letter that we've
4    marked as Defendant's Exhibit 21 to your
5    deposition?
6    A.   The date that's on the letter.
7    Q.   Okay.  And you did not sign your letter; is
8    that correct?
9    A.   I believe I did.  I don't know.  This is a
10   copy of the letter.
11   Q.   This is not the final version of your letter
12   to Mr. Morrison?
13   A.   This is the same letter, it's just a copy of
14   it.
15   Q.   But if this copy is not signed, does that
16   not mean that your original was not signed?
17   A.   My original is signed.  This is a copy that
18   I've had on my computer.  It's the same exact
19   thing that I sent to him, only his copy is signed
20   and this copy is not.
21   Q.   Does the copy of your letter that we've
22   marked as Defendant's Exhibit 21, is the original
23   of it signed by Ms. Sanders as well as yourself?

Page 340

1    A.   Yes.
2    Q.   Did Ms. Sanders go with you to drop off your
3    packet to Mr. Morrison?
4    A.   Yes.
5    Q.   And are the things that you described to Mr.
6    Morrison in Defendant's Exhibit 1(sic), are they
7    part --
8         MR. NEWMAN:  21.
9         MS. SHARP:  Excuse me.  Exhibit 21.
10   Q.   -- are they part of the allegations that you
11   are making against Southern Nuclear and Plant
12   Farley in this lawsuit?
13   A.   Yes.
14   Q.   Looking at Exhibit 21, first page, last
15   paragraph, you make the note: "A member of
16   management initially gets accused of sexual
17   harassment, but it is later discovered that he
18   conceived a child with his subordinate employee,
19   yet continues his job and thus continues to be
20   upwardly mobile on the corporate ladder."
21       Who are you talking about there?
22   A.   Chris Thornell.
23   Q.   And who is it that Mr. Thornell had a child

Page 341

1    with at the plant?
2    A.   My understanding is that she's no longer
3    there.  Shilo Bivins I believe.
4    Q.   Is Ms. Bivins a friend of yours?
5    A.   No, not a friend.
6    Q.   Did she tell you that she and Mr. Thornell
7    had a child together?
8    A.   No.
9    Q.   How do you know that Ms. Bivins and Mr.
10   Thornell had a child together?
11   A.   From conversations going on around the
12   plant.
13   Q.   From whom?
14   A.   I can't recall directly.
15   Q.   So your accusation against Mr. Thornell and
16   Ms. Bivins is based on rumors around the plant?
17   A.   Right.
18   Q.   And you reported these rumors to the NAACP
19   as a fact?
20   A.   No.  I reported this because I wanted this
21   to be investigated.
22   Q.   No.  My question to you is that you reported
23   those rumors to NAACP as a fact.

Page 342

1    A.   No.
2    Q.   Then your complaint to the NAACP is not
3    based on facts; is that what you are saying?
4    A.   Yes, it was based on facts.  But what is in
5    this letter, from what I have been told, I know
6    Chris Thornell is still at the plant; I know he's
7    climbing the corporate ladder.  I knew about
8    sexual harassment charges being brought out on
9    him.  I knew that from Shilo.  But I was later
10   told that the child that she had conceived was
11   his.
12   Q.   Now, you're changing your testimony now and
13   saying that Ms. Bivins specifically told you about
14   your allegation in this letter, are you not?
15   A.   I'm telling you that I was told from her
16   about sexual harassment charges being brought up
17   on him.
18   Q.   But that is contrary --
19   A.   But as far as conceiving the child, no.  No.
20   Q.   Ms. Bivins did not tell you that she
21   conceived a child with Chris Thornell?
22   A.   That is correct.
23   Q.   So you have reported to the NAACP a rumor

18 (Pages 339 to 342)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 343

1    about two individuals; and you know that you do
2    not know the truthfulness of that rumor. Is that
3    your testimony today?
4    A.   I guess.
5    Q.   So, in fact, your statement to the NAACP,
6    your complaint and charge to them, is not based
7    entirely upon facts; is that correct?
8    A.   I guess you could say for this statement,
9    yes.
10   Q.   The second part of this paragraph speaks to
11   an African-American male who gets terminated at
12   the mere mention of sexual harassment, not from
13   the woman he supposedly harassed but by another
14   white male who was interested in the white female.
15       Where do you get that information?
16   A.   I got that from my knowledge.
17   Q.   And tell me what knowledge you base that on.
18   A.   I base that on because I knew about the
19   relationship between Tammy Morris -- Traci Morris
20   and Derrick Henderson.
21       I knew that the shared employee got upset
22   because Derrick went and wrapped that sweater
23   around Traci and had said some things to Traci,

Page 344

1    but I knew of Derrick and Traci's relationship.
2    I've seen them in action at Plant Hatch.
3        And so because of the fact that he didn't
4    like the idea that Derrick is a black male and
5    saying things to Traci, then he decided that he
6    wanted to report that.
7    Q.   Who is this he that you are referring to?
8    A.   I don't recall his name at the time.
9    Mansey, or something like that, is his last name.
10   I don't recall his name.
11   Q.   Is he a Plant Farley employee?
12   A.   Plant Hatch shared employee.
13   Q.   And in your statement to the NAACP, you say,
14   "Meanwhile, an African-American man gets
15   terminated at the mere mention of sexual
16   harassment, not from the woman he supposedly
17   harassed..."
18       Do you know for a fact that Traci Morris did
19   not make an allegation or complaint of sexual
20   harassment against the African-American male that
21   you are referencing in this paragraph?
22   A.   Traci told me from the beginning that she
23   was not the one who initiated it; that it was the

Page 345

1    shared employee who initiated it. And then she
2    went and complained about it.
3    Q.   So, in fact, Ms. Morris did tell you that
4    she did make a complaint to the company of sexual
5    harassment?
6    A.   Yes. Because she came to me and asked me to
7    go and speak to you.
8    Q.   So, in effect, your statement, again, to the
9    NAACP is not truthful here about the harassment
10   allegation made against that African-American
11   male; is that correct?
12   A.   I don't know. What one are you talking
13   about right now?
14   Q.   The end of the first page, the last sentence
15   that begins on that page: "Meanwhile, an
16   African-American man gets terminated at the mere
17   mention of sexual harassment, not from the woman
18   he supposedly harassed, but by another white male
19   who was interested in the white female."
20   A.   That's right. Because the white male was
21   the one who initiated the complaint. It wasn't
22   her.
23   Q.   So are you saying that Ms. Morris did not

Page 346

1    make a complaint to Plant Farley that she was
2    harassed by an African-American male?
3    A.   No. What I'm saying is that she did not
4    initiate it; that the white shared employee
5    initiated it, and then she did say something
6    because it was being investigated. But for her to
7    initiate it at first, no, she did not do that; the
8    shared employee did that.
9    Q.   Ms. McDowell, your statement says nothing
10   about who initiated the sexual harassment
11   allegation, does it?
12   A.   When I indicate in here --
13   Q.   It does not, does it?
14   A.   When I indicated in here that, as an
15   African-American man gets terminated at the mere
16   mention of sexual harassment, that is what I am
17   indicating: when the white male went and
18   mentioned it pertaining to Derrick and Traci, and
19   not from her initially.
20   Q.   Ms. McDowell, would you read that sentence
21   into the record out of Plaintiff's Exhibit 21,
22   please?
23   A.   "Meanwhile, an African-American man gets

19 (Pages 343 to 346)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

| Page 347 | Page 349 |
|---|---|
| 1  terminated at the mere mention of sexual | 1  other people in management. |
| 2  harassment, not from the woman he supposedly | 2  Q.  Anything else? |
| 3  harassed, but by another white male who was | 3  A.  No. |
| 4  interested in the white woman." | 4  Q.  "We have addressed this lack of respect to |
| 5  Q.  Who is the African-American male that you | 5  upper management and the outcome has been |
| 6  are referring to? | 6  retaliation." |
| 7  A.  Derrick Henderson. | 7  Have you told me all of the events that you |
| 8  Q.  Who is the white female that you are | 8  are referencing there, or is there something else? |
| 9  referring to in that statement? | 9  A.  As I stated before, I have told you |
| 10  A.  Traci Morris. | 10  everything that I can recall at this time. |
| 11  Q.  Who is the "another white male," that you | 11  Q.  "We have been falsely accused, and the |
| 12  are referring to in that statement? | 12  company's fix to this was a simple apology." |
| 13  A.  The shared employee from Hatch. | 13  What are you referring to there? |
| 14  Q.  Thank you.  On the second page of your | 14  A.  The Mark Freeman incident. |
| 15  letter of complaint or charge to the EEOC (sic), | 15  Q.  Anything else? |
| 16  the fourth full paragraph states: "We have been | 16  A.  No. |
| 17  denied union representation." | 17  Q.  "We have been unjustly called liars and |
| 18  Tell me what you are referring to there. | 18  thieves." |
| 19  A.  The incident that we've already discussed | 19  What are you referring to there? |
| 20  when Leonard Russ told another union rep that he | 20  A.  When they accused Bobby White, a black man, |
| 21  was entitled to union representation. | 21  of stealing meat out of the cafeteria, and he was |
| 22  MR. NEWMAN:  Now, I want to make sure | 22  not even at work that day. |
| 23  we keep the record clear.  You just made some | 23  Q.  Anything else? |

| Page 348 | Page 350 |
|---|---|
| 1  reference to the EEOC? | 1  A.  No.  That's what I was referring to. |
| 2  MS. SHARP:  Excuse me.  To the extent I | 2  Q.  When did that take place? |
| 3  made reference to the EEOC, I meant the NAACP.  Is | 3  A.  I don't recall. |
| 4  that satisfactory? | 4  Q.  Was it the year you were terminated, 2005? |
| 5  MR. NEWMAN:  Okay. | 5  A.  No. |
| 6  Q.  So you were referring to the Leonard Russ | 6  Q.  The year before, 2004? |
| 7  incident here where you say, "We have been denied | 7  A.  I don't know. |
| 8  union representation"? | 8  Q.  Who was it that accused Mr. White of taking |
| 9  A.  That is correct. | 9  meat out of the cafeteria? |
| 10  Q.  What other incident are you referring to? | 10  A.  I don't recall. |
| 11  A.  That's all I can recall. | 11  Q.  How do you know someone accused Mr. White of |
| 12  Q.  Your statement is that "We have been denied | 12  stealing meat out of the cafeteria? |
| 13  union representation." Who is the we? | 13  A.  From Mr. White and Stephanie. |
| 14  A.  We as a group.  We as a group. | 14  Q.  Ms. Sanders? |
| 15  Q.  Who was part of that group, Ms. McDowell? | 15  A.  That is correct. |
| 16  A.  The helpers. | 16  Q.  When did Mr. White tell you of this? |
| 17  Q.  All of the helpers? | 17  A.  I don't know. |
| 18  A.  Yes. | 18  Q.  When did Ms. Sanders tell you about this? |
| 19  Q.  "We have been talked down and treated less | 19  A.  I don't recall the date. |
| 20  than human." | 20  Q.  On page 3 of your letter to the NAACP, the |
| 21  What are you referring to there? | 21  first full paragraph, you state: "We have been |
| 22  A.  Referring to Shelley Murrell, the way she | 22  given discipline from one year, 18 months and |
| 23  speaks to people:  The way she talks down to us, | 23  terminated for not speaking." |

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 351

1    Who is the we that you are referring to?
2    A.   Me and Stephanie.
3    Q.   Was Ms. Stephanie Sanders terminated for not
4    speaking to anyone?
5    A.   I believe that question was asked before.
6    Q.   Well, I'm asking you related to this
7    document, Defendant's Exhibit 21, your letter to
8    the NAACP.
9        Was Ms. Sanders, as you represent here,
10   terminated for not speaking to anyone?
11   A.   That was something that was initiated from
12   her reprimand that overflowed into termination.
13   Q.   Was Ms. Sanders told that she was terminated
14   for not speaking to anyone?
15   A.   I don't know.  You'll have to ask her.
16   Q.   Did Ms. Sanders tell you that she was
17   terminated for not speaking to anyone?
18   A.   I don't recall.
19   Q.   What is the basis for you saying that Ms.
20   Sanders was terminated for not speaking to anyone?
21   A.   I don't recall at this time.  I know when
22   she was disciplined -- you're saying the
23   difference between when she was terminated, what

Page 352

1    she was terminated for.
2        When she was disciplined, she was
3    disciplined for not speaking to a coworker.
4    Q.   I'm not asking about Ms. Sanders'
5    discipline?
6    A.   Well, that --
7    Q.   My question is --
8    A.   I'm saying it overflowed.  One relates to
9    the other.  And that's the best that I can do at
10   this time.
11   Q.   Do you agree, Ms. McDowell, that your
12   statement here, on page 3 of your complaint to the
13   NAACP, your statement being:  "We have been given
14   discipline from one year, 18 months and terminated
15   for not speaking," is not accurate?
16   A.   No, I wouldn't say that.
17   Q.   Would you say that your statement is not
18   truthful?
19   A.   I wouldn't say that.  You're trying to
20   separate it when one flows with the next.  One
21   thing, the DML, initiated something to the end
22   result of something else.
23       So if that's what we were told initially,

Page 353

1    when we went into the office for receiving a DML,
2    and then after we were terminated for not
3    following the guidelines in the DML, they all go
4    together.
5    Q.   You're under oath here today, Ms. McDowell.
6    Is your statement that this statement in your
7    charge to the NAACP is an accurate and truthful
8    statement that you and Ms. Sanders have been given
9    discipline from one year, 18 months and terminated
10   for not speaking?
11       Are you saying that is a truthful and
12   accurate statement?
13   A.   Yes.
14   Q.   The next to last paragraph begins:  "A few
15   years ago, management stood in the auditorium at
16   Farley Nuclear Plant and stated, 'The good ole boy
17   days are over,' but it is like all the other words
18   that they put out in their company's
19   communications."
20       Who made this statement?
21   A.   I can't recall at this time.
22   Q.   When was it made?
23   A.   It was made during a meeting where everybody

Page 354

1    was brought to the auditorium.  I don't know what
2    year.
3    Q.   All of the plant employees were brought to
4    the auditorium?
5    A.   I wouldn't say all of the plant employees.
6    That would be impossible.
7    Q.   You said, "everybody."  Define "everybody"
8    being brought to the auditorium for me, please?
9    A.   You're trying to nitpick and find little
10   things.  There was a meeting in the auditorium and
11   that was a statement that was made.  Integrity and
12   honesty was supposed to be the main thing.  You
13   know, be honest and integrity.  And that's why
14   that statement was placed in there.  That is not
15   what has been happening.
16   Q.   Who was the plant manager at the time you
17   say this statement was made?
18   A.   I believe Don Grissette.
19   Q.   Exhibit 21, Ms. McDowell, you said that you
20   delivered to Mr. Morrison on March 6, 2006; is
21   that correct?
22   A.   I believe I did.
23   Q.   In your response to the interrogatories,

21 (Pages 351 to 354)

Page 355

1  Exhibit 18, No. 11(c), you have a date of
2  February 14, 2006.
3      What is the February 14th date referring to?
4  A.  It's probably the day that I started the
5  letter. But it was not delivered to him until the
6  6th, so therefore I changed the date on the
7  letter.
8  Q.  And in here you say that Mr. Morrison
9  referred you to Attorney Malcolm Newman?
10  A.  That is correct.
11  Q.  Did you know Mr. Newman before Mr. Morrison
12  referred you to him?
13  A.  No, I did not.
14  Q.  What action, if any, did the NAACP take on
15  your complaint to them?
16  A.  He referred me to Mr. Newman.
17  Q.  Are you aware of the NAACP conducting any
18  type of investigation related to your complaint to
19  them?
20  A.  No, they did not.
21  Q.  Do you know if the NAACP intends to take any
22  further action on your complaint to them?
23  A.  No.

Page 356

1  Q.  Have you spoken with Mr. Morrison since he
2  referred you to Mr. Newman?
3  A.  Yes.
4  Q.  Tell me when.
5  A.  I don't recall.
6  Q.  What was the substance of your conversation
7  with Mr. Morrison at that time?
8  A.  To get a copy of the tape, the last tape,
9  because I couldn't locate it.
10  Q.  So was that after I started your deposition
11  previously?
12  A.  Yes.
13  Q.  How are you related to Marquetta Kelly?
14  A.  She's my niece.
15  Q.  Is that your sister's child?
16  A.  That is correct.
17  Q.  And how are you related to Christopher
18  Kelly?
19  A.  That's my nephew.
20  Q.  Your sister's child?
21  A.  That is correct.
22  Q.  Is your sister married?
23  A.  No.

Page 357

1  Q.  Is she divorced?
2  A.  Yes.
3  Q.  What is her ex-husband's name?
4  A.  Joseph Kelly.
5  Q.  Where does he live?
6  A.  In North Carolina.
7  Q.  And you list the addresses, in No. 14, that
8  you've resided at in the last ten years: 139/103
9  Candlewick Court; is that correct?
10  A.  That's correct.
11  Q.  Is 139/103 one address?
12  A.  The address was initially 103, and it was
13  changed to 139 for E-911 purposes.
14  Q.  Is this a house or an apartment?
15  A.  House.
16  Q.  Do you own this house?
17  A.  Yes.
18  Q.  Do you have a mortgage on the house?
19  A.  Yes.
20  Q.  What is the mortgage company?
21  A.  Alabama Housing Finance.
22  Q.  And how long have you lived there?
23  A.  Eight years.

Page 358

1  Q.  Did you tell me earlier that you had
2  carefully reviewed the responses to these
3  interrogatories, Exhibit 18, before you signed
4  them?
5  A.  Yes.
6  Q.  And you were aware that you were signing
7  these responses under oath?
8  A.  Yes.
9  Q.  No. 5, looking at Exhibit 17, I asked you to
10  identify all lawsuits in which you are or were a
11  party. And your answer was that you have not been
12  involved in any other lawsuits; is that correct?
13  A.  That's correct.
14  Q.  Were you not sued by Jones Finance in 1996
15  for breach of contract?
16  A.  I don't consider that a lawsuit; I thought
17  that was a judgment.
18  Q.  Weren't you sued in 2001 by First Franklin
19  Financial as well?
20  A.  Well, I wasn't sued by Jones Finance because
21  that was settled.
22  Q.  Do you know what it means to be sued, Ms.
23  McDowell?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

## Page 359

1  A.  Well, from my understanding for a lawsuit, I
2  thought it was pertaining to a lawsuit that
3  somebody had out on someone else in the court.  So
4  that's how I answered those questions accordingly.
5  Q.  So were you sued in 2001 by First Financial?
6  A.  Yes.
7  Q.  And you were garnished based on that
8  lawsuit?
9  A.  Yes.
10  Q.  Were you sued in 1998 by State Farm Mutual
11  Insurance?
12  A.  Yes.
13  Q.  Do you know if Mr. Morrison ever listened to
14  the tapes that you sent him as part of your
15  packet?
16  A.  I don't know.
17  Q.  Are you a member of Greater Beulah Baptist
18  Church?
19  A.  No.
20  Q.  Did you ever sit down or just meet with Mr.
21  Morrison to discuss your claims in the letter that
22  you sent to him?
23  A.  No.

## Page 360

1  Q.  How long were you in the Navy?
2  A.  Four and a half years.
3  Q.  Why did you get out?
4  A.  Because my husband asked me to.
5  Q.  Are you a member of Glory to Him Fellowship?
6  A.  I was.
7  Q.  Are you a member of a different church at
8  this point?
9  A.  Yes.
10  Q.  What church is that?
11  A.  Daleville Christian Fellowship.
12  Q.  How long have you been a member of the Ozark
13  Chamber of Commerce?
14  A.  Since 2005.
15  Q.  Since you started your own business?
16  A.  Yes.
17  Q.  Was that the purpose for you joining the
18  chamber of commerce?
19  A.  Yes.
20  Q.  Is the membership in the chamber of commerce
21  in the company's name, Kaye-Jen-Step?
22  A.  Yes.
23  Q.  Interrogatory 20 asked you to list the name,

## Page 361

1  address, and phone number of every individual whom
2  you believe or know has information or knowledge
3  relating to your claims in this lawsuit, and state
4  the nature of the information or knowledge you
5  believe each individual possesses.  And you wrote
6  "N/A" as your response.
7  Is that an accurate and truthful response to
8  that question?
9  A.  Which one is this?
10  Q.  No. 20.
11  A.  It just says address and phone numbers of
12  individuals.  Individuals for what?  What are you
13  asking?
14  Q.  No. 20.  If you will, go back to Exhibit 17,
15  the questions that I posed to you.
16  A.  "Identify all persons who at any time during
17  the past ten years resided with you, including
18  such person's name" --
19  Q.  No. 20 is what you're reading?
20  A.  Oh, I thought you said No. 17.  Okay.
21  Q.  And your response was "N/A."  Is that a
22  truthful, complete, and accurate response to that
23  question?

## Page 362

1  A.  It's an oversight, I guess.  I don't know.
2  Q.  So looking at the question that I posed to
3  you, today do you have a different response from
4  what's reflected on Defendant's Exhibit 18?
5  A.  Well, if you're going on information from
6  what I've stated previously about people and names
7  and stuff that I've given, I've already given that
8  information in my deposition.
9  Q.  So you have already provided that
10  information to me, is your testimony today?
11  A.  Uh-huh.
12  Q.  Yes?
13  A.  Yes.
14  Q.  You testified that white employees who
15  cursed at foremen are treated better than
16  African-American employees, and identified
17  Jonathon Nall, Brad Knighton, Luan Stevens, and
18  Leigh Laney.
19  What is the date of the incidents involving
20  each of these individuals?
21  A.  I don't know.
22  Q.  Who was the foreman involved in each of
23  these incidents?

23 (Pages 359 to 362)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 363

1  A.   Dennis Teat.
2  Q.   What was said to Dennis Teat?
3  A.   They would tell him things like shut up, and
4  he was stupid, and just curse words in general,
5  curse in front of him.
6        MR. NEWMAN:  Tell her the curse words.
7  A.   That he didn't know shit; that he was an
8  idiot; I've heard them call him an asshole.
9  Q.   Anything else?
10  A.   No.
11  Q.   Did you report these incidents?
12  A.   No.
13  Q.   Do you know whether Tim Wilson was
14  disciplined for not taking action against helpers
15  who were insubordinate or disrespectful towards
16  him?
17  A.   Yes.
18  Q.   Was he disciplined?
19  A.   No.
20  Q.   At the time that you say that Deborah
21  Crutchfield shared with Jennifer White your
22  confidential information regarding your request to
23  trade straight time for overtime, do you know

Page 364

1  whether the union contract permitted swapping of
2  straight time for overtime?
3  A.   No.
4  Q.   So the contract did not permit that to take
5  place?
6  A.   I didn't say that; I said no, meaning that I
7  don't know.
8  Q.   Okay.  Do you know if the union had a
9  position on swapping straight time for overtime,
10  when you made your request?
11  A.   No.
12  Q.   Have you ever served as a union steward?
13  A.   No.
14  Q.   Has Ms. Sanders?
15  A.   No.
16  Q.   Do you know of any other employees who
17  requested to swap straight time for overtime?
18  A.   No.
19  Q.   Was your request approved?
20  A.   No.
21  Q.   How did Mrs. Crutchfield's alleged
22  disclosure of this information to Ms. White affect
23  you?

Page 365

1  A.   Because I became upset that Jennifer was
2  allowed to look at my paperwork.
3        Deborah had mentioned in a previous meeting
4  that anyone's paperwork as far as vacation and
5  overtime requests was no one else's business.
6  Q.   In your tape of the September 9, 2005,
7  meeting with Deborah Crutchfield, Shelley Murrell
8  and Mark Freeman, did you tape that entire
9  meeting?
10  A.   Yes.
11  Q.   And it's your testimony that that tape
12  accurately reflects everything that was said in
13  that meeting?
14  A.   Yes.
15  Q.   Including any statements that you made?
16  A.   Yes.
17  Q.   And any statements that Ms. Murrell, Ms.
18  Crutchfield, and Mr. Freeman made?
19  A.   Yes.
20  Q.   Okay.
21        (Defendant's Exhibit No. 22 was
22        marked for identification and a
23        copy of the same is attached

Page 366

1        hereto.)
2  Q.   I'm handing you, Ms. McDowell, what I have
3  marked as Defendant's Exhibit 22 to your
4  deposition.
5        Would you take a moment and look at that
6  exhibit and tell me if you have seen that exhibit
7  before now?
8        (The witness examines the
9        document.)
10  Q.   Have you seen Defendant's Exhibit 22 before
11  now?
12  A.   Yes.
13  Q.   Have you read this document before today?
14  A.   Yes.
15  Q.   Have you produced to your lawyer everything
16  that you have that is responsive to the request in
17  Defendant's Exhibit 22 that you have in your
18  possession, Ms. McDowell?
19  A.   I believe I did.
20        (Defendant's Exhibit No. 23 was
21        marked for identification and a
22        copy of the same is attached
23        hereto.)

24 (Pages 363 to 366)

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 367

1  Q.   I'm handing you what I've marked as
2  Defendant's Exhibit 23 to your deposition.
3      If you would, take a moment and look at your
4  responses; and when you've done that, I'd like to
5  ask you some questions.
6      (The witness examines the
7      document.)
8  Q.   Do you recognize what I've marked as
9  Defendant's Exhibit 23?
10 A.   Yes.
11 Q.   Okay.  And the top page is entitled
12 Plaintiffs' Answer to Request for Production.  And
13 that is a two-page document.  And attached to that
14 are what appear to be handwritten notes.  Do you
15 recognize those notes?
16 A.   Yes.
17 Q.   Did you create those notes?
18 A.   Some of them.
19 Q.   Tell me what you created and what you did
20 not create.
21 A.   The third page, fourth, fifth, and sixth is
22 Stephanie's handwriting.
23 Q.   If you would, ma'am, please reference the

Page 368

1  numbers RFP 0-whatever that number is.
2  A.   Okay.  On the bottom?
3  Q.   Would you, on the record, designate what
4  belongs to Ms. Sanders and what you created?
5  A.   RFP 001 is Ms. Sanders; RFP 002 is Ms.
6  Sanders; RFP 003 is Ms. Sanders; RFP 004 is Ms.
7  Sanders.
8      RFP 005 is mine; RFP 006 is mine; RFP 007 is
9  mine; 008 is mine; 009 is mine; 010 is mine; 11 is
10 mine; 12 is mine; 13 is mine; 16 is mine; 14 is
11 mine; 15 is mine; 17 is mine; 18 is mine; 19 is
12 mine; 20 is mine; 21 is mine; 24 is mine; 22 is
13 mine; 23 is mine; 25 is mine; 26 is mine; 27 is
14 mine; 28 is mine; 29 is mine; 30 is mine; 31 is
15 mine; 32 is mine; 33 is mine; 34 is mine; 35 is
16 mine; 36 is mine; 37 is mine; 38 is mine; 39 is
17 mine; and 40 is mine.
18 Q.   Of your handwritten notes, would you find
19 the note where you made reference to the Don
20 Grissette meeting that you earlier today said you
21 made a note of and produced to your attorney?
22 A.   I don't see it in here.
23 Q.   Where is that note?

Page 369

1  A.   I thought I gave it to my attorney.  If not,
2  I have to look for it.
3  Q.   Your notes actually begin July 9, 2005.  Did
4  you create other notes before July 9, 2005, that
5  you have not produced?
6  A.   Yes.  I have paperwork that I produced.
7  Q.   My question is:  Do you have notes, other
8  than the Don Grissette note, that were made prior
9  to July 9th of 2005?
10 A.   I don't know.  I'd have to -- I don't know
11 if I have notes or not; I'd have to look.
12 Q.   You are certain that you have a note related
13 to your meeting with Don Grissette that you have
14 described previously during your deposition?
15 A.   I had some paperwork that I had written some
16 notes on pertaining to that meeting.  But I have
17 to -- if it's not in my folder, I have to locate
18 it.  I thought that it was here, but I'll have to
19 look for it.
20     MS. SHARP:  Let's go off the record for
21 a minute.
22     (An off-the-record discussion
23     was held.)

Page 370

1  (BY MS. SHARP)
2  Q.   Ms. McDowell, it may be that I have to move
3  the Court to allow me to come back and reconvene
4  your deposition.
5      But I would ask again, as I did about the
6  bank statements, would you please search your
7  home, your office, whatever?
8  A.   If I have it, I'll send it.  I'll send it.
9  Q.   Would you --
10     MR. NEWMAN:  Those bells mean it's
11 lunchtime.
12     MS. SHARP:  This is a good time for a
13 break for me; so if you want to, that's fine.
14     (A lunch recess was taken.)
15 (BY MS. SHARP)
16 Q.   Ms. McDowell, going back to Exhibit 23, I
17 want to ask you some questions about your
18 handwritten notes, beginning on Bates page number
19 RFP 005.
20     You identified these as being your notes
21 beginning with RFP 005 and going through RFP 040,
22 correct?
23 A.   Correct.

25 (Pages 367 to 370)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

Page 371

1  Q.   What dates were these notes on 005 made?
2  A.   It just says Friday, August. I don't know.
3  That's all I have.
4  Q.   Were these notes made before or after you
5  received your DML?
6  A.   I don't know.
7  Q.   In these notes on this page you say,
8  "Deborah never spoke a greeting or a word. She
9  was very cold to us."
10      What do you mean that she was cold to you?
11  A.   She was very cold to us. When we walked in
12  the break room, nothing was said. And she made a
13  smart remark to Phyllis about turnover.
14  Q.   What did she say to Ms. Hughes?
15  A.   That turnover had to be in front of a
16  foreman or the shift supervisor or shift manager.
17  Q.   Was that a requirement?
18  A.   That was something that was just told that
19  day to us.
20  Q.   You said she was speaking to Ms. Hughes
21  though, correct?
22  A.   She was speaking to Ms. Hughes, but she was
23  referring to all of us.

---

Page 372

1  Q.   Why is that a smart remark?
2  A.   Because of the tone that she said it in.
3  Q.   What tone did she take?
4  A.   She said it in a -- she said it in a smart
5  tone.
6  Q.   RFP 006. What date was these notes written?
7  A.   Sometime in August.
8  Q.   You don't know when?
9  A.   2005.
10  Q.   You say, "When we walked in, atmosphere
11  changed." What do you mean?
12  A.   Because they were laughing and joking at the
13  table and talking. And when we walked in the
14  door, everything stopped.
15  Q.   Why did you write this note?
16  A.   I wrote the note because of the issue that
17  was going on as far as the investigation. And I
18  wrote the note to just note down things that I had
19  observed.
20  Q.   So you made this note, this Saturday, August
21  2005 note, after the investigation had taken
22  place?
23  A.   I believe so.

---

Page 373

1  Q.   Okay. Did walking into the break room and
2  having them stop talking and laughing, did that
3  have any effect on you?
4  A.   Yes.
5  Q.   What effect was that?
6  A.   The effect due to the fact that prior to
7  this investigation, you know, Deborah used to
8  speak and be nice; and after the investigation,
9  she had nothing to say to us and she just treated
10  us very coldly.
11  Q.   Did it bother you that they stopped talking
12  and laughing when you walked into the room?
13  A.   Yes.
14  Q.   Explain that to me.
15  A.   I thought I did. It bothered me because of
16  the fact that it seemed like Deborah was taking
17  sides with them.
18  Q.   So it was just Ms. Crutchfield's conduct
19  that you had a problem with, correct, on this
20  occasion?
21  A.   No. It was Jennifer and Tammy's conduct as
22  well. But Deborah's the supervisor.
23  Q.   Okay. Did you make these notes the date

---

Page 374

1  that this event happened?
2  A.   I don't know.
3  Q.   At the end of these notes you say, "Shortly
4  after Phyllis came in and Deborah" -- and then
5  there's nothing. Did you just stop writing?
6  A.   Yes.
7  Q.   Where were you taking these notes?
8  A.   I took these notes at work.
9  Q.   In the break room?
10  A.   I don't recall.
11  Q.   Did you take -- were you writing these notes
12  as these events took place?
13  A.   Maybe. I don't know.
14  Q.   You don't recall?
15  A.   I don't recall.
16  Q.   Did you ever make notes of the events that
17  took place at work after you had left work?
18  A.   These notes, you say?
19  Q.   Any other notes that you've made, did you
20  ever write them down after they had already taken
21  place and you had left the work premises?
22  A.   Yes. The notes that I had to recall my
23  memory.

---

26 (Pages 371 to 374)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 375

1  Q.  Okay. But the notes that we have here RFP
2  005 through 040, did you ever make any of these
3  notes while you were away from work?
4  A.  Away from work as just being off, or away as
5  being terminated? After I was terminated? I need
6  clarity.
7  Q.  Well, the last note I have is September 12,
8  2005, which reflects you were still employed. So
9  it would be away from work.
10  A.  Oh, yes.
11  Q.  So you did make some of these notes when you
12  were not at the plant?
13  A.  Yes.
14  Q.  Okay. Your note 007, take a look at that
15  and tell me why you made this note.
16  A.  I took this note because when I had went to
17  John Wright prior and told him to inform the group
18  that they needed to be doing their job because I
19  had to come in and do their job and my job as
20  well, that's when he posted the note of the
21  conditions or the requirements that a firewatch is
22  supposed to do.
23      Jennifer had firewatch and was supposed to

Page 376

1  perform this duty, and she did not do it. So that
2  left Stephanie having to clean up her mess.
3  Q.  Did you have to clean up her mess?
4  A.  No. That wasn't my job for the night.
5  Q.  So you went to a foreman to report a fellow
6  helper who you were saying had not done her job?
7  A.  No. When I went to John, I asked John to
8  post a list for people to do their job when they
9  had the assigned firewatch. And he posted the
10  list, but it wasn't on this particular occasion.
11      The reason why the letter was drafted was
12  because people were not doing their job and I
13  wanted to make note of it, that they were not
14  checking behind certain people.
15  Q.  But in this instance, you are telling me
16  that the helper that didn't do her job had no
17  impact on you, correct?
18  A.  That's correct.
19  Q.  Where did you speak with John Wright about
20  this situation?
21  A.  In the OSB Building.
22  Q.  Where in the OSB?
23  A.  Where we normally meet.

Page 377

1  Q.  Who normally meets?
2  A.  The group, for turnover and briefing.
3  Q.  Okay. On note 008, it looks like the third
4  sentence on that page, you say, "I asked Alex who
5  was relieving..." Who are you referring to as
6  Alex?
7  A.  What number is that?
8  Q.  008. Looks like the third sentence on the
9  page, fifth line down.
10  A.  I don't know. Alex. I can't think of
11  Alex's last name. I can't think of his name at
12  this time.
13  Q.  Is he a helper?
14  A.  No. He's a shift supervisor.
15  Q.  No.3, on the same page, second paragraph
16  under No.3, you say, "Yet because Nicole is a key
17  witness in this investigation..." What
18  investigation are you referring to?
19  A.  The investigation as far as Phyllis' dress
20  attire.
21  Q.  And why are you saying that Nicole Faulk is
22  a key witness in that investigation?
23  A.  Because Nicole -- Tammy told Nicole that

Page 378

1  Phyllis was going to be -- Phyllis was getting in
2  trouble for coming in with her dress attire before
3  Phyllis even knew she was going to be in trouble.
4      Therefore, it goes back to her being in the
5  office and receiving information from the foreman
6  that was supposed to be confidential.
7  Q.  Did Tammy tell you that she got information
8  from the foreman that was supposed to be
9  confidential information?
10  A.  No. Phyllis told me.
11  Q.  On page RFP 011, sixth line down, "She
12  informed me that she didn't do..." What is that
13  word?
14  A.  She didn't do -- it's supposed to be
15  ladders, l-a-d-d-e-r-s.
16  Q.  Okay. And further down, five lines up from
17  the last sentence on that paragraph, "Paul has
18  been on nights with her for the last two nights."
19      Do you see that sentence?
20  A.  Yes.
21  Q.  What was the reason for making that note?
22  A.  Because when her husband is normally around,
23  she doesn't do her job of what she's supposed to

27 (Pages 375 to 378)

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 379

1  be doing.
2      They're normally sitting together
3  constantly, eating together in the break room or
4  eating in the cafeteria together.
5  Q.    Did you report that Ms. Caldwell was not
6  doing her job on those nights when she worked with
7  her husband?
8  A.    Not during this particular time.
9  Q.    At any time?
10  A.    Yes.
11  Q.    When?
12  A.    Prior to the investigation, I told Deborah
13  that I was tired of doing her job, cleaning up
14  behind her.
15  Q.    You told this to Deborah Crutchfield?
16  A.    That is correct.
17  Q.    Did you tell Ms. Crutchfield on that
18  occasion that Ms. Caldwell had been working with
19  her husband?
20  A.    No.
21      MR. NEWMAN:  Off the record.
22      (An off-the-record discussion
23      was held.)

Page 380

1      MS. SHARP:  For the record, Mr. Newman
2  has asked that we discontinue Ms. McDowell's
3  deposition given that he says that we've gone nine
4  hours into taking Ms. McDowell's deposition.
5  However, we have not completed Ms. McDowell's
6  deposition and we're going to need to reconvene.
7      And I will move the Court for more time to
8  complete her deposition, in part, because we still
9  don't have documentation that Ms. McDowell has
10  been requested to provide, and to try to get the
11  deposition completed.
12      MR. NEWMAN:  And that we had agreed to
13  seven hours per deposition.
14
15
16      FURTHER THE DEPONENT SAITH NOT
17
18
19
20
21
22
23

Page 381

1          C E R T I F I C A T E
2
3  STATE OF ALABAMA
4  BARBOUR COUNTY
5
6      I hereby certify that the above and
7  foregoing deposition was taken down by me in
8  stenotype and the questions and answers thereto
9  were transcribed by means of computer-aided
10  transcription, and that the foregoing represents
11  a true and correct transcript of the testimony
12  given by said witness upon said hearing.
13      I further certify that I am neither of
14  counsel, nor kin to the parties to the action,
15  nor am I in anywise interested in the result of
16  said cause.
17
18
19
20
21      CYNTHIA M. NOAKES,
22      COURT REPORTER and
23      COMMISSIONER

28 (Pages 379 to 381)

# Employee Discipline Guide

**Southern Nuclear**

| | |
|---|---|
| **Employee Name:** Janell McDowell | **Job Title:** Helper |
| **Emp. No.** | **Date:** 8 /16 /05 |
| **Department:** Facilities | **Division, Plant, etc.:** Plant Farley |

*This guide is to help supervisors prepare for and document employee discussions and discipline. By itself it will usually be sufficient documentation for Coaching and Oral Reminders; for Written Reminders and DML's, use this sheet to prepare a letter to the employee. This guide is intended for use with formal discipline only and should not be completed for coaching.*

**PRE-MEETING PREPARATION**

**Brief Description of Problem:**
Harassment of co-worker; failure to follow work instructions; and lack of loyalty, competitiveness, and efficiency.

*Please copy and paste the following symbol as needed to designate appropriate responses below:* ☒

**Date(s) of previous discussion(s) about this problem:**

Is employee currently in an active level of Discipline?  ☐ Yes   ☒ No
☐ Oral Reminder   ☐ Written Reminder   ☐ DML

**Was administered on:** (date)    **for:** (reason)

**Desired Performance:**
Employees are expected to follow the company's non-harassment policy and to be committed to a work environment free of intimidation and harassment. Employees have the responsibility to report to supervision the status of work assignments, and to contribute to the loyalty, competitiveness, and efficiency of the department.

**Actual Performance:**
You encouraged the job steward to meet with a co-worker regarding items that you or others felt the co-workers needed to change. The meeting was harassing in nature as has been your conduct in the workplace toward certain co-workers. Your comments and conduct also indicate that you are attempting to create a division between the employees and supervision. Additionally, you have swapped job assignments with co-workers after you have been instructed not to by Facilities supervision.

**Impact/business reason why employee must solve this problem:**
The company is on notice of a hostile and intimidating work environment created in part by your actions. Swapping job assignments without obtaining supervisory concurrence impedes the supervisor's ability to hold individuals accountable for their actions.

**Consequences to employee for failing to improve to an acceptable level:**
Termination of employment.

Other factors to consider in evaluating this problem:

☐ Length of Service      ☐ Recent discussions about this or other problems

☐ Overall work record      ☐ Need to discuss with others for consultation/approval

This conversation is intended to be:

| ☐ Oral Reminder | ☐ Written Reminder | ☒ DML | ☐ Other |
|---|---|---|---|


**DEFENDANT'S EXHIBIT**
2 McDowell

McDowell v. Southern Nuclear
296

*wrs JBb*

Completed by: _____    Date: 8-11-05

Southern Nuclear
Operating Company, Inc.
Post Office Drawer 470
Ashford, Alabama 36312

TO:        Janell McDowell
FROM:      Randy Johnson
DATE:      August 18, 2005
SUBJECT:   Decision-Making Leave



**SOUTHERN COMPANY**
*Energy to Serve Your World™*

In our meeting on August 16, 2005, we discussed harassment of co-worker; failure to follow work instructions; and lack of loyalty, competitiveness, and efficiency. Additionally, you have swapped job assignments with co-workers after you have been instructed not to by Facilities supervision. We discussed that the company is on notice of a hostile and intimidating work environment created in part by your actions. Swapping job assignments without obtaining supervisory concurrence impedes the supervisor's ability to hold individuals accountable for their actions.

As a result of your actions, you were issued a Decision-Making Leave. This positive discipline will remain active and in your personnel file for 18 months. You were instructed to take a day off with pay to consider the impacts of your actions, the future expectations you must abide by and to return and inform your management of your interest to remain employed or not as a Helper at Farley Nuclear Plant.

We discussed that employees are expected to follow the company's non-harassment policy and to be committed to a work environment free of intimidation and harassment. Employees have the responsibility to report to supervision the status of work assignments, and to contribute to the loyalty, competitiveness, and efficiency of the department. Failing to improve or should any other problems occur which warrants formal discipline, will result in termination of your employment.

You indicated that you were committed to performing your job duties in a way such as not to create a hostile environment. You also committed to not swapping jobs without supervisor concurrence.

I am confident that you understand the meaning of our discussion and the necessary expectations for your future performance. I am confident that you understand the consequences for failure to fully support your commitment.

I look forward to working with you through this situation and moving to a productive future.

Sincerely,

Randy Johnson





Search   ○ This Site  ○ SO Web  [          ]  [🔍]  advanced   help

SO Today : Ethics & Compliance : Policies : SNC Corporate Policies

**Feedback | Site Map | FAQ**

› Home
› Corporate Policies
› Workplace Ethics
› Compliance Program
› Southern Style
› Code of Ethics

**SNC Corporate Policies**
**703 - WORKPLACE FREE OF HARASSMENT POLICY**

**Effective: 05/10/95**
**Revised: 10/06/04**

**Southern Nuclear**

POLICY

**Southern Nuclear Operating Company is committed to providing its employees with a workplace environment which is free from intimidation and harassment. As part of its continuing commitment to equal employment opportunity, Southern Nuclear Operating Company prohibits any acts of harassment on the basis of race, color, religion, age, gender, sexual orientation, national origin, disability, or veteran status.**

**The Company will not permit conduct whether intentional or unintentional, occurring between employees or between an employee and a client, customer, vendor, or other non-employee that creates an intimidating, hostile, or offensive working environment.**

**Prohibited behavior includes, but is not limited to, the following:**

- **Conduct or language that denigrates or shows hostility or aversion toward an individual or group because of race, color,**



DEFENDANT'S EXHIBIT

3 McDowell

religion, age, gender, sexual orientation, national origin, disability, or veteran status, including, but not limited to, jokes, pranks, or epithets.

- Written or graphic material that denigrates or shows hostility or aversion toward an individual or group because of race, color, religion, age, gender, sexual orientation, national origin, disability, or veteran status, which is graphically displayed on Company property, and/or placed where others may see it, and/or circulated in the workplace.

- Verbal or physical conduct of a sexual nature in which submission or rejection of such conduct is used as the basis for any employment decision with regard to the harassed individual.

- Unwelcome sexual advances or touching; requests for sexual favors; attempts to coerce an unwilling person into a sexual relationship; to subject a person to unwanted or unwelcome sexual attention; sexual jokes, gestures, comments or innuendoes; or other conduct of a sexual nature (including matters involving persons of the same sex) which a reasonable person might find offensive. This includes but is not limited to conduct such as: hazing, horseplay, or practical jokes based on an individual's sex; and displaying visual

material such as posters, cartoons, calendars, or pictures of a sexual nature or depicting partially clad or nude individuals.

Southern Nuclear Operating Company insists that all employees act in accordance with this policy, and bring any violations to the Company's attention. If the Company determines that there has been a violation of this policy by any employee, appropriate disciplinary action will be taken up to and including termination of employment.

This policy does not create any contractual right to employment, employee benefits, or other terms and conditions of employment.

IMPLEMENTATION

Employees are personally responsible for managing their daily work activities, behaviors and relationships in a manner consistent with this non-harassment policy.

If an employee is witness to, or subjected to, workplace harassment, that employee should immediately notify his or her supervisor. An employee who feels uncomfortable discussing the issue with the supervisor should notify an appropriate member of management or contact the Concerns Program. Any employee who feels he or she is being harassed by a supervisor need not bring the matter directly to the attention of that supervisor, but should immediately bring the matter to the attention of higher supervision or the Concerns Program.

Due to the sensitive nature of complaints of harassment, all levels of management are accountable for ensuring compliance with the meaning and intent of this policy within their respective areas of operation. Any supervisor or manager who observes, has knowledge of, or receives any complaint concerning harassment, however insignificant it may seem, or

who hears of conduct that may be considered harassment, shall immediately contact their management and Employee Relations. Supervisors and managers who fail to comply with this reporting requirement are subject to discipline.

When an allegation or complaint of harassment is reported, a timely and thorough investigation will be conducted to resolve the allegation or complaint. Investigations will be initiated by the Concerns Program representative (employee source) or Employee Relations (management source). Each employee is expected to cooperate fully and honestly with investigations of possible violations of this policy. Deliberately furnishing incomplete or inaccurate information to investigators will be grounds for disciplinary action, up to and including termination of employment. The identity of persons complaining of harassment will be treated confidentially, and will be disclosed only to the extent necessary to perform an investigation and take appropriate action. The Company will not permit intimidation, harassment, or retaliation against anyone covered under this policy due to filing a complaint, assisting or participating in an investigation, opposing any unlawful act or practice or exercising any other right protected by law.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

JANELL MCDOWELL AND )
STEPHANIE SANDERS, )
        )
      Plaintiffs, )
        )
v. )      **CIVIL ACTION NO.**
        )      **1:06-cv-314-CSC**
SOUTHERN NUCLEAR )
OPERATING COMPANY, INC., )
        
      Defendant.

## PLAINTIFFS' RULE 26 INITIAL DISCLOSURES

Pursuant to FED. R. CIV. P. 26(a) and Local Rule 26.1(a)(1), Plaintiffs Janell McDowell and Stephanie Sanders provides the following initial disclosures:

These initial disclosures represent Plaintiffs' diligent and good faith efforts, without the benefit of discovery, to comply with all applicable rules and procedures. However, these initial disclosures are not intended, and therefore should not be so construed, to represent Plaintiffs' opinions or beliefs that (i) the witnesses identified actually have discoverable, non-privileged person knowledge concerning significant factual issues specifically raised in the pleadings, or that (ii) the documents produced or made available in fact support its

RECEIVED

BY:

ILCOLM R. NEWMAN
ATTORNEY, P.C.
PO. Box 6137
L. 36302-6137

**DEFENDANT'S EXHIBIT**



4 McDowell

1

contentions with respect to any significant factual issue in the case. Plaintiffs' disclosures are made without waiving: (1) the right to object on any proper grounds to the use of any such information, for any purposes, in whole or in part, in any subsequent stage of producing in this action, or any other action; (2) the right to object on any and all grounds, at any time, to any other discovery proceeding involving or relating to the subject matter of these disclosures.   Plaintiffs will supplement these disclosures pursuant to any order of the Court of applicable provisions of the Federal Rules of Civil Procedure and/or Local Rules, if such supplementation is required.

   A.    The following is a list of individuals believed by Plaintiffs to have discoverable, non-privileged personal knowledge that it may use to support their claims:

   1. Phyllis Hughes
      C/o Southern Nuclear Operating Co.

      Ashford, Alabama
      This witness is believed to have knowledge of the facts that support Plaintiffs' claims.

   2. Cheri Collins
      C/o Southern Nuclear Operating Co.

      Ashford, Alabama
      This witness is believed to have knowledge of the facts that support Plaintiffs' claims.

MALCOLM R. NEWMAN
ATTORNEY, P.C.
P.O. Box 6137
an. AL. 36302-6137

2

3.    Graven Townsend
-Address currently unknown except that it is believed that he resides in Prattville, Alabama.

This witness is believed to have knowledge of the facts that support Plaintiffs' claims.


B. Documents to support Plaintiffs' claims are being produced and more will follow as their value is assessed. Plaintiffs have several audio recordings that are also under evaluation and will be made available to the Defendant is they are determined to be of value.


C.    Plaintiffs seek compensatory and punitive damages. Plaintiff McDowell sees two million dollars in compensatory damages as does Plaintiff Sanders.


D. Insurance coverage is not relevant for these Plaintiffs.


Malcolm R. Newman, Attorney, P.C.

Malcolm R. Newman (NEW017)
Attorney for Plaintiff
P.O. Box 6137
Dothan, Alabama 36302
(334) 792-2132
ASB-2826-M39M

ALCOLM R. NEWMAN
ATTORNEY, P.C.
P.O. Box 6137
OTH    L. 36302-6137

## CERTIFICATE OF SERVICE

I hereby certify that on June 15th, 2006, that I have served a copy of the foregoing upon:

Linda J. Sharp
Balch & Bingham, LLP
Post Office Box 306
Birmingham, AL. 35201-0306

by placing a copy of the same in the United States mail, postage prepaid this the 15th day of June, 2006.

*Malcolm Rance Newman*

Malcolm R. Newman

MALCOLM R. NEWMAN
ATTORNEY, P.C.
P.O. Box 6137
)0)    AL. 36302-6137

**From:**        Sanders, Stephanie M.
**Sent:**        Sunday, February 20, 2005 11:15 PM
**To:**          Sanders, Stephanie M.
**Subject:**     FW: Talked with someone last night

-----Original Message-----
**From:**        Collins, Cheri D.
**Sent:**        Tuesday, December 14, 2004 10:33 AM
**To:**          Sanders, Stephanie M.
**Subject:**     Talked with someone last night

Step, John Wright called me last night. We had an excellent talk. I am convinced that he wants to do the right thing, be firm yet fair. He realized that assigning tasks to the same person over and over was not right, and I believe he intends to rectify it. I am asking that you give him your support Step. I have a lot of faith in him, it just takes time to get your arms around something as complex as Facilities. You can be a great help to him with your honest, sweet approach to life and all it dishes out. Take care, and know how much you mean to me, Cheri

**McDowell, Janell**

| | |
|---|---|
| **From:** | Crutchfield, Deborah K. |
| **Sent:** | Wednesday, July 13, 2005 4:23 PM |
| **To:** | McDowell, Janell; Sanders, Stephanie M. |
| **Cc:** | FNP Fac Foreman |
| **Subject:** | FW: Stephanie and Janelle |

Mark asked me about this so I stopped Tony Dumas in the Maintenance Shop and asked him to send me a write-up to put in your files. Thanks for all you do. It doesn't go unnoticed. Thanks again, Deborah

| | |
|---|---|
| **From:** | Dumas, Anthony W. |
| **Sent:** | Wednesday, July 13, 2005 9:26 AM |
| **To:** | Crutchfield, Deborah K. |
| **Subject:** | Stephanie and Janelle |

Deborah this is to let you know that it does not go unnoticed when someone does a little extra service to their customers. Several weeks ago, when I went through backshifts with these two individuals, you could always see them out doing noticeable cleaning. When we got to days and they were assigned the maint. Shop areas you never had to wonder if the trash cans would be emptied or not. The other thing is that when asked if they would mind running a mop over the Breaker Test Shop both said it would not be a problem. There was never a question of when because they did it as they were mopping the general area. Never a gripe or complaint was uttered. They also did not mind mopping the rest of the shop areas either,ie. The elect., I&C, and ect. *It is refreshing to see people not minding doing their job. Thanks goes to Stephanie and Janell for always going and doing the little extra things. Also I don't think these areas have been mopped since then either. Thanks from Myself and the rest of the guys from the Electric shop.*

**From:** Avery, Phillip D.
**Sent:** Friday, July 15, 2005 10:14 AM
**To:** McDowell, Janell; Sanders, Stephanie M.
**Cc:** FNP Fac Foreman
**Subject:** RE: Stephanie and Janelle

Stephanie and Janell, thanks for continuing to be self directed. Mark is right in that it doesn`t go unnoticed.

Phillip

---

**From:** Crutchfield, Deborah K.
**Sent:** Wednesday, July 13, 2005 4:23 PM
**To:** McDowell, Janell; Sanders, Stephanie M.
**Cc:** FNP Fac Foreman
**Subject:** FW: Stephanie and Janelle

Mark asked me about this so I stopped Tony Dumas in the Maintenance Shop and asked him to send me a write-up to put in your files. Thanks for all you do. It doesn't go unnoticed. Thanks again, Deborah

---

**From:** Dumas, Anthony W.
**Sent:** Wednesday, July 13, 2005 9:26 AM
**To:** Crutchfield, Deborah K.
**Subject:** Stephanie and Janelle

Deborah this is to let you know that it does not go unnoticed when someone does a little extra service to their customers. Several weeks ago, when I went through backshifts with these two individuals, you could always see them out doing noticeable cleaning. When we got to days and they were assigned the maint. Shop areas you never had to wonder if the trash cans would be emptied or not. The other thing is that when asked if they would mind running a mop over the Breaker Test Shop both said it would not be a problem. There was never a question of when because they did it as they were mopping the general area. Never a gripe or complaint was uttered. They also did not mind mopping the rest of the shop areas either,ie. The elect., I&C, and ect. *It is refreshing to see people not minding doing their job. Thanks goes to Stephanie and Janell for always going and doing the little extra things. Also I don't think these areas have been mopped since then either. Thanks from Myself and the rest of the guys from the Electric shop.*

**From:**        Avery, Phillip D.
**Sent:**        Wednesday, August 31, 2005 11:48 AM
**To:**        Sanders, Stephanie M.
**Cc:**        FNP Fac Foreman
**Subject:**        FW: S. Sanders

Stephanie thanks for your observant behavior during fire watch. It is greatly appreciated.

Phillip

---

**From:**        Goodson, James W.
**Sent:**        Tuesday, August 23, 2005 3:50 PM
**To:**        Crutchfield, Deborah K.
**Cc:**        Wright, John W.; Freeman, Mark; Murrell, Shelley A.; Avery, Phillip D.; Warren, Wade H.; Hawkins, Douglas L.
**Subject:**        S. Sanders

Job well done by the Non Rad Roving Fire Watch today.

Stephanie Sanders contacted the FPA with a concern about the room temperature rising in 2346. This is the CRDM MG Set Room.
This room contains heat sensitive equipment.

The System Operator and SSS was dispatched immediately to investigate. The room a/c unit was found to be not operating. Fire door # 2327
was propped open to alleviate heat build up in room. A CR was written to investigate problem with a/c unit. The Electricians had the unit back
in operations by 1500 hours.

A turn over to the evening shift fire watch was to monitor the room temperature through the next shifts.

Shift Manager (Doug Hawkins) and Unit Two Shift Supervisor (Wade Warren) wanted to express their appreciation for the fire watch being alert of changing conditions in the plant.

Thank you,

James Goodson
Fire Protection Administrator

## McDowell, Janell

| | |
|---|---|
| **From:** | Bryant, Richard E. |
| **Sent:** | Monday, February 19, 2001 6:42 AM |
| **To:** | Cureton, Jacquelyn; McDowell, Janell; Nall, Jonathan O; Sanders, Stephanie M.; Shaddix, Tammi W. |
| **Subject:** | FW: U-1 Alpha SGFP-Outage. |

Jackie, Janell, Jonathan, Stephanie, and Tammi,

Let me extend my thank you as well. I understand that you all did an excellent and safe job in somewhat record time, your dedication and professionalism has made look good. Please keep up the good work and once again Thank You!

reb

-----Original Message-----

| | |
|---|---|
| **From:** | Barber, William G. |
| **Sent:** | Sunday, February 18, 2001 9:12 AM |
| **To:** | Teat, Elbert D.; Yance, Billy Joe; Crutchfield, Deborah K.; Glasco, Patricia R.; Wilson, Timothy P.; Bryant, Richard E.; Buck, Clifton L. |
| **Cc:** | Kelly, Mark E.; Reneau, Charles A.; Hardaway, Michael; Shaddix, Tammi W.; Sanders, Stephanie M.; McDowell, Janell; Nall, Jonathan O; Cureton, Jacquelyn |
| **Subject:** | U-1 Alpha SGFP-Outage. |

I wanted to take a minute to congratulate everyone on the work that was completed on the Unit-1 Alpha SGFP. From what I witnessed while I was around things went very well. That included Ops tagging the systems and equipment out, maintenance activities and cleaning activities.

I wanted to give a big thumbs up and **JOB WELL DONE** to the helper's that were assigned the tasks of cleaning the oil reservoir and the oil conditioner, and while they were at it the cleaning of the lower oil cooler shell. I believe their efforts were commendable and deserving of some praise. Thanks again for the effort that was put forth to get things completed in an efficient and timely manner.

- **Tammi Shaddix**        Jonathon Nall
- **Janell McDowell**      Jackie Cureton
- **Stephanie Sanders**

Bill Barber
Facilities
2416

1

## McDowell, Janell

| | |
|---|---|
| **From:** | Buck, Clifton L. |
| **Sent:** | Saturday, February 24, 2001 8:12 AM |
| **To:** | McDowell, Janell; Sanders, Stephanie M. |
| **Cc:** | Barber, William G.; Crutchfield, Deborah K.; Glasco, Patricia R.; Teat, Elbert D.; Wilson, Timothy P.; Yance, Billy Joe; Bryant, Richard E. |
| **Subject:** | RE: Excellent Work by Janell and Stephanie |

My thanks as well. I appreciate the positive attitude and effort.

Clif

-----Original Message-----
**From:** Bryant, Richard E.
**Sent:** Saturday, February 24, 2001 1:30 AM
**To:** McDowell, Janell; Sanders, Stephanie M.
**Cc:** Buck, Clifton L.; Barber, William; Crutchfield, Deborah; Glasco, Patricia; Teat, Elbert; Wilson, Timothy; Yance, Billy
**Subject:** FW: Excellent Work by Janell and Stephanie

Janell and Stephanie,

Thank you for taking the extra effort to give us a satisfied customer. Customer satisfaction is what we strive for and you certainly came through. Please keep up the good work and thanks again.

reb

-----Original Message-----
**From:** Lawson, Helen T.
**Sent:** Thursday, February 22, 2001 9:23 AM
**To:** Bryant, Richard E.
**Subject:** Excellent Work by Janell and Stephanie

Yesterday Janell McDowell and Stephanie Sanders were assigned to our area. I asked in the morning if they were going to be able to vacuum and they responded that they were not only planning to vacuum but dust as well.

They came back in the afternoon and dusted (window sills, baseboards, tables, tops of file cabinets) and vacuumed. They not only worked hard but had good attitudes and asked if there was anything else that needed to be done. Our area was really spruced up which was badly needed! Please let them know how appreciative we are. It was a pleasure to come into a clean and orderly work environment this morning.

Thanks, Helen

1

## McDowell, Janell

**From:** Buck, Clifton L.
**Sent:** Thursday, March 21, 2002 6:23 AM
**To:** Sanders, Stephanie M.; McDowell, Janell
**Subject:** FW: J. McDowell & S. Sanders Excellent Supporters

Thanks for your efforts. You bring credit to Facilities as a whole.

Clif

-----Original Message-----
**From:** Singleton, Brenda Wise
**Sent:** Wednesday, March 20, 2002 5:23 PM
**To:** Billy Yance; Deborah Crutchfield; Elbert Teat; Patricia Glasco; Richard Bryant; Timothy Wilson; William Barber
**Cc:** Grissette, Don E.; Buck, Clifton L.; Johnson, J. Randy
**Subject:** J. McDowell & S. Sanders Excellent Supporters

Janelle McDowell and Stephanie Sanders once again came to our aid with flying colors today in preparing the Aud. for the Diversity Mtg. When corporate office staff made last minute requests they jumped right in and helped make everything come together when we had very short turn around time. I appreciate very much their willingness to assist in whatever needs to be done with such good attitudes. They're a pleasure to work with and help ease my stress tremendously because I know I can demand on them to do a good job and follow through.

1

## McDowell, Janell

| | |
|---|---|
| **From:** | McDowell, Janell |
| **Sent:** | Sunday, January 26, 2003 11:25 PM |
| **To:** | McDowell, Janell |
| **Subject:** | FW: Good Job ! |

-----Original Message-----

| | |
|---|---|
| **From:** | Teat, Elbert D. |
| **Sent:** | Thursday, August 22, 2002 12:59 PM |
| **To:** | Bryant, Richard E.; Barber, William G.; Crutchfield, Deborah K. |
| **Cc:** | McDowell, Janell |
| **Subject:** | RE: Good Job ! |

Thanks Janell for the good job.

*DENNIS TEAT*
*EXT: 2490*
*BEEPER # 9815*

-----Original Message-----

| | |
|---|---|
| **From:** | Bryant, Richard E. |
| **Sent:** | Thursday, August 22, 2002 12:09 PM |
| **To:** | Barber, William G.; Crutchfield, Deborah K.; Teat, Elbert D. |
| **Subject:** | FW: Good Job ! |

Please let Janell know how much her work is appreciated.
Thanks,
reb

-----Original Message-----

| | |
|---|---|
| **From:** | Johnson, J. Randy |
| **Sent:** | Thursday, August 22, 2002 11:27 AM |
| **To:** | Bryant, Richard E. |
| **Cc:** | Buck, Clifton L.; Grissette, Don E. |
| **Subject:** | Good Job ! |

Janell McDowell has done and excellent job of keeping the barrier tape up while trimming the hedges. I don't know what or who's prompting her to do that, but I certainly appreciate the approach to that job.

*Randy Johnson*
*Farley AGM- OPS*
*814-4516*

**McDowell, Janell**

| | |
|---|---|
| **From:** | White, Jennifer Jewel |
| **Sent:** | Tuesday, March 02, 2004 4:04 AM |
| **To:** | McDowell, Janell; Sanders, Stephanie M. |
| **Cc:** | Caldwell, Tammy M.; Williams, Darran D. |
| **Subject:** | Thanks |

Hey girls, I just wanted to say thanks for leaving everything in great shape for us. It is so nice to come on shift and find that everything has been done that should be done. You spoiled us. I hope we can return that kind of great work back to you.

Thanks again,

Jennifer

**From:**         Walden, Joe M.
**Sent:**         Wednesday, April 21, 2004 8:56 AM
**To:**           McDowell, Janell; Sanders, Stephanie M.
**Subject:**      FW: Janell McDowell and Stephanie Sanders

WOW – I remain grateful for your dedication.

JMW

-----Original Message-----
**From:** Teat, Elbert D.
**Sent:** Wednesday, April 21, 2004 6:44 AM
**To:** Faulk, Nicole A.; Yance, Billy Joe; Walden, Joe M.; Buck, Clifton L.
**Cc:** Crutchfield, Deborah K.; Wilson, Timothy P.
**Subject:** RE: Janell McDowell and Stephanie Sanders


        Janell and Stephanie the Facilities Supervision appreciate your hard work and
cooperation you both have shown to our
        customers. You both have gone beyond expection of your regular job assignments
several times and we appreciate both
        of you being accountable.

        Thanks Dennis
        -----Original Message-----
        **From:**        Faulk, Nicole A.
        **Sent:**        Wednesday, April 21, 2004 5:32 AM
        **To:**          Yance, Billy Joe
        **Cc:**          Crutchfield, Deborah K.; Teat, Elbert D.; Wilson, Timothy P.
        **Subject:**     Janell McDowell and Stephanie Sanders

BJ -
Just wanted to let you know what a good job Janell McDowell and Stephanie Sanders did
tonight. I asked them if they could empty the bucket and sleeve for the 1A CHG pump CCW
leak every two hours and they did just that and on top of that got a CCW drum to the
combustible storage area on the 100' so that the bucket could be easily emptied. I really
appreciated their hard work and cooperation tonight. They were the only two here - Leonard
Russ called in sick.

They have done a great job on our E/S and N/S

Nicole

**McDowell, Janell**

| | |
|---|---|
| **From:** | Avery, Phillip D. |
| **Sent:** | Thursday, July 22, 2004 3:47 PM |
| **To:** | Key, Ashley Hill; McDowell, Janell; Sanders, Stephanie M. |
| **Cc:** | Freeman, Mark; Wright, John W.; Murrell, Shelley A. |
| **Subject:** | FW: Thanks |

**Importance:**        High

Craig is usually a pretty hard critic. You guys did a great job.

Thanks Phillip

-----Original Message-----
| | |
|---|---|
| **From:** | Hanks, Craig E. |
| **Sent:** | Wednesday, July 21, 2004 7:30 PM |
| **To:** | Avery, Phillip D. |
| **Cc:** | Riley, Stan E. |
| **Subject:** | Thanks |
| **Importance:** | High |

PA,

I've heard some mighty high compliments regarding the effort put forth in cleaning up the hot calibration lab. Please pass my sincere thanks along; we'll probably need some additional help on Friday morning when {hopefully} the rest of the damaged tiles are brought down.  I'll stay in touch.....................

*Thank You,*
*Craig Hanks*
*Farley Calibration Lab*
*Pax: 8-276-4607*
*Fax: 8-276-4681*
*Pager: 7774607*
*E-Mail: cehanks@southernco.com*

 **MIAMI DOLPHINS**

Southern Nuclear
Operating Company, Inc.
Post Office Drawer 470
Ashford, Alabama 36312

TO:        Janell McDowell
FROM:      Randy Johnson
DATE:      August 18, 2005
SUBJECT:   Decision-Making Leave



**SOUTHERN COMPANY**
*Energy to Serve Your World*™

In our meeting on August 16, 2005, we discussed harassment of co-worker; failure to follow work instructions; and lack of loyalty, competitiveness, and efficiency. Additionally, you have swapped job assignments with co-workers after you have been instructed not to by Facilities supervision. We discussed that the company is on notice of a hostile and intimidating work environment created in part by your actions. Swapping job assignments without obtaining supervisory concurrence impedes the supervisor's ability to hold individuals accountable for their actions.

As a result of your actions, you were issued a Decision-Making Leave. This positive discipline will remain active and in your personnel file for 18 months. You were instructed to take a day off with pay to consider the impacts of your actions, the future expectations you must abide by and to return and inform your management of your interest to remain employed or not as a Helper at Farley Nuclear Plant.

We discussed that employees are expected to follow the company's non-harassment policy and to be committed to a work environment free of intimidation and harassment. Employees have the responsibility to report to supervision the status of work assignments, and to contribute to the loyalty, competitiveness, and efficiency of the department. Failing to improve or should any other problems occur which warrants formal discipline, will result in termination of your employment.

You indicated that you were committed to performing your job duties in a way such as not to create a hostile environment. You also committed to not swapping jobs without supervisor concurrence.

I am confident that you understand the meaning of our discussion and the necessary expectations for your future performance. I am confident that you understand the consequences for failure to fully support your commitment.

I look forward to working with you through this situation and moving to a productive future.

Sincerely,

Randy Johnson

**From:**       Jordan, Jason L.
**Sent:**       Thursday, March 03, 2005 5:01 AM
**To:**         FNP Fac Foreman
**Cc:**         Sanders, Stephanie M.; McDowell, Janell; Vickers, Gamaska
**Subject:**    Service Above and Beyond Expectations

        I would like to take this opportunity to express my deepest appreciation for the dedication and hard work exhibited by Stephanie, Janelle, and Gamaska. It has truly been a privilege to have them on my crew and I welcome them back any time. I have been impressed with the personal pride they each took in their jobs. They were instrumental in accomplishing seemingly impossible tasks with untiring devotion. I never once had to worry when any one of them was involved with a job because they made sure the job was complete and done right the first time. This along with their positive attitudes made my job much easier. They have reflected great credit upon themselves as well as Plant Farley and for this, they should be commended.

Thank you,
Jason Jordan
Facilities Foreman
Plant Hatch
8-692-3093



DEFENDANT'S
EXHIBIT

5 McDowell

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22nd Street, Suite 2000
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105

Our Reference:
Charge No. 130-2006-01264

Janell McDowell

# FILE COPY

Ozark, AL

Dear Ms. McDowell:

As indicated by the Dismissal and Notice of Rights which accompanies this letter, the referenced charge of discrimination has been dismissed by this agency.

All of the facts presented in your charge of discrimination have been accepted as true. These facts, however, establish that you were discharged for a reason which, in the Commission's view, would not constitute discrimination on the basis of race, color, sex, or retaliation. Discharge for your part in the creation of a hostile work environment would raise no inference of discrimination sufficient to warrant further Commission investigation or involvement. The findings of the state unemployment agency in connection with your appeal are not relevant to a claim of employment discrimination.

At this time, therefore, the Commission will exercise its statutory and procedural authority to determine jurisdiction and the scope or extent of its investigations. This authority is described in the Commission's Procedural Regulations at 29 CFR 1601.18(a) which states:

> *Where a charge on its face, or as amplified by the statements of the person claiming to be aggrieved discloses, or where after investigation the Commission determines that the charge and every portion thereof is not timely filed, or otherwise fails to state a claim under Title VII or the ADA (Americans with Disabilities Act), the Commission shall dismiss the charge.*

The Commission's Dismissal and Notice of Rights is enclosed. The notice provides you with the opportunity to pursue your claim against the employer named in the charge in Federal court if you disagree with the Commission's interpretation of the facts or the applicable law. Should you decide to pursue the claim, you must do so within 90 days from the date you receive the Dismissal and Notice of Rights.

Sincerely,

*Al Gosa*

Allen Gosa
Enforcement Supervisor

1/19/06
Date

DEFENDANT'S
EXHIBIT

6 McDowell

Faxed to S. Bestw

EEOC Form 161 (3/98)    U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To:  Janell Mcdowell | From:  Birmingham District Office - 420 |
|---|---|
| Ozark, AL | Ridge Park Place<br>1130 22nd Street, South<br>Birmingham, AL 35205 |

|  | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | | |
|---|---|---|---|
| EEOC Charge No. | EEOC Representative | | Telephone No. |
| 130-2006-01264 | Murry A. Gosa,<br>Intake Supervisor | | (205) 212-2119 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ] Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ] While reasonable efforts were made to locate you, we were not able to do so.

[ ] You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_____        1/19/06

Bernice Williams-Kimbrough,        (Date Mailed)
District Director

Enclosures(s)

cc:    FARLEY NUCLEAR PLANT
Ashford, AL 36312

McDowell v. Southern Nuclear
300

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge <u>within 90 days</u> of the date you *receive* this Notice. Therefore, you should keep a record of this date. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than <u>2 years (3 years)</u> before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit <u>before 7/1/02</u> – *not* 12/1/02 -- in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --   Title VII and the ADA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, please make your review request <u>within 6 months</u> of this Notice. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA<br>☒ EEOC | |

_____ _State or local Agency, if any_ _____   and EEOC

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Ms. Janell McDowell | |
| STREET ADDRESS    CITY, STATE AND ZIP CODE<br>Ozark, AL | DATE OF BIRTH |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME<br>Farley Nuclear Plant | NUMBER OF EMPLOYEES, MEMBERS<br>15+ | TELEPHONE (Include Area Code)<br>(334) 899-5156 |
|---|---|---|
| STREET ADDRESS   CITY, STATE AND ZIP CODE<br>P.O Box 470   Ashford, AL | | COUNTY<br>Houston |
| NAME | | TELEPHONE NUMBER (Include Area Code) |
| STREET ADDRESS    CITY, STATE AND ZIP CODE | | COUNTY |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☒ RACE   ☒ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST 8/16/05   LATEST

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

Please see attached letter.

| ☐ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>Janell McDowell<br>Date 12/12/05   Charging Party (Signature) | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br><br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day, month, and year) |

EEOC FORM 5 (Rev. 06/92)

# Janell McDowell

## Ozark, AL

Equal Employment Opportunity Commission
1130 22nd Street, South
Suite 2000
Birmingham, AL  35205

December 12, 2005

Dear EEOC Representative:

My name is Janell McDowell and I am a forty-three year old African-American female residing in Ozark, Alabama. I worked for Farley Nuclear Plant for six and one half years. I had nothing but good evaluations and letters of praises in my file. I am filing this complaint with your establishment for being wrongfully discharged singled out, labeled, retaliated against and discriminated against by management at Farley Nuclear Plant.

On Tuesday, August 16, 2005, I received an 18 month DML (decision making leave) for not speaking to a co-worker. (1) Randy Johnson, (plant manager) stated that by not speaking to Tammy Caldwell created a hostile environment and this was a form of harassment. (2) They also alleged that I was part of a group of employees that harassed Ms. Caldwell. In any case, I spoke with Ms. Caldwell when it was job related and I never said anything out of the way to her.

On Friday, September 9, 2005, two foremen and my supervisor called me in the office saying that they were giving me a 30-day follow up on my 18 month discipline. In the meeting (that I recorded) which was not the complete 30 days, they stated that I was not complying with my conditions of employment. They stated that I did not meet their expectations, because I was not speaking to **THEM** and that was one of the conditions that was contingent upon me staying employed with the company. Well, that was not the truth and not what my DML was for. They had changed from not speaking to Ms. Caldwell to not speaking to them.

On Friday, September 16, 2005, around 2:00 p.m. I was told to report the assistant manager's office by my foreman (John Wright). In the office was Sonny

Bugarrone. (Assistant Plant Manager), Deborah Crutchfield (Facilities Maintenance supervisor), Brad Moore (Maintenance Manager), Cheri Johnson (Human Resource Director), Mike Jackson (my union representative) and myself. Also, security was waiting outside the office to escort me off of plant site. The assistant manager informed me that he was terminating me because I indicated to my supervisor and foremen in the meeting they had with me on September 9, 2005, that I did not care whether I kept my job or not. When I went in the aforementioned meeting (that I recorded) present were Deborah Crutchfield, Shelley Murrell and Mark Freeman and I. As a result, they perjure themselves by telling the assistant plant manager I made that statement not knowing I had taped the conversation. He also indicated that I did not keep my promise about speaking. When I was told to speak and rebuild a friendly relationship with the co-worker nothing was ever mentioned about me speaking (greeting) management. Again, they went from not speaking to Tammy to not speaking to them. According to my DML I had complied with everything that they stated.

On November, 4, 2005, I had a hearing via teleconference with the State of Alabama Department of Industrial Relations Hearings and Appeals representative (Brenda Sulzby), Corporate Human Resource representative (Sharon Bestwick), Human Resource Director (Cheri Johnson) and Facilities Maintenance Supervisor (Debra Crutchfield). In this hearing I learned the contents of a letter that was presenting to Ms. Caldwell by union steward (Doris Ashford). I had absolutely no knowledge of the contents of that letter and when it was presented to Ms. Caldwell. As a matter of fact, when this information was presented Ms. Sulzby asked Ms. Bestwick if the letter was in my handwriting or if they had any proof to tie me to the letter. Ms. Bestwick response was no. Meanwhile, the person who drafted and presented the letter to Ms. Caldwell is gainfully employed at Farley Nuclear Plant.

Thank you for looking into this matter, and I hope to hear from you soon.

Sincerely,

*Janell McDowell*

Janell McDowell

McDowell v. Southern Nuclear
304

**SOUTHERN COMPANY**

| NAME | | |
|---|---|---|
| McDowell, Janell | | |

| TITLE/POSITION | JOB CODE |
|---|---|
| Nuclear Security Officer | 3493 |

| EMPLOYEE NUMBER | EMPLOYMENT DATE |
|---|---|

SOCIAL SECURITY NUMBER

| LOCATION | DEPARTMENT | PERIOD: FROM | TO |
|---|---|---|---|
| Plant Farley | PF-Security | 04-20-98 | 12-31-98 |

## PERFORMANCE PLAN

INDIVIDUAL/TEAM GOALS (WHATS)

Maintain plant security and to ensure no release of radioactive material due to industrial sabotage.
* No personnel errors
* No injuries
* No vehicle accidents

WORK DIMENSIONS/BEHAVIORS (HOWS)

Southern Style
Principles for Nuclear Operations
Code of Ethics
Security Plan, Procedures, CIP's
Safety and Health Plan

## DEVELOPMENT/CAREER PLAN

CAREER GROWTH GOALS

Gain as much knowledge as possible to perform my job efficiently. Also, would like to continue my education in engineering or chemistry.

MAJOR STRENGTHS/SKILLS

Work experience with other organizations, as well as my education. Also, I have excellent people skills.

KEY AREAS FOR DEVELOPMENT

Continue to become more familiar with work practices and Security Procedures.



DEFENDANT'S
EXHIBIT

J. McDowell

**CONTRIBUTION TO TEAM GOALS**

Janell has successfully contributed to the team goal. She has had no personnel errors, vehicle accidents, or injuries. Janell is a Fire Brigade Member, and a Plant Emergency Vehicle Operato

**INDIVIDUAL ACHIEVEMENTS/CONTRIBUTIONS**

Janell is a new employee who has showed a lot of enthusiasm while gaining knowledge and eperience in her new job. Janell is dependable and displays a "Southern Style" attitude. Janel learns quickly, performs work functions without having to be directed, and demonstrates teamwork by willingly pitching in to assist coworkers.

**DEVELOPMENTAL PROGRESS**

Janell has effectively familiarized herself with security operations, Plans, and Procedures and eds to continue in this endeavor. She needs to develop her knowledge of the response plan and sponse tactics.

## COMMENTS

EMPLOYEE

SUPERVISOR

Janell can strengthen her work performance by continuing to become familiar with procedures and by gaining experience in response and emergency drills.

**SIGNATURES**    Employee Signature indicates a review and discussion of this document and does not necessarily imply concurrence.

| EMPLOYEE | DATE |
|---|---|
| *Janell EMcDowell* | 1/13/99 |
| SUPERVISOR | DATE |
| *Lisa Hogg* | 1-13-99 |
| REVIEWER | DATE |
| *Ken Dyar* | 2/25/99 |

# PERFORMANCE PLAN & SUMMARY

**SOUTHERN COMPANY**
*Energy to Serve Your World*

| NAME | TITLE/POSITION | JOB CODE |
|---|---|---|
| McDowell, Janell | Nuclear Security Officer | 3493 |

| SOCIAL SECURITY NUMBER | EMPLOYEE NUMBER | EMPLOYMENT DA |
|---|---|---|
| | | 04-20-98 |

| LOCATION | DEPARTMENT | PERIOD: FROM | TO |
|---|---|---|---|
| Plant Farley | PF-Security (422) | 01-01-99 | 12-31-99 |

## PERFORMANCE PLAN

### INDIVIDUAL/TEAM GOALS (WHATS)

Team: Support the FNP project goals: Nuclear/Industrial Safety, Cost Control, and Seasonal Reliability.
Individual: Maintain plant security and to ensure no release of radioactive material due to industrial sabotage.
* Zero injuries.
* Zero vehicle accidents.
* Zero personnel errors which result in Occurrence Reports.

### WORK DIMENSIONS/BEHAVIORS (HOWS)

Southern Style
Principles for Nuclear Operations
Code of Ethics
Security Plan, Procedures, CIP's
Safety and Health Plan

## DEVELOPMENT/CAREER PLAN

### CAREER GROWTH GOALS

Familiarize myself with the following procedures and guidelines.
Regional Assist
Table Top Drills
Fire Brigade Drills

### MAJOR STRENGTHS/SKILLS

Ability to learn and willful to learn.

### KEY AREAS FOR DEVELOPMENT

Would like to take the following courses for self improvement.
Attitude Your Most Priceless Possession
Wake Up Your Creative Genius



DEFENDANT'S
EXHIBIT

9 McDowell

## PERFORMANCE SUMMARY

### CONTRIBUTION TO TEAM GOALS

Janell has successfully contributed to the team goal. She has had no personnel errors, vehicle accidents, or injuries. Janell is a Fire Brigade Member, and a Plant Emergency Vehicle Operator.

### INDIVIDUAL ACHIEVEMENTS/CONTRIBUTIONS

[ ] has continued to gain knowledge and experience in her new job. Janell learns quickly and performs work functions without having to be directed, and with minimum revision. She completes work as assigned and consistently achieves results. Janell possesses good

**PERFORMANCE PLAN & SUMMARY**                    **McDowell, Janell**                         Page:  2

### INDIVIDUAL ACHIEVEMENTS/CONTRIBUTIONS - Continued

mmunications skills by expressing herself clearly and confidently.

### DEVELOPMENTAL PROGRESS

Janell successfully completed the Southern Company Self Study Courses, "Attitude: Your Most Priceless Possession", and "Wake up Your Creative Genius." Janell was unable to participate in a Security Response Drill this year.

## COMMENTS/SIGNATURES

### EMPLOYEE

### SUPERVISOR

Janell can strengthen her work performance by continuing to become familiar with procedures and by gaining experience in response and emergency drills.

Employee**:   _Janell McDowell_                                    Date:  1. 17.00

**Employee Signature indicates a review and discussion of this document and does not necessarily imply concurrence.

Supervisor:  _Lisa Hogg_                                            Date:  1-17-00

Reviewer:                    _Ken Dyar_                              Date:  1/31/2000

McDowell v. Southern Nuclear
279

# SOUTHERN NUCLEAR OPERATING COMPANY

## ANNUAL EMPLOYEE SAFE WORK PRACTICES INSPECTION

Employee Name _____ Janell McDowell _____

Employee Number _____

(Optional) See Attached List of Employees _____
                                           (CHECK)

Work Location _____ Farley _____

The above listed employee(s) is complying with the safety related work practices required
by Southern Nuclear and applicable OSHA Standards including 1910.269. The inspection
verified that the employee(s):

|  | Comments |
|---|---|
| Has received training in the specific job functions he/she is currently performing; and received safety awareness training in appropriate areas such as HAZCOM, Blood Borne Pathogens, Access to Exposure and Medical Records, Personal Protective Equipment, Hearing Conservation, Asbestos and Lead. | |
| Has conducted or participated in Job Safety Briefings | |
| Understands and follows the Plant Clearance Procedures | N/A |
| Understands and follows all other procedural guidance applicable to work he/she performs | |
| Is knowledgeable of and wears appropriate clothing when exposed to work on or near exposed energized electrical equipment | N/A |
| Utilizes Personal Protective Equipment as required | |
| Utilizes safe work practices applicable to work he/she performs | |

This form shall be maintained for the employee's duration of employment. This form may
be used as an attachment to the employee's Annual Performance Plan and Summary

| Lisa Hogg | *Lisa Hogg* | NSC | 01-17-00 |
|---|---|---|---|
| **Management Inspector (Print Name)** | **Management Inspector (Signature)** | **Title** | **Date** |

McDowell v. Southern Nuclear
280

PERFORMANCE MANAGEMENT PLAN

SOUTHERN COMPANY

NAME:    LAST: MCDOWELL Jan    FIRST: JANELL    JM 7-17-00    9/12/00 JM

2.14.00

EMPLOYEE #: _____

REVIEW PERIOD:    FROM: ~~MARCH 2000~~ January 2000    TO: ~~MARCH 2001~~ December 2001-8

12-27(1)    12-27(1)

DEPARTMENT:    FACILITIES

JOB TITLE:    HELPER

CHECK REASON FOR APPRAISAL:
_____ X _____ Annual
_____ _____ Change of Immediate Supv
_____ _____ Accelerated Input
_____ _____ Other

## I. DEVELOPMENTAL PLAN

**DEMONSTRATED STRENGTHS:**

COMMUNICATION
DEPENDABLE
POSITIVE WORKING RELATIONSHIP
EAGER TO LEARN
TEAM PLAYER
SAFETY
FOLLOWS INSTRUCTIONS
TRAINING QUALIFICATIONS CURRENT
PLANT KNOWLEDGE AS SECURITY OFFICER

**DEVELOPMENTAL NEEDS:**

PROCEDURE ADHERENCE
PLANT KNOWLEDGE OF OPERATIONAL EQUIPMENT AND LOCATION
~~CAPS PROCESS~~    JM 12-27-(1)
COMPUTER SKILLS
DEMONSTRATE SOUTHERN STYLE BEHAVIOR
FOCUS ON PRIORITIES
ORGANIZE AND PLAN WORK
IDENTIFY AND SOLVE PROBLEMS
RADIOLOCIAL CONTROLS

**DEVELOPMENTAL ACTION PLAN:**

RECEIVE NEEDED TRAINING AND ON SHIFT EXPERIENCE TO IMPROVE MY DEVELOPMENTAL NEEDS

DEFENDANT'S
EXHIBIT

Mc Dowell

02/09/00

PERFORMANCE MANAGEMENT PLAN                                    SOUTHERN COMPANY 

## II. PERFORMANCE ASPECTS

| | ABOVE EXPECTATIONS | AT EXPECTATIONS | BELOW EXPECTATIONS |
|---|---|---|---|
| **A. COMMUNICATE TO CREATE SHARED UNDERSTANDING** | | | |
| 1. Communicates accurately and frequently. | | X | |
| 2. Informs co-workers, supervisors or managers when there is a potential problem. | | X | |
| 3. Practices effective team skills. | | X | |
| 4. Strives for positive working relationships. | | X | |
| 5. Provides assistance to others. | | X | |
| 6. Actively participates in planning, pre-job briefs, post-job briefs. | | X | X |
| 7. Maintains the work area (in the field and in the shop) in a professional manner, meeting FNP's housekeeping standards. | | X | (a) 2nd |
| **B. ANTICIPATE ERROR-LIKELY SITUATIONS** | | | |
| 1. Performs self-check. | | X | |
| 2. Checks others. | | X | |
| 3. Focuses attention on the task at hand. | | X | |
| 4. Expects success, but maintains a questioning attitude. | | X | |
| 5. Takes the time needed to do the job right. | | X | |
| **C. CONFIRM THE INTEGRITY OF DEFENSES** | | | |
| 1. Follows approved procedures with a sense of awareness. | | X | |
| 2. Questions the appropriateness of disabling or degrading systems to perform work. | | X | |
| 3. Monitors vital parameters. | | X | |
| 4. Stops the task and collaborates with others when unfamiliar or unanticipated conditions arise. | | X | |
| 5. Uses proper safety equipment. | | X | |
| 6. Uses ALARA concepts and adheres to good radiological safety work procedures. | | X | |
| **D. IMPROVE PERSONAL CAPABILITIES** | | | |
| 1. Seeks ways to improve capabilities. | | X | |
| 2. Acquires knowledge and understanding of the factors that influence human behavior. | | X | |
| 3. Satisfactorily participates in assigned training. | | X | |
| 4. Maintains present qualifications. | | X | |
| 5. Strives to improve knowledge and skills. | | X | |
| 6. Willing to try new/different approaches, as appropriate, to improve FNP. | | X | |
| **PERFORMANCE** | | | |
| 1. Performs assigned tasks / works efficiently and professionally, using approved procedures as applicable. | | X | |

**CLOSEOUT PERFORMANCE SUMMARY**

**OVERALL PERFORMANCE:**

Janell performs assigned task at expected levels. She helps and works well with others

## IV. COMMENTS

**EMPLOYEE:**

**REVIEWING SUPERVISOR:**   I concur with this evaluation.

**SIGNATURES:** (Employee signature indicates review and discussion of this document and does not necessarily imply concurrence.)

| | |
|---|---|
| Employee: *Janell McDowell* | Date: 2/2/01 |
| Immediate Supervisor: *Tim Witt* | Date: 2/2/01 |
| Reviewing Supervisor: *R.E. Bryant* | Date: 02/02/01 |

McDowell v. Southern Nuclear
275

04/26/00

Annual Safe Work Practice Training Checklist

**1.   Hazard Communication (HAZCOM)**                                                Yes    No

    a.   Has employee received initial Hazcom training (Normally provided       ☑      ☐
        by initial GET training and maintaining annual GET retraining current.
        Deals with understanding the use of MSDS sheets and SHP-26)?
    b.   Is the employee aware of the hazards associated with the hazardous materials   ☑      ☐
        used by the employee?

If all the items above were answered as yes the employee meets the training
qualifications for this section.

**2.   Bloodborne Pathogen**

    Is the employee expected be able to act as a first aid responder?           yr ☒    ☑ no

    a.   If yes, is the employee first aid qualifications current (first aide training   yr ☒    ☐
        includes dealing with bloodborne pathogens)?

If all the items above were answered as yes the employee meets the training
qualifications for this section.

    Is the employee a SNC employee not first aid qualified?                     ☐      ☑

    a.   If yes, has the employee been informed to avoid contact with blood       ☑      ☐
        products and if blood type products are encountered Safety & Health
        personnel should be contacted to respond?

If all the items above were answered as yes the employee meets the training
qualifications for this section.

**3.   Access to Exposure and Medical Records**

    a.   Has the employee been informed this year that he has access to his personal   ☑      ☐
        exposure and medical records?

If all the items above were answered as yes the employee meets the training
qualifications for this section.

**4.   Personal Protective Equipment**

    a.   Has the employee been initially instructed when to use, how to wear and the   ☑      ☐
        proper care, maintenance of eye and face protection, hand protection, foot
        protection, head protection and electrical protection equipment?

If all the items above were answered as yes the employee meets the training
qualifications for this section.

McDowell v. Southern Nuclear
276

|  | Yes | No |
|---|---|---|

5. **Hearing Conservation**

   a. Has the employee received annual training on the effects of noise on hearing, the use of hearing protection and the purpose of audiometric testing (Normally provided during annual GET training)?  ☑ ☐

   If all the items above were answered as yes the employee meets the training qualifications for this section.

6. **Asbestos**

   Is the employee expected to be able to perform asbestos work?  ☐ ☑

   a. If yes, is the employee expected to be an asbestos competent person?  ☐ ☑

      If yes, has the employee received the initial Class III 16 hour asbestos competent person training?  ☐ ☑
      Has the employee received the annual asbestos competent person retraining?  ☐ ☑

   If all the items above were answered as yes the employee meets the training qualifications for this section.

   b. If yes, is the employee expected to be able to perform Class III asbestos work?  ☐ ☑

      If yes, has the employee received the initial Class III asbestos worker training?  ☐ ☐
      Has the employee received the annual Class III worker retraining?  ☐ ☐

   If all the items above were answered as yes the employee meets the training qualifications for this section.

   c. If yes, is the employee expected to be able to conduct Class IV asbestos work?  ☐ ☐

      If yes, has the employee received the initial Class IV asbestos worker training?  ☐ ☐

   If all the items above were answered as yes the employee meets the training qualifications for this section.

7. **Lead**

   Is the employee expected to be able to work on lead containing material?  ☐ ☑

   a. If yes, has the employee been given initial general training (HazCom) regarding the hazards of lead exposure?  ☐ ☐

   If all the items above were answered as yes the employee meets the training qualifications for this section.

   Has the employee been exposed to lead in air in excess of 30 ug/m$^3$ (No FNP employees in this category in 1999)?  ☐ ☑

   a. If yes, has the employee been given training regarding the health hazards of lead, protective measures to reduce exposure and other lead safety related training.  ☐ ☐
   If all the items above were answered as yes the employee meets the training qualifications for this section.

PERFORMANCE MANAGEMENT PLAN

SOUTHERN COMPANY ▲

NAME:   LAST: McDowell   FIRST: Janell

EMPLOYEE #:

REVIEW PERIOD:   FROM: 01/01/2001   TO: 12/31/01

*gm 2/2/01*
*gm 3/29/01*
*6/25/01*
*12/18/0*

DEPARTMENT:   Facilities

JOB TITLE:   Helper

CHECK REASON FOR APPRAISAL:
___x___ Annual
_____ Change of Immediate Supv
_____ Accelerated Input
_____ Other

## I. DEVELOPMENTAL PLAN

**DEMONSTRATED STRENGTHS:**

Demonstrates continuous learning
Values and influences team work
Follows instructions
Dependable
Accountable for performance

Practices safe work habits
Produces work on time
Questioning attitude
Produces quality work
Cross trained on both  rad and non-rad side

**DEVELOPMENTAL NEEDS:**

Demonstrate Southern Style
Improve computer skills
Conduct and participate in pre-job briefs prior to each task
Create an observable change in housekeeping and material condition of plant areas ( take ownership )
Learn from operating experiences (lessons learned)
Improve radiological skills
Increase knowledge of plant equipment and plant systems
Strive to achieve error free (human) performance
Place emphasis on the use of human performance tools

**DEVELOPMENTAL ACTION PLAN:**

I will work on my computer skills as much as possible
I will improve my radiological skills and keep my exposure ALARA
I will create an observable change in housekeeping and material condition of plant areas
I will conduct and participate in pre-job briefs prior to each task
I will place emphasis on the use of human performance tools and provide leadership in helping the facilities
group with human performance deficiencies
I will be aggressive in learning new tasks

DEFENDANT'S
EXHIBIT

McDowell

### III. CLOSEOUT PERFORMANCE SUMMARY

**OVERALL PERFORMANCE:**

Janell consistently meets and frequently exceeds performance objectives. She assumes responsibility for personal actions and task as assigned. Takes responsibility for the quality and completeness of work assignments, personally and for others on her team. Effectively organizes and plans work in a manner that produces expected results and synergy among team members. Customer satisfaction has been noted on several occasions during this year from other groups in the plant.

Demonstrates southern style behaviors and places emphasis on Human Performance Tools.

### IV. COMMENTS

**EMPLOYEE:**

I concur.

**REVIEWING SUPERVISOR:**

I Concur with this evaluation.

**SIGNATURES:** (Employee signature indicates review and discussion of this document and does not necessarily imply concurrence.)

| Employee: *Janell McDowell* | Date: 1/10/02 |
|---|---|
| Immediate Supervisor: | Date: 1-10-02 |
| Reviewing Supervisor: *R.E. Bry* | Date: 01-11-02 |

01/10/02

NAME: *Janell McDowell*     EMPLOYEE #:

**I.  Outage/Job Performance (Productivity)**

Looks for ways to stay productive.  Anticipates and thoroughly prepares for job assignments (detailed walkdowns).  Is self-directed.  Accepts and promotes concept of working single person task where safe and judicious.  Is schedule driven.

| Extraordinary [ ] | Meets or exceeds expectations [X] | Below expectations [ ] |

**II.  Equipment Reliability**

Has an intolerance for reworks and equipment failures.  Looks for ways to improve processes and procedures.  Builds quality into every job assignment.

| Extraordinary [ ] | Meets or exceeds expectations [X] | Below expectations [ ] |

**III  Human Performance**

Follows and promotes Human Performance Error Prevention techniques.

| Extraordinary [ ] | Meet or exceeds expectations [X] | Below expectations [ ] |

**IV  Leadership**

Accepts challenging assignments with a positive attitude.  Expects to develop and/or be developed.  Accepts and promotes personal housekeeping responsibilities.  Is an effective communicator.  Acts like an owner.  Is a good steward of company resources.

| Extraordinary [ ] | Meets or exceeds expectations [X] | Below expectations [ ] |

**V  Mentorship**

Looks for ways to mentor and teach.  Is recognized by co-workers for proper and effective utilization of positive reinforcement and critical comments.

| Extraordinary [ ] | Meets or exceeds expectations [X] | Below expectations [ ] |

**VI  Training/Learning Organization**

Utilizes lessons learned, work order feedback forms, condition reports, etc. without being directed.

| Extraordinary [ ] | Meets or exceeds expectations [X] | Below expectations [ ] |

**NOTE:** If below expected level, must have revision to developmental plan attached.  If extraordinary, must provide examples attached.

McDowell v. Southern Nuclear
268

| Supervisor: | Date: 12/18/01 | Employee: *Janell McDowell* |

## Facilities Department

# EXPECTATIONS

1) Want you to do your job – Do it right and Safely
   Plan out your work day.-----Use Human Performance Tools whenever planning out work
   Be a team player.
   Follow instructions.----Be a good listener
   Be proactive:    In helping keep the plant clean.
   Mgmt wants to know when there is job delays and when jobs are completed.

2) Follow the company guidelines on the Southern Style.

3) Treat Mgmt fairly, and we will treat you fairly.  Most of all treat each other Fairly!

4) Communicate – Communicate – Communicate.

5) Want you to be Dependable.
   Obey the company rules.
   Show up to work on time.
   Leave for the day when you are suppose to.
   Take your break when your suppose to.
   Go to lunch when your suppose to.

6) Accept change.

7) Follow your own Developmental Action Plan.

# SOUTHERN NUCLEAR OPERATING COMPANY

## ANNUAL EMPLOYEE SAFE WORK PRACTICES INSPECTION

**Employee Name** *McDowell, Janell*

**Employee Number** _____

**(Optional) See Attached List of Employees** _____
                                              **(CHECK)**

**Work Location** _____

**The above listed employee(s) is complying with the safety related work practices required by Southern Nuclear and applicable OSHA Standards including 1910.269. The inspection verified that the employee(s):**

| | Comments |
|---|---|
| Has received training in the specific job functions he/she is currently performing; and received safety awareness training in appropriate areas such as HAZCOM, Blood Borne Pathogens, Access to Exposure and Medical Records, Personal Protective Equipment, Hearing Conservation, Asbestos and Lead. | |
| Has conducted or participated in Job Safety Briefings | |
| Understands and follows the Plant Clearance Procedures | |
| Understands and follows all other procedural guidance applicable to work he/she performs | |
| Is knowledgeable of and wears appropriate clothing when exposed to work on or near exposed energized electrical equipment | |
| Utilizes Personal Protective Equipment as required | |
| Utilizes safe work practices applicable to work he/she performs | |

**This form shall be maintained for the employee's duration of employment. This form may be used as an attachment to the employee's Annual Performance Plan and Summary**

*BS Vance*                *(signature)*        *Foreman*        *1-10-02*
**Management Inspector**    **Management Inspector**    **Title**        **Date**
**(Print Name)**           **(Signature)**

Annual Safe Work Practice Training Checklist

1.  **Hazard Communication (HAZCOM)**

    Yes     No

    a.  Has employee received initial Hazcom training (Normally provided
        by initial GET training and maintaining annual GET retraining current.
        Deals with understanding the use of MSDS sheets and SHP-26)?
    b.  Is the employee aware of the hazards associated with the hazardous materials
        used by the employee?

    If all the items above were answered as yes the employee meets the training
    qualifications for this section.

2.  **Bloodborne Pathogen**

    Is the employee expected be able to act as a first aid responder?

    a.  If yes, is the employee first aid qualifications current (first aide training
        includes dealing with bloodborne pathogens)?

    If all the items above were answered as yes the employee meets the training
    qualifications for this section.

    Is the employee a SNC employee not first aid qualified?

    a.  If yes, has the employee been informed to avoid contact with blood
        products and if blood type products are encountered Safety & Health
        personnel should be contacted to respond?

    If all the items above were answered as yes the employee meets the training
    qualifications for this section.

3.  **Access to Exposure and Medical Records**

    a.  Has the employee been informed this year that he has access to his personal
        exposure and medical records?

    If all the items above were answered as yes the employee meets the training
    qualifications for this section.

4.  **Personal Protective Equipment**

    a.  Has the employee been initially instructed when to use, how to wear and the
        proper care, maintenance of eye and face protection, hand protection, foot
        protection, head protection and electrical protection equipment?

    If all the items above were answered as yes the employee meets the training
    qualifications for this section.

5. **Hearing Conservation**

                                                                             Yes   No

    a.   Has the employee received annual training on the effects of noise on hearing,  ☑  ☐
the use of hearing protection and the purpose of audiometric testing (Normally
provided during annual GET training)?

If all the items above were answered as yes the employee meets the training
qualifications for this section.

6. **Asbestos**

Is the employee expected to be able to perform asbestos work?         ☑  ☐

    a.   If yes, is the employee expected to be an asbestos competent person?   ☑  ☐

       If yes, has the employee received the initial Class III 16 hour asbestos competent ☑  ☐
person training?
       Has the employee received the annual asbestos competent person retraining?  ☑  ☐

If all the items above were answered as yes the employee meets the training
qualifications for this section.

    b.   If yes, is the employee expected to be able to perform Class III asbestos work?  ☑  ☐

       If yes, has the employee received the initial Class III asbestos worker training?  ☑  ☐
       Has the employee received the annual Class III worker retraining?     ☑  ☐

If all the items above were answered as yes the employee meets the training
    qualifications for this section.

    c.   If yes, is the employee expected to be able to conduct Class IV asbestos work?  ☑  ☐

       If yes, has the employee received the initial Class IV asbestos worker training?  ☑  ☐

If all the items above were answered as yes the employee meets the training
qualifications for this section.

7. **Lead**

Is the employee expected to be able to work on lead containing material?     ☑  ☐

    a.   If yes, has the employee been given initial general training (HazCom) regarding  ☑  ☐
the hazards of lead exposure?

If all the items above were answered as yes the employee meets the training
qualifications for this section.

Has the employee been exposed to lead in air in excess of 30 ug/m$^3$ (No FNP   ☐  ☑
employees in this category in 1999)?

    a.   If yes, has the employee been given training regarding the health hazards of  ☑  ☐
lead, protective measures to reduce exposure and other lead safety related
training.

If all the items above were answered as yes the employee meets the training
qualifications for this section.

# Southern Nuclear Operating Company, Inc.
## PERFORMANCE MANAGEMENT PLAN
*(For employees represented by I.B.E.W.)*

JM 7/22/02
JM 1/13/02
JM 4/03/02

**SOUTHERN COMPANY ▲**
*Energy to Serve Your World™*

| | | | | |
|---|---|---|---|---|
| **NAME:** | **LAST:** | McDowell | **FIRST:** | Janell |
| **EMPLOYEE #:** | | | | |
| **REVIEW PERIOD:** | **FROM:** 1-1-2002 | | **TO:** | 12-31-2002 |

**DEPARTMENT:** Facilities

**JOB TITLE:** Helper

**CHECK REASON FOR APPRAISAL:**

| | |
|---|---|
| X | **Annual** |
| | **Change of Immediate Supv** |
| | **Accelerated Input** |
| | **Other** |
| See Section II. | **Incremental Increase** |

## I. DEVELOPMENTAL PLAN

**DEMONSTRATED STRENGTHS:**
Values and influences teamwork
Accountable for performance
Practices safe work habits
Communication
Practices problem solving
Demonstrates continuous learning

Takes personal responsibility
Demonstrates Southern Style
Professionalism
Makes decisions
Demonstrates character

**DEVELOPMENTAL NEEDS:**
Increase knowledge of plant equipment and plant systems
Strive to achieve error free (human) performance
Create an observable change in housekeeping and material condition of plant areas
Conduct and participate in pre-job briefs prior to each task
Learn from operating experiences (lessons learned)
Place emphasis on the human performance tools and provide leadership in helping the facilities group with human performance deficiencies
Provide leadership and mentorship for new employees
Continue to look for ways to make this a "Great Place to Work"

**DEVELOPMENTAL ACTION PLAN:**
I will continue to look for ways to make this a "Great Place to Work"
I will strive to achieve error free (human) performance
I will create and observable change in housekeeping and material condition of plant areas
I will conduct and participate in pre-job briefs to each task
I will learn from operating experiences (lessons learned)
I will place emphasis on the human performance tools and provide leadership in helping the facilities group with human performance deficiencies
I will provide leadership and mentorship for new employees

**DEFENDANT'S EXHIBIT**

McDowell

# Southern Nuclear Operating Company, Inc.
## PERFORMANCE MANAGEMENT PLAN

### II. PERFORMANCE ASPECTS

| PERFORMANCE ASPECTS | ABOVE | AT | BELOW | COMMENTS |
|---|:---:|:---:|:---:|---|
| | EXPECTATIONS | | | |
| **A. COMMUNICATES TO CREATE SHARED UNDERSTANDING.** | | | | |
| 1. Communicates accurately and frequently. | X | | | |
| 2. Informs coworkers, supervisors, or managers when there is a potential problem. | X | | | |
| 3. Practices effective team skills. | X | | | |
| 4. Strives for positive working relationships. | X | | | |
| 5. Provides assistance to others. | X | | | |
| 6. Actively participates in planning, pre-job briefs, post-job briefs. | | X | | |
| 7. Maintains the work area (in the field and in the shop) in a professional manner, meeting plant housekeeping standards. | X | | | |
| **B. ANTICIPATES ERROR-LIKELY SITUATIONS.** | | | | |
| 1. Performs self-check. | X | | | |
| 2. Checks with others. | X | | | |
| 3. Focuses attention on the task at hand. | X | | | |
| 4. Expects success, but maintains a questioning attitude. | X | | | |
| 5. Takes the time needed to do the job right. | X | | | |
| **C. CONFIRMS THE INTEGRITY OF DEFENSES.** | | | | |
| 1. Follows approved procedures with a sense of awareness. | | X | | |
| 2. Questions the appropriateness of disabling or degrading systems to perform work. | | X | | |
| 3. Monitors vital parameters. | | X | | |
| 4. Stops the task and collaborates with others when unfamiliar or unanticipated conditions arise. | | X | | |
| 5. Uses proper safety equipment. | X | | | |
| 6. Uses ALARA concepts and adheres to good radiological safety work procedures. | X | | | |

McDowell v. Southern Nuclear
260

**Southern Nuclear Operating Company, Inc.**
PERFORMANCE MANAGEMENT PLAN

## II. PERFORMANCE ASPECTS (Continued)

| D. IMPROVES PERSONAL CAPABILITIES. | | | | |
|---|---|---|---|---|
| 1. Proactive; anticipates and resolves problems or roadblocks. | X | | | |
| 2. Assumes ownership of tasks and issues. | X | | | |
| 3. Flexible; handles multiple elements of work activities. | X | | | |
| 4. Helps identify and solve problems, recognized as technical expert. | | X | | |
| 5. Seeks ways to improve capabilities. Seeks difficult or additional tasks. . Strives to improve knowledge and skills. | | X | | |
| 6. Acquires knowledge and understanding of the factors that influence human behavior. | | X | | |
| 7. Maintains present qualifications and satisfactorily participates in assigned training. | | X | | |
| 8. Willing to try new/different approaches, as appropriate, to improve plant. | X | | | |
| E. PERFORMANCE | | | | |
| 1. Performs assigned tasks / works efficiently and professionally, using approved procedures as applicable. | X | | | |
| 2. Supportive of Management's directives, goals and expectations. | X | | | |
| 3. I will support the company's policy of maintaining an open, fair and inclusive work environment. | X | | | |

## THIS SECTION SHOULD BE COMPLETED FOR INCREMENTAL PAY INCREASES ONLY:

Supervision should complete the performance aspects checklist to ensure performance is at an acceptable level for incremental pay increase consideration. In addition to completing the Performance Aspects checklist, supervision should review and assess the employee's time-in-grade, training, qualifications and make a determination of whether to pay an incremental increase.

| NAME:  LAST: | | FIRST: | | INITIAL: | |
|---|---|---|---|---|---|
| JOB TITLE | | | | | |

*Please copy and paste the following symbol as needed to designate appropriate responses below:* ☒

☐ **Meets**   ☐ **Does not meet**  all of the time-in-grade*, training, qualifications and management performance expectations to qualify for consideration for an incremental pay increase.

*For employees at Hatch and Vogtle, step pay increases will be consider based classification criteria at 12 month interval except for SO or Helper, which are considered at six month intervals. Employees at Farley are considered for step increases at six month intervals for all positions.

McDowell v. Southern Nuclear
261

**OVERALL PERFORMANCE:**

Janell has consistently performed at a level that meets and often exceeds the expectations of her direct supervision. Her supervision and other plant personnel have identified her work ethics and high standards of work performance that inevitably has a direct positive effect on her co-workers. During the course of the year she has continuously made the effort to communicate turnover items with her co-workers and or her direct supervision. She has been very influential in creating an observable change in housekeeping and material condition of the plant and the facilities areas. She is accountable for her performance and practices safe work habits. Janell exhibits the Southern Style and is a very honest and trustworthy employee. She is an asset to Farley Nuclear Plant and the Facilities Department. Janell places an emphasis on the use of human performance tools and participates in pre-job briefs.

## IV. COMMENTS

**EMPLOYEE:**

**REVIEWING SUPERVISOR:**

**SIGNATURES:**
(Employee signature indicates review and discussion of this document and does not necessarily imply concurrence.)

| | | |
|---|---|---|
| Employee: | *Janell McDowell* | Date: 1/13/03 |
| Immediate Supervisor: | *Deborah Crutchfield* | Date: 1/13/03 |
| Job Title: | FAC Foreman | |
| Reviewing Supervisor: | *R.E. Bray* | Date: |
| Job Title: | Facilities Supervisor | 01/23/03 |

# SOUTHERN NUCLEAR OPERATING COMPANY

## ANNUAL EMPLOYEE SAFE WORK PRACTICES INSPECTION

Employee Name  _Janell McDowell_

Employee Number  _

(Optional) See Attached List of Employees  _____
                                           (CHECK)

Work Location  _FARley Plant_

The above listed employee(s) is complying with the safety related work practices required by Southern Nuclear and applicable OSHA Standards including 1910.269. The inspection verified that the employee(s):

| | Comments |
|---|---|
| Has received training in the specific job functions he/she is currently performing; and received safety awareness training in appropriate areas such as HAZCOM, Blood Borne Pathogens, Access to Exposure and Medical Records, Personal Protective Equipment, Hearing Conservation, Asbestos and Lead. | Yes |
| Has conducted or participated in Job Safety Briefings | Yes |
| Understands and follows the Plant Clearance Procedures | Yes |
| Understands and follows all other procedural guidance applicable to work he/she performs | Yes |
| Is knowledgeable of and wears appropriate clothing when exposed to work on or near exposed energized electrical equipment | Yes |
| Utilizes Personal Protective Equipment as required | Yes |
| Utilizes safe work practices applicable to work he/she performs | Yes |

This form shall be maintained for the employee's duration of employment. This form may be used as an attachment to the employee's Annual Performance Plan and Summary

_Deborah Crutchfield_          _Deborah Crutchfield_          _Foreman_          _1-13-03_
Management Inspector           Management Inspector           Title              Date
(Print Name)                   (Signature)

McDowell v. Southern Nuclear
263

Annual Safe Work Practice Training Checklist

1. **Hazard Communication (HAZCOM)**

   Yes   No

   a.  Has employee received initial Hazcom training (Normally provided by initial GET training and maintaining annual GET retraining current. Deals with understanding the use of MSDS sheets and SHP-26)?   ☑ ☐

   b.  Is the employee aware of the hazards associated with the hazardous materials used by the employee?   ☑ ☐

   If all the items above were answered as yes the employee meets the training qualifications for this section.

2. **Bloodborne Pathogen**

   Is the employee expected be able to act as a first aid responder?   ☐ ☑

   a.  If yes, is the employee first aid qualifications current (first aide training includes dealing with bloodborne pathogens)?   ☐ ☑

   If all the items above were answered as yes the employee meets the training qualifications for this section.

   Is the employee a SNC employee not first aid qualified?   ☑ ☐

   a.  If yes, has the employee been informed to avoid contact with blood products and if blood type products are encountered Safety & Health personnel should be contacted to respond?   ☑ ☐

   If all the items above were answered as yes the employee meets the training qualifications for this section.

3. **Access to Exposure and Medical Records**

   a.  Has the employee been informed this year that he has access to his personal exposure and medical records?   ☑ ☐

   If all the items above were answered as yes the employee meets the training qualifications for this section.

4. **Personal Protective Equipment**

   a.  Has the employee been initially instructed when to use, how to wear and the proper care, maintenance of eye and face protection, hand protection, foot protection, head protection and electrical protection equipment?   ☑ ☐

   If all the items above were answered as yes the employee meets the training qualifications for this section.

|  |  | Yes | No |
|---|---|---|---|

5. **Hearing Conservation**

   a.  Has the employee received annual training on the effects of noise on hearing, the use of hearing protection and the purpose of audiometric testing (Normally provided during annual GET training)?  ☑  ☐

If all the items above were answered as yes the employee meets the training qualifications for this section.

6. **Asbestos**

Is the employee expected to be able to perform asbestos work?  ☐  ☑

   a.  If yes, is the employee expected to be an asbestos competent person?  ☐  ☑

     If yes, has the employee received the initial Class III 16 hour asbestos competent person training?  ☐  ☑
     Has the employee received the annual asbestos competent person retraining?  ☐  ☑

If all the items above were answered as yes the employee meets the training qualifications for this section.

   b.  If yes, is the employee expected to be able to perform Class III asbestos work?  ☐  ☑

     If yes, has the employee received the initial Class III asbestos worker training?  ☐  ☑
     Has the employee received the annual Class III worker retraining?  ☐  ☑

If all the items above were answered as yes the employee meets the training qualifications for this section.

   c.  If yes, is the employee expected to be able to conduct Class IV asbestos work?  ☐  ☑

     If yes, has the employee received the initial Class IV asbestos worker training?  ☐  ☑

If all the items above were answered as yes the employee meets the training qualifications for this section.

7. **Lead**

Is the employee expected to be able to work on lead containing material?  ☐  ☑

   a.  If yes, has the employee been given initial general training (HazCom) regarding the hazards of lead exposure?  ☐  ☑

If all the items above were answered as yes the employee meets the training qualifications for this section.

Has the employee been exposed to lead in air in excess of 30 ug/m$^3$ (No FNP employees in this category in 1999)?  ☐  ☑

   a.  If yes, has the employee been given training regarding the health hazards of lead, protective measures to reduce exposure and other lead safety related training.  ☐  ☑
If all the items above were answered as yes the employee meets the training qualifications for this section.

# Southern Nuclear Operating Company, Inc.
## PERFORMANCE MANAGEMENT PLAN
*(For employees represented by I.B.E.W.)*



**SOUTHERN COMPANY**
*Energy to Serve Your World™*

JM 12/11/03
JM 5/9/03
JM 7/30/03

| NAME: | LAST: | McDowell | | FIRST: | Janell |
|---|---|---|---|---|---|
| **EMPLOYEE #:** | | | | | |
| **REVIEW PERIOD:** | FROM: | 1-1-2003 | | TO: | 12-31-2003 |

| DEPARTMENT: | Facilities | CHECK REASON FOR APPRAISAL: | |
|---|---|---|---|
| | | X _____ | Annual |
| | | _____ | Change of Immediate Supv. |
| **JOB TITLE:** | Helper | _____ | Accelerated Input |
| | | _____ | Other |
| | | See Section II. | Incremental Increase |

## I. DEVELOPMENTAL PLAN

**DEMONSTRATED STRENGTHS:**

Values and influences teamwork
Accountable for performance
Practices safe work habits
Communication
Practices problem solving
Demonstrates continuous learning

Takes personal responsibility
Demonstrates Southern Style
Professionalism
Makes decisions
Demonstrates character
Dependable

**DEVELOPMENTAL NEEDS:**

Increase knowledge of plant equipment and plant systems
Strive to achieve error free (human) performance
Create an observable change in housekeeping and material condition of plant areas (take ownership)
Conduct and participate in pre-job briefs prior to each task
Learn from operating experiences (lessons learned)
Place emphasis on the human performance tools and provide leadership in helping the facilities group with human performance deficiencies
Work to improve customer service of the group
Continue to look for ways to make this a "Great Place to Work"
Work to increase expertise in all functional facility areas

**DEVELOPMENTAL ACTION PLAN:**

I will continue to look for ways to make this a "Great Place to Work"
I will strive to achieve error free (human) performance
I will create and observable change in housekeeping and material condition of plant areas
I will conduct and participate in pre-job briefs to each task
I will learn from operating experiences (lessons learned)
I will place emphasis on the human performance tools and provide leadership in helping the facilities group with human performance deficiencies
I will work to improve customer service of the group.
I will work to increase expertise in all functional facility areas



DEFENDANT'S EXHIBIT

13 McDowell

McDowell v. Southern Nuclear
254

1

# PERFORMANCE MANAGEMENT PLAN

## II. PERFORMANCE ASPECTS

| PERFORMANCE ASPECTS | ABOVE | AT | BELOW | COMMENTS |
|---|:---:|:---:|:---:|---|
| | EXPECTATIONS | | | |
| **A. COMMUNICATES TO CREATE SHARED UNDERSTANDING.** | | | | |
| 1. Communicates accurately and frequently. | ✓ | | | |
| 2. Informs coworkers, supervisors, or managers when there is a potential problem. | ✓ | | | |
| 3. Practices effective team skills. | ✓ | | | |
| 4. Strives for positive working relationships. | | ✓ | | |
| 5. Provides assistance to others. | ✓ | | | |
| 6. Actively participates in planning, pre-job briefs, post-job briefs. | | ✓ | | |
| 7. Maintains the work area (in the field and in the shop) in a professional manner, meeting plant housekeeping standards. | ✓ | | | |
| **B. ANTICIPATES ERROR-LIKELY SITUATIONS.** | | | | |
| 1. Performs self-check. | | ✓ | | |
| 2. Checks with others. | | ✓ | | |
| 3. Focuses attention on the task at hand. | | ✓ | | |
| 4. Expects success, but maintains a questioning attitude. | ✓ | | | |
| 5. Takes the time needed to do the job right. | ✓ | | | |
| **C. CONFIRMS THE INTEGRITY OF DEFENSES.** | | | | |
| 1. Follows approved procedures with a sense of awareness. | | ✓ | | |
| 2. Questions the appropriateness of disabling or degrading systems to perform work. | | ✓ | | |
| 3. Monitors vital parameters. | | ✓ | | |
| 4. Stops the task and collaborates with others when unfamiliar or unanticipated conditions arise. | ✓ | | | |
| 5. Uses proper safety equipment. | ✓ | | | |
| 6. Uses ALARA concepts and adheres to good radiological safety work procedures. | ✓ | | | |

## II. PERFORMANCE ASPECTS (Continued)

**D. IMPROVES PERSONAL CAPABILITIES.**

| | | | | |
|---|---|---|---|---|
| 1. Proactive: anticipates and resolves problems or roadblocks. | | ✓ | | |
| 2. Assumes ownership of tasks and issues. | ✓ | | | |
| 3. Flexible; handles multiple elements of work activities. | ✓ | | | |
| 4. Helps identify and solve problems, recognized as technical expert. | | ✓ | | |
| 5. Seeks ways to improve capabilities. Seeks difficult or additional tasks. Strives to improve knowledge and skills. | ✓ | | | |
| 6. Acquires knowledge and understanding of the factors that influence human behavior. | | ✓ | | |
| 7. Maintains present qualifications and satisfactorily participates in assigned training. | | ✓ | | |
| 8. Willing to try new/different approaches, as appropriate, to improve plant. | ✓ | | | |
| **E. PERFORMANCE** | | | | |
| 1. Performs assigned tasks / works efficiently and professionally, using approved procedures as applicable. | ✓ | | | |
| 2. Supportive of Management's directives, goals and expectations. | ✓ | | | |
| 3. I will support the company's policy of maintaining an open, fair and inclusive work environment. | ✓ | | | |

## THIS SECTION SHOULD BE COMPLETED FOR INCREMENTAL PAY INCREASES ONLY:

Supervision should complete the performance aspects checklist to ensure performance is at an acceptable level for incremental pay increase consideration. In addition to completing the Performance Aspects checklist, supervision should review and assess the employee's time-in-grade, training, qualifications and make a determination of whether to pay an incremental increase.

| NAME:   LAST: | WALDEN | FIRST: | JOE | INITIAL: | M |
|---|---|---|---|---|---|
| JOB TITLE | TP   FACILITIES   SUPERVISOR | | | | |

*Please copy and paste the following symbol as needed to designate appropriate responses below:* ▓

☒ **Meets**  ▓ **Does not meet**  all of the time-in-grade*, training, qualifications and management performance expectations to qualify for consideration for an incremental pay increase.

*For employees at Hatch and Vogtle, step pay increases will be consider based classification criteria at 12 month interval except for SO or Helper, which are considered at six month intervals. Employees at Farley are considered for step increases at six month intervals for all positions.

**OVERALL PERFORMANCE:**

Janell is a hard working and dedicated employee. She is a team player and maintains good working relationships with those around her. She shows ownership in all of the tasks she performs. Janell took ownership of the Service Building when INPO visited Farley this past October. She was accountable and responsible for this area for two weeks. I received an enormous amount of E-mail stating that her work performance was above and beyond expectations. She is qualified in all aspects of her job. She participates in pre job briefings and uses the Human Performance Tools to maintain her work error free. Janell has proven throughout the year that she is flexible and can be relied upon to start and finish a job with little to no supervision. Janell uses safe work practices in all jobs she performs. She has good communication skills. Janell is an asset to the Facilities group.

## IV. COMMENTS

**EMPLOYEE:**

**REVIEWING SUPERVISOR:**

Concur - (Jmw) 1/28/2004

Janell provides high qaulity work. Observation of her work indicates she is a seeker for perfection.

**SIGNATURES:**
(Employee signature indicates review and discussion of this document and does not necessarily imply concurrence.)

| Employee: | Janell McDowell | Date: 1/8/04 |
|---|---|---|
| Immediate Supervisor: | Deborah Cutchfield | Date: |
| Job Title: | FAC FOREMAN | 1/8/2004 |
| Reviewing Supervisor | Joe M Wulder | Date: |
| Job Title: | Facilities Supervisor | 1/28/2004 |

## SOUTHERN NUCLEAR OPERATING COMPANY

### ANNUAL EMPLOYEE SAFE WORK PRACTICES INSPECTION

Employee Name  Janell McDowell

Employee Number  _____

(Optional) See Attached List of Employees  _____
(CHECK)

Work Location  FNP

The above listed employee(s) is complying with the safety related work practices required by Southern Nuclear and applicable OSHA Standards including 1910.269. The inspection verified that the employee(s):

|  | Comments |
|---|---|
| Has received training in the specific job functions he/she is currently performing; and received safety awareness training in appropriate areas such as HAZCOM, Blood Borne Pathogens, Access to Exposure and Medical Records, Personal Protective Equipment, Hearing Conservation, Asbestos and Lead. | yes jm 1.8.04 |
| Has conducted or participated in Job Safety Briefings | yes, m, 1.8.04 |
| Understands and follows the Plant Clearance Procedures | yes, m, 1.8.04 |
| Understands and follows all other procedural guidance applicable to work he/she performs | yes m 1.8.04 |
| Is knowledgeable of and wears appropriate clothing when exposed to work on or near exposed energized electrical equipment | yes m. 1.8.04 |
| Utilizes Personal Protective Equipment as required | yes m. 1.8.04 |
| Utilizes safe work practices applicable to work he/she performs | yes m. 1.8.04 |

This form shall be maintained for the employee's duration of employment. This form may be used as an attachment to the employee's Annual Performance Plan and Summary

DEBORAH Crutchfield          Deborah Crutchfield    FAC FOREMAN    1-8-2004
Management Inspector          Management Inspector    Title          Date
(Print Name)                 (Signature)

# Southern Nuclear Operating Company, Inc.
## PERFORMANCE MANAGEMENT PLAN
*(For employees represented by I.B.E.W.)*

**SOUTHERN COMPANY**
*Energy to Serve Your World™*

| | | |
|---|---|---|
| **NAME:** **LAST:** McDowell | **FIRST:** | Janell |

**EMPLOYEE #:**

**REVIEW PERIOD:** **FROM:** 1-1-2004    **TO:** 12-31-2004

**DEPARTMENT:** Facilities

**JOB TITLE:** Helper

**CHECK REASON FOR APPRAISAL:**

| | |
|---|---|
| X | Annual |
| | Change of Immediate Supv |
| | Accelerated Input |
| | Other |
| See Section II. | Incremental Increase |

## I. DEVELOPMENTAL PLAN

### DEMONSTRATED STRENGTHS:

Values and influences teamwork
Accountable for performance
Practices safe work habits
Communication
Practices problem solving

Takes personal responsibility
Dependable
Professionalism
Makes decisions
Demonstrates character

### DEVELOPMENTAL NEEDS:

Increase knowledge of plant equipment and plant systems (plant reliability)
Strive to achieve error free (human) performance
Create an observable change in housekeeping and material condition of plant areas (take ownership)
Conduct and participate in pre-job and post job briefs associated with each task
Promote Southern Style
Strive to achieve a bank of sick leave hours in preparation for the unexpected
Help to create a cost effective environment
Strive to achieve zero accidents (personal and vehicle)

### DEVELOPMENTAL ACTION PLAN:

I will increase knowledge of plant equipment and plant systems (plant reliability)
I will strive to achieve error free (human) performance
I will create an observable change in housekeeping and material condition of plant areas ( take ownership)
I will conduct and participate in pre-job and post job briefs associated with each task
I will promote the Southern Style
I will strive to achieve a bank of sick leave hours in preparation for the unexpected
I will help to create a cost effective environment
I will strive to achieve zero accidents (personal and vehicle)

DEFENDANT'S EXHIBIT
14 McDowell

**PERFORMANCE MANAGEMENT PLAN**

## II. PERFORMANCE ASPECTS

| PERFORMANCE ASPECTS | ABOVE | AT | BELOW | COMMENTS |
|---|---|---|---|---|
| | E X P E C T A T I O N S | | | |
| **A. COMMUNICATES TO CREATE SHARED UNDERSTANDING.** | | | | |
| 1. Communicates accurately and frequently. | | X | | |
| 2. Informs coworkers, supervisors, or managers when there is a potential problem. | X | | | |
| 3. Practices effective team skills. | | X | | |
| 4. Strives for positive working relationships. | X | | | |
| 5. Provides assistance to others. | X | | | |
| 6. Actively participates in planning, pre-job briefs, post-job briefs. | | X | | |
| 7. Maintains the work area (in the field and in the shop) in a professional manner, meeting plant housekeeping standards. | X | | | |
| **B. ANTICIPATES ERROR-LIKELY SITUATIONS.** | | | | |
| 1. Performs self-check. | | X | | |
| 2. Checks with others. | X | | | |
| 3. Focuses attention on the task at hand. | X | | | |
| 4. Expects success, but maintains a questioning attitude. | | X | | |
| 5. Takes the time needed to do the job right. | X | | | |
| **C. CONFIRMS THE INTEGRITY OF DEFENSES.** | | | | |
| 1. Follows approved procedures with a sense of awareness. | | X | | |
| 2. Questions the appropriateness of disabling or degrading systems to perform work. | X | | | |
| 3. Monitors vital parameters. | | X | | |
| 4. Stops the task and collaborates with others when unfamiliar or unanticipated conditions arise. | | X | | |
| 5. Uses proper safety equipment. | | X | | |
| 6. Uses ALARA concepts and adheres to good radiological safety work procedures. | | X | | |

McDowell v. Southern Nuclear
246

**Southern Nuclear Operating Company, Inc.**
**PERFORMANCE MANAGEMENT PLAN**

### II. PERFORMANCE ASPECTS (Continued)

| D. IMPROVES PERSONAL CAPABILITIES. | | | | |
|---|:---:|:---:|:---:|:---:|
| 1. Proactive; anticipates and resolves problems or roadblocks. | | X | | |
| 2. Assumes ownership of tasks and issues. | X | | | |
| 3. Flexible; handles multiple elements of work activities. | X | | | |
| 4. Helps identify and solve problems, recognized as technical expert. | X | | | |
| 5. Seeks ways to improve capabilities. Seeks difficult or additional tasks. . Strives to improve knowledge and skills. | X | | | |
| 6. Acquires knowledge and understanding of the factors that influence human behavior. | | X | | |
| 7. Maintains present qualifications and satisfactorily participates in assigned training. | | X | | |
| 8. Willing to try new/different approaches, as appropriate, to improve plant. | | X | | |
| E. PERFORMANCE | | | | |
| 1. Performs assigned tasks / works efficiently and professionally, using approved procedures as applicable. | X | | | |
| 2. Supportive of Management's directives, goals and expectations. | | X | | |
| 3. I will support the company's policy of maintaining an open, fair and inclusive work environment. | | X | | |

## THIS SECTION SHOULD BE COMPLETED FOR INCREMENTAL PAY INCREASES ONLY:

Supervision should complete the performance aspects checklist to ensure performance is at an acceptable level for incremental pay increase consideration. In addition to completing the Performance Aspects checklist, supervision should review and assess the employee's time-in-grade, training, qualifications and make a determination of whether to pay an incremental increase.

| NAME:   LAST: | | FIRST: | | INITIAL: | |
|---|---|---|---|---|---|
| JOB TITLE | | | | | |

*Please copy and paste the following symbol as needed to designate appropriate responses below:*  ☒

☒ **Meets**    ☒ **Does not meet**  all of the time-in-grade*, training, qualifications and management performance expectations to qualify for consideration for an incremental pay increase.

*For employees at Hatch and Vogtle, step pay increases will be consider based classification criteria at 12 month interval except for SO or Helper, which are considered at six month intervals. Employees at Farley are considered for step increases at six month intervals for all positions.

McDowell v. Southern Nuclear
247

## III. CLOSEOUT PERFORMANCE SUMMARY

**OVERALL PERFORMANCE:**

Janell has demonstrated throughout the year that she is dedicated and committed to providing the customers and co-workers she serves with a friendly, helpful, and courteous attitude. She performs her tasks with little or no supervision and is very knowledgeable with the tasks that she performs on a day to day basis. Janell's leadership skills and take charge attitude has made her a go to / subject matter expert on many tasks that are performed in the Facilities Group. She is always willing to assist co-workers of lesser experience and knowledge to gain a better understanding of their tasks. Janell has received numerous emails during the year from site personnel on her work ethic, abilities and knowledge. Janell strives to give suggestions on ways to performs tasks in a safer, efficient and timely matter. Janell's attention to detail provides a consciousness for safety in all tasks that she performs, from pre-job briefing, implementation through completion. Janell's "can do" spirit is greatly appreciated.

## IV. COMMENTS

**EMPLOYEE:**

**REVIEWING SUPERVISOR:**

Janell is a good, hard working employee with a lot of potential. Janell is willing to learn new tasks & takes pride and ownership in her work area. She practices and fosters good team skills and maintains positive working relationships. She provides assistance to others when they need a hand. She maintains safe work practices & places emphasis on the Human Performance Tools while participating in pre-job briefs. She has maintained a questioning attitude and good communication skills.

**SIGNATURES:**
(Employee signature indicates review and discussion of this document and does not necessarily imply concurrence.)

| | | Date: |
|---|---|---|
| Employee: | _Janell McDowell_ | 1/18/05 |
| Immediate Supervisor: Job Title: | _Mark Freeman_ FAC FOREMAN | 1/18/05 |
| Reviewing Supervisor Job Title: | _Deborah Crutchfield_ FAC Sup. | 1/18/05 |

McDowell v. Southern Nuclear
248

4

# SOUTHERN NUCLEAR OPERATING COMPANY

## ANNUAL EMPLOYEE SAFE WORK PRACTICES INSPECTION

Employee Name  **Janell McDowell**

Employee Number  _____

(Optional) See Attached List of Employees  _____
(CHECK)

Work Location  **Farley**

The above listed employee(s) is complying with the safety related work practices required by Southern Nuclear and applicable OSHA Standards including 1910.269. The inspection verified that the employee(s):

| | Comments |
|---|---|
| Has received training in the specific job functions he/she is currently performing; and received safety awareness training in appropriate areas such as HAZCOM, Blood Borne Pathogens, Access to Exposure and Medical Records, Personal Protective Equipment, Hearing Conservation, Asbestos and Lead. | Yes |
| Has conducted or participated in Job Safety Briefings | Yes |
| Understands and follows the Plant Clearance Procedures | Yes |
| Understands and follows all other procedural guidance applicable to work he/she performs | Yes |
| Is knowledgeable of and wears appropriate clothing when exposed to work on or near exposed energized electrical equipment | Yes |
| Utilizes Personal Protective Equipment as required | Yes |
| Utilizes safe work practices applicable to work he/she performs | Yes |

This form shall be maintained for the employee's duration of employment. This form may be used as an attachment to the employee's Annual Performance Plan and Summary

**Mark Freeman**
Management Inspector
(Print Name)

**(M. Freeman)**
Management Inspector
(Signature)

**FAC. Foreman**
Title

**1-18-05**
Date

# PERFORMANCE SUMMARY FOR 2004 (enter correct year here)

Directions: To begin typing, *click* in each gray box. Do not use your "Tab" key.

**Employee Name:**

Janelle McDowell

**Employee's position:**

Helper Nuclear

**Supervisor Name & Position:**

Mark Freeman/ Foreman

**Location:**

Plant Farley

**Date & Specify Mid-year Discussion or End-of-year Summary:**

8-16-2004  Mid year discussion)

CLICK HYPERLINKS BELOW

**Results achieved (page 2 ▸ )**

**Behaviors demonstrated (page 3 ▸ )**

**Developmental achievements (page 4 ▸ )**

Employee Signature: _Janell McDowell_    Date: 8|16|04

Supervisor Signature: _M Freeman_    Date: 8/16/04

Employee Comments (optional):

# RESULTS ACHIEVED

- Consistently achieves results beyond expectations
- Effectively organizes and plans work involving others
- Flexible; handles multiple priorities and seeks additional work when finished with assigned tasks
- Consistently demonstrates a willingness to perform any task at hand with a positive attitude and completes assignments with competence and timeliness

Back (page 1 ◄ )

## BEHAVIORS DEMONSTRATED:

- Innovative: looks for ways to improve workplace effectiveness.
- Superior Performance: takes personal responsibility for individual and organizational success.
- Teamwork: works with others toward common goals, emphasizes cooperation and results, not turf.
- Volunteers for difficult tasks and doesn't shy away from hard work.

Back (page 1 ◄ )

## DEVELOPMENTAL ACHIEVEMENTS:

- Has technical expertise in all areas assigned, both Rad and non-Rad work areas. Is recognized by foremen and peers as a technical expert.
- Holds self accountable for excellent performance. Her technical expertise makes her a valuable asset to the team and she mentors coworkers on how to operate and maintain facilities equipment. Using her years of experience she gives them insight into problem solving and working through minor setbacks which would cause job delays.
- Consistently leads and influences others to be successful. Willingly shares her knowledge with others and is highly respected by her coworkers as a role model.

Back (page 1 ◀ )



**SOUTHERN COMPANY**
*Energy to Serve Your World™*

# PERFORMANCE PLAN & SUMMARY

| | |
|---|---|
| **Employee Name:** | Janell McDowell |
| **Employee Title:** | Facilities Helper |
| **Supervisor Name:** | Mark Freeman |
| **Supervisor Title:** | Facilities Foreman |
| **Location:** | Farley Nuclear |
| **Performance Period:** | 1/1/2005 thru 12/31/2005 |

**This document has 3 parts:**
*(Click on the appropriate hyperlink for further instructions and to access the desired section)*

1. Business Results
2. Behaviors
3. Development

## Performance Plan Discussion

**Supervisor Signature/Date:** *Mark Freeman*    1-28-05
**Employee Signature/Date:** *Janell McDowell*    1/28/05

## Midyear Discussion

**Supervisor Signature/Date:** *Mark Freeman*    7/12/05
**Employee Signature/Date:** *Janell McDowell*    7/12/05

## Year-end Summary

**Performance Summary:**
☐ Expectations Clearly Exceeded
☐ Expectations Fully Met
☒ Expectations Not Fully Met

**Supervisor Signature/Date:** *Deborah Critchfield*    9-19-2005
**Employee Signature/Date:**

McDowell v. Southern Nuclear
237

DEFENDANT'S EXHIBIT
15 McDowell

Version 4.0-11/04



**SOUTHERN COMPANY**
*Energy to Serve Your World*

# PERFORMANCE PLAN & SUMMARY

| | |
|---|---|
| **Employee Name:** | Janell McDowell |
| **Employee Title:** | Facilities Helper |
| **Supervisor Name:** | Mark Freeman |
| **Supervisor Title:** | Facilities Foreman |
| **Location:** | Farley Nuclear |
| **Performance Period:** | 1/1/2005 thru 12/31/2005 |

**This document has 3 parts:**
*(Click on the appropriate hyperlink for further instructions and to access the desired section)*

1. Business Results
2. Behaviors
3. Development

## Performance Plan Discussion

**Supervisor Signature/Date:**

**Employee Signature/Date:**

## Midyear Discussion

**Supervisor Signature/Date:**

**Employee Signature/Date:**

## Year-end Summary

**Performance Summary:**

☐ Expectations Clearly Exceeded
☐ Expectations Fully Met
☐ Expectations Not Fully Met

**Supervisor Signature/Date:**

**Employee Signature/Date:**



McDowell v. Southern Nuclear
238

Version 4.0-11/04

**SOUTHERN COMPANY**
*Energy to Serve Your World™*

## Business Results

### *Instructions*

- Business results are the specific expectations of an employee within a performance period.
- Document one expectation on a page. For additional pages click on "New Business Results Page" on the tool bar above. Do this before entering content. (Option: Document all expectations in one box. Document performance vs. expectations in one box, including separate ratings for each expectation.)

### Results Expected

1. Safety Goals for Team:
   - Have no human performance errors causing a trip / transient / radiation release.
   - Maintain dose and contamination less than team goal.
   - Have no injures that lead to a clock reset.

2. Reliability Goals for Team:
   - Have no plant trip / transient due to maintenance planning and execution.
   - Have no missed Firewatches
   - Have intolerance for equipment failure. Take proactive measures to improve equipment reliability and instill this attitude in your team members.
   - Promote maintenance ownership with facility group equipment
   - Support the plants Maintenance Work Orders and be accountable to complete per scheduled dates.
   - Support the Farley Material Condition Inspection specific deficiencies and be held accountable to complete per scheduled dates when assigned.

3. Cost Goals for Team:
   - Promptly return unused materials to supervisor or supply chain.
   - Don't throw away equipment such as mop heads, trash bags, etc. that can be used again.
   - Don't waste chemicals that you use. Always plan ahead.
   - Be held accountable to clean up work area, shop area, equipment and vehicles at the end of the shifts.

4. Diversity Goal for Team:
   - Encourage different perspectives and respect differences.

5. Learning Organization for Team:
   - Write CR's at low threshold.
   - Turn in Daily Assignment Sheets at the end of each shift.
   - Maintain > 95% completion rate and feedback on Daily Assignment Sheet of work performed

McDowell v. Southern Nuclear
239

Version 4.0-11/04



**SOUTHERN COMPANY**
*Energy to Serve Your World*

---

### Performance Versus Expectations

*Midyear Discussion:*

-Janell has worked consistently without any safety violations, injuries, human performance events or clock reset events.

-Janell hasn't missed a firewatch and wasn't instrumental in any plant trip events because of her job functions.

-Janell is attentive during her duties and aware of plant conditions.

-Janell has brought to the attention of supervision equipment conditions, plant materiel condition and communicates to her fellow co-workers of her discoveries. .

| Clearly Exceeded | Fully Met | Not Fully Met |
|---|---|---|
| | X | |

---

### Performance Versus Expectations

*Year-end Summary:*

Janelle was placed on a Decision Making Leave on 8-16-05 for creating a hostile work environment.

Details of her behavior and attitude are documented in her DML.

Janelle has swapped job assignments after being instructed not to by FAC supervision, which impedes supervision from holding people accountable for their job assignments.

| Clearly Exceeded | Fully Met | Not Fully Met |
|---|---|---|
| | | x |

McDowell v. Southern Nuclear
240



**SOUTHERN COMPANY**
*Energy to Serve Your World*

## Behaviors

*Instructions*
- All employees are expected to demonstrate Southern Style.
- To help focus team performance it may be helpful to identify specific behaviors under each of the three Southern Style areas.
- The rating scale has been simplified to "fully met" and "not fully met" since some behaviors are either demonstrated or they are not.

**Behaviors Expected** *(add more specific behaviors as needed)*
- Demonstrate Southern Style
- Support the company's policy of maintaining an open, fair and inclusive work environment.
- Be accountable to execute performance management effectively.
- Act as an example and mentor to enhance the development of my fellow workers.
- Model the use of the Human Performance Tools.
- Industrial Safety: **Target Zero – Every Job Every Day - Safely**
  a) Be responsible for performing work in a safe manner which includes following all requirements of the Safety and Health Manual and all safety and health related procedures, instructions and guidelines.
  b) Observe other employees to ensure that they are following safe work practices and advising those employees in the proper practices.
  c) Be responsible for looking for safety hazards, correcting any you can and, for those that can not be corrected , protecting other employees from injury by the hazard while reporting it to their supervisor. Write CRs to address these types of hazards.
  d) Report injuries and illnesses to your supervisor as soon as they occur. An accident report must be completed within 24 hours of reporting the injury / illness.
  e) Drive safely when performing assigned duties.

| **Performance Versus Expectations** | |
|---|---|
| *Midyear Discussion*<br>-Janell has demonstrated Southern Style as a work style.  She is very honest, speaks openly, candid, and treats all that she comes in contact with respect.<br>-Janell Supported the Hatch 2005 Spring Outage and received a letter for a job well done. (See Attached letter)<br>-Janell has not been involved in any human performance or safety issues. | **Fully Met** X<br><br><br>**Not Fully Met** |

| **Performance Versus Expectations** | |
|---|---|
| *Year-end Summary:*<br>Since the last week of July, 2005, Janelle has demonstrated attitudes and behaviors inconsistent with the Southern Style.  Instead of supporting the company policy of maintaining an open, fair, and inclusive work environment, she has created a hostile work environment, the details of which are documented in her DML.<br>After being placed on the DML, she continued to demonstrate behaviors contributing to a "chilled" environment, and when spoken to about this, she refused to acknowledge there was a problem. This was demonstrated and documented in her DML follow-up discussion. | **Fully Met**<br><br><br>**Not Fully Met** x |

Version 4.0-11/04

SOUTHERN
COMPANY
*Energy to Serve Your World*

McDowell v. Southern Nuclear
242

Version 4.0-11/04



**SOUTHERN COMPANY**
*Energy to Serve Your World®*

## Development

### Instructions

- Identify what the employee is expected to do:
  - ⇨ meet requirements for success in *current job* – i.e. job-specific skills, knowledge & experience (Leader Performance Standards for leadership positions)
  - ⇨ demonstrate Southern Style
  - ⇨ work on meeting requirements for jobs in *career plan* – i.e. job specific skills, knowledge & experience (Leader Performance Standards for movement into leadership positions)
- Compare these expectations with what the employee has already demonstrated or achieved.
- Identify and prioritize key strengths and gaps. Be specific.
- Develop an action plan. Consider options, costs and potential benefits.

| Key Strengths *(ideally not more than 2)* | Key Gaps *(ideally not more than 2)* |
|---|---|
| 1. Performs tasks with little or no supervision<br>2. Knowledge of Facility Group Assignments<br>3. Dependable | 1. Housekeeping Accountability<br>2. Computer Programs/ Databases |

**Action Plan** *(can include time frame, resources & measures of success)*

1. Have no human performance issues or accidents that resets the clock
2. Focus on target zero—every day, every job, safely
3. Maintain the housekeeping standards world class and look for ways to improve the material condition of the plant
4. Maintain a good attendance record with no tardiness.
5. Have no vehicle accidents.
6. Become proficient in the following computer programs: Housekeeping, Catch Bag, and Syncpower
7. Supported Hatch 2005 Spring Outage

**Midyear Developmental Progress**

1. Janell had no human performance issues or accidents that resulted in a clock reset
2. Janell had no safety issues or injuries
3. Janell has maintained housekeeping standards.
4. Janell has a good attendance record.
5. Janell supported the Hatch 2005 Spring Outage.
6. Janell needs increased development in computer programs

McDowell v. Southern Nuclear
243

**Year-end Developmental Progress**
Janelle was terminated from employment on September 16, 2005.

Version 4.0-11/04

**SOUTHERN COMPANY**
*Energy to Serve Your World*

**Notes:**
See attached letter from Hatch 2005 Spring Outage.

McDowell v. Southern Nuclear
244

Version 4.0-11/04