**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

## Page 1

1     IN THE UNITED STATES DISTRICT COURT
2     FOR THE MIDDLE DISTRICT OF ALABAMA
3          SOUTHERN DIVISION
4
5   CASE NUMBER: 1:06-cv-314-CSC
6
7   JANELL MCDOWELL and
8   STEPHANIE SANDERS,
9     Plaintiffs,
10   vs.
11   SOUTHERN NUCLEAR OPERATING
12   COMPANY, INC.,
13     Defendant.
14
15
16   BEFORE:
17     Cynthia M. Noakes, Court Reporter
18     and Notary Public
19
20
21   DEPOSITION TESTIMONY OF STEPHANIE SANDERS
22
23   ****************************

## Page 2

1        S T I P U L A T I O N
2
3       IT IS STIPULATED AND AGREED by and
4   between the parties through their respective
5   counsel, that the videotaped deposition of
6   STEPHANIE SANDERS may be taken before Cynthia M.
7   Noakes, Court Reporter, at the Law Offices of
8   MALCOLM R. NEWMAN, 219 West Crawford Street,
9   Dothan, Alabama 36301, on the 2nd day of
10   November, 2006.
11       IT IS FURTHER STIPULATED AND AGREED
12   that the signature to and the reading of the
13   deposition by the witness is waived, the
14   deposition to have the same force and effect as
15   if full compliance had been had with all laws and
16   rules of Court relating to the taking of
17   depositions.
18       IT IS FURTHER STIPULATED AND AGREED
19   that it shall not be necessary for any objections
20   to be made by counsel to any questions except as
21   to the form or leading questions, and that
22   counsel for the parties may make objections and
23   assign grounds at the time of the trial, or at

## Page 3

1   the time said deposition is offered in evidence,
2   or prior thereto.
3       IT IS FURTHER STIPULATED AND AGREED
4   that the notice of filing of the deposition by
5   the Court Reporter is waived.
6
7
8
9
10
11
12
13
14
15
16
17   *****************************************
18
19
20
21
22
23

## Page 4

1          INDEX
2   EXAMINATION BY:         PAGE NUMBER:
3   MS. SHARP             8-169
4
5   EXHIBITS:

| Exhibit | Page |
|---|---|
| Defendant's Exhibit No. 1 | 11 |
| Defendant's Exhibit No. 2 | 14 |
| Defendant's Exhibit No. 3 | 22 |
| Defendant's Exhibit No. 4 | 32 |
| Defendant's Exhibit No. 5 | 41 |
| Defendant's Exhibit No. 6 | 43 |
| Defendant's Exhibit No. 7 | 48 |
| Defendant's Exhibit No. 8 | 48 |
| Defendant's Exhibit No. 9 | 61 |
| Defendant's Exhibit No. 10 | 94 |
| Defendant's Exhibit No. 11 | 113 |
| Defendant's Exhibit No. 12 | 129 |
| Defendant's Exhibit No. 13 | 130 |
| Defendant's Exhibit No. 14 | 133 |
| Defendant's Exhibit No. 15 | 135 |
| Defendant's Exhibit No. 16 | 136 |
| Defendant's Exhibit No. 17 | 137 |
| Defendant's Exhibit No. 18 | 140 |

1 (Pages 1 to 4)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 5

1        INDEX (continued)
2
3    Defendant's Exhibit No. 19        142
4    Defendant's Exhibit No. 20        143
5    Defendant's Exhibit No. 21        144
6    Defendant's Exhibit No. 22        145
7    Defendant's Exhibit No. 23        146
8    Defendant's Exhibit No. 24        148
9    Reporter's Certificate            170
10
11
12
13
14
15
16
17
18
19    *********************************************
20
21
22
23

Page 6

1        APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFFS:
4        MR. MALCOLM R. NEWMAN
5        ATTORNEY AT LAW
6        219 West Crawford Street
7        Dothan, Alabama  36301
8
9    ON BEHALF OF THE DEFENDANT:
10        MS. LISA J. SHARP
11        ATTORNEY AT LAW
12        BALCH & BINGHAM, LLP
13        1710 Sixth Avenue North
14        Birmingham, Alabama  35203
15
16    ALSO PRESENT:
17        MS. SHARON F. BESTWICK,
18        Employee Relations Coordinator
19        Southern Nuclear Operating Company,
20        Inc.
21        JANELL MCDOWELL, Co-Plaintiff
22        RICKY ACKER, Videographer
23    *****************************************

Page 7

1        I, CYNTHIA M. NOAKES, a Court Reporter
2    of Eufaula, Alabama, acting as Commissioner,
3    certify that on this date, as provided by the
4    Alabama Rules of Civil Procedure and the
5    foregoing stipulation of counsel, there came
6    before me at the Law Offices of MALCOLM R.
7    NEWMAN, 219 West Crawford Street, Dothan, Alabama
8    36301, beginning at 2:12 p.m., STEPHANIE SANDERS,
9    witness in the above cause, for oral examination,
10    whereupon the following proceedings were had:
11
12        THE VIDEOGRAPHER:  Here begins
13    Videotape No. 1 in the deposition of Stephanie
14    Sanders in the matter of Janell McDowell and
15    Stephanie Sanders v. Southern Nuclear Operating
16    Company, Inc.; case number 1:06-cv-314-CSC.
17        We are on the record.  The time is 2:12
18    p.m., on November 2nd, 2006.  This deposition is
19    taking place at Malcolm Newman's office in Dothan,
20    Alabama.
21        The videographer is Ricky Acker.
22        Would counsel please identify yourselves and
23    state whom you represent?

Page 8

1        MS. SHARP:  I'm Lisa Sharp.  I
2    represent Southern Nuclear Operating Company.
3        MR. NEWMAN:  I'm Malcolm Newman, and I
4    represent the plaintiffs.
5        THE VIDEOGRAPHER:  All others present,
6    would you please state your name for the record?
7        MS. BESTWICK:  Sharon Bestwick.
8        MS. MCDOWELL:  Janell McDowell.
9        THE VIDEOGRAPHER:  Would the reporter
10    please swear in the witness?
11        THE COURT REPORTER:  Would you raise
12    your right hand, please?
13        THE WITNESS:  (Complies.)
14        THE COURT REPORTER:  Do you swear or
15    affirm the testimony you give in this action today
16    will be the truth, the whole truth, and nothing
17    but the truth?
18        THE WITNESS:  I do.
19        THE COURT REPORTER:  Thank you.
20
21        EXAMINATION
22    BY MS. SHARP:
23    Q.   Ms. Sanders, did you tell Cheri Collins that

2 (Pages 5 to 8)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 9

1 you believed that John Wright was discriminating
2 against you based on race?
3 A. I believe what I told Cheri was that he was
4 not doing job assignments fairly.
5 Q. Did Ms. Collins ever tell you that John
6 Wright was making job assignments unfairly based
7 on race?
8 A. No.
9 Q. Do you know someone named Litsa Johnson, who
10 lives in Seale, Alabama?
11 A. Say the name again.
12 Q. Litsa, L-I-T-S-A, Johnson.
13 A. No, ma'am, not that I know of.
14 Q. Why didn't you attend your second-step
15 grievance on September 5th, 2006?
16 A. I didn't attend the first grievance.
17 Q. Were you aware of the first-step grievance
18 hearing?
19 A. I was aware of both of them afterwards. One
20 of the messages I got from A.G. James said my
21 grievance was, I believe he said, November.
22 Q. Were you aware that your second-step
23 grievance hearing had been conducted?

Page 10

1 A. After the fact.
2 Q. How did you become aware after the fact?
3 A. I got the message.
4 Q. From whom?
5 A. My answering machine, from A.G.
6 Q. Have you spoken with Mr. James about your --
7 the outcome of your grievance hearings?
8 A. No. I got a letter from the union saying
9 that they were not going to arbitrate.
10 Q. When did you receive that letter?
11 A. I'm not sure. Maybe two or three weeks ago.
12 Q. Have you provided a copy to your lawyer?
13 A. No, ma'am.
14 Q. Do you recall receiving a request for
15 production of documents that I sent to your
16 lawyer?
17 A. Yes.
18 Q. Did you review, read carefully, that request
19 for production of documents that I sent?
20 A. Yes.
21 Q. Based on what I asked for in that request
22 for production of documents, why didn't you
23 provide your lawyer a copy of that letter from the

Page 11

1 union?
2 A. I just got that two or three weeks ago.
3 Q. I understand that. But why, as of today,
4 November 2nd, have you not provided a copy to your
5 lawyer?
6 A. I just haven't. No reason.
7       (Defendant's Exhibit No. 1 was
8        marked for identification and a
9        copy of the same is attached
10       hereto.)
11 Q. I'm handing you what was given to me earlier
12 today before we started Ms. McDowell's deposition.
13    Can you identify that document for me, which
14 I have marked as Defendant's Exhibit 1?
15 A. It's a pay stub.
16 Q. Is that a pay stub for you?
17 A. Yes.
18 Q. And who is the employer?
19 A. Wal-Mart.
20 Q. Which Wal-Mart?
21 A. The Wal-Mart D.C., in Brundidge, Alabama.
22 Q. How long have you worked for the Wal-Mart in
23 Brundidge?

Page 12

1 A. Since September.
2 Q. What is your position?
3 A. Order filler.
4 Q. Is that the same position Ms. McDowell has?
5 A. Yes.
6 Q. Again, what date was it you began working at
7 Wal-Mart?
8 A. In September.
9 Q. Did you begin working at Wal-Mart the same
10 time that Ms. McDowell did?
11 A. No.
12 Q. Who started working at Wal-Mart first?
13 A. Janell.
14 Q. How much do you make at Wal-Mart per hour?
15 A. 12.65.
16 Q. How many hours do you work weekly?
17 A. It varies.
18 Q. What's the average work schedule for you?
19 A. I guess between -- per pay period, between
20 65 and 75 hours.
21 Q. And you said, "per pay period." Is that an
22 every two-week period?
23 A. Right.

3 (Pages 9 to 12)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

Page 13

1   Q.   So you don't work as much as Ms. McDowell
2   does?
3   A.   Yes. I'm just guessing on average. I mean,
4   we go in at five and we stay until the job is
5   done, until the orders are filled.
6   Q.   Do y'all work together at Wal-Mart?
7   A.   No. Everybody has their own.
8   Q.   But do you and she work the same schedule?
9   A.   Yes.
10  Q.   Do you have any type of insurance through
11  your employment at Wal-Mart?
12  A.   Not yet.
13  Q.   When were you last covered by health
14  insurance, Ms. Sanders?
15  A.   November of last year.
16  Q.   Aside from Wal-Mart, where else have you
17  worked since you stopped your employment with
18  Southern Nuclear Operating Company at Plant
19  Farley?
20  A.   Just with my cleaning service.
21  Q.   And I understand, from Ms. McDowell's
22  deposition, that you are one of her partners in
23  the cleaning service, Kaye-Jen-Step?

---

Page 14

1   A.   Yes.
2   Q.   When do you work in your cleaning service?
3   A.   Tuesday through Friday now.
4   Q.   What time?
5   A.   It varies.
6   Q.   Do you have a set list of clients for your
7   cleaning service?
8   A.   I have some. Then some people we fit in
9   that call just for a one-time cleaning or
10  whatever.
11  Q.   Do you have any other employees in your
12  cleaning service?
13  A.   No.
14  Q.   It's just you, Ms. McDowell, and Ms. Kelly?
15  A.   Right.
16       (Defendant's Exhibit No. 2 was
17       marked for identification and a
18       copy of the same is attached
19       hereto.)
20  Q.   Ms. Sanders, I am handing you a copy of a
21  document that your lawyer provided me just before
22  your deposition.
23       Would you please take a look at that

---

Page 15

1   document and identify it for the record, please?
2   A.   The letter to Mr. Wade Morrison.
3   Q.   Is Mr. Morrison with the NAACP?
4   A.   Yes.
5   Q.   And what was the purpose of you sending or
6   giving this letter to Mr. Morrison?
7   A.   Because of the stuff that was going on at
8   Farley, and we was looking for the NAACP for some
9   help.
10  Q.   Did you yourself hand -- give this letter to
11  Mr. Morrison?
12  A.   I believe I left it with his secretary.
13  Q.   Was Ms. McDowell with you when you delivered
14  the letter?
15  A.   I believe so.
16  Q.   Did you ever meet with Mr. Morrison?
17  A.   No.
18  Q.   Did you ever speak with Mr. Morrison about
19  the substance of this letter, Defendant's Exhibit
20  2 to your deposition?
21  A.   Yes.
22  Q.   When did you speak with Mr. Morrison?
23  A.   I believe I first spoke with him the day of

---

Page 16

1   or the day after Janell was terminated. And the
2   other conversation, I don't recall when it was.
3   Q.   Tell me how that conversation with Mr.
4   Morrison came about.
5   A.   I called to see if I could get assistance
6   from the NAACP and the stuff that I went through,
7   that I was going through at Farley, and that
8   Janell had been through at Farley.
9   Q.   So you say you called Mr. Morrison and spoke
10  with him either the day of or the day after Ms.
11  McDowell was terminated, correct?
12  A.   Right.
13  Q.   Was that the first time you had spoken with
14  Mr. Morrison?
15  A.   Yes.
16  Q.   And that conversation took place before you
17  provided him with this letter?
18  A.   Right.
19  Q.   What did Mr. Morrison say to you in that
20  conversation?
21  A.   To get some information to him, and leave it
22  with his secretary if he wasn't in.
23  Q.   And that was in November of 2005?

---

4 (Pages 13 to 16)

Page 17

1 A.  Whatever Janell's termination day was.
2 Q.  So if Ms. McDowell was terminated on
3 September 16, 2005, would that have been the day
4 that you talked to Mr. Morrison for the first
5 time?
6 A.  Either that day or the day after.
7 Q.  Okay.  And at that time, he asked you to
8 provide him with some information?
9 A.  Right.
10 Q.  But you did not do that until March of 2006?
11 A.  I don't remember when it was.
12 Q.  Did you provide him with any information
13 before you gave him this letter that we've marked
14 as Exhibit 2 to your deposition?
15 A.  I can't remember.
16 Q.  You don't know if you gave him anything
17 else?
18 A.  I don't remember --
19 Q.  Now, earlier --
20 A.  -- at this point.
21 Q.  I'm sorry.  Go ahead.
22 A.  It's been a while.
23 Q.  Earlier, when we were trying to identify Ms.

Page 18

1 McDowell's complaint or charge that she gave to
2 the NAACP, you indicated, in discussing with your
3 lawyer and her, that there might be a third
4 document besides her complaint and your complaint.
5 What document were you referring to?
6 A.  Say that again.  I referred to a --
7 Q.  A third document.  You said there was
8 something else that's missing.
9 A.  I said it looked like one of the top sheets
10 was missing, because there -- there was no heading
11 on it.
12 Q.  On what page were you referring to the
13 heading was missing?
14 A.  I don't know that.
15 Q.  Well, take a look at your Exhibit 2.  And
16 I'm going to show you the complaint that Ms.
17 McDowell identified as her NAACP.
18 MR. NEWMAN:  Now, you're using
19 "complaint" to mean a letter that she sent?
20 MS. SHARP:  Yeah.
21 MR. NEWMAN:  Okay.
22 MS. SHARP:  Well, I'm using "complaint"
23 in regard to my interrogatory request was for any

Page 19

1 charges or other complaints that either of the
2 other plaintiffs have made to an administrative
3 agency.
4 MR. NEWMAN:  I understand that.  But
5 I'm saying you're not talking about the complaint
6 in this case.
7 MS. SHARP:  No.
8 Q.  I'm going to hand you what we had earlier
9 marked as Defendant's Exhibit 21 to Ms. McDowell's
10 deposition.
11 (The witness examines the
12 document.)
13 A.  I'm not sure what it is that's --
14 MR. NEWMAN:  She's going to ask you a
15 question.
16 A.  Oh, I'm sorry.
17 Q.  You said you're not sure which document you
18 were referring to earlier?
19 A.  Right.
20 Q.  Okay.  When you gave Mr. Morrison's
21 secretary your letter, charge or complaint -- the
22 document that we've marked as Exhibit 2 to your
23 deposition -- did you provide him with anything

Page 20

1 else to support the contentions that are contained
2 in Exhibit 2?
3 A.  I'm not sure.  It's -- it's been a while.  I
4 don't remember what all was given to him.
5 Q.  Do you have a copy of everything that you
6 provided to Mr. Morrison?
7 A.  I -- I'm not sure.
8 Q.  You and Ms. McDowell were referring to a
9 packet.
10 A.  Uh-huh.
11 Q.  And Ms. McDowell testified that what she was
12 making reference to was her correspondence to Mr.
13 Morrison, your correspondence to Mr. Morrison, and
14 the three cassette tapes that -- audio tapes that
15 Ms. McDowell had made.
16 Can you recall anything else that you
17 submitted to Mr. Morrison?
18 A.  I can't remember what all we gave him.
19 Q.  Going back to Exhibit 2, Ms. Sanders, on
20 page 2, the last full paragraph on the page,
21 there's a sentence that reads: "I communicate
22 when it was necessary pertaining to my job and I
23 was not disrespectful in doing so.  And if you

5 (Pages 17 to 20)

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

| Page 21 |
|---|
| 1  look at my time and schedule, you will see that |
| 2  during most of that time I was out because my |
| 3  brother was in CCU prior to him passing." |
| 4      What time frame are you referring to in that |
| 5  sentence? |
| 6  A.   This was in August of last year. |
| 7  Q.   Were you out of work for the entire month of |
| 8  August in 2005? |
| 9  A.   No. |
| 10  Q.   How much of that month were you off work |
| 11  related to your brother being hospitalized? |
| 12  A.   Hospitalized, for a week. |
| 13  Q.   And with his passing, how much more time |
| 14  were you off work? |
| 15  A.   Went back to work the weekend after he |
| 16  passed, and then was out the following week of the |
| 17  funeral. |
| 18  Q.   What date was it that he died? |
| 19  A.   August 30th. |
| 20  Q.   The last sentence of that same paragraph, |
| 21  Ms. Sanders, states: "I feel as long as I can |
| 22  communicate respectfully and professionally on my |
| 23  job with things pertaining to my job, I should not |

| Page 22 |
|---|
| 1  be constantly harassed." |
| 2      What are you referring to there when you say |
| 3  that you are constantly harassed? |
| 4  A.   I was talking about the -- in this |
| 5  paragraph, I was talking about the discipline for |
| 6  not speaking. |
| 7  Q.   Was that the only reason you received |
| 8  discipline, for not speaking to someone? |
| 9  A.   That and swapping jobs. |
| 10  Q.   And you were disciplined on August 16th, |
| 11  2005; is that correct? |
| 12  A.   I don't know the date. |
| 13      (Defendant's Exhibit No. 3 was |
| 14      marked for identification and a |
| 15      copy of the same is attached |
| 16      hereto.) |
| 17  Q.   I am showing you, and a copy of your lawyer, |
| 18  Ms. Sanders, copies of what I've marked |
| 19  Defendant's Exhibit 3 to your deposition. |
| 20      Take a look at Exhibit 3 and tell me if you |
| 21  recognize that document. |
| 22      (The witness examines the |
| 23      document.) |

| Page 23 |
|---|
| 1  A.   Yes. |
| 2  Q.   Is Defendant's Exhibit 3 a copy of the |
| 3  discipline that you received in August 2005? |
| 4  A.   Yes. |
| 5  Q.   And is this the discipline that you are |
| 6  referring to in Exhibit 3 when you say you were |
| 7  being constantly harassed? |
| 8  A.   Yes. |
| 9  Q.   Okay.  In the next paragraph on Exhibit 3 |
| 10  (sic) -- it's the first sentence of the next |
| 11  paragraph -- reads: "Prior to this incident, Mark |
| 12  Freeman, who had a copy of the weekend assignment |
| 13  sheet in his hand, called me in the office with |
| 14  two other coworkers." |
| 15      What incident are you referring to in that |
| 16  sentence? |
| 17  A.   When he accused us of changing the schedule. |
| 18  Q.   Okay.  And the question probably was not |
| 19  clear. |
| 20      You start off the sentence, "Prior to this |
| 21  incident..."  What was "this incident"? |
| 22  A.   The one in the -- the paragraph above. |
| 23  Q.   You were receiving the discipline? |

| Page 24 |
|---|
| 1  A.   Right. |
| 2  Q.   Okay.  So Mr. Freeman accused you of |
| 3  changing the schedule after you received the |
| 4  written reprimand that is Defendant's Exhibit 3 to |
| 5  your deposition? |
| 6  A.   No.  Before. |
| 7  Q.   Do you know what date or what month it was |
| 8  that Mr. Freeman accused you of changing the |
| 9  schedule? |
| 10  A.   I have no idea. |
| 11  Q.   Do you know if it was in 2005? |
| 12  A.   Yes. |
| 13  Q.   Do you know if a month had gone by between |
| 14  his accusing you of changing the schedule and you |
| 15  being disciplined for these other things? |
| 16  A.   Had one month gone by? |
| 17  Q.   Yes, ma'am. |
| 18  A.   Oh, yes. |
| 19  Q.   So more than a month had gone by? |
| 20  A.   Right. |
| 21  Q.   Two? |
| 22  A.   Several months had gone by.  Because between |
| 23  the two, I had worked maybe a 30-day outage at |

6 (Pages 21 to 24)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 25

1  Hatch; so it was a while.
2  Q.  So you worked an outage at Hatch after Mr.
3  Freeman accused you of changing the schedule?
4  A.  Right.
5  Q.  Okay. The first paragraph on page 2, same
6  page we're looking at, says, "There were several
7  African Americans that were disciplined this same
8  week." Do you see that sentence?
9  A.  Yes.
10 Q.  Who were the African Americans that you're
11 referring to?
12 A.  Janell, myself -- it's been a while --
13 Leonard Russ, Bobby White. That's all I can
14 recall right now.
15 Q.  And it is -- is it your testimony that
16 Leonard Russ and Bobby White were disciplined the
17 same week in 2005 that you and Ms. McDowell
18 received discipline?
19 A.  Yes.
20 Q.  And this letter, Exhibit 3 (sic) to your
21 deposition, is supposed to be a truthful statement
22 of events that took place at Plant Farley during
23 your employment?

Page 26

1  A.  My discipline? You said Exhibit 3. I'm
2  sorry. You still meant 2.
3  Q.  I should be saying 2; that's correct.
4  A.  Okay.
5  Q.  Is Exhibit 2, your letter or charge or
6  complaint to the NAACP, intended to be a truthful
7  and accurate account of events that took place at
8  Plant Farley?
9  A.  As I recall them.
10 Q.  Ms. McDowell said that you told her about
11 Graven or Grayven (spelled phonetically) Townsend
12 being terminated.
13    What do you know about Mr. Townsend's
14 termination?
15 A.  I just told -- was told that he was
16 terminated.
17 Q.  Who told you that?
18 A.  I believe Doris Ashford.
19 Q.  Aside from what Doris Ashford told you, do
20 you know anything about the circumstances
21 surrounding Mr. Townsend's termination?
22 A.  I can't recall, no, not right now.
23 Q.  Is Ms. -- strike that.

Page 27

1     Was Ms. Ashford a union representative at
2  the time she told you of Mr. Townsend's
3  termination?
4  A.  I don't know.
5  Q.  Do you know how Ms. Ashford knew about Mr.
6  Townsend's termination?
7  A.  No.
8  Q.  Okay. Exhibit 2, last page, the first
9  paragraph, but not the first full paragraph on
10 that page, you describe a situation where you say,
11 "I was pretty sure that the handwriting on the
12 sheet was Shelley Murrell's, and when she came
13 back to work I asked her; and she stated that she
14 changed the job assignments prior to her leaving
15 for the weekend and did not inform the other
16 foremen, and that Mark was wrong for accusing us.
17 However, Deborah Crutchfield pleaded with Janell
18 and I not to report Mark for making such a serious
19 allegation." Do you see that statement?
20 A.  Yes.
21 Q.  Did Deborah Crutchfield tell you why she did
22 not want you to report Mark Freeman for accusing
23 you of changing the assignment sheet?

Page 28

1  A.  Because she said that Jim Parrish was
2  already pressuring her to write Mark up.
3  Q.  Did she tell you why Mr. Parrish was
4  pressuring her to write Mark up?
5  A.  If she did, I don't remember.
6  Q.  And what race is Mr. Freeman?
7  A.  Black.
8  Q.  And the last paragraph on this sentence -- I
9  mean, excuse me, on this page of Exhibit 2 -- next
10 to last sentence -- you say, "A white coworker has
11 stated to the foreman..."
12    Who is the white coworker you're referring
13 to?
14 A.  Let me find where you are now.
15 Q.  Okay.
16 A.  I believe that was Jimmy Johnson and Dennis
17 Teat talking.
18 Q.  Jimmy Johnson?
19 A.  And Dennis Teat.
20 Q.  So was it Jimmy Johnson that made the
21 statement to the foreman?
22 A.  Right.
23 Q.  Okay. And what position did Jimmy Johnson

7 (Pages 25 to 28)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 29

1  hold?
2  A.  He was a helper.
3  Q.  Excuse me?
4  A.  He was a helper.
5  Q.  What race is Mr. Johnson?
6  A.  White.
7  Q.  Did you report this statement that Mr.
8  Johnson made to anyone?
9  A.  No.  This was in morning briefing.
10  Q.  Excuse me?
11  A.  This was in morning briefing.  Everybody was
12  there.
13  Q.  When was this statement made by Mr. Johnson?
14  A.  I don't remember.
15  Q.  Do you know what degrading conduct Mr.
16  Johnson was referring to?
17  A.  I can't -- I can't recall.  It's been a
18  while.
19  Q.  Do you recall the context of Mr. Johnson
20  making this statement?
21  A.  I don't know if it was -- it was in morning
22  briefing, so it might have been something new that
23  came down from management that, you know, he

Page 30

1  didn't agree with.  I can't recall.
2  Q.  Okay.  Why, Ms. Sanders, didn't you apply
3  for unemployment compensation benefits after you
4  left Plant Farley?
5  A.  It wasn't until -- I believe it was Phyllis
6  that called and told me that I had been
7  terminated.  I did not even know that.
8  Because I sent in my resignation, and it was
9  denied because I forgot to sign it, even though I
10  had talked to Deborah the night I faxed it in.
11  Q.  So you sent in a letter of resignation to
12  Deborah Crutchfield via fax?
13  A.  I sent it to Brenda Singleton or Singletary.
14  I can't remember.  It's Randy Johnson's secretary.
15  Q.  And after you sent in a letter of
16  resignation, you say Phyllis Hughes told you that
17  you had been terminated?
18  A.  Uh-huh.
19  Q.  How did Phyllis know that you had been
20  terminated?
21  A.  I think -- I believe she said she spoke with
22  A.G.
23  Q.  The president of the union?

Page 31

1  A.  Right.
2  Q.  You said that you had left a message for
3  Deborah Crutchfield the night before you sent in
4  your letter of --
5  A.  No.  I spoke with Deborah.
6  Q.  You spoke with Deborah Crutchfield the night
7  before you sent your letter of resignation in?
8  A.  The night that I faxed it in.
9  Q.  What did you say to Ms. Crutchfield on that
10  occasion?
11  A.  I asked for a fax number.  And I called her,
12  and she was down at B&G, and she -- I remember her
13  asking Dennis Teat what was the fax number down
14  there.  He didn't know it.  And she told me to
15  hold on for a while.
16  And she said -- first, she asked me if --
17  she said, Are you faxing in some things for Effie?
18  And I said, No, ma'am.  I said, I'm faxing
19  something to you.  She said, Is it your
20  resignation?  I said, Yes, it is.  And she said,
21  Well, hold on and I'm going to figure out where
22  you can fax it to.
23  And she called Randy Johnson's office.

Page 32

1  Brenda was still there.  And she had me to fax it
2  -- she came back to the phone and she gave me the
3  fax number.
4  And she said, Whatever communication you get
5  from myself and Randy, she said, You can disregard
6  it since you're faxing in your resignation.  And I
7  said, Okay.  And that was the end of the
8  conversation.
9  Q.  Who is Effie?
10  A.  The -- well, one of -- I guess, one of the
11  plant nurses.
12  Q.  Do you know why Ms. Crutchfield asked you if
13  you were sending something to Effie, the plant
14  nurse?
15  A.  Yes.  Because I had been out sick.
16  Q.  Had you been told to send in a doctor's
17  excuse to Miss Effie, Ms. Manley?
18  A.  I was told to send her FMLA papers, I
19  believe.
20  Q.  Did you have FMLA paperwork?
21  A.  Some might have been mailed to me; I don't
22  remember.
23  (Defendant's Exhibit No. 4 was

8 (Pages 29 to 32)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 33

1    marked for identification and a
2    copy of the same is attached
3    hereto.)
4    Q.    I have handed you, Ms. Sanders, what I have
5    marked as Exhibit 4 to your deposition.
6        Is that the letter of resignation that you
7    were just testifying about?
8    A.    Yes.
9    Q.    It is dated November 1, 2005, correct?
10   A.    Right.
11   Q.    Is that the date that you faxed that letter
12   in to Deborah Crutchfield?
13   A.    Yes.
14   Q.    Now, this letter has no mention of race
15   being a problem with you working at Plant Farley,
16   does it?
17   A.    I'd have to read it right quick.
18   Q.    Okay.
19        (The witness examines the
20        document.)
21   A.    Okay. And your question is?
22   Q.    Does this letter contain any mention of race
23   being the reason that you are resigning your

Page 34

1    employment from Farley Nuclear Plant?
2    A.    It doesn't state race, but it speaks of them
3    being unfair.
4    Q.    Who is "them"?
5    A.    The company. Management.
6    Q.    Who in management?
7    A.    Okay. As far as what happened with me, it
8    was from the plant manager on down to the foremen
9    that were in my chain of command.
10   Q.    And who -- what plant manager? There have
11   been more than one, I think.
12   A.    Don Grissette was the one that initially
13   singled me out, Janell out, and had put
14   restrictions on us.
15   Q.    Okay. Let me just stop you. I want to talk
16   about you Stephanie Sanders, not Ms. McDowell.
17   A.    Okay.
18   Q.    Okay? So who is it that you say singled you
19   out and put restrictions -- unfair restrictions --
20   on you, Ms. Sanders?
21   A.    Don Grissette.
22   Q.    Anyone else?
23   A.    Everyone that was under him that he -- that

Page 35

1    was in my chain of command that he told.
2    Q.    And I understand that you had a meeting with
3    Mr. Grissette where he told you that he had told
4    his foremen to keep you from working with Ms.
5    McDowell; is that correct?
6    A.    Right.
7    Q.    Did Mr. Grissette tell you that your race
8    was the reason he had told his foremen to do this?
9    A.    No.
10   Q.    Did you complain to anyone at the plant at
11   any time that you felt you were being singled out
12   because of your race?
13   A.    I made that statement in my meeting with Don
14   Grissette. My exact words to him was: "I come in
15   here every day, and I'm being harassed. I live
16   every" -- my exact words to him -- "I live every
17   day with a double sword of being black and female.
18   And what is happening to me is nothing but
19   discrimination."
20        And that's when he said that the reason why
21   he did what he did to us because when he
22   talked to the people that was under him, none of
23   them challenged him.

Page 36

1    Q.    What did Mr. Grissette say he talked to the
2    people under him about?
3    A.    When he questioned them about us and our
4    work performance, I guess, he said nobody -- his
5    words were, "Nobody challenged me."
6        But -- and I believe Janell asked him, you
7    know, "You're the plant manager; they're not going
8    to challenge you."
9    Q.    And Ms. McDowell testified that Mr.
10   Grissette directed his foremen to single you and
11   her out after the cafeteria incident with Tim
12   Wilson.
13       Do you agree that that is when the foremen
14   appeared to start singling you and Ms. McDowell
15   out?
16   A.    Yes.
17   Q.    And Ms. McDowell testified that another
18   helper, Ray Dyke (spelled phonetically) --
19   A.    Ray Dick.
20   Q.    -- Ray Dick, had pointed Mr. Wilson to you
21   and Ms. McDowell and asked Mr. Wilson why wasn't
22   he getting on to you and Ms. McDowell; is that
23   correct?

9 (Pages 33 to 36)

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 37

1    A.    Right.
2    Q.    And that's when Mr. Wilson became rude with
3    you and Ms. McDowell, correct?
4    A.    Right.
5    Q.    Prior to that time, Mr. Wilson had not
6    behaved in that manner toward you and Ms.
7    McDowell?
8    A.    Not at all.  Not at all.
9    Q.    So in your mind, that was the moment when
10   all of these things started happening against you
11   and Ms. McDowell?
12   A.    Right.
13   Q.    What race is Ray Dick?
14   A.    Black.
15   Q.    Going back to your letter of resignation,
16   Ms. Sanders, you never filed an employee concern
17   or grievance, during your employment, stating that
18   race was the reason that you were being singled
19   out, did you?
20   A.    No.
21   Q.    Did you know about the employee concern
22   program during your employment?
23   A.    I knew about the concerns program.  Because

Page 38

1    I had not even been at Farley maybe a month, maybe
2    two months, and I was called upstairs to the
3    concerns program.
4         And there was a female in that position at
5    the time, and I can't recall her name, and she
6    called me up then -- up there then -- to ask me
7    questions.
8         And she said that I was randomly picked from
9    a list of black females, and she asked me five
10   questions.  She said she was going to ask
11   everybody that got picked the same five questions.
12   Because there was a charge of discrimination
13   against black females then.
14   Q.    And you said you had been employed one or
15   two?
16   A.    Maybe one or two months.  And when she
17   called me up there to ask me questions about how I
18   had been treated, you know, I had been treated
19   fine up to that point.
20   Q.    And you don't recall who that female was?
21   A.    That was in that position at the time?
22   Q.    Yes, ma'am.
23   A.    I can't remember right now.

Page 39

1    Q.    So you knew where the concerns office was?
2    A.    Right.
3    Q.    Who was the concerns person at the plant at
4    the time you resigned?
5    A.    Tom Pelham, I believe.
6    Q.    Okay.  Have you ever served as a union
7    representative, as a steward or as an officer in
8    the union?
9    A.    No.
10   Q.    Was Don Grissette the plant manager at the
11   time you resigned from your employment, Ms.
12   Sanders?
13   A.    No.
14   Q.    Who was the plant manager at the time you
15   resigned?
16   A.    Randy Johnson.
17   Q.    How long had Mr. Johnson been the plant
18   manager at the time you resigned?
19   A.    I have no idea.
20   Q.    Now, you said that Phyllis Hughes was the
21   person that told you that you had been terminated
22   from employment at Plant Farley?
23   A.    Right.

Page 40

1    Q.    When did Ms. Hughes tell you this?
2    A.    I don't remember.
3    Q.    Was it a month after you resigned?
4    A.    I can't remember.
5    Q.    How was it that you came to speak to Ms.
6    Hughes on the occasion in which she told you that
7    you had been terminated?
8    A.    She called.
9    Q.    She called you?
10   A.    Yes.
11   Q.    Where?
12   A.    On my cell phone.
13   Q.    Had you spoken with Ms. Hughes, before that
14   occasion, since she had been terminated from Plant
15   Farley?
16   A.    Had I spoke to her prior to that?
17   Q.    Yes.  Since her termination.
18   A.    Yes.
19   Q.    When?
20   A.    I know I talked to her a couple days before
21   -- that was -- that was -- are you saying after my
22   termination?
23   Q.    No.  Between the time Ms. Hughes was

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 41

1   terminated in August of 2005, and the day that she
2   told you that you had been terminated, how many
3   times had y'all spoken?
4   A.   I don't recall. Two or three times, I
5   guess. I don't really remember.
6   Q.   Did she always call you on your cell phone?
7   A.   Mostly, then.
8   Q.   I'm sorry.
9   A.   Then she would, yes.
10  Q.   Had you seen Ms. Hughes during that time
11  frame?
12  A.   She was at my brother's funeral.
13  Q.   Other than at your brother's funeral?
14  A.   No.
15  Q.   Do you consider Ms. Hughes a friend of
16  yours?
17  A.   Yes.
18       (Defendant's Exhibit No. 5 was
19       marked for identification and a
20       copy of the same is attached
21       hereto.)
22  Q.   Ms. Sanders, I have handed you and your
23  attorney what I have marked as Defendant's Exhibit

Page 42

1   5 to your deposition. Have you seen Defendant's
2   Exhibit 5 before today?
3   A.   Yes.
4   Q.   Did you receive a copy of Defendant's
5   Exhibit 5 on, or a day or two after, November 1,
6   2005?
7   A.   After.
8   Q.   After?
9   A.   Uh-huh.
10  Q.   Do you know how long after?
11  A.   A few days after.
12  Q.   Okay. So with that being your testimony,
13  does that help you recall when Phyllis Hughes told
14  you that you had been terminated?
15  A.   No. Because when I got this letter -- the
16  night that I faxed in my resignation, I was told
17  to disregard this letter. So that's what I did.
18  Q.   Okay. So you disregarded this letter --
19  A.   That's what she -- Deborah -- told me:
20  Disregard this letter. Because you asked me why I
21  didn't file for unemployment. I didn't know that
22  I had been terminated.
23  Q.   So in your mind you had resigned from

Page 43

1   employment?
2   A.   Right.
3   Q.   Okay. As of the date -- strike that.
4        (Defendant's Exhibit No. 6 was
5        marked for identification and a
6        copy of the same is attached
7        hereto.)
8   Q.   I'm handing you, Ms. Sanders, and your
9   attorney what I have marked as Defendant's Exhibit
10  6 to your deposition.
11       Take a moment and look at Defendant's
12  Exhibit 6 and tell me if you recall receiving a
13  copy of that letter in October of 2005.
14  A.   Yes.
15  Q.   Does that refresh your recollection
16  regarding your having received FMLA paperwork as
17  well?
18  A.   Yes.
19  Q.   It does?
20  A.   Yes.
21  Q.   Okay. Looking at the first paragraph of
22  this letter, is the statement by Ms. Crutchfield
23  correct that you had not reported to work since

Page 44

1   October 15th, 2005?
2   A.   I believe so.
3   Q.   Why had you not reported to work?
4   A.   I was out sick.
5   Q.   What was wrong with you?
6   A.   Having female problems.
7   Q.   Had you seen a doctor?
8   A.   Yes.
9   Q.   Which doctor did you see at this time?
10  A.   I don't know his name. It was at First Med
11  or something. It was out on Westgate. A place
12  like First Med.
13  Q.   First Med on Westgate Street?
14  A.   I'm not sure. It might have been PriMed;
15  I'm not sure. But it was on Westgate.
16       MR. NEWMAN: Westgate Parkway.
17       THE WITNESS: Yes.
18  Q.   Do you recall the doctor's name that you saw
19  there?
20  A.   I sure don't.
21  Q.   How many times did you see this doctor, from
22  October 15, 2005, to November 1, 2005?
23  A.   I saw him once.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 45

1  Q.  Have you seen that doctor since?
2  A.  No.
3  Q.  Have you been treated at all at that
4  location, that facility, since that time frame?
5  A.  No. They were sending me for tests that
6  following week at Medical Center Outpatient, I
7  believe it was.
8  Q.  Medical Center Outpatient?
9  A.  I think so.
10  Q.  Where is that?
11  A.  On Ross Clark Circle.
12      MR. NEWMAN: It's actually called the
13  Southeast Alabama Medical Center.
14  Q.  Did you go and have those tests done?
15  A.  No.
16  Q.  Why not?
17  A.  At this time that I was out, I was not only
18  sick, I was sick, my mom was sick, and my whole
19  family was still grieving for my brother. I
20  wasn't even getting out of the bed half the time.
21      You know, once I started feeling better with
22  the medication that he gave me, I didn't go for
23  the tests they wanted.

Page 46

1  Q.  What medication did he give you?
2  A.  I can't recall.
3  Q.  But once he gave you the medication, were
4  you feeling well enough to get up and get around?
5  A.  Well, the next week, no. The test was
6  scheduled for the next week, and I did not go.
7  Q.  Did you ever go for the test that --
8  A.  No.
9  Q.  Are you still on that medication today?
10  A.  No.
11  Q.  Do you recall what date it was that you saw
12  the doctor at First Med?
13  A.  I sure don't.
14  Q.  Okay. Why did you not return the FMLA
15  paperwork that Deborah Crutchfield sent to you,
16  Ms. Sanders?
17  A.  I wasn't doing anything. I wasn't doing
18  anything.
19  Q.  Did you contact Effie Manley, the plant
20  nurse, during this time period to explain to her
21  what was going on with you?
22  A.  If I did, I don't remember.
23  Q.  Did you at one point tell Ms. Crutchfield

Page 47

1  that -- or leave a message for Ms. Crutchfield --
2  telling her that you were going to come in and
3  bring in the FMLA paperwork?
4  A.  I don't remember. I might have; I don't
5  remember.
6  Q.  Okay. I am going to, at the conclusion of
7  your deposition, give you a release to sign so
8  that I can get your medical records from First
9  Med.
10  A.  Okay.
11  Q.  Do you have objection to giving me that
12  release, that medical release?
13  A.  No.
14  Q.  You testified that you did receive the
15  November 1 termination letter but that you
16  disregarded the letter?
17  A.  Yes.
18  Q.  Okay. Do you disagree with anything that's
19  reflected in that November 1 termination letter?
20      (The witness examines the
21      document.)
22  A.  Your question again now?
23  Q.  Do you disagree with the content of the

Page 48

1  statements made in that termination letter
2  Defendant's Exhibit 5, to your deposition?
3  A.  No.
4  Q.  Okay.
5      (Defendant's Exhibit No. 7 was
6      marked for identification and a
7      copy of the same is attached
8      hereto.)
9  Q.  I'm passing you and Mr. Newman what I've
10  marked as Defendant's Exhibit 7 to your
11  deposition, Ms. Sanders. Do you recognize that
12  document?
13  A.  Yes.
14  Q.  Have you had an opportunity to read through
15  Defendant's Exhibit 7 prior to today?
16  A.  Yes.
17      (Defendant's Exhibit No. 8 was
18      marked for identification and a
19      copy of the same is attached
20      hereto.)
21  Q.  And holding on to Defendant's Exhibit 7,
22  keeping that in front of you, I'm also going to
23  hand you what I've marked as Defendant's Exhibit 8

12 (Pages 45 to 48)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 49

1   to your deposition.
2   A.   Okay.
3   Q.   Can you tell me if you've seen Defendant's
4   Exhibit 8 prior to today?
5   A.   Yes.
6   Q.   Have you had a chance to review the contents
7   of Defendant's Exhibit 8 carefully, Ms. Sanders?
8   A.   I don't know how carefully, but I've seen
9   it.
10  Q.   Well, you've signed Defendant's Exhibit 8,
11  have you not?
12  A.   Yes.
13  Q.   You understand that you were signing these
14  interrogatory answers under oath, attesting that
15  they were true and accurate?
16  A.   To the best of my knowledge, yes.
17  Q.   And I'm going to have to walk through some
18  of these answers with you, Ms. Sanders, because
19  the interrogatories are Exhibit No. 7 for you
20  are 21 in number, and some of the questions do not
21  match up with your answers.  So I'm going to ask
22  you to help me match things up to what they should
23  be, to what you're answering.  Okay?

Page 50

1   A.   Okay.
2   Q.   On the first page, you say that you are also
3   known -- No. 1, where I ask you for any -- your
4   full name, any nicknames or maiden names, married
5   names, include aliases -- you identify yourself as
6   Stephanie M. Sanders?
7   A.   Uh-huh.
8   Q.   What does the "M" stand for?
9   A.   Marie.
10  Q.   Also known as Step?
11  A.   Yes.
12  Q.   No. 3, I asked you about all employers you
13  have worked for within the past ten years.  And in
14  (a) you identify Kaye-Jen-Step Environmental
15  Hygienic Service; is that correct?
16  A.   Yes.
17  Q.   And that is a business that you own with
18  your co-plaintiff, Ms. McDowell, and her sister,
19  Ms. Kelly?
20  A.   Yes.
21  Q.   And as I understand your testimony earlier,
22  you have no other employees of this business?
23  A.   Right.

Page 51

1   Q.   Other than the three of you?
2   A.   Right.
3   Q.   And do you all three work in the business?
4   A.   Just Janell and I, mostly.
5   Q.   Okay.  And in No. 3 it says, Date hired:
6   September 16, 2005, to the present.
7        Is that the date you formed the business?
8   A.   Right.
9   Q.   Have you and Ms. McDowell worked in the
10  business since September 16th of 2005?
11  A.   She has.  She started before I did.  I can't
12  remember when I started.
13  Q.   Okay.  Is there anything that helps you
14  recall the date you started in the business?
15  A.   No.
16  Q.   Okay.  Do you have copies of your pay stubs
17  from Kaye-Jen-Step, or documentation that reflects
18  your salary or any payments to you for work
19  performed in this business?
20  A.   No.
21  Q.   There is no such documentation?
22  A.   Oh.  I thought you were asking did I have it
23  with me.  That could tell me when I started?

Page 52

1   Q.   Or reflects your salary, your wages, any of
2   that information.
3   A.   Some paperwork.  We have a receipt book.
4   Q.   Okay.  Who maintains the receipt book?
5   A.   Either or.  Now she has a receipt book; I
6   have a receipt book.  Either one can write a
7   receipt to a client.
8   Q.   How often do you take a salary or wages out
9   of the business?
10  A.   How often was I taking it out?
11  Q.   Yes, ma'am.
12  A.   I don't know.  I can't answer that.
13  Q.   You don't know how often you pay yourself
14  out of the business?
15  A.   Once I started, if we did a job together,
16  just automatically split.
17  Q.   Aside from the receipt book, what other
18  documentation do you maintain at Kaye-Jen-Step
19  showing the revenue coming into the company?
20  A.   We have schedules of jobs that we have.
21  Q.   Okay.  Anything else?
22  A.   That's it.
23  Q.   Do you have a client list that you maintain?

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

## Page 53

1  A.  We have all our clients in a book, the ones
2  that we're going to do from week to week. Most of
3  our clients are biweekly.
4  Q.  Okay. But is that different from the
5  schedule you just mentioned?
6  A.  No. It's all the same book.
7  Q.  It's all maintained in one document?
8  A.  Right. One book.
9  Q.  Where is that book?
10  A.  I believe it's at my house. It might be at
11  Janell's; I'm not sure.
12  Q.  Okay. I'm going to need to get you to
13  provide that book to Mr. Newman so that he can get
14  me a copy of it.
15  A.  Okay.
16  Q.  In 3(f), you have: Starting and ending
17  salary: $10.
18      Is that accurate? Looking at Exhibit 8.
19  A.  Yes, ma'am.
20  Q.  So you've only taken $10 in salary out of
21  the business since you signed these
22  interrogatories on September 13, 2006?
23  A.  You mean $10 total?

## Page 54

1  Q.  Yes, ma'am.
2  A.  No, no, no. That's an hour when we're
3  working a job.
4  Q.  That is the rate at which you pay yourself?
5  A.  Yes, ma'am.
6  Q.  All right. Over on 3(j), now this is
7  where --
8      THE WITNESS: Oh, I can't write on
9  that, can I?
10      MR. NEWMAN: No.
11      THE WITNESS: I'm sorry.
12  Q.  Exhibit 8. My questions end at (g), but
13  then we've got (h), (i), (j), and (k).
14      Can you help me match up what your
15  responding to in (h), (i), (j), and (k)?
16  A.  I was probably working on this, and I had
17  two; and I probably picked back up with the wrong
18  one. I had two of these to answer, and I might
19  have -- when I started back working on it, I might
20  have picked up the wrong one to continue.
21  Q.  You had two interrogatories -- sets of
22  interrogatories to answer?
23  A.  Uh-huh.

## Page 55

1  Q.  Were they the same document?
2  A.  I'd have to go home and look at them; I
3  don't know. No, I don't think they were the same.
4      THE WITNESS: Would you have a copy of
5  them?
6  A.  They were a little bit different.
7      MR. NEWMAN: I think probably that
8  she's confusing the request for production and the
9  interrogatories.
10      MS. SHARP: Okay.
11      THE WITNESS: Okay. I'm sorry.
12      MR. NEWMAN: People sometimes do that.
13  A.  I'm sorry.
14  Q.  Okay. Then let's just figure out what you
15  are saying in (h), (i), (j), and (k). And (h)
16  said: The reason employment ended: N/a.
17      Does that go to Kaye-Jen-Step, your
18  business, your personal business?
19  A.  Yes.
20  Q.  Okay. Then in (i) you say: Farley Nuclear
21  Plant. What does that relate to?
22      MR. NEWMAN: Well, the question does
23  say identify all employers within the past ten

## Page 56

1  years.
2  Q.  So is that what you are doing, Ms. Sanders,
3  in (i), just identifying Farley Nuclear Plant as
4  one of your employers in the past ten years?
5  A.  (No response.)
6  Q.  I don't want to put words in your mouth. I
7  just --
8  A.  I guess; I don't know. Probably. Let's see
9  if it matches up. Maybe that's -- I don't know
10  why I put it down there, but that's what they're
11  listed for, past employers.
12  Q.  Okay. And you said, "(see records already
13  obtained.)"
14      What are you referring to in that
15  parenthesis?
16  A.  I have no idea.
17  Q.  Okay.
18  A.  What does the question say? Maybe for
19  positions held; I don't know.
20  Q.  All right. Looking at (j) Sanders and Sons
21  Tires?
22      MS. SHARP: Off the record for a
23  minute.

14 (Pages 53 to 56)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 57

1    (An off-the-record discussion
2    was held.)
3    (BY MS. SHARP)
4    Q.   (j).  You have Sanders and Sons Tires.  What
5    is Sanders and Sons Tires?
6    A.   My dad's car business.
7    Q.   Where is that business located?
8    A.   Here in Dothan.
9    Q.   I'm sorry?
10   A.   Here in Dothan.
11   Q.   What is the address?
12   A.   307 East Spring Street.
13   Q.   When did you work in your dad's tire
14   business?
15   A.   Right before -- I worked there before
16   Extendicare.
17   Q.   What did you do?
18   A.   Just helped load tires, help drive.
19   Q.   What is your dad's name?
20   A.   Eddie Sanders.
21   Q.   Is the business still in operation?
22   A.   Yes.
23   Q.   Same address?

Page 58

1    A.   Yes.
2    Q.   Okay.  And again, in parentheses, you say,
3    "See records already obtained."  Do you know what
4    you're referring to there?
5    A.   Same thing, I guess.  The position or what I
6    did or whatever.
7    Q.   Okay.  And No. 3(c), where I asked you where
8    you identified your date hired in the personal
9    business, you've got September 16, 2005?
10   A.   On what now?
11   Q.   No. 3(c), on the first page of Exhibit 8, I
12   asked you about that date, September 16, 2005?
13   A.   Uh-huh.
14   Q.   That's just incorrect as the date that you
15   were hired in that business?
16   A.   You said that is incorrect?
17   Q.   Is it incorrect?
18   A.   Right, right.
19   Q.   Now, Ms. Sanders, looking at Exhibit 8, your
20   answers to Defendant's First Set of
21   Interrogatories, you did not truthfully answer the
22   questions that I put to you in Defendant's Exhibit
23   7, did you?

Page 59

1    8 is not a truthful response to the
2    questions I put to you in Exhibit 7?
3    A.   Say that again.
4    Q.   Are the answers in Exhibit 8 truthful?
5    A.   8?  To which question?
6    Q.   The questions are in Exhibit 7.
7    A.   Yes, to the best of my knowledge.
8    Q.   Okay.  And you testified earlier that you
9    did not start working in your personal business on
10   September 16th, 2005, correct?
11   A.   Right.
12   Q.   So that response that you signed was not
13   truthful, correct?
14   A.   This response, 3(c)?
15   Q.   Yes, ma'am.
16   A.   But I stated that that was the day the
17   business was started.
18   Q.   But the statement is the date hired, is it
19   not?  "Date hired:  September 16, 2005, to
20   present."  Correct?
21   A.   Right.
22   Q.   That was the response you gave me, correct?
23   A.   The response I gave you was -- say that

Page 60

1    again.
2    Q.   "Date hired:  September 16, 2005, to
3    present."  Am I reading Exhibit 8, No. 3(c)
4    correctly?
5    A.   That's what it reads, yes.
6    Q.   Okay.  And No. 4 of the interrogatories, if
7    you look at Exhibit 7, my question asked if you
8    had ever been discharged and/or disciplined by any
9    employer other than Southern Nuclear.
10   No. 4 of Exhibit 8, your answer is:  "I have
11   never been disciplined by any of my employers."
12   Did I read that correctly?
13   A.   You read it correctly.
14   Q.   That's not a truthful response, is it?
15   A.   To the best of my knowledge it is.
16   Q.   Weren't you given a first written warning
17   when you were employed by Websters Industries?
18   A.   For what?
19   Q.   For attendance.
20   A.   I might have.  I don't remember though.
21   Q.   And, in fact, Ms. Sanders, weren't you given
22   also a second written warning and a suspension
23   from Websters Industries, one of your former

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

Page 61

1  employers?
2      (Defendant's Exhibit No. 9 was
3      marked for identification and a
4      copy of the same is attached
5      hereto.)
6  Q.  I'm handing you and your lawyer what I've
7  marked as Defendant's Exhibit 9 to your
8  deposition.
9      Do you recognize your signature on the two
10  pages that make up --
11  A.  That's what I was looking at. That's the
12  only thing I recognize. I don't remember.
13  Q.  But that is your signature on both pages of
14  Defendant's Exhibit 9?
15  A.  Yes.
16  Q.  And, in fact, didn't you just stop going to
17  work at Webster Industries?
18  A.  Did I just stop going to work?
19  Q.  Yes, ma'am.
20  A.  Did I just stop going to work at Webster?
21  Q.  I'm sorry. Go ahead. Did you not leave
22  your employment at Webster Industries without
23  giving any notice to your employer?

Page 62

1  A.  I told a Kate Reeves that I was leaving to
2  come back to Dothan.
3  Q.  Who is Kate Reeves?
4  A.  She was my supervisor.
5  Q.  And if Websters Industries' records reflect
6  that you quit without giving any notice and that
7  you are not eligible for rehire, do you dispute
8  that?
9  A.  I don't know. Like I say, I don't even
10  remember this. That's been a while ago.
11      THE VIDEOGRAPHER: This marks the end
12  of Videotape No. 1 in the deposition of Stephanie
13  Sanders. We are going off the record. The time
14  is 3:41 p.m.
15      (A brief recess was taken.)
16      THE VIDEOGRAPHER: Here begins
17  Videotape No. 2 in the deposition of Stephanie
18  Sanders. We are going back on the record. The
19  time is 3:47 p.m.
20  (BY MS. SHARP)
21  Q.  Ms. Sanders, going back to Exhibit 8 to your
22  deposition, No. 6, your response to No. 6 --
23  A.  Yes.

Page 63

1  Q.  -- what did Dr. Chris Miller treat you for?
2  A.  I believe it was -- I started going to Dr.
3  Miller, I believe 2004 maybe, for stomach problems
4  that I was having.
5      And then most recently, after I lost my
6  brother he prescribed some medication for me to
7  take the edge off.
8  Q.  When did you see Mr. -- excuse me -- Dr.
9  Miller recently?
10  A.  I didn't see him; I called his office. And
11  his -- I believe his nurse called in some
12  medication for me.
13  Q.  When was that?
14  A.  I don't know the date.
15  Q.  Was it within the last month?
16  A.  It was sometime the end of last year.
17  Q.  Are you still taking that medication?
18  A.  As needed.
19  Q.  Did you take any of that medication today?
20  A.  No.
21  Q.  What medication is it that he prescribed for
22  you?
23  A.  I don't know the name of it.

Page 64

1  Q.  Where did you fill the prescription?
2  A.  I believe that's Walgreens they built across
3  from Winn Dixie. I think it's Walgreens.
4  Q.  Where is it?
5  A.  Walgreens, I believe.
6  Q.  I understand the name of the store. Where
7  is it located?
8  A.  On Ross Clark Circle.
9  Q.  Have you had prescriptions filled any place
10  other than the Walgreens on Ross Clark Circle
11  within the last five years, Ms. Sanders?
12  A.  I -- I may have. I'm not sure.
13  Q.  Is there any other place that you can think
14  of where you may have filled a prescription within
15  the last five years?
16      MR. NEWMAN: If it will be helpful, a
17  better address for that pharmacy might be East
18  Main Street. I'm not sure they consider the
19  circle their address.
20      MS. SHARP: Okay. Thank you, Mr.
21  Newman.
22      MR. NEWMAN: You're welcome.
23  A.  The only other place I might have may be

16 (Pages 61 to 64)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 65

1  CVS. I'm not sure.
2  Q.   Which CVS would you have gone to?
3  A.   The one near the Medical Center.
4  Q.   In No. 8, looking at Defendant's Exhibit 7,
5  Ms. Sanders, I asked you to state whether you had
6  ever applied for unemployment compensation
7  benefits and, if so, identify the employer, the
8  state in which benefits were sought, the date
9  benefits were sought, and whether benefits were
10  received. Do you see that question?
11  A.   Yes.
12  Q.   And you testified earlier that you did not
13  apply for unemployment compensation related to
14  your resignation from Plant Farley because you
15  resigned; is that correct?
16  A.   Yes.
17  Q.   But you have applied for unemployment
18  compensation in other years, have you not?
19  A.   If I have, I don't remember it right now.
20  Q.   You don't recall applying for unemployment
21  compensation in 1994 and 1996?
22  A.   I may have applied during our -- the week
23  that we were closed here. Is that what you're

Page 66

1  referring to? That's the only other time I can
2  remember. We didn't get paid for the week that
3  the plant was closed.
4  Q.   And you applied for benefits?
5  A.   I might have; I don't remember.
6  Q.   Would you dispute the Department of
7  Industrial Relations' records that reflect that
8  you applied for unemployment compensation in the
9  years 1994 and 1996?
10  A.   No. No, because I don't remember.
11  Q.   If you would, look at my question on Exhibit
12  7, No. 12. And it asks you to identify all
13  complaints or charges that you have filed with any
14  federal, state, or local agency, including but not
15  limited to the Equal Employment Opportunity
16  Commission.
17      And your answer to No. 12, in Exhibit 8
18  says, "Equal Employment Opportunity Commission,
19  1130 22nd Street South, Suite 2000, Birmingham,
20  Alabama 35205, January 22nd, 2006 singled out,
21  labeled, race discrimination, retaliation,
22  harassment, sexual harassment and maliciously
23  discharged." Do you see that response?

Page 67

1  A.   Yes.
2  Q.   What are you referring to there?
3  A.   The things that I was subjected to at
4  Farley.
5  Q.   You did not file an EEOC Charge with the
6  Equal Employment Opportunity Commission, did you
7  not -- did you, Ms. Sanders?
8  A.   Yes.
9  Q.   Where is it?
10      THE WITNESS: Is it in my files?
11      MR. NEWMAN: You have to answer.
12      THE WITNESS: Oh, I'm sorry.
13  A.   Yes, I did file it.
14  Q.   Do you have a copy of that charge?
15  A.   Somewhere I do. If I didn't give it to my
16  attorney, I have it somewhere.
17      MS. SHARP: For the record, we have not
18  been provided a copy of Ms. Stephanie Sanders'
19  Equal Employment Opportunity Charge that she says
20  she filed on January 22nd, 2006. Southern Nuclear
21  Operating Company has never been served with a
22  copy of the EEOC Charge, and the EEOC maintains
23  that it never received such a charge from Ms.

Page 68

1  Stephanie Sanders.
2  Q.   Ms. Sanders, if you would locate, as soon as
3  you can, a copy of that EEOC Charge and provide it
4  to your attorney so that he can provide a copy to
5  me.
6  A.   Okay.
7  Q.   And at that time I would want to question
8  you about the allegations of that charge, because
9  I have never laid eyes on it.
10      MR. NEWMAN: Now, let me see if I
11  understand what you just said. The EEOC says they
12  didn't get a charge?
13      MS. SHARP: That's correct.
14      MR. NEWMAN: But you want to find the
15  charge that she filed?
16      MS. SHARP: She just testified that she
17  filed one.
18      MR. NEWMAN: Yeah. But they said they
19  didn't get it, right?
20      MS. SHARP: Right. But she says she
21  has it. So I want to see what she has that
22  she says she filed. There were numerous
23  misrepresentations in her interrogatory responses,

17 (Pages 65 to 68)

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

Page 69

1  and I want to know what --
2      MR. NEWMAN: Okay. I will direct her
3  to get that for you and I will forward this
4  alleged file to you.
5      MS. SHARP: Thank you.
6  Q.  Ms. Sanders, related to the EEOC Charge that
7  you filed, did you receive a Dismissal and Notice
8  of Rights from the EEOC?
9  A.  It was a letter. And I can't remember what
10 it said. I was told that it meant that they
11 couldn't find any findings, which gave me so many
12 days to file a lawsuit.
13 Q.  Do you still have that letter?
14 A.  I thought I turned it in to my attorney, but
15 evidently I did not. I'll have to look for it.
16 Q.  Would you do that and provide it to us as
17 soon as you can?
18 A.  I will.
19 Q.  Since we don't have an EEOC Charge to ask
20 you about, Ms. Sanders, would you tell me, as best
21 you can, what events you say support your
22 allegation that you were singled out? And I'm
23 referring to No. 12 in Exhibit 8.

Page 70

1  A.  In No. 8? This was No. 12?
2  Q.  Yes, ma'am.
3  A.  Okay. Give me the question again.
4  Q.  Tell me what incidents you say support your
5  allegation that you were singled out.
6  A.  I was told I was singled out. Deborah told
7  me that management wanted the foremen to write me
8  up. And she said that she didn't have a reason to
9  write me up because I was a good worker. And her
10 and Dennis Teat were the only two that didn't
11 write us up.
12 Q.  Are there any other incidents that support
13 your allegation that you were singled out?
14 A.  Don Grissette told me he had restrictions on
15 me.
16 Q.  And we've already discussed your meeting
17 with Don Grissette, have we not?
18 A.  Right.
19 Q.  Is there anything else?
20 A.  After the fact, when they combined nonRAD
21 and RAD side, and after I was around the foremen
22 over there, one of the foremen told me that Tim
23 Wilson stated that he regretted what he did to us

Page 71

1  because we were good workers.
2  Q.  Who told you this?
3  A.  One of the foremen on RAD side.
4  Q.  Who was this?
5  A.  Patricia Glasco.
6  Q.  When did she tell you this?
7  A.  During one of the outages. I can't
8  remember.
9  Q.  And tell me exactly what Ms. Glasco told you
10 Tim Wilson told her.
11 A.  That he regretted what he had done to us, or
12 whatever, because we were good workers.
13 Q.  Do you know what he meant by what he had
14 done you?
15 A.  I gathered that whenever we went upstairs
16 after the incident in the cafeteria, he was the
17 one that had had Don put the restrictions on us,
18 is the only thing I can think he was talking
19 about.
20 Q.  But that's what you are assuming?
21 A.  Yes.
22 Q.  Okay. Ms. Glasco did not tell you that Mr.
23 Wilson discussed specifically what it was that he

Page 72

1  regretted doing?
2  A.  Right.
3  Q.  Is there anything else that goes to support
4  your allegation that you were singled out?
5  A.  I can't think of it right now.
6  Q.  Okay. What supports your allegations that
7  you were labeled?
8  A.  It was -- it was all the same.
9  Q.  What supports your allegations that you were
10 subjected to race discrimination?
11 A.  All the same.
12 Q.  What supports your allegations that you were
13 subjected to retaliation?
14 A.  Because everything they did to us was
15 retaliation for going upstairs on Tim Wilson.
16 Q.  Now, did the foremen, other than Tim Wilson,
17 know that you had gone and talked to Don Grissette
18 about -- I'm sorry. Strike that.
19     Did the foremen, other than Tim Wilson, know
20 that you would made a complaint about Tim Wilson
21 and the cafeteria incident?
22 A.  Everybody knew about the whole situation. I
23 mean, when this happened, there were probably

18 (Pages 69 to 72)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

## Page 73

1  three, four tables of engineers that supposedly
2  Tim had to go and apologize to. I don't know if
3  that ever happened. It was -- everybody knew
4  about what happened that day in the cafeteria.
5  Q.  But how do you know that all the other
6  foremen knew that you and Ms. McDowell had
7  complained about Tim Wilson's behavior in the
8  cafeteria?
9  A.  Because I went to -- well, we went to his
10  office and had to schedule a meeting. And that
11  meeting was going to be during our work hours. So
12  we had to go and let the foremen know that we were
13  going to meet with Don Grissette.
14  Q.  About Tim Wilson?
15  A.  Somehow they figured it out what it was
16  about, I guess. Because this was, like I said,
17  this was during all --
18      When I came out of that meeting with Don
19  Grissette, I'm going across the lawn back to my
20  work area. Bill Barber comes out of Cliff Buck's
21  office and tells me, I need you to follow me to
22  B&G. I said, Okay. You need me to come now?
23      Yes, because I need to write you up. Write

## Page 74

1  me up for what? For your job performance.
2      And all of it started from there. The rest
3  of that whole day was spent -- not that day. That
4  day, when I went down looking for union rep, the
5  one that I initially wanted to go down with me, I
6  couldn't find. And when we got down to the
7  building, I ended up with Steve Hornsby. Didn't
8  know him; had just met him. Janell and I had been
9  introduced right then to him.
10      And when he went down to the building, Bill
11  Barber was there by himself. And he said -- well,
12  when we got down there, Steve said, you know, What
13  do you need to write her up for?
14      Well, I'm not going to write her up now.
15  Well, what are you going to write her up for? I
16  don't know; I'll let her know tomorrow.
17      And it was just crazy. So Steve was like,
18  You're going to write her up, but you can't tell
19  her what you're going to write her up for? He
20  said, I'll tell her tomorrow.
21      So that whole day, we was in -- from
22  after break time, we were in meetings with Bill
23  Barber and Richard Bryant and our union rep.

## Page 75

1      Went from there to Cliff Buck's office.
2  This was an all-day process of trying to get this
3  thing that Don Grissette had put down on us,
4  trying to get it all cleared up.
5      And at the end of the day, what was going to
6  be a write-up, Richard Bryant's words to me was:
7  It's a big misunderstanding. We want to start out
8  with a clean slate.
9      Well, Bill Barber made the statement later
10  that management put him up to do things, and then
11  when it came down to it, they didn't back him up.
12  He made that statement to Patricia Glasco.
13  Q.  What evidence do you have that these things
14  were related to your complaint about Tim Wilson?
15  A.  The things that the foremen were doing to
16  us?
17  Q.  The things that you just spent some amount
18  of time describing.
19  A.  All of this started right after the
20  situation with Tim Wilson. Tim and Don Grissette
21  were friends.
22      There -- we hadn't -- there was nothing in
23  our records. We hadn't done anything. And this

## Page 76

1  one incident that just being in the wrong place at
2  the wrong time, because Tim didn't even have a
3  problem with us.
4  Q.  When did the cafeteria incident happened?
5  A.  April Fool's Day. Because we thought he was
6  kidding.
7  Q.  What year?
8  A.  I don't know. I can't answer that.
9  Q.  Was it the same year you were disciplined,
10  2005?
11  A.  No.
12  Q.  What incidents, Ms. Sanders, go into your
13  allegation of being harassed?
14  A.  Just everything that they were doing.
15  Q.  Is it the things that we've already talked
16  about in your deposition?
17  A.  Yes.
18  Q.  What incidents support your allegation of
19  sexual harassment?
20  A.  This was put in because of the being
21  subjected to the things that -- like Tammy
22  bringing the cake in that was inappropriate, them
23  coming in at Hatch with their thongs showing was

19 (Pages 73 to 76)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 77

1 inappropriate, you know.
2 Q.   What else?
3 A.   That's all I can think of right now.
4 Q.   Okay.  So your sexual harassment allegation
5 relates to Tammy Caldwell bringing in an
6 inappropriate cake to the plant?
7 A.   Being subjected to that.  It's not
8 appropriate.  No one wants to see stuff like that.
9 Q.   Did you see the cake?
10 A.   I might have -- I saw it, but I cannot tell
11 you the color or anything like that.  But I
12 glanced at it and did like this (demonstrating).
13 Q.   Did you make a complaint about the cake?
14 A.   No.
15 Q.   Tell me about the thong showing that you say
16 was sexual harassment.
17 A.   They came in on night shift at Hatch, and
18 she -- Tammy Caldwell -- had on this pink outfit,
19 shades and all, and pulled up her shirt and showed
20 people that she had the thong to match it.
21 Q.   Could you see the thong before she pulled up
22 her shirt?
23 A.   I didn't.  Now, she had on a jacket.  This

Page 78

1 was during cold weather, so she had on a jacket
2 and a shirt.  Now, if you could see it when she
3 took the jacket off, I'm pretty sure you could.
4 The shirt matched her pants.  The end of her
5 shirt, the inside shirt matched her pants.  It
6 didn't overlap.  And she had on a jacket that
7 overlapped.
8 Q.   So she actually pulled up her jacket?
9 A.   Right.
10 Q.   And you saw this?
11 A.   Yes.
12 Q.   Other than Tammy Caldwell, who else engaged
13 in that type of inappropriate behavior?
14 A.   That particular incident?
15 Q.   The thong showing.
16 A.   That they were showing off their outfits?  I
17 don't know.  Because when Tammy did that, I walked
18 out.  Our shift -- well, they were coming in and
19 our shift was leaving.
20 Q.   Did you make a complaint about Ms. Caldwell?
21 A.   I didn't complain about it.  I was not on
22 shift with her.  But somebody complained.  Because
23 when the next crew got ready to go to Hatch,

Page 79

1 Deborah said something about wear -- something
2 about "modesty" clothes.  You know, she briefed
3 everybody on how they better dress appropriately
4 over there and we're not going to have the same
5 thing that happened last time.
6 Q.   Was that the next year?
7 A.   It was the next outage.  I don't know if it
8 was, per se, the next year.
9 Q.   Is that the only way that you know that
10 someone complained about Ms. Caldwell wearing the
11 thong in to work?
12 A.   Yes.  I overheard that.  We had lunch.  And
13 the next crew that was going to Hatch, she called
14 them in the little commons area between our break
15 room and the foreman's office.
16       And where I sit, I could hear her telling
17 them about the inappropriate dress from the last
18 crew that was over there.
19 Q.   Did she talk about the incident of Ms.
20 Caldwell wearing the thong in and showing other
21 employees what she was wearing?
22 A.   I didn't hear her call any names.
23 Q.   But did she describe the incident?

Page 80

1 A.   I heard the first part of what she started
2 talking to them about.  But, like I say, everybody
3 was getting ready to leave for lunch.
4 Q.   What goes into your or supports your
5 allegation that you were maliciously discharged?
6 A.   Because if I send in my resignation and you
7 have to have people -- Jackie Cureton told Doris
8 to tell Deborah she quit and she was going to mail
9 in the badge.  They still kept Jackie on the books
10 until December, I think, of that year, so she
11 could get her PPP.
12       You had people -- Phyllis was given a
13 chance.  And they claimed that Phyllis had ...
14 (unintelligible), but they still gave Phyllis the
15 option to resign.
16       But I send in my resignation, I talk to you
17 the night before, you tell me that's fine,
18 disregard whatever communication you get from me
19 and Randy.  And because I forget to sign it?  With
20 everything I was going through, it's a wonder I
21 could even write it.
22       And then they put me down as terminated
23 because I didn't sign it?  That's typical of the

20 (Pages 77 to 80)

Page 81

1   way I was treated the whole time I was there.
2   Q.   Is there anything else that goes with your
3   allegation that you were maliciously discharged?
4   A.   No.
5   Q.   When did you first speak with an attorney
6   about your allegations against Plant Farley and
7   Southern Nuclear Operating Company?
8   A.   Can you ask that again?
9   Q.   When did you first speak with an attorney
10  about your allegations against Plant Farley and
11  Southern Nuclear Operating Company?
12  A.   I don't remember.
13  Q.   Did you speak with an attorney other than
14  Mr. Newman?
15  A.   Yes.
16  Q.   Who was that?
17  A.   A guy named Rod. I don't remember his last
18  name. He was out of Birmingham. Out of
19  Birmingham. Rod, R-O-D.
20  Q.   Okay. How did you get his name?
21  A.   Say that again.
22  Q.   How did you get his name?
23  A.   Mr. Morrison, I believe.

Page 82

1   Q.   How many times did you speak with the
2   attorney out of Birmingham?
3   A.   Just once.
4   Q.   Did you ever meet with him?
5   A.   Briefly.
6   Q.   Where?
7   A.   At the Greater Beulah.
8   Q.   Where?
9   A.   Greater Beulah.
10  Q.   Aside from that attorney, did you speak with
11  any other attorneys about your allegations, other
12  than Mr. Newman?
13  A.   No.
14  Q.   Did you know Mr. Newman before he began
15  representing you?
16  A.   No.
17  Q.   And how did you get Mr. Newman's name?
18  A.   Mr. Morrison.
19  Q.   How did you know Mr. Morrison?
20  A.   He's just well known in the community.
21  Q.   Had you met him before you spoke with him
22  about your allegations against Plant Farley and
23  Southern Nuclear Operating Company?

Page 83

1   A.   I don't know if I specifically met him but
2   I've, you know, seen him often. Like I say, he's
3   well known in the community.
4   Q.   Is the Greater Beulah Baptist Church, is
5   that the church that you attended, have ever
6   attended?
7   A.   No.
8   Q.   Okay. And in your answer, No. 13 of Exhibit
9   8, you have a date of February 14, 2006. What
10  does that date refer to?
11  A.   I have no idea. I can't recall.
12  Q.   Did you ever sit down and talk with Mr.
13  Morrison about your allegations against Plant
14  Farley and Southern Nuclear Operating Company?
15  A.   I remember talking to him over the phone,
16  when he said to get some information in to him.
17  Q.   What else did he tell you?
18  A.   He gave me -- he referred me to Mr. Newman
19  and told me about Mr. Rod out of Birmingham. And
20  that's about it.
21  Q.   How many times did you speak with Mr.
22  Morrison over the phone?
23  A.   Two or three times maybe; I don't know.

Page 84

1   Q.   Do you recall anything else that you
2   discussed with him, besides what you have told me?
3   A.   No.
4   Q.   Is it your testimony that you never met with
5   him about your allegations against Southern
6   Nuclear Operating Company and Plant Farley?
7   A.   Not that I remember.
8   Q.   What is the status of your complaints
9   contained in your letter to Mr. Morrison reflected
10  in Defendant's Exhibit 2?
11  A.   Say that again.
12  Q.   What is the status of your complaints that
13  you sent to Mr. Morrison that are reflected in
14  Defendant's Exhibit 2?
15  A.   I have no idea.
16  Q.   Do you know if he plans to do any type of
17  investigation?
18  A.   Not to my knowledge.
19  Q.   Do you know if the NAACP intends to do any
20  kind of investigation?
21  A.   Not to my knowledge.
22  Q.   Did you discuss with Mr. Morrison conducting
23  any type of investigation?

21 (Pages 81 to 84)

## Page 85

1  A.  I spoke with him about what happened at
2  Farley; and, like I said, he told me to just write
3  down the things that we could recall and send the
4  tapes and he would look at it.
5  Q.  Did he say that the NAACP would take any
6  action on your behalf?
7  A.  No.
8  Q.  Did you tape any conversations with anyone
9  at Plant Farley?
10  A.  No.
11  Q.  Why not?
12  A.  I don't know.
13  Q.  Did you know that Ms. McDowell was taping
14  conversations with employees at Plant Farley?
15  A.  Yes.
16  Q.  Did you discuss with her whether she should
17  tape conversations with employees at Plant Farley?
18  A.  Whether she should?
19  Q.  Yes, ma'am.
20  A.  I don't recall. I knew that she did.
21  Q.  Did she ask you to tape conversations with
22  employees at Plant Farley?
23  A.  Not that I remember. We just discussed it.

## Page 86

1  Q.  How many times did you have that
2  conversation about taping conversations at work?
3  A.  Just when she decided to do it. She's not
4  the only one that's taped conversations; when all
5  several people that taped conversations when all
6  this started going on.
7  Q.  And I want to focus on Ms. McDowell, your
8  co-plaintiff in this lawsuit.
9  A.  Okay.
10  Q.  To your knowledge, how many conversations
11  did Ms. McDowell tape while she was employed at
12  Plant Farley?
13  A.  The ones that you have.
14  Q.  Only the ones that I have?
15  A.  To my knowledge.
16  Q.  Which ones are those?
17  A.  The one of the 30-day follow-up on her DML,
18  the one of her grievance, and one other one. I
19  can't even think of what it is right now.
20  Q.  Who is Shannon Brown?
21  A.  She works at Farley. I don't know her --
22  her title.
23  Q.  What relation is --

## Page 87

1  A.  I think maybe QA; I don't know. She is
2  somehow associated with Birmingham or works for
3  Birmingham at Farley or something. I don't
4  remember. She used to be in HP.
5  Q.  All right. I'm going to need your help
6  again on comparing your responses in Exhibit 8 to
7  my questions in Exhibit 7.
8  A.  Okay.
9  Q.  No. 13, I asked you to identify -- and I'm
10  referring to Exhibit 7, to No. 13. I asked you to
11  identify all of your relatives who are 18 years or
12  older and live in Coffee, Dale, Geneva, Henry, or
13  Houston Counties.
14      No. 13 of your answers refers to the NAACP
15  and the information we just talked about.
16      Does No. 14 of your responses reflect the
17  answer to No. 13 of my questions?
18  A.  Yes.
19  Q.  So your relatives who live in Coffee, Dale,
20  Geneva, Henry, or Houston Counties have the last
21  names Hogan, Kinsey, Thomas, and Sanders?
22  A.  Right.
23  Q.  And in No. 14 of Exhibit 7, my questions to

## Page 88

1  you, asked you to identify any relative who is or
2  was employed by Southern Nuclear during the last
3  ten years.
4      Does that match up with No. 15 of your
5  answers?
6  A.  Yes.
7  Q.  That Shannon Brown is a relative of yours?
8  A.  Yes.
9  Q.  How is she related to you?
10  A.  Shannon's grandmother and my grandmother
11  were sisters. Her grandmother is still living,
12  mine is deceased; but they were sisters.
13  Q.  Would you consider yourself and Ms. Brown to
14  be friends in addition to being relatives?
15  A.  Friendly or friends? I mean, are you saying
16  someone that I talk to often?
17  Q.  Yes, ma'am.
18  A.  No, we don't talk.
19  Q.  Okay. And then No. 15 of my questions is
20  asking you to identify every address you've had
21  for the past two years.
22      That matches up with 16 of your responses?
23  A.  Yes.

Page 89

1  Q.  Okay.  When did you live at East Spring
2  Street?  What were the years that you lived there?
3  A.  Let's see.  I don't remember the dates.
4  Q.  How long did you live at the East Spring
5  Street address?
6  A.  Years.  It's my parents' address.
7  Q.  Okay.  How long did you live at the 2600
8  Denton Road address?
9  A.  Not long at all.
10  Q.  A year?
11  A.  Less than a year.
12  Q.  Is the Farmer Street address your current
13  residence?
14  A.  I'm back and forth.  I'm in the process of
15  trying to -- I was in the process of trying to
16  redo that house.  It's my old grandparents -- my
17  grandparents' old home house.  But I've had to put
18  that on hold, so mostly it's Spring Street.
19  Q.  So you mostly live with your parents?
20  A.  Back and forth.
21  Q.  Okay.  Looking at your response, No. 21, are
22  you a member of Stringer Street AME Church?
23  A.  Yes, ma'am.

Page 90

1  Q.  Okay.  How long have you been a member of
2  the Ozark Chamber of Commerce?
3  A.  Since last year.
4  Q.  Did you join because of the Kaye-Jen-Step
5  business?
6  A.  Yes.
7  Q.  And when were you a member of the NAACP?
8  A.  I can't remember when I joined, but I let my
9  membership lapse.  I think was maybe when I was
10  living in Montgomery; I'm not sure.
11  Q.  And are you a member of Daleville Christian
12  Fellowship?
13  A.  That's where I go to church.  I attend
14  there.
15  Q.  Did you ever hold any type of office with
16  the NAACP?
17  A.  No, ma'am.
18  Q.  Why did you join that organization?
19  A.  I thought it was a good organization.
20  Q.  Did you report to Deborah Crutchfield that
21  Calvin Jones did not perform his firewatch but
22  that he had signed the log saying he had done it?
23  A.  I had a conversation with Deborah about that

Page 91

1  firewatch.  I had been approached by a couple of
2  people in security that wanted to know why I was
3  opening the fire door again when it had not been
4  opened on day shift.  And I think this was like a
5  weekend -- an over-the-weekend thing.  And didn't
6  receive turnover, but I knew who had the firewatch
7  prior to me.  Which they told me who it was anyway
8  when they approached me.  And I got the book; I
9  knew who had it.
10      Well, that next day, I believe, Nichia
11  Hester said that he almost missed a firewatch and
12  they were making a big stink about it.
13      And so I simply went in to Deborah to cover
14  myself, because security said he hadn't been in
15  there all day and wanted to know why I was going
16  back in there.  So, yes, I did talk to Deborah
17  about it.
18  Q.  You said security approached you and asked
19  you about opening the fire door.  Who in security
20  approached you?
21  A.  I can't remember.
22  Q.  Was it plant security or security --
23  corporate security out of Birmingham?

Page 92

1  A.  No.  It was security guards at Plant Farley.
2  Q.  And you said the security guards already
3  knew that Mr. Jones had had the firewatch before
4  you?
5  A.  Yes.  They see who's coming in and out of
6  there.
7  Q.  So prior to you talking to Deborah
8  Crutchfield about Calvin Jones missing the
9  firewatch, you were aware that security knew that
10  Calvin Jones had missed the firewatch, correct?
11  A.  Security approached me about the firewatch
12  because they wanted to know why I was going back
13  in there.  They didn't know if he had missed the
14  firewatch or not.  But when they saw me going back
15  in there, they wanted to know why I was going back
16  and checking those doors.  Security has reported
17  people for firewatches before.
18      So when I got the book, I didn't know if the
19  firewatch was still on there or not.  So when I
20  started, during the day, after I do two or three
21  firewatches and people are asking me, Well, why
22  are you doing that door again? and they put it
23  back on there, I'm not knowing what to say, you

23 (Pages 89 to 92)

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 93

1  know. Well, was it on there last shift? I'm not
2  sure.
3      But, yeah, it was a big stink. Because,
4  like I said, even Nichia Hester, he said, Y'all
5  make sure you do this; you get good turnover to
6  next one, because I almost missed it and security
7  -- once again, security called him in the break
8  room and said, You're about to miss your
9  firewatch. And he said he just did get out there
10 in time. So there's so much commotion going on,
11 you know.
12     And, like I said, I believe this happened
13 over a weekend. And then that Monday morning was
14 when I spoke with Deborah.
15 Q.  Did you consider yourself to be friends with
16 Calvin Jones?
17 A.  Didn't know Calvin.
18 Q.  Okay. You didn't know who he was?
19 A.  I knew who he was, but I'm saying to know
20 him as far as friendly. You know, I'd pass him
21 and speak, just like I would anybody else, you
22 know.
23 Q.  And you mentioned someone named Nichia

Page 94

1  Hester?
2  A.  Yes.
3  Q.  Now, who is that?
4  A.  Another helper.
5  Q.  What race is Calvin Jones?
6  A.  Black.
7  Q.  What race is Nichia Hester?
8  A.  White.
9  Q.  Do you know what happened to Calvin Jones as
10 a result of missing the firewatch?
11 A.  No, I don't.
12 Q.  You don't?
13 A.  No.
14     (Defendant's Exhibit No. 10 was
15     marked for identification and a
16     copy of the same is attached
17     hereto.)
18 Q.  Ms. Sanders, I'm handing you and your
19 attorney a copy of what I've marked as Defendant's
20 Exhibit 10 to your deposition.
21     Take a look at Defendant's Exhibit 10 and
22 tell me if you've seen a copy of that document
23 before now.

Page 95

1  A.  Yes.
2  Q.  Yes?
3  A.  Yes.
4  Q.  Have you had a chance to read through
5  Defendant's Exhibit 10 before today?
6  A.  Yes.
7  Q.  Did you provide your attorney documents in
8  response to Defendant's Exhibit 10?
9  A.  I don't remember if I did.
10 Q.  You don't know?
11 A.  I don't remember.
12 Q.  Do you have any documents that are
13 responsive to the requests in Defendant's Exhibit
14 10?
15 A.  Do I have documents at my house of --
16 Q.  At your home? homes?
17 A.  I do, but I think they're all copies.
18 Q.  Excuse me?
19 A.  I do, but I think they're copies, and my
20 attorney has those documents.
21 Q.  Has copies of everything responsive to the
22 requests in Defendant's Exhibit 10?
23 A.  Copies of what he has.

Page 96

1  Q.  Did you provide your attorney with copies of
2  any documents that you have related to the union
3  at Plant Farley, any grievances or responses to
4  grievances, or correspondence between you and
5  union officers?
6  A.  I don't -- I don't know what all I turned
7  in. Some I may have and some I might not have. I
8  know the letter that I got a week or two ago, I
9  know I didn't turn that in.
10 Q.  So you know that at least that you need to
11 provide to your attorney?
12 A.  Okay.
13 Q.  Would you, when you're looking for that
14 document, look for any other things that are
15 responsive to Request No. 3, and provide those to
16 your attorney as well?
17 A.  Okay.
18 Q.  And did you look for all documents that you
19 have relating to your employment with Southern
20 Nuclear, No. 2?
21 A.  Relating to my employment how?
22 Q.  Any correspondence, letters, forms, anything
23 that you were given during your employment at

24 (Pages 93 to 96)

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 97

1  Southern Nuclear by anyone at the company.
2  A.  I'll have to look and turn it in.
3  Q.  Do you have copies of your W-2 statements
4  for 2005 or 2004 or 2003?
5  A.  In No. 2, are you talking about as far as my
6  finances?
7  Q.  All documents related to your employment
8  with Southern Nuclear.
9  A.  No, I haven't turned -- I don't think I've
10  turned all of them in.
11  Q.  Okay.  I need you to provide all that to
12  your attorney.
13  A.  Okay.
14  Q.  No. 4, all documents related to your wages,
15  earnings, bonuses, or raises from 2005 through the
16  present.
17  A.  I don't have those.
18  Q.  Well, you do have, and you testified that
19  you do have some documentation related to your
20  business, is that not correct?
21  A.  Oh.  For the business, yeah; not from
22  Farley.  Okay.  I'm sorry.
23  Q.  And did you not get any wage and earning

Page 98

1  statements from Southern Nuclear for the period
2  during 2005 that you worked?
3  A.  I have no idea where they are.  I'd have to
4  look for them.
5  Q.  Have you filed your tax return for 2005?
6  A.  My personal?
7  Q.  Yes, ma'am.
8  A.  Yes.
9  Q.  That would be included in this request too.
10  A.  I'd have to look for it.
11  Q.  Did you prepare your own return?
12  A.  No.
13  Q.  Who prepared it for you?
14  A.  I can't recall.  I was referred to someone.
15  Q.  Do you have anything at home that shows who
16  you took your tax returns to and who prepared it?
17  A.  I know where she's located.  She's never in,
18  but I'll see if I can get in touch with her.
19  Q.  Okay.  I do need you to make a reasonable
20  effort to locate all of this information.  I'm
21  entitled to it, and I asked for it well before
22  your deposition so that I could ask you about it
23  today.

Page 99

1  A.  Okay.
2  Q.  No. 5, all tape recordings or other
3  documents respecting any of your discussions with
4  any employees or former employees of Southern
5  Nuclear or the union.
6  Have you provided all of that documentation
7  to your attorney?
8  A.  That I know of.
9  Q.  Did you make any notes while you were
10  employed at Southern Nuclear-Plant Farley?
11  A.  Oh, yes.
12  Q.  Where are they?
13  A.  I don't know.  Some I've redone and turned
14  in.  A lot of notes that I had been taking,
15  especially in the beginning, I haven't located.
16  If it's not too late for you to get them, I'll
17  sure look for them.
18  Q.  Well, I definitely need to have them as soon
19  as you can get them to your lawyer.
20  A.  Okay.
21  Q.  All documents relating to any criminal
22  charges brought against you.  Do you have any such
23  documents?

Page 100

1  A.  No.
2  Q.  Okay.  No. 7, all documents relating to any
3  bankruptcy proceedings involving you.
4  I think you testified in your
5  interrogatories that you have never filed for
6  bankruptcy; is that correct?
7  A.  Right.
8  Q.  No. 8, all documents relating to any EEOC
9  Charges, lawsuits, or other claims you have
10  made/filed against any other employer, prospective
11  employer, any person or entity.
12  And we've already talked about your
13  commitment to get me a copy of the EEOC Charges
14  that you filed in January of this year, correct?
15  A.  Right.
16  Q.  Okay.  All documents related to any EEOC
17  Charges, lawsuits, claims any person or entity has
18  made or filed against you.
19  Do you have any such documents?
20  A.  No.
21  Q.  Have you provided your attorney with all
22  documents related to grievances you have filed or
23  that involve you?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 101

1  A.   No. I don't have any.
2  Q.   Okay. Have you provided your attorney with
3  any other documents that you have sent or received
4  from the EEOC? You testified earlier that you did
5  get a dismissal letter from them?
6  A.   Uh-huh.
7  Q.   And you did commit to provide that to your
8  attorney, correct?
9  A.   Right.
10  Q.   What about No. 12? All documents, including
11  without limitation, all or any portion of every
12  list or log or notes containing names of persons
13  or entities that you have contacted concerning the
14  conduct challenged in the complaint, other than
15  those documents created by your legal counsel.
16  A.   I don't have any.
17  Q.   Okay. 13: Any notes, diaries, or calendars
18  reflecting entries related to your employment with
19  Southern Nuclear and/or the allegations made in
20  the complaint.
21      Have we already talked about any such
22  documents?
23  A.   I'll have to look, yes, ma'am.

Page 102

1  Q.   Do you have any calendars where you wrote
2  down notes related to your employment at Plant
3  Farley?
4  A.   I'll have to look. I had a calendar where I
5  was keeping with how they were doing rotation
6  unfairly. But I'll have to look for it.
7  Q.   What year was that calendar?
8  A.   Maybe 2004. I'm not sure.
9  Q.   All documents relating to any damages or
10  relief you have requested in this lawsuit.
11      Do you have any such documents?
12  A.   That's been turned in.
13  Q.   You have turned that in to your lawyer?
14  A.   Yes.
15  Q.   What document is that that you're referring
16  to?
17  A.   The list. We made a list of the wages that
18  we would have had if we were still at Farley.
19  Just a list of, if we were still there until we
20  retired, what our loss for the whole -- for all of
21  it was.
22  Q.   When did you provide that to your attorney?
23  A.   I'm not sure.

Page 103

1  Q.   Was it within the last week?
2  A.   I'm not sure when it was.
3  Q.   Okay.
4      MS. SHARP: Mr. Newman, I have not seen
5  that calculation.
6      MR. NEWMAN: All right. I know.
7      MS. SHARP: Do you intend to provide it
8  to me? I think I've asked for it.
9      MR. NEWMAN: Well, you can ask for one.
10  But the one that I have, I asked for before, so...
11      MS. SHARP: Well, the initial
12  disclosures require you to provide me a damages
13  calculation. If you've got documentation and that
14  would be the basis for that calculation, I'm
15  entitled to it.
16      MR. NEWMAN: I understand that, Ms.
17  Sharp. The information that's contained in the
18  things that you've already asked for, you will be
19  able to cull those figures from that.
20      Now, what I have asked my clients to do is
21  to sit down and say, Well, what value do you
22  attribute to this? That's between me and my
23  client.

Page 104

1      MS. SHARP: Okay. But I'm not required
2  to cull, under the Rules of Civil Procedure, to
3  come up with your damages calculation. So I need
4  you to provide that to me.
5      MR. NEWMAN: I don't have anything else
6  to say about that.
7  (BY MS. SHARP)
8  Q.   Do you have a copy of the representation
9  agreement between you and your lawyer?
10  A.   I don't know if I do. I'll have to put my
11  hands on it.
12  Q.   Okay. Have you taken any statements or
13  received any statements or affidavits from anyone
14  related to the claims you are making against Plant
15  Farley and Southern Nuclear Operating Company?
16  A.   Okay. Say this again. Repeat that.
17  Q.   Have you taken any statements from anyone,
18  written statements from anyone, or received any
19  written statements from anyone, or any affidavits,
20  related to the allegations you are making in this
21  lawsuit?
22  A.   No.
23  Q.   Have you provided your attorney with all

26 (Pages 101 to 104)

Page 105

1    documents relating to your current and previous
2    employment with other employers?
3    A.    The stuff that I turned in?  Are you talking
4    about the stuff that we brought in today and
5    yesterday for the business?
6    Q.    You brought in -- I've got some
7    documentation --
8    A.    From Wal-Mart and the business.
9    Q.    That's correct.  For two months of your
10   employment.  Excuse me.  I got an account
11   statement from one --
12   A.    Alabama Telco.
13   Q.    For August and September.
14   A.    From Alabama Telco, right?
15   Q.    Correct.  For August and September of 2006,
16   correct?
17   A.    Right.
18   Q.    Okay.  I have received nothing for 2005 when
19   you began your business.
20   A.    Okay.
21   Q.    And you say that you started working at
22   Wal-Mart at the end of September; and you provided
23   me with a pay stub for that time period, correct?

Page 106

1    A.    Okay.
2    Q.    And do you have any document relating to any
3    other employment that you've ever had?
4    A.    No.
5    Q.    And Ms. McDowell testified that there is a
6    second bank account for your business with the
7    Army Aviation Credit Union; is that correct?
8    A.    Yes, ma'am.
9    Q.    Do you have documentation related to that
10   bank account?
11   A.    No.
12   Q.    You have nothing related to that account?
13   A.    No.
14   Q.    Is Ms. McDowell the only person that will
15   have documentation relating to that account?
16   A.    Yes.
17   Q.    Are there any other bank accounts that you
18   have related to your business?
19   A.    No.
20   Q.    Have you provided your attorney with
21   documents in response to No. 18?
22   A.    I don't have any.
23   Q.    Have you provided your attorney with all

Page 107

1    documents that you have responsive to No. 20?
2    A.    That I've located, yes.
3    Q.    Which documents have you given to your
4    attorney that are responsive to No. 20, Ms.
5    Sanders?
6    A.    I can't recall right now.
7    Q.    I'm handing you what I marked during Ms.
8    McDowell's deposition as Defendant's Exhibit 23.
9         Have you seen Defendant's Exhibit 23 before
10   today?
11   A.    Yes.
12   Q.    Can you tell me what Defendant's Exhibit No.
13   23 is, please, ma'am?
14   A.    I'm sorry?
15   Q.    Would you tell me what Defendant's Exhibit
16   No. 23 is, please?
17   A.    Plaintiffs' Answer to Request for
18   Production.
19   Q.    And you say that you have reviewed
20   Defendant's Exhibit 23 before today?
21   A.    These notes, yes.
22   Q.    Okay.  Now, Ms. McDowell testified that
23   documents RFP 001 through 004 are documents that

Page 108

1    you created; is that correct?
2    A.    Yes.
3    Q.    Why did you create these handwritten notes?
4    A.    This was a list I had started of all the
5    people that knew about us being singled out at
6    Farley.
7    Q.    Excuse me?
8    A.    There was a list I started of people that
9    knew of us being singled out at Farley.
10   Q.    When did you create this list?
11   A.    I don't remember.
12   Q.    Did you write the entire list at one time?
13   A.    Doesn't look like it.  I don't remember.
14   Q.    At the top of the list you have Shannon
15   Brown?
16   A.    Uh-huh.
17   Q.    Is that the relative that we talked about
18   earlier?
19   A.    Yes.
20   Q.    Okay.  What would Shannon Brown know about
21   your being singled out?
22   A.    I spoke to Shannon I know at least twice.  I
23   can't remember if the whole situation as far back

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

Page 109

1   as Don Grissette was discussed. But I do know
2   that the last time I spoke to her, I can recall,
3   was about the new foremens and how they were
4   taking over where the other ones left off.
5       And I remember her asking me did I speak to
6   Deborah; and I told her that I did and nothing was
7   being done. I told her that I told Deborah about
8   the old foremen giving new foremen names of people
9   to look out for, to check behind and stuff like
10  this.
11      Yeah, she knew some of the stuff that was
12  going on.
13  Q.   Is she still employed at the plant?
14  A.   I have no idea.
15  Q.   You don't know?
16  A.   No.
17  Q.   When was the last time you spoke with Ms.
18  Brown?
19  A.   I can't remember.
20  Q.   Have you spoken with her since you left
21  Plant Farley?
22  A.   No.
23  Q.   Cheri Collins. Can you tell me — I'm

---

Page 110

1   sorry. I'm having trouble reading this.
2       Would you please read to me what you wrote
3   about Cheri Collins?
4   A.   It says that she was the one that informed
5   me that Don — of Don having the wrong perception
6   of us, which led to us scheduling a meeting with
7   Don.
8   Q.   When did Ms. Collins have this conversation
9   with you?
10  A.   The day of that meeting or the day before
11  that meeting. Because when she told me, if I'm
12  not mistaken, we were getting ready to get
13  everything staged, different jobs, getting ready
14  for an outage.
15      And I believe I ran into her and I asked her
16  if that was something that I needed to do right
17  away or wait until everybody was not so busy. And
18  she said to not let any — I think her words were,
19  "Don't let any grass grow under this. Go ahead
20  and talk to him."
21  Q.   Okay. Was this conversation with Ms.
22  Collins before or after the Tim Wilson incident?
23  A.   After.

---

Page 111

1   Q.   Okay. And did you speak with her in person
2   or by phone?
3   A.   In person those times.
4   Q.   Was this at the same time that you went in
5   and talked to her about the John Wright?
6   A.   No, ma'am.
7   Q.   That was a separate occasion?
8   A.   Right.
9   Q.   Was she just down visiting the plant on this
10  occasion?
11  A.   On the occasion that I asked her if I needed
12  to wait or go ahead and schedule a meeting, I
13  believe she was coming to the service building to
14  go to the cafeteria.
15      I can't remember where or when it was that
16  she told me about Don having the wrong perception
17  of us.
18  Q.   Did she tell you what Mr. Grissette's
19  perception of you was?
20  A.   I can't remember. I can't remember how she
21  put it.
22  Q.   Okay. You wrote down Mike Hall. That's
23  what it looks like. And then you didn't write

---

Page 112

1   anything beside that name. Who is Mike Hall?
2   A.   He's a union member. And I can't remember
3   what I was going to write.
4   Q.   Do you know why you didn't write anything
5   beside his name?
6   A.   No.
7   Q.   It looks like the next name is Anna Jerry?
8   A.   Right.
9   Q.   Who is Anna Jerry?
10  A.   She was our union rep with the incident with
11  Tim Wilson.
12  Q.   Okay. Why do you have a "1" circled next to
13  Ms. Jerry's name?
14  A.   I was going to redo this and try to put
15  everybody in order of how everything started.
16  Like Anna, she had knowledge from the very
17  beginning because she was our union rep with Tim.
18  Q.   So you were going to put this in a
19  chronological order?
20  A.   Somewhat.
21  Q.   Okay.
22      MR. NEWMAN:  Off the record.
23      (An off-the-record discussion

---

28 (Pages 109 to 112)

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

Page 113

1    was held.)
2        THE VIDEOGRAPHER: We're going off the
3    record. The time is 5:03 p.m.
4        (A brief recess was taken.)
5        THE VIDEOGRAPHER: The time is 5:16
6    p.m., and this concludes today's portion of the
7    deposition of Stephanie Sanders. We're going off
8    the record. The time is 5:16 p.m.
9        (The proceedings were adjourned
10        at 5:16 p.m., to the following
11        day, November 3, 2006, at 8:37 a.m.)
12        THE VIDEOGRAPHER: Here begins
13    Videotape No. 3 on Day 2 of the deposition of
14    Stephanie Sanders.
15        We are going on the record. The time is
16    8:37 a.m., on Friday, November 3rd, 2006.
17        (Defendant's Exhibit No. 11 was
18        marked for identification and a
19        copy of the same is attached
20        hereto.)
21    (BY MS. SHARP)
22    Q.    Ms. Sanders, your attorney handed me as we
23    began your deposition this morning, or just before

---

Page 114

1    we began the deposition this morning, a certified
2    mail postal card. I've marked it as Defendant's
3    Exhibit 11 to your deposition.
4        Can you tell me what this card is, ma'am?
5    A.    The receipt from the EEOC receiving my
6    complaint.
7    Q.    Where is the complaint that you say you sent
8    to the EEOC?
9    A.    I still didn't find the letter, but I'm
10    looking for it.
11    Q.    Yesterday I was asking you questions
12    regarding your handwritten notes that we marked as
13    part of Exhibit 23. I want to pick up where we
14    left off in asking you about your notes.
15    A.    Okay.
16    Q.    I think we had discussed, before we broke
17    last night, Anna Jerry would have been the last
18    person I think I asked you about. And you
19    explained to me why you included her in your
20    notes.
21    A.    Yes.
22    Q.    Okay. I'd like you to tell me why you
23    included Tammy Shaddix.

---

Page 115

1    A.    Tammy came to me and told me about some
2    statements that Don Grissette had made. I
3    included her because she was aware of how he was
4    singling us out.
5    Q.    What statements did she tell you Don
6    Grissette had made?
7    A.    That he made the statement to the foremen
8    that he was sick of seeing Janell and I together.
9    Q.    What other statements?
10    A.    That's all I can recall right now.
11    Q.    Did she tell you why he said he was sick of
12    seeing the two of you together?
13    A.    No. Just said that he made the statement.
14    Q.    Did she tell you on how many occasions he
15    made that statement?
16    A.    No.
17    Q.    Do you recall when she said he made that
18    statement?
19    A.    No.
20    Q.    When did she tell you he made the statement?
21    A.    Around the same time that all this was going
22    on, around the time that we had met with Don.
23    Q.    Well, when was that?

---

Page 116

1    A.    Shortly after the incident with Tim Wilson.
2    Q.    And you said the incident with Tim Wilson
3    happened on April Fool's Day 2004, correct?
4    A.    Correct.
5    Q.    And let me ask you this, since we're talking
6    about this subject, to clarify a point: It was
7    mentioned that Tim Wilson went to Don Grissette
8    and told Don Grissette to essentially single the
9    two of you out or to separate the two of you; is
10    that correct? Is that your understanding?
11    A.    Right.
12    Q.    When did Mr. Wilson go to Don Grissette, to
13    your understanding, in relation to the time that
14    you and Ms. McDowell went and complained about Tim
15    Wilson?
16    A.    I have no idea.
17    Q.    You don't know whether it was before?
18    A.    I would think it would be after.
19    Q.    Okay. When you and Ms. McDowell went to
20    complain about Tim Wilson, who did you speak with?
21    A.    Don Grissette.
22    Q.    Was there anyone other than the three of you
23    in the room?

---

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

| Page 117 | Page 119 |
|---|---|

Page 117

1  A.  No.
2  Q.  And you told me yesterday what you recall
3  saying to Don Grissette. Tell me what you recall
4  him saying to you in that meeting.
5  A.  He said that he would handle the situation
6  with Tim as far as his behavior towards us.
7  Q.  Did he say anything else in that meeting?
8  A.  That's the gist of it.
9  Q.  And this was the meeting in which you had
10  gone to Mr. Grissette to complain about Tim
11  Wilson, correct?
12  A.  Right.
13  Q.  Ms. McDowell had mentioned that you also had
14  -- the two of you had had a meeting with Don
15  Grissette whereby you confronted him about being
16  singled out. When did that meeting take place?
17  A.  It's all in the same time frame.
18  Q.  Would that meeting have taken place though
19  after you had gone to him to complain about Tim
20  Wilson?
21  A.  About us being singled out, yes.
22  Q.  And who accompanied you and Ms. McDowell in
23  the meeting in which you went to confront Don

Page 119

1  Q.  And you said, at first, he would not -- he
2  did not say that he had restrictions on you?
3  A.  Right.
4  Q.  What did he say at first? And maybe it
5  would be better if you tell me what happened once
6  you went into Don Grissette's office, so that we
7  can have it clear for the record who said what
8  when.
9  A.  We basically, when we went to meet with him
10  then, we went because of the treatment that we
11  were getting from the foremen.
12  Q.  And this is treatment we've already gone
13  through?
14  A.  Right. We've already discussed it.
15  Q.  Okay. So tell me what you said to Mr.
16  Grissette.
17  A.  Basically, just asked why were we being
18  treated the way we were being treated. Because,
19  you know, I was told from Deborah that we were
20  being singled out, that management wanted us
21  written up.
22  Q.  And what did he say to you?
23  A.  He basically questioned as far as us working

Page 118

1  Grissette about being singled out?
2  A.  No one.
3  Q.  Just the three of you met?
4  A.  Right.
5  Q.  What did Don Grissette say in the meeting
6  when you confronted him about being singled out?
7  A.  I stated that yesterday. When he said that,
8  yes, he had restrictions on us; but when he went
9  to the foremen, no one challenged him on our
10  behalf.
11  Q.  What kind of restrictions did he say he had
12  put on you?
13  A.  He didn't.
14  Q.  You didn't ask him?
15  A.  Well, in the beginning of the meeting, he
16  did not mention that he had restrictions on us.
17  As we walked out, he looked at Janell and saw that
18  Janell was not satisfied with the meeting. And he
19  called her back -- called us back -- and told us
20  to sit back down.
21  And he said, Yes, I did have restrictions on
22  y'all, but it's because no one challenged me when
23  I went to them.

Page 120

1  together, and why is it that he saw us together
2  more than other people that worked together.
3  And we told him that it was because we were
4  constantly being assigned to the routines, which
5  put us in his work area.
6  And we told him that there were times that
7  we had jobs where we were supposed to be outside,
8  and they put us back on routines.
9  And we explained that there were several
10  people that worked together and had been working
11  together much longer than Janell and I. But he
12  saw us more together because we were constantly
13  put on routines.
14  Q.  And what did he say in response to that?
15  A.  He said that he would look into it.
16  Q.  And did he say anything else?
17  A.  The situation with the cafeteria came up
18  again. And he asked why were we not allowed. He
19  said, If you're working in this area, he said, It
20  would make more sense for you to eat in the
21  cafeteria so you wouldn't have to spend all that
22  time going back down to B&G then and coming all
23  the way back up here.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 121

1    And he said he would look into everything
2  and get back to us.
3  Q.  You said yesterday that you told Mr.
4  Grissette that you and Ms. McDowell were being
5  picked on because of race.  And correct me if I'm
6  wrong.  Did you not say that?
7  A.  I said because of being black and female.
8  Q.  Black and female.
9  A.  Right.
10  Q.  Okay.  And what did Mr. Grissette say in
11  response to that?
12  A.  Nothing.
13  Q.  When Mr. Grissette said that it makes more
14  sense for you to eat in the cafeteria, I guess I'm
15  not sure about what would be the alternative to
16  the two of you eating in the cafeteria.
17    Where else would you eat while you're at
18  work?
19  A.  Down at Buildings and Grounds.
20  Q.  Is that a separate designated area?
21  A.  Right.
22  Q.  Is there anything else that you believe
23  Tammy Shaddix would know that could support your

Page 122

1  allegations in this lawsuit, besides what you have
2  already told me?
3  A.  Do I believe there's anything else she might
4  know?
5  Q.  Yes, ma'am.
6  A.  I'm sure she does.  She was a job steward
7  for a long time.  She had a good relationship with
8  the foremen.
9  Q.  But is there anything in particular you
10  believe that she would know that would be in
11  support of your allegations?
12  A.  I wouldn't know.
13  Q.  And you have Don Grissette next on your
14  list.
15  A.  Right.
16  Q.  Have you told me the reasons that you
17  included Mr. Grissette?
18  A.  Yes.
19  Q.  Deborah Crutchfield is the next person that
20  you list.  Have you told me the reasons that you
21  would have included Deborah?
22  A.  We've discussed it, yes.
23  Q.  Bill Barber, same question:  Have you told

Page 123

1  me the reasons you would have included him on your
2  list?
3  A.  Yes, we've been over that.
4  Q.  Joe Walden is the next person that you
5  identify.
6  A.  Yes.  Joe Walden, when he came to the group,
7  he would check behind me and Janell, go on
8  observations with us.
9    And he made the statement to us that we were
10  given a raw deal as far as the way we were being
11  treated, because we were good workers.
12  Q.  Did he make work assignments to the two of
13  you?
14  A.  No.
15  Q.  And you mentioned earlier that you and Ms.
16  McDowell were often assigned to Mr. Grissette's
17  building, and that's why he saw you more often
18  than not?
19  A.  Right.
20  Q.  So does this mean that after he placed
21  restrictions on the two of you, you two were still
22  being assigned to work together?
23  A.  On certain jobs.

Page 124

1  Q.  Did management change either one of your
2  shifts so that you could not work together, after
3  these restrictions were placed on the two of you?
4  A.  No.  We were assigned schedule by seniority.
5  Q.  To your knowledge, did management make an
6  effort to change your schedules that you signed on
7  to?
8  A.  According to the union contract, they can't.
9  Q.  But, to your knowledge, did they try?
10  A.  I have no idea.
11  Q.  Have you told me everything that you believe
12  Joe Walden would know or be able to say to support
13  your allegations in this lawsuit?
14  A.  Yes.
15  Q.  Don Hunter.  You've identified him.  Tell me
16  what Mr. Hunter would be able to say in support of
17  your allegations.
18  A.  Don Hunter was our union rep when we went in
19  with Cliff Buck where Cliff -- where Richard
20  Bryant made a statement to Cliff Buck that he
21  could go ahead and speak freely because Don had
22  already told us about the restrictions against us.
23  He was also my union rep in the meeting with Jim

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

Page 125

1  Parrish.
2  Q.  Which meeting are you talking about?
3  A.  For my discipline.
4  Q.  Anything else with Mr. Hunter?
5  A.  Not that I can recall right now.
6  Q.  Mike Jackson.  Who is Mike Jackson?
7  A.  Mike is a union member.  He was -- I put him
8  because he went with Janell when she was
9  terminated.
10  Q.  Any other reason you included him on your
11  list?
12  A.  He -- I put him because he was a witness
13  also in that meeting to them stating that Janell
14  was terminated for not speaking to management.
15  Q.  Was he your union representative in that
16  meeting?
17  A.  He was Janell's.
18  Q.  Is that Tommy Swift?
19  A.  Yes.
20  Q.  Tell me why you include Tommy Swift.
21  A.  He was the union rep that went with Janell
22  when she was initially disciplined.
23  Q.  Is there any other reason you include Mr.

Page 126

1  Swift on your list?
2  A.  No.
3  Q.  Darrol Johnson?
4  A.  Yes.  He's a helper.  And I put him for the
5  statements that he made to us as far as him having
6  knowledge of us being singled out.
7  Q.  Tell me what specific knowledge he would
8  have about you being singled out.
9  A.  He knew about them trying to write us up.
10  And he came and made a statement that they were
11  really going to be after us now because they
12  weren't able to make that write-up stick.
13  Q.  How did he know about the effort to write
14  you up?
15  A.  I have no idea.
16  Q.  Did you talk to him about it?
17  A.  No.  He came to me.
18  Q.  Do you know if Ms. McDowell talked to him
19  about it?
20  A.  She might have been present when he came to
21  me.
22  Q.  Is there any other reason you included
23  Darrol Johnson on your list?

Page 127

1  A.  No.
2  Q.  How soon after you say management tried to
3  write you up was it that he came and talked to you
4  about that?
5  A.  Maybe two or three days later.
6  Q.  Okay.  Tell me why you included Phillip
7  Avery on your list.
8  A.  Because Luan Stevens told me that Phillip
9  made the statement to her that the old foremen
10  were giving him names of people to watch out for.
11  Q.  What names did Ms. Stevens say the old
12  foremen had given to Mr. Avery?
13  A.  She said he gave him names, and Janell and I
14  were two of the names that were given.  Who else,
15  I don't know.
16  Q.  How did she know that the old foremen gave
17  Phillip Avery names?
18  A.  Phillip told her.
19  Q.  How do you know that?
20  A.  She told me.
21  Q.  When was it that she talked to you about
22  this?
23  A.  I'm not sure.  Shortly after they came over.

Page 128

1  Q.  Have you told me what you believe Shelley
2  Murrell might know or have to say to support the
3  allegations in your lawsuit?
4  A.  I believe so.
5  Q.  Phyllis Hughes is, I think, the last person
6  on your list.
7  A.  Yes.
8  Q.  Have you told me why you've included Phyllis
9  on this list, previously?
10  A.  I believe so.
11  Q.  And when was the last time you spoke with
12  Ms. Hughes?
13  A.  I'm not sure.
14  Q.  How many times have you spoken with her
15  since you left -- since you left Plant Farley?
16  A.  I'm not sure.
17  Q.  More than five?
18  A.  Maybe.
19  Q.  Do you consider Ms. Hughes a friend of
20  yours?
21  A.  Yes.
22  Q.  Do you consider Luan Stevens a friend of
23  yours?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

Page 129

1  A.  Coworker.
2  Q.  A former coworker?
3  A.  Yes.
4  Q.  And you certainly consider Ms. McDowell a
5  friend of yours?
6  A.  Yes.
7  Q.  What year did you go to work at Plant
8  Farley, Ms. Sanders?
9  A.  I believe in '99.
10  Q.  What position were you hired into?
11  A.  Helper.
12      (Defendant's Exhibit No. 12 was
13      marked for identification and a
14      copy of the same is attached
15      hereto.)
16  Q.  I am handing you and your attorney a copy of
17  what I've marked as Defendant's Exhibit 12 to your
18  deposition.
19      Would you take a minute and look at that and
20  tell me if you recognize Defendant's Exhibit 12,
21  please?
22  A.  Yes.
23  Q.  What is Defendant's Exhibit 12?

---

Page 130

1  A.  Evaluation.
2  Q.  Do you recall reviewing this evaluation
3  during your employment at Plant Farley?
4  A.  Yes.
5  Q.  And is this an evaluation for you for the
6  period from October 1999 to March 2000?
7  A.  Yes.
8  Q.  Would you consider this to be a good
9  evaluation?
10  A.  Yes.  As a new employee, I do.
11  Q.  Excuse me?
12  A.  As a new employee, yes, I do.
13  Q.  Who was your immediate supervisor during
14  this work period?
15  A.  Alan Morrow.
16  Q.  And who was the reviewing supervisor during
17  this work period?
18  A.  I don't recall, and I can't read the
19  signature.
20  Q.  Okay.  What race is Mr. Morrow?
21  A.  White.
22      (Defendant's Exhibit No. 13 was
23      marked for identification and a

---

Page 131

1      copy of the same is attached
2      hereto.)
3  Q.  I'm now handing you and your attorney what
4  I've marked as Defendant's Exhibit 13 to your
5  deposition.
6      Tell me if you recognize Defendant's Exhibit
7  13 as your performance evaluation and plan for the
8  work year beginning March 2000 and ending March
9  2001.
10  A.  Yes.
11  Q.  Who was your immediate supervisor for this
12  work period?
13  A.  Dennis Teat.
14  Q.  And what race is Mr. Teat?
15  A.  White.
16  Q.  And who was your reviewing supervisor?
17  A.  Richard Bryant.
18  Q.  And what race is Mr. Bryant?
19  A.  White.
20  Q.  And in this evaluation, like your previous
21  evaluations, you received marks indicating that
22  you met -- you were at expectations in all
23  categories; is that correct?

---

Page 132

1  A.  Yes.
2  Q.  Is that your handwriting on the front page
3  of the evaluation, in the block marked,
4  "Developmental Action Plan"?
5  A.  Yes.
6  Q.  Did you agree with this evaluation?
7  A.  Yes.
8  Q.  What is PPP, Ms. Sanders?
9  A.  I can't think of what it stands for, but
10  it's a performance incentive check.
11  Q.  Did you ever receive PPP while you were
12  employed at Plant Farley?
13  A.  Received the regular PPP, not the one for
14  top performer.
15  Q.  Are you aware if there were employees who
16  received no PPP?
17  A.  Am I aware of any?
18  Q.  Are you aware that there are employees who
19  did not receive any PPP in any given year?
20  A.  No, I don't know of anyone.
21  Q.  Do you know whether the Plant Farley rating
22  structure provides for a person to not receive PPP
23  if they are rated below a certain level?

---

33 (Pages 129 to 132)

Page 133

1   A.   I don't know about a certain level.  I've
2   understood that if they were on a certain
3   discipline, they wouldn't.  But I don't know
4   exactly how that works.
5   Q.   Are you aware that Phyllis Hughes, in some
6   years, did not receive PPP?
7   A.   No, I'm not.
8   Q.   She never told you that?
9   A.   No.
10  Q.   You said she is a friend of yours, correct?
11  A.   Yes.  If she told me, I don't remember.
12       (Defendant's Exhibit No. 14 was
13       marked for identification and a
14       copy of the same is attached
15       hereto.)
16  Q.   I'm handing you and your attorney a document
17  that I've marked as Defendant's Exhibit 14.
18       Do you recognize Defendant's Exhibit 14 as
19  your evaluation, Ms. Sanders, for the year
20  beginning January 2001 and ending December 2001?
21  A.   Yes.
22  Q.   Who was your immediate supervisor during
23  this work period?

Page 134

1   A.   B.J. Yance.
2   Q.   And what race is Mr. Yance?
3   A.   White.
4   Q.   And who was your reviewing supervisor?
5   A.   Richard Bryant.
6   Q.   And in this work year, as in the two
7   previous work years, you received all "meets or
8   exceeds expectations," in every category; is that
9   correct?
10  A.   Yes.
11  Q.   And, in fact, you wrote that you agreed with
12  the above statements reflecting your overall
13  performance, correct?
14  A.   Correct.
15  Q.   On the front page of the performance
16  evaluation and plan, there is a block labeled,
17  "Developmental Action Plan."  Do you see that?
18  A.   Yes.
19  Q.   Did you have input into the goals for this
20  action plan?
21  A.   I believe this was already typewritten when
22  I got my evaluation.
23  Q.   Did you disagree with any of these goals in

Page 135

1   the action plan?
2   A.   No.
3        (Defendant's Exhibit No. 15 was
4        marked for identification and a
5        copy of the same is attached
6        hereto.)
7   Q.   I'm handing you and Mr. Newman what I have
8   marked as Exhibit 15 to your deposition.
9        Ms. Sanders, is Defendant's Exhibit 15 a
10  copy of your performance evaluation and plan for
11  the work year beginning January 2002 and ending
12  December 2002?
13  A.   Yes.
14  Q.   And who was your immediate supervisor for
15  this work period?
16  A.   Deborah Crutchfield.
17  Q.   And we've already identified Ms.
18  Crutchfield's race as Caucasian; is that correct?
19  A.   Correct.
20  Q.   And who is your reviewing supervisor?
21  A.   Richard Bryant.
22  Q.   Take a minute and look at the Overall
23  Performance description on page 4 in the top block

Page 136

1   of this performance plan, and tell me if you agree
2   with the assessment of your overall performance.
3        (The witness examines the
4        document.)
5   A.   Yes.
6   Q.   Was this the first year that Deborah
7   Crutchfield was your foreman or immediate
8   supervisor?
9   A.   I believe so.
10  Q.   And looking at page 2 of this exhibit, you
11  received for this work year more "above
12  expectations" than "at expectations" as a rating;
13  is that correct?
14  A.   Correct.
15  Q.   Do you agree with the Developmental Action
16  Plan items that are noted on page 1?
17  A.   Yes.
18       (Defendant's Exhibit No. 16 was
19       marked for identification and a
20       copy of the same is attached
21       hereto.)
22  Q.   I'm handing you, Ms. Sanders, and your
23  lawyer a copy of what I've marked as Defendant's

34 (Pages 133 to 136)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

| Page 137 | Page 139 |
|---|---|

**Page 137**

1  Exhibit 16 to your deposition.
2      Do you recognize Defendant's Exhibit 16 to
3  be a copy of your performance evaluation and plan
4  for the year beginning January 2003 and ending
5  December 2003?
6  A.   Yes.
7  Q.   Who was your immediate supervisor during
8  this period?
9  A.   Deborah Crutchfield.
10  Q.   And who was your reviewing supervisor?
11  A.   Joe Walden.
12  Q.   Take a look at the Overall Performance
13  comments for you on page 4 of the evaluation and
14  tell me if you agree with this assessment of your
15  performance.
16      (The witness examines the
17          document.)
18  A.   Yes.
19  Q.   And if you would, ma'am, please take a look
20  at the Developmental Action Plan block on page 1
21  and tell me if you agree with the items listed as
22  goals for you.
23  A.   Yes.

**Page 139**

1  time?
2  A.   Mark Freeman.
3  Q.   Okay.  And if you will look on page 4, which
4  is the final page of this summary, at
5  Developmental Achievements that are listed, would
6  you tell me if you agree with the comments there?
7  A.   Yes.
8  Q.   On the first page of the exhibit, under
9  Employee Comments, it looks like you wrote in a
10  comment.
11      Can you tell me what it was that you wrote?
12  A.   I believe it's, "Results achieved," the
13  number "1," and then, "Can't recall."
14  Q.   Do you know what you meant by that?
15  A.   (No response.)
16  Q.   On the second page of the summary, there is
17  a Results Achieved heading.  And the first comment
18  is: "Produces satisfactory work and meets
19  productivity goals. Stephanie produces quality
20  work. For example, during performance of a
21  housekeeping item, Stephanie desired the cleanup
22  process in the spent fuel pool ventilation room be
23  improved."

**Page 138**

1      (Defendant's Exhibit No. 17 was
2          marked for identification and a
3          copy of the same is attached
4          hereto.)
5  Q.   I'm handing you and Mr. Newman a copy of —
6  oh, sorry.
7      THE VIDEOGRAPHER:  Do you want to go
8  off the record for a second?
9      MS. SHARP:  Please.
10      THE VIDEOGRAPHER:  We are going off the
11  record. The time is 9:12 a.m.
12      (A brief recess was taken.)
13      THE VIDEOGRAPHER:  We are back on the
14  record. The time is 9:20 a.m.
15  (BY MS. SHARP)
16  Q.   Ms. Sanders, I just handed you and Mr.
17  Newman a copy of what I've marked as Defendant's
18  Exhibit 17.
19      Do you recognize this as a performance
20  summary for you for the mid year discussion on the
21  date of August 17, 2004?
22  A.   Yes.
23  Q.   And who was your supervisor at this point in

**Page 140**

1      Was that what you were referring to?
2  A.   Yes.
3  Q.   You didn't recall that?
4  A.   No.
5  Q.   Do you recall anything related to that
6  event?
7  A.   No.
8      (Defendant's Exhibit No. 18 was
9          marked for identification and a
10          copy of the same is attached
11          hereto.)
12  Q.   I am now handing you and Mr. Newman a copy
13  of what I've marked as Defendant's Exhibit 18 to
14  your deposition, Ms. Sanders.
15      Do you recognize Defendant's Exhibit 18 to
16  be a copy of your performance evaluation and plan
17  for the work year beginning January 2004 and
18  ending December 2004?
19  A.   Yes.
20  Q.   And who was your immediate supervisor for
21  this work period?
22  A.   Mark Freeman.
23  Q.   And who was your reviewing supervisor?

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

Page 141

1   A.   Deborah Crutchfield.
2   Q.   Take a minute and look at the Overall
3   Performance comments that are on page 4 of this
4   exhibit, and tell me if you agree with this
5   assessment of your overall performance for this
6   work year.
7   A.   Yes.
8   Q.   If you would, look on page 1 of this
9   assessment and tell me if you agree with the
10  Developmental Action Plan items that are listed
11  there.
12  A.   Yes.
13  Q.   Do you recall receiving an incentive payment
14  for this work year, Ms. Sanders, 2004?
15  A.   A PPP check?
16  Q.   Yes, ma'am.
17  A.   Yes.
18  Q.   Do you recall if it was a check -- a gross
19  check for $6,641 for the 2004 work year?
20  A.   I don't recall the amount.
21  Q.   Do you recall receiving an incentive check,
22  a PPP check, for the work year 2003?
23  A.   Yes.

---

Page 142

1   Q.   And do you recall the gross amount of that
2   check being over $6,000 as well?
3   A.   I don't recall how much.
4        (Defendant's Exhibit No. 19 was
5        marked for identification and a
6        copy of the same is attached
7        hereto.)
8   Q.   I've handed you an exhibit that I've marked
9   as Exhibit 19 to your deposition.
10       If you would, take a look at that exhibit
11  and tell me if you recognize that as your
12  performance plan and evaluation for the work year
13  beginning January 2005 and ending December 2005.
14  A.   Yes.
15  Q.   And you -- your employment with Southern
16  Nuclear-Plant Farley was terminated before the end
17  of 2005; is that correct?
18  A.   Say that again. I'm sorry.
19  Q.   Your employment with Southern Nuclear
20  Operating Company-Plant Farley was terminated
21  before the end of 2005; is that correct?
22  A.   Correct.
23  Q.   So I would expect that you do not have any

---

Page 143

1   knowledge of this plan or its contents after the
2   mid year discussion that you had with Mark Freeman
3   which you've dated July 13, 2005, on the front
4   page; is that correct?
5   A.   Right.
6   Q.   Up until July 13, 2005, tell me if you agree
7   with the assessment of your performance as an
8   employee that are reflected in this exhibit.
9        (The witness examines the
10       document.)
11  A.   You're asking about where they have X'd the
12  boxes on page 3?
13  Q.   I asked you: Up until mid year, your mid
14  year discussion with Mark Freeman, do you agree
15  with the assessment of your performance?
16  A.   Yes.
17  Q.   Okay.
18       (Defendant's Exhibit No. 20 was
19       marked for identification and a
20       copy of the same is attached
21       hereto.)
22  Q.   I'm handing you and your attorney what I've
23  marked as Defendant's Exhibit 20 to your

---

Page 144

1   deposition.
2        Would you please identify Defendant's
3   Exhibit 20, Ms. Sanders?
4   A.   Looks like a grievance that was filed by
5   A.G. James.
6   Q.   Is it filed on your behalf?
7   A.   Yes.
8   Q.   Related to your termination?
9   A.   Yes.
10  Q.   Had you seen a copy of that grievance prior
11  to today?
12  A.   No.
13       MR. NEWMAN: I'm sorry. Did you say
14  no?
15       THE WITNESS: I don't recall seeing it.
16       MR. NEWMAN: I just didn't hear you.
17       THE WITNESS: Oh. I'm sorry.
18       MS. SHARP: I heard you say no.
19       (Defendant's Exhibit No. 21 was
20       marked for identification and a
21       copy of the same is attached
22       hereto.)
23  Q.   I am handing you what I've marked as

---

36 (Pages 141 to 144)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

## Page 145

1 Defendant's Exhibit 21.
2      Would you tell me if you recognize
3 Defendant's Exhibit 21?
4 A.   It's also a grievance.
5 Q.   Had you seen that grievance before today?
6 A.   Not that I remember.
7 Q.   Was it filed on your behalf?
8 A.   Yes.
9 Q.   And it was related to your discipline that
10 you received in August 2005?
11 A.   Yes.
12 Q.   Okay.
13      (Defendant's Exhibit No. 22 was
14      marked for identification and a
15      copy of the same is attached
16      hereto.)
17 Q.   I'm handing you and your attorney a copy of
18 what I've marked as Defendant's Exhibit 22 to your
19 deposition.
20      What is Defendant's Exhibit 22, Ms. Sanders?
21 A.   Orientation checklist.
22 Q.   Are those your initials at the bottom of the
23 checklist?

## Page 146

1 A.   Yes.
2 Q.   Were you, in fact, hired at Plant Farley on
3 October 18th, 1999?
4 A.   Yes.
5      (Defendant's Exhibit No. 23 was
6      marked for identification and a
7      copy of the same is attached
8      hereto.)
9 Q.   I'm handing you and Mr. Newman a copy of
10 what I've marked as Defendant's Exhibit 23 to your
11 deposition.
12      Would you take a minute and look at
13 Defendant's Exhibit 23 and tell me if you
14 recognize that as your application for employment
15 with Southern Nuclear Operating Company?
16 A.   Yes.
17 Q.   On page 3 of Defendant's Exhibit 23, your
18 employment history is reflected.  Did you complete
19 that employment history?
20 A.   Yes.
21 Q.   Looking at your entry for Sony?
22 A.   Yes.
23 Q.   And the reason for leaving, it's stated,

## Page 147

1 "Could no longer work 12 hour nights at the time."
2 A.   Right.
3 Q.   Why was that?
4 A.   My grandfather was ill and I was helping
5 care for him.
6 Q.   Okay.  And you resigned your employment from
7 Sony; is that correct?
8 A.   Yes.
9 Q.   In fact, you just stopped coming to work at
10 Sony, did you not?
11 A.   No.
12 Q.   Do you dispute Sony's records that you
13 stopped reporting to work?
14 A.   Yes, I do.
15 Q.   How did you resign?
16 A.   I resigned with Robert Clark, my immediate
17 supervisor.
18 Q.   Did you submit a letter of resignation to
19 Sony?
20 A.   I think I signed paperwork.
21 Q.   Are you aware that you are not eligible for
22 rehire at Sony?
23 A.   No, I didn't.

## Page 148

1 Q.   Who did you say was your supervisor?
2 A.   Robert Clark.
3      (Defendant's Exhibit No. 24 was
4      marked for identification and a
5      copy of the same is attached
6      hereto.)
7 Q.   I'm handing you and Mr. Newman an exhibit
8 that I've marked as Defendant's Exhibit 24 to your
9 deposition.
10      Is that a copy of the resume' that you
11 submitted, Ms. Sanders, to Southern Nuclear
12 Operating Company when you applied for employment?
13 A.   Looks like it.
14 Q.   Looking at your work history, there are some
15 breaks in employment history beginning July 1990
16 to January 1993.
17      Were you not employed during that time
18 period?
19 A.   I believe I was working with my father at
20 this time.
21 Q.   At the Sanders and Sons Tire?
22 A.   Yes.
23 Q.   Would your father have records reflecting

37 (Pages 145 to 148)

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 149

1  that you were employed with him at that time?
2  A.  I'm not sure; he might.
3  Q.  Also, you have a break in employment from
4  September 1995 until July of 1997. Can you
5  explain that?
6  A.  '95 to '97? I believe I was working with
7  him there as well.
8  Q.  Okay. And then a shorter break in
9  employment from December '97 to March '98.
10     Is that the -- what you previously explained
11  your reason for leaving Sony?
12  A.  That's correct.
13  Q.  Did you tell Ms. McDowell why Graven
14  Townsend was terminated?
15  A.  Did I tell her why?
16  Q.  Yes, ma'am.
17  A.  I don't know if I told her why. I know I
18  told her that he was.
19  Q.  So you did not tell her the reason he was
20  terminated?
21  A.  If I did, I don't remember right now.
22  Q.  Did you tell her the reason that Bobby White
23  was terminated?

Page 150

1  A.  I believe so.
2  Q.  What was the reason that Mr. White was
3  terminated?
4  A.  My understanding was from falling asleep on
5  the firewatch.
6  Q.  Could you repeat that?
7  A.  Falling asleep on continuous firewatch.
8  Q.  You didn't tell Ms. McDowell that he was
9  terminated for stealing meat out of the cafeteria?
10  A.  He wasn't terminated for that. That
11  happened two or three years ago.
12  Q.  Did you tell Ms. McDowell why Gamaska
13  Vickers was terminated?
14  A.  Could have.
15  Q.  What was the reason for Mr. Vickers'
16  termination?
17  A.  My understanding, for missing firewatch.
18  Q.  How did you come to learn of that reason for
19  his termination?
20  A.  I'm not sure, but I want to believe that
21  Chris Stovall told me.
22  Q.  Who is Chris Stovall?
23  A.  Helper.

Page 151

1  Q.  Is he a union representative?
2  A.  No.
3  Q.  Do you know how Mr. Stovall would know how
4  -- why Mr. Vickers was terminated?
5  A.  I don't know how he would know.
6  Q.  You testified yesterday that you did not
7  apply for unemployment compensation because
8  Phyllis Hughes told you that Plant Farley had
9  terminated your employment; is that correct?
10  A.  Say that again.
11  Q.  You told me that you had not applied for
12  unemployment compensation, number one, because you
13  had resigned from your employment at Plant Farley
14  in your mind, until Phyllis Hughes told you that
15  you had, in fact, been terminated, correct?
16  A.  Right.
17  Q.  Once you learned that your employment had
18  been terminated, did you apply for unemployment
19  compensation?
20  A.  No.
21  Q.  Why not?
22  A.  No reason.
23  Q.  Did you not need the money?

Page 152

1  A.  Yes.
2  Q.  Tell me all the places, Ms. Sanders, that
3  you have worked since you left your employment
4  with Southern Nuclear Operating Company-Plant
5  Farley.
6  A.  My cleaning business and with Wal-Mart.
7  Q.  You have not worked in your father's
8  business at any time?
9  A.  No.
10  Q.  What efforts have you made to find
11  employment since you left your employment with
12  Southern Nuclear-Plant Farley?
13  A.  I've been mostly trying to promote the
14  business.
15  Q.  Trying to promote your business?
16  A.  Right.
17  Q.  Did you register with the state unemployment
18  service?
19  A.  Yes.
20  Q.  When did you do that?
21  A.  I don't remember.
22  Q.  Was it in 2005, after you were separated
23  from Plant Farley?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

| Page 153 |
|---|
| 1   A.   It was either 2005 or the beginning of 2006. |
| 2   Q.   Have you applied with any other employers in |
| 3   the area for employment? |
| 4   A.   As far as applications? |
| 5   Q.   Yes, ma'am. |
| 6   A.   I can't remember.  I did some applications |
| 7   over the computer, but I can't remember.  I know I |
| 8   think Medical Center was one of them. |
| 9   Q.   Do you still have a copy of what you |
| 10   submitted via computer? |
| 11   A.   No. |
| 12   Q.   Do you have any records that would reflect |
| 13   your efforts to find employment since you |
| 14   separated from Plant Farley? |
| 15   A.   No. |
| 16        MR. NEWMAN:  You mean, other than her |
| 17   business records? |
| 18        MS. SHARP:  Excuse me? |
| 19        MR. NEWMAN:  Other than her business |
| 20   records? |
| 21        MS. SHARP:  Certainly. |
| 22        MR. NEWMAN:  Which we have already |
| 23   agreed to provide to you. |

| Page 154 |
|---|
| 1        MS. SHARP:  Correct.  That is correct. |
| 2   Q.   Have you taken any classes since you |
| 3   separated from Southern Nuclear? |
| 4   A.   No. |
| 5   Q.   Tell me about your efforts to promote your |
| 6   personal business. |
| 7   A.   We have mailed out postcards; we ran a |
| 8   commercial; we did a segment on the Ann Varner |
| 9   show. |
| 10   Q.   Anything else? |
| 11   A.   Not that I can recall. |
| 12   Q.   What is the Ann Varner show? |
| 13   A.   It's a local morning show. |
| 14   Q.   When did you do that show? |
| 15   A.   I don't recall. |
| 16   Q.   Did both you and Ms. McDowell appear on the |
| 17   show, or how did you promote your business on that |
| 18   show? |
| 19   A.   It was just myself. |
| 20   Q.   How many times have you appeared on the |
| 21   show? |
| 22   A.   Once. |
| 23   Q.   Have you taken out any business loans to |

| Page 155 |
|---|
| 1   assist you with your personal business? |
| 2   A.   No. |
| 3   Q.   Have you applied for any? |
| 4   A.   No. |
| 5   Q.   I am going to hand you what was marked |
| 6   during Ms. McDowell's deposition as Defendant's |
| 7   Exhibit 1. |
| 8        It is a copy of the Complaint that was filed |
| 9   in this case, Ms. Sanders, and ask you to take a |
| 10   minute and look at the Complaint. |
| 11        Have you reviewed the Complaint prior to |
| 12   today? |
| 13   A.   Yes. |
| 14   Q.   Do you agree with the accuracy of everything |
| 15   contained in the Complaint? |
| 16   A.   Just glancing over it, yes. |
| 17   Q.   Excuse me? |
| 18   A.   Glancing over it, yes. |
| 19   Q.   Well, I would like you to look, beginning at |
| 20   paragraph 6 of the Complaint, and I want to ask |
| 21   you a couple of questions about it. |
| 22   A.   Number 6? |
| 23   Q.   Yes, ma'am.  Page 2.  Do you agree with the |

| Page 156 |
|---|
| 1   accuracy of No. 6? |
| 2   A.   Yes. |
| 3   Q.   Number 7? |
| 4   A.   Yes. |
| 5   Q.   Okay.  Of paragraph 8? |
| 6   A.   Yes. |
| 7   Q.   And who was the female -- white female |
| 8   coworker that you are referring to in that |
| 9   sentence? |
| 10   A.   Tammy Caldwell. |
| 11   Q.   In paragraph 10, have we discussed the |
| 12   situations where white employees, who you say |
| 13   committed more egregious conduct, were not |
| 14   disciplined at all? |
| 15   A.   Yes. |
| 16   Q.   Have we likewise discussed, in paragraph 11, |
| 17   the whites who were not punished for serious |
| 18   offenses, but blacks are punished for minor or |
| 19   imagined offenses? |
| 20   A.   I'm not sure if we have or not. |
| 21   Q.   Okay.  Well, would you then, please, ma'am, |
| 22   tell me who you are referring to or who is |
| 23   referred to in that paragraph, so I can make sure |

39 (Pages 153 to 156)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 157

1  I've gotten all of those situations?
2  A.  I think you have all those on the list that
3  was turned in by Janell McDowell.
4  Q.  Okay.  So you will adopt what Ms. McDowell
5  has previously said regarding paragraph 11 of the
6  Complaint?
7  A.  Yes.
8  Q.  Yesterday you testified that you have
9  provided your attorney with a calculation of the
10  damages that you and Ms. McDowell have suffered
11  since the end of your employments with Southern
12  Nuclear Operating Company; is that correct?
13  A.  Yes.
14  Q.  Did those damages total a million dollars,
15  that you provided your attorney?
16  A.  Totaled over.
17  Q.  Excuse me?
18  A.  They totaled over.
19  Q.  Give me the number.  Tell me how much those
20  damages totaled.
21  A.  I don't have the figures in my head.
22  Q.  Did they total $4 million?
23  A.  I can't remember what the total was.

Page 158

1  Q.  What were the things that you included in
2  your calculation?
3  A.  The loss of salary from Farley.
4  Q.  Anything else?
5  A.  I can't recall without looking at it.
6  Q.  Are you claiming that the allegations you've
7  made against Plant Farley and Southern Nuclear
8  Operating Company has resulted in any physical
9  problems for yourself?
10  A.  No.
11  Q.  Are you claiming that the allegations
12  resulted in any emotional problems for you?
13  A.  Oh, yeah.
14  Q.  Tell me about those.
15  A.  Just -- not just since I left, but while I
16  was still employed.  You know, the treatment was
17  unbearable.
18     We even told Don Grissette in his office
19  that it was an embarrassment to us about our names
20  going all over the plant site and how people
21  would, you know, stop and jank with us about the
22  way that we were being treated.
23  Q.  And you say this began in April of 2004?

Page 159

1  A.  After that incident in the cafeteria,
2  somewhere around there.
3  Q.  What other emotional problems did you
4  experience?
5  A.  I mean, I can't put into words the way that
6  that whole ordeal, you know, how I felt during the
7  whole ordeal.  I can't put it into words.  I mean,
8  it was awful.  Nobody should have to work under
9  those conditions.
10  Q.  Why did you not file an employee concern?
11  A.  To my understanding from just questioning
12  Tom Pelham -- I believe that's -- Pelham, I
13  believe -- my understanding from him -- just not
14  saying that I had a complaint, but I did stop and
15  question the whole process -- my understanding is
16  when you file a concerns, it stops with Don
17  Grissette.  So he was the cause of all of it.
18  Q.  So Tom Pelham told you that if you filed an
19  employee concern, that --
20  A.  With Farley, it ends up with Don Grissette.
21  Q.  Why didn't you call the corporate concerns
22  program?
23  A.  Didn't feel comfortable in doing so.

Page 160

1  Q.  When did you speak with Tom Pelham?
2  A.  Like I said, I just -- in passing, I just
3  stopped and asked, you know, how the process
4  worked as far as filing a concern with him.
5  Q.  Did you ask him whether there was a
6  difference in the corporate concerns program?
7  A.  No.  I had heard so much about the corporate
8  concerns, like I say, I wasn't comfortable in
9  filing it.
10  Q.  What had you heard about the corporate
11  concerns?
12  A.  That once you do that, they target you more
13  than what the problem is.
14  Q.  Who told you that?
15  A.  It's just talk around the plant, you know,
16  in the union.
17  Q.  Why didn't you file a grievance with the
18  union over your treatment?
19  A.  Didn't think it would do any good.
20  Q.  Why did not you go to the EEOC, while you
21  were employed, about your treatment?
22  A.  Didn't occur to me.  Didn't think of it.
23  Q.  What prompted you to go to the EEOC after

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 161

1  you were separated from Plant Farley?
2  A.  Just -- I'm not sure.
3  Q.  Did Ms. McDowell talk you into doing that?
4  A.  No one talks me into doing anything.
5  Q.  Why didn't you use your contacts with the
6  NAACP to initiate some type of action?
7  A.  I'm not sure.
8  Q.  Have you received any treatment for the
9  emotional problems that you said you suffered as a
10 result of the allegations in the complaint?
11 A.  No.
12 Q.  Did any one of your supervisors, Ms.
13 Sanders, tell you that you were being treated
14 fairly -- unfairly -- because of your race?
15 A.  Any of my supervisors?
16 Q.  Yes, ma'am.
17 A.  Prior to Mark Freeman coming over, he knew
18 about how we were being singled out.  And he
19 didn't say it in those words, but he advised me to
20 get a lawyer.
21 Q.  What did Mr. Freeman tell you?
22 A.  That's all he said:  You need to get a
23 lawyer.  Keep notes.

Page 162

1  Q.  What did Mr. Freeman tell you he knew about
2  the way you were being treated?
3  A.  I can't recall exactly what he said.  He
4  just knew, just like everyone else, about us being
5  singled out.
6  Q.  And you said this was before Mr. Freeman
7  became your foreman?
8  A.  Right.
9  Q.  When did he come over as your foreman?
10 A.  I don't recall.
11 Q.  And you said he told you to take notes?
12 A.  Right.
13 Q.  Did you start taking notes?
14 A.  I had already been taking notes.
15 Q.  Where are those notes?
16 A.  I'm not sure if they've been turned in or
17 not.  I'm pretty sure I still have some of them.
18 I'm not sure.
19 Q.  And to be fair, are these the notes that we
20 talked about yesterday that you are going to
21 gather?
22 A.  Right.
23 Q.  Okay.  Did any of your supervisors tell you

Page 163

1  that your unfair treatment was related to your
2  gender?
3  A.  Not to me.  But I recall Dennis Teat having
4  a conversation with B.J. as far as the way he was
5  rotating us on jobs.
6        And he, one morning when B.J. gave us our
7  assignments, I remember Teat telling him, Man, you
8  need to put these girls out and let them do some
9  other jobs.  Put them out there on a Dixie job.
10       Because everybody knew that they would not
11 do -- Teat and Deborah, initially, were not going
12 along with the way they were doing job
13 assignments.  And Teat did say something to B.J.
14 several times, as well as Deborah.
15 Q.  You said he said, Put these girls out?
16 A.  Out on some other jobs.  Let them go out
17 there on a Dixie job or something.
18 Q.  What girls was he referring to?
19 A.  He was talking about Janell and I.
20 Q.  Were there other female helpers?
21 A.  Yes.
22 Q.  Were there other female helpers doing the
23 same jobs that you and Ms. McDowell were doing?

Page 164

1  A.  They were being rotated the way they were
2  supposed to.
3  Q.  Okay.  So there were other female helpers
4  that were being assigned to some of the jobs that
5  you say or Ms. McDowell said were more favorable?
6  A.  Right.  The white females.  Because I
7  believe -- well, no.  There were only three.
8  There were three black females on our side.
9  Q.  Who was the other black female at that time?
10 A.  Doris Ashford.
11 Q.  And you heard Dennis Teat say this to B.J.
12 Yance?
13 A.  Yes.
14 Q.  Are there any other instances where you say
15 a member of supervision indicated that you were
16 being treated differently because of your gender?
17 A.  Deborah made the statement to us that B.J.
18 did the job assignments the way that he did
19 because he was just set in his ways.
20       He was an older guy.  And she said he, in
21 his mind, he thought that he was doing us a favor
22 by putting us on routines.
23 Q.  Was she referring to you and Ms. McDowell

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 165

1 then?
2 A. Right.
3 Q. Okay. Before Mark Freeman became your
4 foreman, what position was he in?
5 A. I -- I don't even know if I ever knew his
6 job title. I know he worked in the annex
7 building. That's pretty much -- I don't remember
8 what he did.
9     MS. SHARP: Malcolm, if I could have
10 about five minute to look over my notes, I think
11 I'm about finished with Ms. Sanders.
12     MR. NEWMAN: Okay.
13     THE VIDEOGRAPHER: We are going off the
14 record. The time is 10:03 a.m.
15     (A brief recess was taken.)
16     THE VIDEOGRAPHER: We are back on the
17 record. The time is 10:10 a.m.
18 (BY MS. SHARP)
19 Q. Ms. Sanders, you testified earlier that
20 management cannot change a covered employee's
21 schedule once they have signed for a particular
22 schedule; is that correct?
23 A. Right.

Page 166

1 Q. Does the employee get to pick his or her job
2 assignments?
3 A. No.
4 Q. What are the job responsibilities of a
5 helper?
6 A. We have several jobs. But they do a
7 rotating schedule where you rotate through one
8 week this job, one week, you know, the next job.
9 And it just continues through the year that you
10 rotate through that schedule.
11 Q. But what are the responsibilities? What do
12 helpers do?
13 A. Several jobs. We do routines where we clean
14 buildings; we have truck crew, which can be
15 anything: picking up recycled, picking up outside
16 trash, sometimes moving furniture; we have a mail
17 run where we get the mail from Ashford; firewatch.
18     We did at one time cut the grass, keep the
19 grass on plant site done. And there were
20 miscellaneous jobs that would come up from time to
21 time.
22 Q. At the time you were terminated, were
23 helpers doing the landscaping at Plant Farley?

Page 167

1 A. No.
2 Q. Who was doing that?
3 A. Asplundh, I believe.
4 Q. Contractor?
5 A. Yes.
6 Q. What were the jobs that helpers then could
7 do outside, at the time that you were separated
8 from Plant Farley?
9 A. Go get the mail from Ashford. But we had
10 gotten down to so few helpers that that job was
11 assigned along with another job, routines or
12 something.
13 Q. What do you mean you had gotten down to so
14 few helpers?
15 A. The helper group had gotten down so small
16 that, you know, a lot of our jobs were given to
17 contractors, Williams.
18 Q. When did that start happening?
19 A. I don't know. I can't answer that. Just
20 with people going to operations.
21 Q. Who is Eddie Harris?
22 A. A helper.
23 Q. What race is Mr. Harris?

Page 168

1 A. Black.
2 Q. Did he work in your department?
3 A. Yes.
4 Q. Would you say Mr. Harris was a good worker?
5 A. Yes.
6 Q. You testified earlier, when I asked you
7 about receiving PPP, or incentive pay as you
8 explained, that you had never received a top
9 performer pay; is that correct?
10 A. Right.
11 Q. What is top performer pay?
12 A. It's an extra percentage of just extra pay
13 for being elected as the top performer.
14 Q. Were you aware that Mr. Harris received top
15 performer pay in 2003?
16 A. No.
17 Q. Were you aware that he received it in 2004?
18 A. No.
19 Q. Were you aware that he received it in 2005?
20 A. No.
21 Q. In your opinion, is Mr. Harris a good
22 worker?
23 A. Yes.

42 (Pages 165 to 168)

Page 169

1         MS. SHARP:  Malcolm, I don't have any
2     other questions for Ms. Sanders at this point,
3     until I get her EEOC Charge and her notes.  So I
4     want to adjourn the deposition.
5         MR. NEWMAN:  I agree.
6         THE VIDEOGRAPHER:  This marks the end
7     of Videotape No. 3 and Day 2 of the deposition of
8     Stephanie Sanders.
9         We are going off the record.  The time is
10    10:14 a.m.
11
12        FURTHER THE DEPONENT SAITH NOT
13
14
15
16
17
18
19
20
21
22
23

Page 170

1         C E R T I F I C A T E
2
3     STATE OF ALABAMA
4     BARBOUR COUNTY
5
6         I hereby certify that the above and
7     foregoing deposition was taken down by me in
8     stenotype and the questions and answers thereto
9     were transcribed by means of computer-aided
10    transcription, and that the foregoing represents
11    a true and correct transcript of the testimony
12    given by said witness upon said hearing.
13        I further certify that I am neither of
14    counsel, nor kin to the parties to the action,
15    nor am I in anywise interested in the result of
16    said cause.
17
18
19
20
21        CYNTHIA M. NOAKES,
22        COURT REPORTER and
23        COMMISSIONER

## Discipline Guide

**Southern Nuclear**

| Name: Stephanie Sanders | Job Title: Helper |
|---|---|
| Emp. No. | Date: 8 /17 /05 |
| Department: Facilities | Division, Plant, etc.: Plant Farley |

*This guide is to help supervisors prepare for and document employee discussions and discipline. By itself it will usually be sufficient documentation for Coaching and Oral Reminders; for Written Reminders and DML's, use this sheet to prepare a letter to the employee. This guide is intended for use with formal discipline only and should not be completed for coaching.*

### PRE-MEETING PREPARATION

**Brief Description of Problem:**
Harassment of co-worker; failure to follow work instructions; and lack of loyalty, competitiveness, and efficiency.

*Please copy and paste the following symbol as needed to designate appropriate responses below:* ☒

**Date(s) of previous discussion(s) about this problem:**

Is employee currently in an active level of Discipline? ☐ Yes ☒ No
　　　　　　　　☐ Oral Reminder ☐ Written Reminder ☐ DML

| Was administered on: (date) | for: (reason) |
|---|---|

**Desired Performance:**
Employees are expected to follow the company's non-harassment policy and to be committed to a work environment free of intimidation and harassment. Employees have the responsibility to converse with management on work assignments and status, and to contribute to the loyalty, competitiveness, and efficiency of the department.

**Actual Performance:**
Your conduct in the work place has been harassing in nature toward certain co-workers. You do not actively participate in meetings with supervision. Additionally, you have swapped job assignments with co-workers after you have been instructed not to by Facilities supervision.

**Impact/business reason why employee must solve this problem:**
The company is on notice of a hostile and intimidating work environment created in part by your actions. Swapping job assignments without obtaining supervisory concurrence impedes the supervisor's ability to hold individuals accountable for their actions.

**Consequences to employee for failing to improve to an acceptable level:**
Additional discipline up to and including termination of employment.

Other factors to consider in evaluating this problem:

☐ Length of Service　　　　☐ Recent discussions about this or other problems

☐ Overall work record　　　　☐ Need to discuss with others for consultation/approval

This conversation is intended to be:

| ☐ Oral Reminder | ☒ Written Reminder | ☐ DML | ☐ Other |
|---|---|---|---|

DEFENDANT'S
EXHIBIT

3 Sanders

**POST-MEETING NOTES**

Date/Time of Discussion  8/17/05   11:37

Location  Jim Parrish's office

Company representative(s) present  Deborah Critchfield, ~~Bob Hortez~~ BH 8/17/05  Jim Parrish

Union representative(s) present  Don Hunter

☑ Employee agreed to solve the problem  Employee states that she did not harass anyone
☐ Employee did **not** agree to solve the problem
☐ Employee did **not** recognize that there is a problem

**Employee action plan...Employee committed to solve the problem by:**

1. Read and understand Corp Policy 703
2. Continue to abide by the policy
3. Do not jump jobs without supervisor concurrency
4. Communicate openly with the Kitties supervisor to contribute to the loyalty, competitiveness and efficiency of the department.

Significant issues raised by:

**Employee:**  Employee states that she did not harass anyone

**Union:**

This discussion was a:  ☐ Oral Reminder
☑ Written Reminder...(additional documentation necessary)
☐ DML...(additional documentation necessary)

**Additional comments:**

Follow-up dates/plans:  Facilities supervision will conduct follow-up meetings monthly.

Completed by:  _Jim Parrish_          Date:  8-17-05

Southern Nuclear
Operating Company, Inc.
Post Office Drawer 470
Ashford, Alabama 36312

TO:              Stephanie Sanders

FROM:         Jim Parrish

DATE:          August 18, 2005

SUBJECT:    Written Reminder

**SOUTHERN**
**COMPANY**
*Energy to Serve Your World™*

In our meeting on August 17, 2005, we discussed that your conduct in the work place has
been harassing in nature to certain co-workers. You do not actively participate in
meetings with supervision. Additionally, you have swapped job assignments with co-
workers after you have been instructed not to by Facilities supervision. We discussed that
the company is on notice of a hostile and intimidating work environment created in part
by your actions. Swapping job assignments without obtaining supervisory concurrence
impedes the supervisor's ability to hold individuals accountable for their actions.

As a result of your actions, you were issued a Written Reminder. This positive discipline
will remain active and in your personnel file for 12 months. We discussed that
employees are expected to follow the company's non-harassment policy and to be
committed to a work environment free of intimidation and harassment. Employees have
the responsibility to converse with management on work assignments and status, and to
contribute to the loyalty, competitiveness, and efficiency of the department. Failing to
improve could result in additional discipline up to and including termination.

You indicated that you would commit to reading and understanding the Corporate Policy
703 and continue abiding by the Policy. Additionally, you committed to not swapping
jobs without supervisor concurrence.

I am confident that you understand the meaning of our discussion and the necessary
expectations for your future performance. I am confident that you understand the
consequences for failure to fully support your commitment.

I look forward to working with you through this situation and moving to a productive
future.

Sincerely,

Jim Parrish

Jim Parrish

Deborah Crutchfield
Farley Nuclear Plant

November 1, 2005

The purpose of this letter is to inform you that I can no longer work under the Southern Style that is practiced at Farley Nuclear Plant. Corporate Policy 702 Southern Company Code of Ethics states a lot of things that sound good. It states that Southern Style is the foundation of your culture of trust and ethical behavior. It states that you tell the truth- yet we have been lied to and lied on.

It states that you keep your promises and deal fairly and ethically with everyone. Yet, I feel this fairness doesn't apply to everyone. I know that I have personally been singled out, judged unfairly, treated unfairly and disciplined unjustly.

Under the Southern Nuclear Company diversity website there are expectations for management. It says management is to build relationships with team members in order to understand differences and develop trust. I feel there is very little trust. It states management is expected to create an inclusive work environment, but I feel you exclude the ones actually doing the work and show favoritism towards certain ones doing the work.

I feel you have good policies that will build a great company if they were practiced. I've seen people that I felt were good people move into management. Instead of these people daring to be different and do right in order to make a difference, they fall right in with this Southern Style that has always been practiced: Tell the truth, keep our promises and deal fairly and ethically but not with everyone.

Sincerely submitted


Stephanie M. Sanders

DEFENDANT'S
EXHIBIT

4 Sanders

Please forward any mail to:

OZark, AL

Southern Nuclear
Operating Company, Inc.
Post Office Drawer 470
Ashford, Alabama 36312

November 1, 2005

Stephanie Sanders

Dothan AL

**SOUTHERN COMPANY**
*Energy to Serve Your World™*

Dear Ms. Sanders:

The purpose of this letter is to address your recent absences, your failure to keep management informed, and your failure to submit the initial FMLA paperwork. While on the first three nights (October 11th – 13th) you either called in or management called you, you did report to work and did not call to report that you would be absent since Saturday October 15th.

Consequently, management wrote a certified letter to you, which you signed for on Wednesday, October 26th. This letter gave you five days from the receipt of the letter to provide the initial FMLA paperwork to Effie Manley so that a determination could begin on whether the absences were covered under FMLA. The fifth day was Monday, October 31st and the FMLA paperwork was not provided to Effie Manley as was required. While you did call and leave a voice mail for supervision on October 26th, stating you would be in the first of this week with paperwork, you did not provide the paperwork by the fifth day, nor have you otherwise kept management informed regarding your continued absences as was required per the certified letter. It was clear that failure to be compliant with the terms laid out in the certified letter would result in discipline up to and including termination. Additionally, you are currently on an active Written Reminder.

Consequently, your employment is being terminated effective today, November 1, 2005, on the basis of job abandonment.

Randy Johnson

Nuclear Plant General Manager

Deborah Crutchfield

Facilities Supervisor

DEFENDANT'S EXHIBIT
S Sanders



**SENDER:**
- Complete items 1 and/or 2 for additional services.
- Complete items 3, 4a, and 4b.
- Print your name and address on the reverse of this form so that we can return this card to you.
- Attach this form to the front of the mailpiece, or on the back if space does not permit.
- Write *Return Receipt Requested* on the mailpiece below the article number.
- The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):

1. ☐ Addressee's Address
2. ☑ Restricted Delivery

Consult postmaster for fee.

**3. Article Addressed to:**
Stephanie Sanders

Dothan, AL.

Stephanie Sanders

**4a. Article Number**
7000 0520 0013 6361 1078

**4b. Service Type**
| ☐ Registered | ☐ Certified |
| ☐ Express Mail | ☐ Insured |
| ☐ Return Receipt for Merchandise | ☐ COD |

**7. Date of Delivery**
11-3

**5. Received By:** *(Print Name)*
Stephan...

**6. Signature:** *(Addressee or Agent)*
X

**8. Addressee's Address** *(Only if requested and fee is paid)*

Is your RETURN ADDRESS completed on the reverse side?

Thank you for using Return Receipt Service.

PS Form **3811,** December 1994                    **Domestic Return Receipt**

**Southern Nuclear
Operating Company, Inc.**
Post Office Drawer 470
Ashford, Alabama 36312



October 21, 2005

Stephanie Sanders

Dothan AL

Dear Ms. Sanders:

The purpose of this letter is to address your recent absences. While on the first three nights you either called in or management called you, you have not reported to work and have not called to report that you would be absent since Saturday October 15th. Your failure to keep management reasonably informed regarding your ability to report to work may subject you to discipline up to and including termination. You must call supervision immediately to discuss your absences.

Additionally, you have not contacted the plant nurse and we have not received any FMLA paperwork from you. Consequently, we have included the required FMLA paperwork with this letter. Effie Manley must be in receipt of this completed paperwork within five days of the receipt of this certified letter. Failure to call your supervisor upon both receipt of this letter and on an ongoing basis regarding your absences, as well as failure to be compliant in the FMLA process including receipt of the completed form by Farley Safety and Health within five days, will result in discipline up to and including termination.

Deborah Crutchfield

*Deborah Crutchfield*

Facilities Supervisor

DEFENDANT'S
EXHIBIT

6 Sanders

# SOUTHERN NUCLEAR
## NOTIFICATION OF FAMILY AND MEDICAL LEAVE OF ABSENCE (FMLA)

**THE FOLLOWING SECTION MUST BE COMPLETED BY THE EMPLOYEE:**

| Employee's Last Name | First Name | MI | Social Security Number |
|---|---|---|---|
| Employee's Job Title | Department, Region, or Plant | Bin Number | Work Phone Number (Company) |
| Name of Timekeeper | | | Date of Hire |
| Employee's Home Address    Street | City | State    Zip | Home Phone Number |

*LEAVE START DATE:* _____

*PROJECTED LEAVE END DATE:* _____

Leave is Requested for: ☐ Absence From Work
☐ Intermittent Leave
☐ Less than Full Work Schedule
My spouse is an employee of So Co. ☐ NO ☐ Yes (indicate name below)

**Is this absence related to an on-the-job injury?** ☐ No ☐ Yes

**Reason for Leave (MAY BE PAID OR UNPAID)** (Check <u>one</u> block only)

☐ Care for employee's newborn
☐ Adoption or foster placement of a child into employee's home
☐ Serious health condition of employee (not maternity related)
☐ Serious health condition of employee (maternity related)
      Will this leave include extra time off to care for your newborn child after your medical recovery? ☐ Yes ☐ No
☐ Serious health condition of employee's ☐ Spouse ☐ Child ☐ Parent (not in-law)

**Employee's Signature** _____ **Date** _____

**THE FOLLOWING SECTION WILL BE COMPLETED BY SAFETY & HEALTH:**

This is to inform you that you are:

☐ eligible for leave and this leave will be counted against your 12 work-week FMLA leave entitlement.
☐ not eligible for leave because you:
    ☐ have not met the 12 month and 1250 work hour requirement;
    ☐ have indicated you were not treated by a health care provider;
    ☐ did not provide medical certification;
    ☐ did not request FMLA within 2 days of returning to work;
    ☐ or for the following reason: _____
_____

Benefit hours available (Optional)      * maximum allowed 40 hrs./year

# Hrs. basic sick _____  # Hrs. family sickness * _____  # Hrs. vacation _____  # Hrs. float/banked holidays _____

*Southern Company policy requires all paid time (basic sick leave, accrued vacation, etc.) to be taken before unpaid leave will be administered. Please refer to SNC Corporate Guideline 720-010 for additional information. Employees absent for 30 calendar days or longer will require an FFD test prior to return to work.*

**S&H review completed by:** _____ **Extension:** _____ **Date** _____

**Note to Timekeeper:** Please distribute copy to employee and manager/designee.
**Maximum allowed for FMLA is 480 hrs. in a calendar year.**

SNC Form A/379 rev. 09/05

## SOUTHERN NUCLEAR FMLA MEDICAL CERTIFICATION
### Employee's Own Leave – Form B / 380

**THE FOLLOWING INFORMATION MUST BE COMPLETED BY THE EMPLOYEE:**

Name_____ SSN_____ Job Title _____ Date of Birth _____
          (Please print)

Name of Doctor _____ Type of practice _____
                          (Please print)

Provider Address _____
                    (Please print)

Provider Phone # _____      City        State        Zip
                                              FAX # _____

**MEDICAL RELEASE: I** authorize the release of this information to Southern Company and give my permission for the Health Services Specialist/Occupational Health Services Specialist to contact my health care provider to process this request.

**Employee's Signature** _____    **Date** _____

**THE FOLLOWING INFORMATION MUST BE COMPLETED BY THE HEALTH CARE PROVIDER:**

1. The information attached describes what is meant by a "serious health condition" under the Family and Medical Leave Act. Does the employee's condition qualify under any of the categories described? If so, please check the applicable category:
   - ☐ Hospital Care (in-patient)
   - ☐ Absence plus treatment
   - ☐ Pregnancy
   - ☐ Chronic conditions requiring treatment
   - ☐ Multiple treatments (non chronic conditions)
   - ☐ Permanent/long term conditions requiring supervision

2. General nature of condition: _____

3. During treatment for this condition, was/is the employee able to perform work of any kind?   YES ☐ NO ☐
3a. If yes, list any work restrictions recommended and the duration_____
_____

4. Have you prescribed any medication that may adversely affect the employee's safety and work? YES ☐ NO ☐

5. State the approximate date this condition began, dates of office visits, and the probable duration of this condition:
_____
_____

6. If it is necessary for the employee to change his/her work schedule, please complete the following information. Check all that apply:
   Employee will:
   - ☐ Be absent from work
   - ☐ Work on intermittent basis (including treatments)
   - ☐ Work less than a full work schedule

   Dates:
   From _____ To _____
   From _____ To _____
   From _____ To _____

7. If it is necessary for the employee to work on an intermittent basis or work less than a full schedule, please complete the following:
   - ☐ Estimated number of treatments                _____
   - ☐ Estimated intervals between treatments        _____
   - ☐ Actual or estimated dates of treatments (if known)   _____

8. Will any treatments be provided by another provider of health services (e.g., physical therapist)? Please state the nature of the treatment: _____
_____

**Signature of Health Care Provider:** _____

**Date:** _____

In order to comply with confidentiality, please return this form directly to:
**Site FMLA Contact (RN)**
**Phone: Farley - 334-814-4603        Fax:    Farley-334-814-4643**

Form B/380 - Rev. 07/05

## SERIOUS HEALTH CONDITION
### AS DEFINED UNDER THE FAMILY AND MEDICAL LEAVE ACT OF 1993 (FMLA)

A "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves one of the following:

1.  **Hospital care:** Inpatient care (i.e. overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity[1] or subsequent treatment[2] in connection with or consequent to such inpatient care.

2.  **Absence plus treatment:** A period of incapacity more than three consecutive calendar days (including any subsequent treatment or period of incapacity relating to the same condition), that also involves

    - Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g. physical therapist) under orders of, or on referral by, a health care provider;
      or
    - Treatment by a health care provider on at least one occasion which results in a regimen[3] of continuing treatment under the supervision of the health care provider.

3.  **Pregnancy:** Any period of incapacity due to pregnancy, or for prenatal care.

4.  **Chronic conditions requiring treatments:** A chronic condition which

    - Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

    - Continues over an extended period of time (including recurring episodes of a single underlying condition); and

    - May cause episodic rather than a continuing period of incapacity (e.g. asthma, diabetes, epilepsy).

5.  **Permanent/long-term conditions requiring supervision:** A period of incapacity which is permanent or long term due to a condition for which treatment may not be effective. The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider. Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease.

6.  **Multiple treatments (non-chronic conditions):** Any period of absence to receive multiple treatments (including any period of recovery there from) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for restorative surgery after an accident or other injury, or for a condition that would likely result in a period of incapacity of more than three consecutive calendar days in the absence of medical intervention treatment, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), and kidney disease (dialysis).

---

[1] Incapacity, for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment there from, or for recovery there from.

[2] Treatment includes examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye exams, or dental examinations.

[3] A regimen of continuing treatment includes, for example, a course of prescription medication (e.g. an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition. A regimen of treatment does not include the taking of over-the-counter medication such as aspirin, antihistamines, or salves; or bed rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider.

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

| | |
|---|---|
| Postage | $ 37 |
| Certified Fee | 2.30 |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | 3.50 |
| Total Postage & Fees | $ 6.17 |

Postmark
Here

Recipient's Name *(Please Print Clearly) (To be completed by mailer)*
Stephanie Sanders

Street, Apt. No.; or PO Box No.

City, State, ZIP+4
Dothan, AL

PS Form 3800, February 2000          See Reverse for Instructions

---

**SENDER:**
- Complete items 1 and/or 2 for additional services.
- Complete items 3, 4a, and 4b.
- Print your name and address on the reverse of this form so that we can return this card to you.
- Attach this form to the front of the mailpiece, or on the back if space does not permit.
- Write *"Return Receipt Requested"* on the mailpiece below the article number.
- The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):

1. ☐ Addressee's Address
2. ☒ Restricted Delivery

Consult postmaster for fee.

3. Article Addressed to:

Stephanie Sanders

Dothan, AL

4a. Article Number
7000 0520 0013 6362 2432

4b. Service Type
☐ Registered          ☐ Certified
☐ Express Mail       ☐ Insured
☐ Return Receipt for Merchandise   ☐ COD

7. Date of Delivery
10/26/05

5. Received By: *(Print Name)*

8. Addressee's Address *(Only if requested and fee is paid)*

6. Signature: *(Addressee or Agent)*
X

PS Form **3811**, December 1994                **Domestic Return Receipt**

Is your RETURN ADDRESS completed on the reverse side?

Thank you for using Return Receipt Service.

PERFORMANCE MANAGEMENT PLAN

SOUTHERN COMPANY

| NAME: | LAST: SANDERS | FIRST: STEPHANIE |
|---|---|---|

EMPLOYEE #: _____

REVIEW PERIOD:    FROM: MARCH 2000    TO: MARCH 2001

*Sng  10-4-00*
*Sng  7-6-00*
*Sng  2-9-00*

DEPARTMENT:    FACILITIES

JOB TITLE:    HELPER

CHECK REASON FOR APPRAISAL:
____X____ Annual
_____ Change of Immediate Supv
_____ Accelerated Input
_____ Other

## I. DEVELOPMENTAL PLAN

**DEMONSTRATED STRENGTHS:**
1.) TEAM-PLAYER
2.) WILLING TO LEARN NEW JOB TASKS
3.) CAN WORK WELL WITHOUT DIRECT SUPERVISION WHEN FAMILIAR WITH THE TASK
4.) TAKES PRIDE IN THE FINISHED PRODUCT
5.) PERFORMS WORK EFFICIENTLY
6.) INFORMS SUPERVISION AND COWORKERS WHEN THERE IS A POTENTIAL PROBLEM

**DEVELOPMENTAL NEEDS:**
1.) DEMONSTRATE SOUTHERN STYLE
2.) COMMUNICATION
3.) COMPUTER SKILLS
4.) BECOME MORE INVOLVED IN THE FNP SAFETY PROGRAM
5.) IMPROVE RADIOLOGICAL SKILLS
6.) LEARN FACILITIES RAD-SIDE AND NON-RAD SIDE DUTIES
7.) PROCEDURE AWARENESS
8.) ADDITIONAL TRAINING AND TIME ON THE JOB IS NEEDED TO ACQUIRE THE FULL SCOPE OF THE JOB

**DEVELOPMENTAL ACTION PLAN:**

I plan to work on my developmental needs in order to become a more productive employee.

DEFENDANT'S
EXHIBIT

*13 Sanders*

02/08/00



## II. PERFORMANCE ASPECTS

| | ABOVE EXPECTATIONS | AT EXPECTATIONS | BELOW EXPECTATIONS |
|---|---|---|---|
| **A. COMMUNICATE TO CREATE SHARED UNDERSTANDING** | | | |
| 1. Communicates accurately and frequently. | | ✓ | |
| 2. Informs co-workers, supervisors or managers when there is a potential problem. | | ✓ | |
| 3. Practices effective team skills. | | ✓ | |
| 4. Strives for positive working relationships. | | ✓ | |
| 5. Provides assistance to others. | | ✓ | |
| 6. Actively participates in planning, pre-job briefs, post-job briefs. | | ✓ | |
| 7. Maintains the work area (in the field and in the shop) in a professional manner, meeting FNP's housekeeping standards. | | ✓ | |
| **B. ANTICIPATE ERROR-LIKELY SITUATIONS** | | | |
| 1. Performs self-check. | | ✓ | |
| 2. Checks others. | | ✓ | |
| 3. Focuses attention on the task at hand. | | ✓ | |
| 4. Expects success, but maintains a questioning attitude. | | ✓ | |
| 5. Takes the time needed to do the job right. | | ✓ | |
| **C. CONFIRM THE INTEGRITY OF DEFENSES** | | | |
| 1. Follows approved procedures with a sense of awareness. | | ✓ | |
| 2. Questions the appropriateness of disabling or degrading systems to perform work. | | ✓ | |
| 3. Monitors vital parameters. | | ✓ | |
| 4. Stops the task and collaborates with others when unfamiliar or unanticipated conditions arise. | | ✓ | |
| 5. Uses proper safety equipment. | | ✓ | |
| 6. Uses ALARA concepts and adheres to good radiological safety work procedures. | | ✓ | |
| **D. IMPROVE PERSONAL CAPABILITIES** | | | |
| 1. Seeks ways to improve capabilities. | | ✓ | |
| 2. Acquires knowledge and understanding of the factors that influence human behavior. | | ✓ | |
| 3. Satisfactorily participates in assigned training. | | ✓ | |
| 4. Maintains present qualifications. | | ✓ | |
| 5. Strives to improve knowledge and skills. | | ✓ | |
| 6. Willing to try new/different approaches, as appropriate, to improve FNP. | | ✓ | |
| **E. PERFORMANCE** | | | |
| Performs assigned tasks / works efficiently and professionally, using approved procedures as applicable. | | ✓ | |

04/26/00

0314-CSC    Document 19-3    Filed 12/21/2006    Page 58 of 97

OVERALL PERFORMANCE:

Individual Achievements/ Contributions

Team player
Works well within defined areas of responsibility
Assumes responsibility for personal actions
Demonstrates Southern Style behaviors

Stephanie is an easy going employee.  She has performed at expected levels while working in the facilities group.

## IV.  COMMENTS

**EMPLOYEE:**




**REVIEWING SUPERVISOR:**    I concur with this evaluation



**SIGNATURES:  (Employee signature indicates review and discussion of this document and does not necessarily imply concurrence.)**

| Employee: *Stephanie Sanders* | Date: 1-11-01 |
|---|---|
| Immediate Supervisor: *Elbert Q. Deal* | Date: 1-11-01 |
| Reviewing Supervisor: *R.E. Bryant* | Date: 01-20-01 |

04/26/00

Annual Safe Work Practice Training Checklist

1.  **Hazard Communication (HAZCOM)**                                    Yes    No

    a.  Has employee received initial Hazcom training (Normally provided      ☑     ☐
        by initial GET training and maintaining annual GET retraining current.
        Deals with understanding the use of MSDS sheets and SHP-26)?
    b.  Is the employee aware of the hazards associated with the hazardous materials    ☑     ☐
        used by the employee?

    If all the items above were answered as yes the employee meets the training
    qualifications for this section.

2.  **Bloodborne Pathogen**

    Is the employee expected be able to act as a first aid responder?        ☐     ☑

    a.  If yes, is the employee first aid qualifications current (first aide training    ☐     ☑
        includes dealing with bloodborne pathogens)?

    If all the items above were answered as yes the employee meets the training
    qualifications for this section.

    Is the employee a SNC employee not first aid qualified?                ☑     ☐

    a.  If yes, has the employee been informed to avoid contact with blood    ☑     ☐
        products and if blood type products are encountered Safety & Health
        personnel should be contacted to respond?

    If all the items above were answered as yes the employee meets the training
    qualifications for this section.

3.  **Access to Exposure and Medical Records**

    a.  Has the employee been informed this year that he has access to his personal    ☑     ☐
        exposure and medical records?

    If all the items above were answered as yes the employee meets the training
    qualifications for this section.

4.  **Personal Protective Equipment**

    a.  Has the employee been initially instructed when to use, how to wear and the    ☑     ☐
        proper care, maintenance of eye and face protection, hand protection, foot
        protection, head protection and electrical protection equipment?

    If all the items above were answered as yes the employee meets the training
    qualifications for this section.

|  | Yes | No |
|---|---|---|

**5. Hearing Conservation**

a. Has the employee received annual training on the effects of noise on hearing, the use of hearing protection and the purpose of audiometric testing (Normally provided during annual GET training)?   ☑ ☐

If all the items above were answered as yes the employee meets the training qualifications for this section.

**6. Asbestos**

Is the employee expected to be able to perform asbestos work?   ☐ ☑

a. If yes, is the employee expected to be an asbestos competent person?   ☐ ☑

If yes, has the employee received the initial Class III 16 hour asbestos competent person training?   ☐ ☑

Has the employee received the annual asbestos competent person retraining?   ☐ ☑

If all the items above were answered as yes the employee meets the training qualifications for this section.

b. If yes, is the employee expected to be able to perform Class III asbestos work?   ☐ ☑

If yes, has the employee received the initial Class III asbestos worker training?   ☐ ☑

Has the employee received the annual Class III worker retraining?   ☐ ☑

If all the items above were answered as yes the employee meets the training qualifications for this section.

c. If yes, is the employee expected to be able to conduct Class IV asbestos work?   ☐ ☑

If yes, has the employee received the initial Class IV asbestos worker training?   ☐ ☑

If all the items above were answered as yes the employee meets the training qualifications for this section.

**7. Lead**

Is the employee expected to be able to work on lead containing material?   ☑ ☐

a. If yes, has the employee been given initial general training (HazCom) regarding the hazards of lead exposure?   ☑ ☐

If all the items above were answered as yes the employee meets the training qualifications for this section.

Has the employee been exposed to lead in air in excess of 30 ug/m$^3$ (No FNP employees in this category in 1999)?   ☐ ☑

a. If yes, has the employee been given training regarding the health hazards of lead, protective measures to reduce exposure and other lead safety related training.   ☐ ☑

If all the items above were answered as yes the employee meets the training qualifications for this section.

**PERFORMANCE MANAGEMENT PLAN** SOUTHERN COMPANY

| | | | |
|---|---|---|---|
| NAME: | LAST: Sanders | FIRST: Stephanie | SHS 2-5-01<br>SHS 3-29-01<br>SHS 6-25-01<br>SHS 9-10-01<br>SHS 12-18-01<br>SHS 1-10-02 |
| EMPLOYEE #: | | | |
| REVIEW PERIOD: | FROM: 01/01/2001 | TO: 12/31/01 | |

| | |
|---|---|
| DEPARTMENT: Facilities<br>JOB TITLE: Helper | CHECK REASON FOR APPRAISAL:<br>__x__ Annual<br>____ Change of Immediate Supv<br>____ Accelerated Input<br>____ Other |

## I. DEVELOPMENTAL PLAN

**DEMONSTRATED STRENGTHS:**

Demonstrates continuous learning
Values and influences team work
Follows instructions
Dependable
Accountable for performance
Practices safe work habits
Communication
Produces work on time
Questioning attitude
Produces quality work

**DEVELOPMENTAL NEEDS:**

Demonstrate Southern Style
Improve computer skills
Conduct and participate in pre-job briefs prior to each task
Create an observable change in housekeeping and material condition of plant areas ( take ownership )
Learn from operating experiences (lessons learned)
Improve radiological skills
Increase knowledge of plant equipment and plant systems
Strive to achieve error free (human) performance
Place emphasis on the use of human performance tools

**DEVELOPMENTAL ACTION PLAN:**

I will work on my computer skills as much as possible
I will improve my radiological skills and keep my exposure ALARA
I will create an observable change in housekeeping and material condition of plant areas
I will conduct and participate in pre-job briefs prior to each task
I will place emphasis on the use of human performance tools and provide leadership in helping the facilities group with human performance deficiencies
I will be aggressive in learning new tasks

### III. CLOSEOUT PERFORMANCE SUMMARY

**OVERALL PERFORMANCE:**
**Stephanie consistently meets performance objectives. She assumes responsibility for personal actions and task as assigned. Takes responsibility for the quality and completeness of work assignments. Effectively organizes and plans work in a manner that produces expected results. Works well within defined area of responsibility. Establishes good working relationships; easy to do business with.**
**Demonstrates southern style behaviors and places emphasis on Human Performance Tools.**

### IV. COMMENTS

**EMPLOYEE:**

I agree with the above statements. My intentions to continue to be a productive employee as well as learn

**REVIEWING SUPERVISOR:**

I concur with this evaluation.

**SIGNATURES: (Employee signature indicates review and discussion of this document and does not necessarily imply concurrence.)**

| Employee: | Date: |
|---|---|
| *Stephanie Sanders* | 1-10-02 |
| **Immediate Supervisor:** | Date: |
| *signature* | 1-10-02 |
| **Reviewing Supervisor:** | Date: |
| *R.E. Bryt* | 01-11-02 |

01/10/02

NAME: *Stephanie Sanders*    EMPLOYEE #:

## I. Outage/Job Performance (Productivity)

Looks for ways to stay productive. Anticipates and thoroughly prepares for job assignments (detailed walkdowns). Is self-directed. Accepts and promotes concept of working single person task where safe and judicious. Is schedule driven.

| Extraordinary [ ] | Meets or exceeds expectations [X] | Below expectations [ ] |
|---|---|---|

## II. Equipment Reliability

Has an intolerance for reworks and equipment failures. Looks for ways to improve processes and procedures. Builds quality into every job assignment.

| Extraordinary [ ] | Meets or exceeds expectations [X] | Below expectations [ ] |
|---|---|---|

## III Human Performance

Follows and promotes Human Performance Error Prevention techniques.

| Extraordinary [ ] | Meet or exceeds expectations [X] | Below expectations [ ] |
|---|---|---|

## IV Leadership

Accepts challenging assignments with a positive attitude. Expects to develop and/or be developed. Accepts and promotes personal housekeeping responsibilities. Is an effective communicator. Acts like an owner. Is a good steward of company resources.

| Extraordinary [ ] | Meets or exceeds expectations [X] | Below expectations [ ] |
|---|---|---|

## V Mentorship

Looks for ways to mentor and teach. Is recognized by co-workers for proper and effective utilization of positive reinforcement and critical comments.

| Extraordinary [ ] | Meets or exceeds expectations [X] | Below expectations [ ] |
|---|---|---|

## VI Training/Learning Organization

Utilizes lessons learned, work order feedback forms, condition reports, etc. without being directed.

| Extraordinary [ ] | Meets or exceeds expectations [X] | Below expectations [ ] |
|---|---|---|

**NOTE:** If below expected level, must have revision to developmental plan attached. If extraordinary, must provide examples attached.

| Supervisor: | Date: 12/18/01 | Employee: *Stephanie Sanders* |
|---|---|---|

**Facilities Department**

# EXPECTATIONS

1)    Want you to do your job – Do it right and Safely
      Plan out your work day.----Use Human Performance Tools whenever planning out work
      Be a team player.
      Follow instructions.----Be a good listener
      Be proactive:    In helping keep the plant clean.
      Mgmt wants to know when there is job delays and when jobs are completed.

2)    Follow the company guidelines on the Southern Style.

3)    Treat Mgmt fairly, and we will treat you fairly.  Most of all treat each other Fairly!

4)    Communicate – Communicate – Communicate.

5)    Want you to be Dependable.
      Obey the company rules.
      Show up to work on time.
      Leave for the day when you are suppose to.
      Take your break when your suppose to.
      Go to lunch when your suppose to.

6)    Accept change.

7)    Follow your own Developmental Action Plan.

# SOUTHERN NUCLEAR OPERATING COMPANY

## ANNUAL EMPLOYEE SAFE WORK PRACTICES INSPECTION

Employee Name *SANders, Stephanie*

Employee Number _____

(Optional) See Attached List of Employees _____
(CHECK)

Work Location _____

The above listed employee(s) is complying with the safety related work practices required by Southern Nuclear and applicable OSHA Standards including 1910.269. The inspection verified that the employee(s):

| | Comments |
|---|---|
| Has received training in the specific job functions he/she is currently performing; and received safety awareness training in appropriate areas such as HAZCOM, Blood Borne Pathogens, Access to Exposure and Medical Records, Personal Protective Equipment, Hearing Conservation, Asbestos and Lead. | SNS |
| Has conducted or participated in Job Safety Briefings | SNS |
| Understands and follows the Plant Clearance Procedures | SNS |
| Understands and follows all other procedural guidance applicable to work he/she performs | SNS |
| Is knowledgeable of and wears appropriate clothing when exposed to work on or near exposed energized electrical equipment | SNS |
| Utilizes Personal Protective Equipment as required | SNS |
| Utilizes safe work practices applicable to work he/she performs | SNS |

This form shall be maintained for the employee's duration of employment. This form may be used as an attachment to the employee's Annual Performance Plan and Summary

| B J YANCE | W J Yance | Foreman | 1-10-02 |
|---|---|---|---|
| Management Inspector (Print Name) | Management Inspector (Signature) | Title | Date |

Annual Safe Work Practice Training Checklist

1.  **Hazard Communication (HAZCOM)**                                    Yes    No

    a.  Has employee received initial Hazcom training (Normally provided    ☑    ☐
        by initial GET training and maintaining annual GET retraining current.
        Deals with understanding the use of MSDS sheets and SHP-26)?
    b.  Is the employee aware of the hazards associated with the hazardous materials    ☑    ☐
        used by the employee?

    If all the items above were answered as yes the employee meets the training
    qualifications for this section.

2.  **Bloodborne Pathogen**

    Is the employee expected be able to act as a first aid responder?       ☐    ☑

    a.  If yes, is the employee first aid qualifications current (first aide training    ☐    ☐
        includes dealing with bloodborne pathogens)?  H/A

    If all the items above were answered as yes the employee meets the training
    qualifications for this section.

    Is the employee a SNC employee not first aid qualified?                 ☑    ☐

    a.  If yes, has the employee been informed to avoid contact with blood    ☐    ☐
        products and if blood type products are encountered Safety & Health
        personnel should be contacted to respond?

    If all the items above were answered as yes the employee meets the training
    qualifications for this section.

3.  **Access to Exposure and Medical Records**

    a.  Has the employee been informed this year that he has access to his personal    ☑    ☐
        exposure and medical records?

    If all the items above were answered as yes the employee meets the training
    qualifications for this section.

4.  **Personal Protective Equipment**

    a.  Has the employee been initially instructed when to use, how to wear and the    ☑    ☐
        proper care, maintenance of eye and face protection, hand protection, foot
        protection, head protection and electrical protection equipment?

    If all the items above were answered as yes the employee meets the training
    qualifications for this section.

Yes    No

**5. Hearing Conservation**

    a.   Has the employee received annual training on the effects of noise on hearing,  ☑  ☐
          the use of hearing protection and the purpose of audiometric testing (Normally
          provided during annual GET training)?

If all the items above were answered as yes the employee meets the training
qualifications for this section.

**6. Asbestos**

Is the employee expected to be able to perform asbestos work?  ☑  ☐

    a.   If yes, is the employee expected to be an asbestos competent person?  ☐  ☑

        If yes, has the employee received the initial Class III 16 hour asbestos competent ☐  ☑
        person training?
        Has the employee received the annual asbestos competent person retraining?  ☐  ☑

If all the items above were answered as yes the employee meets the training
qualifications for this section.

    b.   If yes, is the employee expected to be able to perform Class III asbestos work?  ☐  ☑

        If yes, has the employee received the initial Class III asbestos worker training?  ☐  ☑
        Has the employee received the annual Class III worker retraining?  ☐  ☑

If all the items above were answered as yes the employee meets the training
    qualifications for this section.

    c.   If yes, is the employee expected to be able to conduct Class IV asbestos work?  ☑  ☐

        If yes, has the employee received the initial Class IV asbestos worker training?  ☑  ☐

If all the items above were answered as yes the employee meets the training
qualifications for this section.

**7. Lead**

Is the employee expected to be able to work on lead containing material?  ☐  ☑

    a.   If yes, has the employee been given initial general training (HazCom) regarding  ☐  ☑
         the hazards of lead exposure?

If all the items above were answered as yes the employee meets the training
qualifications for this section.

Has the employee been exposed to lead in air in excess of 30 ug/m$^3$ (No FNP  ☐  ☑
employees in this category in 1999)?

    a.   If yes, has the employee been given training regarding the health hazards of  ☐  ☑
         lead, protective measures to reduce exposure and other lead safety related
         training.
If all the items above were answered as yes the employee meets the training
qualifications for this section.

2-5-02
4-3-02
T-22-02

# Southern Nuclear Operating Company, Inc.
## PERFORMANCE MANAGEMENT PLAN
*(For employees represented by I.B.E.W.)*

**SOUTHERN COMPANY**
*Energy to Serve Your World™*

| | | | |
|---|---|---|---|
| **NAME:** **LAST:** Sanders | | **FIRST:** Stephanie | |
| **EMPLOYEE #:** | | | |

**REVIEW PERIOD:** **FROM:** 1-1-2002     **TO:** 12-31-2002

| | |
|---|---|
| **DEPARTMENT:** Facilities | **CHECK REASON FOR APPRAISAL:** |
| | X     Annual |
| | _____ Change of Immediate Supv |
| **JOB TITLE:** Helper | _____ Accelerated Input |
| | _____ Other |
| | See Section II.   Incremental Increase |

## I. DEVELOPMENTAL PLAN

**DEMONSTRATED STRENGTHS:**

Values and influences teamwork
Accountable for performance
Practices safe work habits
Communication
Practices problem solving
Demonstrates continuous learning

Takes personal responsibility
Demonstrates Southern Style
Professionalism
Makes decisions
Demonstrates character

**DEVELOPMENTAL NEEDS:**

Increase knowledge of plant equipment and plant systems
Strive to achieve error free (human) performance
Create an observable change in housekeeping and material condition of plant areas
Conduct and participate in pre-job briefs prior to each task
Learn from operating experiences (lessons learned)
Place emphasis on the human performance tools and provide leadership in helping the facilities group with human performance deficiencies
Provide leadership and mentorship for new employees
Continue to look for ways to make this a "Great Place to Work"

**DEVELOPMENTAL ACTION PLAN:**

I will continue to look for ways to make this a "Great Place to Work"
I will strive to achieve error free (human) performance
I will create and observable change in housekeeping and material condition of plant areas
I will conduct and participate in pre-job briefs to each task
I will learn from operating experiences (lessons learned)
I will place emphasis on the human performance tools and provide leadership in helping the facilities group with human performance deficiencies
I will provide leadership and mentorship for new employees

DEFENDANT'S EXHIBIT

15. Sanders

# Southern Nuclear Operating Company, Inc.
## PERFORMANCE MANAGEMENT PLAN

### II. PERFORMANCE ASPECTS

| PERFORMANCE ASPECTS | ABOVE | AT | BELOW | COMMENTS |
|---|---|---|---|---|
| | E X P E C T A T I O N S | | | |
| **A. COMMUNICATES TO CREATE SHARED UNDERSTANDING.** | | | | |
| 1. Communicates accurately and frequently. | X | | | |
| 2. Informs coworkers, supervisors, or managers when there is a potential problem. | X | | | |
| 3. Practices effective team skills. | X | | | |
| 4. Strives for positive working relationships. | X | | | |
| 5. Provides assistance to others. | X | | | |
| 6. Actively participates in planning, pre-job briefs, post-job briefs. | | X | | |
| 7. Maintains the work area (in the field and in the shop) in a professional manner, meeting plant housekeeping standards. | X | | | |
| **B. ANTICIPATES ERROR-LIKELY SITUATIONS.** | | | | |
| 1. Performs self-check. | X | | | |
| 2. Checks with others. | X | | | |
| 3. Focuses attention on the task at hand. | X | | | |
| 4. Expects success, but maintains a questioning attitude. | X | | | |
| 5. Takes the time needed to do the job right. | X | | | |
| **C. CONFIRMS THE INTEGRITY OF DEFENSES.** | | | | |
| 1. Follows approved procedures with a sense of awareness. | | X | | |
| 2. Questions the appropriateness of disabling or degrading systems to perform work. | | X | | |
| 3. Monitors vital parameters. | | X | | |
| 4. Stops the task and collaborates with others when unfamiliar or unanticipated conditions arise. | | X | | |
| 5. Uses proper safety equipment. | X | | | |
| 6. Uses ALARA concepts and adheres to good radiological safety work procedures. | X | | | |

# Southern Nuclear Operating Company, Inc.
## PERFORMANCE MANAGEMENT PLAN

### II. PERFORMANCE ASPECTS (Continued)

| D. IMPROVES PERSONAL CAPABILITIES. | | | | |
|---|---|---|---|---|
| 1. Proactive; anticipates and resolves problems or roadblocks. | | X | | |
| 2. Assumes ownership of tasks and issues. | X | | | |
| 3. Flexible; handles multiple elements of work activities. | X | | | |
| 4. Helps identify and solve problems, recognized as technical expert. | | X | | |
| 5. Seeks ways to improve capabilities. Seeks difficult or additional tasks. . Strives to improve knowledge and skills. | | X | | |
| 6. Acquires knowledge and understanding of the factors that influence human behavior. | | X | | |
| 7. Maintains present qualifications and satisfactorily participates in assigned training. | | X | | |
| 8. Willing to try new/different approaches, as appropriate, to improve plant. | X | | | |
| E. PERFORMANCE | | | | |
| 1. Performs assigned tasks / works efficiently and professionally, using approved procedures as applicable. | | X | | |
| 2. Supportive of Management's directives, goals and expectations. | X | | | |
| 3. I will support the company's policy of maintaining an open, fair and inclusive work environment.   DKL 1-9-03 | X | | | |

## THIS SECTION SHOULD BE COMPLETED FOR INCREMENTAL PAY INCREASES ONLY:

Supervision should complete the performance aspects checklist to ensure performance is at an acceptable level for incremental pay increase consideration. In addition to completing the Performance Aspects checklist, supervision should review and assess the employee's time-in-grade, training, qualifications and make a determination of whether to pay an incremental increase.

| NAME:    LAST: | | FIRST: | | INITIAL: | |
|---|---|---|---|---|---|
| JOB TITLE | | | | | |

*Please copy and paste the following symbol as needed to designate appropriate responses below:* ☒

☐ **Meets**   ☐ **Does not meet**   all of the time-in-grade*, training, qualifications and management performance expectations to qualify for consideration for an incremental pay increase.

*For employees at Hatch and Vogtle, step pay increases will be consider based classification criteria at 12 month interval except for SO or Helper, which are considered at six month intervals. Employees at Farley are considered for step increases at six month intervals for all positions.

## CLOSEOUT PERFORMANCE SUMMARY

**OVERALL PERFORMANCE:**

Stephanie has consistently performed at a level that meets and often exceeds the expectations of her direct supervision. Her supervision and other plant personnel have identified her work ethics and high standards of work performance that inevitably has a direct positive effect on her co-workers. During the course of the year she has continuously made the effort to communicate turnover items with her co-workers and or her direct supervision. She has been very influential in creating an observable change in housekeeping and material condition of the plant and the facilities areas. She is accountable for her performance and practices safe work habits. Stephanie exhibits the Southern Style and is a very honest and trustworthy employee. She is an asset to Farley Nuclear Plant and the Facilities Department. Stephanie places an emphasis on the use of human performance tools and participates in pre-job briefs.

### IV. COMMENTS

**EMPLOYEE:**

**REVIEWING SUPERVISOR:**

**SIGNATURES:**
(Employee signature indicates review and discussion of this document and does not necessarily imply concurrence.)

| Employee: | _Stephanie Cole_ | Date: 1-13-03 |
|---|---|---|
| **Immediate Supervisor:**  Job Title: | _Deborah Crutchfield_  _FAC Foreman_ | Date: 1-13-03 |
| **Reviewing Supervisor**  Job Title: | _R.E. Bryant_  _Facilities Supervisor_ | Date: 01/23/03 |

4

## SOUTHERN NUCLEAR OPERATING COMPANY

### ANNUAL EMPLOYEE SAFE WORK PRACTICES INSPECTION

**Employee Name**  Stephanie Sanders  Stephan~~~~~~  1-13-03

**Employee Number**  _____

**(Optional) See Attached List of Employees**  _____
(CHECK)

**Work Location**  FARley Nuclear Plant

The above listed employee(s) is complying with the safety related work practices required by Southern Nuclear and applicable OSHA Standards including 1910.269. The inspection verified that the employee(s):

| | Comments |
|---|---|
| Has received training in the specific job functions he/she is currently performing; and received safety awareness training in appropriate areas such as HAZCOM, Blood Borne Pathogens, Access to Exposure and Medical Records, Personal Protective Equipment, Hearing Conservation, Asbestos and Lead. | Yes |
| Has conducted or participated in Job Safety Briefings | Yes |
| Understands and follows the Plant Clearance Procedures | Yes |
| Understands and follows all other procedural guidance applicable to work he/she performs | Yes |
| Is knowledgeable of and wears appropriate clothing when exposed to work on or near exposed energized electrical equipment | Yes |
| Utilizes Personal Protective Equipment as required | Yes |
| Utilizes safe work practices applicable to work he/she performs | Yes |

This form shall be maintained for the employee's duration of employment. This form may be used as an attachment to the employee's Annual Performance Plan and Summary

| Deborah Crutchfield | Deborah Crutchfield | Foreman | 01-13-03 |
|---|---|---|---|
| **Management Inspector (Print Name)** | **Management Inspector (Signature)** | **Title** | **Date** |

Annual Safe Work Practice Training Checklist

1.  **Hazard Communication (HAZCOM)**

                                                                         Yes    No

    a.  Has employee received initial Hazcom training (Normally provided by initial GET training and maintaining annual GET retraining current. Deals with understanding the use of MSDS sheets and SHP-26)? — [Yes ☑] [No ☐]

    b.  Is the employee aware of the hazards associated with the hazardous materials used by the employee? — [Yes ☑] [No ☐]

    If all the items above were answered as yes the employee meets the training qualifications for this section.

2.  **Bloodborne Pathogen**

    Is the employee expected be able to act as a first aid responder? — [Yes ☐] [No ☑]

    a.  If yes, is the employee first aid qualifications current (first aide training includes dealing with bloodborne pathogens)? — [Yes ☐] [No ☑]

    If all the items above were answered as yes the employee meets the training qualifications for this section.

    Is the employee a SNC employee not first aid qualified? — [Yes ☑] [No ☐]

    a.  If yes, has the employee been informed to avoid contact with blood products and if blood type products are encountered Safety & Health personnel should be contacted to respond? — [Yes ☑] [No ☐]

    If all the items above were answered as yes the employee meets the training qualifications for this section.

3.  **Access to Exposure and Medical Records**

    a.  Has the employee been informed this year that he has access to his personal exposure and medical records? — [Yes ☑] [No ☐]

    If all the items above were answered as yes the employee meets the training qualifications for this section.

4.  **Personal Protective Equipment**

    a.  Has the employee been initially instructed when to use, how to wear and the proper care, maintenance of eye and face protection, hand protection, foot protection, head protection and electrical protection equipment? — [Yes ☑] [No ☐]

    If all the items above were answered as yes the employee meets the training qualifications for this section.

Yes    No

5.  **Hearing Conservation**

   a.  Has the employee received annual training on the effects of noise on hearing, the use of hearing protection and the purpose of audiometric testing (Normally provided during annual GET training)?    ☑  ☐

If all the items above were answered as yes the employee meets the training qualifications for this section.

6.  **Asbestos**

   Is the employee expected to be able to perform asbestos work?    ☐  ☑

   a.  If yes, is the employee expected to be an asbestos competent person?    ☐  ☑

   If yes, has the employee received the initial Class III 16 hour asbestos competent person training?    ☐  ☑
   Has the employee received the annual asbestos competent person retraining?    ☐  ☑

If all the items above were answered as yes the employee meets the training qualifications for this section.

   b.  If yes, is the employee expected to be able to perform Class III asbestos work?    ☐  ☑

   If yes, has the employee received the initial Class III asbestos worker training?    ☐  ☑
   Has the employee received the annual Class III worker retraining?    ☐  ☑

If all the items above were answered as yes the employee meets the training qualifications for this section.

   c.  If yes, is the employee expected to be able to conduct Class IV asbestos work?    ☐  ☑

   If yes, has the employee received the initial Class IV asbestos worker training?    ☐  ☑

If all the items above were answered as yes the employee meets the training qualifications for this section.

7.  **Lead**

   Is the employee expected to be able to work on lead containing material?    ☐  ☑

   a.  If yes, has the employee been given initial general training (HazCom) regarding the hazards of lead exposure?    ☐  ☑

If all the items above were answered as yes the employee meets the training qualifications for this section.

   Has the employee been exposed to lead in air in excess of 30 ug/m$^3$ (No FNP employees in this category in 1999)?    ☐  ☑

   a.  If yes, has the employee been given training regarding the health hazards of lead, protective measures to reduce exposure and other lead safety related training.    ☐  ☑

If all the items above were answered as yes the employee meets the training qualifications for this section.

# Southern Nuclear Operating Company, Inc.
## PERFORMANCE MANAGEMENT PLAN
*(For employees represented by I.B.E.W.)*

**SOUTHERN COMPANY**
*Energy to Serve Your World™*

| | | |
|---|---|---|
| **NAME:  LAST:** Sanders | **FIRST:** | Stephanie |

**EMPLOYEE #:**

**REVIEW PERIOD:  FROM:** 1-1-2003     **TO:** 12-31-2003

**DEPARTMENT:** Facilities

**JOB TITLE:** Helper

**CHECK REASON FOR APPRAISAL:**

| | |
|---|---|
| X | **Annual** |
| | **Change of Immediate Supv** |
| | **Accelerated Input** |
| | **Other** |
| See Section II. | **Incremental Increase** |

## I. DEVELOPMENTAL PLAN

**DEMONSTRATED STRENGTHS:**

Values and influences teamwork
Accountable for performance
Practices safe work habits
Communication
Practices problem solving
Demonstrates continuous learning

Takes personal responsibility
Demonstrates Southern Style
Professionalism
Makes decisions
Demonstrates character
Dependable

**DEVELOPMENTAL NEEDS:**
Increase knowledge of plant equipment and plant systems
Strive to achieve error free (human) performance
Create an observable change in housekeeping and material condition of plant areas (take ownership)
Conduct and participate in pre-job briefs prior to each task
Learn from operating experiences (lessons learned)
Place emphasis on the human performance tools and provide leadership in helping the facilities group with human performance deficiencies
Work to improve customer service of the group
Continue to look for ways to make this a "Great Place to Work"
Work to increase expertise in all functional facility areas

**DEVELOPMENTAL ACTION PLAN:**
I will continue to look for ways to make this a "Great Place to Work"
I will strive to achieve error free (human) performance
I will create and observable change in housekeeping and material condition of plant areas
I will conduct and participate in pre-job briefs to each task
I will learn from operating experiences (lessons learned)
I will place emphasis on the human performance tools and provide leadership in helping the facilities group with human performance deficiencies
I will work to improve customer service of the group.
I will work to increase expertise in all functional facility areas

DEFENDANT'S EXHIBIT

16 Sanders

## II. PERFORMANCE ASPECTS

| PERFORMANCE ASPECTS | ABOVE | AT | BELOW | COMMENTS |
|---|---|---|---|---|
| | E X P E C T A T I O N S | | | |
| **A. COMMUNICATES TO CREATE SHARED UNDERSTANDING.** | | | | |
| 1. Communicates accurately and frequently. | ✓ | | | |
| 2. Informs coworkers, supervisors, or managers when there is a potential problem. | ✓ | | | |
| 3. Practices effective team skills. | ✓ | | | |
| 4. Strives for positive working relationships. | | ✓ | | |
| 5. Provides assistance to others. | ✓ | | | |
| 6. Actively participates in planning, pre-job briefs, post-job briefs. | | ✓ | | |
| 7. Maintains the work area (in the field and in the shop) in a professional manner, meeting plant housekeeping standards. | ✓ | | | |
| **B. ANTICIPATES ERROR-LIKELY SITUATIONS.** | | | | |
| 1. Performs self-check. | | ✓ | | |
| 2. Checks with others. | | ✓ | | |
| 3. Focuses attention on the task at hand. | | ✓ | | |
| 4. Expects success, but maintains a questioning attitude. | ✓ | | | |
| 5. Takes the time needed to do the job right. | ✓ | | | |
| **C. CONFIRMS THE INTEGRITY OF DEFENSES.** | | | | |
| 1. Follows approved procedures with a sense of awareness. | | ✓ | | |
| 2. Questions the appropriateness of disabling or degrading systems to perform work. | | ✓ | | |
| 3. Monitors vital parameters. | | ✓ | | |
| 4. Stops the task and collaborates with others when unfamiliar or unanticipated conditions arise. | ✓ | | | |
| 5. Uses proper safety equipment. | ✓ | | | |
| 6. Uses ALARA concepts and adheres to good radiological safety work procedures. | ✓ | | | |



PERFORMANCE MANAGEMENT P[...]

## II. PERFORMANCE ASPECTS (Continued)

### D. IMPROVES PERSONAL CAPABILITIES.

| | | | |
|---|:---:|:---:|---|
| 1. Proactive; anticipates and resolves problems or roadblocks. | | ✓ | |
| 2. Assumes ownership of tasks and issues. | ✓ | | |
| 3. Flexible; handles multiple elements of work activities. | ✓ | | |
| 4. Helps identify and solve problems, recognized as technical expert. | | ✓ | |
| 5. Seeks ways to improve capabilities. Seeks difficult or additional tasks. Strives to improve knowledge and skills. | ✓ | | |
| 6. Acquires knowledge and understanding of the factors that influence human behavior. | | ✓ | |
| 7. Maintains present qualifications and satisfactorily participates in assigned training. | | ✓ | |
| 8. Willing to try new/different approaches, as appropriate, to improve plant. | ✓ | | |
| **E. PERFORMANCE** | | | |
| 1. Performs assigned tasks / works efficiently and professionally, using approved procedures as applicable. | ✓ | | |
| 2. Supportive of Management's directives, goals and expectations. | ✓ | | |
| 3. I will support the company's policy of maintaining an open, fair and inclusive work environment. | ✓ | | |

## THIS SECTION SHOULD BE COMPLETED FOR INCREMENTAL PAY INCREASES ONLY:

Supervision should complete the performance aspects checklist to ensure performance is at an acceptable level for incremental pay increase consideration. In addition to completing the Performance Aspects checklist, supervision should review and assess the employee's time-in-grade, training, qualifications and make a determination of whether to pay an incremental increase.

| NAME:    LAST: | WALDEN | FIRST: | JOE | INITIAL: | M |
|---|---|---|---|---|---|
| JOB TITLE | FACILITIES SUPERVISOR | | | | |

*Please copy and paste the following symbol as needed to designate appropriate responses below:* ▨

☒ Meets   ▨ Does not meet   all of the time-in-grade*, training, qualifications and management performance expectations to qualify for consideration for an incremental pay increase.

*For employees at Hatch and Vogtle, step pay increases will be consider based classification criteria at 12 month interval [ex]cept for SO or Helper, which are considered at six month intervals. Employees at Farley are considered for step [incre]ases at six month intervals for all positions.

**III. CLOSEOUT PERFORMANCE SUMMARY**

**OVERALL PERFORMANCE:**

Stephanie is a good, hard working, employee with a lot of potential. Stephanie is willing to learn new tasks and takes pride and ownership in her work. She practices and fosters good team skills and maintain positive working relationships, she provides assistance to others when they need a hand. She maintains safe work practices and places emphasis on the Human Performance Tools while participating in pre job briefings. She has maintained a questioning attitude and good communication skills.

**IV. COMMENTS**

**EMPLOYEE:**

**REVIEWING SUPERVISOR:**

*Agree.*
*Stephanie provides high quality work.*
*Observations of work indicate high level of ownership -*
*JMW 1/28/2004*

**SIGNATURES:**
**(Employee signature indicates review and discussion of this document and does not necessarily imply concurrence.)**

| Employee: | *Stephanie Fowler* | Date: 1-8-04 |
|---|---|---|
| Immediate Supervisor: Job Title: | *Deborah Crutchfield* FAC FOREMAN | Date: 1-8-2004 |
| Reviewing Supervisor Job Title: | *Joe M. Walden* Training Supv. | Date: 1-28-2004 |

4

# SOUTHERN NUCLEAR OPERATING COMPANY

## ANNUAL EMPLOYEE SAFE WORK PRACTICES INSPECTION

Employee Name  _Stephanie Sanders_

Employee Number  _____

(Optional) See Attached List of Employees  _____
                                             (CHECK)

Work Location  _FNP_

The above listed employee(s) is complying with the safety related work practices required by Southern Nuclear and applicable OSHA Standards including 1910.269. The inspection verified that the employee(s):

| | Comments |
|---|---|
| Has received training in the specific job functions he/she is currently performing; and received safety awareness training in appropriate areas such as HAZCOM, Blood Borne Pathogens, Access to Exposure and Medical Records, Personal Protective Equipment, Hearing Conservation, Asbestos and Lead. | yes  ms  1-8-04 |
| Has conducted or participated in Job Safety Briefings | yes  sms  1-8-04 |
| Understands and follows the Plant Clearance Procedures | yes  sms  1-8-04 |
| Understands and follows all other procedural guidance applicable to work he/she performs | yes  sms  1-8-04 |
| Is knowledgeable of and wears appropriate clothing when exposed to work on or near exposed energized electrical equipment | yes  sms  1-8-04 |
| Utilizes Personal Protective Equipment as required | yes  sms  1-8-04 |
| Utilizes safe work practices applicable to work he/she performs | yes  sms  1-8-04 |

**This form shall be maintained for the employee's duration of employment. This form may be used as an attachment to the employee's Annual Performance Plan and Summary**

| Deborah Crutchfield | Deborah Crutchfield | FAC Foreman | 1-8-2004 |
|---|---|---|---|
| Management Inspector (Print Name) | Management Inspector (Signature) | Title | Date |

# PERFORMANCE SUMMARY FOR    (enter correct year here)

Directions: To begin typing, *click* in each gray box. Do not use your "Tab" key.

Employee Name:

Stephanie Sanders

Employee's position:

Helper-Nuclear

Supervisor Name & Position:

Mark Freeman/ Foreman

Location:

Plant Farley

Date & Specify Mid-year Discussion or End-of-year Summary:

8-17-2004     Mid-year discussion

CLICK HYPERLINKS BELOW

**Results achieved (page 2 ▸ )**

**Behaviors demonstrated (page 3 ▸ )**

**Developmental achievements (page 4 ▸ )**

Employee Signature: _Stephanie Sanders_    Date: 8-17-04

Supervisor Signature: _M Freeman_    Date: 8-17-04

Employee Comments (optional):

Results Achieved 1. cast recall



DEFENDANT'S
EXHIBIT

*M Sanders*

## RESULTS ACHIEVED:

- Produces satisfactory work and meets productivity goals. Stephanie produces quality work. For example, during performance of a housekeeping item, Stephanie desired the cleanup process in the spent fuel pool ventilation room be improved.
- Is dependable and focused on team results.
- Holds self accountable for meeting performance expectations.

Back (page 1 ◄ )

## BEHAVIORS DEMONSTRATED:

- Customer Focus; dedicated to meeting expectations and requirements of internal customers.
- Ethical Behavior; presents facts in an honest and direct manner. Stephanie desires that all assignments she performs be of the highest quality.
- Diversity; understands different perspectives and frames of reference.

Back (page 1 ◄ )

## DEVELOPMENTAL ACHIEVEMENTS:

- Job knowledge is sufficient to the extent that most tasks do not require close supervision or assistance from others.
- Efficiently manages assigned tasks.
- Has positive attitude and work assignments are willingly accepted. She requested more training before performing a rad side fire watch that she did not feel comfortable with.

Back (page 1 ◀ )

# Southern Nuclear Operating Company, Inc.
**PERFORMANCE MANAGEMENT PLAN**
*(For employees represented by I.B.E.W.)*

**SOUTHERN ▲**
**COMPANY**
*Energy to Serve Your World™*

| | | | | |
|---|---|---|---|---|
| **NAME:** | **LAST:** | Sanders | **FIRST:** | Stephanie |

**EMPLOYEE #:**

**REVIEW PERIOD:**    **FROM:**  1-1-2004    **TO:**  12-31-2004

**DEPARTMENT:**  Facilities

**JOB TITLE:**  Helper

**CHECK REASON FOR APPRAISAL:**

X _____  Annual

_____  Change of Immediate Supv

_____  Accelerated Input

_____  Other

See Section II.  Incremental Increase

## I. DEVELOPMENTAL PLAN

**DEMONSTRATED STRENGTHS:**

Values and influences teamwork
Accountable for performance
Practices safe work habits
Communication
Practices problem solving

Takes personal responsibility
Dependable
Professionalism
Makes decisions
Demonstrates character

**DEVELOPMENTAL NEEDS:**

Increase knowledge of plant equipment and plant systems (plant reliability)
Strive to achieve error free (human) performance
Create an observable change in housekeeping and material condition of plant areas (take ownership)
Conduct and participate in pre-job and post job briefs associated with each task
Promote Southern Style
Strive to achieve a bank of sick leave hours in preparation for the unexpected
Help to create a cost effective environment
Strive to achieve zero accidents (personal and vehicle)

**DEVELOPMENTAL ACTION PLAN:**

I will increase knowledge of plant equipment and plant systems (plant reliability)
I will strive to achieve error free (human) performance
I will create an observable change in housekeeping and material condition of plant areas ( take ownership)
I will conduct and participate in pre-job and post job briefs associated with each task
I will promote the Southern Style
I will strive to achieve a bank of sick leave hours in preparation for the unexpected
I will help to create a cost effective environment
I will strive to achieve zero accidents (personal and vehicle)

DEFENDANT'S
EXHIBIT

*18 Sanders*

# Southern Nuclear Operating Company, Inc.
## PERFORMANCE MANAGEMENT PLAN

### II. PERFORMANCE ASPECTS

| PERFORMANCE ASPECTS | ABOVE | AT | BELOW | COMMENTS |
|---|---|---|---|---|
| | **E X P E C T A T I O N S** | | | |
| **A. COMMUNICATES TO CREATE SHARED UNDERSTANDING.** | | | | |
| 1. Communicates accurately and frequently. | | X | | |
| 2. Informs coworkers, supervisors, or managers when there is a potential problem. | X | | | |
| 3. Practices effective team skills. | | X | | |
| 4. Strives for positive working relationships. | | X | | |
| 5. Provides assistance to others. | | X | | |
| 6. Actively participates in planning, pre-job briefs, post-job briefs. | | X | | |
| 7. Maintains the work area (in the field and in the shop) in a professional manner, meeting plant housekeeping standards. | X | | | |
| **B. ANTICIPATES ERROR-LIKELY SITUATIONS.** | | | | |
| 1. Performs self-check. | | X | | |
| 2. Checks with others. | | X | | |
| 3. Focuses attention on the task at hand. | X | | | |
| 4. Expects success, but maintains a questioning attitude. | X | | | |
| 5. Takes the time needed to do the job right. | | X | | |
| **C. CONFIRMS THE INTEGRITY OF DEFENSES.** | | | | |
| 1. Follows approved procedures with a sense of awareness. | | X | | |
| 2. Questions the appropriateness of disabling or degrading systems to perform work. | X | | | |
| 3. Monitors vital parameters. | | X | | |
| 4. Stops the task and collaborates with others when unfamiliar or unanticipated conditions arise. | X | | | |
| 5. Uses proper safety equipment. | | X | | |
| 6. Uses ALARA concepts and adheres to good radiological safety work procedures. | | X | | |

# Southern Nuclear Operating Company, Inc.
## PERFORMANCE MANAGEMENT PLAN
### II. PERFORMANCE ASPECTS (Continued)

| D. IMPROVES PERSONAL CAPABILITIES. | | | | |
|---|---|---|---|---|
| 1. Proactive; anticipates and resolves problems or roadblocks. | | X | | |
| 2. Assumes ownership of tasks and issues. | X | | | |
| 3. Flexible; handles multiple elements of work activities. | X | | | |
| 4. Helps identify and solve problems, recognized as technical expert. | | X | | |
| 5. Seeks ways to improve capabilities. Seeks difficult or additional tasks. . Strives to improve knowledge and skills. | | X | | |
| 6. Acquires knowledge and understanding of the factors that influence human behavior. | | X | | |
| 7. Maintains present qualifications and satisfactorily participates in assigned training. | | X | | |
| 8. Willing to try new/different approaches, as appropriate, to improve plant. | | X | | |
| E. PERFORMANCE | | | | |
| 1. Performs assigned tasks / works efficiently and professionally, using approved procedures as applicable. | X | | | |
| 2. Supportive of Management's directives, goals and expectations. | | X | | |
| 3. I will support the company's policy of maintaining an open, fair and inclusive work environment. | | X | | |

## THIS SECTION SHOULD BE COMPLETED FOR INCREMENTAL PAY INCREASES ONLY:

Supervision should complete the performance aspects checklist to ensure performance is at an acceptable level for incremental pay increase consideration. In addition to completing the Performance Aspects checklist, supervision should review and assess the employee's time-in-grade, training, qualifications and make a determination of whether to pay an incremental increase.

| NAME:    LAST: | | FIRST: | | INITIAL: | |
|---|---|---|---|---|---|
| JOB TITLE | | | | | |

*Please copy and paste the following symbol as needed to designate appropriate responses below:*  ☒

☒ **Meets**      ☒ **Does not meet**   all of the time-in-grade*, training, qualifications and management performance expectations to qualify for consideration for an incremental pay increase.

*For employees at Hatch and Vogtle, step pay increases will be consider based classification criteria at 12 month interval except for SO or Helper, which are considered at six month intervals. Employees at Farley are considered for step increases at six month intervals for all positions.

CLOSEOUT PERFORMANCE SUMM

**OVERALL PERFORMANCE:** Stephanie has received numerous emails throughout the year (2004) about the quality of her work and willingness to perform tasks as they are assigned. Stephanie has demonstrated willingness to perform all task with a broad base of experience and knowledge in all aspects of her responsibilities. Stephanie has a questioning/learning attitude and has mentioned several noteworthy potential safety concerns, equipment problems and other job related issues to the attention of supervision. Stephanie takes ownership of all tasks she is a assigned. Stephanie is reliable and dependable. Given the climate of our working environment with the shortage of personnel , Stephanie has contributed to keeping the Facilities Group work load manageable by dong her share of working overtime, both offered and volunteering. Some of the attributes from emails received to describe Stephanie's work ethic, abilities, and customer service are:  " very cooperative, willing to go the extra mile, doing whatever it takes to help our group succeed, good job, a great job done, and proactive in satisfying our customer needs. Stephanie is truly an asset to the Facilities Group.

## IV.  COMMENTS

**EMPLOYEE:**

**REVIEWING SUPERVISOR:**

Stephanie is a good, hard working employee with a lot of potential.  Stephanie is willing to learn new tasks and takes pride and ownership in her work area.  She practices and fosters good team skills and maintains positive working relationships, she provides assistance to others when they need a hand.  She maintains safe work practices and places emphasis on the Human Performance Tools while participating in pre-job briefs.  She has maintained a questioning attitude and good communication skills.

**SIGNATURES:**
**(Employee signature indicates review and discussion of this document and does not necessarily imply concurrence.)**

| Employee: | *Stephanie ___* | Date: 1-18-05 |
|---|---|---|
| Immediate Supervisor: Job Title: | *Mark Freeman* *FAC. Foreman* | Date: 1-18-05 |
| Reviewing Supervisor Job Title: | *Deborah Cutchfield* *FAC Supv.* | Date: 1-18-05 |

4

## SOUTHERN NUCLEAR OPERATING COMPANY

## ANNUAL EMPLOYEE SAFE WORK PRACTICES INSPECTION

Employee Name _Stephanie Sanders_

Employee Number _____

(Optional) See Attached List of Employees _____
(CHECK)

Work Location _Farley_

The above listed employee(s) is complying with the safety related work practices required by Southern Nuclear and applicable OSHA Standards including 1910.269. The inspection verified that the employee(s):

| | Comments |
|---|---|
| Has received training in the specific job functions he/she is currently performing; and received safety awareness training in appropriate areas such as HAZCOM, Blood Borne Pathogens, Access to Exposure and Medical Records, Personal Protective Equipment, Hearing Conservation, Asbestos and Lead. | Yes |
| Has conducted or participated in Job Safety Briefings | Yes |
| Understands and follows the Plant Clearance Procedures | Yes |
| Understands and follows all other procedural guidance applicable to work he/she performs | Yes |
| Is knowledgeable of and wears appropriate clothing when exposed to work on or near exposed energized electrical equipment | Yes |
| Utilizes Personal Protective Equipment as required | Yes |
| Utilizes safe work practices applicable to work he/she performs | Yes |

This form shall be maintained for the employee's duration of employment. This form may be used as an attachment to the employee's Annual Performance Plan and Summary

_Mark Freeman_                    _M Freeman_                    _FAC Foreman_         _1-18-05_
Management Inspector        Management Inspector        Title              Date
(Print Name)                       (Signature)



SOUTHERN
COMPANY

# PERFORMANCE PLAN & SUMMARY

| | |
|---|---|
| **Employee Name:** | Stephanie Sanders |
| **Employee Title:** | Facilities Helper |
| **Supervisor Name:** | Mark Freeman |
| **Supervisor Title:** | Facilities Foreman |
| **Location:** | Farley Nuclear |
| **Performance Period:** | 1/1/2005 thru 12/31/2005 |

This document has 3 parts:
*(Click on the appropriate
hyperlink for further
instructions and to access the
desired section)*

1.  Business Results

2.  Behaviors

3.  Development

## Performance Plan Discussion

Supervisor Signature/Date:    *Mark Freeman*    1-28-05

Employee Signature/Date:    *[signature]*    1-28-05

## Midyear Discussion

Supervisor Signature/Date:    *Mark Freeman*    7-13-05

Employee Signature/Date:    *[signature]*    7-13-05

## Year-end Summary

Performance Summary:

⌐ Expectations Clearly Exceeded

⌐ Expectations Fully Met

☒ Expectations Not Fully Met

Supervisor Signature/Date:    *Debrah Cutchfield*    11-3-05

Employee Signature/Date:

DEFENDANT'S
EXHIBIT

*19 Dardus*

Version 4.0-11/04

**SOUTHERN**
**COMPANY**
*Energy to Serve Your World*

## Business Results

### *Instructions*

- Business results are the specific expectations of an employee within a performance period.
- Document one expectation on a page. For additional pages click on "New Business Results Page" on the tool bar above. Do this before entering content. (Option: Document all expectations in one box. Document performance vs. expectations in one box, including separate ratings for each expectation.)

### Results Expected

1. Safety Goals for Team:
   - Have no human performance errors causing a trip / transient / radiation release.
   - Maintain dose and contamination less than team goal.
   - Have no injures that lead to a clock reset.

2. Reliability Goals for Team:
   - Have no plant trip / transient due to maintenance planning and execution.
   - Have no missed Firewatches
   - Have intolerance for equipment failure. Take proactive measures to improve equipment reliability and instill this attitude in your team members.
   - Promote maintenance ownership with facility group equipment
   - Support the plants Maintenance Work Orders and be accountable to complete per scheduled dates.
   - Support the Farley Material Condition Inspection specific deficiencies and be held accountable to complete per scheduled dates when assigned.

3. Cost Goals for Team:
   - Promptly return unused materials to supervisor or supply chain.
   - Don't throw away equipment such as mop heads, trash bags, etc. that can be used again.
   - Don't waste chemicals that you use. Always plan ahead.
   - Be held accountable to clean up work area, shop area, equipment and vehicles at the end of the shifts.

4. Diversity Goal for Team:
   - Encourage different perspectives and respect differences.

5. Learning Organization for Team:
   - Write CR's at low threshold.
   - Turn in Daily Assignment Sheets at the end of each shift.
   - Maintain > 95% completion rate and feedback on Daily Assignment Sheet of work performed

**SOUTHERN**
**COMPANY**
*Energy to Serve Your World*

| **Performance Versus Expectations** | |
|---|---|
| *Midyear Discussion:* | **Clearly Exceeded** |
| -Stephanie has demonstrated safety as a way of doing her daily tasks | |
| -Stephanie missed no fire watches during this time period, had no injuries or human performance events. | **Fully Met** |
| -Stephanie exhibits good business sense and brings to the attention of supervision when there are financial or material waste. | X |
| - Stephanie experience makes her look at the working environment from different perspectives to enhance the Facility Group as a whole. | **Not Fully Met** |
| | |

| **Performance Versus Expectations** | |
|---|---|
| *Year-end Summary:* | **Clearly Exceeded** |
| -Stephanie has only written one CR this year. | |
| -Stephanie has not demonstrated a support for the diversity goal for the team by encouraging different perspectives and respecting differences. She was placed on a written reminder for harassing a coworker on 8-17-05. | **Fully Met** |
| -Stephanie has swapped job assignments with coworkers without obtaining supervisor concurrence. This impedes supervisor's ability to hold individuals accountable for their actions. | **Not Fully Met** |
| | X |



SOUTHERN
COMPANY
*Energy to Serve Your World*

## Behaviors

### Instructions
- All employees are expected to demonstrate Southern Style.
- To help focus team performance it may be helpful to identify specific behaviors under each of the three Southern Style areas.
- The rating scale has been simplified to "fully met" and "not fully met" since some behaviors are either demonstrated or they are not.

### Behaviors Expected *(add more specific behaviors as needed)*
- Demonstrate Southern Style
- Support the company's policy of maintaining an open, fair and inclusive work environment.
- Be accountable to execute performance management effectively.
- Act as an example and mentor to enhance the development of my fellow workers.
- Model the use of the Human Performance Tools.
- Industrial Safety: **Target Zero – Every Job Every Day - Safely**
  a) Be responsible for performing work in a safe manner which includes following all requirements of the Safety and Health Manual and all safety and health related procedures, instructions and guidelines.
  b) Observe other employees to ensure that they are following safe work practices and advising those employees in the proper practices.
  c) Be responsible for looking for safety hazards, correcting any you can and, for those that can not be corrected , protecting other employees from injury by the hazard while reporting it to their supervisor. Write CRs to address these types of hazards.
  d) Report injuries and illnesses to your supervisor as soon as they occur. An accident report must be completed within 24 hours of reporting the injury / illness.
  e) Drive safely when performing assigned duties.

| Performance Versus Expectations | Fully Met |
|---|---|
| *Midyear Discussion* | |
| *- Stephanie exhibits Southern Style with co-workers and other plant personnel as she performs her daily tasks.  She's honesty and has sound integrity.* | x |
| *-Stephanie is always willing  to lend a helping hand to explain a task or help with tasks  with her co-workers.* | **Not Fully Met** |
| *-Stephanie support the Hatch 2005 Spring outage and received a letter commending her for her good work habits.  (See Attached letter)* | |
| *-Stephanie also received a letter while at Hatch from a fellow Farley employee working the 2005 Hatch Spring outage. (See Attached Letter)* | |

| Performance Versus Expectations | Fully Met |
|---|---|
| *Year-end Summary:* | |
| • Stephanie does not support the company's policy of maintaining an open, fair and inclusive work environment. She had to be placed on a written reminder for harassment of certain coworkers. | **Not Fully Met** |
| • This behavior is contrary to the expectation of acting as an example and mentor to enhance the development of her fellow workers. | x |

Version 4.0-11/04



SOUTHERN
COMPANY
Energy to Serve Your World

---

## Development

### *Instructions*

- Identify what the employee is expected to do:
  - ⇨ meet requirements for success in *current job* – i.e. job-specific skills, knowledge & experience (Leader Performance Standards for leadership positions)
  - ⇨ demonstrate Southern Style
  - ⇨ work on meeting requirements for jobs in *career plan* – i.e. job specific skills, knowledge & experience (Leader Performance Standards for movement into leadership positions)
- Compare these expectations with what the employee has already demonstrated or achieved.
- Identify and prioritize key strengths and gaps. Be specific.
- Develop an action plan. Consider options, costs and potential benefits.

| **Key Strengths** *(ideally not more than 2)* | **Key Gaps** *(ideally not more than 2)* |
|---|---|
| 1. Takes pride and ownership in all assigned tasks 2. Ability to work with others. 3. Dependable | 1. Housekeeping Accountability 2. Computer Programs/ Databases |

**Action Plan** *(can include time frame, resources & measures of success)*

1. Have no human performance issues or accidents that resets the clock
2. Focus on target zero—every day, every job
3. Maintain the housekeeping standards world class and look for ways to improve the material condition of the plant
4. Maintain a good attendance record with no tardiness.
5. Have no vehicle accidents.
6. Become proficient in the following computer programs: Housekeeping, Catch Bag, and Synepower
7. Supported the Hatch 2005 Spring Outage

**Midyear Developmental Progress**
-Stephanie has met the majority of the Action items for this review. She has worked safely and reliable without injury to herself or her fellow workers.
-Stephanie has been dependable, reliable and has very consistent work habits.
-Stephanie supported the Hatch 2005 Spring outage. Stephanie received 2 letters for her performance. (See attached letters)
-Stephanie will continue to enhance her proficiency on the computer programs that are used.

**Year-end Developmental Progress**
-Stephanie has not demonstrated an ability to work well with others as she was placed on a written reminder for harassment of certain coworkers
-Stephanie has not been dependable in recent weeks, having been absent from work several times without notifying supervision. She has shown no accountability for maintaining a good attendance record.

Version 4.0-11/04



Notes:
1. See attached letters (2) from Hatch 2005 Spring Outage

**From:**       Jordan, Jason L.
**Sent:**       Thursday, March 03, 2005 5:01 AM
**To:**         FNP Fac Foreman
**Cc:**         Sanders, Stephanie M.; McDowell, Janell; Vickers, Gamaska
**Subject:**    Service Above and Beyond Expectations

I would like to take this opportunity to express my deepest appreciation for the dedication and hard work exhibited by Stephanie, Janelle, and Gamaska. It has truly been a privilege to have them on my crew and I welcome them back any time. I have been impressed with the personal pride they each took in their jobs. They were instrumental in accomplishing seemingly impossible tasks with untiring devotion. I never once had to worry when any one of them was involved with a job because they made sure the job was complete and done right the first time. This along with their positive attitudes made my job much easier. They have reflected great credit upon themselves as well as Plant Farley and for this, they should be commended.

Thank you,
Jason Jordan
Facilities Foreman
Plant Hatch
8-692-3093

**From:** Jordan, Jason L.
**Sent:** Wednesday, March 02, 2005 5:35 PM
**To:** Sanders, Stephanie M.
**Cc:** FNP Fac Foreman
**Subject:** FW:

-----Original Message-----
**From:** Hilton, Robert B.
**Sent:** Wednesday, March 02, 2005 05:44
**To:** Underwood, Paul R.; Jordan, Jason L.
**Subject:** FW:

-----Original Message-----
**From:** Nelson, Robert J.
**Sent:** Wednesday, March 02, 2005 4:19 AM
**To:** Hilton, Robert B.
**Cc:** Sanders, Stephanie M.
**Subject:**

Robert,

    I just wanted to let you know that Stephanie Sanders went above and beyond this morning when she was working in the Con Bay. Stephanie was stocking clothes in the con bay when she saw I had a lost look on my face. I had placed a connector in the trash and had to retrieve it to have it evaluated. Stephanie took the time to dress out and pull the trash to find the connector. Not only did she pull the trash looking for the connector but she had to look in all three trash cans before finding it. Thank you again for the fine assistance rendered by Stephanie.

                                        Bob Nelson
                                        I & C

**Orientation Checklist**

Southern Nuclear Operating Company

| Name (Last, First Middle) |
|---|
| Sanders, Stephanie M. |

| Date Employed | Department |
|---|---|
| 10-18-99 | FAC |

Monthly

| System Transfer ☐ | Covered ☐ |
| New Employee ☑ | Non-Covered ☐ |

## PERSONNEL

### COMPANY POLICY

✓ Probationary Period

✓ Performance Appraisals
   Initial and Subsequent Reviews

✓ Rate of Pay & Pay Reviews
   Pay Range and Timing of Reviews

✓ Work Schedule
   Hours, Days, Overtime, Absences

✓ Resignation
   Two Week Notice Required

### SAFETY & HEALTH

✓ Safety Rules & Work Practices
   Proper Clothing, Accident Reporting, Work Rules

✓ Alcohol & Drug Policy
   Fitness-For-Duty

✓ Employee Assistance Program

✓ Physical Examination

✓ Wellness/Fitness Program

✓ Smoking Policy

✓ Worker's Compensation

### SECURITY

✓ Identification Badge

✓ Security Rules & Practices
   Key Control, Security of Equipment & Facilities

✓ Parking

### EMPLOYEE RELATIONS

✓ Equal Opportunity
   Affirmative Action, Harrassment

✓ Employee Concerns Program
   Policy, Procedures

✓ Employee Communications
   Bulletin Boards, SYNOPSIS, Newsletter

✓ Positive Discipline Program

### CAREER DEVELOPMENT

✓ Educational Assistance
   Tuition Refund, Home Study

✓ Transfers and Promotions
   Job Posting System, Eligibility

### GENERAL INFORMATION

✓ Change of Address/Personal Data

✓ Inclement Weather Policy

✓ Employee/Total Compensation Handbook

## BENEFITS

### MEDICAL INSURANCE PROGRAM

✓ Group Health Care Plan

✓ COBRA Notice

### LIFE INSURANCE PLANS

✓ Non-Contributory Life Insurance

✓ Contributory Life Insurance

✓ Dependent Life Insurance

### ACCIDENT INSURANCE PLANS

✓ Accidental Death & Dismemberment

✓ Business Travel Insurance

### DISABILITY INSURANCE PLANS

✓ Long-Term Disability Insurance

✓ Accident & Sickness Insurance

### FLEXIBLE BENEFITS PLAN

✓ Before Tax/After Tax Premiums

✓ Flexible Spending Account

✓ COBRA Notice

### SICK LEAVE PROGRAM

✓ Sick Leave

✓ Extended Sick Leave

### CAPITAL ACCUMULATION PLANS

✓ Employee Savings Plan

✓ Employee Stock Ownership Plan

### RETIREMENT

✓ Pension Plan

### OTHER BENEFIT PROGRAMS

✓ Holidays

✓ Vacation

✓ Service Awards

✓ Credit Union

✓ Energy Loans/Appliance Purchases

✓ Discount Vision Plan

✓ Savings Bonds

✓ Computer Loan Program

✓ Miscellaneous Time Off
   (Voting, Jury Duty, Death-In-Family)

**DEFENDANT'S EXHIBIT**

22 Sanders

| HR Representative Initials | Date | HR Representative Initials | Date | Employee Initials | Date |
|---|---|---|---|---|---|
| | | RCA | 10-20-99 | SMS | 10-20-99 |

ORIGINAL - PERSONNEL FILE,   CANARY COPY - BENEFITS FILE,   PINK COPY - EMPLOYEE