IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

JANELLE MCDOWELL and STEPHANIE )
SANDERS,                        )
                               )
     Plaintiffs,              )
                               )
v.                             )     CIVIL ACTION NO.
                               )     1:06-CV-314-CSC
                               )
SOUTHERN NUCLEAR OPERATING     )
COMPANY, INC.,                 )
                               )
     Defendant.               )

## DECLARATION OF DEBORAH CRUTCHFIELD

1.     My name is Deborah Crutchfield, and I am over the age of majority. I have personal knowledge of the matters in this declaration.

2.     I am employed by Southern Nuclear Operating Company ("Southern Nuclear") as a Facilities Supervisor. I have been employed at the Joseph M. Farley Nuclear Plant ("Plant Farley") since September 8, 1986.

3.     Jacqueline Cureton Boutwell submitted her letter of resignation to me on January 3, 2005. Her resignation was effective January 29, 2005. Because she was employed with Southern Nuclear on December 31, 2004, she was eligible for the Company's incentive bonus or PPP for the 2004 work year. A copy of Boutwell's letter of resignation is located at **EXHIBIT A.**

4.     I did not refuse to accept Jacqueline Boutwell's resignation in order for her to receive PPP. Boutwell did call me at home and tell me that she was having problems with her blood pressure and was considering resigning. I suggested that she see a doctor about her blood pressure.

5.     Over the years, I have offered to provide and have provided financial assistance to various Plant employees and former employees, both Caucasian and African

American, when they have faced financial hardship. I also have organized the collection of money to assist Plant employees during financial hardships. Some of the employees whom I can recall helping are Tracie Morris, former Caucasian female Helper, Bobbie White, former African American male Helper, Derroll Johnson, former African American Helper, and former Helper Jimmy Johnson, Caucasian male. I wrote a personal check to help White on one occasion and on another occasion gave him money to assist at Christmas. Regarding Johnson, I sent money to him when he had surgery while he reported to me as a Helper. I also provided financial assistance to Derroll Johnson when he had surgery. I gave money to Sandra Little, an African American former Chemistry employee. I also contributed to the collection of money for former Helper Janell McDowell when she was off work for an extended period of time for medical reasons a few years prior to her termination. Likewise, I offered to assist former Facilities Helper Phyllis Hughes with her health insurance payments so that she, a single parent, could have health coverage for her child. I contributed to the Facilities group's collection for Doris Ashford, and African American former Helper. Race played no role in whether I gave financial assistance to Plant Farley employees and former employees.

6.      While he was the General Manager of Plant Farley, Don Grissette told me that he did not want to see McDowell and Sanders working together on jobs that one Helper could perform. Mr. Grissette said that allowing McDowell and Sanders to work together when an assignment required only one Helper was a waste of resources. He also expressed that he had observed McDowell and Sanders together several times during working hours when they did not appear to be working. Mr. Grissette appeared particularly agitated after he saw McDowell and Sanders sitting in the downstairs lobby of the Service Building sorting through a school order during working hours on one occasion.

7.      Likewise, Mr. Grissette told me that he did not want to see any other two Helpers working together unless the job task required it or safety otherwise dictated. Mr. Grissette's instructions regarding McDowell and Sanders were consistent with his emphasis to Supervision on efficiency and productivity.

8.    We continued to assign McDowell and Sanders to work together when a job assignment required two people.

9.    While she served as a union steward, Facilities Helper Jennifer White brought to my attention McDowell's request to trade overtime for straight time because the Union did not support swapping this time.   McDowell's request was not a "Confidential" matter for Supervision because it was a common request from Helpers at that time and we frequently discussed with the Union its position on swapping time. Also, McDowell's request was treated in the routine manner because it was written on the form that employees generally use to request vacation and placed on the Foremen's desk.

10.    On or about July 28, 2005, John Wright, Phillip Avery and I observed Tammy Caldwell and Jennifer White immediately after a meeting with Doris Ashford in a vacant office next door to the Foremen's office.  Ashford tore up a piece of paper and threw it into the trash can in the office.  Caldwell and White seemed very upset.  After Caldwell, White and Ashford left, I took the pieces of paper out of the trash can and taped them back together.  The paper appeared to be a list (the "List") of complaints.  A copy of the List is located at **EXHIBIT B**.  The List was threatening in my opinion and the Facilities Foremen who saw it also felt that it was threatening or intimidating.

11.    Later that morning, Caldwell came to Facilities Supervision and told us that she and White were being harassed.    Thereafter, Jim Parrish, Facilities Superintendent, and I interviewed Caldwell and then White.  They told us that they were working in a hostile environment and gave us examples of things that they were experiencing and had been dealing with for some time.  A copy of the typewritten notes reflecting our interviews with Caldwell and White is located at **EXHIBIT C**.

12.    Sharon Bestwick ("Sharon"), the Employee Relations Coordinator for Plant Farley, later conducted additional interviews related to Caldwell's and White's allegations of a hostile environment.

13.    During the investigation of Tammy Caldwell's and Jennifer White's hostile environment complaints, Eddie Harris, one of the African American male Helpers

came to me and said that I did not know everything that was going on. Eddie then told me that Helpers were not doing their assigned jobs but were swapping job assignments without Supervision approval. Because Eddie is highly respected and has never given me reason to question his truthfulness, I directed Facilities Foreman John Wright to look into this report of unauthorized job swapping. This research revealed that Helpers Phyllis Hughes, Janelle McDowell, Stephanie Sanders, Leonard Russ, Doris Ashford, and Bobbie White had swapped assignments without approval from Facilities Supervision.

14.     Discipline was issued to several Facilities Helpers as a result of both the harassment investigation and the discovery of unauthorized job swapping. Helpers believed to have engaged in misconduct in both instances and who were disciplined accordingly were the following: Phyllis Hughes, a white female, Janell McDowell, an African American female, Stephanie Sanders, an African American female, and Doris Ashford, an African American female.

15.     Hughes was terminated. Both McDowell and Ashford received Decision Making Leave ("DML"), the highest level of discipline under Southern Nuclear's Positive Discipline Policy, and Sanders was issued a Written Reminder.

16.     Although McDowell historically was a good performer, she was issued a DML based on our belief that she had contributed to a hostile work environment, swapped jobs without Supervision's approval, and had engaged in conduct and made comments suggesting that she was attempting to create a division between employees and Supervision. A copy of the Employee Discipline Guide for McDowell is located at **EXHIBIT D**. I was present when Randy Johnson, the Plant General Manager, read the Discipline Guide to McDowell. Johnson did not use either Tammy Caldwell's or Jennifer White's name during the meeting in which McDowell was issued the DML.

17.     Stephanie Sanders, who also previously had been a good performer, was issued a Written Reminder based on information uncovered in the harassment investigation and management's inquiry into the unauthorized job swaps. We believed that Sanders had engaged in harassing conduct towards co-workers, failed to participate in meetings with Supervision, and swapped job assignments without Supervision's

approval. A copy of the Employee Discipline Guide for Sanders is located at **EXHIBIT E.**

18. Management made a commitment to periodically give McDowell feedback on her progress under her DML. The first feedback meeting with McDowell was attended by Mark Freeman, Shelley Murrell, and I on September 9, 2005. Shelley attended the September feedback meeting because she was going to be evaluating the Helpers while Mark Freeman was at an outage at Plant Vogtle. An outage is a work period when an operating unit is shut down for scheduled refueling and maintenance activities. In addition to Plant Farley, Southern Nuclear operates two other nuclear power plants, Plant Hatch in Baxley, Georgia, and Plant Vogtle near Waynesboro, Georgia. Facilities employees from all three Nuclear Plants are required to support outages at each of the other plants as needed. Plant Hatch has one scheduled outage a year in the spring only because they have 24 month fuel cycle. Plant Farley and Plant Vogtle have 18-month fuel cycles and, therefore, the units at these Plants are shutdown every 18 months to refuel. As such, Plants Farley and Vogtle sometimes have an outage twice a year (spring and fall) depending on fuel cycles.

19. In the September 9 feedback meeting, I recall McDowell standing in front of the desk the entire time. Although we invited her to, she refused to sit down. McDowell kept her arms crossed across her chest, and she never made eye contact while we talked. Although she sometimes responded to what was said to her, she did not seem to take ownership of our feedback on her behaviors that were inconsistent with the terms of her DML. She did not appear to take responsibility for any of the feedback.

20. During that meeting, Shelley Murrell told McDowell that she needed to appear as if she was paying attention in the morning meetings. McDowell insisted that she was paying attention and that Murrell should have questioned her to determine whether she was paying attention. Murrell then told McDowell that holding her head down, keeping her reflective glasses on, and holding her bag on her lap while facing away from the Foreman giving the meeting displayed a lack of interest and was disrespectful to the person speaking.

21.    After the meeting, Murrell, Freeman and I discussed our shared impression that McDowell was not committed to meeting management's expectations as set out in her DML. Based on this assessment, I recommended to Jim Parrish, Brad Moore, Maintenance Manager, and Chere Johnson, Human Resources Supervisor, that McDowell be terminated. A copy of the written recommendation is located at **EXHIBIT F.** Neither race nor gender played any role in my recommendation that McDowell be terminated. Executive management concurred with my recommendation and made the decision to terminate McDowell's employment.

22.    On September 16, 2005, Sonny Bargeron, Assistant Plant General Manager, Brad Moore, Chere Johnson and I met with McDowell to terminate her employment. Mike Jackson accompanied McDowell to the meeting as her union representative. A copy of the Management Discussion Guide that Sonny Bargeron read to McDowell during her termination meeting is located at **EXHIBIT G.**

23.    On or about October 11, 2005, Stephanie Sanders stopped reporting to work. Sanders initially called in sick, but thereafter failed to keep Supervision informed of her status as required. Facilities Supervision made numerous calls to Sanders' home in an effort to determine her status and to get her to return to work. On or about October 21, 2005, I sent Sanders a letter informing her that her failure to keep her Supervision informed of her status was grounds for discipline. I urged Sanders to contact her Supervision immediately and enclosed FMLA paperwork. I advised Sanders that she needed to submit the paperwork to the Safety and Health Department within five (5) days. Although Sanders called and left a voice mail message acknowledging receipt of my letter and the FMLA paperwork, she neither submitted the FMLA paperwork nor reported back to work. As such, on November 1, 2005, Sanders' employment was terminated for Job Abandonment. A copy of the termination letter signed by Randy Johnson and me and mailed on November 1, 2005, is located at **EXHIBIT H.**

24.    After we mailed the termination letter to Sanders, she called and told me that she was faxing a letter of resignation to the Plant. The letter that Sanders faxed,

however, was neither signed nor did it state that Sanders was resigning her employment. A copy of Sanders' resignation letter is located at **EXHIBIT I.**

25.    I know of no occasion that former Helper Jonathan Nall reported to work intoxicated.

26.    It is true that McDowell and Sanders were denied "rest provision" and instead were required to come to work at Plant Farley for their regular schedule after they finished the Plant Hatch outage in spring 2005. None of the Facilities Helpers, however, were allowed rest provision after this outage because of a shortage of manpower resulting from back to back outages (first Plant Hatch and then Plant Vogtle). Rest provision is time off with pay due to a schedule change at management's request. Payment of rest provision is a discretionary decision for management. McDowell and Sanders got off work at Plant Hatch at 7:00 a.m. on Friday, March 4, and were paid 8 hours of travel time for Saturday March 5, although it only takes 5 hours to travel from Plant Hatch to Plant Farley. McDowell and Sanders were off work from 7:00 a.m. on Friday, March 4, until 11:00 p.m. Saturday, March 5, when they reported back to work on their regular shift at Plant Farley. The only Helpers who were allowed to be "OFF" on Saturday, March 5, were those whose regularly scheduled off day was Saturday or those who took vacation. A copy of the Facilities Schedule covering the end of the Plant Hatch spring 2005 outage is located at **EXHIBIT J.**

27.    I never saw the inappropriate cake that was brought to the Plant in 2004. I saw the cake box, but I did not see what the cake looked like in the box nor did I see the cake out of the box.

28.    Former Facilities Helper Chuck Schaule cut down a tree on Company property on February 20, 2003. Schaule miscalculated where the tree would fall and when it did fall, it fell on a Company vehicle. The accident was investigated by Cliff Buck, Health Physics & Chemistry Manager, and then Foreman B. J. Yance.    The accident was not classified as a "vehicle accident" because the damaged vehicle was not being driven and because no other vehicle was involved in the accident. The Condition Report related to this accident is attached as **EXHIBIT K.**

29.    A "firewatch" is a Facilities Helper job assignment that requires the assigned Helper to patrol a designated area of the Plant and monitor specific Fire Protection (FP) component impairment status for indication of the presence of a fire or equipment status change.  This is to be performed on an hourly basis such that each impairment is monitored at least once per 60 minutes (+/-15 minutes).

30.    One type of firewatch is the Service Water Intake Structure ("SWIS") firewatch, which requires that the assigned Helper perform this activity once per hour on the half hour.  The Helper assigned to the SWIS firewatch does not have to stay inside the building the entire time, but he/she must conduct the firewatch inside the building at the designated location at the designated time.

31.    Former Facilities Helper Angela Smith Peters resigned effective April 6, 2005.  At the time of her resignation, Peters was on discipline and was under a Performance Improvement Plan for attendance and performance.

32.    The Company has an Employee Concerns Program that all employees can use to report and resolve issues related to their employment.  Tom Pelham is the Concerns Coordinator at Plant Farley, but Plant Farley employees have access to the Concerns program through the corporate office as well.


I declare under the penalty of perjury that the foregoing is true and correct.


_Deborah Crutchfield_
Deborah Crutchfield

Date: _12-19-2006_

Jan 3, 2005



Southern Nuclear Operating Co.
Farley Nuclear Plant
Human Resources
P.O. Box 470
Ashford, Al 36312

Whomever it may concern,

29 C Johnson

I submit this resignation to become effective January 28, 2005.
I will continue to remain loyal to Southern Company for the safety
and security of Plant Farley.

Sincerely,

Jacquelyn Boutwell

THIS HAS to do w/ U talking 2 Phyl. the
MAJORITY OF the GROUP ASKED ME 2 TALK TO U PRIOR 2

1. BETWEEN US.                              that.
        IF REPEATED TELL IT TRUTHFULLY IN ITS
                        ENTIRELY.

2. DRESS ISSUE
        1. NOT 1. TURNED IN
        2. TALKED 2 MGMT + GOT BALL ROLLING
    3. WHO EVER TOLD U ABOUT WRITE UP W/ RONG.
        & U WRONG FOR REPEATING IT TO OTHER
    MGMT PRIOR TO PH even KNOWING
※.        NOT IDEA "SISTER" wether U LIKE or NOT.

3. SPEAKING ON BEHALF OF THE GROUP
        1) DO NOT TELL THE FRM. HOW TO DO JOB.
    ex. MAKING A LIST OF AREAS TO BE SPRAYED
    FOR SHELLY. THAT'S HER JOB.
        4. YOUR SUPOSE TO direct the person
    COMPLAINING to the FRMN. Let them
    hook up & the procedure a list of what &
    where for hver self. → HAVE U EVER SPRAYED ALL
                        the AREAS MIXED CHEMICALS ?
        2.) STAY OUT OF THE FORMNS OFFICE.
    └ A. IT'S NOT YOUR WORK AREA ) BREAK ROOM.
        B. YOU NEED to BREAK W/ EVERYONE ELSE
        C. DAILY ASSIGNMENT SHEETS HAVE ROOM 4
            TURNOVER - that's WHAT THEY'RE 4.

    ✳ NO REASON 4 U TO BE IN THE FRMS OFF
        UNTIL 320 WHEN U get off at 3.
    ✳ CONSENSIOUS IS THAT U CANT BE TRUSTED -   when not due
    PEOPLE THINK "YOUR 2 SNEAKY. ITS UP to
    U- TO CHANGE THAT. - HOPEFULLY PRIOR TO NEW PEOPLE.
    ✳ U Need 2 REMEMBER those R THE ONES WHO
    KNOW ALL ABOUT THE "SKELETONS" U. PUT IN
    YOUR CLOSET IN GEORGIA - THEY DO KNOW
                        INCLUDING PHYLLIS.
    WHO, WHAT, WHERE, WHEN- HOW CUZ        YOUR
    "BOX TOY" WAS telling it ALL  If they harmed u- they'd of
                        told it to your FAMILY.

EXHIBIT
B
Blumberg No. 5119

Special Assignments/Treatment.
1. AWARDS DAY — NO JOKE IN AM
2. Noting day at HES
   to get Food in D+N when
People gang to D+N.
   Didn't evertake orders For
entire group only AMN& shared.
These actions creates harsh feelings

EXHIBIT

C

Blumberg No. 5119

Interviewed Jennifer White on Wednesday, July 20, 2005 in Jim Parrish's office at ~1430.
People present were: Jim Parrish, Deborah Crutchfield and Jennifer White.

Jim asked her about her job: Jennifer likes her job very much. It is the best job she has ever had.
She said work can be physical and tired but the foremen work with them about duration times in
heat environments.

Jim asked her about the people: She said the situation is the most miserable she has ever
experienced. Rumor meal, in the air that someone is out to get her..such as comments,
discussion and referring to Jen and Tammy without naming names. Very miserable, unhappy
and mean place to work. She talked about a hostile environment referring to the hostile incident:
Spider picture and comments on picture. Jennifer gave the picture to Jim. Jennifer said she was
at her limit on what she can take. She felt the picture represents a hostile environment and it was
directed toward Tammy and her. The picture was on the bulletin board at the OSC outside the
TSC(old Facilities break room). The fire watches sit there between fire watches so the SSS can
easily get them if they need them. As soon as Jennifer saw it she removed. Jennifer said no
foremen saw the picture.

Jennifer said there is a constant artillery that the Foremen are showing favoritism to her. They
have been trying to discredit her with the union. Jennifer has been going to the union for about
two years trying to get something done to get the others off of her. People have turned on her--
black helpers against her because they felt she talked against Derrick Henderson. Jennifer said
the core group of helpers are bullies that intimidate, manipulate and pressures everyone that they
come in contact with. Jennifer said she was pressured to get on the band wagon and raise sand
during the past outage against the new foremen.

She said other helpers are accusing her of going into the foremen's office. She said she is going
in their office strictly on business.

Jim asked her what is the negative impact? Jennifer thinks that the Foremen do not think Tammy
and Jennifer are sucking up. Foremen treat Jennifer, Tammy and all the helpers the same.
Jennifer said the rumor meal can cut you up. Facilities involved in the rumor meal.

Jennifer talked to A.G. earlier today and she felt like A.G. couldn't help her. Her co-workers
have gone to A.G. and told A.G. that A.G. and them need to meet with Jennifer and Tammy and
get them straightened out. A.G. told them there was not anything to straighten out. They think
that A.G. will not do anything with Jennifer and Tammy because he likes them. They are
drowning in meanness in the helper group. Jennifer said no one should have to put up with this
type of conflict behavior.

Jennifer would like for Jim to go over there and tell them to shut up and go to work. She doesn't
know what to do she is at a complete loss. A.G. and the union can't help her she hopes we can.

Interviewed Tammy Caldwell on Wednesday, July 20, 2005 in Jim Parrish's office at ~1400..
People present were: Jim Parish, Deborah Crutchfield and Tammy Caldwell.

Jim asked her about her job: Tammy said the job was great.
Jim asked her about the people: Tammy feels like the people (peers are out to get her). They are
very hard to work with. She talked about the black widow spider picture which she did not have
with her because Jennifer White had the picture.
She feels she cannot enjoy her job because her co-workers are always out to get her.
She discussed the Ray Herrin incident: On July 15, 2005, Tammy was assigned SWIS fire watch
and she went into the SSS office to pick up her firewatch book. After she left Ray Herrin called
Shelley Murrell and told her that he just saw Tammy and that he did not think her sleeve length
met the Safety and Health Manual requirements. He just wanted to make sure we treated
everybody the same on dress attire (referring to the Phyllis incident). Shelley went to the SWIS
to check out the situation and explained to Tammy what she was doing. Tammy's sleeve length
met the Safety and Health requirements. Tammy said she just broke down and started crying
because this was just another incident of how they were out to get her. Tammy said the Ray
Herrin and Phyllis Hughes were good friends. She feels like everyone is watching her to get her
in trouble. Co-workers writing things down in a book. She talked about they write things down
so if someone gets disciplined they can bring up every little incident for showing them (Jen and
Tammy) favoritism.
Tammy feels Phyllis, Janell and Stephanie have started trying to dig up junk saying the foreman
are showing them favoritism because they have seen Tammy and Jennifer in the foremen's
office.
Tammy said she went to Phyllis yesterday (Tuesday, July 19, 2005) and talked to her to see if she
could try and get this straight. Tammy told Phyllis that she did not tell on her about her dress
attire. Phyllis said she did not believe her and that she was going to get corporate involved and
find out the truth. Phyllis said she knew that Tammy had told on her about the dress attire.
Tammy talked about it being a mean and hostile environment.
Tammy said she has changed her attitude because she feels like she has to walk a straight line
because they continue to bring up the past. Tammy says she feels the hate and discontent in the
room. It is an eerie feeling. For example: The foreman told the helpers to turnover at the OSB.
Leonard Russ told Phillip Avery that Tammy and another helper gave turnover in breezeway.
Always trying to find petty stuff to keep the foreman distracted. They are constantly mad at
them because they think Tammy and Jen told on Phyllis. Tammy said they are so mad at them.
Tammy says that if she is in the foreman's office for 5 minutes they are saying she is sucking up
or brown nosing the foremen. She feels like she can not go into the foremen's office and give
input about her job because of the other helpers.
She said it's everyone's responsibility to work with each other with respect and in a civil
environment
Tammy feels like she could not even ask Phyllis for a pen. Phyllis said she knew that Tammy
told on her and that she was going to get corporate involved. Phyllis mentioned that she didn't
get in trouble for the cake incident. Tammy did say that the discussion with Phyllis on Tuesday
was civil. She said she was sorry that the Facility group is still in this mess.



**EXHIBIT**

D

## Employee Discipline Guide

**Southern Nuclear**

| Employee Name: Janell McDowell | Job Title: Helper |
|---|---|
| Emp. No. | Date: 8/16/05 |
| Department: Facilities | Division, Plant, etc.: Plant Farley |

*This guide is to help supervisors prepare for and document employee discussions and discipline. By itself it will usually be sufficient documentation for Coaching and Oral Reminders; for Written Reminders and DML's, use this sheet to prepare a letter to the employee. This guide is intended for use with formal discipline only and should not be completed for coaching.*

**PRE-MEETING PREPARATION**

**Brief Description of Problem:**
Harassment of co-worker; failure to follow work instructions; and lack of loyalty, competitiveness, and efficiency.

*Please copy and paste the following symbol as needed to designate appropriate responses below:* ☒

**Date(s) of previous discussion(s) about this problem:**

Is employee currently in an active level of Discipline?  ☐ Yes  ☒ No
☐ Oral Reminder  ☐ Written Reminder  ☐ DML

**Was administered on:** (date)  **for:** (reason)

**Desired Performance:**
Employees are expected to follow the company's non-harassment policy and to be committed to a work environment free of intimidation and harassment. Employees have the responsibility to report to supervision the status of work assignments, and to contribute to the loyalty, competitiveness, and efficiency of the department.

**Actual Performance:**
You encouraged the job steward to meet with a co-worker regarding items that you or others felt the co-workers needed to change. The meeting was harassing in nature as has been your conduct in the workplace toward certain co-workers. Your comments and conduct also indicate that you are attempting to create a division between the employees and supervision. Additionally, you have swapped job assignments with co-workers after you have been instructed not to by Facilities supervision.

**Impact/business reason why employee must solve this problem:**
The company is on notice of a hostile and intimidating work environment created in part by your actions. Swapping job assignments without obtaining supervisory concurrence impedes the supervisor's ability to hold individuals accountable for their actions.

**Consequences to employee for failing to improve to an acceptable level:**
Termination of employment.

Other factors to consider in evaluating this problem:
☐ Length of Service    ☐ Recent discussions about this or other problems
☐ Overall work record    ☐ Need to discuss with others for consultation/approval
This conversation is intended to be:

| ☐ Oral Reminder | ☐ Written Reminder | ☒ DML | ☐ Other |
|---|---|---|---|

**DEFENDANT'S EXHIBIT**
2 McDowell

McDowell v. Southern Nuclear
296

**Completed by:** _____   **Date:** _____

McDowell v. Southern Nuclear
298

**POST-MEETING NOTES**

Date/Time of Discussion _8-17-05 — 14:10_

Location _GM office - Farley_

Company representative(s) present _Randy Johnson and Chere Johnson_

Union representative(s) present _Tommy Swift and Janell McDowell_

☑ Employee agreed to solve the problem
☐ Employee did **not** agree to solve the problem
☐ Employee did **not** recognize that there is a problem

**Employee action plan...Employee committed to solve the problem by:**

_Committed to performing not job duties in a way such_
_as not to create a hostile environment. Employee admitted_
_agreed to obtain fac. supervision prior to swapping jobs._

Significant issues raised by: _All permission concurrence when_

**Employee:** _Does not feel she harassed anyone nor does she feel_
_she contributed to a hostile work environ. Believes she obtained_
_permission to swap jobs._

**Union:** _____

This discussion was a: ☐ Oral Reminder
☐ Written Reminder...(additional documentation necessary)
☑ DML...(additional documentation necessary)

**Additional comments:** _____

**Follow-up dates/plans:** _Monthly follow-ups with FAC supv._

Southern Nuclear
Operating Company, Inc.
Post Office Drawer 470
Ashford, Alabama 36312

TO:        Janell McDowell
FROM:      Randy Johnson
DATE:      August 18, 2005
SUBJECT:   Decision-Making Leave



**SOUTHERN**
**COMPANY**
*Energy to Serve Your World*™

In our meeting on August 16, 2005, we discussed harassment of co-worker; failure to follow work instructions; and lack of loyalty, competitiveness, and efficiency. Additionally, you have swapped job assignments with co-workers after you have been instructed not to by Facilities supervision. We discussed that the company is on notice of a hostile and intimidating work environment created in part by your actions. Swapping job assignments without obtaining supervisory concurrence impedes the supervisor's ability to hold individuals accountable for their actions.

As a result of your actions, you were issued a Decision-Making Leave. This positive discipline will remain active and in your personnel file for 18 months. You were instructed to take a day off with pay to consider the impacts of your actions, the future expectations you must abide by and to return and inform your management of your interest to remain employed or not as a Helper at Farley Nuclear Plant.

We discussed that employees are expected to follow the company's non-harassment policy and to be committed to a work environment free of intimidation and harassment. Employees have the responsibility to report to supervision the status of work assignments, and to contribute to the loyalty, competitiveness, and efficiency of the department. Failing to improve or should any other problems occur which warrants formal discipline, will result in termination of your employment.

You indicated that you were committed to performing your job duties in a way such as not to create a hostile environment. You also committed to not swapping jobs without supervisor concurrence.

I am confident that you understand the meaning of our discussion and the necessary expectations for your future performance. I am confident that you understand the consequences for failure to fully support your commitment.

I look forward to working with you through this situation and moving to a productive future.

Sincerely,

Randy Johnson



**EXHIBIT E**

**Discipline Guide**  **Southern Nuclear**

| **Name:** Stephanie Sanders | **Job Title:** Helper |
|---|---|
| **Emp. No.** | **Date:** 8 /17 /05 |
| **Department:** Facilities | **Division, Plant, etc.:** Plant Farley |

*This guide is to help supervisors prepare for and document employee discussions and discipline. By itself it will usually be sufficient documentation for Coaching and Oral Reminders; for Written Reminders and DML's, use this sheet to prepare a letter to the employee. This guide is intended for use with formal discipline only and should not be completed for coaching.*

## PRE-MEETING PREPARATION

**Brief Description of Problem:**
Harassment of co-worker; failure to follow work instructions; and lack of loyalty, competitiveness, and efficiency.

*Please copy and paste the following symbol as needed to designate appropriate responses below:* ☒

**Date(s) of previous discussion(s) about this problem:**

Is employee currently in an active level of Discipline?  ☐ Yes    ☒ No
☐ Oral Reminder    ☐ Written Reminder    ☐ DML

| **Was administered on:** (date) | **for:** (reason) |
|---|---|

**Desired Performance:**
Employees are expected to follow the company's non-harassment policy and to be committed to a work environment free of intimidation and harassment. Employees have the responsibility to converse with management on work assignments and status, and to contribute to the loyalty, competitiveness, and efficiency of the department.

**Actual Performance:**
Your conduct in the work place has been harassing in nature toward certain co-workers. You do not actively participate in meetings with supervision. Additionally, you have swapped job assignments with co-workers after you have been instructed not to by Facilities supervision.

**Impact/business reason why employee must solve this problem:**
The company is on notice of a hostile and intimidating work environment created in part by your actions. Swapping job assignments without obtaining supervisory concurrence impedes the supervisor's ability to hold individuals accountable for their actions.

**Consequences to employee for failing to improve to an acceptable level:**
Additional discipline up to and including termination of employment.

Other factors to consider in evaluating this problem:

☐ Length of Service          ☐ Recent discussions about this or other problems

☐ Overall work record        ☐ Need to discuss with others for consultation/approval

This conversation is intended to be:

| ☐ Oral Reminder | ☒ Written Reminder | ☐ DML | ☐ Other |
|---|---|---|---|

DEFENDANT'S EXHIBIT
3 Sanders

**POST-MEETING NOTES**

Date/Time of Discussion  8/17/05    11:37

Location  Jim Parrish's office

Company representative(s) present  Deborah Crutchfield  ~~Dan Hoover~~ pp 8/17/05  Jim Parrish

Union representative(s) present  Don Hunter

☑ Employee agreed to solve the problem  Employee states that she did not harass anyone
☐ Employee did **not** agree to solve the problem
☐ Employee did **not** recognize that there is a problem

**Employee action plan...Employee committed to solve the problem by:**

1. Read and understand Corp Policy 703
2. Continue to abide by the policy
3. Do not jump jobs without supervisor concurrence
4. Communicate openly with facilities supervisor to contribute to the loyalty, competitiveness and efficiency of the department.

Significant issues raised by:

**Employee:**  Employee states that she did not harass anyone

**Union:**

This discussion was a:    ☐ Oral Reminder
☑ Written Reminder...(additional documentation necessary)
☐ DML...(additional documentation necessary)

**Additional comments:**

Follow-up dates/plans:  Facilities supervision will conduct follow-up meetings monthly.

Completed by:  Jim Parrish          Date:  8-17-05

Southern Nuclear
Operating Company, Inc.
Post Office Drawer 470
Ashford, Alabama 36312

TO:         Stephanie Sanders

FROM:       Jim Parrish

DATE:       August 18, 2005

SUBJECT:    Written Reminder



**SOUTHERN COMPANY**
*Energy to Serve Your World*

In our meeting on August 17, 2005, we discussed that your conduct in the work place has been harassing in nature to certain co-workers. You do not actively participate in meetings with supervision. Additionally, you have swapped job assignments with co-workers after you have been instructed not to by Facilities supervision. We discussed that the company is on notice of a hostile and intimidating work environment created in part by your actions. Swapping job assignments without obtaining supervisory concurrence impedes the supervisor's ability to hold individuals accountable for their actions.

As a result of your actions, you were issued a Written Reminder. This positive discipline will remain active and in your personnel file for 12 months. We discussed that employees are expected to follow the company's non-harassment policy and to be committed to a work environment free of intimidation and harassment. Employees have the responsibility to converse with management on work assignments and status, and to contribute to the loyalty, competitiveness, and efficiency of the department. Failing to improve could result in additional discipline up to and including termination.

You indicated that you would commit to reading and understanding the Corporate Policy 703 and continue abiding by the Policy. Additionally, you committed to not swapping jobs without supervisor concurrence.

I am confident that you understand the meaning of our discussion and the necessary expectations for your future performance. I am confident that you understand the consequences for failure to fully support your commitment.

I look forward to working with you through this situation and moving to a productive future.

Sincerely,

Jim Parrish

Jim Parrish

Janelle McDowell:                              9-13-05

EXHIBIT
Blumberg No. 5119
F

Subject:  Janelle McDowell's Status


This letter is written to make a recommendation that Janelle McDowell be terminated.
The reason for termination is based upon the following events:

1. Janelle was placed on a DML on 8-16-05 for harassment of a co-worker; failure to
   follow work instructions; lack of loyalty, competitiveness and efficiency.

2. On 8-24-05 Janelle displayed behaviors contributing to a "chilled" work
   environment in the morning meeting. She kept her hardhat on, her reflective
   safety glasses, and held her personal bag on her lap. Her hardhat is the "wide
   brimmed" one and she kept her head down during the entire meeting. When the
   foreman handed out job assignments, she just put out her hand to take it and didn't
   even look up. During the course of the meeting a letter of thanks from the fire
   administrator to one of our helpers was read for a job well done. She never
   looked up during the whole meeting to acknowledge anything that was said or
   show any interest in what was being said.

3. On 9-9-05, Deborah Crutchfield said "Good Morning" to Janelle and Janelle
   didn't respond in any way. Deborah then said "Good Morning, Janelle" directly
   to her from close up and she still didn't reply.

4. On 9-9-05, a follow-up meeting was held with Janelle to discuss her progress.
   Janelle was invited to sit down but chose to stand with her arms folded leaning up
   against a desk. The follow up meeting is summarized as follows:

   Mark reviewed the outline of the DML and Janelle was asked how she
   thought she was doing with her progress. She said that, like she told Randy
   Johnson, she would come to work and not say anything and just do her job.
   Deborah told her that wasn't the case and she WAS expected to communicate
   to her foremen and that her cold behavior and lack of participation in the
   morning briefings was unacceptable.

   She said she felt like she was being harassed if she was expected to participate
   in the morning briefings when no one else had to and she was being singled
   out and harassed by us.

   Shelley told her she wasn't being singled out at all, that she didn't have to
   SAY anything during the morning briefings, but that she was expected to
   show that she is paying attention like everyone else by at least looking at the
   person conducting the meeting and looking at a foreman when they give the
   job assignments out. She was specifically told that her behavior of sitting
   with her hard hat on, looking down, and turned sideways with her bag on her
   lap and never looking at the foreman conducting the meeting was contributing
   to the "chilled" environment she was placed on the DML for creating.

   She was told that when a foreman addresses her she is expected to look at
   them and acknowledge them. For example, when someone passes her in the

plant and says "hi" it would be expected to get a response and not be ignored. This behavior is all part of a "chilled" environment.

Mark asked her if she understood our concerns about her attitude and she said *"I hear what you're saying."* (She never said "I understand")

When Mark asked if she felt like the foremen specifically were doing anything to her to treat her "unfairly" or "disrespectfully", she replied "NO COMMENT".

It was evident during the meeting that she does not agree that she has a problem with her attitude, she feels like she is being singled out and harassed by her foremen, but won't discuss it.

She was told by Mark that her attitude had to improve and she had to show respect and be civil to other people. She said "ok, no problem".

Janelle consistently displays behavior inconsistent with an inclusive work environment by not acknowledging people when she is spoken to and not practicing the basic civil behavior of returning a greeting when seen on plant site. Janelle has displayed a lack of "desire to develop mutual respect between employees and management, and between all people with whom we work" as quoted from the Memorandum of Agreement between Southern Nuclear Operating Company and Local 796 of the IBEW. This was demonstrated by her having encouraged the job steward to meet with a co-worker regarding items that she or others felt the co-worker needed to change. The comments and her conduct indicated she is attempting to create a division between the employees and supervision.

Given the above events and circumstances it is recommended that Janelle be terminated. There has been a total disregard for the items that were listed in her Decision Making Leave and what is contractually in the IBEW contract.

Deborah Crutchfield
Facilities Supervisor   9-13-05

Management Discussion Guide – Janell McDowell



On August 16, 2005, you were administered a Decision Making Leave regarding harassment of a co-worker; failure to follow work instructions; and lack of loyalty, competitiveness, and efficiency. During the discussion and in the follow up letter to you, the expectations going forward were made clear as were the consequences. Unfortunately, you have chosen not to meet those expectations. On August 24th, in the morning staff meeting your conduct was unacceptable, you showed no interest; showed disrespect for management leading the meeting; and did not properly acknowledge work assignments given to you. On September 9th during a follow-up meeting on your DML, your comments indicated that you do not have the total commitment required to remain an employee. Consequently, effective today, September 18, 2005, your employment with SNC is terminated.

Southern Nuclear
Operating Company, Inc.
Post Office Drawer 470
Ashford, Alabama 36312

EXHIBIT

November 1, 2005



SOUTHERN
COMPANY
*Energy to Serve Your World ™*

Stephanie Sanders

Dothan AL

Dear Ms. Sanders:

The purpose of this letter is to address your recent absences, your failure to keep management informed, and your failure to submit the initial FMLA paperwork. While on the first three nights (October 11th – 13th) you either called in or management called you, you did report to work and did not call to report that you would be absent since Saturday October 15th.

Consequently, management wrote a certified letter to you, which you signed for on Wednesday, October 26th. This letter gave you five days from the receipt of the letter to provide the initial FMLA paperwork to Effie Manley so that a determination could begin on whether the absences were covered under FMLA. The fifth day was Monday, October 31st and the FMLA paperwork was not provided to Effie Manley as was required. While you did call and leave a voice mail for supervision on October 26th, stating you would be in the first of this week with paperwork, you did not provide the paperwork by the fifth day, nor have you otherwise kept management informed regarding your continued absences as was required per the certified letter. It was clear that failure to be compliant with the terms laid out in the certified letter would result in discipline up to and including termination. Additionally, you are currently on an active Written Reminder.

Consequently, your employment is being terminated effective today, November 1, 2005, on the basis of job abandonment.

Randy Johnson

Nuclear Plant General Manager

Deborah Crutchfield

Facilities Supervisor

DEFENDANT'S
EXHIBIT

S Sanders



**SENDER:**
- Complete items 1 and/or 2 for additional services.
- Complete items 3, 4a, and 4b.
- Print your name and address on the reverse of this form so that we can return this card to you.
- Attach this form to the front of the mailpiece, or on the back if space does not permit.
- Write "Return Receipt Requested" on the mailpiece below the article number.
- The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):
1. ☐ Addressee's Address
2. ☒ Restricted Delivery

Consult postmaster for fee.

3. Article Addressed to:

Stephanie Sanders

Lothan, AL

4a. Article Number
7000 0520 0013 63611078

4b. Service Type
☐ Registered          ☒ Certified
☐ Express Mail        ☐ Insured
☐ Return Receipt for Merchandise  ☐ COD

7. Date of Delivery
11-3

5. Received By: (Print Name)
Stephanie Sanders

8. Addressee's Address (Only if requested and fee is paid)

6. Signature: (Addressee or Agent)
X

PS Form 3811, December 1994          Domestic Return Receipt

Is your RETURN ADDRESS completed on the reverse side?

Thank you for using Return Receipt Service.

Deborah Crutchfield
Farley Nuclear Plant

EXHIBIT
I

November 1, 2005

The purpose of this letter is to inform you that I can no longer work under the
Southern Style that is practiced at Farley Nuclear Plant. Corporate Policy
702 Southern Company Code of Ethics states a lot of things that sound good.
It states that Southern Style is the foundation of your culture of trust and
ethical behavior. It states that you tell the truth- yet we have been lied to and
lied on.

It states that you keep your promises and deal fairly and ethically with
everyone. Yet, I feel this fairness doesn't apply to everyone. I know that I
have personally been singled out, judged unfairly, treated unfairly and
disciplined unjustly.

Under the Southern Nuclear Company diversity website there are
expectations for management. It says management is to build relationships
with team members in order to understand differences and develop trust. I
feel there is very little trust. It states management is expected to create an
inclusive work environment, but I feel you exclude the ones actually doing
the work and show favoritism towards certain ones doing the work.

I feel you have good policies that will build a great company if they were
practiced. I've seen people that I felt were good people move into
management. Instead of these people daring to be different and do right in
order to make a difference, they fall right in with this Southern Style that has
always been practiced: Tell the truth, keep our promises and deal fairly and
ethically but not with everyone.

Sincerely submitted

Stephanie M. Sanders

DEFENDANT'S
EXHIBIT

4 Sanders

Please forward any mail to:

OZark, AL

## FACILITIES WEEKLY TIME SHEET

### 03/05/05 THRU 03/11/05

| Name | Miles | SAT 03-05 | SUN 03-06 | MON 03-07 | TUE 03-08 | WED 03-09 | THU 03-10 | FRI 03-11 |
|---|---|---|---|---|---|---|---|---|
| Avery, Phillip | 20 | OFF | OFF | | | | | |
| Freeman, Mark | 44 | Travel Day from Hatch | OFF | Vogtle Schedule 8 | Vogtle Schedule 8 | Vogtle Schedule 8 | Vogtle Schedule 8 | Vogtle Schedule 8 |
| Murrell, Shelley | 50 | OFF | OFF | D 8/1 (020) | D 1 (020) | D 8/3 (020) | D 8/2 (020) | D 8/2 (020) |
| Wright, John | 52 | OFF | OFF | D 8 | D 8/4 | D 8 | D 8 | D 8 |
| Ashford, Doris | 44 | OFF | OFF | D 8 | D 8/4 | D 8 | D 8 | D 8 |
| Boudreaux, Danny | 65 | OFF | OFF | VAC | VAC | VAC | VAC | |
| Caldwell, Tammy | 20 | Travel Day from Hatch | OFF | Vogtle Schedule 8 | Vogtle Schedule 8 | Vogtle Schedule 8 | Vogtle Schedule 8 | Vogtle Schedule 8 |
| Harris, Eddie | 65 | Travel from Hatch 5 hrs | OFF | D 8 | D 8 | D 8 | D 8 | D 8 |
| Hill, Chris | 51 | Travel Day from Hatch | OFF | Vogtle Schedule 8 | Vogtle Schedule 8 | Vogtle Schedule 8 | Vogtle Schedule 8 | Vogtle Schedule 8 |
| Hubbard, Sam | 70 | OFF | OFF | D 8 | D 8 | D 8 | D 8 | D 8 |
| Hughes, Phyllis | 54 | NR | NR | NR | E 8 | OFF | OFF | SICK |
| Johnson, Derrol | 80 | OFF | OFF | E 8 | E 8 | E 8 | E 8/4 | E 8 |
| Knighton, Brad | 30 | ON | ON | D 8/4 | D 8/4 | D 8 | OFF | OFF |
| Locke, John | 70 | OFF | OFF | D 7/1 VAC | D 8 | D 8 | D 8 | OFF |
| McDowell, Janelle | 110 | Travel Day from Hatch | OFF | NR | | | OFF | OFF |



Blumberg No. 5119

EXHIBIT 9

**FACILITIES WEEKLY TIME SHEET**

**03/05/05 THRU 03/11/05**

| | Miles | SAT 03-05 | SUN 03-06 | MON 03-07 | TUE 03-08 | WED 03-09 | THU 03-10 | FRI 03-11 |
|---|---|---|---|---|---|---|---|---|
| Nall, Jonathan | 24 | | D 8 | | D 8/4 | | OFF | OFF |
| Peters, Angela | 52 | SICK | SICK | SICK | SICK | SICK | OFF | OFF |
| Rambacher, Teresa | 92 | OFF | OFF | | | | | |
| Russ, Leonard | 50 | E 8 | OFF | Travel Day to Vogtle D 8 | Vogtle Schedule D 8 | Vogtle Schedule D 8 | Vogtle Schedule D 8 | Vogtle Schedule D 8 |
| Sanders, Stephanie | 40 | Travel from Hatch | | | OFF | OFF | OFF | |
| Schaule, Chuck | 16 | D 8 | D 8 | OFF | OFF | N 8 | N 8 | N 8 |
| Smith, Pam | 44 | | E 8 | | | | | |
| Stovall, Chris | 48 | E VAC | E OFF | Travel Day to Vogtle D 8 | Vogtle Schedule D 8 | Vogtle Schedule D 8 | Vogtle Schedule D 8 | Vogtle Schedule RP |
| Townsend, Graven | 56 | | OFF | SICK | | | | |
| Vickers, Gamaska | 22 | N Travel from ( Hatch ) PAY 5 hrs + 3 | E 8 | OFF | OFF | N 8 | N 8 | N 8 |
| White, Bobby | 36 | NP Body Guard | OFF | Travel Day to Vogtle D 8 | Vogtle Schedule D 8 | Vogtle Schedule D 8 | Vogtle Schedule D 8 | Vogtle Schedule D 8 |
| White, Jennifer | 22 | OFF | OFF | E 8 | E 8 | E 8 | E 8 | E 8 |
| Williams, Albert | 40 | OFF | OFF | E 8 | E 8 | E 8 | E 8 | E 8 |
| Williams, Darran | 44 | E 8 | OFF | Travel Day to Vogtle D 8 | Vogtle Schedule D 8 | Vogtle Schedule D 8 | Vogtle Schedule D 8 | Vogtle Schedule RP |

**FACILITIES WEEKLY TIME SHEET**

**02/26/05 THRU 03/04/05**

| | Miles | SAT 02-26 | SUN 02-27 | MON 02-28 | TUE 03-01 | WED 03-02 | THU 03-03 | FRI 03-04 |
|---|---|---|---|---|---|---|---|---|
| Avery, Phillip | 20 | OFF | OFF | D 8 | D 8/1 | D 8/1 | D 8/1 | D 8 |
| Freeman, Mark | 44 | Hatch Schedule D OFF | Hatch Schedule D 8/4 | Hatch Schedule | Hatch Schedule | Hatch Schedule | Hatch Schedule | Hatch schedule |
| Murrell, Shelley | 50 | OFF | OFF | D 8/1 (020) | D 8/2 (020) | D 8/1 (020) | D 8 | D 8 |
| Wright, John | 52 | OFF | OFF | | | | | |
| Ashford, Doris | 44 | D 8 | D 8 | D 8 | D 8 | D 8 | OFF | OFF |
| Boudreaux, Danny | 65 | Hatch Schedule SD OFF | Hatch Schedule D 12 O/D | Hatch Schedule D 8/4 | Hatch Schedule D 8/4 | Hatch Schedule D 8/4 | Hatch Schedule D 8/4 | Hatch schedule |
| Caldwell, Tammy | 20 | Hatch Schedule D 12 O/D | Hatch Schedule D 12 O/D | Hatch Schedule | Hatch Schedule | Hatch Schedule | Hatch Schedule | Hatch schedule |
| Harris, Eddie | 65 | Hatch Schedule D OFF | Hatch Schedule D 12 O/D | Hatch Schedule D 8/4 | Hatch Schedule D 8/4 | Hatch Schedule D 8/4 | Hatch Schedule D 8/4 | Hatch schedule |
| Hill, Chris | 51 | OFF | OFF | D 8 | D 8 | D 8 | D 8 | D 8 |
| Hubbard, Sam | 70 | OFF | OFF | D 8 | D 8 | D 8 | D 8 | D 8 |
| Hughes, Phyllis | 54 | D 8 | D 8 | OFF | OFF | | | |
| Johnson, Derrol | 80 | OFF | OFF | D 8 | D 8 | D 8 | D 8/2 (B'ham trip) | D 8 |
| Knighton, Brad | 30 | D 8 | | D 8 | D 8 | OFF | OFF | D 8 |
| Locke, John | 70 | OFF | OFF | D 8 | D 8 | D 8 | D 8 | |
| McDowell, Janelle | 110 | Hatch Schedule N OFF | Hatch Schedule N OFF | Hatch Schedule N 8/2 | Hatch Schedule N 8/2 | Hatch Schedule N 8/4 | Hatch Schedule N 8/4 | Hatch Schedule N 8/4 |

## FACILITIES WEEKLY TIME SHEET

### 02/26/05 THRU 03/04/05

| | Miles | SAT 02-26 | SUN 02-27 | MON 02-28 | TUE 03-01 | WED 03-02 | THU 03-03 | FRI 03-04 |
|---|---|---|---|---|---|---|---|---|
| Nall, Jonathan | 24 | N8 | N8 | N8 | N8 | OFF | OFF | D8 |
| Peters, Angela | 52 | N SICK | N SICK | N SICK | N SICK | OFF | OFF | Sick |
| Rambacher, Teresa | 92 | D8 | D8 | D8 | D8 | D VAC | OFF | OFF |
| Russ, Leonard | 50 | OFF | OFF | E 8 | E 8 | E 8/4 | E 8/4 | E 8 |
| Sanders, Stephanie | 40 | Hatch Schedule N OFF | Hatch Schedule N OFF | Hatch Schedule N 8/4 | Hatch Schedule N 8/4 | Hatch Schedule N 8/4 | Hatch Schedule N 8/4 | Hatch Schedule N 8/4 |
| Schaule, Chuck | 16 | N 8 | N 8 | N 8 | N 8 | OFF | OFF | D 8 |
| Smith, Pam | 44 | E 8 | E 8 | OFF | OFF | N 8 | N 8/4 | D 8 |
| Stovall, Chris | 48 | OFF | OFF | E 8 | E 8 | E 8/4 | E FUNERAL AUNT | E FUNERAL AUNT |
| Townsend, Graven | 56 | D 8 | D 8 | D 8 | D 8 | D 8 | OFF Sick | D 8 |
| Vickers, Ganaska | 22 | Hatch Schedule N 8 / 4 | Hatch Schedule N 8 / 4 | Hatch Schedule N OFF | Hatch Schedule N OFF | Hatch Schedule N 8 / 4 | Hatch Schedule N 8 / 4 | Hatch Schedule N 8 / 4 |
| White, Bobby | 36 | OFF | OFF | OFF | N 8 | N 8 | N 8 | N 8 |
| White, Jennifer | 22 | OFF | OFF | D Banked Hol | D Banked Hol | D FLT 05 | D VAC | D VAC |
| Williams, Albert | 40 | OFF | OFF | D 8 | D 8 | D 8 | D 8 | D 8 |
| Williams, Darran | 44 | OFF | OFF | E 8 | E 8 | E 8 | E 8/4 | E 8 |

## CR/QA Record

| Condition Report: 2003000345 | Status: Transmitted | Entry Date: 02/20/2003 | Unit: FS |
|---|---|---|---|

| Discovered: | 02/20/2003 10:19:00AM | Building: Plant Grounds | Event: |
|---|---|---|---|
| By: | DC | Elev: | Date: 02/20/2003 |
| Phone: | 4502 | Room: | Time: 10:15:00AM |
| Dept: | Farley - Facilities | Location: | |
| Sect: | | | |

**Description of Condition:**
Pick-up truck was damaged when fell tree was misguided. The hood, windshield and roof of vehicle was damaged. Truck was parked approximately 80ft. away from the tree being cut.

**What is affected:**
Damaged vehicle

**How Discovered:**
Individual performing the task reported the condition.
Initiated by: B.J.Yance
Originator: BJYANCE
Location: On site cemetary, north west s

| CR Type | | Status | |
|---|---|---|---|

### Dispatch

| Work Event: | | WalkThrough: | No | Hold: | No | OPS Review Req: | No |
|---|---|---|---|---|---|---|---|

**Dispatch Comment:**
Coach - 2

**1.0  Condition Statement.**

Facilities vehicle struck by felled tree while unoccupied and parked in the on-site          grave yard.

**2.0  Event Information**

Vehicle was unoccupied and parked approximately 85 feet away from dead pine          tree that was being cut down by Helpers.
Individuals had notched tree on the side that they wanted it to fall, direction away          from vehicle
After notching completed, individuals started final cut of tree on the opposite side,          expecting it to fall toward the notched side.
   The tree begin to twist and fall in the direction of the parked vehicle.

**3.0  Extent of Condition**

This was an isolated event and an apparent failure by the involved individual to properly notch the tree to ensure that it did not fall toward the vehicle and also ensure that vehicle was far enough away should the tree fall toward it. This event did not represent a reportable condition per 10 CFR 20 or 10 CFR 50 72 or 10 CFR 50 73. Technical Specification compliance was not impacted.

**4.0  Apparent Cause of Event or Condition**

The apparent cause was lack of training of the individuals on proper technique of          cutting down a tree to ensure it falls in the desired direction
Individual assumed that the vehicle was far enough away should the tree fall toward          the vehicle.

**5.0  Corrective Actions**

Involved individuals were coached on use of Human Performance Tools.
Noted during coaching session that use of Situational Awareness, STAR,          Self-Checking, Peer Check, and Time Out tools were not used

Assigned to BJ Yance
Preparer B. J. Yance
Disposition Approved By Richard Bryant
Linked Doc SSY  03000345 DOC

| Dispatch Reviewer: | DC | | UserID: | |
|---|---|---|---|---|
| | Date: | 2/20/2003 12:00:00AM | | |

### Equipment

## CR QA Record

| Condition Report: 2003000345 | Status: Transmitted | Entry Date: 02/20/2003 | Unit: FS |
|---|---|---|---|

**Equipment:**

| | | | |
|---|---|---|---|
| Safety Class: | Active: | Type: | Location: |
| Nuc. Class: | Tag: | Team: | |
| Category: | | Event: | |

Operability ─────────────────────────────────

| Status: | Tracking#: |
|---|---|
| TSLCO#: | Type: |

Comment:

## Initial Review

| Power: 100 | Mode: Mode 1 | RC Temp: | RC Pressure: |
|---|---|---|---|

**Event Related Evolutions In Progress:**

N/A
Reviewed by: Don Canady

| Imm. Reportable No | Hours: N/A | Date: | Time: | NRC Rpt. # |
|---|---|---|---|---|

**Compensatory Actions Taken:**

N/A

## Regulatory

**Received Date:** 2/20/03 **Severity Lev:** 4     **Reportable?** ☐     **Impact to Plant:** Personnel Safety

**Short Explanation:** N/A

**Explanation:** Not reportable under reporting criteria of 10CFR50.72, 50.73, or EIP-8.0. Tech Specs
compliance not impacted.
Reg. Review by: Wayne Vanlandingham
Review Approved by: Harold J. Jones
Closed by Harold J. Jones
Status change to :REGULATORY REVIEW on 2/20/2003 by DECANADY
   Comment: Operations review for reportability performed. Ready for Regulatory Review..
Status change to :REGULATORY APPROVAL on 2/20/2003 by BWVANLAN
   Comment: Regulatory Review performed, Ready for Regulatory Approval.
Status change to :DEPARTMENT REVIEW on 2/20/2003 by HJJONES
   Comment: Regulatory Approval performed, Ready to perform Department review and
approval of disposition.
Status change to :FINAL REVIEW on 3/25/2003 by REBRYANT
   Comment: Department review and approval performed. Ready for Final Regulatory
Review.
Status change to :READY TO TRANSMIT on 3/25/2003 by HJJONES
   Comment: Final Review performed. Ready to Transmit to vault.

**Required Analysis Method** BCD ☐  ACD ☐   RCCA ☒ **RCCA Resp. Dept:**

| Due Date: | 4/6/03 | Disposition Resp. Dept: | Farley - Facilities | | |
|---|---|---|---|---|---|
| Reviewed By: | DC | | 2/20/03 12:00 am | | |
| Approved By: | DC | | 2/20/03 12:00 am | Closed By: DC | 3/25/03 12:00 am |

| TITLE | TO | PER | DATE | TYPE | NUM |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

**PRB/PORC review?** ☐     **Meeting Num:** no     **Date:**

**PRB/PORC Comments**

## CR QA Record

| Condition Report: 2003000345 | Status: Transmitted | Entry Date: 02/20/2003 | Unit: FS |
|---|---|---|---|

### Trending

**Major category:** People

**Safety func. affected:** NA

**Cause Dept:** Farley - Facilities

**Event Description:**

**Event Code Group1:** Health and Safety Events/Personnel Injury/NOT USED

**Event Code Group2:** Training Related Events/Training Not Adequate/NOT USED

**Event Code Group3:**

**Event Code Group4:**

### Disposition

| | | |
|---|---|---|
| **Department:** Farley - Facilities | | **Status:** |
| **Section:** | | Final Review Required |
| **Person:** Data Conversion | | |
| **Prepared By:** DC | **Date:** 3/25/03 | |
| **Approved By:** DC | **Date:** 3/25/03 | **Last Action Due** |

**Disposition:**
Coach - 2

**1.0 Condition Statement:**

Facilities vehicle struck by felled tree while unoccupied and parked in the on-site     grave yard.

**2.0 Event Information:**

Vehicle was unoccupied and parked approximately 85 feet away from dead pine     tree that was being cut down by Helpers.
Individuals had notched tree on the side that they wanted it to fall, direction away     from vehicle.
After notching completed, individuals started final cut of tree on the opposite side,     expecting it to fall toward the notched side.
            The tree begin to twist and fell in the direction of the parked vehicle

**3.0 Extent of Condition:**

This was an isolated event and an apparent failure by the involved individual to properly notch the tree to ensure that it did not fall toward the vehicle and also ensure that vehicle was far enough away should the tree fall toward it. This event did not represent a reportable condition per 10 CFR 20 or 10 CFR 50.72 or 10 CFR 50.73. Technical Specification compliance was not impacted.

**4.0 Apparent Cause of Event or Condition:**

The apparent cause was lack of training of the individuals on proper technique of     cutting down a tree to ensure it falls in the desired direction.
Individual assumed that the vehicle was far enough away should the tree fall toward     the vehicle.

**5.0 Corrective Actions:**

Involved individuals were coached on use of Human Performance Tools.
Noted during coaching session that use of Situational Awareness, STAR,     Self-Checking, Peer Check, and Time Out tools were not used.

Assigned to: BJ Yance
Preparer: B. J. Yance
Disposition Approved By: Richard Bryant
Linked Doc: SSY, 03000345.DOC

### Performance

| Maint. rule scope? NO | Function Failure? NO | Is this an MPFF? NO |
|---|---|---|

Revised                     Page 3 of 5                     Report: CR QA Record

## CR QA Record

| Condition Report: 2003000345 | Status: Transmitted | Entry Date: 02/20/2003 | Unit: FS |
|---|---|---|---|

| Justification By: DC | 2/21/03 | MR assigned to: |
|---|---|---|

**Justification:**
See problem description block.

### RCCA

**Status:**

**Event desc. or failure scenario:**

Condition Statement:

 Facilities vehicle struck by felled tree while unoccupied and parked in the on-site grove yard.

Event Information:

Vehicle was unoccupied and parked approximately 85 feet away from dead pine tree that was being cut down by Helpers.
Individuals had notched tree on the side that they wanted it to fall, direction away from vehicle. After notching completed, individuals started final cut of tree on the opposite side, expecting it to fall toward the notched side. The tree begin to twist and fell in the direction of the parked vehicle.

RCCA Prepared by: Richard Bryant
RCCA Approved By:

**Investigation scope/broadness review**

**Is this a repeat event?** N/A      **Was Previous RCCA adequate?** N/A

**Repeat event review:**

| | | |
|---|---|---|
| ☐ Other train/channel/unit checked | ☐ Other similar process checked | ☐ Other similar component |
| ☒ Pencil and Paper narrative | ☐ Cause identification worksheet | ☐ Apparent cause determination |
| ☐ Barrier analysis | ☐ Fault tree analysis | |
| ☐ Change analysis | ☐ Kepner-Tregoe analysis | |
| ☐ Event and causal factor flow char. | Other: | |

**Description of causes:**

**Cause Dept 1:** Farley - Facilities
**Cause Dept 2:**
**Cause Dept 3:**
**Group1:** HU Factors or People Error/Non-Conservative Decision/Consequences not adequately addressed

**Group2:** Training Practices/Training Content/Specific tool usage less than adequate

**Group3:**

**Group4:**

### Item / Description / Due Date / Respon. Person

| Section | Concurrence? | Respon.Person | ConcurApp | Date | AI |
|---|---|---|---|---|---|

## CR QA Record

| Condition Report: 2003000345 | Status: Transmitted | Entry Date: 02/20/2003 | Unit: FS |
|---|---|---|---|

☐ Sequence of event(s) documents attached
☐ Personnel statement(s) documents attached.
☐ Event(s) review documents attached.

RCCA prepared by:   DC          3/25/03
RCCA approved by:   DC
RCCA final approver: DC

## Comment

## Related Documents

**Documents: (DCMT)**

| Class | Title | Entity | DocumentumID | Ver. | Ver Type | Doc. Num. |
|---|---|---|---|---|---|---|
| QA Findings | QA Record - Version 1.0 | VCRT | RE104354914 | 1.0 | F | CR2003000345 |

**MPS Documents:**

| Class | Type | Title | MPS Doc. ID. | Entity |
|---|---|---|---|---|

**Web Documents:**

| Class | Type | Title | URL |
|---|---|---|---|

## Custom Field

| Property | Value |
|---|---|