IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JANELLE MCDOWELL and STEPHANIE SANDERS, <br><br> Plaintiffs, <br><br> v. <br><br> SOUTHERN NUCLEAR OPERATING COMPANY, INC., <br><br> Defendant. | CIVIL ACTION NO. <br> 1:06-CV-314-CSC |

## DECLARATION OF MARK FREEMAN

1. My name Mark Freeman, and I am over the age of majority. I have personal knowledge of the matters in this declaration.

2. I am employed by Southern Nuclear Operating Company ("Southern Nuclear") as an Assistant Team Leader in the Mechanical Maintenance Department, Team 5. I have been employed at Joseph M. Farley Nuclear Plant ("Plant Farley") since January 31, 2000.

3. I served as a Facilities Foreman from July 2004 until December 2005 at which time I was promoted to my current position. The previous Facilities Foremen did not tell me anything about the personalities, work ethic or any performance issues with any of the Facilities Helpers. Dennis Teat was the only pre-July 2004 Facilities Foreman who retained his position when I and the other new Foremen came on board in July 2004. Neither Teat nor Deborah Crutchfield, who was promoted to Facilities Supervisor over the new Foremen, told me of any concerns with any of the Helpers.

4. While in the role of Facilities Foreman, I supervised Janell McDowell and Stephanie Sanders, two former Facilities Helpers. No one told me to watch, single out or separate Ms. McDowell and Ms. Sanders.

5.  During my tenure as a Facilities Foreman, Dennis Teat, another Foreman, and I selected Janell McDowell to attend a Diesel Generation Equipment Outage Readiness Review meeting with us. Our invitation to attend the meeting was part of our initiative as new Foremen to establish a culture of team work and participation by everyone in the Facilities group. I believe this was the first time that a Plant Farley Facilities Helper had been included in such a meeting, and I thought it was a great opportunity to start exposing Helpers to the decisional processes that dictated their job assignments during Plant outages.

6.  While serving as a Facilities Foreman, I recall asking former Helpers Janell McDowell, Stephanie Sanders and Phyllis Hughes whether they had changed the Helpers' work schedule on one occasion. As soon as I walked away from the three, I realized that I was wrong in taking an accusatory tone with them, and I immediately apologized. I did not question Ms. McDowell, Ms. Sanders, and Ms. Hughes because of either their race or their gender, and I was not motivated by any intent to pick on them. Rather, I did not know who had made the schedule revision. I also asked other Helpers if they had revised the schedule.

7.  When my immediate supervisor, Deborah Crutchfield returned to work, I went to her and told her about my discussion with Ms. McDowell, Ms. Sanders and Ms. Hughes and that I had apologized to them for the way I handled the situation. Ms. Crutchfield suggested that we all sit down and discuss the situation to clear the air. I agreed, and we all met (Ms. McDowell, Ms. Sanders, Ms. Hughes, Ms. Crutchfield and me). During the meeting, I again apologized to the three and expressed my regret over the way I handled the situation. They all accepted my apology and agreed let bygones be bygones.

8.  In the summer of 2005, I was in the Foremen's office in the Outage Support Building and observed Helpers Tammy Caldwell and Jennifer White come out of a meeting with Helper and union steward Doris Ashford. Both Caldwell and White appeared very upset, and I heard Tammy Caldwell say, "This is harassment," as she walked away.

9.   As a result of a subsequent harassment investigation in the Facilities Department and other misconduct that came to light in summer 2005, Ms. McDowell received discipline in the form of a Decision Making Leave (DML), the Company highest level of discipline short of termination. In relation to the DML issued to Ms. McDowell in August 2005, management agreed to have monthly follow-up meetings with Ms. McDowell to give her feedback on her progress under the terms of the DML.

10.   Among the misconduct for which Ms. McDowell was disciplined was her swapping of job assignments without supervisions approval. We, the Foremen, had previously instructed the Helpers to not do this. The reason that I did not address the job swapping issue with Ms. McDowell during her Mid-Year Discussion in July 2005 was that I did not become aware of the unauthorized job swapping until we pulled Helper card keys around the time of the harassment investigation conducted by Sharon Bestwick in August 2005.

11.   Although thirty (30) days had not passed since Ms. McDowell was issued discipline, Deborah Crutchfield, Facilities Supervisor, Shelly Murrell, Facilities Foremen, and I met with Ms. McDowell on September 9, 2005, to review her progress under her DML. Deborah, Shelly and I decided to meet with Ms. McDowell at that time because I was getting ready to leave for an outage at Plant Vogtle in Georgia and would not be back at Plant Farley to give Ms. McDowell her feedback on the 30th day.

12.   As Shelly Murrell was going to be supervising Ms. McDowell in my absence, Deborah and I felt it was important for her to be present at the meeting to hear both the feedback given to Ms. McDowell and Ms. McDowell's feedback to supervision.

13.   Among the things we decided to address with Ms. McDowell was our impression that her attitude toward supervision still needed improvement. For example, we felt she needed to be more attentive in our morning meetings. Ms. McDowell kept her head down in the meetings and did not appear to be paying attention.

14.   Immediately after the September 9, 2005 meeting with Ms. McDowell, I created a record of what had been said and my impression of how the meeting had gone.

Attached to this Declaration is a copy of the record that I created on September 9, 2005, subsequent to the meeting with Ms. McDowell. As reflected by my record, Ms. McDowell was neither receptive to nor interested in the feedback that we gave her during the meeting. Although I tried to get her to communicate any concerns that she had about her supervision or our expectations of her, she simply replied, "No comment." My impression from that meeting was that she was simply going through the motions and was not committed to improving either her attitude or management's perception that she was contributing to a chilled working environment.

15. Ms. Sanders also received discipline in summer 2005. She received a Written Reminder for, among other things, harassment of a co-worker and swapping jobs without supervision's approval.

16. Ms. Sanders was terminated for job abandonment in early November 2005. I was involved in the Plant's efforts to get Ms. Sanders to return to work prior to her termination.

I declare under the penalty of perjury that the foregoing is true and correct.

*Mark Freeman*
Mark Freeman
Date: 12/11/06

Janell McDowell                              9-9-05

Follow up on DML



**Attendees**: Deborah Crutchfield, Mark Freeman, Janell McDowell, and Shelley Murrell

On 9-9-05, a follow-up meeting was held with Janelle McDowell to discuss the progress of her DML.
Mark reviewed the outline of the DML and Janelle was asked how she thought she was doing with her progress. She said that, like she told Randy Johnson, she would come to work and not say anything and just do her job. Deborah told her that wasn't the case and she WAS expected to communicate to her foremen and that her cold behavior and lack of participation in the morning briefings was unacceptable.
She said she felt like SHE was being harassed if she was expected to participate in the morning briefings when no one else had to and she was being singled out and harassed by us.

Shelley told her she wasn't being singled out at all, that she didn't have to SAY anything during the morning briefings, but that she was expected to show that she is paying attention like everyone else by at least looking at the person conducting the meeting and looking at a foreman when they give the job assignments out. She was specifically told that her behavior of sitting with her hard hat on, looking down, and turned sideways with her bag on her lap and never looking at the foreman conducting the meeting was contributing to the "chilled" environment she was placed on the DML for creating.
She was told that when a foreman addresses her she is expected to look at them and acknowledge them. For example, when someone passes her in the plant and says "hi" it would be expected to get a response and not be ignored. This behavior is all part of a "chilled" environment.
Mark asked her if she understood our concerns about her attitude and she said "*I hear what you're saying.*" (She never said "I understand")
When Mark asked if she felt like the foremen specifically were doing anything to her to treat her "unfairly" or "disrespectfully", she replied "NO COMMENT".
It was evident during the meeting that she does not agree that she has a problem with her attitude, she feels like she is being singled out and harassed by her foremen, but won't discuss it.
She was told by Mark that her attitude had to improve and she had to show respect and be civil to other people. She said "ok, no problem".


Mark Freeman                                 9-9-05