# EXHIBIT A

```
                                          mcdowelljanell100606
0001
  1       IN THE UNITED STATES DISTRICT COURT
  2       FOR THE MIDDLE DISTRICT OF ALABAMA
  3                SOUTHERN DIVISION
  4
  5   CASE NUMBER:  1:06-cv-314-CSC
  6
  7   JANELL MCDOWELL and
  8   STEPHANIE SANDERS,
  9        Plaintiffs,
 10   vs.
 11   SOUTHERN NUCLEAR OPERATING
 12   COMPANY, INC.,
 13        Defendant.
 14
 15
 16   BEFORE:
 17        Cynthia M. Noakes, Court Reporter
 18        and Notary Public
 19
 20
 21     DEPOSITION TESTIMONY OF JANELL MCDOWELL
 22
 23         *****************************
0002
  1             S T I P U L A T I O N
  2
  3           IT IS STIPULATED AND AGREED by and
  4   between the parties through their respective
  5   counsel, that the deposition of JANELL MCDOWELL
  6   may be taken before Cynthia M. Noakes, Court
  7   Reporter, at the Law Offices of MALCOLM R.
  8   NEWMAN, 219 West Crawford Street, Dothan, Alabama
  9   36301, on the 6th day of October, 2006.
 10           IT IS FURTHER STIPULATED AND AGREED
 11   that the signature to and the reading of the
 12   deposition by the witness is waived, the
 13   deposition to have the same force and effect as
 14   if full compliance had been had with all laws and
 15   rules of Court relating to the taking of
 16   depositions.
 17           IT IS FURTHER STIPULATED AND AGREED
 18   that it shall not be necessary for any objections
 19   to be made by counsel to any questions except as
 20   to the form or leading questions, and that
 21   counsel for the parties may make objections and
 22   assign grounds at the time of the trial, or at
 23   the time said deposition is offered in evidence,
0003
  1   or prior thereto.
  2           IT IS FURTHER STIPULATED AND AGREED
  3   that the notice of filing of the deposition by
  4   the Court Reporter is waived.
  5
  6
  7
  8
  9
 10
 11
 12
 13
 14
```

```
                              mcdowelljanell100606
15
16   *******************************************
17
18
19
20
21
22
23
0004
 1                  INDEX
 2   EXAMINATION BY:              PAGE NUMBER:
 3   MS. SHARP                       6-110
 4
 5   EXHIBITS:
 6   Defendant's Exhibit No. 1             8
 7   Defendant's Exhibit No. 2            53
 8   Defendant's Exhibit No. 3            54
 9   Defendant's Exhibit No. 4            83
10   Defendant's Exhibit No. 5            99
11   Defendant's Exhibit No. 6           100
12   Reporter's Certificate              111
13
14
15
16
17
18   *******************************************
19
20
21
22
23
0005
 1                APPEARANCES
 2
 3   ON BEHALF OF THE PLAINTIFFS:
 4         MR. MALCOLM R. NEWMAN
 5         ATTORNEY AT LAW
 6         219 West Crawford Street
 7         Dothan, Alabama   36301
 8
 9   ON BEHALF OF THE DEFENDANT:
10         MS. LISA J. SHARP
11         ATTORNEY AT LAW
12         BALCH & BINGHAM, LLP
13         1710 Sixth Avenue North
14         Birmingham, Alabama   35203
15
16   ALSO PRESENT:
17         MS. SHARON F. BESTWICK,
18         Employee Relations Coordinator
19         Southern Nuclear Operating Company,
20         Inc.
21
22
23   *******************************************
0006
 1
 2         I, CYNTHIA M. NOAKES, a Court Reporter
 3   of Eufaula, Alabama, acting as Commissioner,
 4   certify that on this date, as provided by the
 5   Alabama Rules of Civil Procedure and the
```

Page 2

mcdowelljanell100606

```
12  A.   That is correct.
13  Q.   Okay.  And you said it was issued to you by
14  Randy Johnson?
15  A.   That is correct.
16  Q.   Okay.  And, actually, the DML involves more
17  than just creating a hostile work environment,
18  does it not?
19  A.   That is correct.
20  Q.   Okay.  Did you have access to a computer
21  during your employment at Southern Nuclear-Plant
22  Farley?
23  A.   Yes.
0054
 1            (Defendant's Exhibit No. 3 was
 2             marked for identification and a
 3             copy of the same is attached
 4             hereto.)
 5  Q.   I'm handing you and your lawyer what I've
 6  marked as Defendant's Exhibit 3 to your
 7  deposition, and it is a copy of Southern Nuclear's
 8  Policies 703 -- "Corporate Policies 703 -
 9  Workplace Free of Harassment Policy."
10            Are you familiar with that policy, Ms.
11  McDowell?
12  A.   Yes.
13  Q.   And you are aware that this policy was in
14  existence while you were employed with the
15  company?
16  A.   Yes.
17  Q.   When you were issued the DML for, among
18  other things, creating a hostile work environment,
19  did you feel that you dispute that you had
20  violated the company's policy?
21  A.   I know I didn't violate the company policy.
22  Q.   And you were familiar with the policy at the
23  time?
0055
 1  A.   That is correct.
 2  Q.   What did Randy Johnson tell you that you had
 3  done to create a hostile work environment?
 4  A.   He indicated to me that me not speaking to a
 5  female coworker, not greeting her, created a
 6  hostile work environment.
 7            He also indicated that I had told the job
 8  steward to speak to this coworker on my behalf,
 9  which I did not do.
10            He indicated about the swapping of job
11  assignments, and I explained to him on that
12  occasion.
13  Q.   You explained what to Mr. Johnson?
14  A.   About the swapping of job assignments.
15  Q.   Did you deny that you had swapped job
16  assignments?
17  A.   No, I didn't deny swapping job assignments.
18  Q.   Had you, in the past, swapped job
19  assignments with Phyllis Hughes, so that you could
20  work with Ms. Sanders?
21  A.   No, I have not.
22  Q.   You had not?
23  A.   No, I wouldn't say that:  to work with her.
0056
 1  I don't understand.
 2  Q.   Okay.  Had you swapped what you had been
```

mcdowelljanell100606
```
 3   assigned to do with Ms. Hughes, when Ms. Hughes'
 4   assignment was to be paired to do an assignment
 5   with Ms. Sanders?
 6   A.    I have swapped job assignments if Ms. Hughes
 7   did not want to do that job assignment.  I have
 8   swapped job assignments with Phyllis if I have
 9   asked permission to do so.  But to just swap job
10   assignments without permission, no, I have not.
11   Q.    You have never done that?
12   A.    No.  I have always asked for permission.
13   Q.    Okay.  Looking at the policy, at the bottom,
14   there is a listing of prohibited behavior, which
15   includes, "Conduct or language that denigrates or
16   shows hostility or aversion toward an individual
17   or group..."
18         Do you feel that that did not apply to your
19   interactions with Ms. Caldwell?
20   A.    No.  I spoke to Tammy if it had something to
21   do with work related.  Never said anything out of
22   the way to her.  But as far as conversing back and
23   forth with her on a friendly basis, no, I didn't
0057
 1   do that.
 2         But as far as job assignments, when I had to
 3   go to her for a turnover, I did so.  Never said
 4   anything out of the way to her.
 5   Q.    So you would speak to her only on business
 6   related matters?
 7   A.    That is correct.
 8   Q.    There was no friendly conversation or
 9   greetings with her?
10   A.    No friendly conversations, no.  She didn't
11   want it that way.
12   Q.    What about friendly greetings?
13   A.    I spoke and she spoke, you know.  She spoke
14   sometimes; sometimes she didn't speak.  Sometimes
15   I didn't speak.
16   Q.    And when you said another piece of the
17   finding that you had created a hostile work
18   environment related to Doris Ashford.  Tell me
19   about that situation.
20   A.    I don't understand what you are asking me.
21   Q.    What were you accused of doing with regard
22   to Doris Ashford that created a hostile work
23   environment?
0058
 1   A.    I was accused of telling Doris to go and
 2   speak to Tammy, on my behalf, about Tammy staying
 3   in the office; when, in fact, that did not occur.
 4   Q.    Y'all didn't have a conversation about Tammy
 5   Caldwell being in the foreman's office?
 6   A.    We did.  Doris Ashford stopped Stephanie and
 7   myself one day and said, I need to ask y'all a
 8   question.  She said, Do you think Tammy stays in
 9   the foreman's office too much?  We said, Yes.  She
10   said, I just wanted to know.  She said, Because I
11   asked everybody in the group except you and
12   Stephanie.  And she said, And I didn't speak to
13   Sam and Pam because they are painting.
14         So when Doris came to us, we were the last
15   two people that she asked.  But then I'm the one
16   who sent Doris to talk to Tammy.
17   Q.    What did you tell Ms. Ashford when you spoke
```
Page 22

mcdowelljanell100606

```
18  with her?
19  A.    I told her yes.  I answered her question:
20  Do you think Tammy stays in the foreman's office
21  too much?  I said, Yes.
22  Q.    So during the investigation, you said that
23  you did not tell Ms. Bestwick -- you did not
0059
 1  either confirm or deny whether you had said to Ms.
 2  Ashford that Ms. Caldwell stays in the foreman's
 3  office too much; is that correct?
 4  A.    That is not correct.  Ms. Bestwick asked me,
 5  in that meeting, Did you ask Doris to talk to
 6  Tammy for you?  And I didn't confirm or deny it.
 7  All I said was, That was the job steward's job.
 8        Because I knew that Doris was going to speak
 9  to her.  Did I know what Doris said to her in that
10  meeting?  No, I did not.  I did not know Doris
11  went to Tammy with what she did.
12  Q.    But you would neither confirm nor deny it
13  with Ms. Bestwick?
14  A.    Well, I said that I didn't confirm or deny
15  it because I didn't give her a yes or no answer.
16  All I indicated was I knew that Doris was going to
17  speak to Tammy.  But that was the job of the job
18  steward.
19  Q.    Okay.  But you didn't answer Ms. Bestwick's
20  question?
21  A.    No, not really, no.
22  Q.    And that was during the investigation?
23  A.    That is correct.
0060
 1  Q.    Okay.  Did you report to Deborah Crutchfield
 2  that Kevin Jones missed fire watch and signed that
 3  he had done fire watch?
 4  A.    I didn't report it; Stephanie did.  But I
 5  was present when it happened.  And I explained to
 6  Deborah that people were coming up to us asking us
 7  about the fire watch.
 8        Stephanie reported it to Deborah because she
 9  wanted to make sure that she was covered.
10  Q.    Did you report to Deborah Crutchfield when
11  Phyllis Hughes was late to work?
12  A.    I don't know.  I can't recall that.
13  Q.    But is it possible?
14  A.    Anything is possible.
15  Q.    Okay.  Paragraph 8 of the Complaint says,
16  "Plaintiff" -- well, let's skip that; we're
17  talking about Ms. Sanders there.
18        Paragraph 10 says that, "The Plaintiffs were
19  disciplined for this 'infraction' while whites
20  committed more egregious conduct and were not
21  disciplined at all."
22        What conduct are you referring to there?
23  A.    Okay.  The incident that I spoke with Ms.
0061
 1  Bestwick about the cake incident.  I had to go in;
 2  Shannon Brown was interviewing everybody about
 3  that incident.  I don't know who initially
 4  reported the cake.  But I know that Ms. Caldwell
 5  called me in the break room to look at the cake.
 6  When I saw the cake, I jumped, turned around,
 7  walked out the door.  I went to my mailbox, I came
 8  back in, and -- I think his name was Al Deweese --
```

Page 23

mcdonelljarell100606

```
 9  saw the cake.  He came in the break room, told her
10  to close up the box, that that was inappropriate.
11            Tim Wilson, Deborah Crutchfield, and
12  Patricia Glasco were sitting at the table.
13  Deborah and Tim indicated that they didn't see the
14  cake.  They weren't there.  Patricia Glasco was
15  written up for that.
16  Q.    Who is Patricia Glasco?
17  A.    She was a black female foreman at the time.
18  Q.    And you're saying that other white foremen
19  saw the same thing that Ms. Glasco saw, and you're
20  saying that they were not disciplined?
21  A.    That is correct.
22  Q.    What was this cake?  What was the problem
23  with the cake?
0062
 1  A.    It was of a woman's lower anatomy.
 2  Q.    Which white foreman did you say also saw
 3  what Ms. Glasco saw?
 4  A.    Tim Wilson and Deborah Crutchfield.
 5  Q.    Did you give a statement during the
 6  investigation about the cake?
 7  A.    Yes, I did.
 8  Q.    Did you identify Mr. Wilson and Ms.
 9  Crutchfield as having seen the cake, in your
10  statement?
11  A.    I can't verify that; I don't know.  It's
12  been a while.
13  Q.    Who brought the cake into the plant?
14  A.    Tammy Caldwell.
15  Q.    Was Ms. Caldwell disciplined?
16  A.    No.
17  Q.    How do you know that?
18  A.    She told me that her slate was wiped clean.
19  Those were her exact words.
20  Q.    Were y'all specifically talking about
21  whether she had been disciplined because of the
22  cake being brought into the plant?
23  A.    She stopped me one day and started talking
0063
 1  about the incident, saying that she knew who
 2  turned her in about the cake.
 3  Q.    Who was that?
 4  A.    I didn't ask.  And she indicated that every
 5  time we have a feed, she was going to bring in a
 6  cake, in a joking manner.
 7  Q.    Every time you have what?
 8  A.    A feed.  That's when everybody brings in
 9  food.
10  Q.    And you said Patricia Glasco was disciplined
11  about the cake incident.  Was anyone else
12  disciplined?
13  A.    No.
14  Q.    How do you know that?
15  A.    Well, I can't say for anyone else.  I know
16  Tammy told me her slate was wiped clean.  Patricia
17  told me that she was disciplined.
18  Q.    Okay.  What else goes into your allegation
19  in paragraph 10 that whites committed more
20  egregious conduct and were not disciplined?
21  A.    Another incident.  Went over to assist Plant
22  Hatch.  Angela Smith -- at the time Angela Smith;
23  her name is Angela Peters -- Tammy Caldwell came
```

Page 24

```
                                       mcdowelljane110606
0064
 1    in with inappropriate attire on, had thong
 2    undergarments showing, just a lot of inappropriate
 3    behavior.
 4            When Stephanie and I went back to Hatch,
 5    2005 March, we had people coming up to us asking
 6    if we were part of the Dixie Chicks, because that
 7    was their group name.
 8            They were never disciplined for the
 9    inappropriate attire or their behavior.  The only
10    thing that was done, Deborah Crutchfield spoke
11    with the next group that was going over there for
12    an outage and told them what the proper attire
13    was, which there were already guidelines out on
14    what to wear and what not to wear.
15    Q.     And you said this was Angela, at that time
16    Smith but now Peters, and Tammy Caldwell?
17    A.     That is correct.
18    Q.     And you said one of the things was the
19    wearing of inappropriate undergarments and thongs
20    being displayed in the workplace?
21    A.     Thongs being displayed; one putting their
22    legs up and not having any undergarments on;
23    dancing on the tables.
0065
 1    Q.     Anything else?  You said there was a lot of
 2    inappropriate conduct.  Is there anything else?
 3    A.     Not that I can recall at this time.
 4    Q.     Who put their legs up without undergarments?
 5    A.     Angela Peters.
 6    Q.     And you saw that?
 7    A.     No, I did not see that.  That was brought
 8    back to the plant by Albert Williams.
 9    Q.     You didn't witness that?
10    A.     No, I didn't.
11    Q.     Did you witness the dancing on the tables?
12    A.     No, I did not.
13    Q.     How do you know about that?
14    A.     That was brought back to the plant.  That
15    was also mentioned in the meeting from Deborah
16    Crutchfield.
17    Q.     And did you see the thongs being displayed?
18    A.     That I saw.
19    Q.     And that was both Ms. Peters and Ms.
20    Caldwell?
21    A.     That was Ms. Caldwell.
22    Q.     Okay.  And did you make a report about Ms.
23    Caldwell wearing inappropriate attire?
0066
 1    A.     No.
 2    Q.     And you said this was at Plant Hatch?
 3    A.     That is correct.
 4    Q.     Which year?
 5    A.     I don't have the year.
 6    Q.     How do you know that neither of these ladies
 7    was disciplined?
 8    A.     Because Deborah Crutchfield came back, spoke
 9    with everyone and indicated that discipline
10    actions will take place if it happened again.
11    Q.     Did she say that no discipline had been
12    administered?
13    A.     Yes.
14    Q.     She said that?
                                     Page 25
```

mcdowelljanell100606

```
15  A.    Yes.
16  Q.    Was Deborah Crutchfield at the outage, at
17  the Hatch outage?
18  A.    No, she was not.
19  Q.    Okay. Do you know if any supervisors who
20  were at the outage knew about these -- about this
21  conduct while at Plant Hatch?
22  A.    I know Bill Barber was there. I'm pretty
23  sure he heard about it or knew what was going on.
0067
 1  I mean, I can't speak for other foremen. Or what
 2  was said behind closed doors, I don't know that.
 3  Q.    So you're assuming that Bill Barber would
 4  have known?
 5  A.    I'm not going to even assume that.
 6  Q.    Okay. What other egregious conduct have
 7  whites engaged in for which they have not been
 8  disciplined?
 9  A.    I mean, some have been disciplined, but they
10  don't receive a severe discipline like how blacks
11  have.
12        You have a gentleman in security, last name
13  is Rinehardt, told another male, Jeff Mims, to
14  suck his lower anatomy; and he only received 12
15  months probation for that.
16  Q.    And what did you say he told Mr. Mims?
17  A.    To suck his lower anatomy.
18  Q.    And how do you know about this?
19  A.    From Luann Stevens.
20  Q.    How did Ms. Stevens know?
21  A.    I can't answer that.
22  Q.    How do you know about the level of
23  discipline that was given?
0068
 1  A.    Through Luann Stevens.
 2  Q.    What else?
 3  A.    Leonard Russ tells another coworker that
 4  he's entitled to union representation, and
 5  receives a DML for that. Whereas you have
 6  coworkers like Jonathon Nall, Brad Knighton, Luann
 7  Stevens, Lee Laney that has actually cursed at a
 8  foreman that I've heard, and have not been
 9  disciplined at all.
10  Q.    Okay. Leonard Russ, you said, received a
11  DML?
12  A.    Uh-huh.
13  Q.    Yes?
14  A.    Yes.
15  Q.    I always need a verbal response so that
16  Cindy can take it down.
17        For, you said, telling a union member that
18  he was entitled to union representation?
19  A.    That is correct.
20  Q.    How do you know that?
21  A.    Mr. Leonard Russ.
22  Q.    Did you see the discipline that was given to
23  Mr. Russ?
0069
 1  A.    I did not see the discipline that was given
 2  to him; however, I was in the office waiting by
 3  Brenda Singleton's desk when he was in the office
 4  with Randy Johnson.
 5  Q.    You didn't see any confidential paperwork
```