IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JANELL MCDOWELL and ) | |
| STEPHANIE SANDERS ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION NO.  1:06cv314-CSC |
| ) | WO |
| SOUTHERN NUCLEAR OPERATING ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

The plaintiffs, Janell McDowell ("McDowell") and Stephanie Sanders ("Sanders"), former employees of Southern Nuclear Operating Company, bring this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), alleging that they were discriminated against on the basis of their race (African-American) when they were terminated from their employment.

This court has jurisdiction of the plaintiffs' discrimination claims pursuant to the jurisdictional grant in 42 U.S.C. § 2000e-5.  Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to the United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment.  Now pending before the court is Southern Nuclear Operating Company's motion for summary judgment filed on December 21, 2006. (Doc. No. 17.)  The court has carefully reviewed the motion for

summary judgment, the briefs filed in support of and in opposition to the motion, and the supporting and opposing evidentiary materials and concludes that the motion is due to be granted.

## II.  SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  This standard can be met by the movant, in a case in which the ultimate burden of persuasion at trial rests on the nonmovant, either by submitting affirmative evidence negating an essential element of the nonmovant's claim, or by demonstrating that the nonmovant's evidence itself is insufficient to establish an essential element of his or her claim.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Jeffery v Sarasota White Sox, Inc.,* 64 F.3d 590, 593 (11th Cir. 1995); *Edwards v. Wallace Cmty Coll.,* 49 F.3d 1517, 1521 (11th Cir. 1995).

The burden then shifts to the nonmovant to make a showing sufficient to establish the existence of an essential element of his claims, and on which he bears the burden of proof at trial.  *Id.*  To satisfy this burden, the nonmovant cannot rest on the pleadings, but must, by affidavit or other means, set forth specific facts showing that there is a genuine issue for trial.  FED. R. CIV. P. 56(e).

The court's function in deciding a motion for summary judgment is to determine whether there exist genuine, material issues of fact to be tried; and if not, whether the movant

is entitled to judgment as a matter of law. *See Dominick v. Dixie Nat'l Life Ins. Co.,* 809 F.2d 1559 (11th Cir. 1987). It is substantive law that identifies those facts which are material on motions for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986); *See also DeLong Equip. Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499 (11th Cir. 1989).

When the court considers a motion for summary judgment, it must refrain from deciding any material factual issues. All the evidence and the inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir. 1990). *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The movant bears "the exacting burden of demonstrating that there is no dispute as to any material fact in the case." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir. 1983).

### III. FACTS

#### A. Introduction

In 1998, McDowell began her employment as a nuclear security officer at Southern Nuclear Operating Company. (Doc. No. 19, Attach. No. 1, McDowell's Dep., pp. 299-300.) In 2000, McDowell was reassigned to a facilities helper position. (McDowell's Dep., p. 303.) In 1999, Sanders was also hired as a facilities helper. (Doc. No. 19, Attach. No. 2, Sanders' Dep., pp. 129, 146.)

During the Summer of 2005, McDowell, Sanders, and several other employees within

the facilities group became the subjects of a hostile work environment investigation within the organization. In July 2005, Tammy Caldwell ("Caldwell") and Jennifer White ("White"), Caucasian facilities helpers, complained to management that they were subjected to harassment and a hostile work environment. (Bestwick's Declaration, p. 2.) Specifically, Caldwell alleged that Doris Ashford, a union steward, presented her and White with a list of grievances from other helpers which caused Caldwell and White to feel threatened, intimidated, and harassed. (*Id*., p. 5.)

### B. The Discipline of Janell McDowell

During management's investigation of Caldwell's and White's allegations, McDowell admitted to Sharon Bestwick, the employee relations coordinator, that she and Ashford discussed Caldwell's tendency to remain in the foreman's office for an unnecessary amount of time and that she knew that Ashford had planned to meet with Caldwell about the matter; however, McDowell denied that she asked Ashford to speak to Caldwell on her behalf. (McDowell's Dep., pp. 55, 59.)

Ashford's notes from the meeting with Caldwell and White were retrieved by Deborah Crutchfield ("Crutchfield"), the facilities supervisor. (Crutchfield's Declaration, p. 3.) The note lists several topics of discussion, including "Speaking on behalf of the group: (1) Do not tell the frm. how to do job . . . ; (2) Stay out of the Formns Office. . . ." (*Id*., Attach. B.) In addition, the note states, "People think you're a sneaky kiss ass. It's up to U - to change that. - hopefully prior to new people. * U need 2 remember these R the ones who know all about

the 'skeletons' U put in your closet in Georgia including Phyllis. They do know who, what, where, when: how cuz your 'Boy Toy' was telling it all. If they hated U – they'd of told it to your family." (*Id*.) After interviewing several employees, management determined that McDowell encouraged Ashford to confront McDowell about the listed topics.

While conducting the investigation, management also discovered that several employees had violated company policy by swapping jobs.[1] (Crutchfield's Declaration, p. 4.) Management subsequently concluded that McDowell, Sanders, Ashford, and several other helpers had engaged in unauthorized job swapping. (*Id*., p. 4.)

On August 16, 2005, McDowell met with Randy Johnson, the general manager, and was placed on decision-making leave ("DML"). McDowell was specifically charged as follows:

> You encouraged the job steward to meet with a co-worker regarding items that you or others felt the co-workers needed to change. The meeting was harassing in nature as has been your conduct in the workplace toward certain co-workers. Your comments and conduct also indicate that you are attempting to create a division between the employees and supervision. Additionally, you have swapped job assignments with co-workers after you have been instructed not to by Facilities supervision.

(Attach. to McDowell's Dep., Def's Ex. 2.) The DML form also stated the following reasons for requiring McDowell to improve her behavior:

> The company is on notice of a hostile and intimidating

---

[1] McDowell denies that she swapped job assignments without permission. (McDowell's Dep., p. 56.)

> work environment created in part by your actions. Swapping job assignments without obtaining supervisory concurrence impedes the supervisor's ability to hold individuals accountable for their actions.

(*Id*.) Management also cautioned McDowell that her failure to improve would result in the termination of her employment. (*Id*.)

One week later, during a morning meeting with the facilities group, McDowell continued to wear her hard hat and safety goggles, held her bag on her lap, and kept her head down. (Shelley's Declaration, p. 2.) Additionally, on September 9, 2005, McDowell met with members of management, including Shelley Murrell ("Murrell") and Mark Freeman, facilities foremen, and Crutchfield to discuss her progress. (Def's Ex. 4, Deborah Crutchfield's Declaration, p. 5.) During this follow-up meeting, McDowell stood in front of a desk, crossed her arms, and refused to sit down. (*Id*.) McDowell never made eye contact with the members of management during their discussion. (*Id*.) Murrell advised McDowell that she should appear attentive during meetings and discussed how her actions during the facilities group meeting were disrespectful.[2] (Def's Ex. No. 10, Shelley Murrell's Declaration, p. 3.)

After the September 9, 2005, meeting, Crutchfield recommended to executive management that McDowell's employment should be terminated. (Crutchfield's Declaration, p. 6 & Attach. F.) At the conclusion of her recommendation, Crutchfield stated as follows:

---

[2] According to Murrell, McDowell "did not seem to take ownership of what [the managers] were saying" and "did not appear to take any responsibility for any of the feedback." (Shelley Murrell's Declaration, p. 2.)

>Janelle consistently displays behavior inconsistent with an inclusive work environment by not acknowledging people when she is spoken to and not practicing the basic civil behavior of returning a greeting when seen on plant site. Janelle has displayed a lack of "desire to develop mutual respect between employees and management, and between all people with whom we work" as quoted from the Memorandum of Agreement between Southern Nuclear Operating Company and Local 796 of the IBEW. This was demonstrated by her having encouraged the job steward to meet with a co-worker regarding items that she or others felt the co-worker needed to change. The comments and her conduct indicated she is attempting to create a division between the employees and supervision.
>
>Given the above events and circumstances, it is recommended that Janelle be terminated. There has been a total disregard for the items that were listed in her Decision Making Leave and what is contractually in the IBEW contract.

(Crutchfield's Declaration, Attach. F.)  Management subsequently decided to terminate McDowell.  (Crutchfield's Declaration, p. 6.)

On September 16, 2005, Crutchfield and other members of management met with McDowell and terminated her employment. During the meeting, a member of management read the following statement to McDowell:

>On August 16, 2005, you were administered a Decision Making Leave regarding harassment of a co-worker; failure to follow work instructions; and lack of loyalty, competitiveness, and efficiency. During the discussion and in the follow up letter to you, the expectations going forward were made clear as were the consequences. Unfortunately, you have chosen not to meet those expectations. On August 24th, in the morning staff meeting your conduct was unacceptable, you showed no interest; showed disrespect for management leading the meeting; and did not properly acknowledge work assignments given to you. On September 9th during a follow-up meeting on your DML, your

> comments indicated that you do not have the total commitment required to remain an employee. Consequently, effective today, September 16, 2005, your employment with SNC is terminated.

(Crutchfield's Declaration, Attach. G.)[3]

Upon her termination, McDowell submitted a complaint to the Equal Employment Opportunity Commission ("EEOC"). (Bestwick's Declaration, Attach. O.) On January 19, 2006, the EEOC dismissed McDowell's complaint. (*Id*., Attach. Q.) McDowell filed this lawsuit on April 7, 2006. (Doc. No. 1.)

### C. The Discipline of Stephanie Sanders

Upon the conclusion of management's investigation of the hostile work environment allegations in August 2005, Sanders met with Jim Parrish, facilities superintendent, and received a written reminder. The employee discipline guide specifically charged as follows:

> Your conduct in the work place has been harassing in nature toward certain co-workers. You do not actively participate in meetings with supervision. Additionally, you have swapped job assignments with co-workers after you have been instructed not to by Facilities supervision.

---

[3] Subsequent to McDowell's termination, management completed a 2005 year-end summary, stating as follows:

> Since the last week of July 2005, Janelle has demonstrated attitudes and behaviors inconsistent with the Southern Style. Instead of supporting the company policy of maintaining and open, fair, and inclusive work environment, she has created a hostile work environment, the details of which are documented in her DML. After being placed on the DML, she continued to demonstrate behaviors contributing to a "chilled" environment, and when spoken to about this, she refused to acknowledge there was a problem. This was demonstrated and documented in her DML follow-up discussion.

(Attach. to McDowell's Dep., Def's Ex. 15.)

(Attach. to Sanders' Dep., Def's Ex. 3.) Sanders was cautioned that her failure to improve would result in "additional discipline up to and including termination of employment." (*Id*.)

In October 2005, Sanders missed several days of work. On October 21, 2005, Deborah Crutchfield, the facilities manager, sent a certified letter to Sanders, stating as follows:

> The purpose of this letter is to address your recent absences. While on the first three nights you either called in or management called you, you have not reported to work and have not called to report that you would be absent since Saturday October 15th. Your failure to keep management reasonably informed regarding you ability to report to work may subject you to discipline up to and including termination. You must call supervision immediately to discuss your absences.
>
> Additionally, you have not contacted the plant nurse and we have not received any FMLA paperwork from you. Consequently, we have included the required FMLA paperwork within this letter. Effie Manley must be in receipt of this completed paperwork within five days of the receipt of this certified letter. Failure to call your supervisor upon both receipt of this letter and on an ongoing basis regarding your absences, as well as failure to be compliant in the FMLA process including receipt of the completed form by Farley Safety and Health within five days, will result in discipline up to and including termination.

(*Id*.) Upon receiving the letter on October 26, 2006, Sanders left a message on Crutchfield's voice mail indicating that she intended to return the following week with the FMLA paperwork. (Sanders' Dep., pp. 46-47; Crutchfield's Declaration, p. 6.)

On November 1, 2005, management sent Sanders an additional letter, stating that her employment was terminated due to repeated absences from work and her failure to return the

FMLA paperwork.[4]  (Attach. to Sanders' Dep., Def's Ex. 5.)  On that same day, Sanders faxed an unsigned letter to Deborah Crutchfield, in which Sanders stated that she could "no longer work under the Southern Style that is practiced at Farley Nuclear Plant" and that she believed that she was "personally singled out, judged unfairly, treated unfairly and disciplined unjustly."[5]  (Attach. to Sanders' Dep., Def's Ex. 4.)  Sanders subsequently filed this lawsuit against Southern Nuclear Operating Company.[6]  (Doc. No. 1.)

---

[4] The letter states as follows:

The purpose of this letter is to address your recent absences, your failure to keep management informed, and your failure to submit the initial FMLA paperwork.  While on the first three nights (October 11th - 13th) you either called in or management called you, you did [not] report to work and did not call to report that you would be absent since Saturday October 15th.

Consequently, management wrote a certified letter to you, which you signed for on Wednesday, October 26th.  This letter gave you five days from the receipt of the letter to provide the initial FMLA paperwork to Effie Manley so that a determination could being on whether the absences were covered under the FMLA.  The fifth day was Monday, October 31st and the FMLA paperwork was not provided to Effie Manley as was required. While you did call and leave a voice mail for supervision on October 26th, stating you would be in the first of this week with paperwork, you did not provide the paperwork by the fifth day, nor have you otherwise kept management informed regarding your continued absences as was required per the certified letter.  It was clear that failure to be compliant with the terms laid out in the certified letter would result in discipline up to and including termination.  Additionally, you are currently on active Written Reminder.

Consequently, your employment is being terminated effective today, November 1, 2005, on the basis of job abandonment.

(Doc. No. 19, Attach. to Sanders' Dep., Def's Ex. 5.)

[5] After terminating Sanders, Crutchfield completed Sanders' performance review, determining that Sanders did not fully meet expectations in 2005. (Attach. to Sanders' Dep., Def's Ex. 19.)  Crutchfield specifically noted that Sanders swapped job assignments with another employee and that she failed to support the company's policy of maintaining an open, fair, and inclusive work environment.  (*Id*.)

[6] Sanders sent a letter to the EEOC on January 22, 2006, alleging that she was subjected to discrimination. (Sanders' Dep., p. 66-69.)  She alleges that the EEOC sent a letter indicating that the

## V. DISCUSSION

Both Sanders and McDowell claim that they were terminated from their positions as facilities helpers based on their race (African-American). Specifically, the plaintiffs assert that "they were fired for conduct deemed a violation while Tammy Caldwell (and Jennifer White) as white women engaged in far more egregious conduct but suffered no repercussions." (Doc. No. 25, p. 5.) The court construes the plaintiffs' assertion that their termination was racially motivated as a discriminatory discipline claim.[7]

Title VII prohibits discrimination on the basis of race, color, religious, sex, or national origin in a variety of employment practices. *See Walker v. NationsBank of Fla., N.A.*, 53 F.3d 1548, 1555 (11th Cir. 1995). In an employment discrimination case, the plaintiff bears the ultimate burden of proving intentional discrimination. *Texas Dept. of Cmty Affairs v. Burdine*, 450 U.S. 248, 253 (1981). To defeat the defendant's motion for summary

---

Commission "couldn't find any findings." (*Id.*, p. 70.) The defendant asserts that the EEOC has no record of Sanders' complaint. (Doc. No. 18, p. 26.)

[7] In their complaint, the plaintiffs alleged that they "were disciplined for their 'behavior' before they were ultimately terminated," that they "were disciplined for this 'infraction' while whites committed more egregious conduct and were not disciplined at all," and that "the Defendant maintains a racially hostile environment where whites are not punished for serious offenses but blacks are punished for minor imagined offenses." (Doc. No. 1, p. 2.) However, in their response, the plaintiffs indicate that their sole contention is that they were terminated from their positions while Tammy Caldwell and Jennifer White, caucasian women, engaged in more serious misconduct without punishment. (Doc. No. 25, p. 5.) With the exception of their disparate termination claims, the plaintiffs allege no facts in support of their contentions and their brief contains only a general cursory discussion of the law. It is not the court's responsibility to seek out facts in support of the plaintiffs' position; rather, the burden is on the parties to formulate arguments and present facts in support of their positions. *See generally Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994). This court therefore concludes that the plaintiffs' claims of disparate treatment which were unrelated to their terminations and a hostile work environment are abandoned and due to be dismissed.

judgment, McDowell and Sanders must establish a prima facie case of discrimination by one of three generally accepted methods: (1) presenting direct evidence of discriminatory intent; (2) presenting evidence to satisfy the four-part circumstantial evidence test set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); or (3) presenting statistical proof. *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989). The plaintiffs have not presented any direct evidence of discrimination nor do they rely on statistical evidence to support their discrimination claims. Thus, the court will discuss whether the plaintiffs have established circumstantial evidence of discrimination.

The Supreme Court in *McDonnell Douglas Corp., supra*, created the now familiar framework for the burden of production and order of presentation of proof to analyze circumstantial evidence of discrimination. *See Nix v. WCLY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). To establish a prima facie case of discriminatory discipline, a plaintiff must demonstrate that (1) she is a member of a protected class; (2) she has engaged either disputedly or admittedly in misconduct similar to persons outside the protected class; and (3) similarly situated, non-minority employees (persons outside the protected class) received more favorable treatment. *See Jones v. Bessemer Carraway Med. Center*, 137 F.3d 1306, 1311 n. 6, *modified by*, 151 F.3d 1321 (11th Cir. 1998).[8] Proving a prima facie case is not onerous; it requires only that the plaintiff present sufficient evidence

---

[8] The part of this opinion dealing with the establishment of a prima facie case by circumstantial evidence was not superceded by *Jones*, 151 F.3d 1321 (11th Cir. 1998). Only the part of the Court's opinion regarding direct evidence was superceded.

to permit an inference of discrimination. *Burdine*, 450 U.S. at 253-54.

The parties do not dispute that the plaintiffs are African-American and that they were terminated from their positions as helpers. They do disagree, however, as to whether similarly situated persons outside of the plaintiffs' protected class received more favorable treatment. "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to determine whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (citing *Jones*, 137 F.3d at 1311). The plaintiff must identify similarly situated employees, outside the protected class, who engaged in nearly identical misconduct, but received better or more favorable disciplinary treatment. *See Maniccia,* 171 F.3d at 1368; *Jones,* 137 F.3d at 1311; *Jones,* 874 F.2d at 1540; *Nix*, 738 F.2d at 1186. Thus, the court will compare McDowell and Sanders to each identified employee.

First, both McDowell and Sanders assert that, although Jennifer White ("White"), a Caucasian facilities helper, engaged in "far more egregious conduct," she was not punished for her actions. (Doc. No. 25, p. 5.) The plaintiffs, however, have failed to come forward with any competent evidence demonstrating that White participated in any misconduct during her employment at Southern Nuclear Operating Company. Thus, the court concludes that White is not a proper comparator to either McDowell or Sanders when evaluating the plaintiffs' disparate discipline claims.

Secondly, the plaintiffs assert that they were treated differently from Tammy Caldwell. Specifically, they contend that they were terminated for creating a hostile work environment, but that Caldwell was not disciplined for similar conduct. First, the plaintiffs allege that, on one occasion, Caldwell was not punished for showing part of her thong underpants. (Sanders' Dep., pp. 77-78.) The plaintiffs also allege that, on another occasion, Caldwell brought an inappropriate cake[9] to work but that "her slate was wiped clean."[10] (McDowell's Dep., p. 61-62.) If this case were premised on claims of sexual harassment, Caldwell's conduct might be considered icing on the cake; however, Caldwell's conduct, while inappropriate, is not sufficiently similar to the plaintiffs' conduct. It is clear that McDowell was terminated because she was disrespectful to management and other employees during a group meeting and due to her attitude during a follow-up meeting and that Sanders was terminated due to her failure to return to work. Thus, the court concludes that Caldwell is not similarly situated to McDowell or Sanders and that Caldwell is not a proper comparator for evaluating the plaintiffs' disparate discipline claims.

The plaintiffs have failed to come forward with any evidence that they were similarly situated to others who were treated more favorably during their employment at Southern Nuclear Operating Company. Consequently, the defendant is entitled to summary judgment

---

[9] The evidentiary materials indicate that the cake depicted a woman wearing a bikini. (Clifton Buck's Declaration, p. 2.)

[10] Clifton Buck, a Chemistry Manager, proposed an action plan at the facility, including a "coaching session with a female helper identified to have brought the cake on site." (Clifton Buck's Declaration, p. 2.)

with respect to the plaintiffs' discrimination claims.[11]  *See Holifield*, 115 F.3d at 1562.

A separate final judgment will be entered.

Done this 2nd day of February, 2007.

                        /s/Charles S. Coody
                        CHARLES S. COODY
                        CHIEF UNITED STATES MAGISTRATE JUDGE

---

[11] Sanders' Title VII claims are also due to be dismissed because she failed to file an adequate charge of discrimination with the EEOC.  "It is settled law that in order to obtain judicial consideration of [a Title VII] claim, a plaintiff must first file an administrative charge with the EEOC within 180 days after the alleged unlawful employment practice occurred."  *Pijnenburg v. West Georgia Health Sys., Inc.*, 255 F.3d 1304, 1305 (11th Cir. 2001), *citing* 42 U.S.C. § 2000e-5(e)(1).  However, Sanders' letter to the EEOC is not sworn or otherwise verified.  Consequently, her letter does not constitute an adequate EEOC charge.  *See* 42 U.S.C. § 2000e-5(b) (EEOC charges must be made under "oath or affirmation"); 29 C.F.R. § 1601.9 (EEOC charges must be verified); *Pijnenburg*, 255 F.3d at 1307 ("The law is clear that to meet the requirements of Title VII, a charge has to be verified.").